**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| DEX MEDIA, INC., *et al.*,[1] | ) | Case No. 16-11200 (___) |
| Debtors. | ) | (Joint Administration Requested) |

**DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO (A) PAY PREPETITION WAGES, SALARIES, AND OTHER COMPENSATION AND CERTAIN REIMBURSABLE EXPENSES, (B) CONTINUE EMPLOYEE BENEFITS PROGRAMS, (C) CONTINUE CERTAIN ORDINARY COURSE INCENTIVE PROGRAMS FOR NON-INSIDERS, AND (D) PAY RELATED COSTS, AND (II) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") file this motion (this "Motion") for entry of interim and final orders, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B**, (respectively, the "Interim Order" and "Final Order"), (a) authorizing the Debtors to pay certain prepetition (i) wages, salaries, commissions, director obligations, severance obligations, and other compensation and pay such obligations in the ordinary course of business on a postpetition basis, (ii) reimbursable employee expenses and pay such obligations in the ordinary course of business on a postpetition basis, (iii) employee benefits and continue providing such benefits in the ordinary course of business, (iv) amounts related to certain ordinary course incentive compensation programs for non-insider employees and continue such programs in the ordinary course of business, and (v) costs related

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Dex Media, Inc. (0040); Dex Media East, Inc. (5763); Dex Media Holdings, Inc. (9762); Dex Media Service LLC (9647); Dex Media West, Inc. (7004); Dex One Digital, Inc. (9750); Dex One Service, Inc. (0222); R.H. Donnelley APIL, Inc. (6495); R.H. Donnelley Corporation (2490); R.H. Donnelley Inc. (7635); SuperMedia Inc. (5175); SuperMedia LLC (6092); and SuperMedia Sales Inc. (4411). The location of the Debtors' service address is: 2200 West Airfield Drive, P.O. Box 619810, DFW Airport, Texas 75261.

to the foregoing, and (b) granting related relief. In support of this Motion, the Debtors respectfully state as follows.[2]

**Jurisdiction and Venue**

1. The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Debtors confirm their consent pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3. The statutory bases for the relief requested herein are sections 105(a), 362(d), 363(b), and 507(a) of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rule 9013-1(m).

**Background**

4. The Debtors are a leading provider of marketing solutions to more than 400,000 businesses across the United States, and are headquartered in Dallas, Texas. Specifically, a

---

2 The facts and circumstances supporting this Motion are set forth in the *Declaration of Andrew Hede in Support of First Day Motions* (the "First Day Declaration"), filed contemporaneously herewith and incorporated by reference herein.

substantial portion of the Debtors' business is focused on marketing solutions that help businesses and consumers connect with each other. The company's marketing consultants provide essential services, advice, and value to businesses to help them thrive in an increasingly fragmented and competitive marketing services landscape. The Debtors' portfolio of marketing solutions includes: print and digital directories, search engine marketing and optimization, website, video, online display advertising, mobile and CRM applications, online reputation management, social media solutions, and in-depth reports on customers' marketing programs.

5. On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors have filed a motion seeking joint administration of their chapter 11 cases under Bankruptcy Rule 1015(b). The Debtors are operating their businesses as debtors in possession under sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no committees have been appointed or designated.

## Relief Requested

6. The Debtors seek entry of the Interim Order and the Final Order, (a) authorizing the Debtors to pay certain prepetition (i) wages, salaries, commissions, director obligations, severance obligations, and other compensation and pay such obligations in the ordinary course of business on a postpetition basis, (ii) reimbursable employee expenses and pay such obligations in the ordinary course of business on a postpetition basis, (iii) employee benefits and continue providing such benefits in the ordinary course of business, (iv) amounts related to certain ordinary course incentive compensation programs for non-insider employees and continue such programs in the ordinary course of business, and (v) costs related to the foregoing, (b) scheduling a final hearing (the "Final Hearing") to consider entry of the Final Order within approximately 25 days of the commencement of these chapter 11 cases, and (c) granting related relief.

7. Although the Debtors believe that all of the Employee Compensation and Benefits (as defined herein) are vital to the Debtors' businesses, pursuant to the Interim Order the Debtors seek authority to maintain and make payments on account of those Employee Compensation and Benefits that the Debtors believe are necessary to prevent immediate and irreparable harm to the Debtors' businesses during the first 21 days of these chapter 11 cases. In addition, the Debtors seek authority, solely upon entry of the Final Order, to honor, pay, satisfy, or remit all claims, amounts, and prepetition obligations related to the Non-Insider Employee Incentive Programs, Severance Programs, and Director Obligations (each as defined and discussed herein).

**The Debtors' Workforce**

8. As of the Petition Date, the Debtors employ approximately 3,100 hourly and salaried employees (collectively, the "Employees"), nearly all of which are employed on a full-time basis by Dex One Service, Inc. Approximately 1,400 of the Employees—approximately 50 percent of the Debtors' workforce—comprise the Debtors' nationwide sales team. The Debtors are party to seven collective bargaining agreements (the "CBAs") with the International Brotherhood of Electrical Workers of America (the "IBEW") and the Communication Workers of America (the "CWA"),[3] as applicable, which govern the Debtors' relationship with their approximately 750 union-represented Employees. The Debtors supplement their workforce with approximately 120 temporary, contract workers (the "Contract Workers") from approximately ten staffing agencies. Many Contract Workers have significant institutional knowledge regarding the Debtors' operations and are highly skilled. The Contract Workers are a critical supplement to the efforts of the Employees.

[3] Five of the Debtors' CBAs expired in October of 2015. Another of the Debtors' CBAs expired in March of 2016. The Debtors are engaged in continued negotiations with the CWA and, therefore, the Debtors' bargained-for Employees continue to work under the expired, implemented, or ratified CBAs' provisions as appropriate.

9. The Employees (together with the Contract Workers) perform a variety of functions critical to the administration of these chapter 11 cases and the Debtors' successful reorganization. Their skills, knowledge, and understanding of the Debtors' operations and infrastructure are essential to preserving operational stability and efficiency. In many instances, the Employees include highly-trained personnel who cannot be easily replaced. Without the continued, uninterrupted services of the Employees, the effective reorganization of the Debtors will be materially impaired.

10. The vast majority of the Employees rely exclusively on their compensation and benefits to pay their daily living expenses and support their households. These Employees (and their families) would be exposed to significant financial constraints if the Debtors were not permitted to continue paying their Employees compensation (including obligations related to benefits) and maintain other benefits programs. Consequently, the Debtors respectfully submit that the relief requested herein is necessary and appropriate under the facts and circumstances of these chapter 11 cases.

**Employee Compensation and Benefits**

11. To minimize the personal hardship the Employees would suffer if prepetition Employee-related obligations are not paid when due or as expected, and to maintain morale and stability in the Debtors' workforce at this critical time, the Debtors seek authority to pay and honor certain prepetition claims relating to, among other things, wages, salaries, contractor compensation and fees, commissions, expense reimbursements, incentive programs, director obligations, and other compensation, payroll services, federal and state withholding taxes and other amounts withheld (including garnishments, Employees' share of insurance premiums, taxes, 401(k) contributions, and other deductions), health insurance, government healthcare fees, retirement benefits, workers' compensation benefits, vacation time, sick leave, and personal

time, life insurance, short- and long-term disability coverage, severance payments, required minimum pension contributions and administration fees, qualified and non-qualified pension plans, education assistance, relocation assistance, adoption assistance, employee assistance, and other benefits that the Debtors have historically provided in the ordinary course of business (the foregoing and with all obligations and costs related thereto, collectively, the "Employee Compensation and Benefits") and to pay all costs incident to the foregoing. Such prepetition obligations and the relief requested are summarized below:

| **Relief Sought**[4] | **Interim Amount**[5] | **Final Amount** |
|---|---|---|
| **Employee Compensation and Withholding Obligations** | | |
| Unpaid Compensation | $389,000 | $389,000 |
| Unpaid Sales Commissions | $2,944,000 | $2,944,000 |
| Withholding Obligations | $1,647,000 | $1,647,000 |
| Reimbursement Program | $2,440,000 | $2,775,000 |
| **Non-Insider Employee Incentive Programs** | | |
| Credit-Collections Incentive Program | $0 | $2,000 |
| Critical Project Awards | $0 | $0 |
| Quarterly Turnaround Incentive Program | $0 | $3,100,000 |
| **Employee Benefit Programs** | | |
| Health Care Coverage, Administration, and Consulting | $864,000 | $865,000 |
| Government Health Care Fees | $0 | $0 |
| Workers' Compensation Program | $87,000 | $87,000 |
| Life, Death, Accident, and Disability Insurance | $317,000 | $317,000 |
| Vacation Time and Sick Leave | $0 | $9,323,000 |
| 401(k) Plan | $350,000 | $350,000 |
| Pension Plans | $37,000 | $37,000 |
| Non-Qualified Plans | $79,000 | $79,000 |
| Severance Program | $0 | $239,000 |
| COBRA Reimbursements | $7,000 | $79,000 |
| Employee Assistance Program | $2,000 | $2,000 |
| Educational Assistance | $36,000 | $36,000 |
| Adoption Program | $0 | $0 |
| Relocation Assistance Program | $240,000 | $240,000 |
| Employee Referral Program | $36,000 | $36,000 |
| Director Obligations | $0 | $0 |
| **TOTAL** | $9,475,000 | $22,547,000 |

[4] Capitalized terms in this chart shall have the meanings as ascribed to them in this Motion.

[5] The Debtors believe that no amounts set forth herein are in excess of the priority caps set forth in sections 507(a)(4) and (5) of the Bankruptcy Code.

12. Subject to the Court's approval of the relief requested in this Motion, the Debtors intend to continue to provide the Employee Compensation and Benefits in the ordinary course of business. Out of an abundance of caution, however, the Debtors request authority to modify, change, and discontinue any of their Employee Compensation and Benefits and to implement new programs, policies, and benefits in the ordinary course of business during these chapter 11 cases and without the need for further Court approval, subject to applicable law.

## I. Employee Compensation and Withholding Obligations.

### A. Unpaid Compensation.

13. In the ordinary course of business, the Debtors incur payroll obligations for their Employees. Such obligations generally consist of wages and salaries (the "Wages"). The Debtors pay approximately $2,660,000 in Wages for each pay period, which is bi-weekly, with all payments generally made one week in arrears. Substantially all the Employees receive their wages and salaries by direct deposit through electronic transfer of funds directly to their respective accounts, with the small remainder of Employees receiving checks. The Debtors fund their payroll obligations in advance of each pay day and use certain third-party vendors—including Ultimate Software Group ("Ultimate") and PayLogix, LLC—to process payroll and provide related services. The Debtors also remit approximately $11,200 per month to HireRight, LLC, which provides various services related to staffing and new hires for the Debtors, including background checks, certification verifications, and other new hire processing. Because the Employees are generally paid in arrears, certain Employees have not been paid all of their prepetition wages and compensation as of the Petition Date. Wages also may be due and payable as of the Petition Date because of, among other things: (a) potential discrepancies between the amounts paid and the amounts that Employees believe should have been paid, which, upon resolution, may reveal that additional amounts are owed to such Employees; and

(b) the delay between the date when some payroll checks are issued and the date when such checks are presented to an Employee's bank for payment.

14. In addition, the Debtors incur compensation obligations for Contract Workers in the ordinary course of business. The Debtors pay approximately $1,493,000 per month on account of services rendered by Contract Workers and related obligations (the "Contract Worker Fees"). The Debtors process Contract Worker Fees through the accounts payable system, remitting payments to the appropriate staffing vendor, which in turn compensates the applicable Contract Worker. Staffing vendors also charge the Debtors fees for utilizing Contract Workers.

15. As of the Petition Date, the Debtors estimate that approximately $389,000 in prepetition accrued wages, payroll processing fees, Contract Worker Fees, and related obligations (excluding earned but unused Vacation Time and Sick Leave (as defined herein)) earned before the Petition Date remains unpaid (the "Unpaid Compensation"), substantially all of which will become due and payable during the first 21 days of these chapter 11 cases. The Debtors seek authority to honor these prepetition obligations in the ordinary course of business and consistent with past practice, and to continue paying Wages, other compensation, and obligations related thereto in the ordinary course of business on a postpetition basis.

**B. Sales Commissions.**

16. In addition to wages and salaries, the Debtors compensate their 1,400 member sales team on a commission basis (the "Commissions"). Employees earn Commissions for, among other things: (a) increases in ad sales on particular customer accounts; (b) customer contract renewals; and (c) new customer origination. Commissions generally represent a percentage of new value generated by the sales Employee. Commissions are deemed earned after the execution of a customer contract, and are paid on an "as-sold" basis approximately three weeks in arrears. More specifically, Commissions are only deemed earned once a sale is "Final."

A sale is "Final" only where the specific client's advertising is published, the client performs in accordance with the agreement memorializing the sale, and the Debtors confirm that the sale was entered into in compliance with the Debtors' sales policy. Thus, for example, where a client's advertising is cancelled or pulled prematurely, no Commission is earned.

17. The Debtors pay approximately $2,901,000 per bi-weekly pay-period on account of Commissions. The Commissions align the sales representatives' incentives with those of the Debtors, thereby encouraging the sales team to maximize sales for the benefit of all stakeholders. Commissions are a material component of the sales team's overall compensation and, like Wages, the primary source of income for certain of the Debtors' sales representatives.

18. As of the Petition Date, the Debtors estimate that approximately $2,944,000 of earned prepetition Commissions and related obligations have accrued but remain unpaid, substantially all of which will become due and payable within the first 21 days of these chapter 11 cases. The Debtors seek authority to honor these prepetition obligations in the ordinary course of business and consistent with past practice, and to continue the Debtors' compensation practices for their sales team postpetition—including payment of Commissions—in the ordinary course of business.

**C. Withholding Obligations.**

19. During each applicable pay period, the Debtors routinely deduct certain amounts (collectively, the "Deductions") from Employees' paychecks, including, without limitation and as applicable, garnishments, child support, student loan draws, union dues, and other pre-tax deductions payable pursuant to certain Employee Benefit Programs discussed herein (such as an Employee's share of health care benefits and insurance premiums, contributions under health savings accounts and flexible spending plans, 401(k) contributions and deferred compensation contributions, legally ordered deductions, fees, and assessments, and miscellaneous deductions),

and forward those funds to various third-party recipients. On a bi-weekly basis, the Debtors deduct approximately $1,646,000 in the aggregate from Employees' paychecks on account of the Deductions. Except with respect to the Payroll Taxes (as defined and set forth below) and certain insurance premiums, the Debtors remit the Deductions through accounts payable directly to the appropriate party.

20. The Debtors also are required by law to withhold from the Employees' compensation amounts related to, among other things, federal, state, and local income taxes and Social Security and Medicare taxes (collectively, the "Employee Payroll Taxes") for remittance to the appropriate federal, state, and local taxing authorities. The Debtors must then match the Employee Payroll Taxes from their own funds and pay, based upon a percentage of gross payroll, additional amounts for state and federal unemployment insurance (collectively with the Employee Payroll Taxes, the "Payroll Taxes"). The Debtors process the Payroll Taxes and then cause the transfer of these amounts to the appropriate federal, state, or local authority via electronic payroll processing systems licensed to the Debtors by Ultimate. On a bi-weekly basis, the Debtors remit approximately $3,672,000 in the aggregate on account of the Payroll Taxes.

21. As of the Petition Date, the Debtors estimate that the aggregate amount of accrued but unpaid Deductions and Payroll Taxes and related obligations (together, the "Withholding Obligations") is approximately $1,647,000, substantially all of which will become due and payable within the first 21 days of these chapter 11 cases. The Debtors seek authority to pay any unpaid Withholding Obligations in a manner consistent with their historical practices and to continue to honor the Withholding Obligations in the ordinary course of business during the administration of these chapter 11 cases.

**D. Reimbursement Obligations.**

22. In the ordinary course of business, the Debtors reimburse Employees for certain authorized and reasonable expenses that such Employees incur in the scope of their employment and for which they have an expectation of being reimbursed. Although the Debtors' policies and programs are discussed in greater detail below, generally, the Employees use either corporate credit cards or their own funds to pay for their reimbursable expenses and then send their invoices for such expenses directly to the Debtors. In most instances, the Employees are personally liable for any unpaid obligations related to Expense Reimbursements. As a result, the Debtors' inability to reimburse such expenses could impose severe hardship on such individuals where the obligations were incurred for the Debtors' benefit. Accordingly, the Debtors believe that the continued reimbursement of Employee expenses is critical to continued Employee morale as the Debtors transition into their chapter 11 cases.

23. As of the Petition Date, the Debtors estimate that approximately $2,775,000 in the aggregate for amounts payable for Expense Reimbursements, the Car Allowance Program, the Cellphone Allowance Program, and the Corporate Card Programs (each as defined below, collectively, the "Reimbursement Program") and related obligations has accrued but remains unpaid, approximately $2,440,000 of which will become due and payable within the first 21 days of these chapter 11 cases. The Debtors seek authority to honor their prepetition Reimbursement Program obligations, and to continue the Expense Reimbursements, Car Allowance Program, and Corporate Card Programs consistent with historical practice in the ordinary course of the Debtors' business.

**1. Expense Reimbursements.**

24. Although the Debtors maintain specific programs for reimbursements of automobile travel, cellphone use, and use of corporate credit cards, the Debtors also maintain

general policies for reimbursement of authorized and reasonable expenses that such Employees incur in the scope of their employment and for which they have an expectation of being reimbursed (the "Expense Reimbursements"). Expense Reimbursements typically include expenses associated with travel, lodging, ground transportation, meals, technology, and business-related expenses related to the discharge of an Employee's duties. Non-Employee directors also are reimbursed for reasonable out-of-pocket expenses incurred in connection with board meeting attendance. On average, the Debtors pay approximately $1,215,000 per month in the aggregate on account of Expense Reimbursements. As of the Petition Date, the Debtors estimate that approximately $911,000 on account of the Expense Reimbursements has accrued but remains unpaid, substantially all of which will become due and payable within the first 21 days of these chapter 11 cases.

**2. Cellphone Allowance.**

25. In addition to the Debtors' general policies for recoupment of Expense Reimbursements, the Debtors pay for certain cellphone expenses for the Debtors' sales Employees, Director-level Employees and above, and the Debtors' sales field support staff (the "Cellphone Allowance Program"). The Debtors' nationwide sales team generally operates under a "virtual offices" system where sales Employees frequently travel to enter into new sales contracts and maintain existing client relationships throughout the United States. Thus, sales Employees frequently travel and use their mobile devices as the principal means of communication with clients and the Debtors' corporate offices. To facilitate the efficient administration of reimbursement and cost management for mobile/cellphone use, the Debtors reimburse their sales Employees on a bi-weekly basis via direct reimbursements to Employees through the Debtors' payroll system, although the Employees generally incur such charges on a monthly basis. The Debtors pay approximately $110,000 per month on account of the Cellphone

Allowance Program. As of the Petition Date, the Debtors estimate that the aggregate amount of accrued and unpaid expenses on account of the Cellphone Allowance Program is approximately $110,000, substantially all of which will become due within the first 21 days of these chapter 11 cases.

**3. Car Allowance.**

26. The Debtors pay for automobile expenses for the Debtors' sales Employees (the "Car Allowance Program"). The success of the Debtors' nationwide sales team is predicated on establishing and maintaining relationships with various small- and medium-sized business customers throughout the United States. Therefore, these sales Employees therefore frequently travel and use rental cars for such travel. To facilitate the efficient administration of reimbursement and cost management for automobile use, the Debtors use Runzheimer International ("Runzheimer") for automobile reimbursement management, which provides mileage tracking, client-location management, and overall trip detail. The Debtors pay approximately $641,000 per month on account of their car allowance expenses, which include certain fees paid to Runzheimer for administering the program. As of the Petition Date, the Debtors estimate that the aggregate amount of accrued and unpaid expenses on account of the Car Allowance Program is approximately $976,000, approximately $641,000 of which will become due within the first 21 days of these chapter 11 cases.

**4. Corporate Credit Cards.**

27. Furthermore, to efficiently manage and reimburse expenses for certain of the Employees, the Debtors also maintain various accounts with American Express Travelers Related Services, Inc. ("American Express") and Comdata Network Inc. ("Comdata") for business, travel, and related expenses (the "Corporate Card Programs"). The Debtors issue corporate credit cards, including purchase cards and business travel cards, through American

Express and Comdata for their sales Employees under the Corporate Card Programs (the "Corporate Cards"). In most instances, the Debtors and the Employee holder of a Corporate Card are jointly and severally liable for the obligations thereunder. The Corporate Card Programs are integral to the seamless integration of the Debtors' nationwide sales team relying on virtual offices to engage their customer base. The Debtors maintain approximately 900 Corporate Card accounts, and the Debtors remit monthly payments directly to American Express and Comdata based on approved expense reports submitted by Employees. The Debtors' monthly expenditures for the Corporate Card Programs can vary significantly given the seasonal nature of the Debtors' sales business; the Debtors paid approximately $896,000 per month in 2015. As of the Petition Date, the Debtors estimate that approximately $672,000 on account of the Corporate Cards has accrued but remains unpaid, substantially all of which will become due and payable within the first 21 days of these chapter 11 cases.

## II. Non-Insider Employee Incentive Programs.

28. The Debtors seek authority to continue the Credit-Collections Incentive Program, the Critical Project Awards, and the QTIP (each as defined herein and collectively, the "Non-Insider Employee Incentive Programs") and to honor their related prepetition obligations to non-insider Employees thereunder pursuant to the Final Order. The programs described herein are an important component of overall Employee compensation and generate substantial value to the Debtors' estates because they align the Employees' incentives with those of the Debtors and encourage the Employees to achieve goals beneficial to the business as a whole. For the avoidance of doubt, "insiders" of the Debtors (as that term is defined in section 101(31) of the Bankruptcy Code) are excluded from the relief requested herein. To the extent the Debtors propose to make an incentive payment to, or implement an incentive plan for,

any potential insiders, the Debtors will seek separate approval from the Court with respect to such program.[6]

**A. Credit-Collections Incentive Program.**

29. The Debtors provide a short-term incentive program (the "Credit-Collections Incentive Program" and "Credit-Collections Incentives," as applicable) for eight members of the Debtors' accounts collections team, none of whom are "insiders" of the Debtors (as that term is defined in section 101(31) of the Bankruptcy Code). Credit-Collections Incentives are payable monthly, following the first payroll of the month, as a percentage of base salary and are based on the collections team's account reconciliation progress for the preceding month. The Credit Collections Incentive Program aligns the Employees' incentives with those of the Debtors and their stakeholders by emphasizing timely and efficient reconciliation of client accounts.

30. On average, the Debtors pay approximately $1,300 per month on account of the Credit-Collections Incentive Program in the ordinary course of business. As of the Petition Date, the Debtors estimate that approximately $2,000 of Credit-Collections Incentives have accrued but remain unpaid, all of which will become due and payable on or around May 20, 2016. Subject to entry of the Final Order, the Debtors seek authority to honor such prepetition Credit-Collections Incentives and to continue the Credit-Collections Incentive Program in the ordinary course of business on a postpetition basis consistent with historical practice.

**B. Critical Project Awards.**

31. In the ordinary course of business, the Debtors grant retention awards to certain Employees that support critical projects (collectively, the "Critical Project Awards"). Critical

[6] Notwithstanding anything herein to the contrary, the Debtors reserve all rights with respect to the "insider" status or designation of such parties with respect to any further relief that the Debtors may seek from the Court by separate motion.

Project Awards are conditioned upon the applicable Employee remaining in the Debtors' employ through and including specific dates as set forth in the specific Employee's agreement targeted to coincide with the specific project's milestones (each, a "Critical Project Agreement"). Critical Project Awards typically do not exceed $20,000 per Critical Project Agreement. For fiscal year 2016, the Debtors have paid approximately $280,000 of Critical Project Awards. As of the Petition Date, there are no active Critical Project Agreements. Because the Debtors grant Critical Project Awards to Employees whose skills and abilities are required to complete a specific project, the Critical Project Awards also include a performance component, which generally requires the applicable Employee to complete the project specified in the Critical Project Agreement in a particular manner—*i.e.*, eligible Employees must not only remain with the company but they also must do their jobs and do them well in order to receive a Critical Project Award.

32. Critical Project Awards and Critical Project Agreements of this sort are common and consistent with competitive industry practice. The Debtors have determined, in the exercise of their reasonable business judgment, that honoring prepetition obligations under the Critical Project Agreements is essential to incentivizing these critical non-insider Employees to remain with the Debtors during the restructuring. This subset of Employees is highly talented—and frequently sought after by the Debtors' competitors—and would be difficult, if not impossible, to replace given the Debtors' present circumstances if they were to seek employment elsewhere. The payments under the Critical Project Agreements accrue on a monthly basis, although amounts are not due and payable until a fixed date set forth in such agreement.

33. As of the Petition Date, no amounts are due or are outstanding with respect to the Critical Project Awards. Subject to entry of the Final Order, the Debtors seek authority to

continue entering into Critical Project Agreements as necessary in the ordinary course of business on a postpetition basis consistent with historical practice.

**C. Quarterly Turnaround Incentive Program.**

34. In the ordinary course of business, the Debtors have historically maintained their short-term incentive program (the "Prepetition STIP") for a majority of the Debtors' non-union, non-sales Employees. The Debtors recently transitioned the Prepetition STIP, which previously issued awards on an annual basis, to a short-term incentive program which makes payments on a quarterly basis (the "QTIP"). Approximately 1,460 Employees are eligible to receive a quarterly payment under the QTIP if the eligible Employee and the Debtors achieve certain performance goals and the eligible Employee is employed at the time of the QTIP payment. Specifically, consistent with historical practice and the Prepetition STIP, the QTIP focuses solely on performance-based targets, specifically, Earnings Before Interest, Taxes, Depreciation, and Amortization ("EBITDA"). Consistent with the Prepetition STIP, the QTIP establishes a target payment (expressed as a percentage of base salary) for eligible employees, which varies according to each participant's level of responsibility. The total amount of the QTIP payment pool is determined by comparing the Debtors' business results against the Debtors' actual performance relative to EBITDA. Payments under the QTIP are payable only so long as the Debtors reach a minimum threshold achievement, and payments at the so-called "Threshold" level are approximately 50 percent of payments at the "Target" level. In the event the Debtors fail to achieve the "Threshold" EBITDA metric, no awards under the QTIP will be made.

35. Although payments under the QTIP accrue and are paid out throughout the performance year, as of the Petition Date, no amounts are due and payable on account of the QTIP. If the Debtors achieve the performance metrics at the "Threshold" level, the Debtors will make their next QTIP payment on or before August 15, 2016, which the Debtors estimate will be

up to $3,100,000. The Debtors therefore seek authority to continue the QTIP in the ordinary course of business on a postpetition basis with QTIP payments earned in 2016 to be made in 2016 in the ordinary course.

**III. Employee Benefit Programs.**

36. In the ordinary course of business, the Debtors offer a comprehensive package of non-compensation benefits, including health care coverage, workers' compensation, life insurance and disability coverage, vacation time and sick leave, severance, COBRA reimbursements, 401(k) savings plans, pension plans, and other programs (collectively, the "Employee Benefits").

**A. Health Care Coverage.**

37. The Debtors provide all of their Employees with health care coverage, including, among other things, the Medical Plan, the HSA Plan, the FSA, the Prescription Program, the Wellness Incentives, the Dental Plan, the Vision Plan, the MERP, life and disability coverage, and the Stop-Loss Insurance (each as defined below and collectively, the "Health Care Benefits"). Certain of the coverage options are self-insured, in which case the Debtors pay a third-party administrator to administer the plan, and the Debtors are responsible for the costs of related Employee claims. Other plans are fully-insured, meaning that the Debtors pay the insurance carrier a set premium on a monthly basis, and the insurance carrier pays the Employees' claims based on the applicable policy terms. The Debtors pay, in the aggregate, approximately $4,142,700 per month on account of the Health Care Benefits. Enrollment under the Debtors' health care coverage is optional. The Debtors' sponsored Health Care Benefits continue until the end of the month in which employment terminates, although a terminated Employee and his or her enrolled dependents have the right to continue (as defined by law)

medical, dental, vision, and flexible savings accounts coverage pursuant to the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA") for approximately 18 months.

**1. The Medical Plan.**

38. The Debtors offer a comprehensive package of options for medical coverage to current Employees (the "Medical Plan"). Under the Medical Plan, participants have several benefit options, ranging from a low deductible plan, an out-of-network plan, and a high deductible plan. The Medical Plan provides coverage for, among other things, preventive care, doctor visits, hospital care, prescription drugs, and wellness. Generally, the medical and prescription drug coverage in the Medical Plan varies depending on how much the applicable Employees or former Employees pay and the level of coverage such Employees or former Employees elect to receive. Monthly health care premiums also vary depending on the Medical Plan in which the Employee or former Employee is enrolled and whether the Employee or former Employee has dependents covered by the applicable plan. Participants pay bi-weekly premiums which are deducted from their paychecks.

39. The Debtors pay approximately $3,445,000 per month in the aggregate on account of the Medical Plan, including (a) approximately $2,442,000 per month on account of healthcare claims under the Medical Plan, (b) approximately $124,000 per month for CIGNA's administrative service fee for primary health coverage, (c) approximately $833,000 on account of the Prescription Program, (d) approximately $23,000 on account of the Wellness Program, and (e) approximately $17,000 for the Stop-Loss Insurance (each as defined and discussed below). As of the Petition Date, the Debtors estimate that approximately $356,000 has accrued and remains unpaid on account of the Medical Plan, which constitutes (a) approximately $204,000 on account of primary coverage under the Medical Plan, (b) approximately $104,000 on account of the Prescription Program, (c) and approximately $48,000 under the Wellness Program,

substantially all of which will be due and payable within 21 days of these chapter 11 cases. The Debtors seek authority to pay such accrued but unpaid amounts and to continue the Medical Plan in the ordinary course of business on a postpetition basis.

**a. Primary Healthcare Coverage.**

40. The Debtors' primary health care coverage is self-insured and offered through Connecticut General Life Insurance Company ("CIGNA"), which also charges the Debtors a monthly administrative service fee in the amount of approximately $124,000 for the administration of the Debtors' primary healthcare coverage. The Debtors remit approximately $119,000 per day to CIGNA on account of claims made under the CIGNA healthcare coverage. In addition to administering the Debtors' overall healthcare coverage under the Medical Plan, CIGNA also manages the Debtors' Medicare supplement program for a specified group of retirees who continue to participate in the Debtors' health-insurance programs as legacy participants, for which the Debtors pay approximately $1,000 per month. CIGNA also administers a medical expense reimbursement program (the "MERP"), which allows the Debtors to reimburse Employees participating in higher deductible programs under the Medical Plan for certain expenses that would otherwise fall outside of the Medical Plan, including, among other things, deductibles, copayments, prescriptions, and coinsurance. The Debtors pay approximately $6,600 per month on account of the MERP, and reimbursements to Employees under the MERP are tax-deductible upon payment to the applicable Employee. Finally, one retiree participates in a Medicare healthcare plan serviced by Kaiser Foundation Health Plan Inc. that is mandated by the State of Hawaii, which is also self-funded.

41. The Debtors pay approximately $2,566,000 per month for general healthcare coverage under the Medical Plan, including (a) approximately $2,442,000 per month on account of healthcare claims under the Medical Plan and (b) approximately $124,000 per month for

CIGNA's administrative service fee for primary health coverage. As of the Petition Date, the Debtors estimate that approximately $196,000 in medical claims and related fees has accrued and remains unpaid on account of healthcare coverage under the Medical Plan, substantially all of which will be due and payable within 21 days of the Petition Date. The Debtors believe that they are current with respect to CIGNA's administrative service fee.

**b. Prescription Program.**

42. In addition to general medical coverage provided under the Medical Plan, Employees may also participate in the Debtors' prescription drug program (the "Prescription Program"), which is completely-self funded by the Debtors. CaremarkPCS Health, L.P. manages the Prescription Program, for which the Debtors pay approximately $208,000 per week, four times per month. As of the Petition Date, the Debtors estimate that approximately $104,000 has accrued but remains unpaid under the Prescription Program, substantially all of which will become due and payable within 21 days of these chapter 11 cases.

**c. Wellness Incentives.**

43. In addition to general medical coverage provided under the Medical Plan, the Debtors maintain a healthy living-driven incentive program for their Employees (the "Wellness Program" and the "Wellness Incentives," as applicable). Under the Wellness Program, the Employees may receive incentive payments for meeting certain health wellness milestones, including cholesterol levels and overall fitness. CIGNA administers the operation of the Wellness Program, and general administration and tracking for the Debtors' Wellness Program milestones for individual Employees. CIGNA processes the payments for the Debtors' Wellness Incentives, for which Employees may receive up to $550 per Employee, and $550 per such Employee's spouse, if applicable, per year. The Debtors pay approximately $271,000 per year on account of the Wellness Program, including the Wellness Incentives. As of the Petition

Date, the Debtors estimate that approximately $48,000 has accrued and remains unpaid under the Wellness Program, substantially all of which will become due and payable within the first 21 days of these chapter 11 cases.

**d. Stop-Loss Insurance.**

44. Although the Debtors are self-insured with respect to the Medical Plan and the Dental Plan (as defined herein), the Debtors have contracted with ReliaStar Life Insurance Company ("ReliaStar") to provide stop-loss coverage (the "Stop-Loss Insurance") that provides additional protection against catastrophic claim accumulation above $1,000,000 for each Employee. Such insurance generally protects both the Debtors and their Employees from incurring substantial costs beyond what would otherwise be incurred in the ordinary course. The Debtors pay approximately $17,000 per month to ReliaStar for the premiums under the Stop-Loss Insurance. As of the Petition Date, the Debtors estimate that approximately $8,000 has accrued and remains unpaid under the Stop-Loss Insurance, substantially all of which will become due and payable within the first 21 days of these chapter 11 cases.

**2. HSA and FSA Plans.**

45. In addition to managing the majority of the coverage provided under the Medical Plan for the Debtors, CIGNA also manages the Debtors' health savings account program (the "HSA Plan" and, per each individual account, an "HSA"), pursuant to which the Debtors make contributions to participating Employees' HSAs to provide incentives to Employees that participate in the Debtors' high-deductible health programs. Specifically, under the HSA Plan, participating Employees can make before-tax contributions to their HSAs through payroll deductions to cover reimbursements under the program up to the maximum amount permitted by the Internal Revenue Code, 26 U.S.C. §§ 1–9834 (the "IRC"). The Debtors pay approximately $60,000 and $147,000 per month on account of the HSA Plan for the Debtors'

employer contributions and Employee contributions, respectively, and pay CIGNA an administrative service fee of approximately $5,000 per month for administration of the HSA Plan.[7] In addition, WageWorks Inc. manages flexible spending accounts (the "FSA") for pre-HSA plan participants, which accounts are entirely Employee-funded. The Employees pay approximately $116,000 per month for coverage under the FSA. The Debtors do not directly pay any amounts on account of the FSA, as all payments thereunder are deducted from Employees' paychecks, as set forth above.

46. As of the Petition Date, the Debtors estimate that approximately $44,000 in employer contributions, which will be paid by the Debtors, and approximately $108,000 in employee contributions, which will be deducted from Employee paychecks, has accrued under the HSA Plan, substantially all of which will become due and payable within the first 21 days of these chapter 11 cases. The Debtors seek authority to pay such accrued but unpaid amounts and to continue the HSA Plan and the FSA in the ordinary course of business on a postpetition basis.

**3. The Dental and Vision Plans.**

47. The Debtors offer current Employees a self-funded dental plan (the "Dental Plan") through Metropolitan Life Insurance Company ("MetLife") and an Employee-funded vision plan (the "Vision Plan") through Superior Vision Services, Inc. The Vision Plan is entirely Employee funded, and the Debtors deduct premiums under the Vision Plan through Employees' bi-weekly paychecks. The Employees pay approximately $31,000 per month in premiums on account of the Vision Plan.

48. The Debtors pay claims made against the Dental Plan through a minimum-balance account whereby the Debtors reserve an estimated fixed amount per month for

[7] As discussed above, Employees make their own contributions to the HSAs through pre-tax deductions.

expected claims and replenish the account as claims are processed through the Dental Plan. The Debtors pay approximately $202,000 per month on account of claims under the Dental Plan, and also pay MetLife an administrative service fee for the claims management under the Dental Plan in the amount of approximately $11,000 per month. As of the Petition Date, the Debtors estimate that approximately $208,000 is accrued and unpaid under the Dental Plan, substantially all of which will become due and payable within the first 21 days of these chapter 11 cases. The Debtors seek authority to pay such accrued but unpaid amounts and to continue the Vision Plan and the Dental Plan in the ordinary course of business on a postpetition basis.

**B. Health Care Administration and Consulting.**

49. Although the Debtors pay medical and dental claims through accounts payable, the Debtors pay all administrative service fees and premiums to Towers Watson Delaware Inc. ("Towers Watson"), which remits the appropriate fees to the applicable vendors. On a monthly basis, Towers Watson calculates the premiums and administrative service fees due as of the business day following the 15th of the current month and provides the Debtors a consolidated invoice. The Debtors then wire transfer funds to Towers Watson to disperse the payments to the appropriate vendors. The Debtors pay Towers Watson approximately $101,000 per month for administration of the payables under the Debtors' health care coverage programs (the "Plan Administration Fees"). The Debtors also pay Aon Hewitt consulting fees with respect to the design and structure of their healthcare programs and annual enrollment, and actuarial modeling, for which the Debtors pay approximately $25,000 per month and $2,500 per month, respectively (the "Healthcare Consulting" and, together with the Plan Administration Fees, the "Healthcare Administration and Consulting Plan"). As of the Petition Date, the Debtors estimate that approximately $95,000 is accrued and unpaid on account of the Healthcare Administration and Consulting Fees, substantially all of which will become due and payable within the first

21 days of the Petition Date. The Debtors seek authority to pay such accrued but unpaid amounts and to continue the Healthcare Administration and Consulting Plan in the ordinary course of business on a postpetition basis.

**C. Government Health Care Expenses.**

50. As a result of the Patient Protection and Affordable Health Care Act (the "ACA"), effective January 1, 2014, the Debtors incur expenses for certain employer health care obligations. More specifically, the ACA requires employers who maintain self-funded group health insurance plans to pay the Transitional Reinsurance Fee (the "TRF") and Patient-Centered Outcomes Research Trust Fund fee (the "PCORI," and collectively with the TRF, the "Government Health Care Fees"). The amount of the Government Health Care Fees owed by an employer for any given policy year is based on the average number of covered members under the health insurance plan multiplied by a pre-established dollar amount. The Government Health Care Fees are paid on an annual basis. The Debtors paid a TRF of approximately $331,000 for the 2016 coverage year on January 8, 2016, and a PCORI of approximately $19,700 for the 2016 coverage year will become due and payable on July 31, 2016.

51. The Debtors would face significant fines and penalties and may be subject to other liability if they do not continue to pay the Government Health Care Fees. Accordingly, the Debtors seek to continue to pay the Government Health Care Fees on a postpetition basis in the ordinary course of business and consistent with past practices.

**D. Workers' Compensation Program.**

52. The Debtors maintain workers' compensation insurance for the Employees at the statutorily-required level for each state in which the Debtors conduct business (collectively, the "Workers' Compensation Program"). The Debtors' Workers' Compensation Program is insured through American International Group ("AIG"), pursuant to which the

Debtors pay an annual premium of approximately $691,000. The Debtors paid the annual premium on October 9, 2015. The AIG policy is subject to a $250,000 deductible pursuant to which the Debtors cover all fees, including legal fees, charges for investigations, medical-managed fees charged by AIG, and any other claims management expense that is allocated to individual claim files (the "WC Policy Expenses").

53. In addition to the claims payable under the AIG workers' compensation policy, the Debtors also have claims payment obligations with Zurich American Insurance Company ("Zurich") and Travelers Property and Casualty Insurance Company ("Travelers") for all open claims for the period of June 30, 2005 through November 17, 2009, and for the period of June 30, 2010 through June 30, 2013, respectively. The Debtors pay losses as incurred pursuant to their arrangements with Zurich and Travelers and under the AIG policy, which amount to approximately $1,045,000 per year in the aggregate.

54. Furthermore, in accordance with applicable state law, the Debtors pay approximately $56,000 per year to provide workers' compensation coverage to the Employees under state-administered workers' compensation programs, specifically under the "monopolistic" programs administered by Ohio, North Dakota, Washington, and Wyoming.

55. As of the Petition Date, the Debtors estimate that the total amount of accrued and outstanding prepetition WC Policy Expenses arising under the Workers' Compensation Program and claims payable in connection with the Workers' Compensation Program are approximately $87,000 in the aggregate, substantially all of which will become due and payable within the first 21 days of these chapter 11 cases. The Debtors seek authority to pay such accrued but unpaid amounts and to continue the Workers' Compensation Program in the ordinary course of business consistent with the Debtors' historical practices.

**E. Life, Death, and Accident Insurance Benefits and Disability Coverage.**

**1. Life, Death, and Accident Insurance.**

56. The Debtors provide several different types of additional insurance benefits to their existing Employees, including basic life and accidental death and dismemberment coverage, voluntary life and accidental death and dismemberment coverage, short-term disability coverage, and long-term disability coverage (collectively, the "Life, Disability, and Accident Insurance"). The Debtors' contribution is approximately $117,000 per month on account of these insured benefits, exclusive of any Deductions taken from Employees' paychecks, which amount to approximately $62,000 per month. In the event of a death or serious injury, many Employees' long-term planning consists solely of the Life, Disability, and Accident Insurance benefits.

57. Specifically, the Debtors provide Employees with basic term life and accidental death and dismemberment insurance (the "Standard Insurance") through Securian Life Insurance Company ("Securian"). The Standard Insurance is fully-funded by the Debtors and provides benefits in an amount equal to one times an Employee's yearly base earnings. The Debtors pay approximately $39,000 per month in premiums with respect to the Standard Insurance.

58. In addition, Employees may also purchase voluntary life and voluntary accidental death and dismemberment insurance (the "Voluntary Insurance") through Securian Life. Employees may purchase Voluntary Insurance in amounts ranging from one to eight times the applicable Employee's pay, and in other varying amounts for their spouse and children. The Voluntary Insurance is fully funded by the participating Employees through bi-weekly deductions from participating Employees' paycheck.

59. As of the Petition Date, the Debtors estimate that the total amount of accrued and outstanding obligations under the Standard Insurance and the Voluntary Insurance are

approximately $63,000 in the aggregate, substantially all of which will become due and payable within the first 21 days of these chapter 11 cases. The Debtors believe that continuing the administration of the Standard Insurance and benefits thereunder is essential to maintaining morale, protecting Employees' expectations, and protecting their families from the impact of a death or serious injury. Accordingly, the Debtors seek authority to continue to pay obligations under the Standard Insurance and to continue the administration of the Standard Insurance on a postpetition basis in the ordinary course of business and consistent with past practices.

**2. Disability Coverage.**

60. The Debtors provide Employees with both short-term disability benefits (the "Short-Term Disability Benefits"), long-term disability benefits (the "Long-Term Disability Benefits," and together with the Short-Term Disability Benefits, the "Disability Coverage"), and coverage for family medical leave (the "FML Coverage"). In the event of a short-term disability due to an illness, injury, or pregnancy-related condition, eligible Employees may receive partial income replacement of their weekly base earnings, up to 70 percent after the first seven days. The Debtors pay the full cost of the Short-Term Disability Benefits through payroll and qualifying Employees may receive Short-Term Disability Benefits up to a maximum of 26 weeks.

61. Following the termination of the Short-Term Disability Benefits, Employees are eligible to apply for and receive Long-Term Disability Benefits. Under the Long-Term Disability Benefits, eligible Employees are entitled to receive partial income replacement of their weekly base earnings if the Employee is unable to work for an extended length of time due to a medically-approved disability condition. Employees also have the option to buy additional LTD coverage, all of which is fully funded by the participating Employees through bi-weekly deductions from participating Employees' paycheck.

62. The Debtors are fully insured under the vast majority of the Long-Term Disability Benefits and all of the FML Coverage, which are each administered by The Prudential Insurance Company ("Prudential"). The Debtors pay to Prudential a monthly premium of approximately $106,000 for the Long-Term Disability Benefits and a premium of approximately $12,000 for the FML Coverage, and also pay a monthly administrative service fee of approximately $19,000 for administering the Disability Benefits. Certain legacy disability claims are administered by MetLife, for which the Debtors pay approximately $181,000 per month.

63. As of the Petition Date, approximately $254,000 in the aggregate is accrued and unpaid on account of claims and service fees under the Disability Benefits and FML Coverage, substantially all of which will become due and payable within the first 21 days of these chapter 11 cases. Accordingly, the Debtors seek authority to pay any accrued and unpaid amounts on account of the Disability Benefits and FML Coverage, and to continue to provide the Disability Benefits and FML Coverage on a postpetition basis in the ordinary course of business and consistent with past practices.

**F. Vacation Time and Sick Leave.**

64. The Debtors provide a time off with pay program for most Employees to use for their vacation, sick leave, personal time, and other paid-time off, generally at their regular daily rate of pay ("Vacation Time and Sick Leave"). Generally, such pay accrues daily up to a maximum annual accrual of 45 days, depending on length of service. All eligible non-union Employees, and union Employees that obtain approval, are permitted to carry over up to 5 days or 40 hours of Vacation Time and Sick Leave each calendar year[8] unless state-specific laws prevent the forfeiture of accrued time off. The Debtors estimate that approximately $9,323,000

[8] Employees with 16 years or more of service that are accruing 7.69 hours per pay period by December 31, 2016 may carry over 10 hours per year.

in earned but unused Vacation Time and Sick Leave has accrued as of the Petition Date. However, this accrued, unused amount is not a current cash payment obligation, as the Employees are only entitled to cash payments for all accrued Vacation Time and Sick Leave upon termination of employment. Moreover, the Debtors anticipate that the Employees will utilize any accrued Vacation Time and Sick Leave in the ordinary course of business, which will not create any material cash flow requirements beyond the Debtors' normal payroll obligations. The Debtors believe that the continuation of the Vacation Time and Sick Leave policies in accordance with prior practice is essential to maintaining Employee morale during these chapter 11 cases. Further, the policies are broad-based programs upon which all Employees have come to depend, and the Employees would otherwise enjoy the value of their accrued Vacation Time and Sick Leave if they were to take such time off. Thus, the Debtors and their Employees view Vacation Time and Sick Leave as wages compensable with the other relief sought herein. Accordingly, the Debtors seek authority to continue the Vacation Time and Sick Leave policies, including those covering personal time and other paid time-off, in the ordinary course of business on a postpetition basis.

**G. Severance Programs.**

65. The Debtors provide Employees with severance according to the eligibility criteria and terms and conditions set forth in the Debtors' severance policies described herein, specifically, under the Non-Union Severance Program, the Union Severance Program, and the IPP (each as defined herein, collectively, the "Severance Programs"). The Debtors will not pay severance to an Employee unless and until the Employee signs a release of any and all claims in a form satisfactory to the Debtors. Severed Employees receive payments under the Severance Programs depending on their level of seniority and satisfaction of certain criteria such as continuous prior employment.

66. As of the Petition Date, the Debtors estimate that the aggregate amount of accrued and unpaid obligations with respect to the Severance Programs on account of non-insider Employees who have been severed from the Debtors prior to the Petition Date is approximately $239,000. The Debtors thus seek the authority to (a) pay accrued and unpaid amounts arising on account of the Severance Programs pursuant to the Final Order, and (b) continue to maintain the Severance Programs on a postpetition basis pursuant to the Final Order, in the ordinary course of business for any non-insider Employees that may be severed following the Petition Date.[9] The Severance Programs are described in more detail below.

**1. Non-Union Severance Program and Union Severance Program.**

67. Non-union Employees below the Executive Vice President level are entitled to receive a lump-sum payment, ranging from six to 52 weeks of regular pay, depending on length of service (the "Non-Union Severance Program"). Since January 1, 2016, the Debtors paid approximately $1,400,000 on account of the Non-Union Severance Program. As of the Petition Date, the Debtors do not believe that there are any accrued but unpaid amounts under the Non-Union Severance Program.

68. The Debtors provide their union Employees with severance according to the eligibility criteria and terms and conditions set forth in the CBAs (the "Union Severance Program"). Eligible union Employees under the Dex Media West CBAs are entitled to receive a lump-sum payment, ranging from $1,000 through $15,000, depending on length of service, for voluntary terminations, or $2,000 through $48,000 or one year of salary, depending on length of service, for involuntary terminations. Union Employees under the Dex Media East CWA CBAs

[9] For the avoidance of doubt, the Debtors do not seek to make any payments to Employees under the Severance Programs that may be deemed to be insiders; although, as set forth above, the Debtors reserve all rights with respect to the "insider" status of such parties.

are entitled to severance benefits under the Non-Union Severance Program. For the 12-month period preceding the Petition Date, the Debtors paid approximately $6,500,000 on account of the Severance Program with respect to union Employees. As of the Petition Date, the Debtors do not believe that there are any accrued but unpaid amounts under the Union Severance Program.

**2. CWA Income Protection Program.**

69. Certain Employees under the Numbers 1301 and 1302 CWA CBAs also participated in the CWA Income Protection Program (the "IPP"), which is a CWA-specific severance program that provided for staggered payments over a period of time, depending on the applicable Employee's seniority. The aggregate amount of payment obligations under the IPP is a staggered liability for the Debtors, although the Debtors will pay out their aggregate obligations in piecemeal fashion, approximately $17,000 per month, until the IPP terminates in 2017. As of the Petition Date, the Debtors estimate that approximately $239,000 in severance obligations have accrued but remain unpaid under the IPP.

70. The Debtors believe that the Severance Programs are critical to maintaining Employee morale and loyalty. Increased instability in the Debtors' workforce will only undermine the Debtors' ability to strengthen their financial and operational foundation, to generate growth, and to be positioned for long-term success. Permitting the Debtors to pay the unpaid amounts under the Severance Programs will help minimize the adverse effect of the commencement of these chapter 11 cases on their ongoing business operations. Additionally, implementing such programs is not without tangible benefits. As a condition to receiving amounts under the Severance Programs, each Employee must execute a release agreement, whereby the Employee releases any claims held against the Debtors. The Debtors believe that the Severance Programs will help reduce the time and expense that could arise in the absence of the Severance Programs to defend the assertion of claims by severed Employees.

**H. COBRA Reimbursements.**

71. The Debtors also reimburse former Employees for deductions taken on account of COBRA expenses for the duration of their severance benefits. Under COBRA, the Debtors are obligated to offer former Employees and their dependents continued coverage under the Health Care Benefits for a period of up to eighteen months. The Debtors provide these reimbursements directly to the applicable former Employee after the Employee makes their payment to Towers Watson. Approximately 180 former Employees participate under the Debtors' Health Care Benefits under COBRA, although only six former Employees receive reimbursement under the Debtors' healthcare coverage pursuant to COBRA. On average, the Debtors remit approximately $7,000 per month on account of COBRA reimbursements to former Employees (the "COBRA Reimbursements").

72. As of the Petition Date, the Debtors estimate that $79,000 on account of COBRA Reimbursements has accrued and remains unpaid, approximately $7,000 of which will become due and payable within 21 days of the Petition Date. The Debtors seek authorization to remit the COBRA Reimbursements and continue remitting COBRA Reimbursements in the ordinary course of business on a postpetition basis.

**I. 401(k) Plan.**

73. The Debtors sponsor a defined contribution savings plan to provide opportunities for eligible employees to save for retirement. Prior to December 31, 2014, the savings plans included the Dex One 401(k) Savings Plan and the Super Media Savings Plan—the Debtors have since merged the foregoing plans to form the Dex Media Inc. Savings Plan (the "401(k) Plan"). Substantially all of the Debtors' Employees are eligible to participate in the 401(k) Plan beginning immediately upon the commencement of their employment, although vesting occurs two years after the applicable Employee's hire date. The 401(k) Plan generally provides for pre-

tax, post-tax, or Roth contributions of compensation up to limits set by the IRC. Each Employee's 401(k) Plan contributions are deducted automatically from the applicable Employee's paycheck, which contributions are matched in accordance with certain percentages: (a) 100 percent for the first three percent of Employee contributions; and (b) 50 percent of the next three percent. For calendar year 2015, the Debtors paid approximately $11,327,970 in the aggregate for matching contributions under the 401(k) Plan. The 401(k) Plan is administered by Great-West Life & Annuity Insurance Company d/b/a Empower Retirement ("Empower").

74. As of the Petition Date, the Debtors estimate that the aggregate amount of the Debtors' estimated matching contributions under the 401(k) Plan is approximately $350,000, substantially all of which will become due and payable within 21 days of the Petition Date. The Debtors seek authority to pay such accrued but unpaid amounts and to continue the 401(k) Plan in the ordinary course of business consistent with the Debtors' historical practices.

**J. Pension Plans and Other Retirement Plans.**

75. The Debtors maintain certain qualified, defined benefit pension plans and non-qualified benefit pension plans described herein.

**1. Qualified Pension Plans.**

76. The Debtors maintain non-contributory defined benefit pension plans that provide pension benefits to certain of their Employees (collectively, the "Pension Plans"). The Pension Plans include the Dex One Retirement Account, the Dex Media, Inc. Pension Plan (together with the Dex One Retirement Account, the "Dex Plans"), the SuperMedia Pension Plan for Management Employees, and the SuperMedia Pension Plan for Collectively-Bargained Employees (together with the SuperMedia Pension Plan for Management Employees, the "SuperMedia Plans"). On January 25, 2014, the Debtors reached an agreement with the CWA to

freeze the remaining participants in Part 3 of the SuperMedia Pension Plan for Collectively-Bargained Employees. Therefore, effective April 1, 2014, no Employees accrue future pension benefits under any of the programs underlying the Pension Plans. The Debtors do, however, make minimum funding contributions under the Pension Plans, which the Debtors estimate in the aggregate for 2016 to be approximately $5,515,000.

77. The SuperMedia Plans are administered by Empower, which debits quarterly administrative fees directly from the SuperMedia Plans Trusts without further contribution from the Debtors. The Dex Plans are administered by Mercer HR Services LLC, and distributions are carried out by Northern Trust Company, Inc., which charges quarterly administrative fees in the amount of approximately $7,000 to the Debtors, exclusive of the debits derived directly from the plans Trusts. The Debtors also pay Aon Hewitt ("Aon") an annual fee in the amount of approximately $282,000 to assist with actuarial consulting and planning with respect to the Pension Plans, which provides the Debtors with assistance with respect to plan funding, risk management, and plan design. Gilliam Coble and Moser, LLP ("GCM") provides historical benefit plan accounting/calculation research services to the Debtors with respect to the Dex Plans, with billing on an as-needed basis, although the Debtors pay GCM approximately $2,500 on average per month. Finally, Fidelity Investments ("Fidelity") also provides historical record-keeping research services with respect to the Dex Plans on an as-needed basis, for which the Debtors pay approximately $500 per month.

78. As of the Petition Date, the Debtors estimate that approximately $36,000 of obligations under the Pension Plans has accrued but remains unpaid, none of which is on account of the Debtors' minimum funding contributions, and approximately $36,000 of which is on account of fees charged to the Debtors by Aon, Northern Trust, Fidelity, and GCM,

approximately $36,000 of which will become due and payable within the first 21 days of these chapter 11 cases. The Debtors request the authority to pay such accrued and unpaid amounts and to continue the Pension Plan in the ordinary course of business on a postpetition basis.

**2. Non-Qualified Plans.**

79. The Debtors also maintain four non-qualified supplemental retirement plans (the "Non-Qualified Plans"), including two supplemental executive retirement plans, the Dex One Pension Benefit Equalization Plan (the "Dex PBEB") and the SuperMedia Excess Pension Plan (the "SuperMedia SERP") and the Verizon Executive Retirement Life Insurance Plan (the "ERLIP"), and a supplemental 401(k) plan, the Dex One Restoration Plan (the "Supplemental 401(k) Plan"). The Non-Qualified Plans are frozen with regard to new participants, but the Debtors continue to make benefit payments under the Non-Qualified Plans to certain retired employees. As of the Petition Date, approximately $75,000 has accrued and remains unpaid, substantially all of which will become due and payable within the ordinary course of business on a postpetition basis. Accordingly, upon entry of the Final Order, the Debtors seek authority to pay the unpaid amounts on account of the Non-Qualified Plans, and to continue providing benefits under the Non-Qualified Plans in the ordinary course of business on a postpetition basis and consistent with past practice.

**a. SERP Plans.**

80. Payments under each of the SERP Plans may be either monthly or paid out on a lump-sum basis, determined by the date of benefit commencement. There are approximately 106 participants in the SuperMedia SERP, and the Debtors pay monthly annuity payments to beneficiaries in an aggregate amount of approximately $45,000 per month. Effective January 1, 2005, all new payments are in the form of a single lump-sum payment instead of an annuity, and the Debtors paid approximately $344,000 on account of lump-sum payments under

the SuperMedia SERP for the 12 month period leading up to the Petition Date. As of the Petition Date, approximately $55,000 has accrued and is unpaid on account of the SuperMedia SERP, substantially all of which will become due and payable within the first 21 days of these chapter 11 cases.

81. There are approximately 69 participants in the Dex PBEB, and the Debtors pay monthly annuity payments to 13 beneficiaries in an aggregate amount of approximately $7,700 per month. All payments commencing after January 1, 2008 are paid in a single lump-sum payment, and the Debtors paid approximately $344,700 on account of lump-sum payments under the Dex PBEB for the 12 month period leading up to the Petition Date. As of the Petition Date, approximately $18,600 has accrued and is unpaid on account of the Dex PBEB, all of which will become due and payable within the first 21 days of these chapter 11 cases.

**b. ERLIP and Supplemental 401(k) Plan.**

82. There are three remaining participants in the ERLIP, which is a legacy executive retirement program carried over from before SuperMedia, Inc.'s spinoff from Verizon. The three participants in the ERLIP collectively receive approximately $1,500 per month in the aggregate. There are no lump sum payments under the ERLIP. As of the Petition Date, approximately $1,500 has accrued and remains unpaid under the ERLIP, substantially all of which will become due and payable within the first 21 days of these chapter 11 cases in the ordinary course of business on a postpetition basis.

83. There are three remaining participants in the Supplemental 401(k) Plan, who will receive approximately $36,400 in the aggregate upon the termination of their employment with the Debtors. Accordingly, approximately $36,400 has accrued and remains unpaid on account of the Supplemental 401(k) Plan, which will become due and payable in the ordinary course of business on a postpetition basis.

**K. Additional Programs.**

84. In addition to the more comprehensive benefits programs set forth above, the Debtors provide several employee benefits programs that generally contribute to the Employees' wellbeing within the Debtors' corporate culture, including the Employee Assistance Program, the Educational Assistance Program, the Adoption Program, and the Employee Referral Program (collectively, the "Additional Programs"). These programs are briefly set forth below, along with the approximate expenditure per applicable period for each such program. In the aggregate, as of the Petition Date, approximately $314,000 has accrued and remains unpaid on account of the Debtors' obligations under the Additional Programs, substantially all of which will become due and payable within the first 21 days of these chapter 11 cases. The Debtors request the authority to pay such accrued and unpaid amounts and to continue the Additional Programs in the ordinary course of business on a postpetition basis.

**i. Employee Assistance Program.**

85. The Debtors provide their Employees with counseling and other personal services for challenges in Employees' lives pursuant to their employee assistance program (the "Employee Assistance Program"), which is provided through ComPsych Behavioral Health Corporation. The Employee Assistance Program provides the Debtors' Employees with confidential counseling and other wellness resources. The Debtors pay approximately $4,000 per month for these services, which the Debtors believe are valuable and helpful for their Employees. As of the Petition Date, approximately $2,000 in the aggregate is accrued and unpaid on account of the Employee Assistance Program, substantially all of which will become due and payable within 21 days of these chapter 11 cases

**ii. Educational Assistance.**

86. The Debtors provide full-time Employees with access to various supplemental educational programs (the "Education Assistance Program"), which is provided and administered by Bright Horizons Family Solutions, LLC, d/b/a EdAssist. The Education Assistance Program applies only to certain educational opportunities. To be approved, courses must relate to the Employees' current job duties, be approved prior to the time of enrollment, and must be taught at an accredited college, university, or vocational-technical school.

87. Pursuant to the Education Assistance Program, the Debtors will reimburse Employees up to 100 percent of the tuition, fees, and books associated with the successful completion of an approved course, up to $8,000 per calendar year. Successful completion of a course means that the Employee has passed the course with a grade of "C" or better, or its equivalent—a grade of "B" or better will entitle the applicable Employee to full reimbursement, whereas a grade of "C" will entitle such Employee to partial reimbursement. In the aggregate, the Debtors pay eligible Employees approximately $36,000 per month on account of reimbursements under this program. The Debtors believe that Employees' continued education and refinement of their skillset is valuable and ultimately contributes to the Debtors' business as a whole.

88. As of the Petition Date, approximately $36,000 in the aggregate is accrued and unpaid on account of the Education Assistance Program, substantially all of which will become due and payable within 21 days of these chapter 11 cases.

**iii. Adoption Program.**

89. The Debtors provide non-union Employees with an adoption assistance program under which the Debtors will reimburse certain adoption expenses for the adoption of a child, up

to an annual maximum of $10,000. The Debtors do not believe there are any amounts outstanding with respect to this program as of the Petition Date.

**iv. Relocation Assistance Program.**

90. The Debtors pay for certain expenses to relocate or provide temporary housing for certain Employees (the "Relocation Program"). Specifically, the Relocation Program provides Employees with home sale assistance, home finding and temporary living assistance, home purchase assistance, rental assistance, moving and household transportation assistance, and employee and family transition assistance. The Debtors contract with Cartus Corporation ("Cartus") to administer certain aspects of the Relocation Program. Given the Debtors' recent office relocations and closures, the Debtors believe that maintaining the Relocation Program is important to attracting valuable talent and ensuring smooth transitions into the Debtors' facilities. The Debtors pay in the aggregate approximately $240,000 per month on account of Employee relocation expenses and associated administrative costs. As of the Petition Date, the Debtors estimate that approximately $240,000 on account of unpaid obligations related to the Relocation Program has accrued and is unpaid, including administrative fees to Cartus, substantially all of which will become due and payable within 21 days of these chapter 11 cases.

**v. Employee Referral Program.**

91. The Debtors provide cash incentives to current non-insider Employees who refer candidates to fill identified vacant employment positions in the Debtors' sales division (the "Referral Program"). Under the Referral Program, a referring Employee will receive an initial payment once a referred candidate has been hired and a second and final payment once the referred candidate has completed six months of employment with the Debtors. The Debtors believe that this program contributes to the efficient and targeted recruitment of potential new talent for the Debtors, and contributes overall to the Debtors' business. The Debtors pay a total

referral payment of up to $2,500 per referred candidate and approximately $36,000 per month in the aggregate on account of the Referral Program. As of the Petition Date, the Debtors estimate that approximately $36,000 in obligations under the Referral Program has accrued but remains unpaid, substantially all of which will become due and payable within 21 days of these chapter 11 cases.

**L. Postpetition Director Obligations.**

92. The Debtors maintain a board of directors comprised of the Debtors' Chief Executive Officer and six independent directors (each, a "Director"). The Directors are each compensated approximately $150,000 annually, paid in cash on a quarterly basis in advance, and are entitled to expense reimbursement for reasonable out-of-pocket expenses in connection with travel related to their Director duties. In addition, (a) the chairman of the board receives an additional $80,000, annually, (b) the heads and members of the audit and finance and compensation committees receive an additional $25,000, and $7,500 annually, respectively, (c) the head and members of the governance committee receive an additional $15,000 and $5,000, annually, respectively, and (d) the members of the restructuring committee each receive a one-time payment of $15,000 in compensation (the foregoing collectively, the "Director Retainers"). Furthermore, each Director receives a $2,000 fee per committee or board meeting (such fees collectively with the Director Retainers, the "Director Obligations").

93. The Debtors do not believe any amounts on account of the Director Obligations are owed as of the Petition Date. However, out of an abundance of caution, the Debtors request the authority, solely pursuant to the Final Order, to pay postpetition Director compensation and related amounts as such obligations come due in the ordinary course of business.

## Basis for Relief

### I. Sufficient Cause Exists To Authorize the Debtors To Honor the Employee Compensation and Benefits.

#### A. Certain Employee Compensation and Benefits Are Entitled to Priority Treatment.

94. Sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code entitle certain of the Employee Compensation and Benefits owed to the Employees to priority treatment. As priority claims, the Debtors are required to pay these claims in full to confirm a chapter 11 plan. *See* 11 U.S.C. § 1129(a)(9)(B) (requiring payment in full of certain allowed unsecured claims for (a) wages, salaries, or commissions, including severance, and sick leave pay earned by an individual, and (b) contributions to an employee benefit plan). Thus, granting the relief requested herein should only affect the timing of certain payments to the Employees, and should not negatively affect recoveries for general unsecured creditors. Indeed, the Debtors submit that payment of the Employee Compensation and Benefits at this time enhances value for the benefit of all interested parties.

#### B. Payment of Certain Employee Compensation and Benefits Is Required by Law.

95. The Debtors seek authority to pay the Withholding Obligations to the appropriate third-party entities. These amounts principally represent Employee earnings that governments, Employees, and judicial authorities have designated for deduction from the Employees' paychecks. Indeed, certain Withholding Obligations are not property of the Debtors' estates because the Debtors have withheld such amounts from the Employees' paychecks on another party's behalf. *See* 11 U.S.C. §§ 541(b)(1), (d). Furthermore, federal and state laws require the Debtors to withhold certain tax payments from the Employees' paychecks and to pay such amounts to the appropriate taxing authority. 26 U.S.C. §§ 6672, 7501(a); *see also City of Farrell*

*v. Sharon Steel Corp.*, 41 F.3d 92, 95–97 (3d Cir. 1994) (finding that state law requiring a corporate debtor to withhold city income tax from its employees' wages created a trust relationship between debtor and the city for payment of withheld income taxes); *In re DuCharmes & Co.*, 852 F.2d 194, 196 (6th Cir. 1988) (noting that individual officers of a company may be held personally liable for failure to pay trust fund taxes). Because the Withholding Obligations may not be property of the Debtors' estates, the Debtors request that the Court authorize them to transmit the Withholding Obligations on account of the Employees to the proper parties in the ordinary course of business.

96. Similarly, state laws require the Debtors to maintain the Workers' Compensation Program. If the Debtors fail to maintain the Workers' Compensation Program, state laws may prohibit the Debtors from operating in those states. Therefore, payment of all workers' compensation amounts is therefore crucial to the Debtors' continued operations and the success of the Debtors' ongoing chapter 11 process.

## II. Payment of the Employee Compensation and Benefits Is Proper Pursuant to Section 363(b) of the Bankruptcy Code and the Doctrine of Necessity.

97. Section 363 of the Bankruptcy Code provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Under section 363(b), courts require only that the debtor "show that a sound business purpose justifies such actions." *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) (internal citations omitted) (requiring that the debtor show a "sound business purpose" to justify its actions under section 363 of the Bankruptcy Code). Moreover, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *In re Johns-Manville*

*Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) (citation omitted); *see also In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005) (stating that "[o]vercoming the presumption of the business judgment rule on the merits is a near-Herculean task").

98. In addition, the Court may authorize payment of prepetition claims in appropriate circumstances under section 105(a) of the Bankruptcy Code. Section 105(a) of the Bankruptcy Code, which codifies the inherent equitable powers of a bankruptcy court, empowers bankruptcy courts to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." The Court may use its power under section 105(a) to authorize payment of the Employee Compensation and Benefits under the "necessity of payment" rule (also referred to as the "doctrine of necessity"). *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 176 (Bankr. S.D.N.Y. 1989).

99. The United States Court of Appeals for the Third Circuit recognized the "necessity of payment" doctrine in *In re Lehigh & New England Ry. Co.*, 657 F.2d 570, 581 (3d Cir. 1981). The Third Circuit held that a court could authorize the payment of prepetition claims if such payment was essential to the continued operation of the debtor. *Id.* (stating a court may authorize payment of prepetition claims when there "is the possibility that the creditor will employ an immediate economic sanction, failing such payment").

100. The necessity of payment doctrine is designed to foster a debtor's rehabilitation, which courts have recognized is "the paramount policy and goal of Chapter 11." *Ionosphere Clubs*, 98 B.R. at 176; *see also In re Just for Feet, Inc.*, 242 B.R. 821, 826 (D. Del. 1999) (finding that payment of prepetition claims to certain trade vendors was "essential to the survival of the debtor during the chapter 11 reorganization"); *In re Quality Interiors, Inc.*, 127 B.R. 391, 396 (Bankr. N.D. Ohio 1991) ("[P]ayment by a debtor-in-possession of pre-petition claims

outside of a confirmed plan of reorganization is generally prohibited by the Bankruptcy Code," but "[a] general practice has developed . . . where bankruptcy courts permit the payment of certain pre-petition claims, pursuant to 11 U.S.C. § 105, where the debtor will be unable to reorganize without such payment."); *In re Eagle-Picher Indus., Inc.*, 124 B.R. 1021, 1023 (Bankr. S.D. Ohio 1991) (approving payment of prepetition unsecured claims of toolmakers as "necessary to avert a serious threat to the Chapter 11 process").

101. Payment of the Employee Compensation and Benefits is warranted under this authority and the facts of these chapter 11 cases. The majority of the Employees rely exclusively on the Employee Compensation and Benefits to satisfy their daily living expenses. Consequently, Employees will be exposed to significant financial difficulties if the Debtors are not permitted to honor obligations for unpaid Employee Compensation and Benefits.

102. Moreover, Employees provide the Debtors with services necessary to conduct the Debtors' businesses, and the Debtors believe that absent the payment of the Employee Compensation and Benefits owed to the Employees, the Debtors may experience Employee turnover and instability at this critical time in these chapter 11 cases. The Debtors believe that without these payments, the Employees may become demoralized and unproductive because of the potential significant financial strain and other hardships the Employees may face. Such Employees may then elect to seek alternative employment opportunities. Additionally, a significant portion of the value of the Debtors' business is tied to their workforce, which cannot be replaced without significant efforts—which efforts may not be successful given the overhang of these chapter 11 cases. Enterprise value may be materially impaired to the detriment of all stakeholders in such a scenario. Therefore, the Debtors believe that payment of the prepetition obligations with respect to the Employee Compensation and Benefits is a necessary and critical

element of the Debtors' efforts to preserve value and will give the Debtors the greatest likelihood of retention of their Employees as the Debtors seek to operate their businesses in these chapter 11 cases.

103. Indeed, courts in this district have recognized the importance of satisfying employee obligations in cases requesting relief similar to that requested herein. *See, e.g., In re Aspect Software Parent, Inc.*, No. 16-10597 (MFW) (Bankr. D. Del. Apr. 1, 2016) (authorizing debtors to continue employee compensation and benefit programs and pay certain prepetition obligations related thereto on a postpetition basis); *In re Magnum Hunter Res. Corp.*, No. 15-12533 (KG) (Bankr. D. Del. Mar. 10, 2016) (same); *In re Horsehead Holding Corp.*, No. 16-10287 (CSS); (Bankr. D. Del. Mar. 1, 2016) (same); *In re EveryWare Global, Inc.*, No. 15-10743 (LSS) (Bankr. D. Del. Apr. 27, 2015) (same); *In re Energy Future Holdings Corp.*, No. 14-10979 (CSS) (Bankr. D. Del. June 4, 2014) (same).[10] Accordingly, the Debtors respectfully request that the Court authorize the Debtors to pay and continue the Employee Compensation and Benefits in the ordinary course of business and consistent with past practice.

## III. The Non-Insider Employee Incentive Programs Are Reasonable and a Sound Exercise of Business Judgment.

104. The Debtors further request that they be allowed to continue to honor the Non-Insider Employee Incentive Programs in the ordinary course of business, subject to entry of the Final Order. The Debtors submit that the Non-Insider Employee Incentive Programs should be reviewed under section 363(c)(1) of the Bankruptcy Code rather than section 503(c) of the Bankruptcy Code because the Non-Insider Employee Incentive Programs are simply preexisting programs that the Debtors have maintained in the ordinary course, and seek to continue on a

[10] Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request to the Debtors' proposed counsel.

postpetition basis. *See In re Blitz U.S.A. Inc.*, 475 B.R. 209, 215 (Bankr. D. Del. 2012) (determining section 363(c) applies in context of analyzing ordinary course incentive programs). Importantly, by this Motion, the Debtors are not seeking to pay any amounts under the Non-Insider Employee Incentive Programs to potential insiders.

105. The Debtors submit that continuing to maintain the Non-Insider Employee Incentive Programs for non-insiders is a sound exercise of their business judgment and in the best interests of these chapter 11 estates. Importantly, the Non-Insider Employee Incentive Programs are a long-standing component of the Debtors' overall Employee Compensation and Benefits package and are intended to incentivize the Employees in the ordinary operations of the Debtors' businesses. The payments under the Non-Insider Employee Incentive Programs are only made if the applicable Employees attain the required operational and personal performance goals. The Debtors believe that continuing to incentivize performance goals is beneficial for the Debtors' businesses and creditors and will help maximize the value of the Debtors' estates. Accordingly, pursuant to the proposed Final Order, the Debtors respectfully request that the Court authorize the Debtors to continue the Non-Insider Employee Incentive Programs in the ordinary course of business, including payment of prepetition obligations related thereto, if any.

## IV. A Limited Waiver of the Automatic Stay for the Workers' Compensation Program Is Appropriate in this Case.

106. Section 362(a)(1) of the Bankruptcy Code operates to stay:

> [T]he commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title.

Section 362 of the Bankruptcy Code, however, permits a debtor or other parties in interest to request a modification or termination of the automatic stay for "cause." 11 U.S.C. § 362(d)(1).

107. The Debtors seek authorization, under section 362(d) of the Bankruptcy Code, to permit Employees to proceed with their claims, to the extent applicable, against the Workers' Compensation Program in the appropriate judicial or administrative forum. The Debtors believe that cause exists to modify the automatic stay because staying the Employees' workers' compensation claims could have a detrimental effect on the financial well-being and morale of the Employees and lead to the departure of certain Employees who are critical at this juncture. Such departures could cause a severe disruption in the Debtors' business to the detriment of all stakeholders. In addition, as noted above, if the Debtors fail to maintain the Workers' Compensation Program, various states' laws may prohibit the Debtors from operating in those states. Accordingly, the Debtors request a limited waiver of the automatic stay for purposes of allowing the Debtors' Employees to process their claims in accordance with the Workers' Compensation Program.

## V. Cause Exists To Authorize the Debtors' Financial Institutions To Honor Checks and Electronic Fund Transfers.

108. The Debtors have sufficient funds to pay the amounts described in this Motion in the ordinary course of business by virtue of expected cash flows from ongoing business operations and anticipated access to cash collateral. In addition, under the Debtors' existing cash management system, the Debtors can readily identify checks or wire transfer requests as relating to an authorized payment in respect of the Employee Compensation and Benefits, as applicable. Accordingly, the Debtors believe that checks or wire transfer requests, other than those relating to authorized payments, will not be honored inadvertently. Therefore, the Debtors respectfully request that the Court authorize and direct all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested in this Motion.

**The Requirements of Bankruptcy Rule 6003 Are Satisfied**

109. Bankruptcy Rule 6003 empowers a court to grant relief within the first 21 days after the Petition Date "to the extent that relief is necessary to avoid immediate and irreparable harm." For reasons discussed above, authorizing the Debtors to pay certain prepetition (i) wages, salaries, commissions, director obligations, severance obligations, and other compensation, including payment of certain prepetition obligations related thereto, (ii) reimbursable employee expenses, including payment of certain prepetition obligations related thereto, (iii) employee benefits in the ordinary course of business, including payment of certain prepetition obligations related thereto, (iv) amounts related to ordinary course incentive compensation programs for non-insider employees, and (v) costs related to the foregoing, and granting the other relief requested herein is integral to the Debtors' ability to transition their operations into these chapter 11 cases. Failure to receive such authorization and other relief during the first 21 days of these chapter 11 cases would severely disrupt the Debtors' operations at this critical juncture. For the reasons discussed herein, the relief requested is necessary in order for the Debtors to operate their business in the ordinary course and preserve the ongoing value of the Debtors' operations and maximize the value of their estates for the benefit of all stakeholders. Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 to support granting the relief requested herein.

**Reservation of Rights**

110. Nothing contained in this Motion or any actions taken by the Debtors pursuant to the relief granted in the Interim Order and Final Order is intended or should be construed as: (a) an admission as to the validity of any particular claim against a Debtor entity; (b) a waiver of the Debtors' rights to dispute any particular claim on any grounds; (c) a promise or

requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion; (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law; or (g) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to this Motion are valid, and the Debtors expressly reserve their rights to contest the extent, validity, or perfection or seek avoidance of all such liens. If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.

**Waiver of Bankruptcy Rule 6004(a) and 6004(h)**

111. To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

**Notice**

112. The Debtors will provide notice of this Motion to: (a) the Office of the United States Trustee for the District of Delaware; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the administrative agents of the Debtors' prepetition secured credit facilities; (d) counsel to the ad hoc group of the Debtors' prepetition secured lenders; (e) the indenture trustee for the Debtors' prepetition subordinated notes; (f) counsel to the indenture trustee for the Debtors' prepetition subordinated notes; (g) counsel to the administrative agents under the Debtors' prepetition credit agreements; (h) counsel to the ad hoc group of the Debtors' prepetition subordinated note holders; (i) counsel to Mudrick Capital Management, L.P.; (j) the United States Attorney's Office for the District of Delaware; (k) the

Internal Revenue Service; (*l*) the Environmental Protection Agency; (m) the office of the attorneys general for the states in which the Debtors operate; (n) the Securities and Exchange Commission; and (o) any party that has requested notice pursuant to Bankruptcy Rule 2002. As this Motion is seeking "first day" relief, within two business days of the hearing on this Motion, the Debtors will serve copies of this Motion and any order entered in respect to this Motion as required by Local Rule 9013-1(m). The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

**No Prior Request**

113. No prior request for the relief sought in this Motion has been made to this or any other court.

[*Remainder of page intentionally left blank*]

WHEREFORE, the Debtors respectfully request that the Court enter the Interim Order and Final Order, granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Wilmington, Delaware
Dated: May 16, 2016

/s/ *Patrick A. Jackson*
Pauline K. Morgan (Bar No. 3650)
Patrick A. Jackson (Bar No. 4976)
**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
Email: pmorgan@ycst.com
pjackson@ycst.com

- and -

James H.M. Sprayregen, P.C. (*pro hac vice* admission pending)
Marc Kieselstein, P.C. (*pro hac vice* admission pending)
Adam Paul (*pro hac vice* admission pending)
Bradley Thomas Giordano (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
Email: james.sprayregen@kirkland.com
marc.kieselstein@kirkland.com
adam.paul@kirkland.com
bradley.giordano@kirkland.com

*Proposed Counsel for the*
*Debtors and Debtors in Possession*

# EXHIBIT A

**Proposed Interim Order**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| DEX MEDIA, INC., *et al.*,[1] | ) | Case No. 16-11200 (___) |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | **Re: Docket No. __** |

**INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO (A) PAY PREPETITION WAGES, SALARIES, AND OTHER COMPENSATION AND CERTAIN REIMBURSABLE EXPENSES, (B) CONTINUE EMPLOYEE BENEFITS PROGRAMS, (C) CONTINUE CERTAIN ORDINARY COURSE INCENTIVE PROGRAMS FOR NON-INSIDERS, AND (D) PAY RELATED COSTS, AND (II) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of an interim order (this "Interim Order"), (a) authorizing the Debtors to pay certain prepetition (i) wages, salaries, commissions, director obligations, severance obligations, and other compensation and pay such obligations in the ordinary course of business on a postpetition basis, (ii) reimbursable employee expenses and pay such obligations in the ordinary course of business on a postpetition basis, (iii) employee benefits and continue providing such benefits in the ordinary course of business, (iv) amounts related to certain ordinary course incentive compensation programs for non-insider employees and continue such programs in the ordinary course of business, and (v) costs related to the foregoing, and (b) granting related relief; all as more fully set forth in the Motion; and upon the First Day

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Dex Media, Inc. (0040); Dex Media East, Inc. (5763); Dex Media Holdings, Inc. (9762); Dex Media Service LLC (9647); Dex Media West, Inc. (7004); Dex One Digital, Inc. (9750); Dex One Service, Inc. (0222); R.H. Donnelley APIL, Inc. (6495); R.H. Donnelley Corporation (2490); R.H. Donnelley Inc. (7635); SuperMedia LLC (6092); SuperMedia Inc. (5175); and SuperMedia Sales Inc. (4411). The location of the Debtors' service address is: 2200 West Airfield Drive, P.O. Box 619810, DFW Airport, Texas 75261.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and that this Court may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1. The Motion is granted on an interim basis as set forth herein.

2. The final hearing (the "Final Hearing") on the Motion shall be held on __________, 2016, at__:__ _.m., prevailing Eastern Time. Any objections or responses to entry of a final order on the Motion shall be filed on or before 4:00 p.m., prevailing Eastern Time, on __________, 2016, and shall be served on: (a) the Debtors, Dex Media, Inc., 2200 West Airfield Drive, P.O. Box 619810, DFW Airport, Texas 75261, Attn: Raymond Ferrell and Andrew Hede; (b) proposed counsel for the Debtors, Kirkland & Ellis LLP, 300 North LaSalle, Chicago, Illinois 60654, Attn: Adam Paul, Esq. and Bradley Thomas Giordano, Esq.; (c) proposed co-counsel to

the Debtors, Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, Delaware 19801, Attn: Pauline K. Morgan, Esq. and Patrick A. Jackson, Esq.; (d) counsel to the ad hoc group of the Debtors' prepetition secured lenders, Milbank, Tweed, Hadley & McCloy LLP, 28 Liberty Street, New York, New York 10005, Attn: Dennis F. Dunne, Esq.and Gerard Uzzi, Esq., and Milbank, Tweed, Hadley & McCloy LLP, 601 South Figueroa Street, 30th Floor, Los Angeles, CA 90017, Attn: Mark Shinderman, Esq. and Brett Goldblatt, Esq.; (e) counsel to the administrative agents under the Debtors' prepetition credit agreements, Simpson Thacher & Bartlett LLP, 425 Lexington Avenue, New York, New York 10017, Attn: Sandy Qusba, Esq. and Nicholas Baker, Esq.; (f) co-counsel to the administrative agents under the Debtors' prepetition credit agreements, Richards, Layton & Finger, P.A., 920 North King Street, Wilmington, Delaware 19801, Attn: Mark Collins; (g) counsel to the ad hoc group of the Debtors' prepetition subordinated note holders, Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, Bank of America Tower, New York, New York 10036, Attn: Michael S. Stamer, Esq. and Akin Gump Strauss Hauer & Feld LLP, 1700 Pacific Avenue, Suite 1400, Dallas, Texas 75201, Attn: Sarah Link Schultz, Esq.; (h) counsel to Mudrick Capital Management, LP, Wachtell, Lipton, Rosen & Katz, 51 West 52nd Street, New York, New York 10019, Attn: Joshua A. Feltman, Esq.; (i) counsel to any statutory committee appointed in these cases; and (j) the Office of the United States Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801, Attn: Jane M. Leamy, Esq. and Timothy Fox, Esq. In the event no objections to entry of a final order on the Motion are timely received, this Court may enter such final order without need for the Final Hearing.

3. The Debtors are authorized, but not directed, to continue and/or modify, change, and discontinue the Employee Compensation and Benefits, and to implement new programs,

policies, and benefits, in the ordinary course of business, and to pay any prepetition amounts due in connection therewith; *provided* that, pending entry of the Final Order, the Debtors shall not honor any Employee Compensation and Benefits obligations that exceed the priority amounts set forth in sections 507(a)(4) or 507(a)(5) of the Bankruptcy Code; *provided*, *further,* that, pending entry of the Final Order, the Debtors are not authorized to honor obligations under the Non-Insider Employee Incentive Programs; *provided*, *further*, that, pending entry of the Final Order, payments on account of prepetition Employee Compensation and Benefits shall not exceed $9,500,000.

4. Nothing herein shall be deemed to authorize (a) payment by the Debtors of any amounts in satisfaction of prepetition amounts on account of the Non-Insider Employee Incentive Programs or the Severance Programs, or which are otherwise subject to section 503(c) of the Bankruptcy Code, or (b) the Debtors to cash out unpaid Vacation Time and Sick Leave upon termination of an Employee, unless applicable state law requires such payment.

5. The automatic stay is modified, pursuant to section 362(d) of the Bankruptcy Code, solely to the extent necessary to permit Employees to proceed with their claims under the Workers' Compensation Program in the appropriate judicial or administrative forum, and the Debtors are authorized, but not directed, to continue the Workers' Compensation Program and pay all prepetition amounts relating thereto in the ordinary course of business.

6. Notwithstanding anything to the contrary contained herein, (a) any payment to be made, or authorization contained, hereunder shall be subject to the requirements imposed on the Debtors under any orders regarding the use of cash collateral approved by this Court in these chapter 11 cases (including with respect to any budgets governing or relating to such use), and (b) to the extent there is any inconsistency between the terms of such cash collateral orders and

any action taken or proposed to be taken hereunder, the terms of such cash collateral orders shall control.

7. Notwithstanding the relief granted herein and any actions taken hereunder, nothing herein shall create, nor is intended to create, any rights in favor of, or enhance the status of any claim held by, any Employee, Contract Worker, or other third party.

8. Notwithstanding the relief granted in this Interim Order and any actions taken pursuant to such relief, nothing in this Interim Order shall be deemed: (a) an admission as to the validity of any claim against a Debtor entity; (b) a waiver of the Debtors' right to dispute any claim on any grounds; (c) a promise or requirement to pay any prepetition claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Interim Order or the Motion; (e) a request or authorization to assume any prepetition agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law; or (g) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to the Motion are valid, and the Debtors expressly reserved their rights to contest the extent, validity, or perfection or seek avoidance of all such liens.

9. The banks and financial institutions on which checks were drawn or electronic payment requests made in payment of the prepetition obligations approved herein are authorized to receive, process, honor, and pay all such checks and electronic payment requests when presented for payment, and all such banks and financial institutions are authorized to rely on the Debtors' designation of any particular check or electronic payment request as approved by this Interim Order.

10. The Debtors are authorized to issue postpetition checks, or to effect postpetition fund transfer requests, in replacement of any checks or fund transfer requests that are dishonored as a consequence of these chapter 11 cases with respect to prepetition amounts owed in connection with any Employee Compensation and Benefits.

11. The contents of the Motion satisfy the requirements of Bankruptcy Rule 6003(b).

12. Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) and the Local Rules are satisfied by such notice.

13. Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Interim Order are immediately effective and enforceable upon its entry.

14. The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Interim Order in accordance with the Motion.

15. This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Interim Order.

Dated: ___________, 2016
Wilmington, Delaware

____________________________________
UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT B

## Proposed Final Order

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| DEX MEDIA, INC., *et al.*,[1] | ) | Case No. 16-11200 (___) |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | **Re: Docket No. __** |

**FINAL ORDER (I) AUTHORIZING THE DEBTORS TO (A) PAY PREPETITION WAGES, SALARIES, AND OTHER COMPENSATION AND CERTAIN REIMBURSABLE EXPENSES, (B) CONTINUE EMPLOYEE BENEFITS PROGRAMS, (C) CONTINUE CERTAIN ORDINARY COURSE INCENTIVE PROGRAMS FOR NON-INSIDERS, AND (D) PAY RELATED COSTS, AND (II) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of a final order (this "Final Order"), (a) authorizing the Debtors to pay certain prepetition (i) wages, salaries, commissions, director obligations, severance obligations, and other compensation and pay such obligations in the ordinary course of business on a postpetition basis, (ii) reimbursable employee expenses and pay such obligations in the ordinary course of business on a postpetition basis, (iii) employee benefits and continue providing such benefits in the ordinary course of business, (iv) amounts related to certain ordinary course incentive compensation programs for non-insider employees and continue such programs in the ordinary course of business, and (v) costs related to the foregoing, and (b) granting related relief; all as more fully set forth in the Motion; and upon the First Day

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Dex Media, Inc. (0040); Dex Media East, Inc. (5763); Dex Media Holdings, Inc. (9762); Dex Media Service LLC (9647); Dex Media West, Inc. (7004); Dex One Digital, Inc. (9750); Dex One Service, Inc. (0222); R.H. Donnelley APIL, Inc. (6495); R.H. Donnelley Corporation (2490); R.H. Donnelley Inc. (7635); SuperMedia LLC (6092); SuperMedia Inc. (5175); and SuperMedia Sales Inc. (4411). The location of the Debtors' service address is: 2200 West Airfield Drive, P.O. Box 619810, DFW Airport, Texas 75261.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and that this Court may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1. The Motion is granted on a final basis as set forth herein.

2. The Debtors are authorized, but not directed, to continue and/or modify, change, and discontinue the Employee Compensation and Benefits, and to implement new programs, policies, and benefits, in the ordinary course of business, and to pay any prepetition amounts due in connection therewith.

3. The automatic stay is modified, pursuant to section 362(d) of the Bankruptcy Code, solely to the extent necessary to permit Employees to proceed with their claims under the Workers' Compensation Program in the appropriate judicial or administrative forum, and the

Debtors are authorized, but not directed, to continue the Workers' Compensation Program and pay all prepetition amounts relating thereto in the ordinary course of business.

4. Notwithstanding anything to the contrary contained herein, (a) any payment to be made, or authorization contained, hereunder shall be subject to the requirements imposed on the Debtors under any orders regarding the use of cash collateral approved by this Court in these chapter 11 cases (including with respect to any budgets governing or relating to such use), and (b) to the extent there is any inconsistency between the terms of such cash collateral orders and any action taken or proposed to be taken hereunder, the terms of such cash collateral orders shall control.

5. Notwithstanding the relief granted herein and any actions taken hereunder, nothing herein shall create, nor is intended to create, any rights in favor of, or enhance the status of any claim held by, any Employee, Contract Worker, or other third party.

6. Notwithstanding the relief granted in this Final Order and any actions taken pursuant to such relief, nothing in this Final Order shall be deemed: (a) an admission as to the validity of any prepetition claim against a Debtor entity; (b) a waiver of the Debtors' right to dispute any prepetition claim on any grounds; (c) a promise or requirement to pay any prepetition claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Final Order or the Motion; (e) a request or authorization to assume any prepetition agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law; or (g) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to the Motion are valid, and the Debtors expressly reserved their rights to contest the extent, validity, or perfection or seek avoidance of all such liens.

7. The banks and financial institutions on which checks were drawn or electronic payment requests made in payment of the prepetition obligations approved herein are authorized to receive, process, honor, and pay all such checks and electronic payment requests when presented for payment, and all such banks and financial institutions are authorized to rely on the Debtors' designation of any particular check or electronic payment request as approved by this Final Order.

8. The Debtors are authorized to issue postpetition checks, or to effect postpetition fund transfer requests, in replacement of any checks or fund transfer requests that are dishonored as a consequence of these chapter 11 cases with respect to prepetition amounts owed in connection with any Employee Compensation and Benefits.

9. Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) and the Local Rules are satisfied by such notice.

10. Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Final Order are immediately effective and enforceable upon its entry.

11. The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Final Order in accordance with the Motion.

12. This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Final Order.

Dated: ___________, 2016
Wilmington, Delaware

______________________________________
UNITED STATES BANKRUPTCY JUDGE