**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| DEX MEDIA, INC., *et al.*,[1] | ) Case No. 16-11200 (___) |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |

**DISCLOSURE STATEMENT FOR JOINT PREPACKAGED CHAPTER 11 PLAN
OF REORGANIZATION OF DEX MEDIA, INC. AND ITS DEBTOR AFFILIATES**

---

**THIS IS A SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN IN ACCORDANCE WITH BANKRUPTCY CODE SECTION 1125 AND WITHIN THE MEANING OF BANKRUPTCY CODE SECTION 1126, 11 U.S.C. §§ 1125, 1126. THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE COURT. THIS DISCLOSURE STATEMENT WILL BE SUBMITTED TO THE COURT FOR APPROVAL FOLLOWING COMMENCEMENT OF SOLICITATION AND THE DEBTORS' FILING FOR RELIEF UNDER CHAPTER 11 OF THE BANKRUPTCY CODE. THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

---

James H.M. Sprayregen, P.C. (*pro hac vice* admission pending)
Marc Kieselstein, P.C. (*pro hac vice* admission pending)
Adam Paul (*pro hac vice* admission pending)
Bradley Thomas Giordano (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:    james.sprayregen@kirkland.com
          marc.kieselstein@kirkland.com
          adam.paul@kirkland.com
          bradley.giordano@kirkland.com

Pauline K. Morgan (Bar No. 3650)
Patrick A. Jackson (Bar No. 4976)
**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:    (302) 571-6600
Facsimile:    (302) 571-1253
Email:    pmorgan@ycst.com
          pjackson@ycst.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

Dated:  May 2, 2016

---

[1]    The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, include:  Dex Media, Inc. (0040); Dex Media East, Inc. (5763); Dex Media Holdings, Inc. (9762); Dex Media Service LLC (9647); Dex Media West, Inc. (7004); Dex One Digital, Inc. (9750); Dex One Service, Inc. (0222); R.H. Donnelley APIL, Inc. (6495); R.H. Donnelley Corporation (2490); R.H. Donnelley Inc. (7635); SuperMedia LLC (6092);  SuperMedia Inc. (5175); and SuperMedia Sales Inc. (4411).  The location of the Debtors' service address is:  2200 West Airfield Drive, P.O. Box 619810, DFW Airport, Texas 75261.

**IMPORTANT INFORMATION FOR YOU TO READ**

**THE DEADLINE TO VOTE ON THE PLAN (THE "VOTING DEADLINE") IS**

**May 16, 2016, 2016 AT 4:00 P.M., (PREVAILING EASTERN TIME)
WITH RESPECT TO CLASSES 3, 4, 5, AND 6,**

**AND**

**May 30, 2016 AT 4:00 P.M., (PREVAILING EASTERN TIME) WITH RESPECT TO CLASS 7**

**FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE
ACTUALLY RECEIVED BY THE NOTICE AND CLAIMS AGENT
BEFORE THE APPLICABLE VOTING DEADLINE AS DESCRIBED HEREIN.**

The Debtors are providing the information in this *Disclosure Statement for the Joint Prepackaged Chapter 11 Plan of Reorganization of Dex Media, Inc. and its Debtor Affiliates* (this "**Disclosure Statement**") to Holders of Claims entitled to vote on the *Joint Prepackaged Chapter 11 Plan of Reorganization of Dex Media, Inc. and its Debtor Affiliates* (the "**Plan**") for the purpose of soliciting votes to accept the Plan. **Nothing in this Disclosure Statement may be relied upon or used by any entity for any other purpose.**

This Disclosure Statement may not be deemed to provide legal, financial, securities, tax, or business advice. No court has approved the adequacy of this Disclosure Statement, and any subsequent approval of the adequacy of disclosures contained in this Disclosure Statement does not constitute the Court's approval of the merits of the Plan or a guarantee of the accuracy or completeness of the information contained herein. The Debtors have not authorized any entity to give any information about or concerning the Plan other than that which is contained in this Disclosure Statement. The Debtors have not authorized any representations concerning the value of their assets other than as set forth in this Disclosure Statement and in their securities filings. Any information, representations, or inducements made to obtain acceptance of the Plan, which are other than or inconsistent with the information contained in this Disclosure Statement or in the Plan should not be relied upon by any Holder of a Claim entitled to vote to accept or reject the Plan.

The Debtors urge every Holder of a Claim entitled to vote on the Plan to (a) read the entire Disclosure Statement and the Plan carefully, (b) consider all of the information in this Disclosure Statement, including, importantly, the risk factors described in Article VII of this Disclosure Statement, and (c) consult with its own advisor(s) with respect to reviewing this Disclosure Statement, the Plan, all documents attached hereto and the proposed transactions contemplated under the Plan **before** deciding whether to vote to accept or reject the Plan.

The Plan contains a series of releases that are part of the overall settlement of various potential claims. In that respect, parties should be aware that, if the Plan is confirmed, they may be receiving and giving releases as set forth in Article VIII of the Plan and Article IV of this Disclosure Statement.

This Disclosure Statement contains summaries of the Plan, certain statutory provisions, and certain documents related to the Plan. In the event of any inconsistency or discrepancy between a description in this Disclosure Statement and the terms and provisions of the Plan or other documents referenced herein, the Plan or such other documents will govern for all purposes. Except where otherwise specifically noted, factual information contained in this Disclosure Statement has been provided by the Debtors' management. The Debtors do not represent or warrant that the information contained herein or attached hereto is without any material inaccuracy or omission.

Although the Debtors have used their reasonable business judgment to ensure the accuracy of the financial information contained in, or incorporated by reference into, this Disclosure Statement, such financial information has not been and will not be audited or reviewed by the Debtors' independent auditors unless explicitly noted otherwise. The Debtors are generally making the statements and providing the

financial information contained in this Disclosure Statement as of the date hereof where feasible, unless otherwise specifically noted. Although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so, and parties reviewing this Disclosure Statement should not infer that, at the time of their review, the facts set forth herein have not changed since this Disclosure Statement was distributed.

Neither this Disclosure Statement nor the Plan is or should be construed as an admission of fact, liability, stipulation, or waiver. No reliance should be placed on the fact that a particular Claim or potential objection to a particular Claim is, or is not, identified in this Disclosure Statement. The Debtors or the Reorganized Debtors, as applicable, may seek to investigate, file, and prosecute Claims and may object to Claims after Confirmation or the Effective Date of the Plan irrespective of whether this Disclosure Statement identifies any such Claims or objections to Claims.

## SPECIAL NOTICE REGARDING FEDERAL AND STATE SECURITIES LAWS

No bankruptcy court has reviewed this Disclosure Statement or the Plan, and the securities to be issued on or after the Effective Date will have not been the subject of a registration statement filed with the United States Securities and Exchange Commission (the "SEC") or any securities regulatory authority of any state under any state securities law ("Blue Sky Laws"). The Plan has not been approved or disapproved by the SEC or any state securities commission and neither the SEC nor any state securities commission has passed upon the accuracy or adequacy of this Disclosure Statement or the merits of the Plan. Any representation to the contrary is a criminal offense.

This Disclosure Statement has been prepared pursuant to section 1125 of the Bankruptcy Code and Bankruptcy Rule 3016(b) and is not necessarily in accordance with federal or state securities laws or other similar laws, including Blue Sky Laws. The Debtors are relying on the exemption from the Securities Act of 1933, as amended (the "Securities Act") and equivalent state law registration requirements provided by section 1145(a)(1) of the Bankruptcy Code, to exempt the offering and issuance of new securities pursuant to the Plan from registration under the Securities Act and Blue Sky Laws as well as, to the extent necessary, the private placement exemption under section 4(a)(2) of the Securities Act, or Regulation D promulgated thereunder, and similar Blue Sky Law provisions.

This Disclosure Statement contains "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "expect," "anticipate," "estimate," or "continue," or the negative thereof, or other variations thereon or comparable terminology. You are cautioned that all forward looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements. The Liquidation Analysis set forth in Exhibit D, distribution projections, and other information contained herein and attached hereto are estimates only, and the timing and amount of actual distributions to Holders of Allowed Claims may be affected by many factors that cannot be predicted. Any analyses, estimates, or recovery projections may or may not turn out to be accurate. You should carefully read Article VII herein titled "Certain Risk Factors to be Considered Prior to Voting."

Making investment decisions based on the information contained in this Disclosure Statement and/or the Plan is therefore highly speculative. The Debtors recommend that potential recipients of any securities issued pursuant to the Plan consult their own legal counsel concerning the securities laws governing the transferability of any such securities.

## QUESTIONS AND ADDITIONAL INFORMATION

If you would like to obtain copies of this Disclosure Statement, the Plan, or any of the documents attached hereto or referenced herein, or have questions about the solicitation and voting process generally, please contact the Debtors' Notice and Claims Agent by: (a) e-mail at tabulation@epiqsystems.com and reference "DEX" in the subject line; (b) writing to Dex Media, Inc., c/o Epiq Corporate Restructuring, 777 Third Avenue, 12th Floor, New York, NY 10017; or (b) calling 646-282-2500 and asking for the Solicitation Group.

\*        \*        \*        \*

# TABLE OF CONTENTS

Page

**ARTICLE I. IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT** ...........................1
    A.     Introduction ................................................................................................................1
    B.     The Plan ....................................................................................................................4
    C.     Voting Procedures and Requirements ......................................................................16

**ARTICLE II. BACKGROUND TO THE CHAPTER 11 CASES** ...........................................................19
    A.     The Debtors' History and Business ..........................................................................19
    B.     The Debtors' Prepetition Capital Structure .............................................................28

**ARTICLE III. EVENTS LEADING TO THE CHAPTER 11 CASES** ....................................................31
    A.     Decreased Revenues and Operational Initiatives that Need Time to Develop ..........31
    B.     The RSA and Plan ....................................................................................................31

**ARTICLE IV. SUMMARY OF THE PLAN** ..........................................................................................34
    A.     Administrative Claims and Priority Claims .............................................................34
    B.     Classification and Treatment of Claims and Interests ..............................................36
    C.     Means for Implementation of the Plan .....................................................................37
    D.     Treatment of Executory Contracts and Unexpired Leases .......................................43
    E.     Provisions Governing Distributions .........................................................................45
    F.     Procedures for Resolving Contingent, Unliquidated, and Disputed Claims .............50
    G.     Settlement, Release, Injunction, and Related Provisions .........................................52
    H.     Conditions Precedent to Confirmation and Consummation of the Plan ....................56
    I.     Modification, Revocation, or Withdrawal of the Plan ..............................................59
    J.     Retention of Jurisdiction ..........................................................................................59
    K.     Miscellaneous Provisions ........................................................................................61

**ARTICLE V. VALUATION AND FINANCIAL PROJECTIONS** ........................................................64
    A.     Valuation .................................................................................................................64
    B.     Financial Projections ...............................................................................................64

**ARTICLE VI. STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN** ...........................64
    A.     Confirmation Hearing ..............................................................................................64
    B.     Confirmation Standards ...........................................................................................65
    C.     Acceptance by Impaired Classes ..............................................................................66
    D.     Confirmation without Acceptance by All Impaired Classes ......................................67
    E.     Alternatives to Confirmation and Consummation of the Plan ...................................68

**ARTICLE VII. CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING** ...........................68
    A.     Certain Bankruptcy Law Considerations .................................................................68
    B.     Risk Factors that May Affect Recovery Available to Holders of Allowed Claims and the
           Value of Securities to Be Issued Under the Plan ......................................................73
    C.     Risks Associated with Plan Securities .....................................................................73
    D.     Risk Factors that Could Negatively Impact the Debtors' Business ...........................74
    E.     Risks Associated with Forward Looking Statements ................................................83
    F.     Disclosure Statement Disclaimer .............................................................................83
    G.     Liquidation Under Chapter 7 ...................................................................................85

**ARTICLE VIII. IMPORTANT SECURITIES LAW DISCLOSURE** ...................................................85
    A.     New Common Stock of the Reorganized Debtors and the Warrants ..........................85
    B.     Issuance and Resale of Plan Securities ....................................................................85
    C.     No Registration or Listing of Plan Securities ...........................................................86

i

**ARTICLE IX. CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES**.........................**87**

    A.       Certain United States Federal Income Tax Consequences to the Debtors ......................88

    B.       Certain United States Federal Income Tax Consequences to the U.S. Holders of Certain
            Allowed Claims ......................................................................................................90

    C.       Certain United States Federal Income Tax Consequences to Non-U.S. Holders of Certain
            Allowed Claims ......................................................................................................97

    D.       Information Reporting and Backup Withholding.......................................................100

**ARTICLE X. RECOMMENDATION OF THE DEBTORS** ...............................................................**102**

**<u>EXHIBITS</u>**

EXHIBIT A        Joint Prepackaged Chapter 11 Plan of Reorganization of Dex Media, Inc. and Its Debtor Affiliates

EXHIBIT B        Restructuring Support Agreement

EXHIBIT C        Financial Projections

EXHIBIT D        Liquidation Analysis

EXHIBIT E        Valuation Analysis

# ARTICLE I.
## IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT

A.      *Introduction*

Dex Media, Inc. ("Parent") and certain of its affiliates, as proposed debtors and debtors in possession (collectively, the "Debtors"), submit this Disclosure Statement to Holders of Claims against in the Debtors in connection with the solicitation of acceptances with respect to the Plan dated May 2, 2016.[1]  A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference.

The Debtors are a leading provider of local marketing solutions to over 400,000 small and medium business clients across the United States and are headquartered in Dallas, Texas.  The Debtors have approximately 3,100 employees, including 1,400 sales employees who work directly with customers to provide local marketing solutions that drive leads to the Debtors' customers and help them connect with their current and prospective customers.

The economic recession that began in 2008 and the accompanying dislocation of credit markets triggered a decline in the Debtors' print advertising sales—the principal source of the Debtors' revenue.  The Debtors experienced declines in advertising sales due to the economic recession, dislocation of credit markets, declining consumer usage of print directory products, and significant competition and saturation in advertising markets, which placed significant strain on the Debtors' liquidity.  The recession also significantly reduced business spending among small and medium-sized businesses.  National economic conditions resulted in higher collection costs and bad debt expense due to increased difficulty in collecting accounts receivable from advertising clients in financial difficulty.  Additionally, revenue weaknesses resulted from declining consumer usage of print directories in the United States.  This decline was attributable to a number of factors, including increased usage of internet local search and internet-based directory products (particularly in business-to-business and retail categories).

The Debtors in their current form exist as the result of a 2013 merger between two well-known companies in the directory and digital marketing sectors:  Dex One Corporation ("Dex One") and SuperMedia, Inc. ("SuperMedia").  In late 2012, after months of negotiations with each other and their respective lenders, Dex One and SuperMedia entered into a comprehensive agreement whereby the two companies would execute a stock-for-stock merger, while simultaneously amending and extending the maturities on their four secured debt facilities.  Because Dex One and SuperMedia were not able to obtain the necessary lender consents to consummate this transaction out of court, each of the two companies, along with all of their domestic subsidiaries, commenced dual-track chapter 11 cases in March 2013 to effectuate the transaction.  On April 29, 2013, this Court entered separate orders confirming the Dex One and SuperMedia plans of reorganization.  The following day, Dex One and SuperMedia consummated their plans and emerged collectively as the Debtors.

The Debtors expected that the extended runway of their debt facilities, combined with cost synergies resulting from the merger, would give them sufficient breathing room to counteract negative trends in the directories industry.  Unfortunately, many of the same macro challenges continue to affect the Debtors today.  Reduced advertising spending in print directories and lower utilization of these directories by customers, primarily driven by heavy competition from other advertising media (including the internet, email, cable television, newspaper, radio, and social media), has driven the Debtors' revenue down for a number of years.  For example, operating revenue declined from $1.8 billion for calendar-year 2014 to $1.5 billion for calendar-year 2015.  Although the Debtors increased their digital ad presence following their 2013 restructuring and more recently fine-tuned their small-business digital product offerings, digital revenue has not grown at a sufficient rate to offset declines in print revenue.

Additionally, following the merger, the Debtors were not able to realize all of the benefits from the 2013 merger as quickly as they hoped.  For example, despite new digital product offerings, the Debtors were unsuccessful in substantially growing their digital products and services.

---

[1]     Capitalized terms used but not otherwise defined in this Disclosure Statement will have the meaning ascribed to such terms in the Plan.  The summary of the Plan provided herein is qualified in its entirety by reference to the Plan.  In the case of any inconsistency between this Disclosure Statement and the Plan, the Plan will govern in all respects.

The Debtors also faced challenges in integrating legacy Dex One and SuperMedia information technology systems and implementing a streamlined system for interfacing with clients—in part as a result of the complicated post-merger corporate structure (as set forth herein). These integration issues negatively affected sales efforts and client satisfaction.

In response to these challenges, the Debtors brought in a new Chief Executive Officer and revamped their senior management team that designed and has begun implementing a business plan that will allow the new management team to better position the Debtors to succeed given current industry trends. Specifically, the Debtors have launched a series of products designed to help small businesses compete with their larger competitors and thrive using today's sophisticated digital marketing tools, rather than rely solely on search engine marketing. The Debtors believe that these products will significantly assist small businesses with their marketing needs and, accordingly, provide the Debtors with significant upside opportunities. To properly execute on this business plan, however, the Debtors must first right-size their balance sheet; the Plan is designed to do just that.

Each of the Debtors' four secured credit facilities (approximately $2.1 billion outstanding in the aggregate) and subordinated notes (approximately $270 million) are scheduled to mature on December 31, 2016 and January 29, 2017, respectively. As of December 31, 2015, the Debtors were in breach of their covenants under two of their secured credit facilities. As described below, however, the Debtors entered into a forbearance agreement with their Term Loan Lenders regarding such breaches, as well as the breach arising from the Debtors' decision not to make the October 2015 interest payment under the Subordinated Notes.

To address the upcoming maturities, an ad hoc group of Term Loan Lenders under the four secured credit facilities (the "Ad Hoc Lender Group") organized to coordinate discussions with the Debtors to explore restructuring alternatives. With the assistance of their respective advisors, the Debtors, the Ad Hoc Lender Group, and the administrative agents under the secured credit facilities have engaged in meaningful discussions since mid 2015. In furtherance of a comprehensive, value-maximizing restructuring transaction with their secured lenders, the Debtors elected not to make their September 30, 2015 subordinated notes coupon payment and used the grace period under their subordinated notes to continue negotiations with the Ad Hoc Lender Group.

At the same time, and following the execution of a confidentiality agreement, the Debtors engaged with an ad hoc group of note holders (the "Ad Hoc Note Holder Group") and its advisors. Discussions between the Debtors and the Ad Hoc Note Holder Group continued throughout the grace period; however, the two parties did not reach a consensus on a path forward. The Debtors thus elected to forego making their subordinated notes coupon payment prior to the expiration of the grace period, triggering an event of default under the subordinated notes indenture on October 30, 2015.

During this same period of time, the Debtors and the Ad Hoc Lender Group exchanged drafts of a restructuring support agreement and plan term sheet detailing a comprehensive restructuring transaction. In furtherance of these discussions—and immediately prior to the expiration of the grace period—the Debtors, the prepetition agents and certain of Term Loan Lenders (including members of the Ad Hoc Lender Group) entered into a forbearance agreement pursuant to which the Term Loan Lenders agreed to forbear from exercising certain of their rights and remedies until November 23, 2015, including those arising from a cross-default triggered by the Debtors' default under their subordinated notes indenture. Through a series of amendments, the parties subsequently provided an evergreen extension of the forbearance agreement that would last until the date that is three business days after the date that a critical threshold of Term Loan Lenders provides written notice of a termination such that the forbearance agreement no longer has majority support under each of the Debtors' four credit facilities.

The forbearance agreement provided sufficient runway to finalize negotiations with the Ad Hoc Lender Group on the restructuring support agreement and plan term sheet. The Debtors and the Ad Hoc Lender Group also engaged in constructive negotiations with the Ad Hoc Note Holder Group during this process. The Debtors ultimately reached an agreement with parties holding approximately 69 percent in aggregate of claims under the Credit Agreements (the "Supporting Lenders") and approximately 80 percent of claims under the Subordinated Notes (the "Supporting Noteholders") for a consensual balance sheet restructuring transaction that would also address the Debtors' overly complicated organizational structure in a tax-efficient manner. Notably, the restructuring provides a meaningful recovery to general unsecured stakeholders. Ultimately, the Debtors

successfully negotiated a Plan that pays trade and known general unsecured claims in full, as further described herein.

This transaction, which was memorialized in a restructuring support agreement, attached hereto as **Exhibit B** (the "RSA"), provides that the Debtors and the Supporting Lenders, with the support of the Supporting Noteholders, will pursue a consensual, prepackaged chapter 11 plan of reorganization. The Debtors intend to file for chapter 11 protection and subsequently emerge from chapter 11 pursuant to the Plan on an expedited timeline within three to four months following the Petition Date.

As described more fully herein and in the Plan, the Plan will significantly delever the Debtors' balance sheet, address the Debtors' complicated organizational structure, and generally provide for the following treatment of Claims and Interests, among other things:

- Administrative Claims, Other Priority Claims, and Priority Tax claims will be paid in full upon emergence (or, in the case of Priority Tax Claims, treated in accordance with section 1129(a)(9)(C));

- Claims arising under the Debtors' prepetition secured Credit Agreements will receive their Pro Rata share of 100% of (a) the equity of the top-tiered holding company of the Debtors as reorganized (subject to dilution by management equity and/or warrants described herein and in the Plan), (b) Takeback First Lien Term Loan in an aggregate principal amount of $600 million, and (c) their remaining cash collateral;

- Holders of Claims under the Debtors' Subordinated Notes will receive, from proceeds of the collateral of the Term Loan Lenders, as authorized by and consented to by the acceptance of the Plan by the Holders of Credit Agreement Claims, their Pro Rata share of (a) $5 million in Cash, and (b) the Warrants;

- Holders of General Unsecured Claims will receive, from proceeds of the collateral of the Term Loan Lenders, as authorized by and consented to by the acceptance of the Plan by the Holders of Credit Agreement Claims, payment in full on the later to occur of the Effective Date of the Plan or in the ordinary course of business; and

- Claims Relating to the Purchase and/or Sale of Debt and Securities (as described further herein and in the Plan), as well as existing equity interests in Dex Media, Inc., will be cancelled without any distribution to the holders of such claims or interests.

While the Debtors have put together an effective go forward business plan, their present debt load is simply too large given industry challenges. The Debtors worked diligently with their advisors and the Supporting Lenders to develop a business plan, simplify their corporate structure, and properly size a manageable debt capacity going-forward—the result of this process was a Plan that will right-size the Debtors' balance sheet, position them for long-term success, and ensure that the Debtors do not return to bankruptcy.

**THE DEBTORS HAVE NOT COMMENCED BANKRUPTCY CASES UNDER CHAPTER 11 OF THE BANKRUPTCY CODE AT THIS TIME.**

**BECAUSE NO BANKRUPTCY CASES HAVE BEEN COMMENCED, THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY ANY BANKRUPTCY COURT WITH RESPECT TO WHETHER IT CONTAINS ADEQUATE INFORMATION WITHIN THE MEANING OF SECTION 1125(a) OF THE BANKRUPTCY CODE. NONETHELESS, ONCE THE CHAPTER 11 CASES ARE COMMENCED, THE DEBTORS EXPECT TO PROMPTLY SEEK AN ORDER OF THE COURT APPROVING THIS DISCLOSURE STATEMENT PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE AND DETERMINING THAT THE SOLICITATION OF VOTES ON THE PLAN BY MEANS OF THIS DISCLOSURE STATEMENT SATISFIES SECTION 1125(g) OF THE BANKRUPTCY CODE.**

**THE DEBTORS BELIEVE THAT THE PLAN IS FAIR AND EQUITABLE, PROVIDES FOR A LARGER DISTRIBUTION TO THE DEBTORS' CREDITORS THAN WOULD OTHERWISE RESULT FROM LIQUIDATION UNDER CHAPTER 7 OF THE BANKRUPTCY CODE, AND MAXIMIZES THE VALUE OF THE DEBTORS' ESTATES.  AT THIS TIME, THE DEBTORS BELIEVE THIS IS THE BEST AVAILABLE ALTERNATIVE.  FOR THESE REASONS AND THE REASONS DESCRIBED HEREIN, THE DEBTORS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

B.      *The Plan*

The Plan provides for the reorganization of the Debtors as a going concern and the resolution of all Claims against and Interests in each of the 13 Debtors in the Chapter 11 Cases.  Among other things, the Plan also provides for the following recoveries and transactions:

1.      Purpose and Effect of the Plan

The Debtors will seek to reorganize under chapter 11 of the Bankruptcy Code, which is the principal business reorganization chapter of the Bankruptcy Code.  Under chapter 11 of the Bankruptcy Code, a debtor may reorganize its business for the benefit of its stakeholders.  The consummation of a plan of reorganization is the principal objective of a chapter 11 case.  A plan of reorganization sets forth how a debtor will treat Claims and equity Interests.  A bankruptcy court's confirmation of a plan of reorganization binds the debtor, any entity or person acquiring property under the plan, any creditor of or equity security holder in a debtor, and any other entities and persons to the extent ordered by the bankruptcy court pursuant to the terms of the confirmed plan, whether or not such entity or person is impaired pursuant to the plan, has voted to accept the plan or receives or retains any property under the plan.

The Bankruptcy Code authorizes a debtor to solicit votes for the acceptance of a plan of reorganization prior to the filing of a chapter 11 case through a so-called "prepackaged" plan of reorganization process. Because solicitation of acceptances takes place all or in part before the bankruptcy filing, the duration of the bankruptcy case is often less than in conventional bankruptcy cases. Prior to soliciting acceptances of the proposed plan, sections 1125(a) and 1126(b) of the Bankruptcy Code require the plan proponent to prepare and distribute a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment whether to accept or reject the plan. The Debtors are submitting this Disclosure Statement to, and soliciting votes from, the Holders of Claims against them in order to satisfy the requirements of sections 1125(g) and 1126(b) of the Bankruptcy Code.

Among other things (subject to certain limited exceptions and except as otherwise provided in the Plan or the Confirmation Order), the Confirmation Order will discharge the Debtors from any Claim arising before the Effective Date, terminate all of the rights and Interests of pre-bankruptcy equity security Holders and substitute the obligations set forth in the Plan for those pre-bankruptcy Claims and Interests.  Under the Plan, Claims and Interests are divided into Classes according to their relative priority and other criteria.  Each of the Debtors is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code.

The feasibility of the Plan is premised upon, among other things, the Debtors' ability to achieve the goals of their long-range business plan, make the distributions contemplated under the Plan, and pay certain continuing obligations in the ordinary course of the Reorganized Debtors' business.  The Debtors' financial projections are set forth on **Exhibit C**.  Although the Debtors believe the projections in **Exhibit C** are reasonable and appropriate, they include a number of assumptions and are subject to a number of risk factors and to significant uncertainty. Actual results will likely differ from the projections, and the differences may be material.

2.      Financial Restructurings under the Plan

As described more fully herein, as of April 21, 2016, the Debtors had outstanding funded debt in the aggregate principal amount of approximately $2.4 billion, consisting of: (a) $300 million of principal under the Dex East Facility (as defined below); (b) approximately $286 million of principal  under the Dex West Facility

(as defined below); (c) approximately $568 million of principal under the RHDI Facility (as defined below); (d) approximately $967 million of principal under the SuperMedia Facility (as defined below); and (e) approximately $270 million of principal under the Subordinated Notes (as defined below).  The Dex East Facility, the Dex West Facility, the RHDI Facility and the SuperMedia Facility are each governed by a separate Credit Agreement.

As more fully described in the Plan, Holders of Claims under the Dex East Facility will receive as part of their recovery their Pro Rata portion of 13.465456566 percent the Takeback First Lien Term Loans, Holders of Claims under the Dex West Facility will receive as part of their recovery their Pro Rata portion of 14.724949065 percent the Takeback First Lien Term Loans, Holders of Claims under the SuperMedia Facility will receive as part of their recovery their Pro Rata portion of 48.657158733 percent the Takeback First Lien Term Loans, and Holders of Claims under the RHDI Facility will receive as part of their recovery their Pro Rata portion of 23.152435636 percent the Takeback First Lien Term Loans.

The Takeback First Lien Term Loan will be a facility in the aggregate amount of $600 million. The material terms of the Takeback First Lien Term Loan are set forth in the Takeback First Lien Term Loan Credit Agreement Term Sheet attached as <u>Exhibit A</u> to the Plan, and the other terms and conditions of the Takeback First Lien Term Loan will be customary for deals of the type described in the Plan and the RSA and as are reasonably acceptable to the Debtors and certain of the Lenders (as more fully described in the RSA).  Consummation of the Plan and the financial restructurings contemplated thereby will therefore significantly de-lever the Debtors' capital structure. With a sustainable capital structure aligned with the Debtors' business plan, the Reorganized Debtors will be positioned to compete more effectively in their industry.

3.    <u>Recovery Analysis</u>

The Plan provides for a comprehensive restructuring of the Debtors' prepetition obligations, provides for additional liquidity by significantly reducing the Reorganized Debtors' debt service, preserves the going-concern value of the Debtors' business, and protects the jobs of employees.  After a careful review of their current operations, prospects as an ongoing business, financial projections, and estimated recoveries to creditors in a liquidation scenario, the Debtors have concluded that recoveries to the Debtors' stakeholders will be maximized by the Debtors' continued operation as a going concern.  The Debtors believe that their businesses and assets have significant value that would not be realized in a liquidation, either in whole or in substantial part, and that the value of the Debtors' estates is considerably greater as a going concern.  In developing the Plan, the Debtors gave due consideration to various exit alternatives and engaged in extensive discussions and negotiations with all their key stakeholders, including their Supporting Lenders, who, along with the other Term Loan Lenders and Holders of the Subordinated Notes, will be the primary economic stakeholders in the Reorganized Debtors under the Plan. The Debtors submit that the Plan provides for the highest and best recovery for their stakeholders under the circumstances.

4.    <u>Summary of Classification and Treatment of Claims and Interests</u>

All Claims and Interests, except for Administrative Claims, Accrued Professional Compensation Claims, and Priority Tax Claims, are classified in the Classes set forth in Article III of the Plan.  A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes.  A Claim or Interest also is classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The classification of Claims and Interests against each Debtor (as applicable) pursuant to the Plan is as set forth below.  The Plan shall apply as a separate Plan for each of the Debtors, and the classification of Claims and Interests set forth therein shall apply separately to each of the Debtors.[2]  All of the potential Classes for the Debtors

---

[2]    For the avoidance of doubt, and as more fully described in the Plan, the Credit Agreement Claims (including any deficiency Claims against Parent on account thereof) shall apply separately to each of the Debtors, as applicable, in accordance with the

are set forth in the Plan. Certain of the Debtors may not have Holders of Claims or Interests in a particular Class or Classes, and such Claims shall be treated as set forth in Article III.E of the Plan

**The table on the following page is a summary of the classification, treatment, impairment status, voting rights, and potential distributions both under the Plan and pursuant to a liquidation under chapter 7 of the Bankruptcy Code. The amounts set forth below are estimates only. Reference should be made to the entire Disclosure Statement and the Plan for a complete description of the classification and treatment of Claims and Interests. Reference should also be made to the provisions of the Plan, including Article VII thereof, regarding the process for resolving Disputed Claims. The recoveries set forth below are projected recoveries and are therefore subject to change.**

---

Dex East Credit Documents, Dex West Credit Documents, RHDI Credit Documents, and SuperMedia Credit Documents, as applicable.

| Class | Applicable Entities | Claim | Status | Voting Rights | Estimated Range of Recovery Under Plan | Estimated Range of Recovery Under Chapter 7 |
|-------|--------------------|-------|--------|---------------|----------------------------------------|---------------------------------------------|
| 1 | Debtors | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) | 100% | 0% |
| 2 | Debtors | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) | 100% | 100% |
| 3-6 | Debtors | Credit Agreement Claims | Impaired | Entitled to Vote | 73-82% | Variable[4] |
| 7 | Parent | Subordinated Notes Claims | Impaired | Entitled to Vote | 4-6%[5] | 0% |
| 8 | Debtors | General Unsecured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) | 100% | 0% |
| 9 | Debtors | Claims Relating to the Purchase and/or Sale of Debt and Securities | Impaired | Not Entitled to Vote (Deemed to Reject) | 0% | 0% |
| 10 | Debtors | Intercompany Claims | Unimpaired/ Impaired | Not Entitled to Vote (Presumed to Accept/ Deemed to Reject) | 0-100% | 0% |
| 11 | Subsidiary Debtors | Intercompany Interests | Unimpaired/ Impaired | Not Entitled to Vote (Presumed to Accept/ Deemed to Reject) | 0-100% | 0% |
| 12 | Parent | Interests in Parent | Impaired | Not Entitled to Vote (Deemed to Reject) | 0% | 0% |

---

[4]   Estimated ranges of recovery under chapter 7 for Holders of Credit Agreement Claims include approximately 22 percent for Holders of Dex East Credit Facility Claims, approximately 21 percent for Holders of Dex West Credit Facility Claims, approximately 13 percent for Holders of RHDI Credit Facility Claims, and approximately 24 percent for Holders of SuperMedia Credit Facility Claims.

[5]   Estimated range of recovery for Holders of Subordinated Notes Claims assumes a range of $6.2-$13.3 million for the value of the Warrants.

(a)    Class 1 – Other Priority Claims

    (i)    *Classification*:  Class 1 consists of Other Priority Claims.

    (ii)    *Treatment*:  Except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Other Priority Claim, each such Holder shall receive payment in full, in cash, of the unpaid portion of its Other Priority Claim on the Effective Date or as soon thereafter as reasonably practicable (or, if payment is not then due, shall be paid in accordance with its terms in the ordinary course) or pursuant to such other terms as may be agreed to by the Holder of an Other Priority Claim and the Debtors.

    (iii)    *Voting*:  Class 1 is Unimpaired under the Plan.  Each Holder of an Other Priority Claim will be conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, each Holder of an Other Priority Claim will not be entitled to vote to accept or reject the Plan.

(b)    Class 2 – Other Secured Claims

    (i)    *Classification*:  Class 2 consists of Other Secured Claims.

    (ii)    *Treatment*:  On the Effective Date, except to the extent that a Holder of an Other Secured Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Other Secured Claim, each such Holder shall receive either (i) payment in full in cash of the unpaid portion of its Other Secured Claim on the Effective Date or as soon thereafter as reasonably practicable (or if payment is not then due, shall be paid in accordance with its terms in the ordinary course), (ii) reinstatement pursuant to section 1124 of the Bankruptcy Code, (iii) the collateral securing such Holder's Allowed Other Secured Claim, or (iv) such other recovery necessary to satisfy section 1129 of the Bankruptcy Code.

    (iii)    *Voting*:  Class 2 is Unimpaired under the Plan.  Each Holder of an Other Secured Claim will be conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, each Holder of an Other Secured Claim will not be entitled to vote to accept or reject the Plan.

(c)    Class 3 - Dex East Credit Facility Claims

    (i)    *Classification*:  Class 3 consists of all Dex East Credit Facility Claims.

    (ii)    *Allowance*:  The Dex East Credit Facility Claims shall be Allowed in the aggregate amount not less than $300,419,117.58, plus accrued but unpaid interest and fees through the Petition Date to the extent legally permissible and shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, crossclaims, defenses, disallowance, impairment, objection, or any other challenges under any applicable law or regulation by any person or entity.

    (iii)    *Treatment*:  On the Effective Date, or as soon thereafter as reasonably practicable, except to the extent that a Holder of a Dex East Credit Facility Claim agrees to less favorable treatment, in full and final satisfaction,

compromise, settlement, release, and discharge of and in exchange for each Allowed Dex East Credit Facility Claim, each Holder of a Dex East Credit Facility Claim shall receive its Pro Rata share of:

(A)    14.965456566 percent of the New Common Stock (subject to (x) dilution for the Warrants and issuances under the Management Incentive Plan and (y) such Holder's exercise of the Equity Put Option);

(B)    13.465456566 percent of the loans arising under the Takeback First Lien Term Loan (subject to such Holder's exercise of the Equity Put Option); and

(C)    100 percent of the remaining Cash balance in Dex East (after deducting (x) intercompany payables, if any, to Dex One Service, Inc. as of the Effective Date, (y) the Dex East Minimum Operating Cash Contribution, and (z) the Dex East Closing Expenses).

(iv)    *Voting*: Class 3 is Impaired under the Plan. Each Holder of a Dex East Credit Facility Claim will be entitled to vote to accept or reject the Plan.

(d)    Class 4 - Dex West Credit Facility Claims

(i)    *Classification*: Class 4 consists of all Dex West Credit Facility Claims.

(ii)    *Allowance*: The Dex West Credit Facility Claims shall be Allowed in the aggregate amount not less than $274,507,025.17, plus accrued but unpaid interest and fees through the Petition Date to the extent legally permissible and shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, crossclaims, defenses, disallowance, impairment, objection, or any other challenges under any applicable law or regulation by any person or entity.

(iii)    *Treatment*: On the Effective Date, or as soon thereafter as reasonably practicable, except to the extent that a Holder of a Dex West Credit Facility Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed Dex West Credit Facility Claim, each Holder of a Dex West Credit Facility Claim shall receive its Pro Rata share of:

(A)    18.024949065 percent of the New Common Stock (subject to (x) dilution for the Warrants and issuances under the Management Incentive Plan and (y) such Holder's exercise of the Equity Put Option);

(B)    14.724949065 percent of the loans arising under the Takeback First Lien Term Loan (subject to such Holder's exercise of the Equity Put Option); and

(C)    100 percent of the remaining Cash balance in Dex West (after deducting (x) intercompany payables, if any, to Dex One Service, Inc. as of the Effective Date, (y) the Dex West Minimum

9

Operating Cash Contribution, and (z) the Dex West Closing Expenses).

    (iv)    *Voting*: Class 4 is Impaired under the Plan. Each Holder of a Dex West Credit Facility Claim will be entitled to vote to accept or reject the Plan.

(e)    Class 5 - RHDI Credit Facility Claims

    (i)    *Classification*: Class 5 consists of all RHDI Credit Facility Claims.

    (ii)    *Allowance*: The RHDI Credit Facility Claims shall be Allowed in the aggregate amount not less than $ 567,690,116.17, plus accrued but unpaid interest and fees through the Petition Date to the extent legally permissible and shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, crossclaims, defenses, disallowance, impairment, objection, or any other challenges under any applicable law or regulation by any person or entity.

    (iii)    *Treatment*:    On the Effective Date, or as soon thereafter as reasonably practicable, except to the extent that a Holder of a RHDI Credit Facility Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed RHDI Credit Facility Claim, each Holder of a RHDI Credit Facility Claim shall receive its Pro Rata share of:

        (A)    21.652435636 percent of the New Common Stock (subject to (x) dilution for the Warrants and issuances under the Management Incentive Plan and (y) such Holder's exercise of the Equity Put Option);

        (B)    23.152435636 percent of the loans arising under the Takeback First Lien Term Loan (subject to such Holder's exercise of the Equity Put Option); and

        (C)    100 percent of the remaining Cash balance in RHDI (after deducting (x) intercompany payables, if any, to Dex One Service, Inc. as of the Effective Date, (y) the RHDI Minimum Operating Cash Contribution, and (z) the RHDI Closing Expenses).

    (iv)    *Voting*: Class 5 is Impaired under the Plan. Each Holder of a RHDI Credit Facility Claim will be entitled to vote to accept or reject the Plan.

(f)    Class 6 - SuperMedia Credit Facility Claims

    (i)    *Classification*: Class 6 consists of all SuperMedia Credit Facility Claims.

    (ii)    *Allowance*: The SuperMedia Credit Facility Claims shall be Allowed in the aggregate amount not less than $966,784,000.15, plus accrued but unpaid interest and fees through the Petition Date to the extent legally permissible and shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, crossclaims, defenses, disallowance, impairment, objection, or any other challenges under any applicable law or regulation by any person or entity.

(iii)   *Treatment*:   On the Effective Date, or as soon thereafter as reasonably practicable, except to the extent that a Holder of a SuperMedia Credit Facility Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed SuperMedia Credit Facility Claim, each Holder of a SuperMedia Credit Facility Claim shall receive its Pro Rata share of:

    (A)   45.357158733 percent of the New Common Stock (subject to (x) dilution for the Warrants and issuances under the Management Incentive Plan and (y) such Holder's exercise of the Equity Put Option);

    (B)   48.657158733 percent of the loans arising under the Takeback First Lien Term Loan (subject to such Holder's exercise of the Equity Put Option); and

    (C)   100 percent of the remaining Cash balance in SuperMedia (after deducting (x) intercompany payables, if any, to Dex One Service, Inc. as of the Effective Date, (y) the SuperMedia Minimum Operating Cash Contribution, and (z) the SuperMedia Closing Expenses).

(iv)   *Voting*:   Class 6 is Impaired under the Plan.   Each Holder of a SuperMedia Credit Facility Claim will be entitled to vote to accept or reject the Plan.

(g)   Class 7 - Subordinated Notes Claims

(i)   *Classification*:   Class 7 consists of all Subordinated Notes Claims.

(ii)   *Allowance*:   The Subordinated Notes Claims shall be Allowed in the aggregate amount equal to $270,000,000.00, plus accrued but unpaid interest as of the Petition Date.

(iii)   *Treatment*:   On the Effective Date, or as soon thereafter as reasonably practicable, except to the extent that a Holder of a Subordinated Notes Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed Subordinated Notes Claim, each Holder of a Subordinated Notes Claim shall receive its Pro Rata Share of:

    (A)   $5 million in Cash; and

    (B)   the Warrants.

(iv)   *Voting*:   Class 7 is Impaired under the Plan.   Each Holder of a Subordinated Notes Claim that is an Accredited Investor will be entitled to vote to accept or reject the Plan.

(h)   Class 8 - General Unsecured Claims

(i)   *Classification*:   Class 8 consists of all General Unsecured Claims.

(ii)   *Treatment*:   On the Effective Date, or as soon thereafter as reasonably practicable (or, if a General Unsecured Claim is not an Allowed Claim on the Effective Date, on the date that such Claim becomes Allowed or as soon as

reasonably practicable thereafter), except to the extent that a Holder of an Allowed General Unsecured Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive Cash in an amount equal to such Allowed General Unsecured Claim on the later of the Effective Date or in the ordinary course of business with the terms and conditions of the particular transaction giving rise to such Allowed General Unsecured Claim.

(iii)     *Voting*:  Class 8 is Unimpaired under the Plan.  Each Holder of a General Unsecured Claim will be conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, each Holder of a General Unsecured Claim will not be entitled to vote to accept or reject the Plan.

(i)     Class 9 - Claims Relating to the Purchase and/or Sale of Debt and Securities

(i)     *Classification*:  Class 9 consists of all Claims Relating to the Purchase and/or Sale of Debt and Securities.

(ii)     *Allowance*:  Notwithstanding anything to the contrary herein, a Claim Relating to the Purchase and/or Sale of Debt and Securities, if any such Claim exists, may only become Allowed by Final Order of the Court.  The Debtors are not aware of any valid Claims Relating to the Purchase and/or Sale of Debt and Securities and believe that no such Claims Relating to the Purchase and/or Sale of Debt and Securities exist.

(iii)     *Treatment*:  On the Effective Date, each Claim Relating to the Purchase and/or Sale of Debt and Securities shall be cancelled without any distribution and such Holders of Claims Relating to the Purchase and/or Sale of Debt and Securities will receive no recovery.

(iv)     *Voting*:  Class 9 is Impaired under the Plan.  Each Holder of a Claim Relating to the Purchase and/or Sale of Debt and Securities will be conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, each Holder of a Claim Relating to the Purchase and/or Sale of Debt and Securities will not be entitled to vote to accept or reject the Plan.

(j)     Class 10 - Intercompany Claims

(i)     *Classification*:  Class 10 consists of all Intercompany Claims.

(ii)     *Treatment*: Intercompany Claims may be Reinstated as of the Effective Date or, at the Debtors' or the Reorganized Debtors' option, be cancelled, and no distribution shall be made on account of such Claims.

(iii)     *Voting*:  Holders of Intercompany Claims are either Unimpaired, and such Holders of Intercompany Claims conclusively are presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, or Impaired, and such Holders of Intercompany Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, each Holder of an Intercompany Claim will not be entitled to vote to accept or reject the Plan.

(k)     Class 11 - Intercompany Interests

(i)     *Classification*:  Class 11 consists of all Intercompany Interests.

(ii)    *Treatment*:  Intercompany Interests may be Reinstated as of the Effective Date or, at the Debtors' or the Reorganized Debtors' option, be cancelled, and no distribution shall be made on account of such Interests.

(iii)   *Voting*:  Holders of Intercompany Interests are either Unimpaired, and such Holders of Intercompany Interests conclusively are presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, or Impaired, and such Holders of Intercompany Interests are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, each Holder of an Intercompany Interest will not be entitled to vote to accept or reject the Plan.

(l)     Class 12 - Interests in Parent

(i)     *Classification*:  Class 12 consists of all Interests in Parent.

(ii)    *Treatment*:  On the Effective Date, existing Interests in Parent shall be deemed canceled and extinguished, and shall be of no further force and effect, whether surrendered for cancelation or otherwise, and there shall be no distribution to Holders of Interests in Parent on account of such Interests.

(iii)   *Voting*:  Class 12 is Impaired under the Plan.  Each Holder of an Interest in Parent will be conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, each Holder of an Interest in Parent will not be entitled to vote to accept or reject the Plan.

5.   The Releases

In accordance with the RSA, the Plan contains a series of releases that are part of the overall settlement of various potential claims and interests.  In that respect, parties should be aware that, if the Plan is confirmed, they may be receiving and giving releases as set forth in Article VIII of the Plan and Article IV of this Disclosure Statement.

In particular, the Plan provides that certain parties, including Holders of Claims entitled to vote to accept or reject the Plan that do not affirmatively opt out of the third party release provided by Article VIII.F of the Plan pursuant to a duly executed Ballot (according to the instructions provided on such Ballot, herein, and in the Plan), shall grant releases to:  (a) the Debtors; (b) the Reorganized Debtors; (c) the Credit Agreement Agents; (d) the Term Loan Lenders who vote to accept the Plan; (e) the SC Members that vote to accept the Plan; (f) the Backstop Parties who vote to accept the Plan; (g) the Supporting Lenders; (h) the Non-Debtor Subsidiaries; (i) Holders of Subordinated Notes Claims who vote to accept the Plan; (j) with respect to each of the foregoing Entities in clauses (a) through (i), such Entity's respective predecessors, successors and assigns, current and former stockholders, members, limited partners, general partners, equity holders, Affiliates and its and their subsidiaries, principals, partners, parents, equity holders, members, employees, agents, officers, directors, managers, trustees, professionals, representatives, advisors, attorneys, financial advisors, accountants, investment bankers, and consultants; and (k) the DTC.  However,  the releases set forth in Article VIII.F do not release any Claims against any professional related to the Prior Tax Calculation; *provided* that, for the avoidance of doubt, the foregoing shall have no effect on any Claims released or enjoined as part of any prior chapter 11 cases (or the relevant confirmation orders therein) of the Debtors or any of the Debtors' predecessors or affiliates.

As a condition to receiving or enforcing any release granted pursuant to Article VIII.E or Article VIII.F of the Plan, each Released Party and its Affiliates shall release or be deemed to have released the Estates and the

Debtors for any and all Claims or Causes of Action arising from or related to their relationship with the Debtors, but not, for the avoidance of doubt, Accrued Professional Compensation Claims.

As described more fully on the applicable Ballots, Holders who are entitled to vote on the Plan may opt out of the third party release provided in Article VIII.F of the Plan by (a) checking the box on the Ballot and (b) voting to reject the Plan or abstaining. If a Holder votes to accept the Plan, such Holder will be deemed to consent to the third party release, even if such Holder elects to opt out of the third party release. The election to withhold consent to grant such release is at such Holder's option. Likewise, any such Holder that votes to accept or reject the Plan and submits a Ballot without checking the box to opt out of the third party release will be deemed to consent to the third party release.

Accordingly, the Debtors urge Holders permitted to vote on the Plan to thoroughly and carefully read their Ballots, including their right to opt out of the third party release. The Debtors believe the third party release is entirely consensual under the established case law in the United States Bankruptcy Court for the District of Delaware. *See Indianapolis Downs, LLC*, 486 B.R. 286, 304–06 (Bankr. D. Del. 2013). The Debtors will be prepared to meet their burden to establish the basis for the releases, exculpations, and injunctions provided by the Plan as part of Confirmation of the Plan.

6.      The Warrants

As described more fully in the Plan and the RSA, Holders of Claims in Class 7 will receive the Warrants as a portion of the treatment of their Claims. Upon the exercise of the Warrants, holders of the Warrants will be entitled to receive their Pro Rata share of up to 10 percent of the New Common Stock outstanding on the Effective Date, calculated on a fully-diluted basis assuming full exercise of the Warrants and that all Holders of Claims in Class 7 receive Warrants, subject to dilution on account of the management incentive plan described in the RSA. The exercise price for each share of New Common Stock underlying the Warrants will be set on the Effective Date to an amount equal to (x) (A) the aggregate Claim amount of the Credit Agreements, minus (B) the cash distributions made to the Holders of Credit Agreement Claims under the Plan minus (C) the aggregate initial principal amount of the loans under the Takeback First Lien Term Loan (if any) distributed to the Holders of Credit Agreement Claims under the Plan minus (D) any other distributions or consideration other than New Common Stock provided to Holders of Credit Agreement Claims under the Plan, but specifically excluding any reimbursement for costs and expenses incurred in connection with the restructuring of the Company and its subsidiaries, divided by (y) the aggregate number of shares of New Common Stock issued to the holders of Credit Agreements under the Plan on the Effective Date.

The Warrants will provide for a cashless exercise option only in connection with, and at the price implied by, a sale of Parent. The Warrants are exercisable, in whole or in part, at any time on or prior to the seventh anniversary of the Effective Date and have the benefit of anti-dilution protection that adjusts the number of shares of New Common Stock purchasable upon exercise of the Warrants for stock splits, stock dividends, reverse stock splits, or re-combinations and similar transactions. In order to prevent the Reorganized Debtors from becoming subject to SEC reporting requirements, the New Stockholders Agreement may impose certain trading restrictions, and the New Common Stock and Warrants will be subject to certain transfer and other restrictions pursuant to the New Stockholders Agreement designed to maintain the Reorganized Debtors as private, non-reporting companies. For more information on the Warrants, Holders should reference Exhibit B of the RSA. In addition, under certain circumstances described in detail in Article IV.B.2 of the Plan, the Debtors, with the prior consent of the Required Silo-Level Supporting Lenders, may distribute Cash to certain Holders in lieu of Warrants. Such Cash distribution will be calculated as if the Warrants have an implied value of approximately $31 per $1,000 of Subordinated Notes Claims.

7.      Equity Put Option

In accordance with the RSA, Article VI.C of the Plan also provides for an option sponsored by one or more affiliates of Mudrick Capital Management, LP (collectively, "Mudrick") whereby any Holder of Credit Agreement Claims may elect to receive in lieu of all or any portion of the New Common Stock to which such Holder is entitled, the Takeback First Lien Term Loans that would otherwise be distributable to Mudrick in an aggregate principal amount per share of New Common Stock based on a total equity valuation of the Reorganized Debtors of

$50 million, as more fully described herein and in the Backstop Agreement attached to the Plan as Exhibit E. As of the Petition Date, the equity valuation in the Backstop Agreement is $50 million, subject to amendment pursuant to the terms of the Backstop Agreement. The obligation of Mudrick to participate in the put option is governed by a Backstop Agreement.

Pursuant to the Backstop Agreement, this option, however, is subject to the satisfaction (or waiver by Mudrick) of each of the following conditions (as more fully described in the Backstop Agreement): (i) for the fiscal year of 2015, Parent has or, if not yet determinable, is reasonably expected to have, annual EBITDA of not less than $525 million, (ii) Parent shall not have revised downward earnings guidance for 2016 or later relative to that which has been disclosed to Mudrick as of the execution of the RSA, and (iii) there has been no material adverse change in the business of the Debtors. In addition, the Backstop Agreement may be terminated in accordance with the terms set forth therein.

Holders of Credit Agreement Claims wishing to participate in the Equity Put Options will have to make an election on their ballot and indicate the percentage of their New Common Stock they wish to exchange for additional Takeback First Lien Term Loans. Once made, the election to participate in the Equity Put Option is irrevocable and shall be binding on any transferees of Credit Agreement Claims.

Holders of Claims in Classes 3, 4, 5, and 6 should carefully read the Backstop Agreement and the Plan, including Article VI.C thereof, carefully in order to make an election with respect to the option described therein.

8. New Stockholders Agreement

Each recipient of the New Common Stock on the Effective Date (a "Stockholder") shall be deemed to be a party to, and bound by, the New Stockholders Agreement regardless of whether such Holder has executed a signature page thereto. The terms and conditions of the New Stockholders Agreement are described in the Stockholders Agreement Term Sheet (the "Stockholders Term Sheet"), which is attached to the Plan as Exhibit B. Pursuant to the New Stockholders Agreement, the board of directors of Reorganized Parent (the "New Board") will consist of a minimum of seven directors, with a possible maximum of eleven directors.

As more fully described in the Stockholders Term Sheet, the New Board shall be constituted as follows: (a) the Chief Executive Officer of Reorganized Parent will serve as a director; (b) each Stockholder that holds, together with its affiliates, 10 percent or more of the New Common Stock (each such Stockholder, and "Appointing Stockholder") will be entitled to appoint one person to serve as director to the New Board for each 10 percent of the New Common Stock owned (rounded down to the nearest 10 percent); (c) Stockholders who are not Appointing Stockholders holding a majority of the New Common Stock held by all such Stockholders will have the right to elect one person to serve as a director to the New Board (the "Minority Director"); and (d) to the extent that, following the election to the New Board of the persons previously described, there are remaining vacancies, then the holders of a majority of the outstanding Voting Shares (as defined in the Stockholders Term Sheet) will have the right to appoint the remaining directors. If an Appointing Stockholder holds between 40 percent and 50 percent of the New Common Stock, it may either elect to increase the New Board to nine directors or limit the number of directors it appoints to three.

Based on current holdings of the Credit Agreement Claims (and without giving effect to the Equity Put Option), it is anticipated that Mudrick will be able to appoint three (3) directors to the New Board on the Effective Date, and affiliates of Paulson & Co. Inc. will be able to appoint one (1) director to the New Board on the Effective Date.

As described in the Stockholders Term Sheet, the transfer of New Common Stock will also be subject to certain tag, drag, and preemptive rights, as well as subject to restrictions on transfers to competitors and transfers that cause Reorganized Parent to become a public reporting company or will result in an event of default under the Takeback First Lien Term Loan Credit Agreement.

9.    Further Information about the Plan

Confirmation and Consummation of the Plan are subject to certain material conditions precedent described in Article IX of the Plan.  There is no assurance that the Plan will be confirmed or, if confirmed, that such material conditions precedent will be satisfied or waived.

You are encouraged to read this Disclosure Statement in its entirety, including the Plan (which is expressly incorporated into and made a part of this Disclosure Statement) and Article VII herein entitled "Certain Risk Factors to Be Considered Prior to Voting" prior to submitting your Ballot to vote to accept or reject the Plan.  The Debtors urge you to consult with your own advisors with respect to any legal, financial, securities, tax, or business advice in reviewing this Disclosure Statement, the Plan, and each of the transactions contemplated thereby.

The Debtors will File the Plan Supplement with the Court no later than seven days prior to the Confirmation Hearing.  The Plan Supplement will include documents and forms of documents, schedules, and exhibits to the Plan, each of which shall be in form and substance acceptable to the Debtors and the Required Supporting Lenders, including the following, as applicable:  (a) New Organizational Documents; (b) the Warrant Agreement; (c) a chart detailing the Reorganized Debtors' corporate structure and a summary of steps necessary to effectuate such corporate structure; (d) Schedule of Rejected Executory Contracts and Unexpired Leases; (e) a list of retained Causes of Action; (f) Management Incentive Plan; (g) a document listing the members of the New Boards; (h) the New Stockholders Agreement; and (i) the material Takeback First Lien Term Loan Documents.  The Debtors shall have the right to amend the documents contained in, and exhibits to, the Plan Supplement through the Effective Date on terms acceptable to the Required Supporting Lenders.

Assuming the requisite acceptances to the Plan are obtained, the Debtors will seek the Court's approval of the Plan.  If the Plan is confirmed by the Court and Consummation occurs, all Holders of Claims and Interests (including those Holders of Claims or Interests that do not submit Ballots to accept or reject the Plan, or that are not entitled to vote on the Plan) will be bound by the terms of the Plan and the proposed transactions contemplated thereby.

The Plan and all documents to be executed and/or delivered in connection with the Consummation of the Plan, including the documents to be included in the Plan Supplement, are subject to revision and modification from time to time prior to the Effective Date (subject to the terms of the Plan).

C.    *Voting Procedures and Requirements*

The Debtors will seek to obtain Court approval of the Plan.  Section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of a chapter 11 plan.  This Disclosure Statement includes, without limitation, information about:

- the classification and treatment of Claims and Interests under the Plan, including who is entitled to vote and how to vote on the Plan (Articles I and IV hereof);

- the Debtors' corporate history and corporate structure, business operations, and prepetition capital structure and indebtedness (Article II hereof);

- events leading to the Chapter 11 Cases, including the Debtors' prepetition restructuring negotiations and entry into the RSA (Article III hereof);

- certain important effects of Confirmation of the Plan (Articles IV and VI hereof);

- releases contemplated by the Plan that are integral to the overall settlement of Claims and Interests pursuant to the Plan (Article IV hereof);

- certain financial information about the Debtors, including financial projections and liquidation and valuation analyses (Article V hereof and **Exhibits C, D, and E** attached hereto);

- the statutory requirements for confirming the Plan (Article VI hereof);

- certain risk factors Holders of Claims should consider before voting to accept or reject and the Plan and information regarding alternatives to Confirmation of the Plan (Article VII hereof);

- certain important disclosures regarding securities laws (Article VIII hereof); and

- certain United States federal income tax consequences of the Plan (Article IX hereof).

In light of the foregoing, the Debtors believe the Disclosure Statement contains "adequate information" to enable a hypothetical reasonable investor to make an informed judgment about the Plan and complies with all aspects of section 1125 of the Bankruptcy Code.

1. Classes Entitled to Vote on the Plan

Your ability to vote and your distribution, if any, depend on what kind of Claim or Interest that you hold. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Accrued Professional Compensation Claims, and Priority Tax Claims have not been classified. The remainder of Claims and Interests are classified into the Classes as described in the table above.

Only Holders of Claims included in one of the Classes entitled to vote to accept or reject the Plan will receive a Solicitation Package (as defined herein) from the Debtors' Notice and Claims Agent, Epiq Bankruptcy Solutions, LLC. For more information about the treatment of Claims and Interests, see Article I.B.4 herein entitled "Summary of Classification and Treatment of Claims and Interests."

Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan. After Confirmation of the Plan, there are conditions (described in Article IX of the Plan) that need to be satisfied or waived so that the Plan can be Consummated and become effective. References to the Effective Date mean the date that all conditions to the Plan have been satisfied or waived, at which point the Plan may be "consummated." Distributions only will be made after Consummation of the Plan and will be made only to Holders on account of Claims that are or become Allowed. See Article VI herein entitled "Statutory Requirements for Confirmation of the Plan," for a discussion of the conditions to Consummation.

2. Solicitation Procedures

The following materials constitute the solicitation package (the "Solicitation Package") distributed to Holders of Claims in the voting Classes:

- the appropriate Ballot and applicable voting instructions, together with a pre-addressed, postage pre-paid return envelope; and

- this Disclosure Statement and all exhibits hereto, including the Plan and all exhibits thereto.

The Solicitation Package (other than Ballots) may also be obtained by contacting the Notice and Claims Agent by telephone at 646-282-2500 and asking for the Solicitation Group, by e-mail at tabulation@epiqsystems.com and reference "DEX" in the subject line, or by writing to Dex Ballot Processing, c/o Epiq Corporate Restructuring, 777 Third Avenue, 12th Floor, New York, NY 10017. When the Debtors file the Chapter 11 Cases, you may also obtain copies of any pleadings filed with the Court for free by visiting from the Debtors' restructuring website at http://dm.epiq11.com/DexMedia, or for a fee via PACER at http://deb.uscourts.gov.

3. Voting Procedures

April 28, 2016, (the "Voting Record Date"), is the date that was used for determining which holders of Claims are entitled to vote to accept or reject the Plan and receive the Solicitation Package in accordance with the solicitation procedures. Except as otherwise set forth herein, the Voting Record Date and all of the Debtors' solicitation and voting procedures shall apply to all of the Debtors' creditors and other parties in interest.

The Debtors are distributing this Disclosure Statement, accompanied by a Ballot to be used for voting to accept or reject the Plan, to the Holders of Claims entitled to vote to accept or reject the Plan.  If you are a Holder of a Claim in Classes 3, 4, 5, 6, or 7, you may vote to accept or reject the Plan by completing the Ballot and returning it in the envelopes provided.

The Debtors have engaged Epiq Bankruptcy Solutions, LLC to serve as the Notice and Claims Agent. The Notice and Claims Agent is available to answer questions, provide additional copies of all materials, oversee the voting process, and process and tabulate Ballots for each class entitled to vote to accept or reject the Plan.

---

### BALLOTS

**Ballots must be actually received by the Notice and Claims Agent by the applicable Voting Deadline, which is <u>May 16, 2016 at 4:00 p.m.</u>, (prevailing Eastern Time) with respect to <u>Classes 3, 4, 5, and 6</u>, and <u>May 30, 2016 at 4:00 p.m.</u>, (prevailing Eastern Time) with respect to <u>Class 7</u>**

**Ballots must be returned (i) in the pre-paid, pre-addressed return envelope included with the Solicitation Package, (ii) via first class mail, overnight courier, or hand delivery to the address set forth below, or (iii) via email (attaching a scanned pdf of the fully executed ballot) to tabulation@epiqsystems.com and reference "DEX" in the subject line.**

**<u>PLEASE CHOOSE ONLY ONE METHOD TO RETURN YOUR BALLOT.</u>**

**DEX BALLOT PROCESSING**
**C/O EPIQ CORPORATE RESTRUCTURING**
**777 THIRD AVENUE, 12TH FLOOR**
**NEW YORK, NY 10017**

**EMAIL: TABULATION@EPIQSYSTEMS.COM**
**and reference "DEX" in the subject line**

---

**If you have any questions on the procedure for voting on the Plan, please call the Notice and Claims Agent at:**

**+1 (646) 282 2500 (ask for Solicitation Group)**

---

More detailed instructions regarding how to vote on the Plan are contained on the Ballots distributed to Holders of Claims that are entitled to vote to accept or reject the Plan.  If you are eligible to vote, for your vote to be counted, your Ballot must be completed, signed, and received by the applicable Voting Deadline; *provided, however*, that Ballots received by the Notice and Claims Agent after the applicable Voting Deadline may be counted only if the Debtors have granted in writing an extension of the applicable Voting Deadline prior to the applicable Voting Deadline with respect to such Ballot.

Any Ballot that is properly executed by the Holder of a Claim, but that does not clearly indicate an acceptance or rejection of the Plan or that indicates both an acceptance and a rejection of the Plan for all Claims of one Class, will not be counted.  Ballots received by facsimile will not be counted.

Each Holder of a Claim entitled to vote to accept or reject the Plan may cast only one Ballot for each Claim held by such Holder.  By signing and returning a Ballot, each Holder of a Claim in Classes 3, 4, 5, 6, and/or 7 will certify to the Court and the Debtors that no other Ballots with respect to such Claim have been cast or, if any other Ballots have been cast with respect to such Claim, such earlier Ballots are superseded and revoked.

If a holder of a Claim transfers all of such Claim to one or more parties on or after the Voting Record Date and before the holder has cast its vote on the Plan, such Claim holder is automatically deemed to have provided a voting proxy to the purchaser(s) of the holder's Claim, and such purchaser(s) shall be deemed to be the holder(s)

18

thereof as of the Voting Record Date for purposes of voting on the Plan, provided that the transfer complies with the applicable requirements under the RSA, if applicable.

All Ballots are accompanied by return envelopes. It is important to follow the specific instructions provided on each Ballot, as failing to do so may result in your Ballot not being counted.

**IF A BALLOT IS RECEIVED AFTER THE APPLICABLE VOTING DEADLINE, IT WILL NOT BE COUNTED UNLESS THE DEBTORS DETERMINE OTHERWISE.**

**IT IS IMPORTANT THAT THE HOLDER OF A CLAIM IN THE VOTING CLASSES FOLLOW THE SPECIFIC INSTRUCTIONS PROVIDED ON SUCH HOLDER'S BALLOT AND THE ACCOMPANYING INSTRUCTIONS.**

## ARTICLE II.
## BACKGROUND TO THE CHAPTER 11 CASES

A.    *The Debtors' History and Business*

    1.    The Debtors' Corporate History and Organizational Structure

As discussed above, the Debtors are the result of the merger between Dex One and SuperMedia that was consummated through a chapter 11 process in April 2013.

Dex One had its roots in the iconic R.H. Donnelly Company publishing company that was founded in 1886 and was first incorporated in 1917. The R.H. Donnelley Corporation was the first company to print what is commonly known as the "yellow pages"—classified directories of business listings in alphabetized sections. In 1961, Dun & Bradstreet Corporation and R.H. Donnelley Company merged, with R.H. Donnelley Company becoming a wholly owned subsidiary of Dun & Bradstreet Corporation and, in 1973, a Delaware corporation. In November 1996, Dun & Bradstreet Corporation split into three separate public companies: The Dun & Bradstreet Corporation, ACNielsen Corporation, and Cognizant Corporation. Subsequently, in June 1998, the Dun & Bradstreet Corporation separated into two separate public companies: R.H. Donnelley Corporation (formerly the Dun & Bradstreet Corporation) and a new company that changed its name to the Dun & Bradstreet Corporation. In May of 2009, R.H. Donnelley Corporation, facing declining revenues, commenced chapter 11 cases to eliminate approximately $6.4 billion of indebtedness and, on January 29, 2010, the company successfully emerged as Dex One Corporation.

SuperMedia, Inc.'s predecessor companies began publishing directories as part of the "Bell System" under AT&T Corp. In 1936, GTE Corp. was founded and shortly thereafter began publishing directories. In 1984, the local exchange businesses (including the directory operations) of AT&T Corp. were reorganized into seven "regional bell operating companies," which were spun off as independent companies. Two of those companies, NYNEX Corp. and Bell Atlantic Corp., combined their business when Bell Atlantic Corp. acquired NYNEX Corp. in 1997. The combined directory operations of NYNEX Corp., Bell Atlantic Corp., and GTE Corp. began doing business as Verizon Directories Corp. after GTE Corp. became a wholly owned subsidiary of Bell Atlantic Corp. (which was renamed Verizon Communications Inc.) in 2000. In 2006, Verizon spun off its domestic directory business and transferred its domestic print and digital yellow pages directory publishing to a new company, Idearc Inc. On March 31, 2009, Idearc Inc. commenced chapter 11 cases to eliminate approximately $6.25 billion in indebtedness and, on December 31, 2009, the company successfully emerged and subsequently changed its name to SuperMedia Inc.

Although Dex One and SuperMedia emerged from their respective bankruptcies in substantially stronger financial positions, the companies continued to explore operational and strategic initiatives to improve their businesses due to the challenges facing the print directory sector, including increased market concentration, customers' shifts to digital information sources, and the highly competitive nature of the industry. In late 2011, Dex One and SuperMedia began discussions regarding a transaction that would allow them to pursue their operational initiatives while improving their ability to pay down their indebtedness.

On December 5, 2012, Dex One and SuperMedia entered into an Amended and Restated Agreement and Plan of Merger, which contemplated either an in-court or out-of-court merger between the two companies and extension of the companies' secured debt maturities. Because neither Dex One nor SuperMedia was able to obtain the requisite consents to complete the transaction out of court, each of the companies and all of their domestic subsidiaries voluntarily commenced prepackaged chapter 11 cases on March 18, 2013. On April 30, 2013, the two companies consummated the transaction and successfully emerged from bankruptcy as the Debtors.

SuperMedia, LLC's ("SMLLC") prior chapter 11 case, No. 13-10546, remains open for the sole purpose of resolving a dispute between SMLLC and Yellow Pages Photos, Inc. ("YPPI"). On January 12, 2015, SuperMedia commenced an adversary proceeding, Adv. Pro. Case No. 15-50044 (KG) (Bankr. D. Del.) (the "Adversary Proceeding") in which SuperMedia objected to YPPI's proof of claim. SuperMedia and YPPI have completed the Adversary Proceeding trial and are awaiting a decision from the Court.

Immediately following their emergence from bankruptcy, the Debtors increased their digital ad presence and focused on expense reduction. More recently, the Debtors have fine-tuned their small-business digital product offerings to enable the Debtors to significantly expand into this key market space. The combined company has also implemented a business transformation program that, in part, integrates the Dex One and SuperMedia systems to eliminate duplicative services and implements workforce reductions. The Debtors' corporate organization is depicted below:



2.    Business Overview

The Debtors are a leading provider of local marketing solutions for small and medium sized businesses. The Debtors focus on the needs of small and medium sized businesses, because such businesses do not have the time, expertise, or resources to manage their advertising across the vast array of options that now exist in the local search advertising industry. To that end, the Debtors' marketing consultants offer personalized marketing consulting services and exposure across leading media platforms used by consumers searching for local businesses.

The Debtors' marketing solutions are primarily sold under various "Dex" and "SuperMedia" brands, including online local search engine websites, website and social media development, customer management tools, mobile local search applications, placement of clients' information and advertisements on major search engine websites, and print "yellow page" directories. Specifically, the Debtors' local marketing solutions include website development, search engine optimization, market analysis, video development and promotion, reputation management, social media marketing, and tracking/reporting customer leads.

The Debtors' ability to compete effectively in the local search advertising industry is supported by their (a) expanding base of digital capabilities and partnership network, (b) broad, multi-platform product portfolio, (c) employee and sales force, (d) direct and long-standing relationships with their local client base maintained by their locally based marketing consultants, (e) diverse and attractive markets, and (f) agreements with local telephone service providers.

(a)    Partnerships

The Debtors employ a "compete and collaborative" business model, whereby they leverage the experience and expertise of certain competitors and other partners to carry out their day-to-day operations. Through their partnerships, the Debtors offer high-quality, established, and value-added products and services without the risks, capital investment, and ongoing maintenance associated with in-house development. This partnership model enables the Debtors to leverage cutting edge marketing solutions, allowing more customizable solutions for their broad range of clients. For example, the Debtors are one of a select group of Google AdWords Premier SMB Partners, Google's highest level of partnership, which allows the Debtors to receive access to a full range of Google technology, support, and training, an expanded product set, financial incentives, and direct collaboration with Google search engine marketing experts on current and forthcoming products and processes.

The Debtors' expanding partner-provided solutions allow the Debtors to offer web and mobile site creation, web hosting, search engine optimization, network display ads, custom video, and reputation management. The Debtors' partnerships also provide business listings, business reviews, and other consumer-oriented information to enhance user experience with the Debtors' services.

(b)    Multi-Platform Product Portfolio

The Debtors offer their clients promotional solutions in the form of digital solutions and print directories. The Debtors' digital solutions include their recently launched DexHub and DexLnk products, as well as their core lead-generating products, which include digital content creation and management, search engine marketing, search engine optimization, and online business listings. The Debtors' print directories are the familiar yellow and white page directories that have existed since the 19th century. In 2015, the Debtors' top ten directories, as measured by revenue, accounted for approximately five percent of their revenue and no single directory accounted for more than one percent of their revenue.

(i)    Digital Advertising Products and Services

Realizing that the Debtors then-existing digital products were low-margin and rarely translated into recurring revenue streams, the Debtors introduced two products in mid-2015—DexHub and DexLnk—designed to provide critical marketing tools to small businesses, and in turn increase the Debtors' share of this market segment. Combining their expertise in the digital arena with their knowledge of small-business needs, the Debtors tailored DexHub and DexLnk to provide solutions that smaller companies cannot afford to maintain in-house.

In particular, DexHub provides small businesses with a strong platform and marketing services to manage their online presence. The offerings under DexHub include:

- *Content and Hosting*. The Debtors offer advanced solutions that build content—a critical component to advertising—online for their clients. These solutions include both websites and mobile applications. The Debtors also serve clients by hosting their websites.

- *Social Media*. The Debtors recognize that social media usage is growing and believe this is an important medium for clients to engage with existing and prospective customers. The Debtors assist clients in developing and effectively using their social media presence.

- *Digital Presence Management*. The Debtors offer an online reputation monitor to manage each client's listings across the Internet and assist clients in the creation and management of their social reputation and presence.

DexHub, which serves as the foundational package of digital marketing products, ties directly into DexLnk. This comprehensive interface allows the Debtors' clients to manage their customer databases and appointment scheduling. Specifically, DexLnk provides tools that assist businesses with:

- **Managing Customer Relationships**.  The Debtors provide easy to use management tools that allow clients to develop detailed customer profiles.  Through the Debtors' simple interface, clients can use their customized customer databases to cultivate loyal relationships through effective, targeted messages.

- **Schedules and Payments**.  The Debtors provide tools which allow clients' customers to book appointments online and also provide a secure portal through which customers can make online payments.

DexHub and DexLnk serve as gateways to the Debtors' traditional product offerings (offered to clients of all sizes), which clients can purchase separately on an a la carte basis.  These core products allow clients to build customer leads and include:

- **Custom Videos and Targeted Digital Display Advertisements**.  The Debtors help clients create professional-quality videos and distribute them on high-traffic websites.  The Debtors also create engaging banner advertisements and assist clients by displaying those advertisements on the websites most likely to attract local customers.

- **Search Engine Marketing**.  The Debtors allow clients to place their advertisements on the Debtors' proprietary and extensive ad network and track the effectiveness of those advertisements through daily and monthly reporting.

- **Search Engine Optimization**.  The Debtors increase their clients' online visibility by enhancing the content and structure of clients' website to make them more compatible with search engines like Google, Bing, and Yahoo!

- **Online Business Listings**.  The Debtors help clients develop a complete business profile on DexKnows.com and Superpages.com and promote clients' listings above the free listings on these online directories.

- **Print Advertisements**.  As described in more detail below, the Debtors continue to offer the print advertising solutions on which their businesses were founded.

(ii)    Print Advertising Products

The Debtors' print directory advertising products can be broken down into three basic categories: (a) yellow pages; (b) white pages; and (c) directories that consist of both white and yellow pages.  The breadth of the Debtors' directory options enables the Debtors to create customized programs that are responsive to specific client needs and their promotional marketing budgets.  The yellow, white, and combined directories are also efficient sources of information for consumers, featuring a comprehensive list of businesses in local markets.

The Debtors' print yellow page directories are co-branded with various local telephone service providers, including Verizon Communications Inc., AT&T Inc., CenturyLink, Inc., FairPoint Communications, Inc., and Frontier Communications Corporation.  These directories provide a range of paid advertising options, including:

- Listing Options.  Listing options allow advertisers to increase visibility by paying for listing with additional headings, paying for highlighted, bold, or super bold text listings, and purchasing extra lines of text to include information, such as hours of operations, a website address or a more detailed business description.

- In-Column Advertising Options.  For greater prominence on a page, advertisers may expand their basic alphabetical listing by purchasing advertising space in the column in which their listing appears.  In-column options include bolding, special fonts, color and special features, such as logos.

- **Display Advertising Options**.  Display advertisements allow businesses to include a wide range of information, illustrations, photographs, and logos to attract customers.  Display advertisements are usually placed at the front of a heading, ordered first by size and then by advertiser seniority.  This ordering process provides a strong incentive for advertisers to increase the size of their advertisements and to renew their advertising purchases each year to ensure their advertisements receive priority placement.

- **Specialty Advertising**.  Specialty advertising includes ads in the white pages section of the directories and gatefold sections, cover "tip-ons", cover advertising, and specialty tabs that provide businesses with extra space to include more information in their advertisements.

The Debtors offer white page directories to certain local telephone service providers which are still required by state regulations to (a) publish and distribute white page directories of certain residences and businesses that order or receive local telephone service, and (b) provide information relating to telephone service and local and state governmental agencies.  Under their publishing contracts with these local telephone services, the Debtors typically provide a free white page listing to certain residences and businesses with local wireline telephone service, as well as a courtesy listing in the yellow pages for business clients to the extent the local telephone service provider is required to produce such directories.

    (c)      Employees and Sales Force

The Debtors employ approximately 3,100 hourly and salaried employees, and approximately 120 temporary, contract workers.  In addition, the International Brotherhood of Electrical Workers of America and the Communication Workers of America collectively represent approximately 750 of the Employees.  The Debtors are party to seven collective bargaining agreements with these two unions, which govern the Debtors' relationship with their union-represented employees.

The Debtors employ approximately 1,400 sales employees to work directly with clients to provide multiple local marketing solutions to help such clients connect with their customers.  The Debtors divide their local sales force into two principal groups, one that provides face-to-face consulting and one that provides telephone consulting.

In addition to the Debtors' local sales force, the Debtors use approximately 100 third-party certified marketing representatives as an external sales channel to serve national or large regional clients, such as rental car, insurance, and restaurants.  The certified marketing representatives design and create advertisements for national companies and place those advertisements within the Debtors' local media.  The national or regional client using a certified marketing representative typically pays such representative directly, who in turn remits payment to the Debtors after deducting its commission.

    (d)      Officers and Directors

The list below sets forth information about Parent's executive officers as of the Petition Date.

| Name | Position |
|---|---|
| Joseph A. Walsh | President and Chief Executive Officer |
| Andrew D.J. Hede | Chief Restructuring Officer |
| Paul D. Rouse | Executive Vice President - Chief Financial Officer and Treasurer |
| Mark Cairns | Executive Vice President - Integration and Client Experience |

| Raymond R. Ferrell | Executive Vice President - General Counsel and Corporate Secretary |
| James McCusker | Executive Vice President - Chief Revenue Officer |
| Gordon Henry | Executive Vice President - Chief Marketing Officer |
| Debra M. Ryan | Executive Vice President - Chief Human Resources Officer |
| Carleton G. Shaw | Executive Vice President - Chief Information Officer |
| John F. Wholey | Executive Vice President - Operations and Client Services |

Joseph A. Walsh is Dex Media's President and Chief Executive Officer and a member of the Board of Directors. Prior to joining the Debtors in October 2014, Mr. Walsh was the Chairman and Chief Executive Officer of Walsh Partners, a private company founded in 2012 that has been focused on investments and advisory services. Mr. Walsh has also served as the Executive Chairman of Cambium Learning Group, Inc., a leading educational solutions and services company, since March 2013. Mr. Walsh was previously employed by Yellowbook Inc., a digital and print marketing solutions company, from 1987 until 2011, and served as President and Chief Executive Officer and a member of its board of directors from 1993 until 2011. In 1982, Mr. Walsh co-founded IYP Publishing, a company sold in 1985 to DataNational Corporation, a leading provider for enterprise software and services. He served as Vice President of Sales at DataNational until joining Yellowbook in 1987. Mr. Walsh served as Chairman of the Local Search Association (LSA) and on the board of LSA's predecessor, the Yellow Pages Association. He was also Chairman and a long-term board member of the Association of Directory Publishers and served on the board of the Association of Directory Marketing.

Andrew D.J. Hede is a Managing Director with Alvarez & Marsal North America, LLC, a restructuring advisory services firm with numerous offices throughout the country, and has been designated as Dex Media's Chief Restructuring Officer. He has worked as a turnaround consultant and financial advisor for over twenty years. Mr. Hede has substantial knowledge and experience in senior management positions with, or as restructuring advisor to, distressed companies and in assisting distressed companies with stabilizing their financial condition, analyzing their operations, and developing an appropriate business plan to accomplish the necessary restructuring of their operations and finances. Specifically, Mr. Hede has advised or served as a senior executive for, among others, Crescent Resources, LLC, Kimball Hill, Inc., and Vertis Holdings, Inc. Further, Mr. Hede has served as a restructuring advisor for a number of companies or their creditors in a variety of industries.

Paul D. Rouse is Dex Media's Executive Vice President - Chief Financial Officer and Treasurer. Mr. Rouse serves as the principal financial and principal accounting officer of the Debtors, responsible for the Debtors' financial operations. He is also the primary liaison with the investment community, responsible for investor relations, and is also responsible for leading merger and acquisitions transactions. Prior to joining the Debtors in November 2014, Mr. Rouse served as the Chief Financial Officer of Apple and Eve LLC, one of the largest privately held juice companies in the United States, since 2012. Mr. Rouse was employed by Yellowbook Inc., a digital and print marketing solutions company, from 1987 until 2012 where he served as Vice President of Finance and as Treasurer, and had responsibility for corporate and business development. Earlier in his career, Mr. Rouse was employed at JPMorgan in international internal audit and at Ernst and Young in public accounting.

Mark Cairns is Dex Media's Executive Vice President - Integration and Client Experience responsible for the management and improvement of Dex Media's client experience. Prior to joining the Debtors in October 2014, Mr. Cairns was principal of Treales, LLC, a general business consulting company. Prior to that, from 2011 to 2013, he served as the Head of Operations in the United States and United Kingdom for hibu plc (previously Yell Group plc), a company offering digital and print marketing solutions and directories, including Yell.com and Yellow Pages

in the United Kingdom, and Yellowbook in the United States. Since joining Yell Group in 1984, Mr. Cairns held a variety of management positions at Yell Group in the United Kingdom and United States, including as Chief Publishing Officer of Yellow Book Inc.

Raymond R. Ferrell is Dex Media's Executive Vice President - General Counsel and Corporate Secretary. He is responsible for the Debtors' legal, public policy, government relations, and compliance functions. Mr. Ferrell was named Acting Executive Vice President - General Counsel and Corporate Secretary at Dex Media in July 2013. Previously he was Vice President Associate General Counsel - Commercial Operations at SuperMedia since 2009. Prior to SuperMedia, Mr. Ferrell was Senior Counsel - Vice President in the American Express General Counsel's office for over eight years, providing primary support for Global Commercial Cards and the Interactive business unit. Prior to joining American Express, he worked in private practice in New York City and New Jersey, specializing in corporate securities, technology, e-commerce law, and commercial card work.

Gordon Henry is Dex Media's Executive Vice President - Chief Marketing Officer responsible for driving the Debtors' growth strategy and marketing functions across print, digital, mobile and social media, as well as overseeing business development and partnership relationships. Before joining the Debtors in October 2014, Mr. Henry was a senior advisor at Walsh Partners. He previously held the role of vice president and general manager at Deluxe Corp, a digital and print marketing solutions company, from 2011 to 2014, where he led the company's transformation to a provider of internet marketing services for small and medium-size businesses. Prior to joining Deluxe he served as Chief Marketing Officer of Yellowbook Inc., a digital and print marketing solutions company, from 2001 to 2008, where he managed print and online products.

James McCusker is Dex Media's Executive Vice President - Chief Revenue Officer, with responsibility for ensuring that Dex Media provides businesses with effective print and digital advertising tailored to their specific needs. Before assuming his current role, Mr. McCusker served as Vice President of expansion channel sales. Prior to joining the Debtors in May 2015, Mr. McCusker was president and chief sales officer for hibu plc, where he oversaw U.S. operations and media/advertising sales. At Yellowbook, Mr. McCusker progressed through a series of sales leadership roles.

Deb Ryan is Dex Media's Executive Vice President - Chief Human Resources Officer, responsible for the Debtors' human resources and employee administration activities. She previously served as Executive Vice President - Human Resources and Employee Administration of SuperMedia since April 2012. Before joining SuperMedia, she served as Vice President - Franchise Development for Dex One from 2009 to 2011, Vice President - Human Resources - Sales and Operations from 2006 to 2009 and Vice President - Human Resources from 2002 to 2006 at RHDC, responsible for the company's human resources function. Prior to that, Ms. Ryan held various human resources and sales management executive positions.

Carleton G. Shaw is Dex Media's Executive Vice President - Chief Information Officer, responsible for managing the transformation of the Debtors' technology solutions and enterprise change management. Prior to joining the Debtors in October 2014, Mr. Shaw was a principal with Houstonian Partners, LLC, focused on investment and advisory services. Prior to joining Houstonian Partners, LLC, Mr. Shaw was the Global Chief Information Officer at hibu plc from 2011 until 2013. Previously he held various roles at Yellowbook from 1990, including as EVP - Operations to Chief Information Officer, responsible for Yellowbook's technology and enterprise change management.

John F. Wholey is Dex Media's Executive Vice President - Operations and Client Services, responsible for the Debtors' back office operations' and non-sales customer facing functions, supporting production, fulfillment and servicing of all print and digital product and service offerings. Prior to joining the Debtors in January 2015, Mr. Wholey served as a Head of United States Operations of hibu plc from March 2014 until November 2014, where he was responsible for all operational aspects of the business from order capture to production, fulfillment, publishing, distribution, customer service and sales support for all print and digital product offerings. Previously, from March 2011 to March 2014, Mr. Wholey headed contact centers for hibu in the United States and United Kingdom and prior to that Mr. Wholey served as hibu's Vice President of Operations since 2000.

The following table provides summary information about Parent's current directors:

| Name | Director Since | Position/Committee Memberships |
|------|----------------|-------------------------------|
| Jonathan B. Bulkeley | 2013 | • Audit and Finance<br>• Compensation and Benefits (Chair) |
| Thomas D. Gardner | 2013 | • Audit and Finance<br>• Compensation and Benefits<br>• Corporate Governance<br>• Restructuring Committee |
| W. Kirk Liddell | 2013 | • Audit and Finance (Chair)<br>• Restructuring Committee |
| Thomas S. Rogers | 2013 | • Compensation and Benefits<br>• Corporate Governance |
| Alan F. Schultz | 2013 | • Chairman of the Board<br>• Restructuring Committee |
| Joseph A. Walsh | 2014 | • President and Chief Executive Officer |
| Douglas D. Wheat | 2013 | • Corporate Governance (Chair) |

As described in the Plan, as of the Effective Date, the term of the current members of the board of directors of the Debtors shall expire, and the initial boards of directors, including the New Boards, as well as the officers of each of the Reorganized Debtors, shall be appointed in accordance with the New Organizational Documents and other constituent documents of each Reorganized Debtor. The initial New Board of Reorganized Parent shall be selected in a manner consistent with the provisions of the New Stockholder Agreement Term Sheet and shall consist of those individuals disclosed prior to the Confirmation Hearing as part of the Plan Supplement. Successors will be elected in accordance with the New Organizational Documents of Reorganized Parent.

Members of the Debtors' current management team will either (a) with regard to a member of the management team who is presently subject to a written management agreement, enter into a new (or amended) employment agreement on terms acceptable to the Debtors, such member of the management team, and the Required Supporting Lenders, or (b) with regard to a member of the management team who is not presently subject to a written management agreement, then, should such member and the Required Supporting Lenders choose to enter into a written management agreement, any such new employment agreement shall be mutually acceptable to the Debtors, such member of the management team, and the Required Supporting Lenders.

 (e)  Clients

As of December 31, 2015, the Debtors maintained a strongly diversified client base, with more than 400,000 business clients across the United States. In mid-2015, the Debtors began a dual-track approach to expand their client base. First, as described above, the Debtors rolled out a series of products specifically designed to give small businesses an edge in today's marketplace. Second, the Debtors began targeting geographic markets where they had no previous presence by hiring a team of sales employees who had regional expertise and relationships in those markets. The Debtors believe this dual-track approach will significantly increase their client base and presence in previously unserviced markets.

The Debtors do not depend on the sale of advertising to a particular industry or to a particular client. The Debtors' top ten local clients represented less than one percent of their revenue, and no single local client accounted for more than 0.1 percent of the Debtors' revenue. The Debtors' broad client base reduces their exposure to adverse

economic conditions that may affect particular geographic regions or specific industries and provides additional stability to their operating results.

### (f)    Digital and Print Business Cycles

The Debtors' digital business operations require the following steps:   (a) gathering client content; (b) selecting the appropriate advertising channels and generating an advertising solution; (c) launching the advertising solution to the appropriate channels; and (d) providing real time reporting and monthly performance summary reports to clients.

The Debtors generally publish their print and digital directories on a 12 or 13 month cycle.  The Debtors' directory publishing cycles are staggered throughout the year, allowing the Debtors to more efficiently use their infrastructure and sales capabilities, as well as the resources of their third-party vendors.  The major steps of the publication and distribution process of the Debtors' directories are:   (a) creating advertisements; (b) finalizing artwork, proofing, and paginating directories; (c) printing directories; (d) transporting directories to distributors; and (e) distributing directories to residences and businesses.  The Debtors use various third-party vendors to print, transport, and distribute their directories.

### (g)    Competition

The local search advertising industry is highly competitive.  The Debtors compete with many different local media sources, including newspapers, radio, television, the internet, billboards, direct mail, telemarketing and other yellow page directory publishers.  Certain of the Debtors' competitors, including Yellowbook, contend for business in most of the Debtors' major markets.  Other competitors contend for business in certain select markets, such as YP and The Berry Company in the yellow page directory market, and Google, Yahoo!, and Bing in the digital market.  The Debtors compete with these publishers on cost per reference, quality, features, usage, and distribution.

Where the Debtors are the authorized publisher of print directories (*i.e.*, in the markets in which the Debtors use the brand of the local telephone service provider), the Debtors leverage the strong awareness of the local telephone service provider brand, higher usage of their directories by consumers, and their long-term client relationships.   Under certain non-compete agreements, these local telephone service providers generally are restricted from publishing tangible or digital (excluding internet) media directory products consisting principally of listings and classified advertisements of telephone customers in the markets in which they are the local telephone service provider.

The Debtors also compete with the internet directories of other publishers, such as Yellowpages.com, as well as other internet sites that provide local consumer information, such as Yelp, Angie's List, and Foursquare.  The Debtors have sought to increase their presence in the digital marketplace by entering into partnerships and commercial agreements with certain major competitors that may have significantly greater technological and financial resources than the Debtors have, including Google, Yahoo!, and Bing.

Recognizing the highly competitive market that the Debtors participate in, the Debtors have renewed their focus on small businesses, which have seen their market share slowly shifted to larger, regional, and national competitors, as well as internet sales portals such as Amazon and Facebook.  The Debtors believe DexHub and DexLnk will provide small businesses a much needed boost to reengage customers and take back market share.

### (h)    Intellectual Property

The Debtors own and control a number of trade secrets, trademarks, service marks, trade names, copyrights, patents, and other intellectual property rights that, in the aggregate, are material to the Debtors' businesses; the Debtors rely on a combination of copyright, trademark, patent, trade secret, non-disclosure, and contract safeguards to protect their intellectual property.  The Debtors are also licensed to use certain technology and other intellectual property rights owned and controlled by third parties and the Debtors similarly license certain

technology and intellectual property to third parties.  Under certain of their license agreements, the Debtors have either exclusive or non-exclusive listing, publishing, delivery, or resale rights in various geographic markets.

B.    *The Debtors' Prepetition Capital Structure*

As of December 31, 2015, the Debtors reported approximately $1.3 billion in total assets and approximately $2.7 billion in total liabilities.  As described in greater detail below, as of April 21, 2016, the outstanding amount of the Debtors' consolidated funded debt obligations totaled approximately $2.4 billion and comprised:  (a) approximately $300 million of principal obligations under the Dex East Facility; (b) approximately $275 million of principal obligations under the Dex West Facility; (c) $568 million of principal obligations under the RHDI Facility; (d) $967 million of principal obligations under the SuperMedia Facility; and (e) $270 million of principal obligations under the Subordinated Notes (each as defined herein, and collectively, the "Prepetition Debt Obligations").  As set forth the Debtors' corporate organization chart, approximately eight percent of the equity interests in Parent are held by Paulson & Co. Inc., with the remainder owned by certain current and former directors and officers and other public shareholders.  The Prepetition Debt Obligations are summarized in the chart below and described in in greater detail herein.

As described in more detail in the paragraphs below, the Term Loan Lenders under the Dex East Facility, the Dex West Facility, the RHDI Facility, and the SuperMedia Facility have security interests in substantially all the assets of the Debtors. The Subordinated Notes are contractually and structurally subordinated to all outstanding amounts under the Credit Agreements and are structurally subordinated to any existing or future liabilities of Parent's direct and indirect subsidiaries.

| Debt Obligation | Approximate Principal Amount Outstanding as of April 21, 2016 | Average Interest Rate | Maturity Date |
|---|---|---|---|
| *Secured Debt* | | | |
| Dex East Facility | $300 million | 6% | 12/31/2016 |
| Dex West Facility | $275 million | 8% | 12/31/2016 |
| RHDI Facility | $568 million | 9.75% | 12/31/2016 |
| SuperMedia Facility | $967 million | 11.6% | 12/31/2016 |
| *Unsecured Debt* | | | |
| Subordinated Notes | $270 million | 14% | 1/29/2017 |

1.    The Dex East Facility

Debtor Dex East is the borrower under that certain Amended and Restated Credit Agreement, dated as of April 30, 2013 (as amended, restated, supplemented, or otherwise modified from time to time, the "Dex East Credit Agreement"), among Dex East, as borrower, Parent, Dex Media Holdings, Inc. ("DMHI"), JPMorgan Chase Bank, N.A. ("JPMorgan"), as administrative agent and collateral agent, and each of the lenders from time to time party thereto.  The Dex East Credit Agreement provides Dex East with a secured term loan facility, subject to the terms and conditions set forth therein (the "Dex East Facility"), which requires quarterly payments of principal and matures on December 31, 2016.  As of April 21, 2016 approximately $300 million of principal remains outstanding under the Dex East Facility, with an average interest rate of six percent.

Under the Security Documents (as defined in the Dex East Credit Agreement), the obligations under the Dex East Facility are secured by substantially all assets of Dex East (including stock of Dex Media Service LLC ("DMS") and Dex Media East BRE LLC).  Pursuant to the Shared Guarantee and Collateral Agreement (as defined below), the obligations under the Dex East Facility are secured by guarantees from Parent, DMHI, Dex One Service, Inc. ("Service"), and, solely with respect to share pledges of the subsidiaries owned by them, Dex One Digital, Inc.

("Dex Digital") and R.H. Donnelley Corporation ("RHDC").  Pursuant to the Subordinated Guarantee Agreement (as defined below), obligations under the Dex East Facility are guaranteed on an unsecured basis by RHDI, Dex West, and SuperMedia, in each case on a subordinated basis to the obligations under the RHDI Facility, Dex West Facility, and SuperMedia Facility, respectively.

2.  The Dex West Facility

Debtor Dex West is the borrower under that certain Amended and Restated Credit Agreement, dated as of April 30, 2013 (as amended, restated, supplemented, or otherwise modified from time to time, the "Dex West Credit Agreement"), among Dex West, as borrower, Parent, DMHI, JPMorgan, as administrative agent and collateral agent, and each of the lenders from time to time party thereto.  The Dex West Credit Agreement provides Dex West with a secured term loan facility, subject to the terms and conditions set forth therein (the "Dex West Facility"), which requires quarterly payments of principal and matures on December 31, 2016.  As of April 21, 2016, approximately $275 million of principal remains outstanding under the Dex West Facility, with an average interest rate of eight percent.

Under the Security Documents (as defined in the Dex West Credit Agreement), the obligations under the Dex West Facility are secured by substantially all assets of Dex West (including stock of DMS and Dex Media West BRE LLC).  Pursuant to the Shared Guarantee and Collateral Agreement, the obligations under the Dex West Facility are secured by guarantees from Parent, DMHI, Service, and, solely with respect to share pledges of the subsidiaries owned by them, Dex Digital and RHDC.  Pursuant to the Subordinated Guarantee Agreement (as defined below), obligations under the Dex West Facility are guaranteed on an unsecured basis by RHDI, Dex East, and SuperMedia, in each case on a subordinated basis to the obligations under the RHDI Facility, Dex East Facility, and Dex West Facility, respectively.

3.  The RHDI Facility

Debtor RHDI is the borrower under that certain Fourth Amended and Restated Credit Agreement, dated as of April 30, 2013 (as amended, restated, supplemented, or otherwise modified from time to time, the "RHDI Credit Agreement"), among RHD, as borrower, Parent, Deutsche Bank Trust Company Americas ("Deutsche"), as administrative agent and collateral agent, and each of the lenders from time to time party thereto.  The RHDI Credit Agreement provides RHDI with a secured term loan facility, subject to the terms and conditions set forth therein (the "RHDI Facility"), which requires quarterly payments of principal and interest and matures on December 31, 2016.  As of April 21, 2016, approximately $568 million of principal remains outstanding under the RHDI Facility, with an average interest rate of 9.75 percent.

Under the Security Documents (as defined in the RHDI Credit Agreement), the obligations under the RHDI Facility are secured by substantially all assets of RHDI (including stock of R.H. Donnelley APIL, Inc. ("APIL") and R.H. Donnelley BRE LLC) and APIL.  Pursuant to the Shared Guarantee and Collateral Agreement, the obligations under the RHDI Facility are secured by guarantees from Parent, DMHI, Service, and, solely with respect to share pledges of the subsidiaries owned by them, Dex Digital and RHDC.  Pursuant to the Subordinated Guarantee Agreement (as defined below), obligations under the RHDI Facility are guaranteed on an unsecured basis by Dex East, Dex West, and SuperMedia, in each case on a subordinated basis to the obligations under the Dex East Facility, Dex West Facility and the SuperMedia Facility, respectively.

4.  The SuperMedia Facility

Debtor SuperMedia is the borrower under that certain Amended and Restated Loan Agreement, dated as of April 30, 2013 (as amended, restated, supplemented, or otherwise modified from time to time, the "SuperMedia Credit Agreement" and together with the Dex East Credit Agreement, the Dex West Credit Agreement, and the RDHI Credit Agreement, the "Credit Agreements"), among SuperMedia., as borrower, Parent, JPMorgan, as administrative agent and collateral agent, and each of the lenders from time to time party thereto.  The SuperMedia Credit Agreement provides SuperMedia with a secured term loan facility, subject to the terms and conditions set forth therein (the "SuperMedia Facility" and together with the Dex East Facility, the Dex West Facility, and the RHDI Facility, the "Secured Credit Facilities"), which requires principal payment at maturity (subject to required prepayments based on available cash), and matures on December 31, 2016.  As of April 21, 2016, approximately

$967 million of principal remains outstanding under the SuperMedia Facility, with an average interest rate of 11.6 percent.

Under the Security Documents (as defined in the SuperMedia Credit Agreement), the obligations under the SuperMedia Facility are secured by substantially all assets of SuperMedia (including stock of SuperMedia LLC ("SMLLC"), SuperMedia Sales, Inc. ("SMS"), SuperMedia BRE LLC, and 65 percent of the stock of SuperMedia UK, Ltd.), SMLLC, and SMS.  Pursuant to the Shared Guarantee and Collateral Agreement, the obligations under the SuperMedia Facility are guaranteed on an unsecured basis by Parent, and are guaranteed on a secured basis by DMHI and Service.  Pursuant to the Subordinated Guarantee Agreement (as defined below), obligations under the SuperMedia Facility are guaranteed on an unsecured basis by Dex East, Dex West, and RHDI, in each case on a subordinated basis to the obligations under the Dex East Facility, Dex West Facility, and the RHDI Facility, respectively.

5.   The Subordinated Notes

Parent is the issuer of certain 12%/14% Subordinated Notes Due 2017 (the "Subordinated Notes") issued pursuant to that certain Indenture dated as of January 29, 2010, as amended by that certain First Supplemental Indenture dated as of April 30, 2013 (together, the "Indenture"), with The Bank of New York Mellon as Trustee.  Interest is payable bi-annually, on March 31 and September 30, with an option to elect to make such payment 50 percent in cash and 50 percent in-kind, with an average interest rate of 14 percent.  The Subordinated Notes mature on January 29, 2017.  The Subordinated Notes are unsecured, are not guaranteed, and, as referenced above, are effectively subordinated in right of payment to all of Parent's existing and future secured debt.  Specifically, the Subordinated Notes are contractually and structurally subordinated to all outstanding amounts under the Credit Agreements, and any amendments thereto, and are structurally subordinated to any existing or future liabilities (including trade payables) of its direct and indirect subsidiaries.

In late April 2016, the Debtors learned that, because they had not made the cash portion of its September 30, 2015 interest payment, the payment-in-kind portion of the payment had not been credited.  The payment-in-kind portion of the September 30, 2015 payment was subsequently credited, which resulted in an aggregate principal amount outstanding under the Subordinated Notes of $270,076,620.00, as of April 21, 2016.

6.   The Intercreditor Agreement, Shared Guarantee and Collateral Agreement, and Subordinated Guarantee Agreement

DMI, DMHI, Dex Digital, Service, RHDC (collectively, the "Shared Guarantors"), JPMorgan, as administrative agent under the Dex East Credit Agreement, the Dex West Credit Agreement, and the SuperMedia Credit Agreement, Deutsche, as administrative agent under the RHDI Credit Agreement and JPMorgan, as shared collateral agent are parties to that certain Collateral Agency and Intercreditor Agreement, dated as of January 29, 2010 (as amended and restated as of April 30, 2013 and as further amended from time to time and with all supplements and exhibits thereto, the "Intercreditor Agreement").  The Intercreditor Agreement governs certain of the respective rights and interests of Term Loan Lenders under the Credit Agreements relating to, among other things, their rights with respect to the exercise of remedies in connection with any Event of Default (as defined in the Intercreditor Agreement) or a bankruptcy filing, and such Intercreditor Agreement provides for related enforcement and turnover provisions with respect to the Shared Guarantors and the collateral pledged by such entities.

DMI, DMHI, Dex Digital, Service, RHDC, Dex East, Dex West, RHDI, SuperMedia and JPMorgan, as shared collateral agent are parties to that certain Shared Guarantee and Collateral Agreement, dated as of January 29, 2010 (as amended and restated as of April 30, 2013 and as further amended from time to time and with all supplements and exhibits thereto, the "Shared Guarantee and Collateral Agreement").  The Shared Guarantee and Collateral Agreement, as detailed above, provides for certain secured and unsecured guarantees for each of the Secured Credit Facilities.

Dex East, Dex West, RHDI, SuperMedia, JPMorgan, as administrative agent under the Dex East Credit Agreement, JPMorgan, as administrative agent under the Dex West Credit Agreement, JPMorgan, as administrative Agent under the SuperMedia Credit Agreement, Deutsche, as administrative agent under the RHDI Credit

Agreement and JPMorgan, as subordinated guarantee agent are parties to that certain Subordinated Guarantee Agreement dated as of January 29, 2010 (as amended and restated as of April 30, 2013 and as further amended from time to time and with all supplements and exhibits thereto, the "Subordinated Guarantee Agreement"). Pursuant to the Subordinated Guarantee Agreement, as detailed above, each borrower under each of the Secured Credit Facilities has guaranteed the obligations under the other three Secured Credit Facilities on an unsecured basis. Each borrower's guarantee is subordinated in right and time of payment to the prior payment of the obligations under such borrower's Secured Credit Facility.

7.   Other Obligations

The Debtors maintain four qualified defined benefit pension plans and two non-qualified pension plans. Each of the pension plans has been frozen such that no employee accrues future pension benefits. As of December 31, 2015, the accumulated benefit obligations for all defined benefit pension plans was approximately $580 million, compared to total pension plan assets of approximately $511 million.

**ARTICLE III.**
**EVENTS LEADING TO THE CHAPTER 11 CASES**

A.   *Decreased Revenues and Operational Initiatives that Need Time to Develop*

The Debtors have not been able to fully capitalize on the operational and financial opportunities generated by the April 2013 merger. While the Debtors appropriately focused on growing their digital platform, the Debtors could not grow their digital revenue fast enough to offset their declining print revenue.

Additionally, the Debtors continue to face the challenges that have dominated the local search advertising industry in recent years, namely, increased market concentration and the need to balance print and digital operations. That is, reduced advertising spending in print directories, primarily driven by heavy competition from other advertising media (including the internet, cable television, newspaper, and radio), has put a strain on the Debtors' financial condition and has not fully been offset by growing digital revenue.

The Debtors have undertaken a series of operational and financial initiatives in response to the challenging market conditions and upcoming maturities, including hiring a new Chief Executive Officer in October 2014, revamping the senior-management team, and implementing enterprise-wide organizational restructuring programs to streamline operations. These programs include the launch of virtual sales offices in lieu of more than 100 brick-and-mortar offices nationwide, the automation of the sale process, the integration of certain systems to eliminate redundancies, workforce reductions, and the Debtors' new and improved business model that provides for enhanced product offerings for small businesses.

The Debtors believe that such programs will position them to realize growth and improve profitability over the long term. Nevertheless, the Debtors' initiatives have, to date, been insufficient to offset declining print revenues. Given the Debtors' decreasing revenues and operating income, the Debtors are suffering from the effects of excess leverage and have been unable to maintain historic profitability levels through business improvements, cost-cutting, and self-help measures alone. With a right-sized balance sheet, however, the Debtors believe their enhanced business plan will allow them to succeed despite industry challenges.

B.   *The RSA and Plan*

In mid 2015, the Debtors retained financial advisor Moelis & Company LLC ("Moelis"), restructuring advisor Alvarez & Marsal North America, LLC ("A&M"), and legal advisor Kirkland & Ellis LLP ("K&E") to advise the Debtors' management and board of directors in their evaluation of the Debtors' capital structure and to engage in discussions with their funded debt holders.

During this same time, the Ad Hoc Lender Group was formed to coordinate discussions with the Debtors. The Debtors have been engaged in negotiations with the Ad Hoc Lender Group and administrative agents under the Secured Credit Facilities mid 2015. As discussed above, the Debtors, in consultation with their advisors, chose not

to make their September 30, 2015 Subordinated Notes coupon payment, but have nonetheless been engaged with the Ad Hoc Note Holder Group since the fall of 2015.

On December 15, 2015, the Debtors disclosed that historic United States federal and state income tax attributes of their consolidated tax group may be materially overstated, and could require revision (any such determination, calculation, and reporting of each of the Debtors' (or their predecessors in interest's) tax attributes, tax basis, and tax liabilities from January 1, 2010 through December 31, 2015 to the extent such determination, calculation, or reporting relate to the erroneous calculations referenced in Form 12b-25 filed by the Debtors on March 31, 2016, the "Prior Tax Calculation").  Such revision may not only reduce the total amount of usable tax attributes available to the Debtors' consolidated tax group, but also might affect the allocation of such remaining attributes among the individual Debtors that constitute the members of such group, thereby potentially affecting value available for distribution to Holders of Claims against certain Debtors.  Together with the Supporting Lenders, and with the assistance of the Debtors' tax and auditing professionals Ernst & Young LLP, KPMG LLP, and PricewaterhouseCoopers LLP, the Debtors are investigating and recalculating their prior reported attributes and analyzing the effects on the structure of a restructuring transaction of any and all changes to such attributes.  The Debtors currently estimate that as of December 31, 2015, the Debtors had consolidated net operating loss carryforwards ("NOLs") for U.S. federal income tax purposes of approximately $317 million and tax basis in amortizable intangibles of approximately $373 million.  The proposed Plan reflects the Debtors' and their professionals' best current understanding of the availability and allocation of the Debtors' federal and state tax attributes within the consolidated group.

After considerable arms'-length negotiations and ongoing analysis with respect to the Debtors' tax attributes, the Debtors and the Supporting Lenders, who hold approximately 69 percent of claims in aggregate under the Credit Agreements, and the Supporting Noteholders, who hold approximately 80 percent of claims under the Subordinated Notes, reached an agreement for a consensual balance sheet restructuring transaction which was memorialized in the RSA.  The Debtors, their advisors, the Supporting Lenders, and the Supporting Noteholders were acutely aware that the Debtors only recently emerged from bankruptcy and diligently worked together to shape a debt load commensurate with the Debtors' going-forward business plan so as to avoid any future chapter 11 filings.

The RSA sets forth the parameters of a financial restructuring to be implemented pursuant to a prepackaged chapter 11 plan of reorganization—namely, the Plan.  Specifically, as more fully set forth herein, in the Plan, and in the RSA, the RSA and the Plan contemplate a prompt emergence from chapter 11 with the following key terms:

- Administrative Claims, Other Priority Claims, and Priority Tax claims will be paid in full upon emergence (or, in the case of Priority Tax Claims, treated in accordance with section 1129(a)(9)(C)). These claims will be funded based on the following percentages:
  - 48.657158733 percent by Holders of Claims under the SuperMedia Credit Agreement;
  - 23.152435636 percent by Holders of Claims under the RHDI Credit Agreement;
  - 14.724949065 percent by Holders of Claims under the Dex West Credit Agreement; and
  - 13.465456566 percent by Holders of Claims under the Dex East Credit Agreement;

- Claims arising under the Debtors' prepetition secured Credit Agreements will receive their Pro Rata share of 100% of (a) the equity of the top tiered holding company of the Debtors as reorganized (subject to dilution by management equity and/or warrants described herein and in the Plan), (b) Takeback First Lien Term Loan in an aggregate principal amount of $600 million, and (c) their remaining cash collateral, other than a minimum Cash balance of $35 million for use by the Reorganized Debtors, to be allocated among the four Credit Agreements in accordance with Article III.B of the Plan and Article I.B.4 of this Disclosure Statement.

  - The equity of the top tiered holding company of the Debtors as reorganized will be allocated based on the following percentages:
    - 45.357158733 percent to Holders of Claims under the SuperMedia Credit Agreement;
    - 21.652435636 percent to Holders of Claims under the RHDI Credit Agreement;

- 18.024949065 percent to Holders of Claims under the Dex West Credit Agreement; and
- 14.965456566 percent to Holders of Claims under the Dex East Credit Agreement;
  - ○ The Takeback First Lien Term Loan will be allocated based on the following percentages:
    - 48.657158733 percent to Holders of Claims under the SuperMedia Credit Agreement;
    - 23.152435636 percent to Holders of Claims under the RHDI Credit Agreement;
    - 14.724949065 percent to Holders of Claims under the Dex West Credit Agreement; and
    - 13.465456566 percent to Holders of Claims under the Dex East Credit Agreement;

  - ○ The minimum Cash balance of $35 million will be funded based on the following percentages:
    - 45.357158733 percent by Holders of Claims under the SuperMedia Credit Agreement;
    - 21.652435636 percent by Holders of Claims under the RHDI Credit Agreement;
    - 18.024949065 percent by Holders of Claims under the Dex West Credit Agreement; and
    - 14.965456566 percent by Holders of Claims under the Dex East Credit Agreement;

- Holders of Claims under the Debtors' Subordinated Notes will receive, from proceeds of the collateral of the Term Loan Lenders, as authorized by and consented to by the acceptance of the Plan by the Holders of Credit Agreement Claims, their Pro Rata share of (a) $5 million in Cash, and (b) the Warrants. The $5 million in Cash will be funded based on the following percentages:
  - ○ 48.657158733 percent by Holders of Claims under the SuperMedia Credit Agreement;
  - ○ 23.152435636 percent by Holders of Claims under the RHDI Credit Agreement;
  - ○ 14.724949065 percent by Holders of Claims under the Dex West Credit Agreement; and
  - ○ 13.465456566 percent by Holders of Claims under the Dex East Credit Agreement;

- Holders of General Unsecured Claims will receive, from proceeds of the collateral of the Term Loan Lenders, as authorized by and consented to by the acceptance of the Plan by the Holders of Credit Agreement Claims, payment in full on the later to occur of the Effective Date of the Plan or in the ordinary course of business;

- Claims Relating to the Purchase and/or Sale of Debt and Securities (as described further herein and in the Plan), as well as existing equity interests in Dex Media, Inc., will be cancelled without any distribution to the holders of such claims or interests;

- the Debtors will emerge with a simplified corporate structure; and

- the Plan will become effective within 120 days after the Petition Date or the RSA may terminate.

The RSA sets forth a clear pathway to emergence, and the Debtors believe the transaction embodied in the Plan will leave the reorganized enterprise substantially deleveraged and, when combined with the Debtors' new business plan, well-positioned to implement the Debtors' business plan compete in the print and digital advertising markets in the years to come.

Because the transaction contemplated under the RSA is based on a consensual agreement with the Debtors' key stakeholders and provides more value to creditors than would have been possible under a liquidation of the Debtors' businesses—including a full recovery to holders of trade claims and employees—the Debtors anticipate confirming the Plan within a relatively short timeframe.  The Debtors believe that the quick emergence

contemplated under the RSA will enhance the Debtors' capital position and allow the Debtors to continue to focus on providing advertising solutions to the market.

## ARTICLE IV.
## SUMMARY OF THE PLAN

A.      *Administrative Claims and Priority Claims*

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified and, thus, are excluded from the classification of Claims and Interests set forth in Article III of the Plan.

1.      Administrative Claims

Except with respect to Administrative Claims that are Accrued Professional Compensation Claims and except to the extent that an Administrative Claim has already been paid during the Chapter 11 Cases or a Holder of an Allowed Administrative Claim and the applicable Debtor(s) agree to less favorable treatment, each Holder of an Allowed Administrative Claim (which, for the avoidance of doubt, shall include any Administrative Claim that is Allowed under the Cash Collateral Order) shall be paid in full in Cash on the unpaid portion of its Allowed Administrative Claim on the latest of:  (a) on or as soon as reasonably practicable after the Effective Date if such Administrative Claim is Allowed as of the Effective Date; (b) on or as soon as reasonably practicable after the date such Administrative Claim is Allowed; and (c) the date such Allowed Administrative Claim becomes due and payable, or as soon thereafter as is reasonably practicable; *provided* that Allowed Administrative Claims that arise in the ordinary course of the Debtors' businesses shall be paid in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to such transactions.  Notwithstanding the foregoing, no request for payment of an Administrative Claim need be Filed with respect to an Administrative Claim previously Allowed by Final Order.

Except as otherwise provided in Article II.A of the Plan and except with respect to Administrative Claims that are Accrued Professional Compensation Claims, requests for payment of Allowed Administrative Claims must be Filed and served on the Reorganized Debtors pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the Administrative Claims Bar Date.  Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or their property and such Administrative Claims shall be deemed discharged as of the Effective Date.  Objections to such requests, if any, must be Filed and served on the Reorganized Debtors and the requesting party no later than 60 days after the Effective Date.

2.      Professional Compensation

(a)      Professional Fee Escrow.

As soon as reasonably practicable after the Confirmation Date and no later than the Effective Date, the Debtors shall establish the Professional Fee Escrow.  The Debtors shall fund the Professional Fee Escrow with Cash equal to the Professional Fee Escrow Amount.  The Professional Fee Escrow shall be funded no later than the Effective Date and maintained in trust for the Professionals and shall not be considered property of the Debtors' Estates; *provided* that any excess of the amount of the Professional Fee Escrow over the aggregate Allowed Accrued Professional Compensation Claims to be paid from the Professional Fee Escrow shall be distributed in accordance with Article VI of the Plan to Holders of Allowed Dex East Credit Facility Claims, Dex West Credit Facility Claims, RHDI Credit Facility Claims, and SuperMedia Credit Facility Claims in the same percentages set forth in the definitions of Dex East Closing Expenses, Dex West Closing Expenses, RHDI Closing Expenses, and SuperMedia Closing Expenses, respectively.

(b)      Final Fee Applications and Payment of Accrued Professional Compensation Claims.

All final requests for payment of Accrued Professional Compensation Claims incurred during the period from the Petition Date through the Confirmation Date, shall be Filed no later than 45 days after the Effective Date. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code, Bankruptcy Rules and prior Court orders, the Allowed amounts of such Accrued Professional Compensation Claims shall be determined by the Court. The amount of Accrued Professional Compensation Claims owing to the Professionals shall be paid in Cash to such Professionals from funds held in the Professional Fee Escrow when such Claims are Allowed by a Final Order. To the extent that funds held in the Professional Fee Escrow are unable to satisfy the amount of Accrued Professional Compensation Claims owing to the Professionals, such Professionals shall have an Allowed Administrative Claim for any such deficiency, which shall be satisfied in accordance with Article II.A of the Plan. After all Accrued Professional Compensation Claims have been paid in full, the Final Order allowing such Accrued Professional Compensation Claims shall direct the escrow agent to return any excess amounts to the Reorganized Debtors and any such amounts shall be distributed in accordance with Article VI of the Plan to Holders of Allowed Dex East Credit Facility Claims, Dex West Credit Facility Claims, RHDI Credit Facility Claims, and SuperMedia Credit Facility Claims in the same percentages set forth in the definitions of Dex East Closing Expenses, Dex West Closing Expenses, RHDI Closing Expenses, and SuperMedia Closing Expenses, respectively.

(c)    Estimation of Fees and Expenses.

To receive payment for unbilled fees and expenses incurred through the Confirmation Date, the Professionals shall estimate their Accrued Professional Compensation Claims before and as of the Confirmation Date and shall deliver such estimate to the Debtors no later than five calendar days prior to the Effective Date; *provided* that such estimate shall not be considered an admission with respect to the fees and expenses of such Professional and such Professionals are not bound to any extent by the estimates. If a Professional does not provide an estimate, the Debtors, in consultation with the Required Support Lenders, may estimate the unbilled fees and expenses of such Professional. The total amount so estimated shall be utilized by the Debtors to determine the Professional Fee Escrow Amount.

(d)    Post-Confirmation Date Fees and Expenses.

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Court, pay in Cash the reasonable legal, professional, or other fees and expenses incurred by the Debtors. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code, the Interim Compensation Order, or the Ordinary Course Professionals Order in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors may employ and pay any Professional or Ordinary Course Professional in the ordinary course of business without any further notice to or action, order, or approval of the Court.

3.    Priority Tax Claims

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code. In the event an Allowed Priority Tax Claim is also a Secured Tax Claim, such Claim shall, to the extent it is Allowed, be treated as an Other Secured Claim if such Claim is not otherwise paid in full.

4.    Statutory Fees

All fees due and payable pursuant to section 1930 of Title 28 of the U.S. Code prior to the Effective Date shall be paid by the Debtors. On and after the Effective Date, the Reorganized Debtors shall pay any and all such fees when due and payable, and shall file with the Court quarterly reports in a form reasonably acceptable to the U.S. Trustee. Each Debtor shall remain obligated to pay quarterly fees to the U.S. Trustee until the earliest of that particular Debtor's case being closed, dismissed, or converted to a case under Chapter 7 of the Bankruptcy Code.

B.      *Classification and Treatment of Claims and Interests*

1.      Special Provision Governing Unimpaired Claims

Except as otherwise specifically provided in the Plan, nothing in the Plan or herein shall be deemed to affect, diminish, or impair the Debtors' or the Reorganized Debtors' rights and defenses, both legal and equitable, with respect to any Reinstated Claim or Unimpaired Claim, including, but not limited to, legal and equitable defenses to setoffs or recoupment against Reinstated Claims or Unimpaired Claims; and, except as otherwise specifically provided in the Plan, nothing in the Plan or herein shall be deemed to be a waiver or relinquishment of any Claim, Cause of Action, right of setoff, or other legal or equitable defense which the Debtors had immediately prior to the Petition Date, against or with respect to any Claim left Unimpaired by the Plan.  Except as otherwise specifically provided in the Plan, the Reorganized Debtors shall have, retain, reserve, and be entitled to assert all such Claims, Causes of Action, rights of setoff, and other legal or equitable defenses which they had immediately prior to the Petition Date fully as if the Chapter 11 Cases had not been commenced, and all of the Reorganized Debtors' legal and equitable rights with respect to any Reinstated Claim or Claim left Unimpaired by the Plan may be asserted after the Confirmation Date and the Effective Date to the same extent as if the Chapter 11 Cases had not been commenced.

2.      Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by an Impaired Class of Claims.  The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.

3.      Elimination of Vacant Classes

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

4.      Voting Classes; Presumed Acceptance by Non-Voting Classes

If a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Plan shall be presumed accepted by the Holders of such Claims or Interests in such Class.

5.      Presumed Acceptance and Rejection of the Plan

To the extent Class 10 Intercompany Claims and Class 11 Intercompany Interests are Reinstated, each Holder of a Claim or Interest in Class 10 or 11 is presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and is not entitled to vote to accept or reject the Plan.  To the extent Class 10 Intercompany Claims and Class 11 Intercompany Interests are cancelled, each Holder of a Claim or Interest in Class 10 or 11 is deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and is not entitled to vote to accept or reject the Plan.

6.      Intercompany Interests

To the extent Reinstated under the Plan, distributions on account of Intercompany Interests are not being received by Holders of such Intercompany Interests on account of their Intercompany Interests but for the purposes of administrative convenience, for the ultimate benefit of the holders of New Common Stock, and in exchange for the Debtors' and Reorganized Debtors' agreement under the Plan to make certain distributions to the Holders of Allowed Claims.  For the avoidance of doubt, any Interest in Non-Debtor Subsidiaries owned by a Debtor shall continue to be owned by the applicable Reorganized Debtor.

36

7.    Controversy Concerning Impairment

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

8.    Subordinated Claims

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise, including, without limitation, the Intercreditor Agreement or the Subordinated Notes Indenture.  Pursuant to section 510 of the Bankruptcy Code, the Debtors or Reorganized Debtors reserve the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

C.    *Means for Implementation of the Plan*

1.    Restructuring Transactions

On the Effective Date, or as soon as reasonably practicable thereafter, the Reorganized Debtors may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the RSA and the Plan (the "Restructuring Transactions"), including:  (1) the execution and delivery of any appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Plan, and that satisfy the requirements of applicable law and any other terms to which the applicable Entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (3) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law; (4) if implemented pursuant to the Plan, all transactions necessary to provide for the purchase of substantially all of the assets or Interests of any of the Debtors, which purchase may be structured as a taxable transaction for United States federal income tax purposes; (5) the execution and delivery of the Takeback First Lien Term Loan Documents; (6) engaging an agent under the Warrant Agreement; and (7) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

2.    Sources of Consideration for Plan Distributions

The Reorganized Debtors shall fund distributions under the Plan as follows:

(a)    Cash on Hand

The Reorganized Debtors shall use Cash on hand to fund distributions to certain Holders of Claims against the Debtors in accordance with Article III of the Plan.

(b)    Issuance and Distribution of New Common Stock and Warrants

The issuance of the New Common Stock, including the shares of the New Common Stock, the Warrants, and the shares of the New Common Stock issuable upon exercise of the Warrants, shall be authorized without the need for any further corporate action and without any further action by the Holders of Claims or Interests.  Each holder of the New Common Stock shall be deemed to be a party to, and bound by, the New Stockholders Agreement regardless of whether such holder has executed a signature page thereto.

All of the shares of New Common Stock issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable. Each distribution and issuance of the New Common Stock under the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

On the Effective Date, none of the New Common Stock or Warrants will be registered under the Securities Act or listed on a national securities exchange, the Reorganized Debtors will not be reporting companies under the Securities Exchange Act, the Reorganized Debtors shall not be required to and will not file reports with the Securities and Exchange Commission or any other entity or party, and the Reorganized Debtors shall not be required to file monthly operating reports with the Court after the Effective Date. In order to prevent the Reorganized Debtors from becoming subject to the reporting requirements of the Securities Exchange Act, except in connection with a public offering, the New Stockholders Agreement may impose certain trading restrictions, and the New Common Stock and Warrants will be subject to certain transfer and other restrictions pursuant to the New Stockholders Agreement designed to maintain the Reorganized Debtors as private, non-reporting companies.

Notwithstanding anything to the contrary in the Plan or herein, solely with respect to the distribution of Warrants pursuant to Article III.B.7.c.ii of the Plan, in the event the Debtors determine that the number of Holders receiving Warrants is such that the Debtors reasonably believe that there is a risk that the Reorganized Parent could be required to be (a) a reporting company under the Securities Exchange Act, or (b) registered on any public exchange, the Debtors, with the prior consent of the Required Silo-Level Supporting Lenders, are authorized to, in lieu of distributing Warrants pursuant to Article III.B.7.c.ii of the Plan, either (x) distribute the Alternative Distribution directly to the Holder entitled to the lowest number of Warrants, and continuing such cash-out with respect to the Holder entitled to the next lowest number of Warrants or (y) issue such Warrants to a trust and provide for liquidation of such Warrants and distribution of the proceeds thereof), in each case to the extent necessary or appropriate to ensure Reorganized Parent will not be required to be a reporting company under the Securities Exchange Act or registered on any public exchange; *provided* that, notwithstanding the foregoing, the Supporting Noteholders shall in any event receive Warrants directly rather than Cash as contemplated by this paragraph.

3.    Takeback First Lien Term Loan

The Reorganized Debtors shall enter into the Takeback First Lien Term Loan on the Effective Date. Each Term Loan Lender shall receive its share of the loans under the Takeback First Lien Term Loan pursuant to Article III.B of the Plan. The Takeback First Lien Term Loan shall be on terms set forth in the Takeback First Lien Loan Documents, in an amount equal to $600 million on the Effective Date.

Confirmation shall be deemed approval of the Takeback First Lien Term Loan (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees paid by the Debtors or the Reorganized Debtors in connection therewith), to the extent not approved by the Court previously, and the Reorganized Debtors are authorized to execute and deliver those documents necessary or appropriate to obtain the Takeback First Lien Term Loan, including the Takeback First Lien Term Loan Documents, without further notice to or order of the Court, act or action under applicable law, regulation, order, or rule or vote, consent, authorization, or approval of any Person, subject to such modifications as the Reorganized Debtors may deem to be necessary to consummate the Takeback First Lien Term Loan (in consultation with the Takeback First Lien Administrative Agent and the Required Supporting Lenders).

On the Effective Date, (a) upon the granting of liens in accordance with the Takeback First Lien Term Loan Documents, the lenders thereunder shall have valid, binding, and enforceable liens on the collateral specified in the Takeback First Lien Term Loan Documents and (b) upon the granting of guarantees, mortgages, pledges, liens, and other security interests in accordance with the Takeback First Lien Term Loan Documents, the guarantees, mortgages, pledges, liens, and other security interests granted to secure the obligations arising under the Takeback First Lien Term Loan Documents shall be granted in good faith as an inducement to the lenders thereunder to convert to term loans thereunder and shall be deemed not to constitute a fraudulent conveyance or fraudulent transfer, shall not otherwise be subject to avoidance, and the priorities of such liens and security interests shall be as set forth in the Takeback First Lien Term Loan Documents.

4.    Corporate Existence

Except as otherwise provided in the Plan, the New Organizational Documents, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, each Debtor shall continue to exist after the Effective Date as a separate corporation, limited liability company, partnership, or other form of entity, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form of entity, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and by-laws (or other analogous formation documents) in effect before the Effective Date, except to the extent such certificate of incorporation and bylaws (or other analogous formation documents) are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).

On the Effective Date, pursuant to section 1123(a)(5)(C) of the Bankruptcy Code and applicable state law, and as described in the Plan Supplement, the Debtors shall effectuate the merger or consolidation of one or more of the Debtors with one or more Entities.

5.    Vesting of Assets in the Reorganized Debtors

Except as otherwise provided in the RSA the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, all property in each Estate, all Causes of Action, all Executory Contracts and Unexpired Leases assumed by any of the Debtors, and any property acquired by any of the Debtors, including Interests held by the Debtors in Non-Debtor Subsidiaries, pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances. On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property, and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

6.    Cancellation of Existing Securities

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date:  (1) the obligations of the Debtors under the Dex East Credit Agreement, the Dex West Credit Agreement, the RDHI Credit Agreement, the SuperMedia Credit Agreement, and the Subordinated Notes Indenture, and any other certificate, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document, directly or indirectly, evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Interest (except such certificates, notes, or other instruments or documents evidencing indebtedness or obligations of the Debtors that are specifically Reinstated pursuant to the Plan) shall be cancelled solely as to the Debtors and the Reorganized Debtors shall not have any continuing obligations thereunder; and (2) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors (except such agreements, certificates, notes, or other instruments evidencing indebtedness or obligations of the Debtors that are specifically Reinstated pursuant to the Plan) shall be released and discharged; *provided* that notwithstanding Confirmation or the occurrence of the Effective Date, any such indenture or agreement that governs the rights of the Holder of a Claim or Interest shall continue in effect solely for purposes of (a) enabling Holders of Allowed Claims and Allowed Interests to receive distributions under the Plan as provided therein, and for a Servicer to perform such other necessary functions with respect thereto, if any, (b) permitting a Servicer to seek compensation and reimbursement for any reasonable and documented fees and expenses, if any, incurred in making distributions pursuant to the Plan, and (c) preserving all rights and obligations not released pursuant to Article VIII.F of the Plan as between non-Debtor Entities bound thereunder (including any indemnity obligations that a Holder of a Claim or Interest may owe to another Holder); *provided, further*, that the preceding proviso shall not affect the discharge of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan or result in any expense or liability to the Reorganized Debtors, except to the extent set forth in or provided for under the Plan; *provided, further*, that

nothing in this section shall effect a cancellation of any New Common Stock, the Warrants, or, to the extent Reinstated, the Intercompany Interests.

On and after the Effective Date, all duties and responsibilities of the Dex East Administrative Agent under the Dex East Credit Agreement, the Dex West Administrative Agent under the Dex West Credit Agreement, the RHDI Administrative Agent under the RHDI Credit Agreement, the SuperMedia Administrative Agent under the SuperMedia Credit Agreement, and the Subordinated Notes Indenture Trustee under the Subordinated Notes Indenture, as applicable, shall be discharged unless otherwise specifically set forth in or provided for under the Plan or the Plan Supplement.

If the record holder of the Subordinated Notes is DTC or its nominee or another securities depository or custodian thereof, and such Subordinated Notes are represented by a global security held by or on behalf of DTC or such other securities depository or custodian, then each such holder of the Subordinated Notes shall be deemed to have surrendered such holder's note, debenture or other evidence of indebtedness upon surrender of such global security by DTC or such other securities depository or custodian thereof.

7.    Corporate Action

Upon the Effective Date, or as soon thereafter as is reasonably practicable, all actions contemplated by the Plan shall be deemed authorized and approved by the Court in all respects, including, as applicable:  (1) the issuance of the New Common Stock and the Warrants; (2) the selection of the directors and officers for Reorganized Parent and the other Reorganized Debtors; (3) execution and delivery of the Takeback First Lien Term Loan Documents; (4) adoption of the Management Incentive Plan by the New Board of the Reorganized Parent; (5) implementation of the Restructuring Transactions; and (6) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date).   Upon the Effective Date, all matters provided for in the Plan involving the corporate structure of Reorganized Parent and the other Reorganized Debtors, and any corporate action required by the Debtors, Reorganized Parent, or the other Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors, or officers of the Debtors, Reorganized Parent, or the other Reorganized Debtors.  On or (as applicable) before the Effective Date, the appropriate officers of the Debtors, Reorganized Parent, or the other Reorganized Debtors shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of Reorganized Parent and the other Reorganized Debtors, including the Takeback First Lien Term Loan Documents and any and all other agreements, documents, securities, and instruments relating to the foregoing, to the extent not previously authorized by the Court.  The authorizations and approvals contemplated by Article IV.F of the Plan shall be effective notwithstanding any requirements under non-bankruptcy law.

8.    New Organizational Documents

To the extent required under the Plan or applicable nonbankruptcy law, on the Effective Date Reorganized Parent will file the New Organizational Documents with the applicable Secretary of State and/or other applicable authorities in the state, province, or country of incorporation in accordance with the corporate laws of the respective state, province, or country of incorporation.   Pursuant to section 1123(a)(6) of the Bankruptcy Code, the New Organizational Documents of Reorganized Parent will prohibit the issuance of non-voting equity securities. After the Effective Date, Reorganized Parent may amend and restate the New Organizational Documents, and the Reorganized Debtors may file their respective certificates or articles of incorporation, bylaws, or such other applicable formation documents, and other constituent documents as permitted by the laws of the respective states, provinces, or countries of incorporation and the New Organizational Documents.

9.    Directors and Officers of the Reorganized Debtors

As of the Effective Date, the term of the current members of the board of directors of Parent shall expire, and the initial board of directors shall be appointed in accordance with the New Organizational Documents and other constituent documents of Reorganized Parent.  The initial New Board of Reorganized Parent shall be selected in a manner consistent with the provisions of the New Stockholders Agreement Term Sheet and shall consist of those

individuals disclosed prior to the Confirmation Hearing as part of the Plan Supplement. Successors will be elected in accordance with the New Organizational Documents of Reorganized Parent.

As of the Effective Date, the initial officers of the Reorganized Debtors will be the officers of the Debtors existing immediately prior to the Effective Date and the existing directors of the Reorganized Debtors, other than Reorganized Parent, will be the directors of such Debtors existing immediately prior to the Effective Date.

Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors will, to the extent practicable, disclose in advance of the Confirmation Hearing the identity and affiliations of any Person proposed to serve on the initial New Boards, as well as those Persons that will serve as an officer of Reorganized Parent or any of the Reorganized Debtors. To the extent any such director or officer is an "insider" under the Bankruptcy Code, the nature of any compensation to be paid to such director or officer will also be disclosed. Each such director and officer shall serve from and after the Effective Date pursuant to the terms of the New Organizational Documents and other constituent documents of Reorganized Parent and the Reorganized Debtors.

10. Effectuating Documents; Further Transactions

On and after the Effective Date, Reorganized Parent, the Reorganized Debtors, and the officers and members of the New Boards thereof, are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the Securities issued pursuant to the Plan, including the New Common Stock and the Warrants, in the name of and on behalf of Reorganized Parent or the Reorganized Debtors, without the need for any approvals, authorization, or consents except those expressly required pursuant to the Plan.

11. Exemption from Certain Taxes and Fees

To the maximum extent permitted pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, sale or use tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents pursuant to such transfers of property without the payment of any such tax, recordation fee, or governmental assessment.

12. Preservation of Causes of Action

In accordance with section 1123(b) of the Bankruptcy Code, but subject in all respects to Article IV.L and Article VIII of the Plan, and as otherwise set forth in the RSA or any other order of the Court, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and such rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Causes of Action against it as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action against it. The Debtors or the Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the RSA or the Plan, Confirmation Order, or other Court order, the Debtors or Reorganized Debtors, as applicable, expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

In accordance with section 1123(b)(3) of the Bankruptcy Code, except as otherwise provided in the Plan, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors. The applicable Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Court.

13.  Release of Avoidance Actions

On the Effective Date, and except to the extent otherwise reserved in the Plan Supplement, the Debtors, on behalf of themselves and their estates, shall release any and all Avoidance Actions and the Debtors and the Reorganized Debtors, and any of their successors or assigns and any Entity acting on behalf of the Debtors or the Reorganized Debtors, shall be deemed to have waived the right to pursue any and all Avoidance Actions. No Avoidance Actions shall revert to creditors of the Debtors.

14.  Director and Officer Liability Insurance

To the extent that the D&O Liability Insurance Policies are considered to be Executory Contracts, notwithstanding anything in the Plan to the contrary, effective as of the Effective Date, the Reorganized Debtors shall be deemed to have assumed all unexpired D&O Liability Insurance Policies with respect to the Debtors' directors, managers, officers, and employees serving on or prior to the Petition Date pursuant to section 365(a) of the Bankruptcy Code. Entry of the Confirmation Order will constitute the Court's approval of the Reorganized Debtors' assumption of each of the unexpired D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Reorganized Debtors under the Plan as to which no Proof of Claim need be filed.

Before the Petition Date, the Debtors obtained reasonably sufficient tail coverage (i.e., director, manager, and officer insurance coverage that extends beyond the end of the policy period) under a D&O Liability Insurance Policy for the current and former directors, officers, and managers. After the Effective Date, the Reorganized Debtors shall not terminate or otherwise reduce the coverage under any D&O Liability Insurance Policy (including such tail coverage liability insurance) in effect and all members, managers, directors, and officers of the Debtors who served in such capacity at any time prior to the Effective Date of the Plan shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such members, managers, directors, and/or officers remain in such positions after the Effective Date of the Plan.

15.  Management Incentive Plan

On the Effective Date, equity grants equal to 10 percent of the New Common Stock (on a fully diluted basis) shall be reserved for continuing directors, officers, and employees of the Reorganized Debtors, on terms to be negotiated with certain material terms included in the Plan Supplement. The form and timing of Management Incentive Plan grants will be determined by the compensation committee of the New Board of the Reorganized Parent.

16.  Employee and Retiree Benefits

All employment, severance, retirement, indemnification, and other similar employee-related agreements or arrangements in place as of the Effective Date with the Debtors and the Non-Debtor Subsidiaries, including retirement income plans and welfare benefit plans, or discretionary bonus plans or variable incentive plans regarding payment of a percentage of annual salary based on performance goals and financial targets for certain employees, shall be assumed by the Reorganized Debtors and shall remain in place after the Effective Date in accordance with the terms of such agreements or arrangements, as may be amended by agreement between the beneficiaries of such agreements, plans, or arrangements, on the one hand, and the Debtors (with the consent of the Required Supporting

Lenders), on the other hand, or, after the Effective Date, by agreement with the Reorganized Debtors, and the Reorganized Debtors will continue to honor such agreements, arrangements, programs, and plans; *provided* that the foregoing shall not apply to the Debtors' Value Creation Program or any of the Debtors' existing equity-based compensation, agreements, or arrangements, which, for the avoidance of doubt, shall be cancelled as of the Effective Date.  Nothing in the Plan shall limit, diminish, or otherwise alter the Reorganized Debtors' defenses, claims, Causes of Action, or other rights with respect to any such contracts, agreements, policies, programs, and plans. Notwithstanding the foregoing, pursuant to section 1129(a)(13) of the Bankruptcy Code, on and after the Effective Date, all retiree benefits (as that term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

D.      *Treatment of Executory Contracts and Unexpired Leases*

     1.      <u>Assumption and Rejection of Executory Contracts and Unexpired Leases</u>

On the Effective Date, except as otherwise provided in the Plan, all Executory Contracts or Unexpired Leases not otherwise assumed or rejected will be deemed assumed by the applicable Reorganized Debtor in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than: (1) those that are identified on the Schedule of Rejected Executory Contracts and Unexpired Leases; (2) those that have been previously rejected by a Final Order; (3) those that are the subject of a motion to reject Executory Contracts or Unexpired Leases that is pending on the Confirmation Date; or (4) those that are subject to a motion to reject an Executory Contract or Unexpired Lease pursuant to which the requested effective date of such rejection is after the Effective Date.

Entry of the Confirmation Order shall constitute a Court order approving the assumptions, assumptions and assignments, or rejections of such Executory Contracts or Unexpired Leases as set forth in the Plan or the Schedule of Rejected Executory Contracts and Unexpired Leases, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Unless otherwise indicated, assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date.  Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Court order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by the provisions of the Plan or any order of the Court authorizing and providing for its assumption under applicable federal law.  Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by a Final Order of the Court on or after the Effective Date.

     2.      <u>Claims Based on Rejection of Executory Contracts or Unexpired Leases</u>

Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be filed with the Court within 30 days after the date of entry of an order of the Court (including the Confirmation Order) approving such rejection.  **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed within such time will be automatically Disallowed, forever barred from assertion, and shall not be enforceable against, as applicable, the Debtors, the Reorganized Debtors, the Estates, or property of the foregoing parties, without the need for any objection by the Debtors or the Reorganized Debtors, as applicable, or further notice to, or action, order, or approval of the Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.**  Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III.B.8 of the Plan.

     3.      <u>Cure of Defaults for Assumed Executory Contracts and Unexpired Leases</u>

Any monetary defaults under an Executory Contract or Unexpired Lease shall be deemed cured, and all pecuniary losses relating to any defaults (monetary or nonmonetary) shall be deemed compensated, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the proposed cure amount set forth on the Cure Notice amount in Cash on the Effective Date or as soon as reasonably practicable thereafter, subject to the limitations described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may

otherwise agree. In the event of a dispute regarding (1) the amount of any Cure Claim, (2) the ability of the Reorganized Debtors or any assignee, to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption or the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order or Final Orders resolving the dispute and approving the assumption.

At least 14 days before the Confirmation Hearing, the Debtors shall distribute, or cause to be distributed, Cure Notices of proposed assumption and proposed amounts of Cure Claims to the applicable third parties. Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or related cure amount must be Filed, served and actually received by the Debtors at least seven days before the Confirmation Hearing. Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or cure amount will be deemed to have assented to such assumption or cure amount. Notwithstanding anything in the Plan to the contrary, in the event that any Executory Contract or Unexpired Lease is removed from the Schedule of Rejected Executory Contracts and Unexpired Leases after such 14-day deadline, a Cure Notice of proposed assumption and proposed amounts of Cure Claims with respect to such Executory Contract or Unexpired Lease will be sent promptly to the counterparty thereof and a noticed hearing set to consider whether such Executory Contract or Unexpired Lease can be assumed.

In any case, if the Court determines that the Allowed Cure Claim with respect to any Executory Contract or Unexpired Lease is greater than the amount set forth in the applicable Cure Notice, the Debtors or Reorganized Debtors, as applicable, will have the right to add such Executory Contract or Unexpired Lease to the Schedule of Rejected Executory Contracts and Unexpired Leases, in which case such Executory Contract or Unexpired Lease will be deemed rejected as the Effective Date.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the date that the Debtors assume such Executory Contract or Unexpired Lease. Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Court.

4.    Indemnification Obligations

Notwithstanding anything in the Plan to the contrary (but subject to Article III.B.9 of the Plan), each Indemnification Obligation shall be assumed by the applicable Debtor, effective as of the Effective Date, pursuant to sections 365 and 1123 of the Bankruptcy Code or otherwise. Each Indemnification Obligation shall remain in full force and effect, shall not be modified, reduced, discharged, impaired, or otherwise affected in any way, and shall survive Unimpaired and unaffected, irrespective of when such obligation arose.

The Debtors shall assume the Indemnification Obligations for the current and former directors, officers, managers, employees, and other professionals of the Debtors, in their capacities as such. Notwithstanding the foregoing, nothing shall impair the ability of Reorganized Debtors to modify indemnification obligations (whether in the bylaws, certificates or incorporate or formation, limited liability company agreements, other organizational or formation documents, board resolutions, indemnification agreements, employment contracts, or otherwise) arising after the Effective Date; *provided* that none of the Reorganized Debtors shall amend or restate any New Organizational Documents before or after the Effective Date to terminate or adversely affect any of the Reorganized Debtors' Indemnification Obligations.

5.    Insurance Policies

Without limiting Article IV.M of the Plan, all of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as and deemed to be Executory Contracts under the Plan. On the Effective Date, the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments related thereto.

6.    Restructuring Support Agreement

The RSA is treated as and deemed to be an Executory Contract under the Plan.  Unless otherwise previously assumed by the Debtors, on the Effective Date, the RSA shall be deemed assumed by the Debtors and any defaults thereunder shall be cured prior to the Effective Date, unless otherwise waived by the Required Supporting Lenders or the Required Silo-Level Supporting Lenders, as applicable.

7.    Modifications, Amendments, Supplements, Restatements, or Other Agreements

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, and supplements to, or restatements of, prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

8.    Reservation of Rights

Neither the inclusion of any Executory Contract or Unexpired Lease on Schedule G of the Debtors' Schedules of Assets and Liabilities, the Cure Notice, or the Schedule of Rejected Executory Contracts and Unexpired Leases, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors, or, after the Effective Date, the Reorganized Debtors, shall have 30 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

9.    Nonoccurrence of Effective Date

In the event that the Effective Date does not occur, the Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases of nonresidential real property pursuant to section 365(d)(4) of the Bankruptcy Code.

10.    Contracts and Leases Entered into After the Petition Date

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the applicable Debtor or Reorganized Debtor liable thereunder in the ordinary course of its business. Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) that have not been rejected as of the date of Confirmation will survive and remain unaffected by entry of the Confirmation Order.

E.    *Provisions Governing Distributions*

1.    Timing and Calculation of Amounts to Be Distributed

Unless otherwise provided in the Plan, on the Effective Date or as soon as reasonably practicable thereafter (or, if a Claim is not an Allowed Claim on the Effective Date, on the date that such Claim becomes Allowed or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim shall receive the full amount of the distributions that the Plan provides for Allowed Claims in each applicable Class.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be

deemed to have been completed as of the required date. If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VII of the Plan. Except as otherwise provided in the Plan, Holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

On the Effective Date, or as soon as reasonably practicable thereafter, the Reorganized Debtors shall distribute the New Common Stock pursuant to the terms set forth in the Plan.

2.    Distributions to Be Made Under the Plan

Except as otherwise provided in the Plan, all distributions made under the Plan shall be made by the Reorganized Debtors on the Effective Date or as soon as reasonably practicable thereafter, except that distributions to Holders of Allowed Claims governed by a separate agreement and administered by a Servicer shall be deposited with the appropriate Servicer, at which time such distributions shall be deemed complete, and the Servicer shall deliver such distributions in accordance with the Plan and the terms of the governing agreement; *provided* that New Common Stock shall be distributed by a third-party transfer agent designated by the Debtors. Distributions to Holders of Dex East Credit Facility Claims, Dex West Credit Facility Claims, RHDI Credit Facility Claims, and SuperMedia Credit Facility Claims shall only be made to the Holders as of the Distribution Record Date, as determined by the register of the applicable Credit Agreement Agent.

The Reorganized Debtors and any Servicer, to the extent it provides services related to distributions pursuant to the Plan, shall only be required to act and make distributions in accordance with the terms of the Plan and shall have no (x) liability for actions taken in accordance with the Plan or in reliance upon information provided to them in accordance with the Plan, or (y) obligation or liability for distributions under the Plan to any party who does not hold an Allowed Claim as of the Distribution Record Date or who does not otherwise comply with the terms of the Plan.

To the extent a Servicer provides services related to distributions pursuant to the Plan, it shall be entitled to reasonable and customary compensation from the Reorganization Debtors for such services and reimbursement for reasonable and customary expenses incurred in connection with such services.

3.    Distributions Transferred Pursuant to the Equity Put Option

Subject to the satisfaction or waiver by the Backstop Parties of the Alternative Distribution Conditions, each Term Loan Lender may elect to receive in lieu of all or any portion of the New Common Stock to which such Lender is entitled pursuant to Article III.B loans under the Takeback First Lien Term Loan that would otherwise be distributable to the Backstop Parties in an aggregate principal amount per share of New Common Stock based on a total equity valuation of the Reorganized Debtors of $50 million, as more fully described herein and the Backstop Agreement.

4.    Delivery of Distributions and Undeliverable or Unclaimed Distributions

(a)    Delivery of Distributions

(i)    Delivery of Distributions to the Dex East Administrative Agent

Except as otherwise provided in the Plan, all distributions to Holders of Dex East Credit Facility Claims shall be governed by the Dex East Credit Agreement and shall be deemed completed when made to the Dex East Administrative Agent, which shall be deemed to be the Holder of all Dex East Credit Facility Claims for purposes of distributions to be made under the Plan. The Dex East Administrative Agent shall hold or direct such distributions for the benefit of the Holders of Allowed Dex East Credit Facility Claims, as applicable. As soon as practicable in accordance with the requirements set forth

in Article VI of the Plan, the Dex East Administrative Agent shall arrange to deliver such distributions to or on behalf of such Holders of Allowed Dex East Credit Facility Claims.

(ii)     Delivery of Distributions to the Dex West Administrative Agent

Except as otherwise provided in the Plan, all distributions to Holders of Dex West Credit Facility Claims shall be governed by the Dex West Credit Agreement and shall be deemed completed when made to the Dex West Administrative Agent, which shall be deemed to be the Holder of all Dex West Credit Facility Claims for purposes of distributions to be made under the Plan. The Dex West Administrative Agent shall hold or direct such distributions for the benefit of the Holders of Allowed Dex West Credit Facility Claims, as applicable. As soon as practicable in accordance with the requirements set forth in Article VI of the Plan, the Dex West Administrative Agent shall arrange to deliver such distributions to or on behalf of such Holders of Allowed Dex West Credit Facility Claims.

(iii)     Delivery of Distributions to the RHDI Administrative Agent

Except as otherwise provided in the Plan, all distributions to Holders of RHDI Credit Facility Claims shall be governed by the RHDI Credit Agreement and shall be deemed completed when made to the RHDI Administrative Agent, which shall be deemed to be the Holder of all RHDI Credit Facility Claims for purposes of distributions to be made under the Plan. The RHDI Administrative Agent shall hold or direct such distributions for the benefit of the Holders of Allowed RHDI Credit Facility Claims, as applicable. As soon as practicable in accordance with the requirements set forth in Article VI of the Plan, the RHDI Administrative Agent shall arrange to deliver such distributions to or on behalf of such Holders of Allowed RHDI Credit Facility Claims.

(iv)     Delivery of Distributions to the SuperMedia Administrative Agent

Except as otherwise provided in the Plan, all distributions to Holders of SuperMedia Credit Facility Claims shall be governed by the SuperMedia Credit Agreement and shall be deemed completed when made to the SuperMedia Administrative Agent, which shall be deemed to be the Holder of all SuperMedia Credit Facility Claims for purposes of distributions to be made under the Plan. The SuperMedia Administrative Agent shall hold or direct such distributions for the benefit of the Holders of Allowed SuperMedia Credit Facility Claims, as applicable. As soon as practicable in accordance with the requirements set forth in Article VI of the Plan, the SuperMedia Administrative Agent shall arrange to deliver such distributions to or on behalf of such Holders of Allowed SuperMedia Credit Facility Claims.

(v)     Delivery of Distributions to Subordinated Notes Indenture Trustee

Except as otherwise provided in the Plan, all distributions to Holders of Subordinated Notes Claims shall be deemed completed when made to the Subordinated Notes Indenture Trustee, which shall be deemed to be the Holder of all Subordinated Notes Claims for purposes of distributions to be made under the Plan. The Subordinated Notes Indenture Trustee shall hold or direct such distributions for the benefit of the Holders of Allowed Subordinated Notes Claims, as applicable. As soon as practicable in accordance with the requirements set forth in Article VI of the Plan, the Subordinated Notes

47

Indenture Trustee shall arrange to deliver such distributions to or on behalf of such Holders of Allowed Subordinated Notes Claims.

(b)    Delivery of Distributions in General

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims (other than Holders of Credit Agreement Claims or Subordinated Notes Claims) or Interests shall be made to Holders of record as of the Distribution Record Date by the Reorganized Debtors or a Servicer, as appropriate: (1) to the signatory set forth on any of the Proofs of Claim Filed by such Holder or other representative identified therein (or at the last known addresses of such Holder if no Proof of Claim is Filed or if the Debtors have been notified in writing of a change of address on or before the date that is 10 days before the Effective Date); (2) at the addresses set forth in any written notices of address changes delivered to the Reorganized Debtors after the date of any related Proof of Claim; (3) at the addresses reflected in the Schedules if no Proof of Claim has been Filed and the Reorganized Debtors have not received a written notice of a change of address on or before the date that is 10 days before the Effective Date; or (4) on any counsel that has appeared in the Chapter 11 Cases on the Holder's behalf.  Subject to Article VI of the Plan, distributions under the Plan on account of Allowed Claims shall not be subject to levy, garnishment, attachment, or like legal process, so that each Holder of an Allowed Claim shall have and receive the benefit of the distributions in the manner set forth in the Plan.  The Debtors, the Reorganized Debtors, or any Servicer making distributions shall not incur any liability whatsoever on account of any distributions under the Plan except for gross negligence or willful misconduct.

(c)    Minimum Distributions

No fractional shares of New Common Stock or Warrants shall be distributed, and no Cash shall be distributed in lieu of such fractional amounts.  When any distribution pursuant to the Plan on account of an Allowed Claim would otherwise result in the issuance of Cash or a number of shares of New Common Stock or Warrants that is not a whole number, the actual distribution of  shares of Cash, New Common Stock, or Warrants, as applicable, shall be rounded as follows: (a) fractions of one-half or greater shall be rounded to the next higher whole number and (b) fractions of less than one-half shall be rounded to the next lower whole number with no further payment therefore.  The total amount of Cash and the total number of authorized shares of New Common Stock and Warrants to be distributed pursuant to the Plan shall be adjusted as necessary to account for the foregoing rounding.

(d)    Undeliverable Distributions and Unclaimed Property

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Reorganized Debtors have determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; *provided* that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the Effective Date.  After such date, all unclaimed property or interests in property shall be redistributed Pro Rata as provided under the Plan (it being understood that, for purposes of Article VI.D.3 of the Plan, "Pro Rata" shall be determined as if the Claim underlying such unclaimed distribution had been Disallowed) and all other unclaimed property or interests in property shall revert to the Reorganized Debtors without need for a further order by the Court (notwithstanding any applicable federal, provincial, or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such property or Interest in property shall be discharged and forever barred.

(e)    Warrants

As described in Article III.B.7 of the Plan, the Holders of Subordinated Notes Claims on the Effective Date (immediately prior to the consummation of the Plan) may receive the Warrants from the Reorganized Debtors on the Effective Date.  The Warrants may be subject to certain transfer, exercise and other restrictions and appropriate legends pursuant to, among other things, the Warrant Agreement.  Notwithstanding anything to the contrary in the Plan, in no event shall the terms of the Warrants cause Reorganized Parent to be required by the Securities Act or the Exchange Act, including without limitation Section 12(g) or 15(d) of the Exchange Act, or any other federal, state or local securities laws, to register with the SEC or other similar regulatory authority any class of equity securities of Parent or to file periodic reports under Section 13 or 15(d) of the Exchange Act.  The Warrant

Agreement shall contain transfer, exercise and other restrictions and appropriate legends and consistent with the Noteholder Term Sheet to ensure that the terms of the Warrants and the Warrant Agreement do not result in such registration or reporting requirements on the part of Reorganized Parent.

5.  Securities Registration Exemption

Pursuant to section 1145 of the Bankruptcy Code, the issuances of the New Common Stock, the Warrants, and the shares of the New Common Stock issuable upon exercise of the Warrants, as contemplated by the Plan are exempt from, among other things, the registration requirements of Section 5 of the Securities Act and any other applicable U.S. state or local law requiring registration prior to the offering, issuance, distribution, or sale of Securities. The New Common Stock and the Warrants (a) are not "restricted securities" as defined in Rule 144(a)(3) under the Securities Act, and (b) are freely tradable and transferable by any initial recipient thereof that (i) is not an "affiliate" of the Reorganized Debtors as defined in Rule 144(a)(1) under the Securities Act, (ii) has not been such an "affiliate" within 90 days of such transfer, and (iii) is not an entity that is an "underwriter" as defined in subsection (b) of Section 1145 of Title 11 of the United States Code.

Should the Reorganized Debtors elect on or after the Effective Date to reflect any ownership of the New Common Stock or the Warrants through the facilities of the DTC, the Reorganized Debtors need not provide any further evidence other than the Plan or the Confirmation Order with respect to the treatment of the New Common Stock or the Warrants or under applicable securities laws.

The DTC shall be required to accept and conclusively rely upon the Plan and Confirmation Order in lieu of a legal opinion regarding whether the New Common Stock or the Warrants are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

Notwithstanding anything to the contrary in the Plan, no entity (including, for the avoidance of doubt, the DTC) may require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the New Common Stock or the Warrants are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

6.  Compliance with Tax Requirements

In connection with the Plan, to the extent applicable, Reorganized Parent and the Reorganized Debtors, as applicable, shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors, as applicable, shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions or establishing any other mechanisms they believe are reasonable and appropriate. The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

7.  Allocations

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest as Allowed under the Plan.

8.  No Postpetition Interest on Claims

Unless otherwise specifically provided for in an order of the Court, the Plan, or the Confirmation Order, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claims or Interests and no Holder of a Claim or Interest shall be entitled to interest accruing on or after the Petition Date on any such Claim.

9. Setoffs and Recoupment

Except as otherwise expressly provided in the Plan, the Debtors or the Reorganized Debtors, as applicable, may, but shall not be required to, setoff against or recoup from any Claims of any nature whatsoever that the Debtors or the Reorganized Debtors may have against the claimant, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any such Claim it may have against the Holder of such Claim.

10. Claims Paid or Payable by Third Parties

(a)    Claims Paid by Third Parties

The Debtors or the Reorganized Debtors, as applicable, shall reduce in full a Claim, and such Claim shall be Disallowed without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or a Reorganized Debtor; *provided* that the Debtors shall provide 21 days' notice to the Holder prior to any disallowance of such Claim during which period the Holder may object to such disallowance, and if the parties cannot reach an agreed resolution, the matter shall be decided by the Court.  Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such Holder shall, within 14 days of receipt thereof, repay or return the distribution to the Reorganized Debtors to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.  The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the Reorganized Debtors annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the 14-day grace period specified above until the amount is repaid.

(b)    Claims Payable by Third Parties

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.  To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Court; *provided* that the Debtors shall provide 21 days' notice to the Holder of such Claim prior to any disallowance of such Claim during which period the Holder may object to such disallowance, and if the parties cannot reach an agreed resolution, the matter shall be decided by the Court.

(c)    Applicability of Insurance Policies

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy.  Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained in the Plan constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

F.    *Procedures for Resolving Contingent, Unliquidated, and Disputed Claims*

1. Allowance of Claims

After the Effective Date, each of the Debtors or the Reorganized Debtors shall have and retain any and all rights and defenses such Debtor had with respect to any Claim immediately before the Effective Date.  Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is

50

deemed Allowed pursuant to the Plan or a Final Order, including the Confirmation Order (when it becomes a Final Order), allowing such Claim.

### 2. Claims and Interests Administration Responsibilities

Except as otherwise specifically provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, after the Effective Date, the Reorganized Debtors by order of the Court, shall have the sole authority: (1) to File, withdraw, or litigate to judgment objections to Claims; (2) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Court.

### 3. Estimation of Claims

Before or after the Effective Date, the Debtors or the Reorganized Debtors may (but are not required to) at any time request that the Court estimate any Disputed Claim or Disputed Interest that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Court has ruled on any such objection, and the Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to any Claim or during the appeal relating to such objection. Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register, but that has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Court. In the event that the Court estimates any Disputed, contingent, or unliquidated Claim, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions), and the relevant Debtor may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim. If the estimated amount constitutes a maximum limitation on such Claim, the Debtors or the Reorganized Debtors, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate distribution on account of such Claim. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before 21 days after the date on which such Claim is estimated. All of the aforementioned Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Court.

### 4. Adjustment to Claims Register Without Objection

Any Claim that has been paid or satisfied, or any Claim that has been amended or superseded, may be adjusted or expunged on the Claims Register by the Debtors or the Reorganized Debtors without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Court.

### 5. Time to File Objections to Claims

Any objections to Claims shall be Filed on or before the Claims Objection Deadline.

### 6. Disallowance of Claims

Any Claims held by Entities from which property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors or the Reorganized Debtors. All Proofs of Claim Filed on account of an indemnification obligation to a director, officer, or employee shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such

indemnification obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order, or approval of the Court.

**Except as provided in the Plan or herein or otherwise agreed, any and all Proofs of Claim filed after the Claims Bar Date shall be deemed Disallowed and expunged as of the Effective Date without any further notice to or action, order, or approval of the Court, and Holders of such Claims may not receive any distributions on account of such Claims, unless on or before the Confirmation Hearing such late Filed Claim has been deemed timely Filed by a Final Order.**

7. Amendments to Claims

On or after the Effective Date, except as provided in the Plan or the Confirmation Order, a Claim may not be Filed or amended without the prior authorization of the Court or the Reorganized Debtors and any such new or amended Claim Filed without such prior authorization shall be deemed Disallowed in full and expunged without any further action, order, or approval of the Court.

8. No Distributions Pending Allowance

If an objection to a Claim or portion thereof is Filed as set forth in Article VII of the Plan, no payment or distribution provided under the Plan shall be made on account of such Claim or portion thereof unless and until such Disputed Claim becomes an Allowed Claim.

9. Distributions After Allowance

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan. As soon as reasonably practicable after the date that the order or judgment of a court of competent jurisdiction allowing any Disputed Claim becomes a Final Order, the Reorganized Debtors shall provide to the Holder of such Claim the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, less any previous distribution (if any) that was made on account of the undisputed portion of such Claim, without any interest, dividends, or accruals to be paid on account of such Claim unless required under applicable bankruptcy law or as otherwise provided in Article III.B of the Plan.

10. Single Satisfaction of Claims

Holders of Allowed Claims may assert such Claims against each Debtor obligated with respect to such Claims, and such Claims shall be entitled to share in the recovery provided for the applicable Class of Claims against each obligated Debtor based upon the full Allowed amount of such Claims. Notwithstanding the foregoing, in no case shall the aggregate value of all property received or retained under the Plan on account of any Allowed Claim exceed 100 percent of the underlying Allowed Claim plus applicable interest, if any.

G. *Settlement, Release, Injunction, and Related Provisions*

1. Compromise and Settlement of Claims, Interests, and Controversies

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest. The entry of the Confirmation Order shall constitute the Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable. In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or

approval of the Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against, and Interests in, the Debtors and their Estates and Causes of Action against other Entities.

### 2.    Discharge of Claims and Termination of Interests

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided  in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any intercompany claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, liens on, obligations of, rights against, and interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (a) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (b) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (c) the Holder of such a Claim or Interest has accepted the Plan.  Any default or "event of default" by the Debtors or Affiliates with respect to any Claim or Interest that existed immediately before or on account of the Filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Effective Date.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring.

### 3.    Term of Injunctions or Stays

Unless otherwise provided in the Plan or in a Final Order, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 362 of the Bankruptcy Code or otherwise and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

### 4.    **Release of Liens**

**Except as otherwise specifically provided in the Plan, the Takeback First Lien Term Loan Documents, or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns, in each case, without any further approval or order of the Court and without any action or Filing being required to be made by the Debtors.  In addition, the Dex East Administrative Agent, the Dex West Administrative Agent, the RHDI Administrative Agent, and the SuperMedia Administrative Agent shall execute and deliver all documents reasonably requested by the Debtors, Reorganized Debtors, or administrative agent(s) for the Takeback First Lien Term Loan to evidence the release of such mortgages, deeds of trust, Liens, pledges, and other security interests and shall authorize the Reorganized Debtors to file UCC-3 termination statements (to the extent applicable) with respect thereto.**

### 5.    **Debtor Release**

**Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, on and after the Effective Date, the Released Parties are deemed expressly, unconditionally, generally, and individually and collectively, forever acquitted, released, and discharged by the Debtors, the Reorganized Debtors, and the Estates, each on behalf of itself and its predecessors, successors and assigns, subsidiaries, affiliates, current and former officers, directors, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers,**

consultants, representatives, management companies, fund advisors and other professionals, from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative claims asserted or assertable on behalf of the Debtors, any Claims asserted or assertable on behalf of any Holder of any Claim against or Interest in the Debtors and any Claims asserted or assertable on behalf of any other entity, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereinafter arising, in law, equity, contract, tort or otherwise, by statute or otherwise, that such releasing party (whether individually or collectively), ever had, now has or hereafter can, shall or may have, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring efforts, the Debtors' intercompany transactions (including dividends paid), any preference or avoidance claim pursuant to sections 544, 547, 548, and 549 of the Bankruptcy Code, the purchase, sale, or rescission of the purchase or sale of, or any other transaction relating to any security or other debt obligations of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is affected by or classified in the Plan, the business or contractual arrangements between the Debtors and the Released Parties, the restructuring of Claims and Interests before or during the Restructuring Transactions implemented by the Plan or any other transaction or other arrangement with the Debtors whether before or during the Restructuring Transactions, the negotiation, formulation or preparation of the Restructuring Transactions, the RSA, the Plan, the Plan Supplement, the Disclosure Statement, the Takeback First Lien Term Loan Documents, or any related agreements, any asset purchase agreement, instruments or other documents (including, for the avoidance of doubt, providing any legal opinion requested by any entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the RSA, the Disclosure Statement, the Plan, the Chapter 11 Cases, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities or other debt obligations pursuant to the Plan, or the distribution of property under the Plan, or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place or arising on or before the Effective Date related or relating to any of the foregoing, except for any act or omission that constitutes actual fraud, gross negligence or willful misconduct as determined by a Final Order of a court of competent jurisdiction; *provided* that nothing in the foregoing shall result in any of the Debtors' officers and directors waiving any indemnification Claims against the Debtors or any of their insurance carriers or any rights as beneficiaries of any insurance policies, which indemnification obligations and insurance policies shall be assumed by the Reorganized Debtors. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, any of the Restructuring Transactions, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

6. **Third Party Release**

Except as otherwise provided in the Plan, as of the Effective Date and to the fullest extent authorized by applicable law, each Releasing Party expressly, unconditionally, generally and individually and collectively forever releases, acquits, and discharges the Debtors, Reorganized Debtors, and Released Parties from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative Claims asserted or assertable on behalf of the Debtors, any Claims asserted or assertable on behalf of any Holder of any Claim against or Interest in the Debtors and any Claims asserted or assertable on behalf of any other entity, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereinafter arising, in law, equity, contract, tort or otherwise, by statute or otherwise, that such Releasing Party (whether individually or collectively), ever had, now has or hereafter can, shall or may have, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring efforts, the Debtors' intercompany transactions (including dividends paid), any preference or avoidance claim pursuant to sections 544, 547, 548, and 549 of the Bankruptcy Code, the purchase, sale, or rescission of the purchase or sale of any security or other debt obligation of the Debtors, or any other transaction relating to any security or other debt obligation of the Debtors, or any other transaction or other arrangement with the Debtors whether before or during the Restructuring Transactions, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is affected by or classified in the Plan, the business or contractual arrangements between the Debtors and the Released

Parties, the restructuring of Claims and Interests before or during the Restructuring Transactions implemented by the Plan, the negotiation, formulation or preparation of the Restructuring Transactions, the RSA, the Plan, the Plan Supplement, the Disclosure Statement, the Takeback First Lien Term Loan Documents, or any related agreements, any asset purchase agreement, instruments or other documents (including, for the avoidance of doubt, providing any legal opinion requested by any entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the RSA, the Disclosure Statement, the Plan, the Chapter 11 Cases, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities or other debt obligation pursuant to the Plan, or the distribution of property under the Plan, or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place or arising on or before the Effective Date related or relating to any of the foregoing, except for any act or omission that constitutes actual fraud, gross negligence or willful misconduct as determined by a Final Order of a court of competent jurisdiction; *provided* that nothing in the foregoing shall result in any of the Debtors' officers and directors waiving any indemnification Claims against the Debtors or any of their insurance carriers or any rights as beneficiaries of any insurance policies, which indemnification obligations and insurance policies shall be assumed by the Reorganized Debtors. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, any of the Restructuring Transactions, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Notwithstanding anything to the contrary in the foregoing, the releases set forth in Article VIII.F of the Plan do not release any Claims against any professional related to the Prior Tax Calculation; *provided* that, for the avoidance of doubt, the foregoing shall have no effect on any Claims released or enjoined as part of any prior chapter 11 cases (or the relevant confirmation orders therein) of the Debtors or any of the Debtors' predecessors or affiliates.

7.    Exculpation

Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any Exculpated Claim; *provided* that the foregoing "Exculpation" shall have no effect on the liability of any entity that results from any such act or omission that is determined by a Final Order to have constituted actual fraud, gross negligence, or willful misconduct.  The Exculpated Parties have participated in any and all activities potentially underlying any Exculpated Claim in good faith and in compliance with the applicable laws.

8.    Injunction

Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or Confirmation Order, all Entities who have held, hold, or may hold Claims or Interests that have been released pursuant to Article VIII.E or Article VIII.F of the Plan, discharged pursuant to Article VIII.B of the Plan, or are subject to exculpation pursuant to Article VIII.G of the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Non-Debtor Subsidiaries, the Reorganized Debtors, the Released Parties, or the Exculpated Parties:  (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (c) creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests released or settled pursuant to the Plan.  Notwithstanding anything to the contrary in the foregoing, the injunction does not

**enjoin any party under the Plan or under any document, instrument, or agreement (including those attached to the Disclosure Statement or set forth in the Plan Supplement) executed to implement the Plan from bringing an action to enforce the terms of the Plan or such document, instrument, or agreement (including those attached to the Disclosure Statement or set forth in the Plan Supplement) executed to implement the Plan.**

9.    Protection Against Discriminatory Treatment

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another Entity with whom the Reorganized Debtors have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

10.    Recoupment

In no event shall any Holder of Claims or Interests be entitled to recoup any Claim against any claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

11.    Subordination Rights.

Any distributions under the Plan to Holders shall be received and retained free from any obligations to hold or transfer the same to any other Holder and shall not be subject to levy, garnishment, attachment, or other legal process by any Holder by reason of claimed contractual subordination rights. Any such subordination rights shall be waived, and the Confirmation Order shall constitute an injunction enjoining any Entity from enforcing or attempting to enforce any contractual, legal, or equitable subordination rights to property distributed under the Plan, in each case other than as provided in the Plan.

H.    *Conditions Precedent to Confirmation and Consummation of the Plan*

1.    Limited Severability of the Plan

The Plan shall apply as a separate Plan for each of the Debtors. For the avoidance of doubt, Parent's Plan is severable from any other Debtor's Plan and the Confirmation and Consummation of any other Debtor's Plan is not conditioned on the Confirmation and Consummation of Parent's Plan.

2.    Conditions Precedent to the Confirmation Date

It shall be a condition to Confirmation of the Plan that the following conditions shall have been satisfied (or waived pursuant to the provisions of Article IX.D of the Plan):

      (a)      The Confirmation Order shall have been approved by the Court and not stayed, and be in form and substance acceptable to the Debtors and the Required Supporting Lenders;

      (b)      Each of the Plan, Disclosure Statement, Plan Supplement (including, with respect to any amendments, modifications, supplements and exhibits thereto related to the foregoing), and other Definitive Documents (as such term is defined in the RSA and as applicable) shall be consistent with the RSA (as applicable) and in form and substance acceptable to

the Required Supporting Lenders and shall have been Filed subject to the terms of the Plan;

(c)     The Takeback First Lien Term Loan shall have been approved, as applicable; and

(d)     The Confirmation Order shall, among other things:

(i)     authorize the Debtors and the Reorganized Debtors to take all actions necessary or appropriate to enter into, implement, and consummate the contracts, instruments, releases, leases, indentures, and other agreements or documents created in connection with the Plan;

(ii)     decree that the provisions of the Confirmation Order and the Plan are nonseverable and mutually dependent;

(iii)     authorize the Reorganized Debtors to: (i) issue the New Common Stock and the Warrants pursuant to the exemption from registration under the Securities Act provided by section 1145 of the Bankruptcy Code or other exemption from such registration or pursuant to one or more registration statements; and (ii) enter into any agreements contained in the Plan Supplement (including, without limitation, the Takeback First Lien Term Loan Documents);

(iv)     decree that the Confirmation Order shall supersede any Court orders issued prior to the Confirmation Date that may be inconsistent with the Confirmation Order;

(v)     authorize the implementation of the Plan in accordance with its terms; and

(vi)     provide that, to the maximum extent permitted pursuant to section 1146 of the Bankruptcy Code, the assignment or surrender of any lease or sublease, and the delivery of any deed or other instrument or transfer order, in furtherance of, or in connection with the Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of assets contemplated under the Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax (including, any mortgages or security interest filing to be recorded or filed in connection with the Takeback First Lien Term Loan Documents).

3.     <u>Conditions Precedent to the Effective Date</u>

It shall be a condition to Consummation of the Plan that the following conditions shall have been satisfied (or waived pursuant to the provisions of Article IX.D of the Plan):

(a)     The Confirmation Order shall have become a Final Order that has not been stayed or modified or vacated on appeal;

(b)     The Debtors and the beneficiaries under the Value Creation Program shall have taken all actions necessary to terminate such plan;

(c)     The Takeback First Lien Term Loan Documents (which shall be consistent with the Takeback First Lien Term Loan Credit Agreement Term Sheet), as applicable, in form and substance acceptable to the Debtors and the Required Supporting Lenders shall have been executed and delivered by all of the Entities that are parties thereto, and all conditions precedent to the consummation of such Takeback First Lien Term Loan shall have been waived or satisfied in accordance with the terms thereof, and the closing of the Takeback First Lien Term Loan shall have occurred;

57

(d)     The New Organizational Documents shall, if applicable, have been duly filed with the applicable authorities in the relevant jurisdictions;

(e)     All governmental or other approvals required to effectuate the terms of the Plan shall have been obtained;

(f)     All actions, documents, certificates, and agreements necessary to implement the Plan shall have been effected or executed and delivered to the required parties and, to the extent required, filed with the applicable government units in accordance with applicable law;

(g)     The RSA shall not have terminated and shall be in full force and effect and shall not be (a) identified on the Schedule of Rejected Executory Contracts and Unexpired Leases or (b) subject of a pending motion to reject Executory Contracts or Unexpired Leases, and the Debtors shall be in compliance therewith;

(h)     The Professional Fee Escrow shall have been established and funded in Cash in accordance with Article II.B of the Plan; and

(i)     The Debtors shall have negotiated a new employment agreement with the Chief Executive Officer of Parent on terms acceptable to the Required Supporting Lenders.

4.   Waiver of Conditions

The conditions to Confirmation of the Plan and to the Effective Date of the Plan set forth in Article IX of the Plan may be waived only by consent of the Debtors in consultation with the Required Supporting Lenders, without notice, leave, or order of the Court or any formal action other than proceedings to confirm or consummate the Plan, subject to the terms of the Bankruptcy Code and the Bankruptcy Rules.

5.   Substantial Consummation

"Substantial Consummation" of the Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

6.   Effect of Non-Occurrence of Conditions to the Effective Date

If the Effective Date does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall:  (1) constitute a waiver or release of any Claims by or Claims against or Interests in the Debtors; (2) prejudice in any manner the rights of the Debtors, any Holders of a Claim or Interest or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders, or any other Entity in any respect.

7.   Fees and Expenses of Credit Agreement Agents,  SC Members, and Supporting Noteholders

On the Effective Date, the Reorganized Debtors shall pay, in full, in Cash, the unpaid reasonable fees, expenses, costs, and other charges of:  (a) the Credit Agreement Agents (including any unpaid cash management fees or expenses (which, for the avoidance of doubt, the Debtors intend to pay in the ordinary course during these Chapter 11 Cases) and the fees and expenses of Simpson Thacher & Bartlett LLP and Richards, Layton & Finger); (b) the SC Members (including the fees and expenses of Milbank, Tweed, Hadley & McCloy LLP, Wachtell, Lipton, Rosen & Katz, Morris, Nichols, Arsht & Tunnell  LLP, Houlihan Lokey Capital, Inc., and PJT Partners Inc.); and (c) the Supporting Noteholders (including the fees and expenses of Akin Gump Strauss Hauer & Feld LLP and Ducera Partners up to $500,000 in the aggregate), in each case in accordance with the Cash Collateral Order and the RSA, and as required by the underlying credit agreement, indemnity, or fee letter.

I.    *Modification, Revocation, or Withdrawal of the Plan*

    1.   <u>Modification and Amendments</u>

        Subject to the limitations contained in the Plan, and subject to the terms of the RSA, the Debtors, with the consent of the Required Supporting Lenders, reserve the right to modify the Plan and seek Confirmation consistent with the Bankruptcy Code and the Bankruptcy Rules and, as appropriate, not resolicit votes on such modified Plan. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, the Debtors expressly reserve their rights to alter, amend, or modify materially the Plan with respect to the Debtors, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.

    2.   <u>Effect of Confirmation on Modifications</u>

        Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

    3.   <u>Revocation or Withdrawal of the Plan</u>

        Subject to the terms of the RSA, the Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date.  If the Debtors revoke or withdraw the Plan, or if Confirmation and Consummation does not occur, then:  (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall: (i) constitute a waiver or release of any Claims or Interests; (ii) prejudice in any manner the rights of the Debtors or any other Entity, including the Holders of Claims or the Non-Debtor Subsidiaries; or (iii) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity, including the Non-Debtor Subsidiaries.

J.    *Retention of Jurisdiction*

        Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Court shall retain jurisdiction over the Chapter 11 Cases and all matters, arising out of, or related to, the Chapter 11 Cases and the Plan, including jurisdiction to:

    1.   Allow, Disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Interests; *provided* that, for the avoidance of doubt, the Court's retention of jurisdiction with respect to such matters shall not preclude the Debtors or the Reorganized Debtors, as applicable, from seeking relief from any other court, tribunal, or other legal forum of competent jurisdiction with respect to such matters;

    2.   decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

    3.   resolve any matters related to:  (a) the assumption and assignment or rejection of any Executory Contract or Unexpired Lease to which a Debtor is a party or with respect to which a Debtor may be liable in any manner and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Claims related to the rejection of an Executory Contract or Unexpired Lease, Cure Costs pursuant to section 365 of the Bankruptcy

Code, or any other matter related to such Executory Contract or Unexpired Lease; (b) the Reorganized Debtors amending, modifying, or supplementing, after the Confirmation Date, pursuant to Article V of the Plan, any Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed and assigned or rejected or otherwise; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

4.   ensure that distributions to Holders of Allowed Claims and Interests are accomplished pursuant to the provisions of the Plan;

5.   adjudicate, decide, or resolve any motions, adversary proceedings, contested, or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.   adjudicate, decide, or resolve any and all matters related to Causes of Action;

7.   adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

8.   enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

9.   enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

10.  resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

11.  issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

12.  resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the settlements, compromises, discharges, releases, injunctions, exculpations, and other provisions contained in Article VIII of the Plan and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

13.  resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to Article VI.K.1 of the Plan;

14.  enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

15.  determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement;

16.  adjudicate any and all disputes arising from or relating to distributions under the Plan or any transactions contemplated therein;

17.  consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Court order, including the Confirmation Order;

18.  determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

19.  hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

20.  hear and determine all disputes involving the existence, nature, or scope of the release provisions set forth in the Plan, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

21.  enforce all orders previously entered by the Court;

22.  hear any other matter not inconsistent with the Bankruptcy Code;

23.  enter an order concluding or closing the Chapter 11 Cases; and

24.  enforce the injunction, release, and exculpation provisions set forth in Article VIII of the Plan.

As of the Effective Date, notwithstanding anything in Article XII of the Plan to the contrary, the Takeback First Lien Term Loan Documents shall be governed by the jurisdictional provisions therein and the Court shall not retain jurisdiction.

K.    *Miscellaneous Provisions*

1.    Immediate Binding Effect

Subject to Article IX.A of the Plan and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan, the final versions of the documents contained in the Plan Supplement, and the Confirmation Order shall be immediately effective and enforceable and deemed binding upon the Debtors or the Reorganized Debtors, as applicable, and any and all Holders of Claims or Interests (regardless of whether such Claims or Interests are deemed to have accepted or rejected the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in the Plan, each Entity acquiring property under the Plan or the Confirmation Order, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.  All Claims and debts shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or debt has voted on the Plan.

2.    Additional Documents

On or before the Effective Date, the Debtors may File with the Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors and all Holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

3.    Reservation of Rights

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Court shall enter the Confirmation Order.  Neither the Plan, any statement or provision contained in the Plan, nor any action taken or not taken by any Debtor with respect to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

4.    <u>Successors and Assigns</u>

The rights, benefits, and obligations of any Entity named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, affiliate, officer, director, manager, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

5.    <u>Service of Documents</u>

Any pleading, notice, or other document required by the Plan to be served on or delivered to the Debtors or Reorganized Debtors shall be served on:

| | |
|---|---|
| the Debtors: | Dex Media, Inc.<br>2200 West Airfield Drive<br>P.O. Box 619810<br>DFW Airport, Texas 75261<br>Attn.:  General Counsel and Chief Restructuring Officer<br><br><u>with copies to:</u><br><br>Kirkland & Ellis LLP<br>Kirkland & Ellis International LLP<br>300 North LaSalle Drive<br>Chicago, Illinois  60654<br>Attn.:  Adam Paul and Bradley Thomas Giordano |
| the Dex East Administrative Agent,<br>the Dex West Administrative Agent, or<br>the SuperMedia Administrative Agent: | JPMorgan Chase Bank, N.A.<br>383 Madison Avenue<br>New York, NY 10179<br>Attn: Neil Boylan<br><br><u>with copies to:</u><br><br>Simpson Thacher & Bartlett LLP<br>425 Lexington Avenue<br>New York, NY 10017<br>Attn: Sandeep Qusba and Nicholas Baker |
| the RHDI Administrative Agent: | Deutsche Bank Trust Company Americas<br>60 Wall Street<br>New York, NY 10005<br>Attn: General Counsel<br><br><u>with copies to:</u><br><br>Simpson Thacher & Bartlett LLP<br>425 Lexington Avenue<br>New York, NY 10017<br>Attn: Sandeep Qusba and Nicholas Baker |
| the SC Members: | Milbank, Tweed, Hadley & McCloy LLP<br>28 Liberty Street<br>New York, NY 10005<br>Attn: Dennis Dunne and Gerard Uzzi |

Milbank, Tweed, Hadley & McCloy LLP
601 South Figueroa Street
30th Floor
Los Angeles, CA 90017
Attn.: Mark Shinderman and Brett Goldblatt

6.    Term of Injunctions or Stays

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.   All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

7.    Entire Agreement

Except as otherwise indicated, the Plan, the Confirmation Order, the Plan Supplement, the RSA, the Takeback First Lien Term Loan Documents, and the Warrant Agreement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

8.    Exhibits

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.   After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Debtors' restructuring website at http://dm.epiq11.com/DexMedia or the Court's website at www.deb.uscourts.gov.   To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Court, the non-exhibit or non-document portion of the Plan shall control.

9.    Nonseverability of Plan Provisions

If, prior to Confirmation, any term or provision of the Plan is held by the Court to be invalid, void, or unenforceable, the Court shall be prohibited from  altering or  interpreting such term or provision to make it valid or enforceable, *provided* that at the request of the Debtors (in their sole discretion), the Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such terms or provision shall then be applicable as altered or interpreted provided that any such alteration or interpretation shall be acceptable to the Debtors.   The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtors' consent; and (3) nonseverable and mutually dependent.

10.    Votes Solicited in Good Faith

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan and any previous plan, and, therefore, neither any of such parties or individuals or the Reorganized Debtors will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan and any previous plan.

11.   Closing of Chapter 11 Cases

The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, File with the Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Court to close the Chapter 11 Cases.

# ARTICLE V.
# VALUATION AND FINANCIAL PROJECTIONS

A.    *Valuation*

The Plan provides for the distribution of New Common Stock to Holders in Classes 3, 4, 5, and 6 and distribution of Warrants to Holders in Class 7. Accordingly, Moelis, at the request of the Debtors, has performed an analysis, which is attached hereto as **Exhibit E**, of the estimated implied value of the Reorganized Debtors on a going-concern basis as of an assumed Effective Date of June 30, 2016 (the "Valuation Analysis"). The Valuation Analysis, including the procedures followed, assumptions made, qualifications, and limitations on review undertaken described therein, should be read in conjunction with Article VII of this Disclosure Statement, entitled "Certain Risk Factors To Be Considered Prior to Voting." The Valuation Analysis is based on data and information as of March 22, 2016. Moelis makes no representations as to changes to such data and information that may have occurred since the date of the Valuation Analysis.

B.    *Financial Projections*

As further discussed in Article VI.B.2 of this Disclosure Statement, the Debtors believe the Plan meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code, as confirmation is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any successor to the Debtors under the Plan. In connection with developing the Plan, and for purposes of determining whether the Plan satisfies feasibility standards, the Debtors' management has developed the financial projections, which are attached hereto as **Exhibit C** and incorporated by reference. The Debtors' management has analyzed the Reorganized Debtors' ability to meet their obligations under the Plan and to maintain sufficient liquidity and capital resources to conduct their businesses. In general, as illustrated by the attached financial projections, the Debtors believe that the Reorganized Debtors will be viable. The Debtors believe that the Reorganized Debtors will have sufficient liquidity to fund obligations as they arise, thereby maintaining value. Accordingly, the Debtors believe the Plan satisfies the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code.

# ARTICLE VI.
# STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN

The following is a brief summary of the confirmation process. Holders of Claims and Interests are encouraged to review the relevant provisions of the Bankruptcy Code and to consult their own advisors with respect to the summary provided herein.

A.    *Confirmation Hearing*

Under section 1128(a) of the Bankruptcy Code, the Court, after notice, may hold a hearing to confirm a plan of reorganization. On the Petition Date, the Debtors will file a motion requesting that the Court set a date and time for the Confirmation Hearing. In this case, the Debtors will also request that the Court approve this Disclosure Statement at the Confirmation Hearing. The Confirmation Hearing, once set, may be continued from time to time without further notice other than an adjournment announced in open court or a notice of adjournment filed with the Court and served on those parties who have requested notice under Bankruptcy Rule 2002 and the Entities who have filed an objection to the Plan, if any, without further notice to parties in interest. The Court, in its discretion and prior to the Confirmation Hearing, may put in place additional procedures governing the Confirmation Hearing. Subject to section 1127 of the Bankruptcy Code and the RSA, the Plan may be modified, if necessary, prior to, during, or as a result of the Confirmation Hearing, without further notice to parties in interest.

Additionally, section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation.  The Debtors, in the same motion requesting a date for the Confirmation Hearing, will request that the Court set a date and time for parties in interest to file Plan objections.  All objections to the Plan must be Filed with the Court and served on the Debtors and certain other parties in interest in accordance with the applicable order of the Court so that they are received on or before the deadline to file such objections as set forth therein.

B.      *Confirmation Standards*

At the Confirmation Hearing, the Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code.  The Debtors believe that the Plan satisfies or will satisfy all of the statutory requirements of chapter 11 of the Bankruptcy Code and that they have complied or will have complied with all of the requirements of chapter 11 of the Bankruptcy Code.  Specifically, the Debtors believe that the Plan satisfies or will satisfy the applicable confirmation requirements of section 1129 of the Bankruptcy Code, including those set forth below.

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtors, as the Plan proponents, have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or to be made under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been or will be disclosed to the Court, and any such payment:  (1) made before the confirmation of the Plan is reasonable; or (2) is subject to the approval of the Court as reasonable, if it is to be fixed after confirmation of the Plan.

- With respect to each Class of Claims, each Holder of an Impaired Claim has accepted the Plan or will receive or retain under the Plan on account of such Claim property of a value as of the Effective Date of the Plan that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code.  With respect to each Class of Interests, each Holder of an Impaired Interest will receive or retain under the Plan on account of such Interest property of a value as of the Effective Date of the Plan that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code.

- Each Class of Claims that is entitled to vote on the Plan has either accepted the Plan or is not Impaired under the Plan, or the Plan can be confirmed without the approval of such voting Class of Claims pursuant to section 1129(b) of the Bankruptcy Code.

- Except to the extent that the Holder of a particular Claim will agree to a different treatment of its Claim, the Plan provides that:  (1) Holders of Claims specified in sections 507(a)(2) and 507(a)(3) will receive, under different circumstances, Cash equal to the amount of such Claim either on the Effective Date (or as soon as practicable thereafter), no later than 30 days after the Claim becomes Allowed, or pursuant to the terms and conditions of the transaction giving rise to the Claim; (2) Holders of Claims specified in sections 507(a)(1), 507(a)(4), 507(a)(5), 507(a)(6), or 507(a)(7) of the Bankruptcy Code will receive on account of such Claims Cash equal to the Allowed amount of such Claim on the Effective Date of the Plan (or as soon thereafter as is reasonably practicable) or Cash payable over no more than six months after the Petition Date; and (3) Holders of Claims specified in section 507(a)(8) of the Bankruptcy Code will receive on account of such Claim regular installment payments of Cash of a total value, as of the Effective Date of the Plan, equal to the Allowed amount of such Claim over a period ending not later than five years after the Petition Date.

- At least one class of Impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any "insider," as that term is defined by section 101(31) of the Bankruptcy Code, holding a Claim in that Class.

- Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any successors thereto under the Plan, unless the Plan contemplates such liquidation or reorganization.

- The Debtors have paid or the Plan provides for the payment of the required filing fees pursuant to 28 U.S.C. § 1930 to the clerk of the Court.

1.    Best Interests of Creditors Test - Liquidation Analysis

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each class, that each holder of a claim or an interest in such class either (a) has accepted the plan or (b) will receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtors liquidated under chapter 7 of the Bankruptcy Code.

To demonstrate compliance with the "best interests" test, the Debtors, with the assistance of their advisors, prepared the Liquidation Analysis, attached hereto as **Exhibit D**, showing that the value of the distributions provided to Holders of Allowed Claims and Interests under the Plan would be the same or greater than under a hypothetical chapter 7 liquidation.

2.    Financial Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that the Court find that Confirmation is not likely to be followed by the liquidation of the Reorganized Debtors or the need for further financial reorganization, unless the Plan contemplates such liquidation or reorganization.  The Debtors believe that the Plan meets the financial feasibility requirement.  Moreover, the Debtors believe that sufficient funds will exist to make all distributions required by the Plan.  Accordingly, the Debtors believe that the Plan satisfies the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code.  As noted above, the Debtors have worked diligently to develop a business plan and properly size their future debt capacity.  The Debtors believe that the Plan will substantially deleverage their business and right-size their balance sheet, position them for long-term success, and ensure that the Debtors do not return to bankruptcy.

C.    *Acceptance by Impaired Classes*

The Bankruptcy Code requires, as a condition to confirmation, that, except as described in the following section, each class of claims or interests that is impaired under a plan, accept the plan.  A class that is not impaired under a plan is presumed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required.  Pursuant to section 1124 of the Bankruptcy Code, a class is impaired unless the plan: (1) leaves unaltered the legal, equitable, and contractual rights to which the claim or the interest entitles the holder of such claim or interest; (2) cures any default, reinstates the original terms of such obligation, and compensates the applicable party in question; or (3) provides that, on the effective date, the holder of such claim or interest receives cash equal to the allowed amount of that claim or, with respect to any interest, any fixed liquidation preference to which the holder of such interest is entitled or to any fixed price at which the debtor may redeem the security.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired creditors as acceptance by holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject a plan.  Thus, a Class of creditor Claims will have voted to accept the Plan only if two-thirds (2/3) in amount and a majority in number actually voting cast their ballots in favor of acceptance, subject to Article III of the Plan.

D.    *Confirmation without Acceptance by All Impaired Classes*

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if impaired classes entitled to vote on the plan have not accepted it or if an impaired class is deemed to reject the plan, *provided that* the plan is accepted by at least one impaired class.  Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, such plan will be confirmed, at the plan proponent's request, in a procedure commonly known as "cram down," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

1.    <u>No Unfair Discrimination</u>

The test for unfair discrimination applies to classes of claims or interests that are of equal priority and are receiving different treatment under the Plan.  The test does not require that the treatment be the same or equivalent but that such treatment be "fair."  In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (*e.g.*, classes of the same legal character).  The Debtors do not believe the Plan discriminates unfairly against any Impaired Class of Claims or Interests that have voted against or are deemed to vote against the Plan.  The Debtors believe that the Plan and the treatment of all Classes of Claims and Interests satisfy the foregoing requirements for non-consensual Confirmation.

To the extent that the treatment of Classes 7, 8, and 9 may otherwise constitute unfair discrimination (which the Debtors do not concede), the Debtors believe that any disparate treatment between such Classes results from permissible "gifting" by the Term Loan Lenders and complies with all relevant provisions of the Bankruptcy Code.  *See, e.g., In re World Health Alternatives, Inc*., 344 B.R. 291 (Bankr. D. Del. 2006) (permitting secured creditors to give up a portion of their distribution under a plan to certain holders of unsecured claims); *In re Genesis Health Ventures, Inc*., 266 B.R. 591 (Bankr. D. Del. 2001) (it was permissible for certain junior creditors to receive distributions while other creditors of equal priority received different treatment where the debtors could provide distribution only because senior secured creditors were willing to give up portion of value that they would otherwise receive); *In re TSIC*, 393 B.R. 71 (Bankr. D. Del. 2008) (approving a gift settlement from a stalking horse bidder to unsecured creditors within a § 363 sale).  The Debtors will be prepared to meet their burden of demonstrating that the Plan complies with section 1129(b) of the Bankruptcy Code, include the prohibition of unfair discrimination, at the Confirmation Hearing.

2.    <u>Fair and Equitable Test</u>

The fair and equitable test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in such class.  As to each non-accepting class, the test sets different standards depending on the type of claims or interests in such class.  As set forth below, the Debtors believe that the Plan satisfies the "fair and equitable" requirement, notwithstanding the fact that certain Classes are deemed to reject the Plan.  There is no Class of equal priority receiving more favorable treatment and no Class that is junior to such dissenting Class that will receive or retain any property on account of the Claims or Interests in such Class.

(a)    Secured Claims

The condition that a plan be "fair and equitable" to a non-accepting class of secured claims includes the requirements that:  (i) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the plan; and (ii) each holder of a secured claim in the class receives deferred cash payments totaling at least the allowed amount of such claim with a present value, as of the effective date of the plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens.

(b)        Unsecured Claims

The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the requirement that either:  (i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (ii) the holder of any claim or any interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or junior interest any property.

(c)        Interests

The condition that a plan be "fair and equitable" to a non-accepting class of interests includes the requirements that either:  (i) the plan provides that each holder of an interest in that class receives or retains under the plan on account of that interest property of a value, as of the effective date of the plan, equal to the greater of: (1) the allowed amount of any fixed liquidation preference to which such holder is entitled; (2) any fixed redemption price to which such holder is entitled; or (ii) the value of such interest; or (iii) if the class does not receive the amount as required under (i) hereof, no class of interests junior to the non-accepting class may receive a distribution under the plan.

E.        *Alternatives to Confirmation and Consummation of the Plan*

If the Plan cannot be confirmed, the Debtors may seek to:  (a) prepare and present to the Court an alternative chapter 11 plan for confirmation; (b) effect a merger or sale transaction, including, potentially, a sale of all or substantially all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code; or (c) liquidate the Debtors under chapter 7 of the Bankruptcy Code.  If the Debtors were to pursue a liquidation, the Chapter 11 Cases would be converted to cases under chapter 7 of the Bankruptcy Code and a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code.  A discussion of the effects that a chapter 7 liquidation would have on Creditors' recoveries and the Debtors is described in the unaudited Liquidation Analysis, attached hereto as **Exhibit D**.

## ARTICLE VII.
## CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING

*Holders of Claims entitled to vote should read and consider carefully the risk factors set forth below, as well as the other information set forth in this Disclosure Statement and the documents delivered together herewith, referred to or incorporated by reference herein, prior to voting to accept or reject the Plan.  These factors should not be regarded as constituting the only risks present in connection with the Debtors' business or the Plan and its implementation.  For additional risk factors, please refer to Parent's most recent Annual Report in Form 10-K and Quarterly Reports in Form 10-Q for the quarters ended March 31, 2015, June 30, 2015, and September 30, 2015, which are incorporated by reference into this Disclosure Statement and are publicly available in their entirety at (a) the Debtors' investor relations website, located at http://ir.dexmedia.com and (b) the SEC's Electronic Data Gathering, Analysis, and Retrieval system, located at http://www.sec.gov/edgar/searchedgar/companysearch.html.*

A.        *Certain Bankruptcy Law Considerations*

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to Holders of Allowed Claims and Allowed Interests under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of Holders of Claims in such Impaired Classes.

1.        <u>Parties in Interest May Object to, and the Court May Disagree with, the Plan's Classification of Claims and Interests</u>

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Debtors believe that the classification of Claims and Interests under the Plan complies with the

requirements set forth in the Bankruptcy Code because the Debtors created thirteen Classes of Claims and Interests, each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims and Interests in each such Class.  However, a Claim or Interest Holder could challenge the Debtors' classification.  In such an event, the cost of the Chapter 11 Cases and the time needed to confirm the Plan may increase, and there can be no assurance that the Court will agree with the Debtors' classification.  If the Court concludes that the classifications of Claims and Interests under the Plan do not comply with the requirements of the Bankruptcy Code, the Debtors may need to modify the Plan. Such modification could require re-solicitation of votes on the Plan.  The Plan may not be confirmed if the Court determines that the Debtors' classification of Claims and Interests is not appropriate.

2.    Failure to Satisfy Vote Requirements

If votes are received in number and amount sufficient to enable the Court to confirm the Plan, the Debtors may seek, as promptly as practicable thereafter, Confirmation.  If the Plan does not receive the required support, the Debtors may elect to amend the Plan, seek to sell their assets pursuant to section 363 of the Bankruptcy Code, or proceed with liquidation.

3.    The Debtors May Not Be Able to Secure Confirmation of the Plan Within the Milestones Currently Required by the RSA

The Debtors may not be able to secure confirmation of the Plan within the milestones currently contemplated by the RSA, which requires, among other things, for the Court to enter an order confirming the Plan within 120 days of the Petition Date, unless such milestone is extended as provided in the RSA.  The Debtors cannot guarantee that the Required Supporting Lenders would agree to amend the RSA to extend the confirmation milestone beyond what is currently contemplated in the RSA.  To the extent that the terms or conditions of the RSA are not satisfied, or to the extent events giving rise to termination of the RSA occur, the RSA may terminate prior to the Confirmation of the Plan, which could result in the loss of support for the Plan by important creditor constituents.  Any such loss of support could adversely affect the Debtors' ability to reorganize and confirm and consummate the Plan.

4.    The Debtors May Not Be Able to Secure Confirmation of the Plan, or the Court May Require the Debtors to Re-Solicit Votes With Respect to the Plan

The Debtors cannot assure you that the Plan will be confirmed by the Court. Section 1129 of the Bankruptcy Code, which sets forth the requirements for confirmation of a plan of reorganization, requires, among other things, that all claims and interests have been classified in compliance with the provisions of section 1122 of the Bankruptcy Code and that, under the plan of reorganization, each holder of a claim or interest within each impaired class either accepts the plan of reorganization or receives or retains cash or property of a value, as of the date the plan of reorganization becomes effective, that is not less than the value such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

If the Plan is filed, there can be no assurance that modifications to the Plan would not be required for Confirmation, or that such modifications would not require a re-solicitation of votes on the Plan.

Moreover, the Court could fail to approve this Disclosure Statement and determine that the votes in favor of the Plan should be disregarded. The Debtors then would be required to recommence the solicitation process, which would include re-filing a plan of reorganization and disclosure statement. Typically, this process involves a 60- to 90-day period and includes a Court hearing with respect to the required approval of a disclosure statement, followed (after Court approval) by solicitation of claim and interest holder votes for the plan of reorganization, followed by a confirmation hearing at which the Court will determine whether the requirements for confirmation have been satisfied, including the requisite claim and interest holder acceptances.

If the Plan is not confirmed, the Chapter 11 Cases may be converted into cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed or elected to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code.  A discussion of the effects that a

chapter 7 liquidation would have on the recoveries of holders of claims and interests and the Debtors' liquidation analysis are set forth under the unaudited Liquidation Analysis, attached hereto as **Exhibit D**.

5.   The Court May Not Find that the Plan Meets the Feasibility Requirement of the Bankruptcy Code

Section 1129 of the Bankruptcy Code, which sets forth the requirements for confirmation of a plan of reorganization, requires, among other things, a finding by the Court that the plan of reorganization is "feasible," *i.e.* that Confirmation is not likely to be followed by the liquidation of the Reorganized Debtors or the need for further financial reorganization.  While the Debtors believe the Plan satisfies this requirement, there can be no assurance that the Court will conclude that the feasibility test and other requirements of section 1129 of the Bankruptcy Code have been met with respect to the Plan.

6.   Nonconsensual Confirmation

In the event that any impaired class of claims does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting classes.  The Debtors believe that the Plan satisfies these requirements and the Debtors may request such nonconsensual Confirmation in accordance with section 1129(b) of the Bankruptcy Code.  Nevertheless, there can be no assurance that the Court will reach this conclusion.  In addition, with respect to the Plan, the pursuit of nonconsensual Confirmation of the Plan may result in, among other things, increased expenses and the expiration of the entities' commitments to provide support for the Plan, financially or otherwise.

7.   The Debtors May Object to the Amount or Classification of a Claim

Except as otherwise provided in the Plan, the Debtors and other parties in interest reserve the right to object to the amount or classification of any Claim or Interest under the Plan.  The estimates set forth in this Disclosure Statement cannot be relied on by any holder of a Claim or Interest where such Claim or Interest is subject to an objection.  Any holder of a Claim or Interest that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

8.   Risk of Non-Occurrence of the Effective Date

Although the Debtors believe that the Effective Date would occur very shortly after the Confirmation Date, there can be no assurance as to such timing.

The Confirmation and effectiveness of the Plan are subject to certain conditions that may or may not be satisfied.  The Debtors cannot assure you that all requirements for Confirmation and effectiveness required under the Plan will be satisfied.

9.   Risk of Termination of the RSA

To the extent that the terms or conditions of the RSA are not satisfied, or to the extent events giving rise to termination of the RSA occur, the RSA may terminate prior to the Confirmation or Consummation of the Plan, which could result in the loss of support for the Plan by important creditor constituents and could result in the loss of use of cash collateral by the Debtors under certain circumstances.  Any such loss of support could adversely affect the Debtors' ability to confirm and consummate the Plan.

10.   Parties May Object to the Plan on Account of the Third Party Release Provisions

Any party in interest could object to the Plan on the grounds that the third party releases are not given consensually or in a permissible non-consensual manner.  In response to such an objection, the Court could determine that the third party releases are not valid under the Bankruptcy Code.  If the Court makes such a

determination, the Plan could not be confirmed without modifying the Plan to alter or remove the third party release provision. This could result in substantial delay in Confirmation of the Plan or the Plan not being confirmed at all.

11.   The Court May Find the Solicitation of Acceptances Inadequate

Usually, votes to accept or reject a plan of reorganization are solicited after the filing of a petition commencing a chapter 11 case. Nevertheless, a debtor may solicit votes prior to the commencement of a chapter 11 case in accordance with sections 1125(g) and 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018(b). Sections 1125(g) and 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018(b) require that:

- solicitation comply with applicable nonbankruptcy law;

- the plan of reorganization be transmitted to substantially all creditors and other interest holders entitled to vote; and

- the time prescribed for voting is not unreasonably short.

In addition, Bankruptcy Rule 3018(b) provides that a holder of a claim or interest who has accepted or rejected a plan before the commencement of the case under the Bankruptcy Code will not be deemed to have accepted or rejected the plan if the court finds after notice and a hearing that the plan was not transmitted in accordance with reasonable solicitation procedures. Section 1126(b) of the Bankruptcy Code provides that a holder of a claim or interest that has accepted or rejected a plan before the commencement of a case under the Bankruptcy Code is deemed to have accepted or rejected the plan if (i) the solicitation of such acceptance or rejection was in compliance with applicable nonbankruptcy law, rule or regulation governing the adequacy of disclosure in connection with such solicitation or (ii) there is no such law, rule, or regulation, and such acceptance or rejection was solicited after disclosure to such holder of adequate information (as defined by section 1125(a) of the Bankruptcy Code). While the Debtors believe that the requirements of sections 1125(g) and 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018(b) will be met, there can be no assurance that the Court will reach the same conclusion.

12.   The Debtors May Be Unsuccessful in Obtaining First Day Orders To Permit Them To Pay Their Vendors, Employees, or To Continue To Operate Their Businesses, in the Ordinary Course of Business

The Debtors have tried to address potential concerns of their vendors, employees, and other key parties in interest that might arise from the filing of the Plan through a variety of provisions incorporated into or contemplated by the Plan, including the Debtors' intention to seek appropriate Court orders to permit the Debtors to pay their prepetition and postpetition accounts payable to parties in interest in the ordinary course. However, there can be no guarantee that the Debtors will be successful in obtaining the necessary approvals of the Court for such arrangements or for every party in interest the Debtors may seek to treat in this manner, and, as a result, the Debtors' businesses might suffer.

13.   The Court May Not Approve the Debtors' Use of Cash Collateral

Upon commencing the Chapter 11 Cases, the Debtors will ask the Court to authorize the Debtors to use cash collateral to fund the Chapter 11 Cases and to provide customary adequate protection to the lenders under the Credit Agreements, which requests will be in accordance with the terms of the RSA. Such access to cash collateral will provide liquidity during the pendency of the Chapter 11 Cases. There can be no assurance that the Court will approve such use of cash collateral on the terms requested. Moreover, if the Chapter 11 Cases take longer than expected to conclude, the Debtors may exhaust their available cash collateral. There is no assurance that the Debtors will be able to obtain an extension of the right to use cash collateral, in which case, the liquidity necessary for the orderly functioning of the Debtors' businesses may be impaired materially.

14.     The Debtors May Seek to Amend, Waive, Modify, or Withdraw the Plan at Any Time Prior to Confirmation

The Debtors or the Reorganized Debtors, as applicable, reserve the right, in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the RSA, and consistent with the terms of the Plan, to amend the terms of the Plan or waive any conditions thereto if and to the extent such amendments or waivers are consistent with the terms of the RSA and necessary or desirable to consummate the Plan. The potential impact of any such amendment or waiver on the holders of Claims and Interests cannot presently be foreseen but may include a change in the economic impact of the Plan on some or all of the proposed Classes or a change in the relative rights of such Classes. All holders of Claims and Interests will receive notice of such amendments or waivers required by applicable law and the Court. If, after receiving sufficient acceptances, but prior to Confirmation of the Plan, the Debtors seek to modify the Plan, the previously solicited acceptances will be valid only if: (a) all classes of adversely affected creditors and interest holders accept the modification in writing; or (b) the Court determines, after notice to designated parties, that such modification was *de minimis* or purely technical or otherwise did not adversely change the treatment of holders of accepting Claims and Interests or is otherwise permitted by the Bankruptcy Code.

15.     Other Parties in Interest Might Be Permitted To Propose Alternative Plans of Reorganization That May Be Less Favorable to Certain of the Debtors' Constituencies Than the Plan

If another party in interest were to propose an alternative plan of reorganization following expiration or termination of the Debtors' exclusivity period, such a plan may be less favorable to existing holders of Claims. The Debtors consider maintaining relationships with their stakeholders, employees, and users as critical to maintaining the value of their enterprise following the Effective Date and have sought to treat those constituencies accordingly. However, proponents of alternative plans of reorganization may not share the Debtors' assessments and may seek to impair the Claims or Interests of such constituencies to a greater degree. If there were competing plans of reorganization, the Chapter 11 Cases likely would become longer, more complicated, and much more expensive.

16.     Material Transactions Could Be Set Aside as Fraudulent Conveyances or Preferential Transfers

Certain payments received by stakeholders prior to the bankruptcy filing could be challenged under applicable debtor/creditor or bankruptcy laws as either a "fraudulent conveyance" or a "preferential transfer." A fraudulent conveyance occurs when a transfer of a debtor's assets is made with the intent to defraud creditors or in exchange for consideration that does not represent reasonably equivalent value to the property transferred. A preferential transfer occurs upon a transfer of property of the debtor while the debtor is insolvent for the benefit of a creditor on account of an antecedent debt owed by the debtor that was made on or within 90 days before the petition date or one year before the petition date, if the creditor, at the time of such transfer, was an insider. If any transfer were challenged in the Court and found to have occurred with regard to any of the Debtors' material transactions, the Court could order the recovery of all amounts received by the recipient of the transfer.

17.     Contingencies Could Affect Distributions of Impaired Classes to Accept or Reject the Plan

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Court orders certain Allowed Claims to be subordinated to other Allowed Claims. The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims and Allowed Interests under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

B.    *Risk Factors that May Affect Recovery Available to Holders of Allowed Claims and the Value of Securities to Be Issued Under the Plan*

    1.    <u>Actual Amounts of Allowed Claims May Differ from Estimated Amounts of Allowed Claims, Thereby Adversely Affecting the Recovery of Some Creditors</u>

The estimate of Allowed Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions.  Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary significantly from the estimated Claims contained in this Disclosure Statement.  Moreover, the Debtors cannot determine with any certainty at this time the number or amount of Claims that will ultimately be Allowed.  Such differences may materially and adversely affect, among other things, the recoveries to Holders of Allowed Claims under the Plan and the Debtors' and the Reorganized Debtors' abilities to meet the Debtors' current projected financial results.

    2.    <u>The RSA May Terminate, Thereby Preventing the Debtors From Consummating the Plan as Applicable to the Debtors</u>

As noted above, to the extent that the terms or conditions of the RSA are not satisfied, or to the extent events giving rise to termination of the RSA occur, the RSA may terminate prior to the Confirmation or Consummation of the Plan, which could result in the loss of support for the Plan by important creditor constituents and could result in the loss of use of cash collateral by the Debtors under certain circumstances.  Any such loss of support could adversely affect the Debtors' ability to confirm and consummate the Plan and the recoveries contemplated for Holders thereunder.

    3.    <u>The Reorganized Debtors May Not Be Able to Meet the Projected Financial Results under the Plan</u>

The Reorganized Debtors may not be able to meet the Debtors' current projected financial results or achieve projected revenues and cash flows that they have assumed in projecting future business prospects.  To the extent that the Reorganized Debtors do not meet the Debtors' projected financial results, the Reorganized Debtors may lack sufficient liquidity to continue operating as planned, may be unable to service their debt obligations, and may not be able to meet their working capital and operational needs.  Any one of these failures may preclude the Reorganized Debtors from, among other things: (a) generating and growing revenues; (b) taking advantage of future business opportunities; and (c) responding to competitive pressures.  While the financial projections represent management's view based on current known facts and assumptions about future operations, there is no guarantee that the financial projections will be realized.

    4.    <u>Certain Tax Implications of the Debtors' Bankruptcy May Increase the Tax Liability of the Reorganized Debtors</u>

Holders of Allowed Claims should carefully review Article IX herein, "Certain United States Federal Tax Income Consequences" to determine how the tax implications of the Plan and the Chapter 11 Cases may adversely affect the Reorganized Debtors.

C.    *Risks Associated with Plan Securities*

    1.    <u>The Debtors May Not Be Able To Achieve Their Projected Financial Results</u>

The Debtors may not be able to meet their projected financial results or achieve the revenue or cash flow that the Debtors have assumed in projecting their future business prospects.  If the Debtors do not achieve these projected revenue or cash flow levels, the Debtors may lack sufficient liquidity to continue operating as planned after emergence.  The financial projections represent management's view based on currently known facts and hypothetical assumptions about their future operations.  They do not, however, guarantee the Debtors' future financial performance.

2.        The Plan Exchanges Senior Securities for Junior Securities

If the Plan is confirmed and consummated, certain Holders of Claims will receive Plan Securities (as defined below). Thus, in agreeing to the Plan, certain of such Holders will be consenting to the exchange of their interests in senior debt for junior securities that will be subordinate to all future creditor claims.

3.        A Liquid Trading Market for the Plan Securities May Not Develop

The Debtors make no assurance that liquid trading markets for the Plan Securities will develop. The liquidity of any market for the Plan Securities will depend, among other things, upon the number of holders of Plan Securities, the Reorganized Debtors' financial performance, and the market for similar securities, none of which can be determined or predicted. Therefore, the Debtors cannot assure that an active trading market will develop or, if a market develops, what the liquidity or pricing characteristics of that market will be.

4.        The Debtors May Be Controlled by Significant Holders

Under the Plan, certain holders of Allowed Claims will receive New Common Stock or Warrants for New Common Stock and, as described in the Stockholders Term Sheet and Article I.B.8 of this Disclosure Statement, certain of those holders may be entitled to appoint one or more directors. If holders of a significant number of shares of New Common Stock were to act as a group, such holders might be in a position to control the outcome of actions requiring shareholder approval.

5.        The Debtors' Financial Projections Are Subject to Inherent Uncertainty Due to the Numerous Assumptions Upon Which They Are Based

The Debtors' financial projections are based on numerous assumptions including timely Confirmation and Consummation pursuant to the terms of the Plan, the anticipated future performance of the Debtors, industry performance, general business and economic conditions, and other matters, many of which are beyond the control of the Debtors and some or all of which may not materialize. In addition, unanticipated events and circumstances occurring subsequent to the date that the Disclosure Statement is approved by the Court may affect the actual financial results of the Debtors' operations. These variations may be material and may adversely affect the ability of the Debtors to make payments with respect to indebtedness following Consummation. Because the actual results achieved throughout the periods covered by the projections may vary from the projected results, the projections should not be relied upon as an assurance of the actual results that will occur. Except with respect to the projections and except as otherwise specifically and expressly stated, the Disclosure Statement does not reflect any events that may occur subsequent to the date of the Disclosure Statement. Such events may have a material impact on the information contained in the Disclosure Statement. The Debtors do not intend to update the projections and, therefore, the projections will not reflect the impact of any subsequent events not already accounted for in the assumptions underlying the projections.

D.        *Risk Factors that Could Negatively Impact the Debtors' Business*

The Debtors are subject to a number of risks, including (a) bankruptcy-related risk factors and (b) general business and financial risk factors. Any or all such factors, some of which are enumerated below, could have a materially adverse effect on the business, financial condition, or results of operations of the Debtors and the Reorganized Debtors. Additional risks and uncertainties not currently known to the Debtors or that the Debtors currently deem to be immaterial at this time may also materially adversely affect the Debtors' business, financial condition, or results of operations. Any of the following risks could materially adversely affect the Debtors' business, financial condition, or results of operations.

1.        Bankruptcy Related Risk Factors

While the Debtors have attempted to mitigate  the following risk factors by proposing a prepackaged plan, for the duration of the Chapter 11 Cases, the Debtors' operations and the Debtors' ability to execute their business

strategy will be subject to the risks and uncertainties associated with bankruptcy. These risks include, among other things:

- The Chapter 11 Cases may adversely affect the Debtors' business prospects and their ability to operate.

- The Chapter 11 Cases and the attendant difficulties of operating the Debtors' business while attempting to reorganize the business in bankruptcy may make it more difficult to maintain and promote the Debtors' goods and services and attract customers to their business.

- The Chapter 11 Cases will cause the Debtors to incur substantial costs for fees and other expenses associated with the Chapter 11 Cases.

- The Chapter 11 Cases may prevent the Debtors from continuing to grow their business and may restrict their ability to pursue other business strategies. Among other things, the Bankruptcy Code limits the Debtors' ability to incur additional indebtedness, make investments, sell assets, consolidate, merge or sell, or otherwise dispose of assets or grant liens. These restrictions may place the Debtors at a competitive disadvantage.

- Transactions by the Debtors outside the ordinary course of business are subject to the prior approval of the Court, which may limit their ability to timely respond to certain events or take advantage of certain opportunities. The Debtors may not be able to obtain Court approval or such approval may be delayed with respect to actions they seek to undertake during the pendency of the Chapter 11 Cases.

- The Debtors may be unable to retain and motivate key executives and employees through the process of reorganization, and the Debtors may have difficulty attracting new employees. In addition, so long as the Chapter 11 Cases continue, the Debtors' senior management will be required to spend a significant amount of time and effort dealing with the reorganization instead of focusing exclusively on business operations.

- There can be no assurance as to the Debtors' ability to maintain sufficient financing sources to fund their business and meet future obligations. The Debtors currently are financing their operations during their reorganization using cash on hand, but there can be no assurance that the Debtors will be able to continue financing their operations through cash on hand, or that the Debtors will continue to be authorized to use the Term Loan Lenders' collateral (including cash collateral).

- The Debtors intend to preserve as much of the benefit of their existing Executory Contracts and Unexpired Leases as is appropriate, consistent with their business plan. However, with respect to some limited classes of Executory Contracts, the Debtors may need to obtain the consent of the counterparty to maintain the benefit of the contract. There is no guarantee that such consent either would be forthcoming or that conditions would not be attached to any such consent that makes assuming the contracts unattractive. The Debtors then would be required to either forego the benefits offered by such contracts or to find alternative arrangements to replace them.

- There can be no assurance that the Debtors will be able to successfully develop, prosecute, confirm, and consummate the Plan with respect to the Chapter 11 Cases that are acceptable to the Court and the Debtors' creditors, Interest Holders, and other parties in interest. Additionally, third parties may seek and obtain Court approval to terminate or shorten the exclusivity period for the Debtors to propose and confirm the Plan, to appoint a chapter 11 trustee, or to convert the cases to chapter 7 cases.

In addition, the uncertainty regarding the eventual outcome of the Debtors' restructuring, and the effect of other unknown adverse factors could threaten the Debtors' existence as a going-concern. Continuing on a

going-concern basis of the Debtors' business is dependent upon, among other things, obtaining Court approval of a chapter 11 plan, maintaining the support of key vendors and customers, and retaining key personnel, along with financial, business, and other factors, many of which are beyond the Debtors' control.  Under the priority scheme established by the Bankruptcy Code, unless creditors agree otherwise in accordance with the Bankruptcy Code, distributions from the estate for prepetition liabilities and postpetition liabilities must comply with section 1129 of the Bankruptcy Code.  The ultimate recovery to Holders of Claims or Interests, if any, will not be determined until Confirmation of the Plan or an alternative to a chapter 11 plan.  No assurance can be given as to what values, if any, will be ascribed in the Chapter 11 Cases to each of these constituencies or what types or amounts of distributions, if any, they will receive.

2.     Bankruptcy Length Risk Factor

The Debtors estimate that the process of obtaining Confirmation of the Plan by the Court will last approximately 90-120 days from the Petition Date, but it could last considerably longer if, for example, Confirmation is contested or the conditions to Confirmation or Consummation are not satisfied or waived.

Although the Plan is designed to minimize the length of the bankruptcy proceedings, it is impossible to predict with certainty the amount of time that the Debtors may spend in bankruptcy, and the Debtors cannot be certain that the Plan will be confirmed.  Even if confirmed on a timely basis, a bankruptcy proceeding to confirm the Plan could itself have an adverse effect on the Debtors' businesses.  There is a risk, due to uncertainty about the Debtors' future that, among other things:

- customers could move to the Debtors' competitors;

- employees could be distracted from performance of their duties or more easily attracted to other career opportunities; and

- suppliers, vendors, or other business partners could terminate their relationship with the Debtors or demand financial assurances or enhanced performance, any of which could impair the Debtors' prospects.

A lengthy bankruptcy proceeding also would involve additional expenses and divert the attention of management from the operation of the Debtors' businesses.

The disruption that the bankruptcy process would have on the Debtors' businesses could increase with the length of time it takes to complete the Chapter 11 Cases.  If the Debtors are unable to obtain Confirmation of the Plan on a timely basis, because of a challenge to the Plan or otherwise, the Debtors may be forced to operate in bankruptcy for an extended period of time while they try to develop a different plan of reorganization that can be confirmed.  A protracted bankruptcy case could increase both the probability and the magnitude of the adverse effects described above.

3.     General Business and Financial Risk Factors

The Debtors are subject to various business and financial risks, including, without limitation, the following:

(a)     General Economic Conditions

In the financial projections, the Debtors have assumed that the general economic conditions of the United States economy will not materially deteriorate over the next several years.  The stability of economic conditions is subject to many factors outside the Debtors' control, including interest rates, inflation, unemployment rates, the housing market, consumer spending, war, terrorism, and many other factors.  Any one of these or other economic factors could have a significant impact on the operating performance of the Debtors.  There is no guarantee that economic conditions will improve in the near term.

In particular, substantially all of the Debtors' revenue is derived from the sale of advertising. Expenditures by advertising clients are sensitive to economic conditions and tend to decline in a recession or other periods of economic uncertainty. Any decline of this type could materially affect the Debtors' business, prospects, financial condition, results of operations, and cash flow.

The Debtors' business was subject to the impact of previous adverse economic conditions, including customer attrition, declines in overall advertising spending by customers, and the significant impact of the weak local business conditions on consumer spending in client's markets. The Debtors' total operating revenue was negatively affected by the previous economic downturn. Future economic conditions or other events that could impact purchasing patterns could have a material adverse effect on business.

(b)    Implementation of Business Plan

The Debtors believe that they will succeed in implementing and executing their business plan and financial restructuring. However, there are risks that the goals of the Debtors' going-forward business plan and financial restructuring strategy will not be achieved. In such event, the Debtors may be unable to refinance maturing debt or be forced to sell all or parts of their business, develop and implement further restructuring plans not contemplated herein, or become subject to further insolvency proceedings.

In particular, on December 11, 2014, the Debtors announced an organizational restructuring program designed to reorganize and refocus the Debtors' business. The successful implementation of the program presents significant organizational design and infrastructure challenges. In addition, the program may not advance the Debtors' business strategy as expected. As a result, the Debtors may not be able to implement the program as planned, including realizing, in full or in part, the anticipated benefits from the program. Events and circumstances, such as financial or strategic difficulties, delays and unexpected costs may occur that could result in not realizing all or any of the anticipated benefits. Any failure to implement the program in accordance with expectations could have a material adverse effect on the Debtors' business, financial condition, results of operations, and prospects.

(c)    Decline in Print Yellow Pages

Overall references to print yellow page directories in the United States declined from approximately 14.5 billion in 2005 to approximately 4.7 billion in 2013. This decline is primarily attributable to increased use of internet search providers, as well as the proliferation of very large retail stores for which consumers and businesses may not reference the yellow pages. The Debtors expect the decline in usage will continue to negatively affect advertising sales associated with traditional print business. A significant further decline in usage of print directories could impair the Debtors' ability to maintain or increase advertising prices and cause businesses to reduce or discontinue purchasing advertising in their yellow page directories. Either or both of these factors could adversely affect revenue and have a material adverse effect on business, financial condition, results of operations, and prospects. These trends resulted in print advertising sales declining in 2015, and the Debtors expect these trends to continue in 2016 and beyond.

(d)    Competition

The directory advertising industry in the United States is highly competitive. Some of the incumbent publishers with which the Debtors compete are or may become larger than the Debtors and have or may obtain greater financial resources than the Debtors. Although the Debtors may have limited market overlap with incumbent publishers, relative to the size of their overall footprint, the Debtors may not be able to compete effectively with these publishers for advertising sales in these limited markets. In addition, independent publishers may commit more resources to certain markets than the Debtors are able to commit, thus limiting the Debtors' ability to compete effectively in these areas.

The Debtors also compete for advertising sales with other traditional media, including newspapers, magazines, radio, direct mail, telemarketing, billboards, and television. Many of these competitors are larger than the Debtors and have greater financial resources than the Debtors. The market share of these competitors may increase and the Debtors' market share may decrease.

77

(e)    Changes in Technology and Consumer Preferences

Advances in communications technology (including wireless devices and voice over internet protocol) and demographic factors (including shifts from wireline telephone communications to wireless or other communications technologies) continue to erode the market position of the local telephone service providers.  The use of traditional local telephone service providers is declining.  The Debtors believe the loss of market share by local telephone service providers in any particular local service area decreases the value of their brand name in those particular local telephone markets.  As a result, the Debtors may not fully realize the benefits of their commercial arrangements with the local telephone service providers.

In addition, the local search advertising industry is subject to changes arising from developments in technology, including information distribution methods and users' technological preferences.  The use of the internet and wireless devices by consumers as a means to transact commerce may result in new technologies being developed and services being provided that could compete with the Debtors' services.  Internet search engines and service providers such as Google, Yahoo!, Bing, Facebook, and Twitter, among others, are placing a high priority on local commercial search initiatives and also have significantly greater technological and financial resources than the Debtors, and their accumulated customer information allows them to offer targeted advertising on a greater scale than the Debtors.

As a result of these factors, the Debtors' growth and future financial performance may depend on their ability to develop and market new products and services, to implement their new business plan, and to utilize new distribution channels, while enhancing existing products, services, and distribution channels, to incorporate the latest technological advances and accommodate changing user preferences, including the use of the internet and wireless devices.  The Debtors may not be able to develop and market new services.  In addition, if the Debtors fail to anticipate or respond adequately to changes in technology and user preferences or are unable to finance the capital expenditures necessary to respond to such changes, it could adversely affect their business prospects, financial condition, results of operations, and cash flow.

(f)    Potential Data Breaches

A breach of cyber/data security that impairs the Debtors' information technology infrastructure could disrupt normal business operations and affect the Debtors' ability to control their assets, access customer information, and limit communication with third parties.  Any loss of confidential or proprietary data through a breach could materially and adversely affect the Debtors' reputation, expose them to legal claims, impair their ability to execute on business strategies, and adversely affect business, prospects, financial condition, results of operations, and cash flow.

(g)    Reliance on Technology

Most of the Debtors' business activities rely to a significant degree on the efficient and uninterrupted operation of their computer and communications systems and those of others.  Any failure of existing or future systems could impair the Debtors' ability to collect, process, and store data and perform the day-to-day management of their business.  Such a result could have a material adverse effect on the Debtors' business, prospects, financial condition, results of operations, and cash flow.

The Debtors' computer and communications systems are vulnerable to damage or interruption from a variety of sources.  A natural disaster or other unanticipated problems that lead to the corruption or loss of data at the Debtors' facilities could have a material adverse effect on business, prospects, financial condition, results of operations, and cash flow.

(h)    Reliance on Small and Medium Sized Local Businesses

As of December 31, 2014, approximately 86 percent of the Debtors' advertising revenues were derived from the sale of marketing solutions to local businesses, which are generally small and medium sized businesses. In the ordinary course of the Debtors' business, the Debtors extend credit to these customers in the form of a trade

receivable for advertising purchases. Local businesses, however, tend to have fewer financial resources and higher failure rates than large businesses, especially during a downturn in the general economy. The proliferation of very large retail stores may continue to adversely affect local businesses. The Debtors believe these limitations are significant contributing factors to having customers not renew their advertising. If customers fail to pay within specified credit terms, the Debtors may cancel their advertising in future directories, which could further impact the Debtors' ability to collect past due amounts, as well as adversely impact their advertising sales and revenue trends. In addition, full or partial collection of delinquent accounts can take an extended period of time. Consequently, the Debtors could be adversely affected by their dependence on and extension of credit to local businesses in the form of trade receivables.

(i)    Dependence on Third Party Providers

The Debtors depend on third parties to print, publish, and distribute their directories. In connection with these services, the Debtors rely on the systems and services of third party service providers, their ability to perform key functions on the Debtors' behalf in a timely manner and in accordance with agreed levels of service, and their ability to attract and retain sufficient qualified personnel to perform services on the Debtors' behalf. There are a limited number of these providers with sufficient scale to meet the Debtors' needs. A failure in the systems of one of the Debtors' key third party service providers, or their inability to perform in accordance with the terms of their contracts or to retain sufficient qualified personnel, could have a material adverse effect on business, prospects, financial condition, results of operations, and cash flow.

If the Debtors were to lose the services of any of their key third party service providers, they would be required to hire and train sufficient personnel to perform these services or to find an alternative service provider. In some cases, it would be impracticable for the Debtors to perform these functions, including the printing of their directories. In the event the Debtors were required to perform any of the services that they currently outsource, it is unlikely that they would be able to perform them without incurring additional costs.

(j)    Termination of Key Internet Provider Agreements

The Debtors have expanded their internet distribution by establishing relationships with several other Internet yellow page directory providers, portals, search engines, and individual websites, which makes their content easier for search engines to access and provides a greater response to general searches on the internet. Under the terms of the agreements with these internet providers, the Debtors place their clients' advertisements on major search engines, which give the Debtors access to a higher volume of traffic than they could generate on their own, without relinquishing the client relationship. The search engines benefit from the Debtors' local sales force and full service capabilities for attracting and serving advertisers that might not otherwise transact business with search engines. The termination of one or more of the Debtors' agreements with major search engines could adversely affect their business.

(k)    Paper Prices and Availability

Paper is the principal raw material the Debtors use to produce their print directories. The price of paper is set each year based on total tonnage by supplier, paper basis weights, production capacity, and market price. The Debtors do not engage in hedging activities to limit their exposure to increases in paper prices. If the Debtors cannot secure access to paper in the necessary amounts or at reasonable prices, or if paper costs increase substantially, it could have a material adverse effect on business, prospects, financial condition, results of operations, and cash flow.

(l)    Reliance on Certified Marketing Representatives

Approximately 14 percent of the Debtors' advertising revenue is derived from the sale of advertising to national or large regional companies, including rental car companies, insurance companies, and pizza delivery companies. These companies typically purchase advertisements for placement in multiple geographic regions. Substantially all of the revenue from these large advertisers is derived through certified marketing representatives. Certified marketing representatives are independent third parties that act as agents for national companies and design

their advertisements, arrange for the placement of those advertisements in the Debtors' markets, and provide billing services.  The Debtors' relationships with these national advertisers depend significantly on the performance of the certified marketing representatives, which the Debtors do not control.  If some or all of the certified marketing representatives with whom the Debtors have existing relationships were unable or unwilling to transact business with the Debtors on acceptable terms or at all, this inability or unwillingness could materially adversely affect the Debtors' business.  In addition, any decline in the performance of the certified marketing representatives could harm the Debtors' ability to generate revenue from national accounts and could have a material adverse effect on their business.

(m)    Employees

The success of the Debtors' business is highly dependent upon their ability to continue to recruit, train, and retain skilled employees.  The market for certain of such employees is highly competitive.  The Debtors may be unsuccessful in attracting and retaining the employees they need, and, in such event, their business could be materially adversely affected.  The Debtors' inability to hire new personnel with the requisite skills could impair their ability to provide products to their customers or to manage their business effectively.

In addition, the success of the Debtors' business is dependent on the leadership of their key personnel.  The loss of a significant number of experienced key personnel could have a material adverse effect on business, prospects, financial condition, results of operations, and cash flow.

The Debtors' success also depends on their ability to identify, hire, train, and retain qualified sales personnel in each of the regions in which they operate.  The Debtors currently expend significant resources and management time in identifying and training their local marketing consultants and sales managers.  The Debtors' ability to attract and retain qualified sales personnel will depend, however, on numerous factors, including factors outside their control, such as conditions in the local employment markets in which the Debtors operate.

Furthermore, the Debtors' success depends on the continued services of key personnel, including their experienced senior management team as well as their regional sales management personnel.  If the Debtors fail to retain the necessary key personnel, it could have a material adverse effect on business, prospects, financial condition, results of operations, and cash flow.

(n)    Labor Issues

As noted above, the International Brotherhood of Electrical Workers of America and the Communication Workers of America collectively represent approximately 750 of the Debtors' employees.  In addition, the employees of some of the Debtors' key suppliers are represented by unions.  Work stoppages or slowdowns involving the Debtors' union-represented employees, or those of their suppliers, could significantly disrupt operations and increase operating costs, which would have a material adverse effect on business.

The inability to negotiate acceptable terms with the unions could also result in increased operating costs from higher wages or benefits paid to union employees or replacement workers.  A greater percentage of the Debtors' work force could also become represented by unions.  If a union decides to strike, and others choose to honor its picket line, it could have a material adverse effect on business.

(o)    Intellectual Property

Various trademarks and other intellectual property rights are key to the Debtors' business.  The Debtors rely upon a combination of patent, trademark, copyright, and trade secret laws as well as contractual arrangements to protect their intellectual property rights.  The Debtors may be required to bring lawsuits against third parties to protect their intellectual property rights.  Similarly, the Debtors may be party to proceedings by third parties challenging the Debtors' rights.  Lawsuits brought by the Debtors may not be successful, or the Debtors may be found to infringe the intellectual property rights of others.  As the commercial use of the internet further expands, it may be more difficult to protect the Debtors' trade names from domain name infringement or to prevent others from using internet domain names that associate their businesses with the Debtors.  In the past, the Debtors have received

80

claims of material infringement of intellectual property rights. Related lawsuits, regardless of the outcome, could result in substantial costs and diversion of resources and could have a material adverse effect on business. Further, the loss of important trademarks or other intellectual property rights could have a material adverse effect upon business, prospects, financial condition, results of operations, and cash flow.

       (p)      Regulation of Information Technology

As the internet continues to develop, the provision of internet services and the commercial use of the internet and internet-related applications may become subject to greater regulation. Regulation of the internet and internet-related services is still developing, both by new laws and government regulation, and also by industry self-regulation. If the Debtors' regulatory environment becomes more restrictive, including increased internet regulation, the Debtors' profitability could decrease.

       (q)      Regulation Related to Print Directories

A number of states and municipalities are considering, and a limited number of municipalities have enacted, legislation or regulations that would limit or restrict the Debtors' ability to distribute their print directories in the markets they serve. The most restrictive laws or regulations would prohibit the Debtors from distributing their print directories unless residents affirmatively "opt in" to receive print directories. Other, less restrictive laws or regulations would require the Debtors to allow residents to "opt out" of receiving print directories. In addition, some states and municipalities are considering legislation or regulations that would shift the costs and responsibilities of waste management for discarded directories from municipalities to the producers of the directories. These laws and regulations will likely, if and where adopted, increase the Debtors' costs, reduce the number of directories that are distributed, and negatively impact the Debtors' ability to market their advertising to new and existing clients. If these or similar laws and regulations are widely adopted, it could have a material adverse effect on business, prospects, financial condition, results of operations, and cash flow.

In addition, regulations established by state public utility commissions typically require local telephone service providers to publish and distribute white page directories of certain residences and businesses that order or receive local telephone service from the local telephone service providers. These regulations also require a local telephone service provider, in specified cases, to include information relating to the provision of telephone service provided by the local telephone service provider in the service area, as well as information relating to local and state governmental agencies. The costs of publishing, printing and distributing the white page directories are included in the Debtors' operating expenses.

Under the terms of the Debtors' publishing agreements with the local telephone service providers, the Debtors are required to perform the providers' regulatory obligation to publish white page directories in the markets in which the Debtors are the directory publisher. If any additional legal requirements are imposed with respect to this obligation, the Debtors would be obligated to comply with these requirements even if they were to increase operating costs. The Debtors' results of operations relative to competing directory publishers that do not have those obligations could be adversely affected due to these potential compliance costs.

       (r)      Telecommunication Partner Bankruptcies

In the event that any of the Debtors' telecommunications partners sought protection under bankruptcy laws, the Debtors' agreements with such partners could be materially adversely impacted. In addition, the Debtors' telecommunication partners may be unable in such circumstance to provide services to the Debtors under their contracts. Consequently, the bankruptcy of any of the Debtors' telecommunication partners could have an adverse effect on business prospects, financial condition, results of operations, and cash flow.

       (s)      Non-Competition Agreements

The Debtors entered into non-competition agreements with certain local telephone service providers pursuant to which they each agreed not to publish tangible or digital (excluding internet) media directories consisting principally of wireline listings and classified advertisements of subscribers in the markets in which the

Debtors are the publisher of their directories.  However, under applicable law, a covenant not to compete is generally only enforceable to the extent it is necessary to protect a legitimate business interest of the party seeking enforcement, if it does not unreasonably restrain the party against whom enforcement is sought, and if it is not contrary to the public interest.

Enforceability of non-competition covenants may be uncertain.  If a court were to determine that the non-competition agreement is unenforceable (in full or in part), the restricted parties could compete directly against the Debtors in the previously restricted markets, which could have a material adverse effect on business.

(t)      Litigation

Potential judgments, fines or penalties relating to these lawsuits, other claims, or investigations or allegations by government or regulatory agencies may have a material adverse effect on business, prospects, financial condition, results of operations, and cash flow.  The Debtors are also exposed to other claims and litigation relating to their business, as well as methods of collection, processing, and use of personal data.  The Debtors' clients and users of client data collected and processed by the Debtors could also file claims against the Debtors if their data were found to be inaccurate, or if personal data stored by the Debtors were improperly accessed and disseminated by unauthorized persons.  These claims could have a material adverse effect on business, prospects, financial condition, results of operations, and cash flow.

(u)      Environmental Laws and Regulations

The Debtors' operations are subject to the requirements of federal, state, and local environmental and occupational health and safety laws and regulations, the violation of which can result in substantial costs and liabilities, including material civil and criminal fines and penalties.  Such requirements include those pertaining to pollution, the protection of human health and the environment, air emissions, wastewater discharges, occupational safety and health, and the generation, handling, treatment, remediation, use, storage, transport, release of, and exposure to, hazardous substances and wastes.  The Debtors have incurred and will continue to incur costs and capital expenditures to comply with these environmental requirements and to obtain and maintain all necessary permits.  Any failure by the Debtors to comply with such laws and regulations could subject the Debtors to significant civil or criminal fines and penalties and other liabilities.

Under certain of these laws and regulations, such as the federal Superfund statute, the obligation to investigate and remediate contamination at a facility may be imposed on current and former owners or operators or on persons who may have sent waste to that facility for disposal.  Liability under these laws and regulations may be without regard to fault or to the legality of the activities giving rise to the contamination.  The Debtors may incur costs to investigate and remediate these conditions.  In connection with contamination, the Debtors may also be liable for natural resource damages, government penalties, and claims by third parties for personal injury and property damage. In addition, the Debtors may incur liabilities in connection with any future environmental contamination or any previously unknown but currently existing environmental conditions at the Debtors' facilities.  The costs of investigation, remediation, and other costs with respect to identified environmental conditions, including conditions at offsite disposal locations with respect to which the Debtors have been notified of potential liability, could be significant.

In addition, environmental laws and regulations, and the interpretation or enforcement of these laws and regulations, are constantly evolving and it is impossible to predict accurately the effect that changes in these laws and regulations, or their interpretation or enforcement, may have on business, prospects, financial condition, results of operations, and cash flow.  Should environmental laws and regulations, or their interpretation or enforcement, become more stringent, the costs of compliance could increase.  If the Debtors cannot pass along future cost increases to their customers, any such increases may have an adverse effect on business, prospects, financial condition, results of operations, and cash flow.

(v)      Future Business Combinations, Acquisitions, Mergers or Joint Ventures

The Debtors actively consider strategic transactions from time to time.  The Debtors evaluate acquisitions, joint ventures, alliances, or co-production programs as opportunities arise, and the Debtors may be engaged in

varying levels of negotiations with potential competitors at any time. The Debtors may not be able to effect transactions with strategic alliance, acquisition, or co-production program candidates on commercially reasonable terms or at all. The integration of companies that have previously been operated separately involves a number of risks; as such, if the Debtors enter into these transactions, the Debtors also may not realize the benefits the Debtors anticipate and the Debtors may subject themselves to unforeseen contingent liabilities. Consummating any acquisitions, joint ventures, alliances, or co-production programs could result in the incurrence of additional debt and related interest expense. In addition, the Debtors may not be able to obtain additional financing for these transactions.

E.    *Risks Associated with Forward Looking Statements*

1.    <u>Financial Information Is Based on the Debtors' Books and Records and, Unless Otherwise Stated, No Audit Was Performed</u>

**The financial information contained in this Disclosure Statement has not been audited**. In preparing this Disclosure Statement, the Debtors relied on financial data derived from their books and records that was available at the time of such preparation. Although the Debtors have used their reasonable business judgment to ensure the accuracy of the financial information provided in this Disclosure Statement, and while the Debtors believe that such financial information fairly reflects the financial condition of the Debtors, the Debtors are unable to represent or warrant that the financial information contained herein and attached hereto is without inaccuracies.

2.    <u>Financial Projections and Other Forward Looking Statements Are Not Assured, Are Subject to Inherent Uncertainty Due to the Numerous Assumptions Upon Which They Are Based and, as a Result, Actual Results May Vary</u>

This Disclosure Statement contains various projections concerning the financial results of the Debtors' operations, including the financial projections, that are, by their nature, forward looking, and which projections are necessarily based on certain assumptions and estimates. Should any or all of these assumptions or estimates ultimately prove to be incorrect, the actual future experiences of the Reorganized Debtors may turn out to be different from the financial projections. The financial projections do not reflect emergence adjustments including the impact of generally accepted "fresh start" accounting.

Specifically, the projected financial results contained in this Disclosure Statement reflect numerous assumptions concerning the anticipated future performance of the Reorganized Debtors, some of which may not materialize, including, without limitation, assumptions concerning: (a) the timing of Confirmation and Effective Date of the Plan in accordance with its terms; (b) the anticipated future performance of the Reorganized Debtors, including the ability to maintain or increase revenue and gross margins, control future operating expenses, or make necessary capital expenditures; (c) general business and economic conditions; (d) overall industry performance and trends; (e) the Debtors' ability to maintain market strength and receive vendor support by way of favorable purchasing terms; (f) the Debtors' ability to secure certain key contracts; and (g) customer preferences continuing to support the Debtors' operations.

Due to the inherent uncertainties associated with projecting financial results generally, the projections contained in this Disclosure Statement will not be considered assurances or guarantees of the amount of funds or the amount of Claims that may be Allowed in the various Classes. While the Debtors believe that the financial projections contained in this Disclosure Statement are reasonable, there can be no assurance that they will be realized.

F.    *Disclosure Statement Disclaimer*

1.    <u>Information Contained Herein Is for Soliciting Votes</u>

The information contained in this Disclosure Statement is for the purposes of soliciting acceptances of the Plan and may not be relied upon for any other purpose.

2.        No Legal or Tax Advice Is Provided to You by this Disclosure Statement

**This Disclosure Statement is not legal advice to you.**  The contents of this Disclosure Statement should not be construed as legal, business, or tax advice.  Each Holder of a Claim or an Interest should consult his or her own legal counsel, accountant, or other applicable advisor with regard to any legal, tax, and other matters concerning his or her Claim or Interest.  This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation of the Plan.

3.        No Admissions Made

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any entity (including, without limitation, the Debtors) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, the Reorganized Debtors, Holders of Allowed Claims or Allowed Interests, or any other parties in interest.

4.        Failure to Identify Litigation Claims or Projected Objections

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement.  The Debtors or the Reorganized Debtors may seek to investigate, File, and prosecute Claims and Interests and may object to Claims or Interests after the Confirmation or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies such Claims or Interests or objections to such Claims or Interests.

5.        No Waiver of Right to Object or Right to Recover Transfers and Assets

The vote by a Holder of an Allowed Claim for or against the Plan does not constitute a waiver or release of any claims, causes of action, or rights of the Debtors or the Reorganized Debtors (or any entity, as the case may be) to object to that Holder's Claim, or recover any preferential, fraudulent, or other voidable transfer of assets, regardless of whether any claims or causes of action of the Debtors or their respective estates are specifically or generally identified herein.

6.        Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors

The Debtors' advisors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement.  Although the Debtors' advisors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not verified independently the information contained herein.

7.        Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update

The statements contained in this Disclosure Statement are made by the Debtors as of the date of this Disclosure Statement, unless otherwise specified herein, and the delivery of this Disclosure Statement after the date of this Disclosure Statement does not imply that there has not been a change in the information set forth herein since that date.  While the Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement.  Further, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Court.

8.        No Representations Outside this Disclosure Statement Are Authorized

No representations concerning or relating to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, should not be relied upon by you in arriving at your decision.  You should promptly

report unauthorized representations or inducements to the counsel to the Debtors and the United States Trustee for the District of Delaware.

G.     *Liquidation Under Chapter 7*

        If no plan can be confirmed, the Debtors' Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code.  A discussion of the effects that a chapter 7 liquidation would have on the recoveries of Holders of Claims or Interests and the Debtors' liquidation analysis is set forth in Article VI herein, "Statutory Requirements for Confirmation of the Plan" and the Liquidation Analysis attached hereto as **Exhibit D**.

**ARTICLE VIII.**
**IMPORTANT SECURITIES LAW DISCLOSURE**

A.     *New Common Stock of the Reorganized Debtors and the Warrants*

        The Plan provides that, on the Effective Date or as soon thereafter as reasonably practicable, certain Holders of Allowed Claims may receive, in part, New Common Stock of the Reorganized Debtors or Warrants, and certain Holders may also later receive New Common Stock issuable upon exercise of the Warrants (collectively, the "Plan Securities").  On or prior to the Effective Date, the Reorganized Debtors will reserve for issuance the Plan Securities required to be issued pursuant to the Plan.

        No registration statement will be filed under the Securities Act, or pursuant to any state securities laws with respect to the offer and distribution of securities under the Plan. Prior to the filing of the Chapter 11 Cases, the Debtors will rely on the exemption provided by section 4(a)(2) of the Securities Act and applicable exemptions from Blue Sky Laws. The Debtors believe that the provisions of section 1145(a)(1) of the Bankruptcy Code will exempt the issuance and distribution of securities (other than the securities issued under the Plan (the "1145 Securities")) from federal and state securities registration requirements. The 1145 Securities issued to affiliates of the Reorganized Debtors will be treated as issued pursuant to section 1145(a)(1), but will be subject to the restrictions on resale of securities held by affiliates of an issuer.

B.     *Issuance and Resale of Plan Securities*

        1.     Offer and Sale of Plan Securities:  Bankruptcy Code Exemption

        Section 1145(a)(1) of the Bankruptcy Code exempts the offer or sale of securities under a plan of reorganization from registration under Section 5 of the Securities Act and state laws if three principal requirements are satisfied:  (a) the securities must be issued "under a plan" of reorganization by the debtor or its successor under a plan or by an affiliate participating in a joint plan of reorganization with the debtor; (b) the recipients of the securities must hold a claim against, an interest in, or a claim for administrative expenses in the case concerning the debtor or such affiliate; and (c) the securities must be issued in exchange for the recipient's claim against or interest in the debtor, or such affiliate, or "principally" in such exchange and "partly" for cash or property.  In reliance upon this exemption, the Debtors believe that the offer and sale, under the Plan, of the Plan Securities will be exempt from registration under the Securities Act and state securities laws with respect to any Holder of Allowed Claims who is not deemed to be an "underwriter" as defined in Section 1145(b) of the Bankruptcy Code.

        In addition, the Debtors will seek to obtain, as part of the Confirmation Order, a provision confirming such exemption.  Accordingly, subject to compliance with the New Organizational Documents, such securities generally may be resold:  (a) without registration under the Securities Act or other federal securities laws pursuant to an exemption provided by Section 4(1) of the Securities Act, unless the Holder is an "underwriter" (see discussion below) with respect to such securities, as that term is defined under the Bankruptcy Code; and (b) without registration under state securities or Blue Sky laws pursuant to various exemptions provided by the respective laws of the several states.  However, recipients of securities issued under the Plan are advised to consult with their own legal advisors as to the availability of any such exemption from registration under state law in any given instance and as to any applicable requirement or conditions to such availability.

2.      Subsequent Transfers of Plan Securities

Section 1145(b) of the Bankruptcy Code defines the term "underwriter" for purposes of the Securities Act as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer:"  (a) purchases a claim against, interest in, or claim for an administrative expense in the case concerning the debtor, if such purchase is with a view to distributing any security received in exchange for such a claim or interest; (b) offers to sell securities offered or sold under a plan for the holders of such securities; (c) offers to buy securities offered or sold under the plan from the holders of such securities, if the offer to buy is:  (i) with a view to distribution of such securities; and (ii) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan; or (d) is an "issuer" with respect to the securities, as the term "issuer" is defined in Section 2(a)(11) of the Securities Act.

The term "issuer" is defined in Section 2(a)(4) of the Securities Act; however, the reference contained in Section 1145(b)(1)(D) of the Bankruptcy Code to Section 2(a)(11) of the Securities Act purports to include as statutory underwriters all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities. "Control" (as such term is defined in Rule 405 of Regulation C under the Securities Act) means the possession, direct or indirect, of the power to direct or cause the direction of the policies of a person, whether through the ownership of voting securities, by contract, or otherwise. Accordingly, an officer or director of a reorganized debtor (or its successor) under a plan of reorganization may be deemed to be a "control person," particularly if such management position is coupled with the ownership of a significant percentage of the debtor's (or successor's) voting securities.  Ownership of a significant amount of voting securities of a reorganized debtor could also result in a person being considered to be a "control person."

To the extent that persons deemed to be "underwriters" receive Plan Securities pursuant to the Plan, resales by such persons would not be exempted by Section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law.  Such persons would not be permitted to resell such Plan Securities, unless such securities were registered under the Securities Act or an exemption from such registration requirements were available.  Entities deemed to be statutory underwriters for purposes of Section 1145 of the Bankruptcy Code may, however, be able, at a future time and under certain conditions, to sell securities without registration pursuant to the resale provisions of Rule 144 under the Securities Act or another available exemption under the Securities Act.

Whether or not any particular person would be deemed to be an "underwriter" with respect to the Plan Securities to be issued pursuant to the Plan, or an "affiliate" of Parent would depend upon various facts and circumstances applicable to that person.  Accordingly, we express no view as to whether any such person would be such an "underwriter" or "affiliate."

PERSONS WHO RECEIVE PLAN SECURITIES UNDER THE PLAN ARE URGED TO CONSULT THEIR OWN LEGAL ADVISOR WITH RESPECT TO THE RESTRICTIONS APPLICABLE UNDER THE SECURITIES LAWS AND THE CIRCUMSTANCES UNDER WHICH SECURITIES MAY BE SOLD IN RELIANCE ON SUCH LAWS. THE FOREGOING SUMMARY DISCUSSION IS GENERAL IN NATURE AND HAS BEEN INCLUDED IN THIS DISCLOSURE STATEMENT SOLELY FOR INFORMATIONAL PURPOSES. WE MAKE NO REPRESENTATIONS CONCERNING, AND DO NOT PROVIDE, ANY OPINIONS OR ADVICE WITH RESPECT TO THE PLAN SECURITIES OR THE BANKRUPTCY MATTERS DESCRIBED IN THIS DISCLOSURE STATEMENT. IN LIGHT OF THE UNCERTAINTY CONCERNING THE AVAILABILITY OF EXEMPTIONS FROM THE RELEVANT PROVISIONS OF FEDERAL AND STATE SECURITIES LAWS, WE ENCOURAGE EACH PARTY-IN INTEREST TO CONSIDER CAREFULLY AND CONSULT WITH ITS OWN LEGAL ADVISORS WITH RESPECT TO ALL SUCH MATTERS. BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR HOLDER MAY BE AN UNDERWRITER, WE MAKE NO REPRESENTATION CONCERNING THE ABILITY OF A PERSON TO DISPOSE OF THE PLAN SECURITIES.

C.      *No Registration or Listing of Plan Securities*

The issuer of the Plan Securities of the will not be required to file periodic reports under the Securities Exchange Act or seek to list the Plan Securities for trading on a national securities exchange.  Consequently, there

will not be "current public information" (as such term is defined in Rule 144) regarding the issuer of the Plan Securities.

## ARTICLE IX.
## CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES

The following discussion is a summary of certain U.S. federal income tax consequences of the consummation of the Plan to the Debtors and to certain Holders of Claims. The following discussion does not address the U.S. federal income tax consequences to Holders (i) whose Claims are Unimpaired or otherwise entitled to payment in full in Cash under the Plan or (ii) that are otherwise not entitled to vote under the Plan. This summary is based on the Internal Revenue Code of 1986, as amended, (the "IRC"), the Treasury Regulations promulgated thereunder, judicial authorities, published administrative positions of the Internal Revenue Service (the "IRS") and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. No opinion of counsel has been obtained and the Debtors do not intend to seek a ruling from the IRS as to any of the tax consequences of the Plan discussed below. The discussion below is not binding upon the IRS or the courts. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtors, the Reorganized Debtors, or to Holders of Claims or Interests in light of their individual circumstances, nor does it address tax issues with respect to Holders that are subject to special treatment under the U.S. federal income tax laws (including, for example, banks, governmental authorities or agencies, pass-through entities, subchapter S corporations, trusts, dealers and traders in securities, insurance companies, financial institutions, tax-exempt organizations, small business investment companies, persons who are related to the Debtors within the meaning of the IRC, persons using a mark-to-market method of accounting, holders of Claims or Interests who are themselves in bankruptcy, persons who received their Claims or Interests pursuant to the exercise of an employee stock option or otherwise as compensation, and regulated investment companies and those holding, or who will hold, Claims, Interests, or other certain assets, as part of a hedge, straddle, conversion, or constructive sale transaction). Furthermore, the following summary of certain U.S. federal income tax consequences of the Plan does not purport to address any aspect of state, local, estate, gift, non-U.S., or other tax law. This summary assumes that a Holder of Claims or Interests holds only Claims or Interests in a single Class and holds a Claim as a "capital asset" (within the meaning of section 1221 of the IRC). The following discussion assumes the debt obligation(s) underlying each Allowed Claim is properly treated as debt (rather than equity) of the Debtor(s) the Holder has the Allowed Claim against. Lastly, this discussion assumes that the Restructuring Transactions will be completed in accordance with the RSA and as further described herein and in the Plan.

For purposes of this discussion, a "U.S. Holder" is a Holder that is: (1) an individual citizen or resident of the United States for U.S. federal income tax purposes; (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (A) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons have authority to control all substantial decisions of the trust or (B) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person. For purposes of this discussion, a "Non-U.S. Holder" is any Holder that is not a U.S. Holder other than any partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder, the tax treatment of a partner (or other owner) generally will depend upon the status of the partner (or other owner) and the activities of the partner (or other owner) and the entity. Partners (or other owners) of partnerships (or other pass-through entities) that are Holders should consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

**THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR INTEREST. ALL HOLDERS OF CLAIMS AND INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL, NON-U.S., AND OTHER TAX CONSEQUENCES OF THE PLAN.**

A.    *Certain United States Federal Income Tax Consequences to the Debtors*

    1.    Cancellation of Debt and Reduction of Tax Attributes

        In general, absent an exception, a debtor will realize and recognize cancellation of debt income ("COD Income") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (x) the amount of Cash paid, (y) the "issue price" (defined below) of any new debt issued in satisfaction of the existing indebtedness and (z) the fair market value of any other consideration given in satisfaction of such indebtedness at the time of the exchange.

        A debtor will not, however, be required to include any amount of COD Income in gross income if the debtor is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding. Instead, as a consequence of such exclusion, a debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income pursuant to section 108 of the IRC. In general, tax attributes will be reduced in the following order: (a) NOLs; (b) general business credit carryovers; (c) minimum tax credit carryovers; (d) capital loss carryovers; (e) tax basis in assets (but not below the amount of liabilities to which the debtor remains subject); (f) passive activity loss and credit carryovers; and (g) foreign tax credits. A debtor with COD Income may elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the IRC. The reduction in tax attributes occurs only after the taxable income (or loss) for the year of the debt discharge has been determined. Subject to the discussion below under the heading "Excess Loss Accounts," excess COD Income over the amount of available tax attributes is not subject to U.S. federal income tax and has no other U.S. federal income tax impact.

        In the context of a consolidated group of corporations, the tax rules provide for a complex ordering mechanism in determining how the tax attributes of one member can be reduced by the COD Income of another member. Under the Treasury Regulations, the tax attributes of each member of an affiliated group of corporations that is excluding COD Income is first subject to reduction. To the extent the debtor member's tax basis in stock of a lower-tier member of the affiliated group is reduced, a "look through rule" requires that a corresponding reduction be made to the tax attributes of the lower-tier member. If a debtor member's excluded COD Income exceeds its tax attributes, the excess COD Income is applied to reduce certain remaining consolidated tax attributes of the affiliated group.

        In connection with the Restructuring Transactions, Debtors expect to realize significant COD Income. Because the Plan provides that holders of certain Claims will receive New Common Stock, Warrants and the shares of the Takeback First Lien Term Loan, the exact amount of any COD Income that will be realized by the Debtors, and accordingly the amount of tax attributes required to be reduced (if any), will depend in part on the fair market value of the New Common Stock and Warrants and the "issue price" of the Takeback First Lien Term Loan and will not be determinable until the consummation of the Plan. The Debtors expect that the amount of such COD Income will be significant and will likely eliminate all of their NOLs allocable to periods prior to the Effective Date. In addition, a significant amount of the Debtors' tax basis in their assets, including certain current assets such as receivables, will likely be reduced by COD Income that is not absorbed by the NOLs. As discussed below under the heading "Excess Loss Accounts," it is also possible that there will be some amount of currently taxable income as a result of there being an excess loss account in the stock of one or more Debtors and COD Income of such a Debtor in excess of available tax attributes.

2.    Limitation on NOLs and Other Tax Attributes

For the period ending December 31, 2015, the Debtors estimate that they had NOLs for U.S. federal income tax purposes of approximately $317 million. As discussed above, the Debtors' NOLs will likely be eliminated after computing the Debtors' taxes for the year in which the Plan is implemented. To the extent that any remain they will be subject to limitation as described below.

(a)    General Section 382 Annual Limitation

Under section 382 of the IRC, if a corporation undergoes an "ownership change," the amount of any remaining NOLs, tax credit carryforwards, net unrealized built-in losses, and possibly certain other attributes of the Reorganized Debtors allocable to periods prior to the Effective Date (collectively, "Pre-Change Losses") that may be utilized to offset future taxable income generally are subject to an annual limitation. In general, the amount of the annual limitation to which a corporation that undergoes an ownership change would be subject in any "post-change year" is equal to the product of (a) the fair market value of the stock of the loss corporation immediately before the ownership change (with certain adjustments) multiplied by (b) the "long-term tax-exempt rate" in effect for the month in which the ownership change occurs (currently, 2.65 percent for March 2016). The annual limitation under section 382 represents the amount of pre-change NOLs, as well as certain built-in losses recognized within the five year period following the ownership change, that may be used each year to offset income. The Section 382 Limitation may be increased to the extent that the Debtors have a net unrealized built-in gain in their assets upon implementation of the Plan, and either recognize certain built-in gains in their assets during the five-year period following the ownership change, or are treated as recognizing built-in gains pursuant to the safe harbors provided in IRS Notice 2003-65. Limitations on the use of built-in losses may be imposed if the Debtors have a net unrealized built-in loss in their assets upon implementation of the Plan. Section 383 of the IRC applies a similar limitation to capital loss carryforwards and tax credits. Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year. As discussed below, however, special rules may apply in the case of a corporation which experiences an ownership change as the result of a bankruptcy proceeding.

The Debtors expect that the distribution of New Common Stock pursuant to the Plan will result in an ownership change. The Debtors expect to have a net unrealized built-in gain in their assets as of the time the Plan is implemented.

(b)    Special Bankruptcy Exceptions

An exception to the foregoing annual limitation rules generally applies when a debtor company's former shareholders and so called "qualified creditors" of a debtor company in Chapter 11 receive, in respect of their claims or interests, at least 50 percent of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in Chapter 11) pursuant to a confirmed Chapter 11 plan (the "382(l)(5) Exception"). Under the 382(l)(5) Exception, a debtor's Pre-Change Losses are not limited on an annual basis but, instead, are required to be reduced by the amount of any interest deductions claimed during the three taxable years preceding the taxable year that includes the Effective Date, and during the part of the taxable year prior to and including the Effective Date of the plan of reorganization, in respect of all debt converted into stock in the reorganization. If the 382(l)(5) Exception applies and the Reorganized Debtors undergo another ownership change within two years after Consummation of the Plan, then the Reorganized Debtors' section 382 annual limitation will generally be reduced to zero, which would effectively preclude utilization of Pre-Change Losses.

Where the 382(l)(5) Exception is not applicable (either because the debtor company does not qualify for it or the debtor otherwise elects not to utilize the 382(l)(5) Exception), a second special rule will generally apply (the "382(l)(6) Exception"). When the 382(l)(6) Exception applies, a corporation in bankruptcy that undergoes an "ownership change" generally is permitted to determine the fair market value of its stock after taking into account the increase in value resulting from any surrender or cancellation of creditors' claims in the bankruptcy. This differs from the ordinary rule that requires the fair market value of a corporation that undergoes an ownership change to be determined before the events giving rise to the change. The 382(l)(6) Exception also differs from the 382(l)(5) Exception in that under it the Reorganized Debtors would not be required to reduce their NOLs by the amount of certain interest deductions claimed by the Debtors within the prior three-year period and the Reorganized Debtors

may undergo a change of ownership within two years without triggering any reduction in their Section 382 annual limitation.

The Debtors have not yet determined whether they are eligible for, or, if so, whether they will elect out of, the 382(l)(5) Exception.

3.    Alternative Minimum Tax

In general, an alternative minimum tax ("AMT") is imposed on a corporation's alternative minimum taxable income ("AMTI") at a 20 percent rate to the extent such tax exceeds the corporation's regular federal income tax for the year.  AMTI is generally equal to regular taxable income with certain adjustments.  For purposes of computing AMTI, certain tax deductions and other beneficial allowances are modified or eliminated.  For example, except for alternative tax NOLs generated in or deducted as carryforwards in taxable years ending in certain years, which can offset 100 percent of a corporation's AMTI, only 90 percent of a corporation's AMTI may be offset by available alternative tax NOL carryforwards.  Additionally, under Section 56(g)(4)(G) of the IRC, an ownership change (as discussed above) that occurs with respect to a corporation having a net unrealized built-in loss in its assets will cause, for AMT purposes, the adjusted basis of each asset of the corporation immediately after the ownership change to be equal to its proportionate share (determined on the basis of respective fair market values) of the fair market value of the assets of the corporation, as determined under Section 382(h) of the IRC, immediately before the ownership change.

Any AMT that a corporation pays generally will be allowed as a nonrefundable credit against its regular federal income tax liability in future years when the corporation is not subject to the AMT.  Any unused credit is carried forward indefinitely.

4.    Excess Loss Accounts

Generally, within a consolidated group, a corporation's basis in the stock of a subsidiary corporation is (a) increased by the income of such subsidiary and any contributions to such subsidiary and (b) decreased by any losses of such subsidiary which are used by the group and by any distributions from such subsidiary.  If total net reductions exceed the parent's initial basis in the subsidiary stock, that excess is called an "excess loss account" and is treated as  negative basis. The consolidated group must recognize income equal to an excess loss account in a subsidiary's stock in certain events, including (x) on the subsidiary's recognition of COD Income (discussed above) where the COD Income is excluded from income and the consolidated group does not reduce its tax attributes by the amount of the excluded COD Income, and (y) if the stock of the subsidiary is treated as disposed of for no consideration.  The Debtors believe that they have an excess loss account in the stock of one or more subsidiaries. It is possible that a Debtor will recognize excluded COD Income in excess of available tax attributes and that there will be an excess loss account in the stock of that Debtor.  In that case, the Debtors will recognize taxable income in the amount of such excess COD Income, but not to exceed the excess loss account.  Furthermore, the Debtors are contemplating a number of Restructuring Transactions that would simplify the current corporate structure but under certain circumstances could require the Debtors to recognize gain equal to their excess loss accounts.  In deciding whether and to what extent to simplify their corporate structure, the Debtors will endeavor to minimize current and future cash tax costs and in doing so will take into account the expected cost of triggering any excess loss account into income.

B.    *Certain United States Federal Income Tax Consequences to the U.S. Holders of Certain Allowed Claims*

The following discussion assumes that the Debtors will undertake the Restructuring Transactions currently contemplated by the Plan.  Holders of Claims and Interests are urged to consult their tax advisors regarding the tax consequences of the Restructuring Transactions.

1.    U.S. Federal Income Tax Consequences to Holders of Allowed Class 3, Class 4, Class 5, and Class 6 Claims

Pursuant to the Plan and in full and final satisfaction of their Claims, Holders of Allowed Class 3, Class 4, Class 5, and Class 6 Claims will receive their Pro Rata share of 100% of (a) New Common Stock, (b) the Takeback

First Lien Term Loan, and (c) their remaining Cash Collateral. Additionally, Article VI.C of the Plan provides for an equity put option by which a Holder of Credit Agreement Claims may elect to receive loans under the Takeback First Lien Term Loan in lieu of all or any portion of the New Common Stock to which such Holder is otherwise entitled.

The U.S. federal income tax consequences of the Plan to U.S. Holders of Allowed Class 3, Class 4, Class 5, and Class 6 Claims will depend, in part, on whether the transactions undertaken pursuant to the Plan qualify in whole or in part as an exchange of stock or securities in a tax-free reorganization to which the Reorganized Debtors are treated as a party under the reorganization provisions of the IRC (a "Reorganization"). If the transactions undertaken pursuant to the Plan constitute a Reorganization, the U.S. federal income tax consequences to such U.S. Holders of Claims will further depend on whether the Claims surrendered constitute "securities" for U.S. federal income tax purposes of the Debtor that issued the obligation constituted the Claim, its successor, or another party to the Reorganization. The U.S. federal income tax consequences will also depend on the Restructuring Transactions entered into to simplify the Debtors' corporate structure. In particular, if one or more Debtors is merged into, or transfers all of its assets to, Parent or a new subsidiary of Parent, such transaction could constitute a "G" Reorganization to which both Parent and such Debtor would be a party.

(a)    Treatment of a Debt Instrument as a "Security"

Whether a debt instrument constitutes a "security" is determined based on all relevant facts and circumstances, but most authorities have held that the length of the term of a debt instrument at initial issuance is an important factor in determining whether such instrument is a security for U.S. federal income tax purposes. These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that it is a security. There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof with respect to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into an Interest of the obligor, whether payments of interest are fixed, variable, or contingent, and whether such payments are made on a current basis or accrued.

(b)    Treatment of Holders of Allowed Class 3, Class 4, Class 5, and Class 6 Claims if the Exchange is Treated as a Reorganization

If a debt instrument constituting an Allowed Class 3, Class 4, Class 5, or Class 6 Claim is a security and Parent is treated as a party to a Debtor's Reorganization, and, if only loans are received in exchange for the Claim, the Takeback First Lien Term Loan is treated as a "security" for U.S. federal income tax purposes, the exchange of a U.S. Holder's Allowed Class 3, Class 4, Class 5, or Class 6 Claim should be treated as a Reorganization, under the IRC. If the exchange is treated as a Reorganization, there are two potential scenarios: Parent issuing the New Common Stock and the Takeback First Lien Term Loan is treated as a party to a Debtor's Reorganization, and (1) the Takeback First Lien Term Loan is not treated as a security; or (2) the Takeback First Lien Term Loan is treated as a security.

If the Takeback First Lien Term Loan is not treated as a security, a U.S. Holder should not recognize loss with respect to the exchange and should not recognize gain (subject to the discussion of accrued interest below) except to the extent of Cash and the fair market value of the interest in the Takeback First Lien Term Loan received. A U.S. Holder who is subject to this treatment will take a tax basis in the interest in the Takeback First Lien Term Loan received equal to its fair market value. The U.S. Holder will take a tax basis in the New Common Stock equal to the U.S. Holder's tax basis of the surrendered Claim increased by the amount of gain recognized in the exchange but reduced by the amount of cash and the fair market value of the interest received in the Takeback First Lien Term Loan. A U.S. Holder's holding period for its interest in the Takeback First Lien Term Loan received (and any property received attributable to accrued but untaxed interest) should begin on the day following the Effective Date. A U.S. Holder's holding period for the New Common Stock received should include the holding period for the obligation constituting the surrendered Allowed Claim exchanged for such property. Note that if the U.S. Holder receives additional loans under the Take-Back Paper Facility in lieu of all New Common Stock pursuant to the equity put option, the U.S. Holder will receive only loans that are not treated as securities for U.S. federal income tax purposes and Cash in exchange for its Allowed Claim. As a result, the exchange will not be treated as a

Reorganization with respect to such holder and the U.S. federal income tax consequences to such U.S. Holder will be substantially similar to the consequences, described below under the heading "Treatment of Holders of Allowed Class 3, Class 4, Class 5, and Class 6 Claims if the Exchange is Not Treated as a Reorganization."

If the Takeback First Lien Term Loan is treated as a security, a U.S. Holder should not recognize loss with respect to the exchange and should not recognize gain (subject to the discussion of accrued interest below) except to the extent of Cash received. A U.S. Holder who is subject to this treatment will take an aggregate tax basis in the New Common Stock and its interest in the Takeback First Lien Term Loan received equal to the U.S. Holder's tax basis in the surrendered Allowed Claim increased by the amount of gain recognized in the exchange and reduced by the amount of Cash received. Such aggregate tax basis will be allocated between the New Common Stock and the interest in the Takeback First Lien Term Loan received on the basis of their relative fair market value. A U.S. Holder's holding period for the New Common Stock and its interest in the Takeback First Lien Term Loan received (except, in each case, to the extent attributable to accrued but untaxed interest) should each include the holding period for the obligation constituting the surrendered Allowed Claim exchanged for such property.

(c)    Treatment of Holders of Allowed Class 3, Class 4, Class 5, and Class 6 Claims if the Exchange is Not Treated as a Reorganization

If (i) the Allowed Class 3, Class 4, Class 5, or Class 6 Claims are not treated as securities for U.S. federal income tax purposes or (ii) if Parent is not a party to a Debtor's Reorganization or (iii) the Takeback First Lien Term Loan is not treated as a security for U.S. federal income tax purposes and the U.S. Holder receives additional loans under the Take-Back Paper Facility in lieu of all New Common Stock pursuant to the equity put option (as described above under the heading "Treatment of Holders of Allowed Class 3, Class 4, Class 5, and Class 6 Claims if the Exchange is Treated as a Reorganization"), a U.S. Holder of such Claim will be treated as exchanging such Claim for its Pro Rata Share of the New Common Stock and/or the Takeback First Lien Term Loan and Cash in a fully taxable exchange under section 1001 of the IRC. Accordingly, each U.S. Holder of such Claim should recognize gain or loss equal to the difference between (1) the issue price of the Pro Rata Share of the Takeback First Lien Term Loan, and/or the fair market value of New Common Stock, and the Cash, if any, in each case, to the extent such consideration is not allocable to accrued but untaxed interest that is received in exchange for the Claim; and (2) such U.S. Holder's adjusted tax basis, if any, in the obligation constituting such Claim. The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the U.S. Holder, the nature of the Claim in such U.S. Holder's hands, whether the Claim constitutes a capital asset in the hands of the U.S. Holder, whether the Claim was purchased at a discount, and whether and to what extent the U.S. Holder has previously claimed a bad debt deduction with respect to its Claim. If recognized gain is capital gain, it generally would be long-term capital gain if the holder held its Claim for more than one year at the time of the exchange. The deductibility of capital losses is subject to certain limitations as discussed below. See the discussions of accrued interest and market discount below. A U.S. Holder's tax basis in any New Common Stock or Takeback First Lien Term Loan received should equal the fair market value of such stock or issue price of such loan as of the date such stock is distributed or such loan is issued to the U.S. Holder. A U.S. Holder's holding period for the New Common Stock or Takeback First Lien Term Loan received should begin on the day following the Effective Date.

2.    U.S. Federal Income Tax Consequences to U.S. Holders of Allowed Class 7 Claims

Pursuant to the Plan, U.S. Holders of Allowed Class 7 Claims will receive their Pro Rata Share of $5 million in Cash and Warrants.

The U.S. federal income tax consequences of the Plan to U.S. Holders of Allowed Class 7 Claims will depend, in part, on whether the transactions undertaken pursuant to the Plan qualify in whole or in part as a Reorganization. If the transactions undertaken pursuant to the Plan constitute a Reorganization, the U.S. federal income tax consequences to such U.S. Holders of Claims will further depend on whether the Claims surrendered constitute "securities" for U.S. federal income tax purposes of the Debtor that issued the obligation constituted the Claim, its successor, or another party to the Reorganization. The U.S. federal income tax consequences will also depend on the Restructuring Transactions entered into to simplify the Debtors' corporate structure.

(a)    Treatment of Holders of Allowed Class 7 Claims if the Exchange is Treated as a Reorganization

If a U.S. Holder receiving its Pro Rata Share of $5 million in Cash and Warrants in exchange for its Allowed Class 7 Claim and (i) the Subordinated Note constituting an Allowed Class 7 Claim is a security the exchange of such U.S. Holder's allowed Allowed Class 7 Claim should be treated as a recapitalization, and therefore a Reorganization, under the IRC. As a result, a U.S. Holder should not recognize loss with respect to the exchange and should not recognize gain (subject to the discussion of accrued interest below) except to the extent of Cash received. The U.S. Holder will take a tax basis in the Warrants equal to the U.S. Holder's tax basis of the surrendered Claim increased by the amount of gain recognized in the exchange but reduced by the amount of Cash received. A U.S. Holder's holding period for the Warrants received should include the holding period for the obligation constituting the surrendered Allowed Claim exchanged for such property.

(b)    Treatment of Holders of Allowed Class 7 Claims if the Exchange is Not Treated as a Reorganization

If a U.S. Holder is receiving its Pro Rata Share of $5 million in Cash and Warrants in exchange for its Allowed Class 7 Claim but the Subordinated Notes are not treated as securities for U.S. federal income tax purposes, such U.S. Holder of such Claim will be treated as exchanging such Claim for Cash or its Pro Rata Share of $5 million in Cash and Warrants in a fully taxable exchange under section 1001 of the IRC. Accordingly, each U.S. Holder of such Claim should recognize gain or loss equal to the difference between (1) the fair market value of Cash and Warrants received, if any, in each case, to the extent such consideration is not allocable to accrued but untaxed interest that is received in exchange for the Claim; and (2) such U.S. Holder's adjusted tax basis, if any, in the obligation constituting such Claim. The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the U.S. Holder, the nature of the Claim in such U.S. Holder's hands, whether the Claim constitutes a capital asset in the hands of the U.S. Holder, whether the Claim was purchased at a discount, and whether and to what extent the U.S. Holder has previously claimed a bad debt deduction with respect to its Claim. If recognized gain is capital gain, it generally would be long-term capital gain if the holder held its Claim for more than one year at the time of the exchange. The deductibility of capital losses is subject to certain limitations as discussed below. See the discussions of accrued interest and market discount below. A U.S. Holder's tax basis in any Warrants received should equal the fair market value of such Warrants as of the date such Warrants are distributed to the U.S. Holder. A U.S. Holder's holding period for the Warrants received should begin on the day following the Effective Date.

**U.S. HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE RECOGNITION OF GAIN OR LOSS, FOR FEDERAL INCOME TAX PURPOSES, ON THE SATISFACTION OF THEIR CLAIMS.**

3.    Accrued Interest

To the extent that any amount received by a U.S. Holder of a surrendered Allowed Claim under the Plan is attributable to accrued but unpaid interest and such amount has not previously been included in the U.S. Holder's gross income for U.S. federal income tax purposes, such amount should be taxable to the U.S. Holder as ordinary interest income. Conversely, a U.S. Holder of a surrendered Allowed Claim may be able to recognize a deductible loss (or, possibly, a write-off against a reserve for worthless debts) to the extent that any accrued interest on the debt instruments constituting such claim was previously included in the U.S. Holder's gross income but was not paid in full by the Debtors. Such loss may be ordinary, but the tax law is unclear on this point.

The extent to which the consideration received by a U.S. Holder of a surrendered Allowed Claim will be attributable to accrued interest on the debt underlying the surrendered Allowed Claim is unclear. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a Chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, while certain Treasury Regulations generally treat a payment under a debt instrument first as a payment of accrued and untaxed interest and then as a payment of principal. Application of these treatments to a final payment on a debt instrument being discharged at a discount in bankruptcy is unclear. Pursuant to the Plan, distributions in respect of Allowed Claims will be allocated first to the principal amount of such claims (as determined for U.S. federal income tax purposes) and then, to the extent the

consideration exceeds the principal amount of the claims, to any portion of such claims for accrued but unpaid interest.  However, the provisions of the Plan are not binding on the IRS or a court with respect to the appropriate tax treatment for creditors.

**U.S. HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE ALLOCATION OF CONSIDERATION RECEIVED IN SATISFACTION OF THEIR CLAIMS AND THE FEDERAL INCOME TAX TREATMENT OF ACCRUED BUT UNPAID INTEREST.**

4.    <u>Market Discount</u>

Under the "market discount" provisions of sections 1276 through 1278 of the IRC, some or all of any gain realized by a U.S. Holder exchanging the debt instruments constituting its Allowed Claim may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt constituting the surrendered Allowed Claim.

In general, a debt instrument is considered to have been acquired with "market discount" if its U.S. Holder's adjusted tax basis in the debt instrument is less than (i) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (ii) in the case of a debt instrument issued with "original issue discount," ("<u>OID</u>") its adjusted issue price, by at least a *de minimis* amount (equal to 0.25 percent of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a U.S. Holder on the taxable disposition (determined as described above) of debt constituting its Allowed Claim that was acquired with "market discount" should be treated as ordinary income to the extent of the "market discount" that accrued thereon while such debts were considered to be held by the U.S. Holder (unless the Holder elected to include "market discount" in income as it accrued).  To the extent that the surrendered debts that were acquired with market discount are exchanged in a tax-free or other reorganization transaction for other property (as may occur here), any market discount that accrued on the Allowed Claims (i.e., up to the time of the exchange) but was not recognized by the U.S. Holder is carried over to the property received therefore and any gain recognized on the subsequent sale, exchange, redemption or other disposition of the property is treated as ordinary income to the extent of the accrued, but not recognized, market discount.

5.    <u>U.S. Federal Income Tax Consequences to U.S. Holders of New Common Stock</u>

(a)    Dividends on New Common Stock

Any distributions made on account of the New Common Stock will constitute dividends for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of the Reorganized Debtors as determined under U.S. federal income tax principles.  To the extent that a U.S. Holder receives distributions that would otherwise constitute dividends for U.S. federal income tax purposes but that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the U.S. Holder's basis in its shares of New Common Stock.  Any such distributions in excess of the U.S. Holder's basis in its shares (determined on a share-by-share basis) generally will be treated as capital gain.

Subject to applicable limitations, distributions treated as dividends paid to U.S. Holders that are corporations generally will be eligible for the dividends-received deduction.  However, the dividends-received deduction is only available if certain holding period requirements are satisfied.  The length of time that a shareholder has held its stock is reduced for any period during which the shareholder's risk of loss with respect to the stock is diminished by reason of the existence of certain options, contracts to sell, short sales, or similar transactions.  In addition, to the extent that a corporation incurs indebtedness that is directly attributable to an investment in the stock on which the dividend is paid, all or a portion of the dividends received deduction may be disallowed.

(b)    Sale, Redemption, or Repurchase of New Common Stock

Unless a non-recognition provision applies, U.S. Holders generally will recognize capital gain or loss upon the sale, redemption, or other taxable disposition of New Common Stock. Such capital gain or loss will be long-term capital

94

gain if at the time of the sale, exchange, retirement, or other taxable disposition, the U.S. Holder held the New Common Stock for more than one year.  Long-term capital gains of an individual taxpayer generally are taxed at preferential rates.  The deductibility of capital losses is subject to certain limitations as described below.

        (c)      Medicare Tax

Certain U.S. Holders that are individual, estates, or trusts are required to pay an additional 3.8 percent tax on, among other things, dividends and gains from the sale or other disposition of capital assets.  U.S. Holders that are individuals, estates, or trusts should consult their tax advisors regarding the effect, if any, of this tax provision on their ownership and disposition of New Common Stock.

      6.    <u>U.S. Federal Income Tax Consequences to U.S. Holders of the Takeback First Lien Term Loans.</u>

        (a)      Interest.

Stated interest paid to a U.S. Holder will be includible in the U.S. Holder's gross income as ordinary interest income at the time interest is received or accrued in accordance with the U.S. Holder's regular method of tax accounting for U.S. federal income tax purposes.

If the "stated redemption price at maturity" of the Takeback First Lien Term Loan exceeds the "issue price" of the Takeback First Lien Term Loan by an amount equal to or greater than a statutorily defined de minimis amount, the Takeback First Lien Term Loan will be considered to be issued with OID for U.S. federal income tax purposes.  The stated redemption price at maturity of the Takeback First Lien Term Loan is the total of all payments due on the Takeback First Lien Term Loan other than payments of "qualified stated interest."  In general, qualified stated interest is stated interest that is payable unconditionally in cash or in property (other than debt instruments of the issuer) at least annually at a single fixed rate (or at certain qualifying floating rates).

The determination of "issue price" for purposes of this analysis will depend, in part on whether the Takeback First Lien Term Loan is traded on an "established securities market" for U.S. federal income tax purposes.  The issue price of a debt instrument that is traded on an established market (or that is issued for stock or securities so traded) would be the fair market value of such debt instrument (or such stock or securities so traded) on the issue date as determined by such trading.  The issue price of a debt instrument that is neither so traded nor issued for stock or securities so traded would be its stated principal amount (provided that the interest rate on the debt instrument exceeds the applicable federal rate published by the IRS).  Although not free from doubt, the Debtors believe that either the Takeback First Lien Term Loan or the existing debt that is tendered for such new loan will be treated as traded on an established securities market for U.S. federal income tax purposes, in which case the issue price of the Takeback First Lien Term Loan will likely not equal the stated redemption price at maturity of such loan and the loan may be treated as issued with OID.

For purposes of determining whether there is OID, the de minimis amount is generally equal to ¼ of 1 percent of the principal amount of the Takeback First Lien Term Loan multiplied by the number of complete years to maturity from their original issue date, or if the Takeback First Lien Term Loan provides for payments other than payments of qualified stated interest before maturity, multiplied by the weighted average maturity (as determined under applicable Treasury regulations).  If the Takeback First Lien Term Loan is issued with OID, a U.S. Holder generally (i) will be required to include the OID in gross income as ordinary interest income as it accrues on a constant yield to maturity basis over the term of the Takeback First Lien Term Loan, in advance of the receipt of the cash attributable to such OID and regardless of the holder's method of accounting for U.S. federal income tax purposes, but (ii) will not be required to recognize additional income upon the receipt of any cash payment on the Takeback First Lien Term Loan that is attributable to previously accrued OID that has been included in its income.  If the amount of OID on the Takeback First Lien Term Loan is de minimis, rather than being characterized as interest, any payment attributable to the de minimis OID will be treated as gain from the sale of the Takeback First Lien Term Loan, and a pro rata amount of such de minimis OID must be included in income as principal payments are received on the Takeback First Lien Term Loan.

(b)    Sale, Exchange or Other Taxable Disposition.

Upon the sale, exchange or other taxable disposition of an interest in the Takeback First Lien Term Loan, a U.S. Holder generally will recognize taxable gain or loss equal to the difference, if any, between the amount realized on the sale, exchange or other taxable disposition (other than accrued but unpaid interest, which will be taxable as interest) and the U.S. Holder's adjusted tax basis in their interest in the Takeback First Lien Term Loan.  A U.S. Holder's adjusted tax basis in their interest in the Takeback First Lien Term Loan will depend on whether the U.S. Holder receives such loan as part of a transaction that is treated as a Reorganization for U.S. federal income tax purposes and, if it is treated as part of a Reorganization, whether the Takeback First Lien Term Loan is considered a security for tax purposes.  A U.S. Holder's tax basis in Takeback First Lien Term Loans will be increased by any previously accrued OID and decreased by any payments on the Takeback First Lien Term Loan other than qualified stated interest.  Any such gain or loss generally will be capital gain or loss and generally will be long-term capital gain or loss if the interest in the Takeback First Lien Term Loan has been held for more than one year at the time of its sale, exchange or other taxable disposition.  Certain non-corporate U.S. Holders (including individuals) may be eligible for preferential rates of U.S. federal income tax in respect of long-term capital gains.  The deductibility of capital losses is subject to limitations as discussed below.

7.    U.S. Federal Income Tax Consequences to Holders of Warrants

The exercise of a Warrant by the U.S. Holder thereof should not give rise to taxable gain or loss.  The holding period of the New Common Stock acquired upon exercise of the Warrants should begin on the date of such exercise, and should not include the period during which such Warrants were held.  The U.S. Holder's tax basis in the New Common Stock acquired upon exercise should include the U.S. Holder's tax basis in the Warrants increased by the amount paid upon exercise.  In the event that a U.S. Holder sells its Warrants in a taxable transaction, the U.S. Holder will recognize gain or loss upon such sale in an amount equal to the difference between the amount realized upon such sale and the U.S. Holder's tax basis in the Warrants.  Such gain or loss will be treated as gain or loss from the sale or exchange of property which has the same character as the New Common Stock to which the Warrants relate would have had in the hands of the U.S. Holder if such New Common Stock had been acquired by the U.S. Holder upon exercise.  If such sale gives rise to capital gain or loss to the U.S. Holder, such gain or loss will be long-term or short-term in character based upon the length of time such U.S. Holder has held his or her Warrants.

If Warrants held by a U.S. Holder expire unexercised, such Warrants should be deemed to have been sold or exchanged on the day of expiration.  Such expiration should therefore in most cases give rise to a loss, unless such U.S. Holder previously claimed a deduction for the worthlessness of such Warrants in a previous taxable period.

The rules applicable to the treatment of warrants are complex, particularly in the context of warrants acquired in a complex transaction such as this one.  U.S. Holders of Warrants are urged to consult their tax advisors to review and determine the tax consequences associated with the receipt, ownership and disposition of such Warrants.

8.    Limitations on Use of Capital Losses

U.S. Holders of Claims who recognize capital losses as a result of the distributions under the Plan will be subject to limits on their use of capital losses.  For noncorporate U.S. Holders, capital losses may be used to offset any capital gains (without regard to holding periods) plus ordinary income to the extent of the lesser of (1) $3,000 ($1,500 for married individuals filing separate returns) or (2) the excess of the capital losses over the capital gains.  U.S. Holders, other than corporations, may carry over unused capital losses and apply them to capital gains and a portion of their ordinary income for an unlimited number of years.  For corporate U.S. Holders, losses from the sale or exchange of capital assets may only be used to offset capital gains.  Corporate U.S. Holders may only carry over unused capital losses for the five years following the capital loss year, but are allowed to carry back unused capital losses to the three years preceding the capital loss year.

C.      *Certain United States Federal Income Tax Consequences to Non-U.S. Holders of Certain Allowed Claims*

      1.      <u>U.S. Federal Income Tax Consequences to Non-U.S. Holders of Allowed Class 3, Class 4, Class 5, Class 6, and Class 7 Claims</u>

This following discussion includes only certain U.S. federal income tax consequences of the Restructuring Transactions to Non-U.S. Holders. The discussion does not include any non-U.S. tax considerations. The rules governing the U.S. federal income tax consequences to Non-U.S. Holders are complex. Each Non-U.S. Holder should consult its own tax advisor regarding the U.S. federal, state, and local and the foreign tax consequences of the consummation of the Plan to such Non-U.S. Holder and the ownership and disposition of the New Common Stock, as applicable.

Whether a Non-U.S. Holder realizes gain or loss on the exchange and the amount of such gain or loss is determined in the same manner as set forth above in connection with U.S. Holders.

      (a)      Gain Recognition

Any gain recognized by a Non-U.S. Holder on the exchange of its Claim generally will not be subject to U.S. federal income taxation unless (i) the Non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the Restructuring Transactions occur and certain other conditions are met or (ii) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States).

If the first exception applies, to the extent that any gain is taxable and does not qualify for deferral as described above in connection with U.S. Holders, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange. If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange in the same manner as a U.S. Holder. In order to claim an exemption from withholding tax, such Non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or such successor form as the IRS designates). In addition, if such a Non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30 percent (or such lower rate provided by an applicable treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

      (b)      Accrued Interest

Payments to a Non-U.S. Holder that are attributable to accrued but untaxed interest generally will not be subject to U.S. federal income or withholding tax, provided that the withholding agent has received or receives, prior to payment, appropriate documentation (generally, IRS Form W-8BEN or W-8BEN-E) establishing that the Non-U.S. Holder is not a U.S. person, unless:

      (i)      the Non-U.S. Holder actually or constructively owns 10 percent or more of the total combined voting power of all classes of Parent's stock entitled to vote;

      (ii)     the Non-U.S. Holder is a "controlled foreign corporation" that is a "related person" with respect to Parent (each, within the meaning of the IRC);

      (iii)    the Non-U.S. Holder is a bank receiving interest described in Section 881(c)(3)(A) of the IRC; or

      (iv)     such interest is effectively connected with the conduct by the Non-U.S. Holder of a trade or business within the United States (in which case, provided the Non-U.S. Holder provides a properly executed IRS Form W-8ECI (or successor form) to the withholding agent, the Non-U.S. Holder (x) generally will not be subject to withholding tax, but (y) will be subject to U.S. federal income tax in the same manner as a U.S. Holder (unless an applicable income tax treaty provides

otherwise), and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the accrued but untaxed interest at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty)).

A Non-U.S. Holder that does not qualify for exemption from withholding tax with respect to accrued but untaxed interest that is not effectively connected income generally will be subject to withholding of U.S. federal income tax at a 30 percent rate (or at a reduced rate or exemption from tax under an applicable income tax treaty) on payments that are attributable to accrued but untaxed interest. For purposes of providing a properly executed IRS Form W-8BEN or W-8BEN-E, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business.

     2.    <u>U.S. Federal Income Tax Consequences to Non-U.S. Holders of Owning and Disposing of Shares of New Common Stock and Takeback First Lien Term Loans</u>

     (a)    Dividends on New Common Stock

Any distributions made with respect to New Common Stock will constitute dividends for U.S. federal income tax purposes to the extent of the Reorganized Debtors' current or accumulated earnings and profits as determined under U.S. federal income tax principles.  To the extent that a Non-U.S. Holder receives distributions that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the Non-U.S. Holder's basis in its shares.  Any such distributions in excess of a Non-U.S. Holder's basis in its shares (determined on a share-by-share basis) generally will be treated as capital gain from a sale or exchange (and the respective excess distributions as proceeds from a sale or exchange); *see* discussion below of sale, redemption, or repurchase of New Common Stock.  Except as described below, dividends paid with respect to New Common Stock held by a Non-U.S. Holder that are not effectively connected with a Non-U.S. Holder's conduct of a U.S. trade or business (or if an income tax treaty applies, are not attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) will be subject to U.S. federal withholding tax at a rate of 30 percent (or lower treaty rate or exemption from tax, if applicable). A Non-U.S. Holder generally will be required to satisfy certain IRS certification requirements in order to claim a reduction of or exemption from withholding under a tax treaty by filing IRS Form W-8BEN or W-8BEN-E (or a successor form) upon which the Non-U.S. Holder certifies, under penalties of perjury, its status as a non-U.S. person and its entitlement to the lower treaty rate or exemption from tax with respect to such payments.  Dividends paid with respect to New Common Stock held by a Non-U.S. Holder that are effectively connected with a Non-U.S. Holder's conduct of a U.S. trade or business (and if an income tax treaty applies, are attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) generally will be subject to U.S. federal income tax in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the dividends at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty).

     (b)    Sale, Redemption, or Repurchase of New Common Stock

A Non-U.S. Holder generally will not be subject to U.S. federal income tax with respect to any gain realized on the sale or other taxable disposition (including a cash redemption) of New Common Stock unless:

     (i)    such Non-U.S. Holder is an individual who is present in the United States for 183 days or more in the taxable year of disposition or who is subject to special rules applicable to former citizens and residents of the United States; or

     (ii)    such gain is effectively connected with such Non-U.S. Holder's conduct of a U.S. trade or business (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States); or

(iii)      the Reorganized Debtors are or have been during a specified testing period a "U.S. real property holding corporation" for U.S. federal income tax purposes.

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of disposition of New Common Stock.  If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to such gain in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to earnings and profits effectively connected with a U.S. trade or business that are attributable to such gains at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty).  The Debtors consider it unlikely, based on their current business plans and operations, that any of the Reorganized Debtors will become a "U.S. real property holding corporation" in the future.

(c)      Payments under the Takeback First Lien Term Loan

Payments to a Non-U.S. Holder with respect to the Takeback First Lien Term Loan that are treated as interest, including payment attributable to any OID (see discussion above) generally will not be subject to U.S. federal income or withholding tax, provided that the withholding agent has received or receives, prior to payment, appropriate documentation (generally, IRS Form W-8BEN or W-8BEN-E) establishing that the Non-U.S. Holder is not a U.S. person, unless:

(i)      the Non-U.S. Holder actually or constructively owns 10 percent or more of the total combined voting power of all classes of the Reorganized Parent's stock entitled to vote;

(ii)      the Non-U.S. Holder is a "controlled foreign corporation" that is a "related person" with respect to Reorganized Parent (each, within the meaning of the IRC);

(iii)      the Non-U.S. Holder is a bank receiving interest described in Section 881(c)(3)(A) of the IRC; or

(iv)      such interest is effectively connected with the conduct by the Non-U.S. Holder of a trade or business within the United States (in which case, provided the Non-U.S. Holder provides a properly executed IRS Form W-8ECI (or successor form) to the withholding agent, the Non-U.S. Holder (x) generally will not be subject to withholding tax, but (y) will be subject to U.S. federal income tax in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise), and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to interest at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty)).

A Non-U.S. Holder that does not qualify for exemption from withholding tax with respect to interest that is not effectively connected income generally will be subject to withholding of U.S. federal income tax at a 30 percent rate (or at a reduced rate or exemption from tax under an applicable income tax treaty) on payments that are attributable to interest, including any OID.

For purposes of providing a properly executed IRS Form W-8BEN or W-8BEN-E, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business.

(d)      Sale, Exchange or Other Disposition of the Takeback First Lien Term Loan

Any gain recognized by a Non-U.S. Holder on the sale, exchange or other disposition of the Takeback First Lien Term Loan (other than an amount representing accrued but unpaid interest on the loans, which is subject to the rules discussed above under "Payments under the Takeback First Lien Term Loan") generally will not be subject to U.S. federal income taxation unless (i) the Non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the disposition occurs and certain other conditions are met or

(ii) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States).

If the first exception applies, to the extent that any gain is taxable and does not qualify for deferral as a Reorganization as described above, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange. If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange in the same manner as a U.S. Holder. In order to claim an exemption from withholding tax, such Non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or such successor form as the IRS designates). In addition, if such a Non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30 percent (or such lower rate provided by an applicable treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

3.    <u>FATCA</u>

Under the Foreign Account Tax Compliance Act ("<u>FATCA</u>"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account holders and investors or be subject to withholding on the receipt of "withholdable payments." For this purpose, "withholdable payments" are generally U.S. source payments of fixed or determinable, annual or periodical income (including dividends, if any, on shares of New Common Stock), and also include gross proceeds from the sale of any property of a type which can produce U.S. source interest or dividends (which would include New Common Stock). FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding tax.

As currently proposed, FATCA withholding rules would apply to payments of gross proceeds from the sale or other disposition of property of a type which can produce U.S. source interest or dividends that occurs after December 31, 2018.

Each Non-U.S. Holder should consult its own tax advisor regarding the possible impact of these rules on such Non-U.S. Holder's ownership of New Common Stock.

D.    *Information Reporting and Backup Withholding*

The Debtors will withhold all amounts required by law to be withheld from payments of interest and dividends. The Debtors will comply with all applicable reporting requirements of the IRC. In general, information reporting requirements may apply to distributions or payments made to a Holder of an Allowed Claim under the Plan. Additionally, under the backup withholding rules, a Holder of a Claim may be subject to backup withholding, currently at a rate of 28%, with respect to distributions or payments made pursuant to the Plan unless, in the case of a U.S. Holder, such U.S. Holder provides a properly executed IRS Form W-9 and, in the case of Non-U.S. Holder, such Non-U.S. Holder provides a properly executed applicable IRS Form W-8 (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption). Backup withholding is not an additional tax but is, instead, an advance payment that may entitle the Holder to a refund from the IRS to the extent it results in an overpayment of tax, provided that the required information is provided to the IRS.

In addition, from an information reporting perspective, the Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

THE UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF UNITED STATES FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF A CLAIM OR INTEREST IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION.  ALL HOLDERS OF CLAIMS AND INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM UNDER THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, NON-U.S., OR OTHER TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.

## ARTICLE X.
## RECOMMENDATION OF THE DEBTORS

In the opinion of the Debtors, the Plan provides the highest or best recoveries to stakeholders under the circumstances because it provides for a larger distribution to the Debtors' creditors than would otherwise result in liquidation under chapter 7 of the Bankruptcy Code. In addition, any alternative other than Confirmation of the Plan could result in extensive delays and increased administrative expenses resulting in smaller distributions to Holders of Allowed Claims and Interests than proposed under the Plan. Accordingly, the Debtors recommend that Holders of Claims entitled to vote on the Plan support Confirmation of the Plan and vote to accept the Plan.

Respectfully submitted,

Dated: May 2, 2016

Dex Media, Inc. (for itself and all Debtors)

By: _____
Name:   Andrew Hede
Title:   Chief Restructuring Officer

Prepared by:

James H.M. Sprayregen, P.C. (*pro hac vice* admission pending)
Marc Kieselstein, P.C. (*pro hac vice* admission pending)
Adam Paul (*pro hac vice* admission pending)
Bradley Thomas Giordano (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:   (312) 862-2000
Facsimile:   (312) 862-2200
Email:   james.sprayregen@kirkland.com
           marc.kieselstein@kirkland.com
           adam.paul@kirkland.com
           bradley.giordano@kirkland.com

Pauline K. Morgan (Bar No. 3650)
Patrick A. Jackson (Bar No. 4976)
**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:   (302) 571-6600
Facsimile:   (302) 571-1253
Email:   pmorgan@ycst.com
           pjackson@ycst.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**EXHIBIT A**

**Joint Prepackaged Chapter 11 Plan of
Dex Media, Inc. and Its Debtor Affiliates**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| DEX MEDIA, INC., *et al.*,[1] | ) | Case No. 16-11200 (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**JOINT PREPACKAGED CHAPTER 11 PLAN OF REORGANIZATION
OF DEX MEDIA, INC. AND ITS DEBTOR AFFILIATES**

James H.M. Sprayregen, P.C. (*pro hac vice* admission pending)
Marc Kieselstein, P.C. (*pro hac vice* admission pending)
Adam Paul (*pro hac vice* admission pending)
Bradley Thomas Giordano (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200
Email:     james.sprayregen@kirkland.com
            marc.kieselstein@kirkland.com
            adam.paul@kirkland.com
            bradley.giordano@kirkland.com

Pauline K. Morgan (Bar No. 3650)
Patrick A. Jackson (Bar No. 4976)
**YOUNG CONAWAY STARGATT & TAYLOR,
LLP**
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:     (302) 571-6600
Facsimile:     (302) 571-1253
Email:     pmorgan@ycst.com
            pjackson@ycst.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

THIS CHAPTER 11 PLAN IS BEING SOLICITED FOR ACCEPTANCE OR REJECTION IN ACCORDANCE WITH BANKRUPTCY CODE SECTION 1125 AND WITHIN THE MEANING OF BANKRUPTCY CODE SECTION 1126. THIS CHAPTER 11 PLAN WILL BE SUBMITTED TO THE BANKRUPTCY COURT FOR APPROVAL FOLLOWING SOLICITATION AND THE DEBTORS' FILING FOR CHAPTER 11 BANKRUPTCY.

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Dex Media, Inc. (0040); Dex Media East, Inc. (5763); Dex Media Holdings, Inc. (9762); Dex Media Service LLC (9647); Dex Media West, Inc. (7004); Dex One Digital, Inc. (9750); Dex One Service, Inc. (0222); R.H. Donnelley APIL, Inc. (6495); R.H. Donnelley Corporation (2490); R.H. Donnelley Inc. (7635); SuperMedia LLC (6092); SuperMedia Inc. (5175); and SuperMedia Sales Inc. (4411). The location of the Debtors' service address is: 2200 West Airfield Drive, P.O. Box 619810, DFW Airport, Texas 75261.

**TABLE OF CONTENTS**

**ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW** .................................................................................................. 1
    A.          Defined Terms ................................................................................................. 1
    B.          Rules of Interpretation .................................................................................. 14
    C.          Computation of Time ..................................................................................... 14
    D.          Governing Law ............................................................................................... 14
    E.          Reference to Monetary Figures .................................................................... 14
    F.          Reference to the Debtors or the Reorganized Debtors ................................. 15
    G.          Controlling Document ................................................................................... 15

**ARTICLE II. ADMINISTRATIVE CLAIMS AND PRIORITY CLAIMS** .......................... 15
    A.          Administrative Claims ................................................................................... 15
    B.          Professional Compensation ........................................................................... 15
    C.          Priority Tax Claims ....................................................................................... 16
    D.          Statutory Fees ................................................................................................ 17

**ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS** ............................ 17
    A.          Summary of Classification ............................................................................ 17
    B.          Treatment of Claims and Interests ............................................................... 18
    C.          Special Provision Governing Unimpaired Claims ....................................... 23
    D.          Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code ................................................................................................................ 23
    E.          Elimination of Vacant Classes ...................................................................... 23
    F.          Voting Classes; Presumed Acceptance by Non-Voting Classes .................... 23
    G.          Presumed Acceptance and Rejection of the Plan ......................................... 24
    H.          Intercompany Interests .................................................................................. 24
    I.          Controversy Concerning Impairment ........................................................... 24
    J.          Subordinated Claims ..................................................................................... 24

**ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN** .................................. 24
    A.          Restructuring Transactions ........................................................................... 24
    B.          Sources of Consideration for Plan Distributions .......................................... 25
    C.          Corporate Existence ...................................................................................... 26
    D.          Vesting of Assets in the Reorganized Debtors .............................................. 26
    E.          Cancellation of Existing Securities ............................................................... 26
    F.          Corporate Action ........................................................................................... 27
    G.          New Organizational Documents .................................................................... 28
    H.          Directors and Officers of the Reorganized Debtors ..................................... 28
    I.          Effectuating Documents; Further Transactions ........................................... 28
    J.          Exemption from Certain Taxes and Fees ...................................................... 28
    K.          Preservation of Causes of Action .................................................................. 29
    L.          Release of Avoidance Actions ........................................................................ 29
    M.          Director and Officer Liability Insurance ...................................................... 29
    N.          Management Incentive Plan ........................................................................... 30
    O.          Employee and Retiree Benefits ..................................................................... 30

**ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES** ...................... 30
    A.          Assumption and Rejection of Executory Contracts and Unexpired Leases ........... 30
    B.          Claims Based on Rejection of Executory Contracts or Unexpired Leases ...................... 31
    C.          Cure of Defaults for Assumed Executory Contracts and Unexpired Leases .................... 31
    D.          Indemnification Obligations .......................................................................... 32
    E.          Insurance Policies .......................................................................................... 32

F.          Restructuring Support Agreement ....................................................................32
G.          Modifications, Amendments, Supplements, Restatements, or Other Agreements............32
H.          Reservation of Rights ....................................................................................32
I.           Nonoccurrence of Effective Date....................................................................33
J.           Contracts and Leases Entered into After the Petition Date ...........................33

**ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS ...................................................33**
A.          Timing and Calculation of Amounts to Be Distributed ....................................33
B.          Distributions to Be Made Under the Plan .......................................................33
C.          Distributions Transferred Pursuant to the Equity Put Option ...........................34
D.          Delivery of Distributions and Undeliverable or Unclaimed Distributions.................34
E.          Warrants......................................................................................................36
F.          Securities Registration Exemption..................................................................36
G.          Compliance with Tax Requirements................................................................36
H.          Allocations..................................................................................................37
I.           No Postpetition Interest on Claims .................................................................37
J.           Setoffs and Recoupment ..............................................................................37
K.          Claims Paid or Payable by Third Parties ........................................................37

**ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT,  UNLIQUIDATED, AND DISPUTED CLAIMS...........................................................................................................38**
A.          Allowance of Claims .....................................................................................38
B.          Claims and Interests Administration Responsibilities ......................................38
C.          Estimation of Claims .....................................................................................38
D.          Adjustment to Claims Register Without Objection ...........................................39
E.          Time to File Objections to Claims ..................................................................39
F.          Disallowance of Claims.................................................................................39
G.          Amendments to Claims..................................................................................39
H.          No Distributions Pending Allowance ..............................................................39
I.           Distributions After Allowance ........................................................................39
J.           Single Satisfaction of Claims ........................................................................40

**ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS ....................40**
A.          Compromise and Settlement of Claims, Interests, and Controversies ..............40
B.          Discharge of Claims and Termination of Interests ..........................................40
C.          Term of Injunctions or Stays ........................................................................40
D.          Release of Liens...........................................................................................41
E.          Debtor Release.............................................................................................41
F.          Third Party Release.......................................................................................42
G.          Exculpation ..................................................................................................43
H.          Injunction ....................................................................................................43
I.           Protection Against Discriminatory Treatment ..................................................43
J.           Recoupment .................................................................................................43
K.          Subordination Rights. ...................................................................................44

**ARTICLE IX. CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN .............................................................................................................44**
A.          Limited Severability of the Plan .....................................................................44
B.          Conditions Precedent to the Confirmation Date ..............................................44
C.          Conditions Precedent to the Effective Date ....................................................45
D.          Waiver of Conditions.....................................................................................45
E.          Substantial Consummation ............................................................................46
F.          Effect of Non-Occurrence of Conditions to the Effective Date ........................46
G.          Fees and Expenses of Credit Agreement Agents, SC Members, and Supporting Noteholders..................................................................................................46

**ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN**................................46
    A.      Modification and Amendments...........................................................................46
    B.      Effect of Confirmation on Modifications...........................................................46
    C.      Revocation or Withdrawal of the Plan ..............................................................46

**ARTICLE XI. RETENTION OF JURISDICTION** ...........................................................................47

**ARTICLE XII. MISCELLANEOUS PROVISIONS** ..........................................................................49
    A.      Immediate Binding Effect..................................................................................49
    B.      Additional Documents.......................................................................................49
    C.      Reservation of Rights .......................................................................................49
    D.      Successors and Assigns .....................................................................................49
    E.      Service of Documents........................................................................................49
    F.      Term of Injunctions or Stays ............................................................................50
    G.      Entire Agreement..............................................................................................50
    H.      Exhibits.............................................................................................................51
    I.      Nonseverability of Plan Provisions...................................................................51
    J.      Votes Solicited in Good Faith...........................................................................51
    K.      Closing of Chapter 11 Cases.............................................................................51

**Exhibits**

Exhibit A        Takeback First Lien Term Loan Credit Agreement Term Sheet
Exhibit B        New Stockholders Agreement Term Sheet
Exhibit C        Noteholder Term Sheet
Exhibit D        Restructuring Support Agreement
Exhibit E        Backstop Agreement

## INTRODUCTION

Dex Media, Inc. ("Dex Media") and its debtor affiliates, as debtors and debtors in possession (each, a "Debtor" and, collectively, the "Debtors") propose this joint plan of reorganization (together with the documents comprising the Plan Supplement, the "Plan") for the resolution of outstanding Claims against, and Interests in, the Debtors. Capitalized terms used and not otherwise defined shall have the meanings ascribed to such terms in Article I.A hereof or the Disclosure Statement, as applicable. Holders of Claims and Interests may refer to the Disclosure Statement for a discussion of the Debtors' history, businesses, assets, results of operations, historical financial information, and projections of future operations, as well as a summary and description of the Plan. The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code. The Plan shall apply as a separate Plan for each of the Debtors, and the classification of Claims and Interests set forth herein shall apply separately to each of the Debtors.

ALL HOLDERS OF CLAIMS AND INTERESTS, TO THE EXTENT APPLICABLE, ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

## ARTICLE I.
## DEFINED TERMS, RULES OF INTERPRETATION,
## COMPUTATION OF TIME, AND GOVERNING LAW

A.    *Defined Terms*

As used in this Plan, capitalized terms have the meanings set forth below.

1.    "*Accredited Investor*" has the meaning set forth in Rule 501 of Regulation D promulgated under the Securities Act.

2.    "*Accrued Professional Compensation Claims*" means all Claims for reasonable and documented accrued fees and expenses (including transaction or sale fees) for services rendered by a Professional through and including the Confirmation Date, to the extent such fees and expenses have not been paid pursuant to the Interim Compensation Order or any other order of the Court and regardless of whether a monthly fee statement or interim fee application has been Filed for such fees and expenses. To the extent the Court denies or reduces by a Final Order any amount of a Professional's fees or expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Accrued Professional Compensation Claim.

3.    "*Administrative Claim*" means a Claim for costs and expenses of administration of the Debtors' Estates pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors; (b) Allowed Accrued Professional Compensation Claims; and (c) all Allowed requests for compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code.

4.    "*Administrative Claims Bar Date*" means the first Business Day that is 30 days following the Effective Date, except as specifically set forth in the Plan or a Final Order.

5.    "*Affiliate*" shall have the meaning set forth in section 101(2) of the Bankruptcy Code.

6.    "*Allowed*" means with respect to any Claim, except as otherwise provided herein: (a) a Claim that is evidenced by a Proof of Claim Filed by the Claims Bar Date in accordance with the Claims Bar Date Order (or for which Claim under the Plan, the Bankruptcy Code, or a Final Order of the Court a Proof of Claim is not or shall not be required to be Filed); (b) a Claim that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim, as applicable, has been timely Filed; or (c) a Claim Allowed pursuant to the Plan or a Final Order; *provided* that with respect to a Claim described in clauses (a) and (b) above, such Claim shall be considered Allowed only if and to the extent that with respect to such Claim no objection to the allowance

thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Court, or such an objection is so interposed and the Claim, as applicable, shall have been Allowed by a Final Order; *provided, further*, that the Debtors or Reorganized Debtors may affirmatively determine to allow any Claim described in clause (a) notwithstanding the fact that the period within which an objection may be interposed has not yet expired.  Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim is or has been timely Filed (if required by the Claims Bar Date Order), is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Court.  Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes such Debtor or Reorganized Debtor, as applicable.  For the avoidance of doubt, except as provided herein or otherwise agreed, any and all Proofs of Claim Filed after the Claims Bar Date shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-filed Claims and shall be expunged as of the Effective Date without any further notice to or action, order, or approval of the Court, and Holders of such Claims may not receive any distributions on account of such Claims, unless on or before the Effective Date such late Filed Claims have been deemed timely Filed by a Final Order. "Allow" and "Allowing" shall have correlative meanings.

7.      "*Alternative Distribution*" means the Cash value of the distributions provided to Holders pursuant to Article IV.B.2, calculated as if the Warrants have an implied value of approximately $31 per $1,000 of Subordinated Notes Claims.

8.      "*Alternative Distribution Condition*s" has the meaning ascribed to such term in the Backstop Agreement.

9.      "*Avoidance Actions*" means any and all actual or potential Claims and Causes of Action to avoid a transfer of property or an obligation incurred by the Debtors arising under chapter 5 of the Bankruptcy Code, including sections 544, 545, 547, 548, 549, 550, 551, and 553(b) of the Bankruptcy Code.

10.      "*Backstop Agreement*" means the Backstop Agreement by and among the Debtors and each Backstop Party thereto, from time to time (as amended, supplemented, or otherwise modified from time to time), which is attached hereto as Exhibit E.

11.      "*Backstop Parties*" has the meaning ascribed to such term in the Backstop Agreement.

12.      "*Ballot*" means a ballot indicating acceptance or rejection of the Plan and to make an election with respect to the third party release provided by Article VIII.F hereof.

13.      "*Bankruptcy Code*" means title 11 of the United States Code, as amended and in effect during the pendency of the Chapter 11 Cases.

14.      "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Cases, promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Court.

15.      "*Business Day*" means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

16.      "*Cash*" means the legal tender of the United States of America or the equivalent thereof.

17.      "*Cash Collateral Order*" means the interim order or the Final Order, as applicable, to be entered by the Court, in form and substance acceptable to the Debtors, the Required Supporting Lenders, and the Credit Agreement Agents (solely to the extent such Credit Agreement Agents' rights are affected) authorizing the Debtors to use the Term Loan Lenders' collateral (including cash collateral) and granting adequate protection to the Term Loan Lenders.

18. "*Causes of Action*" means any action, claim, cause of action, controversy, demand, right, action, Lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license, and franchise of any kind or character whatsoever, whether known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law, or in equity or pursuant to any other theory of law. For the avoidance of doubt, "Cause of Action" includes: (a) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) the right to object to Claims or Interests; (c) any Claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress, and usury; and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any state or foreign law fraudulent transfer or similar claim.

19. "*Chapter 11 Cases*" means (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Court and (b) when used with reference to all of the Debtors, the procedurally consolidated and jointly administered chapter 11 cases pending for the Debtors in the Court.

20. "*Claim*" shall have the meaning set forth in section 101(5) of the Bankruptcy Code.

21. "*Claims Bar Date*" means the date or dates to be established by the Court by which Proofs of Claim must be Filed.

22. "*Claims Bar Date Order*" means that certain order entered by the Court establishing the Claims Bar Date.

23. "*Claims Objection Deadline*" means the deadline for objecting to a Claim, which shall be on the date that is the later of (a) 180 days after the Effective Date and (b) such other period of limitation as may be specifically fixed by the Debtors or the Reorganized Debtors, as applicable, or by an order of the Court for objecting to such Claims.

24. "*Claims Register*" means the official register of Claims maintained by the Notice and Claims Agent.

25. "*Claims Relating to the Purchase and/or Sale of Debt and Securities*" means any Claims arising from (a) rescission of a purchase or sale of a security or bank debt of the Debtors or an Affiliate of the Debtors, (b) purchase or sale of such a security or bank debt, (c) reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such a Claim, or (d) indemnification Claims of professionals related to any of the foregoing.

26. "*Class*" means a category of Holders of Claims or Interests as set forth in Article III hereof pursuant to section 1122(a) of the Bankruptcy Code.

27. "*Closing Expenses*" means Allowed Administrative Claims, Accrued Professional Compensation Claims, financing fees, Cash payments made on account of any Claims (other than the Credit Agreement Claims) on or after the Effective Date, and any other fees or expenses necessary for the Debtors to emerge from chapter 11.

28. "*Confirmation*" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases.

29. "*Confirmation Date*" means the date upon which the Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

30. "*Confirmation Hearing*" means the hearing held by the Court to consider Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code.

31.     "*Confirmation Order*" means an order of the Court, on terms acceptable to the Required Supporting Lenders, confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

32.     "*Consummation*" means the occurrence of the Effective Date.

33.     "*Court*" means the United States Bankruptcy Court for the District of Delaware having jurisdiction over the Chapter 11 Cases, and, to the extent of the withdrawal of any reference under 28 U.S.C. § 157 or the Amended Standing Order of Reference dated February 29, 2012, the United States District Court for the District of Delaware.

34.     "*Credit Agreement Agents*" means the Dex East Administrative Agent, the Dex West Administrative Agent, the RHDI Administrative Agent, and the SuperMedia Administrative Agent.

35.     "*Credit Agreement Claims*" means the Dex East Credit Facility Claims, the Dex West Credit Facility Claims, the RHDI Credit Facility Claims, and the SuperMedia Credit Facility Claims.

36.     "*Credit Agreements*" means the Dex East Credit Agreement, the Dex West Credit Agreement, the RDHI Credit Agreement, and the SuperMedia Credit Agreement.

37.     "*Cure Claim*" means a monetary Claim based upon the Debtors' defaults under any Executory Contract or Unexpired Lease at the time such contract or lease is assumed by the Debtors pursuant to section 365 of the Bankruptcy Code.

38.     "*Cure Notice*" means a notice of a proposed amount to be paid on account of a Cure Claim in connection with an Executory Contract or Unexpired Lease to be assumed under the Plan pursuant to section 365 of the Bankruptcy Code, which notice shall include (a) procedures for objecting to proposed assumptions of Executory Contracts and Unexpired Leases, (b) Cure Claims to be paid in connection therewith, and (c) procedures for resolution by the Court of any related disputes.

39.     "*D&O Liability Insurance Policies*" means all insurance policies (including any "tail policy") of any of the Debtors for current or former directors', managers', and officers' liability.

40.     "*Debtors*" means, collectively:  Dex Media, Inc.; Dex Media East, Inc.; Dex Media Holdings, Inc.; Dex Media Service LLC; Dex Media West, Inc.; Dex One Digital, Inc.; Dex One Service, Inc.; R.H. Donnelley APIL, Inc.; R.H. Donnelley Corporation; R.H. Donnelley Inc.; SuperMedia LLC; SuperMedia Inc.; and SuperMedia Sales Inc., the debtors and debtors in possession in the Chapter 11 Cases.

41.     "*Deutsche Bank*" means Deutsche Bank Trust Company Americas.

42.     "*Dex East*" means Dex Media East, Inc.

43.     "*Dex East Administrative Agent*" means JPMorgan, in its capacity as administrative agent, collateral agent, shared collateral agent, and subordinated guarantee agent under the Dex East Credit Agreement and the other Dex East Credit Documents.

44.     "*Dex East Closing Expenses*" means 13.465456566% of the Closing Expenses.

45.     "*Dex East Credit Agreement*" means that certain Amended and Restated Credit Agreement, dated as of April 30, 2013 (as amended, restated, supplemented, or otherwise modified from time to time), among Dex East, as borrower, Dex Media, Inc., Dex Media Holdings, Inc., the Dex East Administrative Agent, and each of the lenders from time to time party thereto.

46.     "*Dex East Credit Documents*" means the Dex East Credit Agreement and all related agreements and documents executed by any of the Debtors in connection with the Dex East Credit Agreement.

47. "*Dex East Credit Facility Claims*" means all Claims against the Debtors arising under the Dex East Credit Documents.

48. "*Dex East Lenders*" means, collectively, (a) the lenders from time to time party to the Dex East Credit Agreement, and (b) the holders of economic interests or rights relating to the loans issued under the Dex East Credit Agreement.

49. "*Dex East Minimum Operating Cash Contribution*" means 14.965456566% of the Minimum Operating Cash Contribution.

50. "*Dex West*" means Dex Media West, Inc.

51. "*Dex West Administrative Agent*" means JPMorgan, in its capacity as administrative agent, collateral agent, shared collateral agent, and subordinated guarantee agent under the Dex West Credit Agreement and the other Dex West Credit Documents.

52. "*Dex West Closing Expenses*" means 14.724949065% of the Closing Expenses.

53. "*Dex West Credit Agreement*" means that certain Amended and Restated Credit Agreement, dated as of April 30, 2013 (as amended, restated, supplemented, or otherwise modified from time to time), among Dex West, as borrower, Dex Media, Inc., Dex Media Holdings, Inc., the Dex West Administrative Agent, and each of the lenders from time to time party thereto.

54. "*Dex West Credit Documents*" means the Dex West Credit Agreement and all related agreements and documents executed by any of the Debtors in connection with the Dex West Credit Agreement.

55. "*Dex West Credit Facility Claims*" means all Claims against the Debtors arising under the Dex West Credit Documents.

56. "*Dex West Lenders*" means, collectively, (a) the lenders from time to time party to the Dex West Credit Agreement, and (b) the holders of economic interests or rights relating to the loans issued under the Dex West Credit Agreement.

57. "*Dex West Minimum Operating Cash Contribution*" means 18.024949065% of the Minimum Operating Cash Contribution.

58. "*Disallowed*" means, with respect to any Claim, a Claim or any portion thereof that (a) has been disallowed by a Final Order, (b) is Scheduled as zero or as contingent, disputed, or unliquidated and as to which no Proof of Claim (if required by the Claims Bar Date Order) or request for payment of an Administrative Claim has been timely Filed or deemed timely Filed with the Court pursuant to the Bankruptcy Code, any Final Order of the Court, or otherwise under applicable law or this Plan, (c) is not Scheduled and as to which no Proof of Claim (if required by the Claims Bar Date Order) or request for payment of an Administrative Claim has been timely Filed or deemed timely Filed with the Court pursuant to the Bankruptcy Code, any Final Order of the Court, or otherwise under applicable law or this Plan, (d) has been withdrawn by agreement of the applicable Debtor and the Holder thereof, or (e) has been withdrawn by the Holder thereof.

59. "*Disclosure Statement*" means the *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Dex Media, Inc. and its Debtor Affiliates*, dated as of May 2, 2016, including all exhibits and schedules thereto and references therein that relate to the Plan, that is prepared and distributed in accordance with applicable law, and which shall be in form and substance acceptable to the Debtors and the Required Supporting Lenders.

60. "*Disputed*" means a Claim that is not yet Allowed.

61.    "*Distribution Record Date*" means the date for determining which Holders of Claims or Interests are eligible to receive distributions hereunder and shall be the Confirmation Date or such other date as designated in advance by the Debtors, with the consent of the Required Supporting Lenders and the Credit Agreement Agents, by notice on the docket for the Chapter 11 Cases.

62.    "*DTC*" means Depository Trust Company.

63.    "*Effective Date*" means, with respect to the Plan, the date that is a Business Day selected by the Debtors and the Required Supporting Lenders on which:  (a) no stay of the Confirmation Order is in effect; (b) all conditions precedent specified in Article IX.C have been satisfied or waived (in accordance with Article IX.D); and (c) the Plan is declared effective.  Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable after the Effective Date.

64.    "*Entity*" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

65.    "*Equity Put Option*" means the option available to each Term Loan Lender, pursuant to the terms of the Backstop Agreement, to receive, in lieu of distributions of New Common Stock loans under the Takeback First Lien Term Loan.

66.    "*Estate*" means, as to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

67.    "*Exculpated Claim*" means any Cause of Action or any Claim related to any act or omission derived from, based upon, related to, or arising from the Debtors' in- or out-of-court restructuring efforts, the Chapter 11 Cases, the marketing process, formulation, preparation, dissemination, negotiation, or Filing of the Restructuring Support Agreement and related prepetition transactions, the Disclosure Statement, the Plan (including any term sheets related thereto), or any contract, instrument, release or other agreement or document (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with any of the foregoing, including without limitation (a) the Restructuring Support Agreement, (b) the issuance of the New Common Stock and the Warrants, (c) the execution, delivery, and performance of the Takeback First Lien Term Loan Documents, (d) the Backstop Agreement, and (e) the distribution of property under the Plan or any other agreement under the Plan, except for Claims or Causes of Action related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence; *provided* that the Exculpated Parties shall be entitled, in all respects, to reasonably rely upon the advice of counsel with respect to the foregoing; *provided*, *further*, that the foregoing shall not be deemed to release, affect, or limit any of the rights and obligations of the Exculpated Parties from, or exculpate the Exculpated Parties with respect to, any of the Exculpated Parties' obligations or covenants arising under the Confirmation Order, the Plan, the Plan Supplement, the Takeback First Lien Term Loan Documents, and any contracts, instruments, releases, and other agreements or documents delivered in connection with, or contemplated by, the foregoing.

68.    "*Exculpated Parties*" means each of:  (a) the Debtors; (b) the Reorganized Debtors; (c) the Term Loan Lenders who vote to accept the Plan; (d) the Supporting Lenders; (e) the Backstop Parties; (f) the Credit Agreement Agents; (g) the Supporting Noteholders; (h) with respect to each of the foregoing Entities in clauses (a) through (f), such Entity's current and former Affiliates, and such Entity's and such Affiliates' current and former equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors and assigns, subsidiaries, managed accounts or funds, and each of their respective current and former equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, and other professionals, each in their capacity as such; and (i) the DTC.

69.    "*Executory Contract*" means a contract to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

70.     "*Federal Judgment Rate*" means the federal judgment rate in effect as of the Petition Date, compounded annually.

71.     "*File*," "*Filed*," or "*Filing*" means file, filed, or filing in the Chapter 11 Cases with the Court or, with respect to the filing of a Proof of Claim or proof of Interest, the Notice and Claims Agent.

72.     "*Final Order*" means an order or judgment of the Court (or any other court of competent jurisdiction) entered by the Clerk of the Court (or the clerk of such other court) on the docket in the Chapter 11 Cases (or the docket of such other court), which has not been reversed, stayed, modified, amended, or vacated, and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, stay, reargument, or rehearing has expired and as to which no appeal, petition for certiorari, or motion for new trial, stay, reargument, or rehearing shall be pending or (b) if an appeal, writ of certiorari, new trial, stay, reargument, or rehearing thereof has been sought, such order or judgment of the Court (or other court of competent jurisdiction) shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, stay, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari, or move for a new trial, stay, reargument, or rehearing shall have expired, as a result of which such order shall have become final in accordance with rule 8002 of the Bankruptcy Rules; *provided* that the possibility that a motion under rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such order, shall not cause an order not to be a Final Order.

73.     "*General Unsecured Claim*" means any Claim against the Debtors that is not otherwise paid in full during the Chapter 11 Cases and is not:  (a) an Administrative Claim; (b) a Priority Tax Claim; (c) an Other Priority Claim; (d) an Other Secured Claim; (e) a Credit Agreement Claim; (f) a Subordinated Notes Claim; (g) an Intercompany Claim; or (h) a Claim Relating to the Purchase and/or Sale of Debt and Securities.

74.     "*Governmental Unit*" shall have the meaning set forth in section 101(27) of the Bankruptcy Code.

75.     "*Holder*" means an Entity holding a Claim or an Interest.

76.     "*Impaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is not Unimpaired.

77.     "*Indemnification Obligations*" means each of the Debtors' indemnification obligations in place as of the Effective Date, whether in the bylaws, certificates of incorporation or formation, limited liability company agreements, other organizational or formation documents, board resolutions, management or indemnification agreements, or employment or other contracts, for their current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals and agents of the Debtors, as applicable.

78.     "*Intercompany Claim*" means any Claim held by (a) one Debtor against another Debtor or (b) a Non-Debtor Subsidiary against a Debtor.

79.     "*Intercompany Interest*" means, other than an Interest in Parent, (a) an Interest in a Debtor or a Non-Debtor Subsidiary held by a Debtor or a Non-Debtor Subsidiary or (b) an Interest in a Debtor or a Non-Debtor Subsidiary held by an Affiliate of a Debtor or a Non-Debtor Subsidiary.

80.     "*Intercreditor Agreement*" means that certain Collateral Agency and Intercreditor Agreement, dated as of January 29, 2010, by and among Parent, Dex Media Holdings, Inc., Dex One Digital, Inc., Dex One Service, Inc., R.H. Donnelley Corporation, Deutsche Bank, as RHDI Administrative Agent, JPMorgan, as Dex East Administrative Agent, Dex West Administrative Agent, SuperMedia Administrative Agent, and shared collateral agent, and the other parties from time to time party thereto (as amended, restated, supplemented, or otherwise modified from time to time).

81.     "*Interests*" means the common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profits interests of any Debtor and options, warrants, rights, or other securities or agreements to acquire the common stock, preferred stock, limited liability company interests, or other equity,

ownership, or profits interests of any Debtor (whether or not arising under or in connection with any employment agreement), including any claim against the Debtors subject to subordination pursuant to section 510(b) of the Bankruptcy Code arising from or related to any of the foregoing.

82.    "*Interim Compensation Order*" means that certain order entered by the Court establishing procedures for the compensation of Professionals.

83.    "*JPMorgan*" means JPMorgan Chase Bank, N.A.

84.    "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001.

85.    "*Lien*" shall have the meaning set forth in section 101(37) of the Bankruptcy Code.

86.    "*Management Incentive Plan*" means that certain post-Effective Date management and New Board incentive plan, the material terms of which shall be set forth in the Plan Supplement.

87.    "*Minimum Operating Cash Contribution*" means a Cash contribution to the Reorganized Debtors in an amount equal to $35 million minus the remaining Cash balance in Dex One Service, Inc. (after accounting for any intercompany payables made to Dex One Service, Inc. by any other Debtor as of the Effective Date) as of the Effective Date to fund (a) general operational requirements and (b) such other payments as mutually agreed upon by the Debtors and the Required Supporting Lenders.  For the avoidance of doubt, the initial $35 million Cash contribution shall be deemed to occur on the Effective Date, and the related accounting adjustments necessary to ascertain the remaining Cash balance in Dex One Service, Inc. as of the Effective Date shall occur as soon as reasonably practicable thereafter.

88.    "*New Boards*" means the initial board of directors, members, or managers, as applicable, of each Reorganized Debtor as designated pursuant to Article IV.H.

89.    "*New Common Stock*" means the common stock, par value of $0.01 per share, of Reorganized Parent, authorized and issued pursuant to the Plan.

90.    "*New Organizational Documents*" means the form of the certificates or articles of incorporation, bylaws, or such other applicable formation documents of the Reorganized Parent, which forms shall be included in the Plan Supplement and shall be consistent with the New Stockholders Agreement Term Sheet.

91.    "*New Stockholders Agreement*" means the stockholders agreement with respect to the New Common Stock, which shall be substantially in the form to be included in the Plan Supplement and on the terms set forth in the New Stockholders Agreement Term Sheet but may include such other terms as agreed to by the Debtors and the Required Supporting Lenders.

92.    "*New Stockholders Agreement Term Sheet*" means Exhibit B hereto.

93.    "*Non-Debtor Subsidiaries*" means:  (a) Dex One Digital BRE LLC; (b) Dex Media East BRE LLC; (c) Dex Media BRE LLC; (d) Dex Media West BRE LLC; (e) Dex One Services BRE LLC; (f) R.H. Donnelley BRE LLC; (g) R.H. Donnelley 2 BRE LLC; (h) SuperMedia BRE LLC; and (i) SuperMedia UK, Ltd.

94.    "*Noteholder Term Sheet*" means that certain term sheet providing for, among other things, the issuance of the Warrants, which is attached as Exhibit C hereto.

95.    "*Notice and Claims Agent*" means Epiq Bankruptcy Solutions, LLC.

96.    "*Ordinary Course Professionals*" shall mean the various attorneys, accountants, auditors, and other professionals the Debtors employ in the ordinary course of their business and retained by the Debtors pursuant to the Ordinary Course Professionals Order.

97.    "*Ordinary Course Professionals Order*" shall mean that certain order entered by the Court establishing the procedures for retention and compensation of the Ordinary Course Professionals.

98.    "*Other Priority Claim*" means any allowed Claim against any Debtor entitled to priority in right of payment under section 507(a) of the Bankruptcy Code, other than:  (a) an Administrative Claim; or (b) a Priority Tax Claim, to the extent such Claim has not already been paid during the Chapter 11 Cases.

99.    "*Other Secured Claim*" means any Secured Claim against any Debtor that is not a Credit Agreement Claim.

100.    "*Parent*" means Dex Media, Inc.

101.    "*Person*" shall have the meaning set forth in section 101(41) of the Bankruptcy Code.

102.    "*Petition Date*" shall mean the date on which the Debtors commenced the Chapter 11 Cases.

103.    "*Plan Supplement*" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan, each of which shall be in form and substance acceptable to the Debtors and the Required Supporting Lenders (as amended, supplemented, or modified from time to time in accordance with the terms hereof and the Bankruptcy Code and the Bankruptcy Rules) and consistent with the Restructuring Support Agreement, to be Filed by the Debtors no later than seven days before the Confirmation Hearing, and additional documents or amendments to previously Filed documents, Filed before the Confirmation Date as amendments to the Plan Supplement, including the following, as applicable:  (a) New Organizational Documents; (b) the Warrant Agreement; (c) a chart detailing the Reorganized Debtors' corporate structure and a summary of steps necessary to effectuate such corporate structure; (d) Schedule of Rejected Executory Contracts and Unexpired Leases; (e) a list of retained Causes of Action; (f) Management Incentive Plan; (g) a document listing the members of the New Boards; (h) the New Stockholders Agreement; and (i) the material Takeback First Lien Term Loan Documents.  The Debtors shall have the right to amend the documents contained in, and exhibits to, the Plan Supplement through the Effective Date on terms acceptable to the Required Supporting Lenders.

104.    "*Prior Tax Calculation*" means the determination, calculation, and reporting of each of the Debtors' (or their predecessors in interest's) tax attributes, tax basis, and tax liabilities from January 1, 2010 through December 31, 2015 to the extent such determination, calculation, or reporting relate to the erroneous calculations referenced in form 12b-25 filed by the Debtors on March 31, 2016.

105.    "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

106.    "*Pro Rata*" means the proportion that an Allowed Claim or Allowed Interest in a particular Class bears to the aggregate amount of Allowed Claims or Allowed Interests in that respective Class, or the proportion that Allowed Claims or Allowed Interests in a particular Class bear to the aggregate amount of Allowed Claims or Allowed Interests in a particular Class and other Classes entitled to share in the same recovery as such Allowed Claim or Allowed interests under the Plan.

107.    "*Professional*" means an Entity:  (a) employed pursuant to a Court order in accordance with sections 327 or 1103 of the Bankruptcy Code and to be compensated for services rendered before or on the Confirmation Date, pursuant to sections 327, 328, 329, 330, or 331 of the Bankruptcy Code; or (b) awarded compensation and reimbursement by the Court pursuant to section 503(b)(4) of the Bankruptcy Code.

108.    "*Professional Fee Escrow*" means an interest-bearing escrow account to hold and maintain an amount of Cash equal to the Professional Fee Escrow Amount funded by the Debtors or the Reorganized Debtors as soon as reasonably practicable after the Confirmation Date and no later than the Effective Date solely for the purpose of paying all remaining Allowed and unpaid Accrued Professional Compensation Claims.  Such Cash shall remain subject to the jurisdiction of the Court.

109.    "*Professional Fee Escrow Amount*" means the aggregate unpaid Accrued Professional Compensation Claims through the Confirmation Date as estimated in accordance with Article II.B.

110.    "*Proof of Claim*" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

111.    "*Reinstated*" or "*Reinstatement*" means, with respect to Claims and Interests, the treatment provided for in section 1124 of the Bankruptcy Code.

112.    "*Released Party*" means each of the following in their capacity as such:  (a) the Debtors; (b) the Reorganized Debtors; (c) the Credit Agreement Agents; (d) the Term Loan Lenders who vote to accept the Plan; (e) the SC Members that vote to accept the Plan; (f) the Backstop Parties who vote to accept the Plan; (g) the Supporting Lenders; (h) the Non-Debtor Subsidiaries; (i) Holders of Subordinated Notes Claims who vote to accept the Plan; (j) with respect to each of the foregoing Entities in clauses (a) through (i), such Entity's respective predecessors, successors and assigns, current and former stockholders, members, limited partners, general partners, equity holders, Affiliates and its and their subsidiaries, principals, partners, parents, equity holders, members, employees, agents, officers, directors, managers, trustees, professionals, representatives, advisors, attorneys, financial advisors, accountants, investment bankers, and consultants; and (k) the DTC; *provided* that as a condition to receiving or enforcing any release granted pursuant to Article VIII.E or Article VIII.F hereof, each Released Party and its Affiliates shall release or be deemed to have released the Estates and the Debtors for any and all Claims or Causes of Action arising from or related to their relationship with the Debtors, but not, for the avoidance of doubt, Accrued Professional Compensation Claims.  For the avoidance of doubt, and notwithstanding anything herein to the contrary, in no event shall an Entity that opts out of the releases be a "Released Party."

113.    "*Releasing Party*" means each of the following in their capacity as such:  (a) the Released Parties (other than the Debtors); (b) all Holders of Claims and Interests who are deemed to accept the Plan; (c) all Holders of Claims who vote to accept the Plan; (d) all holders of Claims who abstain from voting on the Plan and who do not opt out of the releases provided by the Plan; (e) all holders of Claims who vote to reject the Plan and who do not opt out of the releases provided by the Plan; and (f) with respect to each of the foregoing Entities, their respective current and former officers, directors, managers, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals.

114.    "*Reorganized Debtors*" means the Debtors, or any successors thereto, by merger, consolidation, or otherwise, on or after the Effective Date, including any new entity formed pursuant to the Restructuring Transactions to directly or indirectly acquire the assets or equity of the Debtors.

115.    "*Reorganized Parent*" means Parent, or any successors thereto, by merger, consolidation, or otherwise, on or after the Effective Date, including any new holding company formed pursuant to the Restructuring Transactions to indirectly acquire the assets or equity of the Debtors.

116.    "*Required Silo-Level Supporting Lenders*" means, as of any date of determination, SC Members holding 66 2/3 percent or more of the aggregate principal amount of each of the Credit Agreements held by all SC Members.

117.    "*Required Supporting Lenders*" means, as of any date of determination, not less than three SC Members holding, controlling, or having the ability to control more than 50 percent of the aggregate principal amount under the Credit Agreements held by all SC Members.

118.    "*Restructuring Support Agreement*" means the Restructuring Support Agreement, dated as of May 2, 2016, as amended, supplemented, or otherwise modified from time to time in accordance with its terms, a copy of which is attached as Exhibit D hereto.

119.    "*Restructuring Transactions*" shall have the meaning set forth in Article IV.A.

120.    "*RHDI*" means R.H. Donnelley Inc.

121.    "*RHDI Administrative Agent*" means Deutsche Bank, in its capacity as administrative and collateral agent under the RHDI Credit Agreement and the other RHDI Credit Documents.

122.    "*RHDI Closing Expenses*" means 23.152435636% of the Closing Expenses.

123.    "*RHDI Credit Agreement*" means that certain Fourth Amended and Restated Credit Agreement, dated as of April 30, 2013 (as amended, restated, supplemented, or otherwise modified from time to time), among RHDI, as borrower, Dex Media, Inc., the RHDI Administrative Agent, and each of the lenders from time to time party thereto.

124.    "*RHDI Credit Documents*" means the RHDI Credit Agreement and all related agreements and documents executed by any of the Debtors in connection with the RHDI Credit Agreement.

125.    "*RHDI Credit Facility*" means the credit facility under the RHDI Credit Agreement.

126.    "*RHDI Credit Facility Claims*" means all Claims against the Debtors arising under the RHDI Credit Documents.

127.    "*RHDI Lenders*" means, collectively, (a) the lenders from time to time party to the RHDI Credit Agreement, and (b) the holders of economic interests or rights relating to the loans issued under the RHDI Credit Agreement.

128.    "*RHDI Minimum Operating Cash Contribution*" means 21.652435636% of the Minimum Operating Cash Contribution.

129.    "*SC Members*" means, collectively, Mudrick Capital Management, LP, Paulson & Co., Ares Management LLC, and Silver Point Capital, L.P.

130.    "*Schedule of Rejected Executory Contracts and Unexpired Leases*" means the schedule (including any amendments or modifications thereto), if any, of certain Executory Contracts and Unexpired Leases to be rejected by the Debtors pursuant to the Plan, as set forth in the Plan Supplement, as may be amended by the Debtors, in consultation with the Required Supporting Lenders, from time to time prior to the Effective Date.

131.    "*Schedules*" means, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code and in substantial accordance with the Official Bankruptcy Forms, as the same may have been amended, modified, or supplemented from time to time.

132.    "*Secured*" means when referring to a Claim, a Claim:  (a) secured by a Lien on property in which the applicable Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Final Order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in such Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code; or (b) otherwise Allowed pursuant to the Plan as a Secured Claim.

133.    "*Secured Tax Claims*" means any Secured Claim against any Debtor that, absent its secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of time limitations), including any related Secured Claim for penalties.

134.    "*Securities Act*" means the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, as amended, or any similar federal, state or local law.

135.    "*Securities Exchange Act*" means the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a–78nn, as amended.

136.    "*Security*" shall have the meaning set forth in section 101(49) of the Bankruptcy Code.

137.    "*Servicer*" means an agent or other authorized representative of Holders of Claims.

138.    "*Subordinated Notes*" means the 12%/14% percent Senior Subordinated Notes Due 2017, issued in the original principal amount of $300,000,000 pursuant to the Subordinated Notes Indenture.

139.    "*Subordinated Notes Claims*" means all Claims against the Debtors arising under the Subordinated Notes Indenture.

140.    "*Subordinated Notes Indenture*" means that certain Indenture, dated as of January 29, 2010, between Parent (as successor in interest to Dex One Corporation (f/k/a R.H. Donnelley Corporation)), as issuer, and the Subordinated Notes Indenture Trustee (as amended, restated, supplemented, or otherwise modified from time to time), providing for the issuance of the Subordinated Notes.

141.    "*Subordinated Notes Indenture Trustee*" means The Bank of New York Mellon, solely in its capacity as indenture trustee under the Subordinated Notes Indenture.

142.    "*Subsidiary Debtors*" means, collectively, each of the Debtors other than Parent.

143.    "*SuperMedia*" means SuperMedia Inc.

144.    "*SuperMedia Administrative Agent*" means JPMorgan, in its capacity as administrative agent, collateral agent, shared collateral agent, and subordinated guarantee agent under the SuperMedia Credit Agreement and the other SuperMedia Credit Documents.

145.    "*SuperMedia Closing Expenses*" means 48.657158733% of the Closing Expenses.

146.    "*SuperMedia Credit Agreement*" means that certain Amended and Restated Loan Agreement, dated as of April 30, 2013 (as amended, restated, supplemented, or otherwise modified from time to time), among SuperMedia, as borrower, Dex Media Inc., the SuperMedia Administrative Agent, and each of the lenders from time to time party thereto.

147.    "*SuperMedia Credit Documents*" means the SuperMedia Credit Agreement and all related agreements and documents executed by any of the Debtors in connection with the SuperMedia Credit Agreement.

148.    "*SuperMedia Credit Facility*" means the credit facility under the SuperMedia Credit Agreement.

149.    "*SuperMedia Credit Facility Claims*" means all Claims against the Debtors arising under the SuperMedia Credit Documents.

150.    "*SuperMedia Lenders*" means, collectively, (a) the lenders from time to time party to the SuperMedia Credit Agreement, and (b) the holders of economic interests or rights relating to the loans issued under the SuperMedia Credit Agreement.

151.    "*SuperMedia Minimum Operating Cash Contribution*" means 45.357158733% of the Minimum Operating Cash Contribution.

152.    "*Supporting Dex East Lenders*" means those Dex East Lenders party to the Restructuring Support Agreement from time to time, together with their respective permitted successors and assigns.

153.    "*Supporting Dex West Lenders*" means those Dex West Lenders party to the Restructuring Support Agreement from time to time, together with their respective permitted successors and assigns.

154.    "*Supporting Lenders*" means, collectively, the Supporting Dex East Lenders, the Supporting Dex West Lenders, the Supporting RHDI Lenders, and the Supporting SuperMedia Lenders.

155.    "*Supporting Noteholders*" means, as of any date of determination, Holders of Subordinated Notes Claims holding 66 2/3 percent or more of the aggregate principal amount of the Subordinated Notes Claims.

156.    "*Supporting RHDI Lenders*" means those RHDI Lenders party to the Restructuring Support Agreement from time to time, together with their respective permitted successors and assigns.

157.    "*Supporting SuperMedia Lenders*" means those SuperMedia Lenders party to the Restructuring Support Agreement from time to time, together with their respective permitted successors and assigns.

158.    "*Takeback First Lien Administrative Agent*" means the administrative agent under the Takeback First Lien Term Loan Documents, together with any of its successors in such capacity, the identify of which shall be satisfactory to the Debtors and Required Supporting Lenders.

159.    "*Takeback First Lien Term Loan*" means a term loan on terms set forth in the Takeback First Lien Loan Documents, in an amount equal to $600 million on the Effective Date.

160.    "*Takeback First Lien Term Loan Credit Agreement*" means the credit agreement, consistent with the Takeback First Lien Term Loan Credit Agreement Term Sheet and consistent with the Restructuring Support Agreement, to be dated as of the Effective Date, providing for the Takeback First Lien Term Loan, and which shall be in form and substance acceptable to the Debtors and the Required Silo-Level Supporting Lenders, in consultation with the Takeback First Lien Administrative Agent.

161.    "*Takeback First Lien Term Loan Credit Agreement Term Sheet*" means that certain term sheet providing for, among other things, the Takeback First Lien Term Loan Credit Agreement, which is attached as Exhibit A hereto.

162.    "*Takeback First Lien Term Loan Documents*" means in connection with the Takeback First Lien Term Loan, the Takeback First Lien Term Loan Credit Agreement, notes, deeds of trust, Uniform Commercial Code statements, and other loan documents, to be dated as of the Effective Date, governing the Takeback First Lien Term Loan, which documents shall be included in the Plan Supplement, and which shall be consistent with the Restructuring Support Agreement and in form and substance acceptable to the Debtors and the Required Silo-Level Supporting Lenders, in consultation with the Takeback First Lien Administrative Agent.

163.    "*Term Loan Lenders*" means the Dex East Lenders, the Dex West Lenders, the RHDI Lenders, and the SuperMedia Lenders.

164.    "*U.S. Trustee*" means the Office of the United States Trustee for the District of Delaware.

165.    "*Unexpired Lease*" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

166.    "*Unimpaired*" means, with respect to a Class of Claims or Interests, a Claim or an Interest that is unimpaired within the meaning of section 1124 of the Bankruptcy Code, including through payment in full in cash.

167.    "*Value Creation Program*" means that certain Dex Media, Inc. Value Creation Program, effective as of October 14, 2014.

168.    "*Warrants*" means those certain warrants to acquire shares of New Common Stock representing up to 10 percent, in the aggregate, of the New Common Stock, on a fully diluted basis, as of the Effective Date (but subject to dilution on or after the Effective Date for awards under the Management Incentive Plan), to be issued pursuant to the Warrant Agreement.

169.    "*Warrant Agreement*" means that certain agreement providing for, among other things, the issuance and terms of the Warrants, the form and of which shall be Filed pursuant to the Plan Supplement and on the terms set forth in the Noteholder Term Sheet and such other terms agreed to by the Debtors and the Required Supporting Lenders and reasonably acceptable to the Supporting Noteholders.

B.      *Rules of Interpretation*

For purposes herein:  (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) except as otherwise provided, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (3) except as otherwise provided, any reference herein to an existing document or exhibit having been Filed or to be Filed shall mean that document or exhibit, as it may thereafter be amended, restated, supplemented, or otherwise modified in accordance with the terms of the Plan; (4) unless otherwise specified, all references herein to "Articles" are references to Articles of the Plan or hereto; (5) unless otherwise stated, the words "herein," "hereof," and ''hereto'' refer to the Plan in its entirety rather than to a particular portion of the Plan; (6) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (7) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation;" (8) unless otherwise specified, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (9) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (10) any docket number references in the Plan shall refer to the docket number of any document Filed with the Court in the Chapter 11 Cases; (11) references to "Proofs of Claim," "Holders of Claims," "Disputed Claims," and the like shall include "Proofs of Interest," "Holders of Interests," "Disputed Interests," and the like as applicable; (12) references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable state limited liability company laws; (13) any immaterial effectuating provisions may be interpreted by the Debtors or the Reorganized Debtors in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Court or any other Entity; and (14) except as otherwise provided, any references to the Effective Date shall mean the Effective Date or as soon as reasonably practicable thereafter.

C.      *Computation of Time*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

D.      *Governing Law*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated herein, the laws of the State of New York, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); *provided* that corporate or limited liability company governance matters relating to the Debtors or the Reorganized Debtors, as applicable, not incorporated or formed (as applicable) in the State of New York shall be governed by the laws of the state of incorporation or formation (as applicable) of the applicable Debtor or Reorganized Debtor.

E.      *Reference to Monetary Figures*

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided herein.

F.      *Reference to the Debtors or the Reorganized Debtors*

        Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or the Reorganized Debtors shall mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

G.      *Controlling Document*

        In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects.  In the event of an inconsistency between the Plan and the Plan Supplement, the terms of the relevant document in the Plan Supplement shall control (unless stated otherwise in such Plan Supplement document or in the Confirmation Order).  In the event of an inconsistency between the Confirmation Order and the Plan, the Confirmation Order shall control.

## ARTICLE II.
## ADMINISTRATIVE CLAIMS AND PRIORITY CLAIMS

        In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified and, thus, are excluded from the classification of Claims and Interests set forth in Article III hereof.

A.      *Administrative Claims*

        Except with respect to Administrative Claims that are Accrued Professional Compensation Claims and except to the extent that an Administrative Claim has already been paid during the Chapter 11 Cases or a Holder of an Allowed Administrative Claim and the applicable Debtor(s) agree to less favorable treatment, each Holder of an Allowed Administrative Claim (which, for the avoidance of doubt, shall include any Administrative Claim that is Allowed under the Cash Collateral Order) shall be paid in full in Cash on the unpaid portion of its Allowed Administrative Claim on the latest of:  (a) on or as soon as reasonably practicable after the Effective Date if such Administrative Claim is Allowed as of the Effective Date; (b) on or as soon as reasonably practicable after the date such Administrative Claim is Allowed; and (c) the date such Allowed Administrative Claim becomes due and payable, or as soon thereafter as is reasonably practicable; *provided* that Allowed Administrative Claims that arise in the ordinary course of the Debtors' businesses shall be paid in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to such transactions.  Notwithstanding the foregoing, no request for payment of an Administrative Claim need be Filed with respect to an Administrative Claim previously Allowed by Final Order.

        Except as otherwise provided in this Article II.A and except with respect to Administrative Claims that are Accrued Professional Compensation Claims, requests for payment of Allowed Administrative Claims must be Filed and served on the Reorganized Debtors pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the Administrative Claims Bar Date.  Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or their property and such Administrative Claims shall be deemed discharged as of the Effective Date.  Objections to such requests, if any, must be Filed and served on the Reorganized Debtors and the requesting party no later than 60 days after the Effective Date.

B.      *Professional Compensation*

        1.      Professional Fee Escrow.

        As soon as reasonably practicable after the Confirmation Date and no later than the Effective Date, the Debtors shall establish the Professional Fee Escrow.  The Debtors shall fund the Professional Fee Escrow with Cash equal to the Professional Fee Escrow Amount.  The Professional Fee Escrow shall be funded no later than the Effective Date and maintained in trust for the Professionals and shall not be considered property of the Debtors'

Estates; *provided* that any excess of the amount of the Professional Fee Escrow over the aggregate Allowed Accrued Professional Compensation Claims to be paid from the Professional Fee Escrow shall be distributed in accordance with Article VI to Holders of Allowed Dex East Credit Facility Claims, Dex West Credit Facility Claims, RHDI Credit Facility Claims, and SuperMedia Credit Facility Claims in the same percentages set forth in the definitions of Dex East Closing Expenses, Dex West Closing Expenses, RHDI Closing Expenses, and SuperMedia Closing Expenses, respectively.

2.          <u>Final Fee Applications and Payment of Accrued Professional Compensation Claims.</u>

All final requests for payment of Accrued Professional Compensation Claims incurred during the period from the Petition Date through the Confirmation Date, shall be Filed no later than 45 days after the Effective Date. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code, Bankruptcy Rules and prior Court orders, the Allowed amounts of such Accrued Professional Compensation Claims shall be determined by the Court. The amount of Accrued Professional Compensation Claims owing to the Professionals shall be paid in Cash to such Professionals from funds held in the Professional Fee Escrow when such Claims are Allowed by a Final Order. To the extent that funds held in the Professional Fee Escrow are unable to satisfy the amount of Accrued Professional Compensation Claims owing to the Professionals, such Professionals shall have an Allowed Administrative Claim for any such deficiency, which shall be satisfied in accordance with Article II.A of the Plan. After all Accrued Professional Compensation Claims have been paid in full, the Final Order allowing such Accrued Professional Compensation Claims shall direct the escrow agent to return any excess amounts to the Reorganized Debtors and such amounts shall be distributed in accordance with Article VI to Holders of Allowed Dex East Credit Facility Claims, Dex West Credit Facility Claims, RHDI Credit Facility Claims, and SuperMedia Credit Facility Claims in the same percentages set forth in the definitions of Dex East Closing Expenses, Dex West Closing Expenses, RHDI Closing Expenses, and SuperMedia Closing Expenses, respectively.

3.          <u>Estimation of Fees and Expenses.</u>

To receive payment for unbilled fees and expenses incurred through the Confirmation Date, the Professionals shall estimate their Accrued Professional Compensation Claims before and as of the Confirmation Date and shall deliver such estimate to the Debtors no later than five calendar days prior to the Effective Date; *provided* that such estimate shall not be considered an admission with respect to the fees and expenses of such Professional and such Professionals are not bound to any extent by the estimates. If a Professional does not provide an estimate, the Debtors, in consultation with the Required Support Lenders, may estimate the unbilled fees and expenses of such Professional. The total amount so estimated shall be utilized by the Debtors to determine the Professional Fee Escrow Amount.

4.          <u>Post-Confirmation Date Fees and Expenses.</u>

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Court, pay in Cash the reasonable legal, professional, or other fees and expenses incurred by the Debtors. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code, the Interim Compensation Order, or the Ordinary Course Professionals Order in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors may employ and pay any Professional or Ordinary Course Professional in the ordinary course of business without any further notice to or action, order, or approval of the Court.

C.       *Priority Tax Claims*

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code. In the event an Allowed Priority Tax Claim is also a Secured Tax Claim, such Claim shall, to the extent it is Allowed, be treated as an Other Secured Claim if such Claim is not otherwise paid in full.

D.    *Statutory Fees*

All fees due and payable pursuant to section 1930 of Title 28 of the U.S. Code prior to the Effective Date shall be paid by the Debtors.  On and after the Effective Date, the Reorganized Debtors shall pay any and all such fees when due and payable, and shall file with the Court quarterly reports in a form reasonably acceptable to the U.S. Trustee.  Each Debtor shall remain obligated to pay quarterly fees to the U.S. Trustee until the earliest of that particular Debtor's case being closed, dismissed, or converted to a case under Chapter 7 of the Bankruptcy Code.

# ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

A.    *Summary of Classification*

Claims and Interests, except for Administrative Claims, Accrued Professional Compensation Claims, and Priority Tax Claims, are classified in the Classes set forth in this Article III.  A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes.  A Claim or Interest also is classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The classification of Claims and Interests against each Debtor (as applicable) pursuant to the Plan is as set forth below.  The Plan shall apply as a separate Plan for each of the Debtors, and the classification of Claims and Interests set forth herein shall apply separately to each of the Debtors.[2]  All of the potential Classes for the Debtors are set forth herein. Certain of the Debtors may not have Holders of Claims or Interests in a particular Class or Classes, and such Claims shall be treated as set forth in Article III.E hereof.

1.    <u>Class Identification</u>

The classification of Claims and Interests against each Debtor (as applicable) pursuant to the Plan is as follows:

| Class | Applicable Entities | Claim | Status | Voting Rights |
|---|---|---|---|---|
| 1 | Debtors | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 2 | Debtors | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 3 | Debtors | Dex East Credit Facility Claims | Impaired | Entitled to Vote |
| 4 | Debtors | Dex West Credit Facility Claims | Impaired | Entitled to Vote |
| 5 | Debtors | RHDI Credit Facility Claims | Impaired | Entitled to Vote |
| 6 | Debtors | SuperMedia Credit Facility Claims | Impaired | Entitled to Vote |

---

[2]    For the avoidance of doubt, the Credit Agreement Claims (including any deficiency Claims against Parent on account thereof) shall apply separately to each of the Debtors, as applicable, in accordance with the Dex East Credit Documents, Dex West Credit Documents, RHDI Credit Documents, and SuperMedia Credit Documents, as applicable.

| Class | Applicable Entities | Claim | Status | Voting Rights |
|-------|---------------------|-------|--------|---------------|
| 7 | Parent | Subordinated Notes Claims | Impaired | Entitled to Vote |
| 8 | Debtors | General Unsecured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 9 | Debtors | Claims Relating to the Purchase and/or Sale of Debt and Securities | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 10 | Debtors | Intercompany Claims | Unimpaired/Impaired | Not Entitled to Vote (Presumed to Accept/ Deemed to Reject) |
| 11 | Subsidiary Debtors | Intercompany Interests | Unimpaired/Impaired | Not Entitled to Vote (Presumed to Accept/ Deemed to Reject) |
| 12 | Parent | Interests in Parent | Impaired | Not Entitled to Vote (Deemed to Reject) |

B.      *Treatment of Claims and Interests*

1.      Class 1 – Other Priority Claims

      a.      *Classification*:  Class 1 consists of Other Priority Claims.

      b.      *Treatment*:  Except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Other Priority Claim, each such Holder shall receive payment in full, in cash, of the unpaid portion of its Other Priority Claim on the Effective Date or as soon thereafter as reasonably practicable (or, if payment is not then due, shall be paid in accordance with its terms in the ordinary course) or pursuant to such other terms as may be agreed to by the Holder of an Other Priority Claim and the Debtors.

      c.      *Voting*:  Class 1 is Unimpaired under the Plan.  Each Holder of an Other Priority Claim will be conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, each Holder of an Other Priority Claim will not be entitled to vote to accept or reject the Plan.

2.      Class 2 – Other Secured Claims

      a.      *Classification*:  Class 2 consists of Other Secured Claims.

      b.      *Treatment*:  On the Effective Date, except to the extent that a Holder of an Other Secured Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Other Secured Claim, each such Holder shall receive either (i) payment in full in cash of the unpaid portion of its Other Secured Claim on the Effective Date or as soon thereafter as reasonably practicable (or if payment is not then due, shall be paid in accordance with its terms in the ordinary course), (ii) reinstatement pursuant to section 1124 of the Bankruptcy Code, (iii) the collateral securing such Holder's Allowed Other Secured Claim, or (iv) such other recovery necessary to satisfy section 1129 of the Bankruptcy Code.

      c.      *Voting*:  Class 2 is Unimpaired under the Plan.  Each Holder of an Other Secured Claim will be conclusively presumed to have accepted the Plan pursuant to section 1126(f) of

the Bankruptcy Code. Therefore, each Holder of an Other Secured Claim will not be entitled to vote to accept or reject the Plan.

3.      Class 3 - Dex East Credit Facility Claims

   a.      *Classification*: Class 3 consists of all Dex East Credit Facility Claims.

   b.      *Allowance*: The Dex East Credit Facility Claims shall be Allowed in the aggregate amount not less than $300,419,117.58, plus accrued but unpaid interest and fees through the Petition Date to the extent legally permissible and shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, crossclaims, defenses, disallowance, impairment, objection, or any other challenges under any applicable law or regulation by any person or entity.

   c.      *Treatment*: On the Effective Date, or as soon thereafter as reasonably practicable, except to the extent that a Holder of a Dex East Credit Facility Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed Dex East Credit Facility Claim, each Holder of a Dex East Credit Facility Claim shall receive its Pro Rata share of:

      i.      14.965456566 percent of the New Common Stock (subject to (x) dilution for the Warrants and issuances under the Management Incentive Plan and (y) such Holder's exercise of the Equity Put Option);

      ii.     13.465456566 percent of the loans arising under the Takeback First Lien Term Loan (subject to such Holder's exercise of the Equity Put Option); and

      iii.    100 percent of the remaining Cash balance in Dex East (after deducting (x) intercompany payables, if any, to Dex One Service, Inc. as of the Effective Date, (y) the Dex East Minimum Operating Cash Contribution, and (z) the Dex East Closing Expenses).

   d.      *Voting*: Class 3 is Impaired under the Plan. Each Holder of a Dex East Credit Facility Claim will be entitled to vote to accept or reject the Plan.

4.      Class 4 - Dex West Credit Facility Claims

   a.      *Classification*: Class 4 consists of all Dex West Credit Facility Claims.

   b.      *Allowance*: The Dex West Credit Facility Claims shall be Allowed in the aggregate amount not less than $274,507,025.17, plus accrued but unpaid interest and fees through the Petition Date to the extent legally permissible and shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, crossclaims, defenses, disallowance, impairment, objection, or any other challenges under any applicable law or regulation by any person or entity.

   c.      *Treatment*: On the Effective Date, or as soon thereafter as reasonably practicable, except to the extent that a Holder of a Dex West Credit Facility Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed Dex West Credit Facility Claim, each Holder of a Dex West Credit Facility Claim shall receive its Pro Rata share of:

      i.      18.024949065 percent of the New Common Stock (subject to (x) dilution for the

Warrants and issuances under the Management Incentive Plan and (y) such Holder's exercise of the Equity Put Option);

ii.    14.724949065 percent of the loans arising under the Takeback First Lien Term Loan (subject to such Holder's exercise of the Equity Put Option); and

iii.    100 percent of the remaining Cash balance in Dex West (after deducting (x) intercompany payables, if any, to Dex One Service, Inc. as of the Effective Date, (y) the Dex West Minimum Operating Cash Contribution, and (z) the Dex West Closing Expenses).

d.    *Voting*:  Class 4 is Impaired under the Plan.  Each Holder of a Dex West Credit Facility Claim will be entitled to vote to accept or reject the Plan.

5.    <u>Class 5 - RHDI Credit Facility Claims</u>

a.    *Classification*:  Class 5 consists of all RHDI Credit Facility Claims.

b.    *Allowance*:  The RHDI Credit Facility Claims shall be Allowed in the aggregate amount not less than $567,690,116.17, plus accrued but unpaid interest and fees through the Petition Date to the extent legally permissible and shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, crossclaims, defenses, disallowance, impairment, objection, or any other challenges under any applicable law or regulation by any person or entity.

c.    *Treatment*:  On the Effective Date, or as soon thereafter as reasonably practicable, except to the extent that a Holder of a RHDI Credit Facility Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed RHDI Credit Facility Claim, each Holder of a RHDI Credit Facility Claim shall receive its Pro Rata share of:

i.    21.652435636 percent of the New Common Stock (subject to (x) dilution for the Warrants and issuances under the Management Incentive Plan and (y) such Holder's exercise of the Equity Put Option);

ii.    23.152435636 percent of the loans arising under the Takeback First Lien Term Loan (subject to such Holder's exercise of the Equity Put Option); and

iii.    100 percent of the remaining Cash balance in RHDI (after deducting (x) intercompany payables, if any, to Dex One Service, Inc. as of the Effective Date, (y) the RHDI Minimum Operating Cash Contribution, and (z) the RHDI Closing Expenses).

d.    *Voting*:  Class 5 is Impaired under the Plan.  Each Holder of a RHDI Credit Facility Claim will be entitled to vote to accept or reject the Plan.

6.    <u>Class 6 - SuperMedia Credit Facility Claims</u>

a.    *Classification*:  Class 6 consists of all SuperMedia Credit Facility Claims.

b.    *Allowance*:  The SuperMedia Credit Facility Claims shall be Allowed in the aggregate amount not less than $966,784,000.15, plus accrued but unpaid interest and fees through the Petition Date to the extent legally permissible and shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination

(whether equitable, contractual, or otherwise), counterclaims, crossclaims, defenses, disallowance, impairment, objection, or any other challenges under any applicable law or regulation by any person or entity.

c.     *Treatment*: On the Effective Date, or as soon thereafter as reasonably practicable, except to the extent that a Holder of a SuperMedia Credit Facility Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed SuperMedia Credit Facility Claim, each Holder of a SuperMedia Credit Facility Claim shall receive its Pro Rata share of:

   i.     45.357158733 percent of the New Common Stock (subject to (x) dilution for the Warrants and issuances under the Management Incentive Plan and (y) such Holder's exercise of the Equity Put Option);

   ii.    48.657158733 percent of the loans arising under the Takeback First Lien Term Loan (subject to such Holder's exercise of the Equity Put Option); and

   iii.   100 percent of the remaining Cash balance in SuperMedia (after deducting (x) intercompany payables, if any, to Dex One Service, Inc. as of the Effective Date, (y) the SuperMedia Minimum Operating Cash Contribution, and (z) the SuperMedia Closing Expenses).

d.     *Voting*: Class 6 is Impaired under the Plan.  Each Holder of a SuperMedia Credit Facility Claim will be entitled to vote to accept or reject the Plan.

7.     <u>Class 7 - Subordinated Notes Claims</u>

a.     *Classification*:  Class 7 consists of all Subordinated Notes Claims.

b.     *Allowance*:  The Subordinated Notes Claims shall be Allowed in the aggregate amount equal to $270,000,000, plus accrued but unpaid interest as of the Petition Date.

c.     *Treatment*: On the Effective Date, or as soon thereafter as reasonably practicable, except to the extent that a Holder of a Subordinated Notes Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed Subordinated Notes Claim, each Holder of a Subordinated Notes Claim shall receive its Pro Rata Share of:

   i.     $5 million in Cash; and

   ii.    the Warrants.

d.     *Voting*: Class 7 is Impaired under the Plan.  Each Holder of a Subordinated Notes Claim that is an Accredited Investor will be entitled to vote to accept or reject the Plan.

8.     <u>Class 8 - General Unsecured Claims</u>

a.     *Classification*:  Class 8 consists of all General Unsecured Claims.

b.     *Treatment*: On the Effective Date, or as soon thereafter as reasonably practicable (or, if a General Unsecured Claim is not an Allowed Claim on the Effective Date, on the date that such Claim becomes Allowed or as soon as reasonably practicable thereafter), except to the extent that a Holder of an Allowed General Unsecured Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed General Unsecured Claim, each Holder of an Allowed

General Unsecured Claim shall receive Cash in an amount equal to such Allowed General Unsecured Claim on the later of the Effective Date or in the ordinary course of business with the terms and conditions of the particular transaction giving rise to such Allowed General Unsecured Claim.

c.  *Voting*:  Class 8 is Unimpaired under the Plan.  Each Holder of a General Unsecured Claim will be conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, each Holder of a General Unsecured Claim will not be entitled to vote to accept or reject the Plan.

9.  Class 9 - Claims Relating to the Purchase and/or Sale of Debt and Securities

a.  *Classification*:  Class 9 consists of all Claims Relating to the Purchase and/or Sale of Debt and Securities.

b.  *Allowance*:  Notwithstanding anything to the contrary herein, a Claim Relating to the Purchase and/or Sale of Debt and Securities, if any such Claim exists, may only become Allowed by Final Order of the Court.  The Debtors are not aware of any valid Claim Relating to the Purchase and/or Sale of Debt and Securities and believe that no such Claims Relating to the Purchase and/or Sale of Debt and Securities exist.

c.  *Treatment*:  On the Effective Date, each Claim Relating to the Purchase and/or Sale of Debt and Securities shall be cancelled without any distribution and such Holders of Claims Relating to the Purchase and/or Sale of Debt and Securities will receive no recovery.

d.  *Voting*:  Class 9 is Impaired under the Plan.  Each Holder of a Claim Relating to the Purchase and/or Sale of Debt and Securities will be conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, each Holder of a Claim Relating to the Purchase and/or Sale of Debt and Securities will not be entitled to vote to accept or reject the Plan.

10.  Class 10 - Intercompany Claims

a.  *Classification*:  Class 10 consists of all Intercompany Claims.

b.  *Treatment*:  Intercompany Claims may be Reinstated as of the Effective Date or, at the Debtors' or the Reorganized Debtors' option, be cancelled, and no distribution shall be made on account of such Claims.

c.  *Voting*:  Holders of Intercompany Claims are either Unimpaired, and such Holders of Intercompany Claims conclusively are presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, or Impaired, and such Holders of Intercompany Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, each Holder of an Intercompany Claim will not be entitled to vote to accept or reject the Plan.

11.  Class 11 - Intercompany Interests

a.  *Classification*:  Class 11 consists of all Intercompany Interests.

b.  *Treatment*:  Intercompany Interests may be Reinstated as of the Effective Date or, at the Debtors' or the Reorganized Debtors' option, be cancelled, and no distribution shall be made on account of such Interests.

      c.      *Voting*: Holders of Intercompany Interests are either Unimpaired, and such Holders of Intercompany Interests conclusively are presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, or Impaired, and such Holders of Intercompany Interests are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, each Holder of an Intercompany Interest will not be entitled to vote to accept or reject the Plan.

12.     <u>Class 12 - Interests in Parent</u>

      a.      *Classification*: Class 12 consists of all Interests in Parent.

      b.      *Treatment*: On the Effective Date, existing Interests in Parent shall be deemed canceled and extinguished, and shall be of no further force and effect, whether surrendered for cancelation or otherwise, and there shall be no distribution to Holders of Interests in Parent on account of such Interests.

      c.      *Voting*: Class 12 is Impaired under the Plan. Each Holder of an Interest in Parent will be conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, each Holder of an Interest in Parent will not be entitled to vote to accept or reject the Plan.

C.     *Special Provision Governing Unimpaired Claims*

Except as otherwise specifically provided in this Plan, nothing herein shall be deemed to affect, diminish, or impair the Debtors' or the Reorganized Debtors' rights and defenses, both legal and equitable, with respect to any Reinstated Claim or Unimpaired Claim, including, but not limited to, legal and equitable defenses to setoffs or recoupment against Reinstated Claims or Unimpaired Claims; and, except as otherwise specifically provided in this Plan, nothing herein shall be deemed to be a waiver or relinquishment of any Claim, Cause of Action, right of setoff, or other legal or equitable defense which the Debtors had immediately prior to the Petition Date, against or with respect to any Claim left Unimpaired by this Plan. Except as otherwise specifically provided in this Plan, the Reorganized Debtors shall have, retain, reserve, and be entitled to assert all such Claims, Causes of Action, rights of setoff, and other legal or equitable defenses which they had immediately prior to the Petition Date fully as if the Chapter 11 Cases had not been commenced, and all of the Reorganized Debtors' legal and equitable rights with respect to any Reinstated Claim or Claim left Unimpaired by this Plan may be asserted after the Confirmation Date and the Effective Date to the same extent as if the Chapter 11 Cases had not been commenced.

D.     *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by an Impaired Class of Claims. The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.

E.     *Elimination of Vacant Classes*

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

F.     *Voting Classes; Presumed Acceptance by Non-Voting Classes*

If a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Plan shall be presumed accepted by the Holders of such Claims or Interests in such Class.

G.        *Presumed Acceptance and Rejection of the Plan*

To the extent Class 10 Intercompany Claims and Class 11 Intercompany Interests are Reinstated, each Holder of a Claim or Interest in Class 10 or 11 is presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and is not entitled to vote to accept or reject the Plan.  To the extent Class 10 Intercompany Claims and Class 11 Intercompany Interests are cancelled, each Holder of a Claim or Interest in Class 10 or 11 is deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and is not entitled to vote to accept or reject the Plan.

H.        *Intercompany Interests*

To the extent Reinstated under the Plan, distributions on account of Intercompany Interests are not being received by Holders of such Intercompany Interests on account of their Intercompany Interests but for the purposes of administrative convenience, for the ultimate benefit of the holders of New Common Stock, and in exchange for the Debtors' and Reorganized Debtors' agreement under the Plan to make certain distributions to the Holders of Allowed Claims.  For the avoidance of doubt, any Interest in Non-Debtor Subsidiaries owned by a Debtor shall continue to be owned by the applicable Reorganized Debtor.

I.        *Controversy Concerning Impairment*

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

J.        *Subordinated Claims*

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise, including, without limitation, the Intercreditor Agreement or the Subordinated Notes Indenture.  Pursuant to section 510 of the Bankruptcy Code, the Debtors or Reorganized Debtors reserve the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THE PLAN

A.        *Restructuring Transactions*

On the Effective Date, or as soon as reasonably practicable thereafter, the Reorganized Debtors may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Restructuring Support Agreement and the Plan (the "Restructuring Transactions"), including:   (1) the execution and delivery of any appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Plan, and that satisfy the requirements of applicable law and any other terms to which the applicable Entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (3) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law; (4) if implemented pursuant to the Plan, all transactions necessary to provide for the purchase of substantially all of the assets or Interests of any of the Debtors, which purchase may be structured as a taxable transaction for United States federal income tax purposes; (5) the execution and delivery of the Takeback First Lien Term Loan Documents; (6) engaging an agent under the Warrant Agreement; and (7) all other actions that the

applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

B.     *Sources of Consideration for Plan Distributions*

The Reorganized Debtors shall fund distributions under the Plan as follows:

1.     Cash on Hand

The Reorganized Debtors shall use Cash on hand to fund distributions to certain Holders of Claims against the Debtors in accordance with Article III of the Plan.

2.     Issuance and Distribution of New Common Stock and Warrants

The issuance of the New Common Stock, including the shares of the New Common Stock, the Warrants, and the shares of the New Common Stock issuable upon exercise of the Warrants, shall be authorized without the need for any further corporate action and without any further action by the Holders of Claims or Interests.  Each holder of the New Common Stock shall be deemed to be a party to, and bound by, the New Stockholders Agreement regardless of whether such holder has executed a signature page thereto.

All of the shares of New Common Stock issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable.  Each distribution and issuance of the New Common Stock under the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

On the Effective Date, none of the New Common Stock or Warrants will be registered under the Securities Act or listed on a national securities exchange, the Reorganized Debtors will not be reporting companies under the Securities Exchange Act, the Reorganized Debtors shall not be required to and will not file reports with the Securities and Exchange Commission or any other entity or party, and the Reorganized Debtors shall not be required to file monthly operating reports with the Bankruptcy Court after the Effective Date.  In order to prevent the Reorganized Debtors from becoming subject to the reporting requirements of the Securities Exchange Act, except in connection with a public offering, the New Stockholders Agreement may impose certain trading restrictions, and the New Common Stock and Warrants will be subject to certain transfer and other restrictions pursuant to the New Stockholders Agreement designed to maintain the Reorganized Debtors as private, non-reporting companies.

Notwithstanding anything to the contrary herein, solely with respect to the distribution of Warrants pursuant to Article III.B.7.c.ii hereof, in the event the Debtors determine that the number of Holders receiving Warrants is such that the Debtors reasonably believe that there is a risk that the Reorganized Parent could be required to be (a) a reporting company under the Securities Exchange Act, or (b) registered on any public exchange, the Debtors, with the prior consent of the Required Silo-Level Supporting Lenders, are authorized to, in lieu of distributing Warrants pursuant to Article III.B.7.c.ii hereof, either (x) distribute the Alternative Distribution directly to the Holder entitled to the lowest number of Warrants, and continuing such cash-out with respect to the Holder entitled to the next lowest number of Warrants or (y) issue such Warrants to a trust and provide for liquidation of such Warrants and distribution of the proceeds thereof), in each case to the extent necessary or appropriate to ensure Reorganized Parent will not be required to be a reporting company under the Securities Exchange Act or registered on any public exchange; *provided* that, notwithstanding the foregoing, the Supporting Noteholders shall in any event receive Warrants directly rather than Cash as contemplated by this paragraph.

3.     Takeback First Lien Term Loan

The Reorganized Debtors shall enter into the Takeback First Lien Term Loan on the Effective Date.  Each Term Loan Lender shall receive its share of the loans under the Takeback First Lien Term Loan pursuant to Article III.B.  The Takeback First Lien Term Loan shall be on terms set forth in the Takeback First Lien Loan Documents, in an amount equal to $600 million on the Effective Date.

Confirmation shall be deemed approval of the Takeback First Lien Term Loan (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees paid by the Debtors or the Reorganized Debtors in connection therewith), to the extent not approved by the Court previously, and the Reorganized Debtors are authorized to execute and deliver those documents necessary or appropriate to obtain the Takeback First Lien Term Loan, including the Takeback First Lien Term Loan Documents, without further notice to or order of the Court, act or action under applicable law, regulation, order, or rule or vote, consent, authorization, or approval of any Person, subject to such modifications as the Reorganized Debtors may deem to be necessary to consummate the Takeback First Lien Term Loan (in consultation with the Takeback First Lien Administrative Agent and the Required Supporting Lenders).

On the Effective Date, (a) upon the granting of liens in accordance with the Takeback First Lien Term Loan Documents, the lenders thereunder shall have valid, binding, and enforceable liens on the collateral specified in the Takeback First Lien Term Loan Documents and (b) upon the granting of guarantees, mortgages, pledges, liens, and other security interests in accordance with the Takeback First Lien Term Loan Documents, the guarantees, mortgages, pledges, liens, and other security interests granted to secure the obligations arising under the Takeback First Lien Term Loan Documents shall be granted in good faith as an inducement to the lenders thereunder to convert to term loans thereunder and shall be deemed not to constitute a fraudulent conveyance or fraudulent transfer, shall not otherwise be subject to avoidance, and the priorities of such liens and security interests shall be as set forth in the Takeback First Lien Term Loan Documents.

C.    *Corporate Existence*

Except as otherwise provided in the Plan, the New Organizational Documents, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, each Debtor shall continue to exist after the Effective Date as a separate corporation, limited liability company, partnership, or other form of entity, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form of entity, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and by-laws (or other analogous formation documents) in effect before the Effective Date, except to the extent such certificate of incorporation and bylaws (or other analogous formation documents) are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).

On the Effective Date, pursuant to section 1123(a)(5)(C) of the Bankruptcy Code and applicable state law, and as described in the Plan Supplement, the Debtors shall effectuate the merger or consolidation of one or more of the Debtors with one or more Entities.

D.    *Vesting of Assets in the Reorganized Debtors*

Except as otherwise provided in the Restructuring Support Agreement or the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, all property in each Estate, all Causes of Action, all Executory Contracts and Unexpired Leases assumed by any of the Debtors, and any property acquired by any of the Debtors, including Interests held by the Debtors in Non-Debtor Subsidiaries, pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances.  On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property, and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

E.    *Cancellation of Existing Securities*

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date: (1) the obligations of the Debtors under the Dex East Credit Agreement, the Dex West Credit Agreement, the RDHI Credit Agreement, the SuperMedia Credit Agreement, and the Subordinated Notes Indenture, and any other certificate, share, note, bond, indenture, purchase right, option,

warrant, or other instrument or document, directly or indirectly, evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Interest (except such certificates, notes, or other instruments or documents evidencing indebtedness or obligations of the Debtors that are specifically Reinstated pursuant to the Plan) shall be cancelled solely as to the Debtors and the Reorganized Debtors shall not have any continuing obligations thereunder; and (2) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors (except such agreements, certificates, notes, or other instruments evidencing indebtedness or obligations of the Debtors that are specifically Reinstated pursuant to the Plan) shall be released and discharged; *provided* that notwithstanding Confirmation or the occurrence of the Effective Date, any such indenture or agreement that governs the rights of the Holder of a Claim or Interest shall continue in effect solely for purposes of (a) enabling Holders of Allowed Claims and Allowed Interests to receive distributions under the Plan as provided herein and for a Servicer to perform such other necessary functions with respect thereto, if any, (b) permitting a Servicer to seek compensation and reimbursement for any reasonable and documented fees and expenses, if any, incurred in making distributions pursuant to the Plan, and (c) preserving all rights and obligations not released pursuant to Article VIII.F of the Plan as between non-Debtor Entities bound thereunder (including any indemnity obligations that a Holder of a Claim or Interest may owe to another Holder); *provided, further,* that the preceding proviso shall not affect the discharge of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan or result in any expense or liability to the Reorganized Debtors, except to the extent set forth in or provided for under this Plan; *provided, further,* that nothing in this section shall effect a cancellation of any New Common Stock, the Warrants, or, to the extent Reinstated, the Intercompany Interests.

On and after the Effective Date, all duties and responsibilities of the Dex East Administrative Agent under the Dex East Credit Agreement, the Dex West Administrative Agent under the Dex West Credit Agreement, the RHDI Administrative Agent under the RHDI Credit Agreement, the SuperMedia Administrative Agent under the SuperMedia Credit Agreement, and the Subordinated Notes Indenture Trustee under the Subordinated Notes Indenture, as applicable, shall be discharged unless otherwise specifically set forth in or provided for under the Plan or the Plan Supplement.

If the record holder of the Subordinated Notes is DTC or its nominee or another securities depository or custodian thereof, and such Subordinated Notes are represented by a global security held by or on behalf of DTC or such other securities depository or custodian, then each such holder of the Subordinated Notes shall be deemed to have surrendered such holder's note, debenture or other evidence of indebtedness upon surrender of such global security by DTC or such other securities depository or custodian thereof.

F.    *Corporate Action*

Upon the Effective Date, or as soon thereafter as is reasonably practicable, all actions contemplated by the Plan shall be deemed authorized and approved by the Court in all respects, including, as applicable: (1) the issuance of the New Common Stock and the Warrants; (2) the selection of the directors and officers for Reorganized Parent and the other Reorganized Debtors; (3) execution and delivery of the Takeback First Lien Term Loan Documents; (4) adoption of the Management Incentive Plan by the New Board of the Reorganized Parent; (5) implementation of the Restructuring Transactions; and (6) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date). Upon the Effective Date, all matters provided for in the Plan involving the corporate structure of Reorganized Parent and the other Reorganized Debtors, and any corporate action required by the Debtors, Reorganized Parent, or the other Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors, or officers of the Debtors, Reorganized Parent, or the other Reorganized Debtors. On or (as applicable) before the Effective Date, the appropriate officers of the Debtors, Reorganized Parent, or the other Reorganized Debtors shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of Reorganized Parent and the other Reorganized Debtors, including the Takeback First Lien Term Loan Documents and any and all other agreements, documents, securities, and instruments relating to the foregoing, to the extent not previously authorized by the Court. The authorizations and approvals contemplated by this Article IV.F shall be effective notwithstanding any requirements under non-bankruptcy law.

G.      *New Organizational Documents*

To the extent required under the Plan or applicable nonbankruptcy law, on the Effective Date Reorganized Parent will file the New Organizational Documents with the applicable Secretary of State and/or other applicable authorities in the state, province, or country of incorporation in accordance with the corporate laws of the respective state, province, or country of incorporation.  Pursuant to section 1123(a)(6) of the Bankruptcy Code, the New Organizational Documents of Reorganized Parent will prohibit the issuance of non-voting equity securities.  After the Effective Date, Reorganized Parent may amend and restate the New Organizational Documents, and the Reorganized Debtors may file their respective certificates or articles of incorporation, bylaws, or such other applicable formation documents, and other constituent documents as permitted by the laws of the respective states, provinces, or countries of incorporation and the New Organizational Documents.

H.      *Directors and Officers of the Reorganized Debtors*

As of the Effective Date, the term of the current members of the board of directors of Parent shall expire, and the initial board of directors shall be appointed in accordance with the New Organizational Documents and other constituent documents of Reorganized Parent.  The initial New Board of Reorganized Parent shall be selected in a manner consistent with the provisions of the New Stockholders Agreement Term Sheet and shall consist of those individuals disclosed prior to the Confirmation Hearing as part of the Plan Supplement.  Successors will be elected in accordance with the New Organizational Documents of Reorganized Parent.

As of the Effective Date, the initial officers of the Reorganized Debtors will be the officers of the Debtors existing immediately prior to the Effective Date and the existing directors of the Reorganized Debtors, other than Reorganized Parent, will be the directors of such Debtors existing immediately prior to the Effective Date.

Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors will, to the extent practicable, disclose in advance of the Confirmation Hearing the identity and affiliations of any Person proposed to serve on the initial New Boards, as well as those Persons that will serve as an officer of Reorganized Parent or any of the Reorganized Debtors.  To the extent any such director or officer is an "insider" under the Bankruptcy Code, the nature of any compensation to be paid to such director or officer will also be disclosed.  Each such director and officer shall serve from and after the Effective Date pursuant to the terms of the New Organizational Documents and other constituent documents of Reorganized Parent and the Reorganized Debtors.

I.      *Effectuating Documents; Further Transactions*

On and after the Effective Date, Reorganized Parent, the Reorganized Debtors, and the officers and members of the New Boards thereof, are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the Securities issued pursuant to the Plan, including the New Common Stock and the Warrants, in the name of and on behalf of Reorganized Parent or the Reorganized Debtors, without the need for any approvals, authorization, or consents except those expressly required pursuant to the Plan.

J.      *Exemption from Certain Taxes and Fees*

To the maximum extent permitted pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, sale or use tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents pursuant to such transfers of property without the payment of any such tax, recordation fee, or governmental assessment.

K.      *Preservation of Causes of Action*

In accordance with section 1123(b) of the Bankruptcy Code, but subject in all respects to Article IV.L and Article VIII hereof, and as otherwise set forth in the Restructuring Support Agreement or any other order of the Court, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and such rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Causes of Action against it as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action against it. The Debtors or the Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Restructuring Support Agreement or the Plan, Confirmation Order, or other Court order, the Debtors or Reorganized Debtors, as applicable, expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

In accordance with section 1123(b)(3) of the Bankruptcy Code, except as otherwise provided herein, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors.  The applicable Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action.  The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Court.

L.      *Release of Avoidance Actions*

On the Effective Date, and except to the extent otherwise reserved in the Plan Supplement, the Debtors, on behalf of themselves and their estates, shall release any and all Avoidance Actions and the Debtors and the Reorganized Debtors, and any of their successors or assigns and any Entity acting on behalf of the Debtors or the Reorganized Debtors, shall be deemed to have waived the right to pursue any and all Avoidance Actions.  No Avoidance Actions shall revert to creditors of the Debtors.

M.      *Director and Officer Liability Insurance*

To the extent that the D&O Liability Insurance Policies are considered to be Executory Contracts, notwithstanding anything in the Plan to the contrary, effective as of the Effective Date, the Reorganized Debtors shall be deemed to have assumed all unexpired D&O Liability Insurance Policies with respect to the Debtors' directors, managers, officers, and employees serving on or prior to the Petition Date pursuant to section 365(a) of the Bankruptcy Code.  Entry of the Confirmation Order will constitute the Court's approval of the Reorganized Debtors' assumption of each of the unexpired D&O Liability Insurance Policies.  Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Reorganized Debtors under the Plan as to which no Proof of Claim need be filed.

Before the Petition Date, the Debtors obtained reasonably sufficient tail coverage (i.e., director, manager, and officer insurance coverage that extends beyond the end of the policy period) under a D&O Liability Insurance Policy for the current and former directors, officers, and managers.  After the Effective Date, the Reorganized Debtors shall not terminate or otherwise reduce the coverage under any D&O Liability Insurance Policy (including such tail coverage liability insurance) in effect and all members, managers, directors, and officers of the Debtors who served in such capacity at any time prior to the Effective Date of the Plan shall be entitled to the full benefits of

any such policy for the full term of such policy regardless of whether such members, managers, directors, and/or officers remain in such positions after the Effective Date of the Plan.

N.    *Management Incentive Plan*

On the Effective Date, equity grants equal to 10 percent of the New Common Stock (on a fully diluted basis) shall be reserved for continuing directors, officers, and employees of the Reorganized Debtors, on terms to be negotiated with certain material terms included in the Plan Supplement.  The form and timing of Management Incentive Plan grants will be determined by the compensation committee of the New Board of the Reorganized Parent.

O.    *Employee and Retiree Benefits*

All employment, severance, retirement, indemnification, and other similar employee-related agreements or arrangements in place as of the Effective Date with the Debtors and the Non-Debtor Subsidiaries, including retirement income plans and welfare benefit plans, or discretionary bonus plans or variable incentive plans regarding payment of a percentage of annual salary based on performance goals and financial targets for certain employees, shall be assumed by the Reorganized Debtors and shall remain in place after the Effective Date in accordance with the terms of such agreements or arrangements, as may be amended by agreement between the beneficiaries of such agreements, plans, or arrangements, on the one hand, and the Debtors (with the consent of the Required Supporting Lenders), on the other hand, or, after the Effective Date, by agreement with the Reorganized Debtors, and the Reorganized Debtors will continue to honor such agreements, arrangements, programs, and plans; *provided* that the foregoing shall not apply to the Debtors' Value Creation Program or any of the Debtors' existing equity-based compensation, agreements, or arrangements, which, for the avoidance of doubt, shall be cancelled as of the Effective Date.  Nothing in the Plan shall limit, diminish, or otherwise alter the Reorganized Debtors' defenses, claims, Causes of Action, or other rights with respect to any such contracts, agreements, policies, programs, and plans. Notwithstanding the foregoing, pursuant to section 1129(a)(13) of the Bankruptcy Code, on and after the Effective Date, all retiree benefits (as that term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.    *Assumption and Rejection of Executory Contracts and Unexpired Leases*

On the Effective Date, except as otherwise provided herein, all Executory Contracts or Unexpired Leases not otherwise assumed or rejected will be deemed assumed by the applicable Reorganized Debtor in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than:  (1) those that are identified on the Schedule of Rejected Executory Contracts and Unexpired Leases; (2) those that have been previously rejected by a Final Order; (3) those that are the subject of a motion to reject Executory Contracts or Unexpired Leases that is pending on the Confirmation Date; or (4) those that are subject to a motion to reject an Executory Contract or Unexpired Lease pursuant to which the requested effective date of such rejection is after the Effective Date.

Entry of the Confirmation Order shall constitute a Court order approving the assumptions, assumptions and assignments, or rejections of such Executory Contracts or Unexpired Leases as set forth in the Plan or the Schedule of Rejected Executory Contracts and Unexpired Leases, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Unless otherwise indicated, assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date.  Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Court order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by the provisions of the Plan or any order of the Court authorizing and providing for its assumption under applicable federal law.  Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by a Final Order of the Court on or after the Effective Date.

B.      *Claims Based on Rejection of Executory Contracts or Unexpired Leases*

Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be filed with the Court within 30 days after the date of entry of an order of the Court (including the Confirmation Order) approving such rejection.  **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed within such time will be automatically Disallowed, forever barred from assertion, and shall not be enforceable against, as applicable, the Debtors, the Reorganized Debtors, the Estates, or property of the foregoing parties, without the need for any objection by the Debtors or the Reorganized Debtors, as applicable, or further notice to, or action, order, or approval of the Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.**  Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III.B.8 of the Plan.

C.      *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases*

Any monetary defaults under an Executory Contract or Unexpired Lease shall be deemed cured, and all pecuniary losses relating to any defaults (monetary or nonmonetary) shall be deemed compensated, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the proposed cure amount set forth on the Cure Notice amount in Cash on the Effective Date or as soon as reasonably practicable thereafter, subject to the limitations described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.  In the event of a dispute regarding (1) the amount of any Cure Claim, (2) the ability of the Reorganized Debtors or any assignee, to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption or the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order or Final Orders resolving the dispute and approving the assumption.

At least 14 days before the Confirmation Hearing, the Debtors shall distribute, or cause to be distributed, Cure Notices of proposed assumption and proposed amounts of Cure Claims to the applicable third parties. Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or related cure amount must be Filed, served and actually received by the Debtors at least seven days before the Confirmation Hearing.  Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or cure amount will be deemed to have assented to such assumption or cure amount.  Notwithstanding anything herein to the contrary, in the event that any Executory Contract or Unexpired Lease is removed from the Schedule of Rejected Executory Contracts and Unexpired Leases after such 14-day deadline, a Cure Notice of proposed assumption and proposed amounts of Cure Claims with respect to such Executory Contract or Unexpired Lease will be sent promptly to the counterparty thereof and a noticed hearing set to consider whether such Executory Contract or Unexpired Lease can be assumed.

In any case, if the Court determines that the Allowed Cure Claim with respect to any Executory Contract or Unexpired Lease is greater than the amount set forth in the applicable Cure Notice, the Debtors or Reorganized Debtors, as applicable, will have the right to add such Executory Contract or Unexpired Lease to the Schedule of Rejected Executory Contracts and Unexpired Leases, in which case such Executory Contract or Unexpired Lease will be deemed rejected as the Effective Date.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the date that the Debtors assume such Executory Contract or Unexpired Lease.  Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Court.

D.      *Indemnification Obligations*

Notwithstanding anything in the Plan to the contrary (but subject to Article III.B.9 of the Plan), each Indemnification Obligation shall be assumed by the applicable Debtor, effective as of the Effective Date, pursuant to sections 365 and 1123 of the Bankruptcy Code or otherwise.  Each Indemnification Obligation shall remain in full force and effect, shall not be modified, reduced, discharged, impaired, or otherwise affected in any way, and shall survive Unimpaired and unaffected, irrespective of when such obligation arose.

The Debtors shall assume the Indemnification Obligations for the current and former directors, officers, managers, employees, and other professionals of the Debtors, in their capacities as such.  Notwithstanding the foregoing, nothing shall impair the ability of Reorganized Debtors to modify indemnification obligations (whether in the bylaws, certificates or incorporate or formation, limited liability company agreements, other organizational or formation documents, board resolutions, indemnification agreements, employment contracts, or otherwise) arising after the Effective Date; *provided* that none of the Reorganized Debtors shall amend or restate any New Organizational Documents before or after the Effective Date to terminate or adversely affect any of the Reorganized Debtors' Indemnification Obligations.

E.      *Insurance Policies*

Without limiting Article IV.M, all of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as and deemed to be Executory Contracts under the Plan.  On the Effective Date, the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments related thereto.

F.      *Restructuring Support Agreement*

The Restructuring Support Agreement is treated as and deemed to be an Executory Contract under the Plan.  Unless otherwise previously assumed by the Debtors, on the Effective Date, the Restructuring Support Agreement shall be deemed assumed by the Debtors and any defaults thereunder shall be cured prior to the Effective Date, unless otherwise waived by the Required Supporting Lenders or the Required Silo-Level Supporting Lenders, as applicable.

G.      *Modifications, Amendments, Supplements, Restatements, or Other Agreements*

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, and supplements to, or restatements of, prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

H.      *Reservation of Rights*

Neither the inclusion of any Executory Contract or Unexpired Lease on Schedule G of the Debtors' Schedules of Assets and Liabilities, the Cure Notice, or the Schedule of Rejected Executory Contracts and Unexpired Leases, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors, or, after the Effective Date, the Reorganized Debtors, shall have 30 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

I.       *Nonoccurrence of Effective Date*

In the event that the Effective Date does not occur, the Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases of nonresidential real property pursuant to section 365(d)(4) of the Bankruptcy Code.

J.       *Contracts and Leases Entered into After the Petition Date*

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the applicable Debtor or Reorganized Debtor liable thereunder in the ordinary course of its business. Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) that have not been rejected as of the date of Confirmation will survive and remain unaffected by entry of the Confirmation Order.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

A.       *Timing and Calculation of Amounts to Be Distributed*

Unless otherwise provided in the Plan, on the Effective Date or as soon as reasonably practicable thereafter (or, if a Claim is not an Allowed Claim on the Effective Date, on the date that such Claim becomes Allowed or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim shall receive the full amount of the distributions that the Plan provides for Allowed Claims in each applicable Class. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VII of the Plan. Except as otherwise provided in the Plan, Holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

On the Effective Date, or as soon as reasonably practicable thereafter, the Reorganized Debtors shall distribute the New Common Stock pursuant to the terms set forth in the Plan.

B.       *Distributions to Be Made Under the Plan*

Except as otherwise provided in the Plan, all distributions made under the Plan shall be made by the Reorganized Debtors on the Effective Date or as soon as reasonably practicable thereafter, except that distributions to Holders of Allowed Claims governed by a separate agreement and administered by a Servicer shall be deposited with the appropriate Servicer, at which time such distributions shall be deemed complete, and the Servicer shall deliver such distributions in accordance with the Plan and the terms of the governing agreement; *provided* that New Common Stock shall be distributed by a third-party transfer agent designated by the Debtors. Distributions to Holders of Dex East Credit Facility Claims, Dex West Credit Facility Claims, RHDI Credit Facility Claims, and SuperMedia Credit Facility Claims shall only be made to the Holders as of the Distribution Record Date, as determined by the register of the applicable Credit Agreement Agent.

The Reorganized Debtors and any Servicer, to the extent it provides services related to distributions pursuant to the Plan, shall only be required to act and make distributions in accordance with the terms of the Plan and shall have no (x) liability for actions taken in accordance with the Plan or in reliance upon information provided to them in accordance with the Plan, or (y) obligation or liability for distributions under the Plan to any party who does not hold an Allowed Claim as of the Distribution Record Date or who does not otherwise comply with the terms of the Plan.

To the extent a Servicer provides services related to distributions pursuant to the Plan, it shall be entitled to reasonable and customary compensation from the Reorganization Debtors for such services and reimbursement for reasonable and customary expenses incurred in connection with such services.

C.    *Distributions Transferred Pursuant to the Equity Put Option*

Subject to the satisfaction or waiver by the Backstop Parties of the Alternative Distribution Conditions, each Term Loan Lender may elect to receive in lieu of all or any portion of the New Common Stock to which such Lender is entitled pursuant to Article III.B loans under the Takeback First Lien Term Loan that would otherwise be distributable to the Backstop Parties in an aggregate principal amount per share of New Common Stock based on a total equity valuation of the Reorganized Debtors of $50 million, as more fully described in the Disclosure Statement and the Backstop Agreement.

D.    *Delivery of Distributions and Undeliverable or Unclaimed Distributions*

1.    Delivery of Distributions

a.    Delivery of Distributions to the Dex East Administrative Agent

Except as otherwise provided in the Plan, all distributions to Holders of Dex East Credit Facility Claims shall be governed by the Dex East Credit Agreement and shall be deemed completed when made to the Dex East Administrative Agent, which shall be deemed to be the Holder of all Dex East Credit Facility Claims for purposes of distributions to be made hereunder.  The Dex East Administrative Agent shall hold or direct such distributions for the benefit of the Holders of Allowed Dex East Credit Facility Claims, as applicable.  As soon as practicable in accordance with the requirements set forth in this Article VI, the Dex East Administrative Agent shall arrange to deliver such distributions to or on behalf of such Holders of Allowed Dex East Credit Facility Claims.

b.    Delivery of Distributions to the Dex West Administrative Agent

Except as otherwise provided in the Plan, all distributions to Holders of Dex West Credit Facility Claims shall be governed by the Dex West Credit Agreement and shall be deemed completed when made to the Dex West Administrative Agent, which shall be deemed to be the Holder of all Dex West Credit Facility Claims for purposes of distributions to be made hereunder.  The Dex West Administrative Agent shall hold or direct such distributions for the benefit of the Holders of Allowed Dex West Credit Facility Claims, as applicable.  As soon as practicable in accordance with the requirements set forth in this Article VI, the Dex West Administrative Agent shall arrange to deliver such distributions to or on behalf of such Holders of Allowed Dex West Credit Facility Claims.

c.    Delivery of Distributions to the RHDI Administrative Agent

Except as otherwise provided in the Plan, all distributions to Holders of RHDI Credit Facility Claims shall be governed by the RHDI Credit Agreement and shall be deemed completed when made to the RHDI Administrative Agent, which shall be deemed to be the Holder of all RHDI Credit Facility Claims for purposes of distributions to be made hereunder.  The RHDI Administrative Agent shall hold or direct such distributions for the benefit of the Holders of Allowed RHDI Credit Facility Claims, as applicable.  As soon as practicable in accordance with the requirements set forth in this Article VI, the RHDI Administrative Agent shall arrange to deliver such distributions to or on behalf of such Holders of Allowed RHDI Credit Facility Claims.

d.    Delivery of Distributions to the SuperMedia Administrative Agent

Except as otherwise provided in the Plan, all distributions to Holders of SuperMedia Credit Facility Claims shall be governed by the SuperMedia Credit Agreement and shall be deemed completed when made to the SuperMedia Administrative Agent, which shall be deemed to be the Holder of all SuperMedia Credit Facility Claims for purposes of distributions to be made hereunder.  The SuperMedia Administrative Agent shall hold or direct such distributions for the benefit of the Holders of Allowed SuperMedia Credit Facility Claims, as applicable.  As soon as practicable in accordance with the requirements set forth in this Article VI, the SuperMedia Administrative Agent

shall arrange to deliver such distributions to or on behalf of such Holders of Allowed SuperMedia Credit Facility Claims.

e.    Delivery of Distributions to Subordinated Notes Indenture Trustee

Except as otherwise provided in the Plan, all distributions to Holders of Subordinated Notes Claims shall be deemed completed when made to the Subordinated Notes Indenture Trustee, which shall be deemed to be the Holder of all Subordinated Notes Claims for purposes of distributions to be made hereunder.  The Subordinated Notes Indenture Trustee shall hold or direct such distributions for the benefit of the Holders of Allowed Subordinated Notes Claims, as applicable.  As soon as practicable in accordance with the requirements set forth in this Article VI, the Subordinated Notes Indenture Trustee shall arrange to deliver such distributions to or on behalf of such Holders of Allowed Subordinated Notes Claims.

f.    Delivery of Distributions in General

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims (other than Holders of Credit Agreement Claims or Subordinated Notes Claims) or Interests shall be made to Holders of record as of the Distribution Record Date by the Reorganized Debtors or a Servicer, as appropriate:  (1) to the signatory set forth on any of the Proofs of Claim Filed by such Holder or other representative identified therein (or at the last known addresses of such Holder if no Proof of Claim is Filed or if the Debtors have been notified in writing of a change of address on or before the date that is 10 days before the Effective Date); (2) at the addresses set forth in any written notices of address changes delivered to the Reorganized Debtors after the date of any related Proof of Claim; (3) at the addresses reflected in the Schedules if no Proof of Claim has been Filed and the Reorganized Debtors have not received a written notice of a change of address on or before the date that is 10 days before the Effective Date; or (4) on any counsel that has appeared in the Chapter 11 Cases on the Holder's behalf.  Subject to this Article VI, distributions under the Plan on account of Allowed Claims shall not be subject to levy, garnishment, attachment, or like legal process, so that each Holder of an Allowed Claim shall have and receive the benefit of the distributions in the manner set forth in the Plan.  The Debtors, the Reorganized Debtors, or any Servicer making distributions shall not incur any liability whatsoever on account of any distributions under the Plan except for gross negligence or willful misconduct.

2.    Minimum Distributions

No fractional shares of New Common Stock or Warrants shall be distributed, and no Cash shall be distributed in lieu of such fractional amounts.  When any distribution pursuant to the Plan on account of an Allowed Claim would otherwise result in the issuance of Cash or a number of shares of New Common Stock or Warrants that is not a whole number, the actual distribution of shares of Cash, New Common Stock, or Warrants, as applicable, shall be rounded as follows: (a) fractions of one-half or greater shall be rounded to the next higher whole number and (b) fractions of less than one-half shall be rounded to the next lower whole number with no further payment therefore.  The total amount of Cash and the total number of authorized shares of New Common Stock and Warrants to be distributed pursuant to the Plan shall be adjusted as necessary to account for the foregoing rounding.

3.    Undeliverable Distributions and Unclaimed Property

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Reorganized Debtors have determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; *provided* that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the Effective Date.  After such date, all unclaimed property or interests in property shall be redistributed Pro Rata as provided under the Plan (it being understood that, for purposes of this Article VI.D.3, "Pro Rata" shall be determined as if the Claim underlying such unclaimed distribution had been Disallowed) and all other unclaimed property or interests in property shall revert to the Reorganized Debtors without need for a further order by the Court (notwithstanding any applicable federal, provincial, or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such property or Interest in property shall be discharged and forever barred.

E.      *Warrants*

As described in Article III.B.7 above, the Holders of Subordinated Notes Claims on the Effective Date (immediately prior to the consummation of the Plan) may receive the Warrants from the Reorganized Debtors on the Effective Date.  The Warrants may be subject to certain transfer, exercise and other restrictions and appropriate legends pursuant to, among other things, the Warrant Agreement.  Notwithstanding anything to the contrary in the Plan, in no event shall the terms of the Warrants cause Reorganized Parent to be required by the Securities Act or the Exchange Act, including without limitation Section 12(g) or 15(d) of the Exchange Act, or any other federal, state or local securities laws, to register with the SEC or other similar regulatory authority any class of equity securities of Parent or to file periodic reports under Section 13 or 15(d) of the Exchange Act.  The Warrant Agreement shall contain transfer, exercise and other restrictions and appropriate legends and consistent with the Noteholder Term Sheet to ensure that the terms of the Warrants and the Warrant Agreement do not result in such registration or reporting requirements on the part of Reorganized Parent.

F.      *Securities Registration Exemption*

Pursuant to section 1145 of the Bankruptcy Code, the issuances of the New Common Stock, the Warrants, and the shares of the New Common Stock issuable upon exercise of the Warrants as contemplated by the Plan are exempt from, among other things, the registration requirements of Section 5 of the Securities Act and any other applicable U.S. state or local law requiring registration prior to the offering, issuance, distribution, or sale of Securities.  The New Common Stock and the Warrants (a) are not "restricted securities" as defined in Rule 144(a)(3) under the Securities Act, and (b) are freely tradable and transferable by any initial recipient thereof that (i) is not an "affiliate" of the Reorganized Debtors as defined in Rule 144(a)(1) under the Securities Act, (ii) has not been such an "affiliate" within 90 days of such transfer, and (iii) is not an entity that is an "underwriter" as defined in subsection (b) of Section 1145 of Title 11 of the United States Code.

Should the Reorganized Debtors elect on or after the Effective Date to reflect any ownership of the New Common Stock or the Warrants through the facilities of the DTC, the Reorganized Debtors need not provide any further evidence other than the Plan or the Confirmation Order with respect to the treatment of the New Common Stock or the Warrants or under applicable securities laws.

The DTC shall be required to accept and conclusively rely upon the Plan and Confirmation Order in lieu of a legal opinion regarding whether the New Common Stock or the Warrants are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

Notwithstanding anything to the contrary in the Plan, no entity (including, for the avoidance of doubt, the DTC) may require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the New Common Stock or the Warrants are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

G.      *Compliance with Tax Requirements*

In connection with the Plan, to the extent applicable, Reorganized Parent and the Reorganized Debtors, as applicable, shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors, as applicable, shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions or establishing any other mechanisms they believe are reasonable and appropriate.  The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

H.      *Allocations*

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest as Allowed herein.

I.      *No Postpetition Interest on Claims*

Unless otherwise specifically provided for in an order of the Court, the Plan, or the Confirmation Order, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claims or Interests and no Holder of a Claim or Interest shall be entitled to interest accruing on or after the Petition Date on any such Claim.

J.      *Setoffs and Recoupment*

Except as otherwise expressly provided herein, the Debtors or the Reorganized Debtors, as applicable, may, but shall not be required to, setoff against or recoup from any Claims of any nature whatsoever that the Debtors or the Reorganized Debtors may have against the claimant, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any such Claim it may have against the Holder of such Claim.

K.      *Claims Paid or Payable by Third Parties*

1.      Claims Paid by Third Parties

The Debtors or the Reorganized Debtors, as applicable, shall reduce in full a Claim, and such Claim shall be Disallowed without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or a Reorganized Debtor; *provided* that the Debtors shall provide 21 days' notice to the Holder prior to any disallowance of such Claim during which period the Holder may object to such disallowance, and if the parties cannot reach an agreed resolution, the matter shall be decided by the Court.  Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such Holder shall, within 14 days of receipt thereof, repay or return the distribution to the Reorganized Debtors to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.  The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the Reorganized Debtors annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the 14-day grace period specified above until the amount is repaid.

2.      Claims Payable by Third Parties

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.  To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Court; *provided* that the Debtors shall provide 21 days' notice to the Holder of such Claim prior to any disallowance of such Claim during which period the Holder may object to such disallowance, and if the parties cannot reach an agreed resolution, the matter shall be decided by the Court.

3.      Applicability of Insurance Policies

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

## ARTICLE VII.
## PROCEDURES FOR RESOLVING CONTINGENT,
## UNLIQUIDATED, AND DISPUTED CLAIMS

A.      *Allowance of Claims*

After the Effective Date, each of the Debtors or the Reorganized Debtors shall have and retain any and all rights and defenses such Debtor had with respect to any Claim immediately before the Effective Date.  Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed pursuant to the Plan or a Final Order, including the Confirmation Order (when it becomes a Final Order), allowing such Claim.

B.      *Claims and Interests Administration Responsibilities*

Except as otherwise specifically provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, after the Effective Date, the Reorganized Debtors by order of the Court, shall have the sole authority: (1) to File, withdraw, or litigate to judgment objections to Claims; (2) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Court.

C.      *Estimation of Claims*

Before or after the Effective Date, the Debtors or the Reorganized Debtors may (but are not required to) at any time request that the Court estimate any Disputed Claim or Disputed Interest that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Court has ruled on any such objection, and the Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to any Claim or during the appeal relating to such objection.  Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register, but that has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Court.  In the event that the Court estimates any Disputed, contingent, or unliquidated Claim, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions), and the relevant Debtor may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim.  If the estimated amount constitutes a maximum limitation on such Claim, the Debtors or the Reorganized Debtors, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate distribution on account of such Claim.  Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before 21 days after the date on which such Claim is estimated.  All of the aforementioned Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Court.

D.      *Adjustment to Claims Register Without Objection*

Any Claim that has been paid or satisfied, or any Claim that has been amended or superseded, may be adjusted or expunged on the Claims Register by the Debtors or the Reorganized Debtors without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Court.

E.      *Time to File Objections to Claims*

Any objections to Claims shall be Filed on or before the Claims Objection Deadline.

F.      *Disallowance of Claims*

Any Claims held by Entities from which property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors or the Reorganized Debtors.  All Proofs of Claim Filed on account of an indemnification obligation to a director, officer, or employee shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such indemnification obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order, or approval of the Court.

**Except as provided herein or otherwise agreed, any and all Proofs of Claim filed after the Claims Bar Date shall be deemed Disallowed and expunged as of the Effective Date without any further notice to or action, order, or approval of the Court, and Holders of such Claims may not receive any distributions on account of such Claims, unless on or before the Confirmation Hearing such late Filed Claim has been deemed timely Filed by a Final Order.**

G.      *Amendments to Claims*

On or after the Effective Date, except as provided in the Plan or the Confirmation Order, a Claim may not be Filed or amended without the prior authorization of the Court or the Reorganized Debtors and any such new or amended Claim Filed without such prior authorization shall be deemed Disallowed in full and expunged without any further action, order, or approval of the Court.

H.      *No Distributions Pending Allowance*

If an objection to a Claim or portion thereof is Filed as set forth in Article VII, no payment or distribution provided under the Plan shall be made on account of such Claim or portion thereof unless and until such Disputed Claim becomes an Allowed Claim.

I.      *Distributions After Allowance*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan.  As soon as reasonably practicable after the date that the order or judgment of a court of competent jurisdiction allowing any Disputed Claim becomes a Final Order, the Reorganized Debtors shall provide to the Holder of such Claim the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, less any previous distribution (if any) that was made on account of the undisputed portion of such Claim, without any interest, dividends, or accruals to be paid on account of such Claim unless required under applicable bankruptcy law or as otherwise provided in Article III.B.

J.        *Single Satisfaction of Claims*

Holders of Allowed Claims may assert such Claims against each Debtor obligated with respect to such Claims, and such Claims shall be entitled to share in the recovery provided for the applicable Class of Claims against each obligated Debtor based upon the full Allowed amount of such Claims.  Notwithstanding the foregoing, in no case shall the aggregate value of all property received or retained under the Plan on account of any Allowed Claim exceed 100 percent of the underlying Allowed Claim plus applicable interest, if any.

## ARTICLE VIII.
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.        *Compromise and Settlement of Claims, Interests, and Controversies*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest.  The entry of the Confirmation Order shall constitute the Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable.  In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against, and Interests in, the Debtors and their Estates and Causes of Action against other Entities.

B.        *Discharge of Claims and Termination of Interests*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided  in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any intercompany claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, liens on, obligations of, rights against, and interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (a) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (b) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (c) the Holder of such a Claim or Interest has accepted the Plan.  Any default or "event of default" by the Debtors or Affiliates with respect to any Claim or Interest that existed immediately before or on account of the Filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Effective Date.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring.

C.        Term of Injunctions or Stays

Unless otherwise provided herein or in a Final Order, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 362 of the Bankruptcy Code or otherwise and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

D.    ***Release of Liens***

Except as otherwise specifically provided in the Plan, the Takeback First Lien Term Loan Documents, or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns, in each case, without any further approval or order of the Court and without any action or Filing being required to be made by the Debtors.    In addition, the Dex East Administrative Agent, the Dex West Administrative Agent, the RHDI Administrative Agent, and the SuperMedia Administrative Agent shall execute and deliver all documents reasonably requested by the Debtors, Reorganized Debtors, or administrative agent(s) for the Takeback First Lien Term Loan to evidence the release of such mortgages, deeds of trust, Liens, pledges, and other security interests and shall authorize the Reorganized Debtors to file UCC-3 termination statements (to the extent applicable) with respect thereto.

E.    ***Debtor Release***

Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, on and after the Effective Date, the Released Parties are deemed expressly, unconditionally, generally, and individually and collectively, forever acquitted, released, and discharged by the Debtors, the Reorganized Debtors, and the Estates, each on behalf of itself and its predecessors, successors and assigns, subsidiaries, affiliates, current and former officers, directors, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals, from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative claims asserted or assertable on behalf of the Debtors, any Claims asserted or assertable on behalf of any Holder of any Claim against or Interest in the Debtors and any Claims asserted or assertable on behalf of any other entity, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereinafter arising, in law, equity, contract, tort or otherwise, by statute or otherwise, that such releasing party (whether individually or collectively), ever had, now has or hereafter can, shall or may have, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring efforts, the Debtors' intercompany transactions (including dividends paid), any preference or avoidance claim pursuant to sections 544, 547, 548, and 549 of the Bankruptcy Code, the purchase, sale, or rescission of the purchase or sale of, or any other transaction relating to any security or other debt obligations of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is affected by or classified in the Plan, the business or contractual arrangements between the Debtors and the Released Parties, the restructuring of Claims and Interests before or during the Restructuring Transactions implemented by the Plan or any other transaction or other arrangement with the Debtors whether before or during the Restructuring Transactions, the negotiation, formulation or preparation of the Restructuring Transactions, the Restructuring Support Agreement, the Plan, the Plan Supplement, the Disclosure Statement, the Takeback First Lien Term Loan Documents, or any related agreements, any asset purchase agreement, instruments or other documents (including, for the avoidance of doubt, providing any legal opinion requested by any entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the Plan, the Chapter 11 Cases, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities or other debt obligations pursuant to the Plan, or the distribution of property under the Plan, or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place or arising on or before the Effective Date related or relating to any of the foregoing, except for any act or omission that constitutes actual fraud, gross negligence or willful misconduct as determined by a Final Order of a court of competent jurisdiction; *provided* that nothing in the foregoing shall result in any of the Debtors' officers and directors waiving any indemnification Claims against the Debtors or any of their insurance carriers or any

41

rights as beneficiaries of any insurance policies, which indemnification obligations and insurance policies shall be assumed by the Reorganized Debtors.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, any of the Restructuring Transactions, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

F.        *Third Party Release*

Except as otherwise provided in the Plan, as of the Effective Date and to the fullest extent authorized by applicable law, each Releasing Party expressly, unconditionally, generally and individually and collectively forever releases, acquits, and discharges the Debtors, Reorganized Debtors, and Released Parties from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative Claims asserted or assertable on behalf of the Debtors, any Claims asserted or assertable on behalf of any Holder of any Claim against or Interest in the Debtors and any Claims asserted or assertable on behalf of any other entity, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereinafter arising, in law, equity, contract, tort or otherwise, by statute or otherwise, that such Releasing Party (whether individually or collectively), ever had, now has or hereafter can, shall or may have, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring efforts, the Debtors' intercompany transactions (including dividends paid), any preference or avoidance claim pursuant to sections 544, 547, 548, and 549 of the Bankruptcy Code, the purchase, sale, or rescission of the purchase or sale of any security or other debt obligation of the Debtors, or any other transaction relating to any security or other debt obligation of the Debtors, or any other transaction or other arrangement with the Debtors whether before or during the Restructuring Transactions, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is affected by or classified in the Plan, the business or contractual arrangements between the Debtors and the Released Parties, the restructuring of Claims and Interests before or during the Restructuring Transactions implemented by the Plan, the negotiation, formulation or preparation of the Restructuring Transactions, the Restructuring Support Agreement, the Plan, the Plan Supplement, the Disclosure Statement, the Takeback First Lien Term Loan Documents, or any related agreements, any asset purchase agreement, instruments or other documents (including, for the avoidance of doubt, providing any legal opinion requested by any entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the Plan, the Chapter 11 Cases, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities or other debt obligation pursuant to the Plan, or the distribution of property under the Plan, or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place or arising on or before the Effective Date related or relating to any of the foregoing, except for any act or omission that constitutes actual fraud, gross negligence or willful misconduct as determined by a Final Order of a court of competent jurisdiction; *provided* that nothing in the foregoing shall result in any of the Debtors' officers and directors waiving any indemnification Claims against the Debtors or any of their insurance carriers or any rights as beneficiaries of any insurance policies, which indemnification obligations and insurance policies shall be assumed by the Reorganized Debtors.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, any of the Restructuring Transactions, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any Claims against any professional related to the Prior Tax Calculation; *provided* that, for the avoidance of doubt, the foregoing shall have no effect on any Claims released or enjoined as part of any prior chapter 11 cases (or the relevant confirmation orders therein) of the Debtors or any of the Debtors' predecessors or affiliates.

G.    *Exculpation*

Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any Exculpated Claim; *provided* that the foregoing "Exculpation" shall have no effect on the liability of any entity that results from any such act or omission that is determined by a Final Order to have constituted actual fraud, gross negligence, or willful misconduct.  The Exculpated Parties have participated in any and all activities potentially underlying any Exculpated Claim in good faith and in compliance with the applicable laws.

H.    *Injunction*

Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or Confirmation Order, all Entities who have held, hold, or may hold Claims or Interests that have been released pursuant to Article VIII.E or Article VIII.F of the Plan, discharged pursuant to Article VIII.B of the Plan, or are subject to exculpation pursuant to Article VIII.G of the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Non-Debtor Subsidiaries, the Reorganized Debtors, the Released Parties, or the Exculpated Parties:  (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (c) creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests released or settled pursuant to the Plan.  Notwithstanding anything to the contrary in the foregoing, the injunction does not enjoin any party under the Plan or any document, instrument, or agreement (including those attached to the Disclosure Statement or set forth in the Plan Supplement) executed to implement the Plan from bringing an action to enforce the terms of the Plan or such document, instrument, or agreement (including those attached to the Disclosure Statement or set forth in the Plan Supplement) executed to implement the Plan.

I.    *Protection Against Discriminatory Treatment*

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another Entity with whom the Reorganized Debtors have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

J.    *Recoupment*

In no event shall any Holder of Claims or Interests be entitled to recoup any Claim against any claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

K.      *Subordination Rights.*

Any distributions under the Plan to Holders shall be received and retained free from any obligations to hold or transfer the same to any other Holder and shall not be subject to levy, garnishment, attachment, or other legal process by any Holder by reason of claimed contractual subordination rights. Any such subordination rights shall be waived, and the Confirmation Order shall constitute an injunction enjoining any Entity from enforcing or attempting to enforce any contractual, legal, or equitable subordination rights to property distributed under the Plan, in each case other than as provided in the Plan.

## ARTICLE IX.
## CONDITIONS PRECEDENT TO CONFIRMATION
## AND CONSUMMATION OF THE PLAN

A.      *Limited Severability of the Plan*

The Plan shall apply as a separate Plan for each of the Debtors. For the avoidance of doubt, Parent's Plan is severable from any other Debtor's Plan and the Confirmation and Consummation of any other Debtor's Plan is not conditioned on the Confirmation and Consummation of Parent's Plan.

B.      *Conditions Precedent to the Confirmation Date*

It shall be a condition to Confirmation of the Plan that the following conditions shall have been satisfied (or waived pursuant to the provisions of Article IX.D hereof):

1.      The Confirmation Order shall have been approved by the Court and not stayed, and be in form and substance acceptable to the Debtors and the Required Supporting Lenders;

2.      Each of the Plan, Disclosure Statement, Plan Supplement (including, with respect to any amendments, modifications, supplements and exhibits thereto related to the foregoing), and other Definitive Documents (as such term is defined in the Restructuring Support Agreement and as applicable) shall be consistent with the Restructuring Support Agreement (as applicable) and in form and substance acceptable to the Required Supporting Lenders and shall have been Filed subject to the terms hereof;

3.      The Takeback First Lien Term Loan shall have been approved, as applicable; and

4.      The Confirmation Order shall, among other things:

    a.      authorize the Debtors and the Reorganized Debtors to take all actions necessary or appropriate to enter into, implement, and consummate the contracts, instruments, releases, leases, indentures, and other agreements or documents created in connection with the Plan;

    b.      decree that the provisions of the Confirmation Order and the Plan are nonseverable and mutually dependent;

    c.      authorize the Reorganized Debtors to: (i) issue the New Common Stock and the Warrants pursuant to the exemption from registration under the Securities Act provided by section 1145 of the Bankruptcy Code or other exemption from such registration or pursuant to one or more registration statements; and (ii) enter into any agreements contained in the Plan Supplement (including, without limitation, the Takeback First Lien Term Loan Documents);

    d.      decree that the Confirmation Order shall supersede any Court orders issued prior to the Confirmation Date that may be inconsistent with the Confirmation Order;

    e.        authorize the implementation of the Plan in accordance with its terms; and

    f.        provide that, to the maximum extent permitted pursuant to section 1146 of the Bankruptcy Code, the assignment or surrender of any lease or sublease, and the delivery of any deed or other instrument or transfer order, in furtherance of, or in connection with the Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of assets contemplated under the Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax (including, any mortgages or security interest filing to be recorded or filed in connection with the Takeback First Lien Term Loan Documents).

## C.    *Conditions Precedent to the Effective Date*

It shall be a condition to Consummation of the Plan that the following conditions shall have been satisfied (or waived pursuant to the provisions of Article IX.D hereof):

1.    The Confirmation Order shall have become a Final Order that has not been stayed or modified or vacated on appeal;

2.    The Debtors and the beneficiaries under the Value Creation Program shall have taken all actions necessary to terminate such plan;

3.    The Takeback First Lien Term Loan Documents (which shall be consistent with the Takeback First Lien Term Loan Credit Agreement Term Sheet), as applicable, in form and substance acceptable to the Debtors and the Required Supporting Lenders shall have been executed and delivered by all of the Entities that are parties thereto, and all conditions precedent to the consummation of such Takeback First Lien Term Loan shall have been waived or satisfied in accordance with the terms thereof, and the closing of the Takeback First Lien Term Loan shall have occurred;

4.    The New Organizational Documents shall, if applicable, have been duly filed with the applicable authorities in the relevant jurisdictions;

5.    All governmental or other approvals required to effectuate the terms of this Plan shall have been obtained;

6.    All actions, documents, certificates, and agreements necessary to implement the Plan shall have been effected or executed and delivered to the required parties and, to the extent required, filed with the applicable government units in accordance with applicable law;

7.    The Restructuring Support Agreement shall not have terminated and shall be in full force and effect and shall not be (a) identified on the Schedule of Rejected Executory Contracts and Unexpired Leases or (b) subject of a pending motion to reject Executory Contracts or Unexpired Leases, and the Debtors shall be in compliance therewith; and

8.    The Professional Fee Escrow shall have been established and funded in Cash in accordance with Article II.B.

9.    The Debtors shall have negotiated a new employment agreement with the Chief Executive Officer of Parent on terms acceptable to the Required Supporting Lenders.

## D.    *Waiver of Conditions*

The conditions to Confirmation of the Plan and to the Effective Date of the Plan set forth in this Article IX may be waived only by consent of the Debtors in consultation with the Required Supporting Lenders without notice,

leave, or order of the Court or any formal action other than proceedings to confirm or consummate the Plan, subject to the terms of the Bankruptcy Code and the Bankruptcy Rules.

E.     *Substantial Consummation*

"Substantial Consummation" of the Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

F.     *Effect of Non-Occurrence of Conditions to the Effective Date*

If the Effective Date does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall:  (1) constitute a waiver or release of any Claims by or Claims against or Interests in the Debtors; (2) prejudice in any manner the rights of the Debtors, any Holders of a Claim or Interest or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders, or any other Entity in any respect.

G.     *Fees and Expenses of Credit Agreement Agents, SC Members, and Supporting Noteholders*

On the Effective Date, the Reorganized Debtors shall pay, in full, in Cash, the unpaid reasonable fees, expenses, costs, and other charges of:  (a) the Credit Agreement Agents (including any unpaid cash management fees or expenses (which, for the avoidance of doubt, the Debtors intend to pay in the ordinary course during these Chapter 11 Cases) and the fees and expenses of Simpson Thacher & Bartlett LLP and Richards, Layton & Finger); (b) the SC Members (including the fees and expenses of Milbank, Tweed, Hadley & McCloy LLP, Wachtell, Lipton, Rosen & Katz, Morris, Nichols, Arsht & Tunnell LLP, Houlihan Lokey Capital, Inc., and PJT Partners Inc.); and (c) the Supporting Noteholders (including the fees and expenses of Akin Gump Strauss Hauer & Feld LLP and Ducera Partners up to $500,000 in the aggregate), in each case in accordance with the Cash Collateral Order and the Restructuring Support Agreement, and as required by the underlying credit agreement, indemnity, or fee letter.

### ARTICLE X.
### MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A.     *Modification and Amendments*

Subject to the limitations contained in the Plan, and subject to the terms of the Restructuring Support Agreement, the Debtors, with the consent of the Required Supporting Lenders, reserve the right to modify the Plan and seek Confirmation consistent with the Bankruptcy Code and the Bankruptcy Rules and, as appropriate, not resolicit votes on such modified Plan.  Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, the Debtors expressly reserve their rights to alter, amend, or modify materially the Plan with respect to the Debtors, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.

B.     *Effect of Confirmation on Modifications*

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.     *Revocation or Withdrawal of the Plan*

Subject to the terms of the Restructuring Support Agreement, the Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date.  If the Debtors revoke or withdraw the Plan, or if Confirmation and Consummation does not occur, then:  (1) the Plan shall be null and void in all respects; (2) any settlement or

compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall:  (i) constitute a waiver or release of any Claims or Interests; (ii) prejudice in any manner the rights of the Debtors or any other Entity, including the Holders of Claims or the Non-Debtor Subsidiaries; or (iii) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity, including the Non-Debtor Subsidiaries.

## ARTICLE XI.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Court shall retain jurisdiction over the Chapter 11 Cases and all matters arising out of, or related to, the Chapter 11 Cases and the Plan, including jurisdiction to:

1. Allow, Disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Interests; *provided* that, for the avoidance of doubt, the Court's retention of jurisdiction with respect to such matters shall not preclude the Debtors or the Reorganized Debtors, as applicable, from seeking relief from any other court, tribunal, or other legal forum of competent jurisdiction with respect to such matters;

2. decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3. resolve any matters related to:  (a) the assumption and assignment or rejection of any Executory Contract or Unexpired Lease to which a Debtor is a party or with respect to which a Debtor may be liable in any manner and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Claims related to the rejection of an Executory Contract or Unexpired Lease, Cure Costs pursuant to section 365 of the Bankruptcy Code, or any other matter related to such Executory Contract or Unexpired Lease; (b) the Reorganized Debtors amending, modifying, or supplementing, after the Confirmation Date, pursuant to Article V hereof, any Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed and assigned or rejected or otherwise; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

4. ensure that distributions to Holders of Allowed Claims and Interests are accomplished pursuant to the provisions of the Plan;

5. adjudicate, decide, or resolve any motions, adversary proceedings, contested, or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6. adjudicate, decide, or resolve any and all matters related to Causes of Action;

7. adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

8. enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

9. enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

10.      resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

11.      issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

12.      resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the settlements, compromises, discharges, releases, injunctions, exculpations, and other provisions contained in Article VIII hereof and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

13.      resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to Article VI.K.1 hereof;

14.      enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

15.      determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement;

16.      adjudicate any and all disputes arising from or relating to distributions under the Plan or any transactions contemplated therein;

17.      consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Court order, including the Confirmation Order;

18.      determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

19.      hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

20.      hear and determine all disputes involving the existence, nature, or scope of the release provisions set forth in the Plan, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

21.      enforce all orders previously entered by the Court;

22.      hear any other matter not inconsistent with the Bankruptcy Code;

23.      enter an order concluding or closing the Chapter 11 Cases; and

24.      enforce the injunction, release, and exculpation provisions set forth in Article VIII hereof.

As of the Effective Date, notwithstanding anything in this Article XII to the contrary, the Takeback First Lien Term Loan Documents shall be governed by the jurisdictional provisions therein and the Court shall not retain jurisdiction.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

A.    *Immediate Binding Effect*

Subject to Article IX.A hereof and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan, the final versions of the documents contained in the Plan Supplement, and the Confirmation Order shall be immediately effective and enforceable and deemed binding upon the Debtors or the Reorganized Debtors, as applicable, and any and all Holders of Claims or Interests (regardless of whether such Claims or Interests are deemed to have accepted or rejected the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in the Plan, each Entity acquiring property under the Plan or the Confirmation Order, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.  All Claims and debts shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or debt has voted on the Plan.

B.    *Additional Documents*

On or before the Effective Date, the Debtors may File with the Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors and all Holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.    *Reservation of Rights*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Court shall enter the Confirmation Order.  Neither the Plan, any statement or provision contained in the Plan, nor any action taken or not taken by any Debtor with respect to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

D.    *Successors and Assigns*

The rights, benefits, and obligations of any Entity named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, affiliate, officer, director, manager, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

E.    *Service of Documents*

Any pleading, notice, or other document required by the Plan to be served on or delivered to the Debtors or Reorganized Debtors shall be served on:

the Debtors:                    Dex Media, Inc.
                                2200 West Airfield Drive
                                P.O. Box 619810
                                DFW Airport, Texas 75261
                                Attn.:  General Counsel and Chief Restructuring Officer

                                with copies to:

                                Kirkland & Ellis LLP
                                Kirkland & Ellis International LLP
                                300 North LaSalle Drive
                                Chicago, Illinois  60654

|  | Attn.:  Adam Paul and Bradley Thomas Giordano |
|---|---|
| the Dex East Administrative Agent, the Dex West Administrative Agent, or the SuperMedia Administrative Agent: | JPMorgan Chase Bank, N.A. 383 Madison Avenue New York, NY 10179 Attn: Neil Boylan |
|  | with copies to: |
|  | Simpson Thacher & Bartlett LLP 425 Lexington Avenue New York, NY 10017 Attn: Sandeep Qusba and Nicholas Baker |
| the RHDI Administrative Agent: | Deutsche Bank Trust Company Americas 60 Wall Street New York, NY 10005 Attn: General Counsel |
|  | with copies to: |
|  | Simpson Thacher & Bartlett LLP 425 Lexington Avenue New York, NY 10017 Attn: Sandeep Qusba and Nicholas Baker |
| the SC Members: | Milbank, Tweed, Hadley & McCloy LLP 28 Liberty Street New York, NY 10005 Attn.: Dennis Dunne and Gerard Uzzi |
|  | Milbank, Tweed, Hadley & McCloy LLP 601 South Figueroa Street 30th Floor Los Angeles, CA 90017 Attn.: Mark Shinderman and Brett Goldblatt |

F.      *Term of Injunctions or Stays*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

G.      *Entire Agreement*

Except as otherwise indicated, the Plan, the Confirmation Order, the Plan Supplement, the Restructuring Support Agreement, the Takeback First Lien Term Loan Documents, and the Warrant Agreement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

H.      *Exhibits*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Debtors' restructuring website at http://dm.epiq11.com/DexMedia or the Court's website at www.deb.uscourts.gov.  To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Court, the non-exhibit or non-document portion of the Plan shall control.

I.      *Nonseverability of Plan Provisions*

If, prior to Confirmation, any term or provision of the Plan is held by the Court to be invalid, void, or unenforceable, the Court shall be prohibited from altering or interpreting such term or provision to make it valid or enforceable, *provided* that at the request of the Debtors (in their sole discretion), the Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such terms or provision shall then be applicable as altered or interpreted provided that any such alteration or interpretation shall be acceptable to the Debtors.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtors' consent; and (3) nonseverable and mutually dependent.

J.      *Votes Solicited in Good Faith*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan and any previous plan, and, therefore, neither any of such parties or individuals or the Reorganized Debtors will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan and any previous plan.

K.      *Closing of Chapter 11 Cases*

The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, File with the Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Court to close the Chapter 11 Cases.

Respectfully submitted, as of the date first set forth above,

Dex Media, Inc. (for itself and all Debtors)

By: _____

Name:    Andrew Hede

Title:    Chief Restructuring Officer

**Exhibit A to the Plan**

Takeback First Lien Term Loan Credit Agreement Term Sheet

**DEX MEDIA, INC.**
**Takeback First Lien Facility**

**Summary of Principal Terms and Conditions**

Terms used but not defined herein have the meanings given to such terms in either the Restructuring Support Agreement dated as of May 2, 2016 (together with all exhibits and annexes thereto, the "**Restructuring Support Agreement**") or the Joint Pre-packaged Chapter 11 Plan of Reorganization of the Borrower (as defined below) and its debtor affiliates.

| | |
|---|---|
| **Borrower** | Reorganized Dex Media (the "**Borrower**"), formerly debtor and debtor-in-possession in the Chapter 11 Cases. |
| **Guarantors** | Dex One Digital, Inc., R.H. Donnelley Corporation, R.H. Donnelley Inc., Super Media Inc., Dex Media Holdings, Inc., Dex One Service, Inc., Dex Media West, Inc., Dex Media East, Inc., R.H. Donnelley Apil, Inc., SuperMedia LLC, SuperMedia Sales, Inc.,[1] and each other direct and indirect domestic subsidiary of the Borrower (excluding Dex Media Service LLC) (collectively, the "**Guarantors**", and together with the Borrower, the "**Credit Parties**"). |
| **Takeback First Lien Facility** | Secured term loan facility (the "**Takeback First Lien Facility**" or the "**Exit Financing**"), the holders thereof referred to as the "**Lenders**", comprised of a $600,000,000 term loan (the "**Takeback First Lien Term Loans**") converted on the basis set forth in the Restructuring Support Agreement from the loans under the outstanding prepetition Credit Agreements of the Credit Parties (the "**Prepetition Facilities**") on the Closing Date (as defined below). Takeback First Lien Term Loans that are prepaid may not be re-borrowed. |
| **Use of Proceeds** | The Takeback First Lien Facility will be used to refinance a portion of the "Loans" under the Credit Agreements (i.e.; the Prepetition Facilities), as further provided in the Approved Plan. |
| **Closing Date** | The date on which the Takeback First Lien Term Loan is issued under the Takeback First Lien Facility and the Reorganization is consummated pursuant to the Approved Plan (the "**Closing Date**"); which shall be the "Effective Date" under the Approved Plan. |
| **Maturity** | The date that is 5 years after the Closing Date. |
| **Collateral** | A first priority perfected senior lien on substantially all assets of the Credit Parties, other than 35% of the voting equity of any first tier foreign subsidiaries and certain other customary exceptions to be agreed by the Required Silo-Level Supporting Lenders and the Borrower (the "**Collateral**"). |

---

[1] For avoidance of doubt, if any Guarantor listed herein is merged/liquidated out of existence during a corporate reorganized prior to the Closing Date, the list of Guarantors will be revised to eliminate such Guarantor.

| | |
|---|---|
| **Interest Rate** | Interest shall be paid in cash ("**Interest**"). Interest on the Loans will accrue at the Libor Rate plus the Margin.  As used herein, the Margin means "10.0% *per annum*". |
| | As used herein, the term "<u>Libor Rate</u>" will have a meaning customary and appropriate for financings of this type, and the basis for calculating accrued interest and the interest periods for loans bearing interest at the Libor Rate will be customary and appropriate for financings of this type (which in no event shall be less than 1.0%). |
| | During the continuance of an Event of Default, the Takeback First Lien Term Loans and all other outstanding obligations will bear interest at an additional 2.00% *per annum* above the interest rate otherwise applicable. |
| **Scheduled Amortization** | None. |
| **Excess Cash Flow Sweep** | Commencing with the first full fiscal quarter ending after the Closing Date, on a quarterly basis, an amount equal to (a) 37.5% of the Excess Cash Flow (as defined below) of the Credit Parties shall be available for Dutch Auction Purchases (as defined below) and (b) 37.5% of the Excess Cash Flow of the Credit Parties shall be available for Open Market Purchases (as defined below) or Dutch Auction Purchases; <u>provided that</u> to the extent not utilized as set forth in clauses (a) and (b) above such amount shall be swept to prepay the Takeback First Lien Term Loans at par. Any such payments due in accordance with this paragraph may be made at any time throughout the relevant quarter (provided they would not exceed the maximum amounts permitted for such quarter); <u>provided that</u> all repurchases under clauses (a) and (b) above shall be completed within 45 days after the date on which financial statements are (or are required to have been) delivered for such fiscal quarter. |
| | The remaining 25% of Excess Cash Flow ("**Borrower's Portion of Excess Cash Flow**"), which shall accumulate and unused portions shall be carried forward into subsequent fiscal quarters and may be utilized (at the Borrower's option) for (i) Dutch Auction Purchases, (ii) Open Market Purchases, (iii) prepayment of the Takeback First Lien Term Loan at par or (iv) for general corporate purposes expressly permitted by the Takeback First Lien Facility; <u>provided that</u> notwithstanding the foregoing, if, and to the extent, the pro forma total leverage ratio is not below 1.25x as of the end of such fiscal quarter, then the Borrower's Portion of Excess Cash Flow for such fiscal quarter shall be required to be utilized for either (i), (ii) or (iii) within 45 days after the date on which financial statements are (or are required to have been) delivered for such fiscal quarter. Acquisitions will be permitted, using accumulated Borrower's Portion of Excess Cash Flow, provided that pro forma total leverage shall be below 1.25x. |
| | If Excess Cash Flow is equal to or less than zero, the Borrower shall not be required to repay or repurchase indebtedness pursuant to this section. |
| | "**Excess Cash Flow**" means net cash provided by operating activities for |

the relevant period, <u>minus</u> capital expenditures made during such period, <u>minus</u> the amount of net operating cash required so that the Credit Parties have cash or cash equivalents on hand equal to the Minimum Liquidity Amount.

"**Minimum Liquidity Amount**" means $35,000,000 in cash or cash equivalents, or such lesser amount of cash and cash equivalents as the board of directors of the Borrower determines in its sole discretion.

| | |
|---|---|
| **Call Protection** | None. |
| **Mandatory Prepayments** | The Takeback First Lien Term Loans shall be prepaid with: |

    (i)   100% of the net cash proceeds of non-ordinary course asset sales, casualty events or condemnation events (subject to baskets, reinvestment rights and exclusions to be agreed);

    (ii)  100% of the proceeds of debt incurrences (other than debt permitted under the Takeback First Lien Term Loan Documentation); and

    (iii) 100% of the proceeds of equity issuances.

**Conditions to Closing**    Usual and customary for facilities of this type, including, without limitation, the following:

A.  The negotiation, execution and delivery of customary definitive documentation in respect of the Exit Financing (i) substantially consistent with the terms set forth in this Term Sheet and (ii) all other terms shall be reasonably satisfactory to the Required Silo-Level Supporting Lenders and the Borrower (the "**Takeback First Lien Term Loan Documentation**").

B.  The Reorganization shall have been consummated in accordance with the Approved Plan (all conditions set forth therein having been satisfied or waived (with any such waiver having been approved by the Required Silo-Level Supporting Lenders)), and substantial consummation (as defined in Section 1101 of the Bankruptcy Code) of the Approved Plan in accordance with its terms shall have occurred contemporaneously with the closing of the Takeback First Lien Term Loans.

C.  The Required Silo-Level Supporting Lenders shall be reasonably satisfied that, on the Closing Date, immediately after giving effect to the consummation of the Approved Plan, the issuance of the Takeback First Lien Term Loans to occur on the Closing Date and any other transactions to occur on the Closing Date, the Credit Parties and their subsidiaries shall have outstanding no indebtedness other than indebtedness outstanding under the Exit Financing and any additional indebtedness on terms and conditions (including as to amount) satisfactory to the Required Silo-Level Supporting Lenders and, if secured, subject to intercreditor arrangements reasonably satisfactory to the Required Silo-Level Supporting Lenders and the Administrative Agent.

D.  The terms and conditions of the Takeback First Lien Facility shall be

substantively consistent with the terms and conditions described herein and all other terms and conditions shall be reasonably satisfactory to the Required Silo-Level Supporting Lenders and the Borrower.

E. Delivery of evidence that all required insurance has been maintained and that the Administrative Agent has been named as loss payee and additional insured.

F. Accuracy of representations and warranties contained in the Takeback First Lien Term Loan Documentation in all material respects (or, in the case of representations and warranties that are qualified by materiality, in all respects) and absence of default and Event of Default under the Takeback First Lien Term Loan Documentation.

G. Compliance with customary documentation conditions for facilities of this type, including the delivery of customary legal opinions and closing certificates (including a customary solvency certificate), good standing certificates and certified organizational documents, in each case, in form and substance reasonably satisfactory to the Required Silo-Level Supporting Lenders and the Administrative Agent.

H. The Administrative Agent shall have a first priority perfected senior lien on the Collateral of the Credit Parties or reasonably satisfactory covenants to perfect such liens promptly after the Closing Date.

I. Receipt by the Administrative Agent of customary lien searches.

J. There shall be no litigation, governmental, administrative or judicial action against the Credit Parties that could reasonably be expected to restrain or prevent the Reorganization or the Takeback First Lien Facility.

K. Payment by the Borrower on the Closing Date of (i) the customary administrative and collateral agency fee and expenses (including the fees and expenses of counsel to the Administrative Agent) due on such date, and (ii) all expenses payable on the Closing Date pursuant to the terms hereof or the Restructuring Support Agreement.

L. Such other conditions precedent as the Required Silo-Level Supporting Lenders shall reasonably require.

| | |
|---|---|
| **Representations and Warranties** | Usual and customary for facilities of this type (including usual and customary materiality qualifiers, thresholds and qualifications) and such other representations and warranties as the Required Silo-Level Supporting Lenders may reasonably require. |
| **Affirmative and Negative Covenants** | Usual and customary for facilities of this type (including usual and customary materiality qualifiers, thresholds and qualifications) and such other covenants as the Required Silo-Level Supporting Lenders may reasonably require, including without limitation: acquisitions solely from (i) Borrower's Portion of Excess Cash Flow or (ii) if not funded with Borrower's Portion of Excess Cash Flow, acquisitions in which total acquisition consideration does not exceed $10.0 million in the aggregate for all such acquisitions during the term of the Takeback First Lien |

- 4 -

|                                   | Facility.                                                                                                                                                                                                                                                                                                                                                                                                 |
|-----------------------------------|-------|
| **Financial Covenants**           | A total debt to EBITDA covenant of 5.0x, applicable to the Credit Parties, measured as of the end of each fiscal quarter commencing with the first full fiscal quarter ending after the Closing Date. |
|                                   | Maximum capital expenditure per fiscal year of $40,000,000, tested as of the end of each fiscal year. |
| **Events of Default**             | Usual and customary for facilities of this type (including usual and customary grace periods, materiality qualifiers, thresholds and qualifications) and such other events of default as the Required Silo-Level Supporting Lenders may reasonably require. |
| **Financial and Other Reporting** | Usual and customary for facilities of this type (including usual and customary materiality qualifiers, thresholds and qualifications). |
| **Amendments and Voting**         | Required Lenders (other than items usual and customary for facilities of this type requiring consent of each Lender directly and adversely affected thereby (e.g. reducing principal owed to such Lender, the rate of interest owed to such Lender (excluding the waiver of the imposition of default rate interest), postponing maturity of such Lender's loan, etc.)); provided that 66-2/3% of Lenders shall be required for amendments to provisions governing the Excess Cash Flow Sweep (including builder basket leverage ratio), Debt Buy-Backs and restricted payments covenant. |
| **Required Lenders**              | Lenders holding a majority of the Takeback First Lien Term Loans. |
| **Expenses and Indemnification**  | Usual and customary for facilities of this type. |
| **Other Provisions**              | The Takeback First Lien Term Loan Documentation will include customary provisions regarding increased costs, illegality, tax indemnities, waiver of trial by jury and other similar provisions. |
| **Assignments and Participations**| Usual and customary for facilities of this type. |
| **Debt Buy-Back**                 | While no buy-backs of the equity shall be permitted, subject to ordinary course equity buy-backs (e.g. departing or deceased employees and a dollar threshold to be agreed) (or, for the avoidance of doubt, payment of dividends), the Takeback First Lien Facility shall provide that (a) Takeback First Lien Term Loans may be purchased and assigned below par (in an amount not to exceed the then accumulated excess cash flow of the Credit Parties) on a non-pro rata basis through (i) open market purchases through a broker ("**Open Market Purchases**") and/or (ii) Dutch auction or similar procedures that are offered to all Lenders on a pro rata basis and permit the Borrower to pay the lowest price within the proposed range to each agreeing Lender ("**Dutch Auction Purchases**")  in accordance with procedures to be agreed and subject to customary restrictions and (b) a Credit Party shall be eligible assignees of such Takeback First Lien Term Loans; provided that any such Takeback First |

|  |  |
|---|---|
|  | Lien Term Loans acquired by a Credit Party shall be cancelled (and be deemed automatically cancelled) promptly upon acquisition thereof. |
| **Governing Law** | State of New York. |
| **Administrative Agent** | Wilmington Trust, National Association or successor agent (the "**Administrative Agent**"). |

**Exhibit B to the Plan**

New Stockholders Agreement Term Sheet

# DEX MEDIA, INC.

## STOCKHOLDERS AGREEMENT TERM SHEET

This Stockholders Agreement Term Sheet (this "Term Sheet") describes the principal terms of a proposed Stockholders Agreement to be entered into by all of the stockholders (each, a "Stockholder" and, collectively, the "Stockholders") of Reorganized Dex, Inc. ("Reorganized Dex") in connection with the restructuring of Dex Media, Inc. and its subsidiaries (collectively, the "Companies"). Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Restructuring Support Agreement to which this Term Sheet is attached.

THIS TERM SHEET DOES NOT CONSTITUTE (NOR SHALL IT BE CONSTRUED AS) AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY PLAN, IT BEING UNDERSTOOD THAT SUCH A SOLICITATION, IF ANY, ONLY WILL BE MADE IN COMPLIANCE WITH APPLICABLE PROVISIONS OF SECURITIES, BANKRUPTCY AND/OR OTHER APPLICABLE LAWS.

THE TRANSACTIONS DESCRIBED HEREIN WILL BE SUBJECT TO THE COMPLETION OF DEFINITIVE DOCUMENTS INCORPORATING THE TERMS SET FORTH HEREIN AND THE CLOSING OF ANY TRANSACTION SHALL BE SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN SUCH DEFINITIVE DOCUMENTS.

| | |
|---|---|
| Stockholders Agreement: | The stockholders of Reorganized Dex (the "Stockholders") will be required to enter into a stockholders agreement (the "Stockholders Agreement") governing the rights of the Stockholders in connection with the affairs of the Reorganized Dex prior to receipt of shares of common stock of Reorganized Dex ("Common Stock") in the restructuring. |
| Board of Directors: | Composition of the Board.  The board of directors of Reorganized Dex (the "Board") shall consist of a minimum of seven directors and, subject to expansion as provided below, a maximum of nine directors. The Board shall be constituted as follows: |

- Appointing Stockholder Rights.  Each Stockholder that holds 10% or more of the outstanding Common Stock (an "Appointing Stockholder") will be entitled to appoint one person to serve as director to the Board for each 10% of the Common Stock so owned; provided that (x) in calculating the percentage ownership of Common Stock of any Appointing Stockholder for purposes of this section, such Appointing Stockholder's holdings shall be rounded down to the nearest 10% (i.e., there will be no fractional appointment rights), (y) in the event the percentage ownership of Common Stock of any Appointing Stockholder falls below any 10% threshold (a "10% Threshold Event"), such Appointing

Stockholder shall forfeit the right to appoint one director of Reorganized Dex upon the occurrence of each such 10% Threshold Event, and (z) if any Appointing Stockholder holds 40% or more and less than 50%, such Appointing Stockholder shall elect to either (i) increase board to nine directors (with additional vacancies filled as described below under "Remaining Directors") (the "<u>Increased Board Election</u>") or (ii) limit the number of directors such Appointing Stockholder is entitled to appoint to three directors.

- <u>Minority Director</u>:  Non-Appointing Stockholders (as defined below) holding a majority of the outstanding Common Stock held by all Non-Appointing Stockholders will have the right to elect one person to serve as a director to the Board (the "<u>Minority Director</u>").  The Nominating Stockholders (as defined below) holding a majority of the outstanding Common Stock held by all Nominating Stockholders will be entitled to nominate an individual for election as the Minority Director.  "<u>Non-Appointing Stockholders</u>" means all Stockholders other than Appointing Stockholders.  "<u>Nominating Stockholders</u>" means each Stockholder that, together with its affiliates, holds 5% or more but less than 10%.

- <u>CEO Director</u>.  The Chief Executive Officer of Reorganized Dex will be appointed as a director of Reorganized Dex.

- <u>Remaining Directors</u>:  To the extent that following the election to the Board of the persons described above there are fewer than seven directors (or, if the Increased Board Election has been made, nine directors), then the holders of a majority of the outstanding Voting Shares (as defined below) will have the right to appoint a number of directors (each, a "<u>Remaining Director</u>" and together with the Minority Director, the "<u>Non-Appointed Outside Directors</u>") that would result in seven directors (or, if the Increased Board Election has been made, nine directors).  "<u>Voting Shares</u>" means (i) all shares of Common Stock owned by Non-Appointing Stockholders and (ii) all shares of Common Stock held by each Appointing Stockholder in excess of the percentage necessary for the director appointment rights exercised by that Appointing Stockholder under "Appointing Stockholder Rights" above.

- <u>Automatic Expansion</u>.  To the extent that the Appointing Stockholders have the right to designate more than seven directors, then the size of the Board shall be automatically expanded such that there are sufficient director seats for all

2

directors entitled to be designated by the Appointing Stockholders, the Minority Director and the Chief Executive Officer.

- Optional Expansion:  Stockholders holding a majority of the outstanding Common Stock will have the right to expand the Board to up to 11 directors, which additional directors will be appointed and elected in accordance with the "Remaining Directors" paragraph above.

Each Appointing Stockholder entitled to nominate a director may remove its nominated director(s) and, upon removal of such director(s), shall be entitled to nominate his or her replacement.

Each Minority Director and Remaining Director vacancy on the Board may only be filled as described above under "Minority Director" and "Remaining Directors," respectively.

The Board may remove any director for cause, which will be defined in the Stockholders Agreement.  If a director removed for cause was appointed by an Appointing Stockholder, upon removal of such director, such Appointing Stockholder shall be entitled to nominate his or her replacement.

Committees.  The Board shall have a Compensation Committee and an Audit Committee, and the Minority Director shall be a member of each such committee.  Each Appointing Stockholder with the right to appoint at least one director to the Board will have the right to designate one of its director appointees to be a member of the Compensation Committee and Audit Committee.

Compensation:  Directors will be entitled to compensation set by the Board from time to time, provided, that each of the following will only be entitled to compensation equal to half of the compensation set for other similarly-situated directors: (i) any director that is a director, officer or employee of an Appointing Stockholder, or (ii) any director that is a consultant of an Appointing Stockholder and is determined by majority vote of the directors other than the directors appointed by such Appointing  Stockholder to be the equivalent of a substantially full-time employee of such Appointing Stockholder notwithstanding being classified as a consultant.

Affiliate Transactions.  Affiliate transactions will require the approval of a majority of the disinterested members of the Board.

Dividends.  Approval of Stockholders holding not less than 66 2/3% of

3

the outstanding Common Stock will be required for the declaration or payment of any dividends by Reorganized Dex.

Management Incentive Plan.  The Management Incentive Plan (as defined in the Approved Plan) and the initial grants to the senior executive officers of the Company shall be subject to the approval of the Board, which approval must also include the Minority Director; provided, however that for the avoidance of doubt the reservation of 10% of the Common Stock (on a fully diluted basis but without giving effect to the exercise of the Warrants (as defined in the Approved Plan)) shall be reserved for continuing directors, officers, and employees and such reserve shall not be subject to approval of the Board.

Transfer Rights:

Transfers Generally.  Subject to securities laws, certain proscribed procedures, the tag-along rights described below and any applicable restrictive legends, transfers of Common Stock to non-Competitors (as defined below) that are "accredited investors" for purposes of the Securities Act of 1933, as amended, will generally be permitted, so long as such transfer (a) will not cause Reorganized Dex to become a public company and (b) will not result in an event of default under the Exit Term Loan Facility (as defined in Exhibit A) or any successor credit facility.  All transferees will be required to (a) become a party to the Stockholders Agreement and (b) provide an "accredited investor" certification to the Company.

Transfers to Competitors.  Transfers to any person determined by the Board to be a Competitor will not be permitted without the prior approval of the Board.

"Competitor" means any person engaged (whether directly or indirectly through the control of any other person) other than through Reorganized Dex and its subsidiaries in the business of providing yellow page services or other similar targeted advertising in North America; provided, that no potential transferee shall be deemed to be a Competitor on account of owning less than 10% (or, in the case of any person that was a lender as of the Petition Date, 20%) of the outstanding shares of equity securities issued by any Competitor, provided, that potential transferee does not have the right to appoint, and no director, officer or employee of such potential transferee is, a director of such Competitor.

Tag-Along Rights:

Each Stockholder will have the right to "tag along" on a transfer by one or more Stockholders of 35% or more of the outstanding Common Stock in a single transaction or a series of related transactions (but specifically excluding transfers by a Stockholder to an entity affiliated

4

with such Stockholder).  The term "tag along" means the right of the electing Stockholder to have its Common Stock sold along with and on the same terms as the Common Stock being sold in the transaction giving rise to such tag-along rights (on a pro rata basis if less than all of Reorganized Dex is being sold).

Preemptive Rights:    Subject to certain customary exceptions, Stockholders that are "accredited investors" will be entitled to preemptive rights on new issuances of equity. Such Stockholders will be required to notify Reorganized Dex of their intent to exercise such preemptive rights within 10 days of having been offered the right to participate in such equity issuance.

Stockholders that are "accredited investors" will be entitled to preemptive rights (in proportion to their respective holdings of Common Stock) on issuances of debt in which one or more Appointing Stockholders (or any of their respective affiliates) participate.  Such Stockholders will be required to notify Reorganized Dex of their intent to exercise such preemptive rights within 10 days of having been offered the right to participate in such debt issuance.

Approved Sale:    In the case of a sale of Reorganized Dex that constitutes a Drag Sale (as defined below), Stockholders holding a majority of the outstanding Common Stock will have the right to cause Reorganized Dex to be sold in such Drag Sale (whether by stock transfer, asset transfer or merger) and require all other Stockholders take related actions in order to facilitate such Drag Sale.  Stockholders will be entitled to the same price and generally all the same terms in connection with such sale. "Drag Sale" means a sale of Reorganized Dex (whether by stock transfer, asset transfer or merger) that has been approved by (a) Stockholders holding a majority of the outstanding Common Stock and (b) the Board, which approval must include at least one Non-Appointed Outside Director.

Reports:    Reorganized Dex will furnish audited financial statements (with notes) annually to all stockholders. On a quarterly basis, each stockholder will be furnished with unaudited financial statements (with notes). Each such report shall be accompanied by a reasonably detailed narrative discussion of the changes in Reorganized Dex's financial condition and results of operations compared with the prior periods presented, which will, with respect to Reorganized Dex's audited consolidated annual financial statements, be in form and substance similar to the discussion contained in the "Management Discussion & Analysis" section of a report filed in accordance with the Securities Exchange Act of 1934.  Quarterly and annual financial statements of

Reorganized Dex will be required to be posted to a freely accessible section of the Reorganized Dex website.

On an annual basis, each Stockholder will be furnished with the then-current budget of Reorganized Dex.  Such annual budgets will be made available on the Intralinks site described below.

Promptly after issuing the the annual and quarterly reports, Reorganized Dex will hold a conference call to discuss with the Stockholders the information contained in such annual and quarterly reports, including the results of the Company's operations and the financial performance of the Company, and to answer questions of the Stockholders.  The intention is that such conference calls be held concurrently with the earnings calls for lenders of the Company; however, if the lender earnings calls are held separately, the Stockholders will be invited to and permitted to join such earnings calls.

The obligation of Reorganized Dex to deliver reports and notices to its Stockholders will be satisfied by posting such reports to an Intralinks or similar site made available to the Stockholders.

Registration Rights:    Each Stockholder that, together with its affiliates, holds 5% or more of the outstanding Common Stock will receive customary demand registration rights (including rights to demand a shelf registration) which may not be exercised until 180 days after Reorganized Dex's initial public offering.  All stockholders will receive piggyback and S-3 registration rights (when such form becomes available) with reasonable and customary terms.

Approved Public
Offering:    Subject to the Board approving such public offering of Common Stock, the Triggering Group (as defined below) will have the right to cause Reorganized Dex to conduct a public offering of Common Stock (the "Approved Public Offering"), which Approved Public Offering may be required by the Triggering Group to include shares of Common Stock held by the Stockholders (the "Secondary Offering Shares").  Reorganized Dex will control the Approved Public Offering process, including the selection of underwriters.  If Secondary Offering Shares are to be included in the Approved Public Offering, each Stockholder will have the obligation to sell in the Approved Public Offering its pro rata share of such Secondary Offering Shares, but in no event more than 15% of the Common Stock held by such Stockholder without such Stockholder's consent; provided, however, that to the extent any Stockholders elect to sell more Common Stock in the Approved Public Offering, the number of shares to be included in

the Approved Public Offering by Stockholders expressing an interest to sell less will be correspondingly and proportionately (based on Common Stock ownership) reduced.

Upon consummation of the Approved Public Offering, the terms of the Stockholders Agreement will terminate to the extent provided below under "Term."

"Triggering Group" means (a) prior to the second anniversary of the effective date of the Approved Plan, Stockholders holding a majority of the outstanding Common Stock, and (b) thereafter, Stockholders holding 35% of the outstanding Common Stock.

The Stockholders Agreement will contain customary underwriter lock-up provisions.

Amendments:    Reorganized Dex will not amend or waive any provision of the Stockholders Agreement without approval of Reorganized Dex and the holders of a majority of the outstanding Common Stock; provided, that:

(i)    if any such amendment or waiver would have a disproportionate material effect on any Stockholder, such Stockholder's approval will be required,

(ii)    if any such amendment or waiver would result in the reduction in the number of directors an Appointing Stockholder has the right to appoint, such Appointing Stockholder's approval will be required,

(iii)    if any such amendment or waiver would materially and adversely affect a Stockholder's  preemptive rights, information rights, tag along rights, protections under the "Approved Sale" provision above (including the approval rights to trigger a Drag Sale as described in the definition thereof), protections under the "Approved Public Offering" provision above, or the rights described in the proviso to the "Confidentiality" section below, or increase the transfer restrictions applicable to such Stockholder,  such Stockholder's approval will be required,

(iv)    if any such amendment or waiver is to the nomination rights of the Nominating Stockholders with respect to the Minority Director, each such Nominating Stockholder's approval will be required,

(v)     if any such amendment or waiver is to (A) clause (z) under "Appointing Stockholder Directors" above, (B) the provision described above under "Remaining Directors" or (C) the provision described above under "Affiliate Transactions," the approval of the holders of a majority of the outstanding Voting Shares shall be required,

(vi)    if any such amendment or waiver is to the Stockholders' right to elect the Minority Director, the approval of each Nominating Stockholder and Non-Appointing Stockholders holding a majority of the outstanding Common Stock held by all Non-Appointing Stockholders will be required,

(vii)   if any such amendment or waiver is to the provision described above under "Dividends," the approval of Stockholders holding not less than 66 2/3% of the outstanding Common Stock, and

(viii)  if any such amendment or waiver is to the provision described below under "Term," the approval of Stockholders holding at least 90% of the outstanding Common Stock will be required.

Term:   The Stockholders Agreement shall remain in effect until terminated (a) by agreement of Reorganized Dex and Stockholders holding at least 90% of the outstanding Common Stock or (b) upon Reorganized Dex becoming a public company; provided that in the case of clause (b), (i) the provisions described above under the heading "Registration Rights" shall survive such termination and (ii) the right to appoint or nominate directors to the Board may only be modified or terminated to the extent necessary to meet applicable listing requirements of any securities exchange or quotation system on which the Common Stock is expected to be listed or quoted.

Confidentiality:    Subject to certain customary exceptions, each Stockholder will agree to customary confidentiality restrictions, provided that Stockholders may disclose confidential information to prospective transferees that have executed a confidentiality agreement in such form as may be reasonably required by Reorganized Dex.

Governing Law:      The Stockholders Agreement will be governed by Delaware law.

**Exhibit C to the Plan**

Noteholder Term Sheet

# DEX MEDIA, INC.

## SUBORDINATED NOTEHOLDER TERM SHEET

This Subordinated Noteholder Term Sheet (this "Term Sheet") describes the principal terms of a potential settlement with the holders of Subordinated Notes to be effected in connection with the restructuring of Dex Media, Inc. and its subsidiaries. Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Restructuring Support Agreement and Approved Plan (as defined in the Restructuring Support Agreement) to which this Term Sheet is attached.

THIS TERM SHEET DOES NOT CONSTITUTE (NOR SHALL IT BE CONSTRUED AS) AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY PLAN, IT BEING UNDERSTOOD THAT SUCH A SOLICITATION, IF ANY, ONLY WILL BE MADE IN COMPLIANCE WITH APPLICABLE PROVISIONS OF SECURITIES, BANKRUPTCY AND/OR OTHER APPLICABLE LAWS.

THE TRANSACTIONS DESCRIBED HEREIN WILL BE SUBJECT TO THE COMPLETION OF DEFINITIVE DOCUMENTS INCORPORATING THE TERMS SET FORTH HEREIN AND THE CLOSING OF ANY TRANSACTION SHALL BE SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN SUCH DEFINITIVE DOCUMENTS.

| Company | Dex Media, Inc. and following the Effective Date (as defined below), reorganized Dex Media, Inc. (the "Company"). |
|---|---|
| **Debt Instruments** | The outstanding loans under the below agreements constitute the "Debt Instruments": <br><br> • RHDI Facility: Fourth Amended and Restated Credit Agreement, dated as of April 30, 2013 (as amended, restated, supplemented, or otherwise modified from time to time), among R.H. Donnelley Inc., as borrower, the Company, Deutsche Bank Trust Company Americas, as Administrative Agent and Collateral Agent, and each of the lenders from time to time party thereto; <br><br> • SuperMedia Facility:  Loan Agreement, dated as of December 31, 2009 (as amended, restated, supplemented, or otherwise modified from time to time), among SuperMedia Inc., as borrower, the Company, JPMorgan Chase Bank, N.A., as Administrative Agent and Collateral Agent, and each of the lenders from time to time party thereto; <br><br> • Dex East Facility: Credit Agreement, dated as of October 24, 2007 (as amended, restated, supplemented, or otherwise modified from time to time), among Dex |

| | |
|---|---|
| | Media East, Inc., as borrower, the Company, Dex Media Holdings, Inc., JPMorgan Chase Bank, N.A., as Administrative Agent and Collateral Agent, and each of the lenders from time to time party thereto; and<br><br>• <u>Dex West Facility</u>: Credit Agreement, dated as of June 6, 2008 (as amended, restated, supplemented, or otherwise modified from time to time), among Dex Media West, Inc., as borrower, the Company, Dex Media Holdings, Inc., JPMorgan Chase Bank, N.A., as Administrative Agent and Collateral Agent, and each of the lenders from time to time party thereto. |
| **Subordinated Notes** | The 12%/14% Senior Subordinated Notes due January 29, 2017 issued pursuant to that certain Indenture, dated as of January 29, 2010, between R.H. Donnelley Corporation as issuer and The Bank of New York Mellon as trustee (the "<u>Subordinated Notes</u>"). |
| ***Restructuring*** | |
| **Restructuring Support Agreement** | Holders of Subordinated Notes (the "<u>Subordinated Noteholders</u>") representing not less than 66 2/3% in amount of the outstanding Subordinated Notes will enter into a restructuring support agreement (the "<u>RSA</u>") with the Company and holders representing not less than a majority of the outstanding aggregate principal amount under the Debt Instruments (the "<u>SC Members</u>") reflecting the terms of this Term Sheet. |
| **Treatment** | The Plan of Reorganization of the Company acceptable to the SC Members and the Company (the "<u>Approved Plan</u>") will provide that each holder of allowed claims under the Subordinated Notes (as defined in Regulation D of the Securities Act) will receive its pro rata share of the following on or as soon as practicable, but in no event later than 10 business days, after the effective date of the Approved Plan (the "<u>Effective Date</u>"):<br><br>• the Cash Amount (as defined below); and<br><br>• the Warrants (as defined below);<br><br><u>provided</u>, <u>however</u>, that if the number of holders of Warrants would result in the Company potentially being required to be (i) a reporting company under the Securities Exchange Act of 1934, or (ii) registered on any public exchange, then the Company will have the right provide Alternative Distributions (as defined in the Approved Plan) in the manner provided for in the Approved |

|  | Plan |
|---|---|
|  | "Cash Amount" means $5 million in cash. |
|  | Notwithstanding anything to the contrary herein, if the Company determines that the number of holders of allowed claims under the Subordinated Notes receiving Warrants, when combined with the number of holders that will receive New Common Stock (as defined below) under the Approved Plan and taking into account, for this purpose, the Company's estimate of shares of New Common Stock (as defined below) to be issued in respect of management incentive packages, other issuances contemplated under the Approved Plan, or otherwise, would potentially be required to be (a) a reporting company under the Securities Exchange Act of 1934, or (b) registered on any public exchange, the Company may, in lieu of distributing Warrants, provide for a mechanism to distribute cash (either by distributing cash directly or by issuing such Warrants to a trust and providing for liquidation of such shares and distribution of the proceeds thereof or some other mechanism), on such terms that are acceptable to the Required Supporting Lenders to the extent necessary or appropriate to ensure the Company is not required to be a reporting company or registered on any public exchange; provided that, notwithstanding the foregoing, the Supporting Noteholders shall in any event and at all times receive Warrants directly rather than cash as contemplated by this paragraph. |
| **Expenses** | Within 2 business days of the execution of the RSA, the Company will pay the reasonable and documented fees and expenses of Ducera Partners ("Ducera") and Akin Gump Strauss Hauer & Feld LLP ("Akin Gump") incurred through the date of the execution of the RSA, and shall continue to pay the reasonable and documented fees and expenses of Akin Gump through the Effective Date; provided, however, that the fees and expenses of Ducera and Akin Gump shall not exceed an aggregate of $500,000.  For the avoidance of doubt, without duplication of the foregoing and subject to the proviso in the foregoing sentence, to the extent that the fees and expenses of Ducera and Akin Gump have been previously paid by the Subordinated Noteholders, the Company shall reimburse such Subordinated Noteholders for such fees and expenses within 2 business days of the execution of the RSA. |

| Warrants | |
|---|---|
| **Warrants** | The warrants to be issued by the Company pursuant to the Approved Plan (the "Warrants") will entitle the holders thereof (the "Holders") to receive, upon the exercise of the Warrants, shares of common stock in the Company ("New Common Stock") equal to in the aggregate of 10% of the New Common Stock of the Company outstanding on the Effective Date, calculated on a fully-diluted basis as of the Effective Date assuming full exercise of the Warrants, subject to dilution on account of any management incentive plan implemented by the Company (a "Management Incentive Plan"), as such percentage may be reduced to take proper account of Alternative Distributions to Subordinated Noteholders made in accordance with the Approved Plan. |
| **Exercise Price** | The exercise price (the "Exercise Price") for each share of New Common Stock underlying the Warrants will be initially an amount equal to:<br><br>(x) (A) the aggregate Claim amount of all Debt Instruments minus (B) the cash distributions made to the holders of Debt Instruments under the Approved Plan minus (C) the aggregate initial principal amount of the loans under the Takeback First Lien Term Loan (if any) distributed to the holders of Debt Instruments under the Approved Plan minus (D) any other distributions or consideration other than New Common Stock provided to holders of the Debt Instruments under the Approved Plan, but specifically excluding any reimbursement for costs and expenses incurred in connection with the restructuring of the Company and its subsidiaries,<br><br>divided by<br><br>(y) the aggregate number of shares of New Common Stock issued to the holders of Debt Instruments under the Approved Plan on the Effective Date.<br><br>The Warrants will provide for a cashless exercise option only in connection with, and at the price implied by, a sale of the Company. No third party appraisal will be permitted or required. |
| **Exercise Period** | The Warrants will be exercisable, in whole or in part, at any time on or prior to the 7th anniversary of the Effective Date (the "Expiration Date"). |

| | |
|---|---|
| **Conditions to Exercise** | • Delivery of an exercise form.<br>• Payment of the exercise price, unless such exercise is on a cashless basis in connection with a sale of the Company.<br>• Execution of a joinder to the Company's Stockholders Agreement, which Stockholders Agreement shall be substantially on the terms set forth in the Stockholders Agreement Term Sheet. |
| **Redemption** | The Warrants will not be subject to redemption by the Company or any other person. |
| **Anti-dilution Protection** | The Warrants will have the benefit of customary proportional anti-dilution protection that will appropriately adjust the Exercise Price and number of shares of New Common Stock purchasable upon exercise of the Warrants including, without limitation, in the event of (a) stock splits, stock dividends (including reverse stock splits), and (b) combinations, subdivisions or other reclassifications of any New Common Stock.<br><br>If the Company distributes to the holders of New Common Stock any dividend or other distribution of cash, indebtedness or other securities or property, then the Exercise Price shall be reduced by an amount equal to such dividend or other distribution made in respect of one share of New Common Stock. |
| **Transfers** | The Warrants and shares of New Common Stock to be issued upon exercise of the Warrants shall be issued and freely transferable pursuant to the exemption to SEC registration provided in Section 1145 of the Bankruptcy Code so long as such transfer will not cause the Company to become a public company; provided, however, that transfers to any person determined by the Board to be a Competitor (as defined below) will not be permitted without the prior approval of the Board of Directors of the Company; and provided, further, that the New Common Stock issued upon exercise of the Warrants will be subject to restrictions on transfer set forth in the Stockholders Agreement.<br><br>"Competitor" means any person engaged (whether directly or indirectly through the control of any other person) other than through the Company and its subsidiaries in the business of providing yellow page services or other similar targeted advertising in North America; provided, that no potential transferee shall be deemed to be a Competitor on account of owning less than 10% (or, in the case of any person that was a lender as of the Petition Date, 20%) of the outstanding shares of |

5

| | |
|---|---|
| | equity securities issued by any Competitor, <u>provided</u>, that potential transferee does not have the right to appoint, and no director, officer or employee of such potential transferee is, a director of such Competitor. |
| **Sales of the Company** | <u>Sale for All Cash</u>:  If a sale of the Company is consummated prior to the Expiration Date in which all of the consideration paid to non-employee stockholders consists of cash and the per share consideration paid is less than the Exercise Price, then the Warrants will be deemed to have expired worthless and will be cancelled for no further consideration.<br><br><u>Other Sales</u>:  In the case of any other sale transaction involving the Company that occurs prior to the Expiration Date, upon consummation of such transaction:<br><br>(a)  in lieu of each share of New Common Stock for which a Warrant is exercisable at the time of such sale transaction, such Warrant shall automatically become exercisable for the kind and amount of securities, cash or other assets which the holder of such Warrant would have owned immediately after such sale transaction if such holder had exercised such Warrant in respect of such share of New Common Stock immediately before the effective date of the transaction (and the terms of such Warrant shall otherwise remain substantially unchanged); and<br><br>(b)  the Exercise Price of such Warrant will not be modified as a result of such sale transaction.<br><br><u>For illustrative purposes only</u>:  In the event of:<br><br>(a)  a Warrant exercisable for two shares of New Common Stock with an Exercise Price of $100 per share; and<br><br>(b)  a sale transaction with a buyer pursuant to which the holders of New Common Stock are entitled to receive in respect of each share of New Common Stock held by such holders two shares of common stock of such buyer and $10 in cash (collectively, the "<u>Per Share Consideration Unit</u>"), then<br><br>such Warrant shall become exercisable for two Per Share Consideration Units (i.e., a total of 4 shares of common stock of such buyer and $20 in cash) for an exercise price equal to $100 for each Per Share Consideration Unit. |

| | |
|---|---|
| **Stockholders Agreement** | As a condition to issuance of shares of New Common Stock upon exercise of any of the Warrants, the Holder thereof will be obligated to execute a joinder to the Stockholders Agreement. Prior to exercise, holders of Warrants will not be entitled to any voting, registration, preemptive or other rights under the Stockholders Agreement. For the avoidance of doubt, upon exercise of the Warrants and issuance of the shares of New Common Stock, such holders thereof shall have the same rights as similarly situated holders of New Common Stock. |
| **Reports** | The Company will furnish the same annual audited and quarterly unaudited financial statements and other information to the Holders at the same time such financial statements and other information are delivered or made available to the holders of New Common Stock under the Stockholders Agreement. |
| **Amendments** | The terms and conditions of the Warrants may be amended by the Company with the affirmative vote or written consent of the holders of a majority of the outstanding Warrants; provided, that the consent of each Holder affected thereby shall be required for any amendment pursuant to which (i) the Exercise Price would be increased and/or the number of shares of New Common Stock would be decreased (in each case, other than pursuant to antidilution adjustments), and (ii) the time period during which the Warrants are exercisable would be shortened. |
| **Administration** | The Warrants will be issued in book-entry form. |
| **Notice** | The Company shall promptly provide the Holders with notice of (i) any event that may cause a share and/or Exercise Price adjustment, (ii) a sale transaction, and (iii) record dates, dividends, extraordinary transactions and liquidation events, at least five (5) business days prior to the effectiveness of such event or sale transaction. |
| **Governing Law and Jurisdiction** | Delaware. |

**Exhibit D to the Plan**

Restructuring Support Agreement

See Exhibit B to the Disclosure Statement

**Exhibit E to the Plan**

Backstop Agreement

## BACKSTOP AGREEMENT

This BACKSTOP AGREEMENT (this "Agreement"), dated as of May 2, 2016, is entered into by and among Dex Media, Inc., a Delaware corporation (the "Company"), on behalf of itself and its direct and indirect subsidiaries, and each of the signatories hereto under the heading "Backstop Party" (each, a "Backstop Party" and collectively the "Backstop Parties"). Capitalized terms used and not otherwise defined in this Agreement shall have the meanings set forth in the RSA (as defined below) and the Approved Plan attached thereto as Exhibit A, a copy of which is attached to this Agreement as Exhibit A.

## RECITALS

**WHEREAS**, on or prior to the date hereof, the Company and certain of its subsidiaries (collectively, the "Companies") entered into that certain Restructuring Support Agreement (the "RSA") with lenders and their affiliates under the SuperMedia Facility, the Dex East Facility, the Dex West Facility, and the RHDI Facility;

**WHEREAS**, pursuant to the terms of the RSA, (a) the Lenders will be given the opportunity to elect to receive in lieu of all or any portion of the New Common Stock to which such Lender is entitled loans under the Takeback First Lien Term Loan that would otherwise be distributable to the Backstop Parties in an aggregate principal amount per New Common Stock Share based on Reorganized Dex Equity Value; and (b) the Backstop Parties have agreed to receive and acquire the New Common Stock subject to such elections in lieu of receiving distributions under the Approved Plan of loans under the Takeback First Lien Term Loan (collectively, the "Backstop").

## AGREEMENT

**NOW, THEREFORE**, in consideration of the mutual promises contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Company and each of the Backstop Parties hereby agree as follows:

1.  Defined Terms.

    (a)    "Alternative Amount" of any Electing Lender means an amount equal to (i) a fraction, the numerator of which is the Subject Equity Shares of such Electing Lender and the denominator of which is the Total Equity Shares multiplied by (ii) the Reorganized Dex Equity Value.

    (b)    "Alternative Treatment Distributions" with respect to an Electing Lender means loans in the Takeback First Lien Term Loan with an aggregate principal amount equal to the Alternative Amount of such Electing Lender.

    (c)    "Alternative Treatment Election" means an Initial Election of a Lender or, if delivered, the last Modified Election of such Lender delivered to the Company by the Election Deadline in accordance with the instructions set forth in the Ballot.

(d)    "Ballot" has the meaning given to such term in the definition of Initial Election below.

(e)    "Dex East Sharing Percentage" of each Backstop Party means (i) the percentage of all Dex East Credit Facility Claims held by such Backstop Party multiplied by (ii) 13.465456566%.

(f)    "Dex West Sharing Percentage" of each Backstop Party means (i) the percentage of all Dex West Credit Facility Claims held by such Backstop Party multiplied by (ii) 14.724949065%.

(g)    "Election Deadline" means the Voting Deadline, as defined in the Disclosure Statement, or such later date as the parties hereto may determine after notice to the Lenders as set forth in Section 8(h) hereof.

(h)    "Electing Lender" means a Lender that has made an Alternative Treatment Election.

(i)    "Initial Election" means the initial election by any Lender in its ballot (the "Ballot") delivered by the Company under the Disclosure Statement and the Approved Plan to receive Alternative Treatment Distributions in lieu of all or any portion of New Common Stock to which such Lender would otherwise be entitled under the provisions of the Approved Plan.

(j)    "Modified Election" means an election of a Lender, at any time following any material modification of the terms of the Backstop (if any) in accordance with Section 8 hereof, to receive Alternative Treatment Distributions in lieu of all or any portion of New Common Stock to which such Lender would otherwise be entitled under the provisions of the Approved Plan.

(k)    "Pro Rata Share" means, as to each Backstop Party, a fraction, the numerator of which is such Backstop Party's Sharing Percentage and the denominator of which is the sum of the Sharing Percentages of all Backstop Parties.

(l)    "Reorganized Dex Equity Value" means $50,000,000.

(m)    "Required Backstop Parties" means Backstop Parties representing a majority of the Sharing Percentages of all Backstop Parties.

(n)    "RHDI Sharing Percentage" of each Backstop Party means (i) the percentage of all RHDI Credit Facility Claims held by such Backstop Party multiplied by (ii) 23.152435636%.

(o)    "Sharing Percentage" for each Backstop Party means the sum of (i) the RHDI Sharing Percentage of such Backstop Party, (ii) the SuperMedia Sharing Percentage of such Backstop Party, (iii) the Dex East Sharing Percentage of such Backstop Party, and (iv) the Dex West Sharing Percentage of such Backstop Party.

(p)     "Subject Equity Shares" of an Electing Lender means the number of shares of New Common Stock subject to the Alternative Treatment Election made by such Electing Lender.

(q)     "SuperMedia Sharing Percentage" of each Backstop Party means (i) the percentage of all SuperMedia Credit Facility Claims held by such Backstop Party multiplied by (ii) 48.657158733%.

(r)     "Total Equity Shares" means the aggregate number of shares of New Common Stock that will be outstanding on the Plan Effective Date following the distributions contemplated by the Approved Plan plus, to the extent not issued as of the Plan Effective Date, the aggregate shares of New Common Stock reserved for issuance to management of the Company as of the Plan Effective Date pursuant to the MIP or similar incentive plan as described under "Management Incentive Plan" on Exhibit A to the RSA.

2.     Backstop Party Commitments.

(a)     Subject to the terms and conditions of this Agreement and the occurrence of the Plan Effective Date and subject to satisfaction as of the Plan Effective Date of the Alternative Distribution Conditions (as defined below), each Backstop Party agrees to support (and not object to) the following treatment of its Claims:  in lieu of distributions to such Backstop Party under the Approved Plan of loans under the Takeback First Lien Term Loan ("Covered Loans") in a principal amount equal to such Backstop Party's Pro Rata Share of the aggregate principal amount of Covered Loans to which all Electing Lenders are entitled solely as a result of Alternative Treatment Elections  (to which such Backstop Party would otherwise be entitled under the Approved Plan on account of its Claims), such Backstop Party shall receive its Pro Rata Share of the aggregate Subject Equity Shares subject to Alternative Treatment Elections for which Electing Lenders receive Covered Loans (which alternative distributions to Backstop Parties are referred to as "Alternative Backstop Party Distributions").

(b)     Each Backstop Party agrees not to make an Alternative Treatment Election in respect of its Claims.

(c)     One or more Backstop Parties may, by agreement among them and by providing written notice to the Company not less than two business days prior to the Plan Effective Date, reallocate among themselves their respective shares of the Alternative Backstop Party Distributions to the extent that such Backstop Party's share of the Covered Loans is equal to or less than the loans under the Takeback First Lien Term Loan to which such Backstop Party would otherwise be entitled under the Approved Plan on account of its Claims.

(d)     Notwithstanding anything to the contrary in this Agreement, each Backstop Party, in its sole discretion, may designate that some or all of the Alternative Backstop Party Distributions to which such Backstop Party is otherwise entitled be issued in the name of and delivered to, one or more of its affiliates without the prior written consent of any other parties hereto, provided that written notice of such designation shall be given to the Company at least two business days prior to the Plan Effective Date.

3.  <u>Representations and Warranties of the Company</u>.  The Company represents and warrants to each Backstop Party as of the date of this Agreement and as of the Plan Effective Date (in each case other than those representations and warranties that address matters only as of a particular date or only with respect to a specific period of time, which need only be true and correct as of such date or with respect to such period) as follows:

(a)  <u>Authority</u>.  The Company (i) has the corporate power and authority to execute, deliver, and perform its obligations under this Agreement, and to consummate the transactions contemplated herein and (ii) the execution, delivery, and performance by the Company under this Agreement and the consummation of the transactions contemplated herein have been duly authorized by all necessary corporate action on the part of the Company.

(b)  <u>Validity</u>.  This Agreement has been duly executed and delivered by the Company and constitutes the legal, valid, and binding agreement of the Company, enforceable against the Company in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium, or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

(c)  <u>No Conflict</u>.  The execution, delivery, and performance by the Company (when such performance is due) of this Agreement does not and shall not (i) violate any provision of law, rule, or regulation applicable to it, or (ii) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under its certificate of incorporation or by-laws (or other organizational documents).

(d)  <u>Authorization of Governmental Authorities</u>.  To the best of the Company's knowledge, no action by (including any authorization, consent, or approval), in respect of, or filing with, any governmental authority is required for, or in connection with, the valid and lawful authorization, execution, delivery, and performance by the Company of this Agreement; provided that the Restructuring shall be subject to approval by the Bankruptcy Court in the Chapter 11 Cases.

(e)  <u>No Reliance</u>.  The Company (i) is a sophisticated party with respect to the matters that are the subject of this Agreement, (ii) has had the opportunity to be represented and advised by legal counsel in connection with this Agreement, (iii) has adequate information concerning the matters that are the subject of this Agreement, and (iv) has independently and without reliance upon the Backstop Parties or any other Party, and based on such information as the Company has deemed appropriate, made its own analysis and decision to enter into this Agreement, except that the Company has relied upon the Backstop Parties' express representations, warranties and covenants in this Agreement and the RSA, which it enters, or as to which it acknowledges and agrees, voluntarily and of its own choice and not under coercion or duress.

4.  <u>Representations and Warranties of the Backstop Parties</u>.  Each Backstop Party represents and warrants to the Company as follows:

(a)  <u>Authority</u>.  (i) Such Backstop Party is duly organized, validly existing, and in good standing under the laws of the jurisdiction of its organization, and has all the requisite

corporate, partnership, or other power and authority to execute, deliver and perform their obligations under this Agreement, and to consummate the transactions contemplated herein; and (ii) the execution, delivery and performance by such Backstop Party of this Agreement and the consummation of the transactions contemplated herein have been duly authorized by all necessary action (corporate partnership or otherwise) on the part of such Backstop Party and no other proceedings on the part of such Backstop Party are necessary to authorize and approve this Agreement or any of the transactions contemplated herein.

(b)     <u>Validity</u>.  This Agreement has been duly executed and delivered by such Backstop Party and constitutes the legal, valid, and binding agreement of such Backstop Party, enforceable against such Backstop Party in accordance with its terms.

(c)     <u>No Conflict</u>.  The execution, delivery, and performance by such Backstop Party (when such performance is due) of this Agreement does not and shall not (i) violate any provision of law, rule, or regulation applicable to it, or its certificate of incorporation or bylaws or other organizational documents, or (ii) conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it is a party.

(d)     <u>Authorization of Governmental Authorities</u>.  No action by (including any authorization, consent, or approval), in respect of, or filing with, any governmental authority is required for, or in connection with, the valid and lawful authorization, execution, delivery, and performance by such Backstop Party pursuant to this Agreement.

(e)     <u>No Reliance</u>.  Such Backstop Party (i) is a sophisticated party with respect to the subject matter of this Agreement, (ii) has been represented and advised by legal counsel in connection with this Agreement, (iii) has adequate information concerning the matters that are the subject of this Agreement, and (iv) has independently and without reliance upon the Company, or any officer, employee, agent, or representative thereof, and based on such information as such Backstop Party has deemed appropriate, made their own analysis and decision to enter into this Agreement, except that such Backstop Party has relied upon the Company's express representations, warranties, and covenants in this Agreement and the RSA, and such Backstop Party acknowledges that it has entered into this Agreement voluntarily and of its own choice and not under coercion or duress.

(f)     <u>Title</u>.  Such Backstop Party (i) is either (A) the sole legal and beneficial owner of the principal amount of the Claims set forth in Exhibit C to the RSA, or (B) has sole investment or voting discretion with respect to the principal amount of the Claims set forth in Exhibit C to the RSA and has the power and authority to bind the beneficial owner(s) of such Claims to the terms of this Agreement, (ii) has full power and authority to act on behalf of, vote, and consent to matters concerning such Claims and dispose of, exchange, assign, and transfer such Claims, and (iii) holds no Claims that are not identified in Exhibit C to the RSA.  Other than pursuant to this Agreement, such Claims are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal or other limitation on disposition or encumbrance of any kind, that would adversely affect in any way such Backstop Party's performance of its obligations contained in this Agreement at the time such obligations are required to be performed.

(g)   Certification.  Such Backstop Party is either (i) a "qualified institutional buyer" as defined in Rule 144A of the Securities Act of 1933, as amended (the "Securities Act"), (ii) an "accredited investor" as defined by Rule 501 of the Securities Act, (iii) a non-U.S. person under Regulation S under the Securities Act, or (iv) the foreign equivalent of the foregoing subparts (i) or (ii).

5.   Conditions.  The obligations of each Backstop Party set forth in Section 2 above, the entitlement of Electing Lenders to Alternative Treatment Distributions and the obligation of the Backstop Parties to accept the Alternative Backstop Party Distributions, shall be subject to the fulfillment, or waiver by the Required Backstop Parties, of each of the following conditions (the "Alternative Distribution Conditions"):

(a)   2015 EBITDA.  The Company has or, if not yet determinable, is reasonably expected to have, annual EBITDA for the Company's 2015 fiscal year (calculated in the same manner as Adjusted EBITDA as it appears in the Company's 8-K announcing second quarter 2015 financial results, filed with the Securities Exchange Commission on August 6, 2015) of not less than $525 million.

(b)   Downward Earnings Guidance.  The Company shall not, prior to the Plan Effective Date, have publicly announced (including in the Disclosure Statement or the data underlying the disclosures contained therein) or disclosed to the SC Members earnings guidance for the Company's 2016 fiscal year or any subsequent fiscal period that is less than the earnings guidance which has been disclosed to the Backstop Parties as of the execution of the RSA.

(c)   Material Adverse Change.  Since December 31, 2015 and through the Plan Effective Date, no event, development, condition or state of affairs will exist or have occurred which resulted, or would reasonably be expected to result in, a material adverse effect on (i) the business, properties, financial condition or results of operations of the Company and its subsidiaries, taken as a whole, or (ii) the ability of the Company and its subsidiaries to implement the Restructuring in accordance with the RSA (together, a "Material Adverse Effect"); provided that (A) neither the preparation, filing, pendency nor announcement of the voluntary Chapter 11 Cases or the Restructuring made pursuant to the RSA shall constitute a Material Adverse Effect, or be taken into account in determining whether any Material Adverse Effect has occurred, and (B) no event, developments, condition or state of affairs existing as of the date hereof which were disclosed in writing to the Backstop Parties shall constitute a Material Adverse Effect, or be taken into account in determining whether a Material Adverse Effect has occurred, to the extent that it is reasonably apparent on its face that the information disclosed would reasonably be expected to give rise to a Material Adverse Effect.

(d)   Representations and Warranties.  The representations and warranties of the Company contained in this Agreement shall be true and correct in all material respects at and as of the Plan Effective Date as if made at and as of such time (other than those representations and warranties that address matters only as of a particular date or only with respect to a specific period of time, which need only be true and correct in all material respects as of such date or with respect to such period), and the Company shall have performed or complied in all material respects with all agreements and covenants required by this Agreement to be performed or complied with by it prior to or at and as of the Plan Effective Date.

(e)      Plan Effective Date.  The Plan Effective Date with respect to the Approved Plan shall have occurred.

6.      Termination.  This Agreement may be terminated at any time prior to the Plan Effective Date:

(a)      by agreement of the Company and the Required Backstop Parties;

(b)      by the Required Backstop Parties in the event (i) of a material breach hereof by the Company if the Company fails to cure such breach within five business days following notification thereof by the Required Backstop Parties or (ii) upon notification of the Company by the Required Backstop Parties that the satisfaction of any condition to the Backstop Parties' obligations under this Agreement becomes impossible or impracticable with the use of commercially reasonable efforts if the failure of such condition to be satisfied is not caused by a breach hereof by any of the Backstop Parties;

(c)      by the Company in the event of a material breach hereof by any Backstop Party if the Backstop Parties fail to cure such breach within five business days following notification thereof by the Company;

(d)      by the Company in the event that the Backstop Parties cease to hold, control, or have the ability to control Claims that under the Approved Plan would entitle the Backstop Parties to loans under the Takeback First Lien Term Loan at least equal to the Covered Loans; and

(e)      by the Required Backstop Parties in the event the RSA shall have been terminated in respect of the Required Backstop Parties.

If this Agreement is validly terminated pursuant to this Section 6, this Agreement will forthwith become null and void, and there will be no liability or obligation on the part of any party hereto (or any of their respective officers, directors, employees, agents or other representatives or affiliates).

7.      Additional Backstop Parties.  From time to time with the written consent of the Required Backstop Parties and the Company, one or more persons may agree to be bound by this Agreement as a "Backstop Party" pursuant to a joinder reasonably acceptable to the Required Backstop Parties and the Company (each, an "Additional Backstop Party").  Upon an Additional Backstop Party becoming party to this Agreement in accordance with this Section 7, the Sharing Percentage and Pro Rata Share of such Additional Backstop Party and the Pro Rata Share of each other Backstop Party shall be established/adjusted consistent with the relative holdings of Claims by all such Backstop Parties.

8.      Miscellaneous.

(a)      No Assignment.  Except as expressly provided in this Agreement, this Agreement shall not be assignable by any party without the prior written consent of all other parties hereto (and any purported assignment without such consent shall be null and void *ab initio*) and is intended to be solely for the benefit of the parties hereto and is not intended to

confer any benefits upon, or create any rights in favor of, any person other than the parties hereto.

      (b)    <u>Amendment and Waiver; Election Binding</u>.

      (i)    No modification of or amendment to this Agreement shall be valid or binding unless set forth in writing and executed by the Company and the Required Backstop Parties hereto, and no waiver of any breach of any term or provision of this Agreement shall be effective or binding unless made in writing and signed by the party purporting to give the same and, unless otherwise provided, shall be limited to the specific breach waived. No modification of or amendment to this Agreement shall reduce the amount or alter the nature of the Alternative Treatment Distributions to which an Electing Lender is entitled.

      (ii)    Subject to clause (i) above, any material modification of the terms and conditions of the Backstop, including, without limitation, an extension of the Election Deadline, shall be delivered to the Lenders and the parties to this Agreement in accordance with <u>Section 8(h)</u> hereof not fewer than ten business days prior to the Election Deadline (as the same may be modified).

      (iii)    Any Initial Election or Modified Election by an Electing Lender to receive Alternative Treatment Distributions shall be irrevocable and shall constitute a binding agreement among such Electing Lender, the Backstop Parties and the Company.

      (c)    <u>Entire Agreement</u>. This Agreement, together with the RSA, the Definitive Documents and the other documents and agreements contemplated by the RSA, set forth the entire understanding of the parties hereto with respect to the subject matter hereof and supersede all prior agreements, discussions or understandings regarding the subject matter hereof, whether written or oral. This Agreement may be executed in any number of counterparts, each of which shall be an original, and all of which, when taken together, shall constitute one agreement. Delivery of an executed signature page of this Agreement by facsimile (or other form of electronic) transmission shall be effective as delivery of a manually executed counterpart hereof.

      (d)    <u>Further Assurances</u>. Each party shall execute and deliver all such further documents and instruments and do all acts and things as any other party may after the date hereof reasonably require to carry out or better evidence the full intent and meaning of this Agreement.

      (e)    <u>Assigns</u>. All terms of this Agreement shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and permitted assigns.

      (f)    <u>Headings</u>. Introduction and paragraph headings in this Agreement are for convenience only and shall not affect the construction of this Agreement.

      (g)    <u>Governing Law; Jurisdiction</u>.

      (i)    THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO ANY CONFLICTS OF LAW PROVISION

WHICH WOULD REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION.

(ii)     By its execution and delivery of this Agreement, each of the Parties hereto irrevocably and unconditionally agrees for itself that any legal action, suit, or proceeding against it with respect to any matter under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit, or proceeding, shall be brought, to the extent possible, in either the United States District Court for the Southern District of New York or any New York State court sitting in New York City or following the Petition Date, the Bankruptcy Court (the "Chosen Courts").  By execution and delivery of this Agreement, each of the Parties irrevocably accepts and submits itself to the exclusive jurisdiction of the Chosen Courts, generally and unconditionally, with respect to any such action, suit, or proceeding, and waives any objection it may have to venue or the convenience of the forum.

(h)     Notices.  Other than any notice relating to a material modification of the terms of the Backstop, any notice required or permitted under this Agreement shall be given in writing and shall be deemed effectively given upon personal delivery to the party to be notified or upon delivery by confirmed facsimile transmission or nationally recognized overnight courier service and addressed to the party to be notified at the address indicated for such party on the signature page hereof, or at such other address as such party may designate by ten days' advance written notice to the other parties.  Notices relating to material modifications of the Backstop (if any), shall be delivered electronically to such parties.  For Lenders who are not also Backstop Parties, notices relating to any such material modification shall be sent to the electronic mail address provided to the Company following receipt of and in accordance with the Ballot.  For Backstop Parties, notices relating to any such material modification shall be sent to the electronic address indicated for such party on the signature page hereto, or at such other email address as such Backstop Party may designate by ten days' advance written notice to the other parties hereto.

(i)     Obligations Several and Not Joint.  It is understood that (i) each of the Backstop Parties  is entering into this Agreement on behalf of such Backstop Party, and not on behalf of any other Backstop Party, (ii) the obligations of each Backstop Party hereunder are several and not joint, (iii) the relationship of the Backstop Parties shall not be deemed a partnership, joint venture or similar arrangement and (iv) no Backstop Party shall have any liability for any breach of any provision of this Agreement by any other Backstop Party.

(j)     Specific Performance.  Each party hereto acknowledges that money damages would be both incalculable and an insufficient remedy for any breach of this Agreement by such party and that any such breach would cause the other parties hereto irreparable harm.  Accordingly, each party hereto also agrees that, in the event of any breach or threatened breach of the provisions of this Agreement by such party, the other parties hereto shall be entitled to equitable relief without the requirement of posting a bond or other security, including in the form of injunctions and orders for specific performance, in addition to all other remedies available to such other parties at law or in equity.

## FIRST AMENDMENT TO
## BACKSTOP AGREEMENT

This FIRST AMENDMENT TO BACKSTOP AGREEMENT (this "Amendment"), dated as of May 16, 2016, is entered into by and among Dex Media, Inc., a Delaware corporation (the "Company"), on behalf of itself and its direct and indirect subsidiaries, and each of the signatories hereto under the heading "Backstop Party" (each, a "Backstop Party" and collectively the "Backstop Parties").  Capitalized terms used and not otherwise defined in this Amendment shall have the meanings set forth in the Backstop Agreement, dated as of May 2, 2016 (the "Original Agreement"), among the parties hereto.

## RECITALS

**WHEREAS**, as of May 2, 2016, the parties hereto entered into the Original Agreement;

**WHEREAS**, pursuant to the terms of the Original Agreement, the parties hereto wish to amend the Original Agreement pursuant to this Amendment, which Amendment constitutes a "material modification of the terms of the Backstop" in accordance with the definition of "Modified Election".

## AGREEMENT

**NOW, THEREFORE**, in consideration of the mutual promises contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Company and each of the Backstop Parties hereby agree to amend the Original Agreement as follows:

1.     Amendment to Section 1.  Section 1 of the Original Agreement is hereby amended as follows:

(a)     Paragraph (g) of Section 1 is hereby amended and restated in its entirety as follows, with deleted language indicated by ~~strikethrough~~ and newly added language indicated by double underline:

"<u>"Election Deadline</u>" means ~~the Voting Deadline, as defined in the Disclosure Statement~~<u>May 31, 2016</u>, or such later date as the parties hereto may determine after notice to the Lenders as set forth in Section 8(h) hereof."

(b)     Paragraph (l) of Section 1 is hereby amended and restated in its entirety as follows, with deleted language indicated by ~~strikethrough~~ and newly added language indicated by double underline:

"<u>"Reorganized Dex Equity Value</u>" means $~~50,000,000~~<u>100,000,000</u>."

2.     Notice to Lenders.  The Company agrees to deliver to the Lenders in accordance with Section 8(h) of the Original Agreement (a) a written notice of the amendments set forth in Section 1 above and (b) an election form permitting each Lender (including those Lenders that

made an Initial Election) to make a Modified Election at any time prior to the Election Deadline.

        3.    <u>Miscellaneous</u>.

        (a)    The Original Agreement as hereby amended remains in full force and effect.

        (b)    THIS AMENDMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO ANY CONFLICTS OF LAW PROVISION WHICH WOULD REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION.

        (c)    This Amendment sets forth the entire understanding of the parties hereto with respect to the subject matter hereof and supersedes all prior agreements, discussions or understandings regarding the subject matter hereof, whether written or oral.

        (d)    This Amendment may be executed in any number of counterparts, each of which shall be an original, and all of which, when taken together, shall constitute one agreement. Delivery of an executed signature page of this Amendment by facsimile (or other form of electronic) transmission shall be effective as delivery of a manually executed counterpart hereof.

[Signature Pages Follow]

#4850-9679-8257

## EXHIBIT B

**Restructuring Support Agreement**

## RESTRUCTURING SUPPORT AGREEMENT

This Restructuring Support Agreement (this "Agreement") is entered into as of May 2, 2016 by and among (i) Dex Media, Inc. ("Dex Media") and each of its subsidiaries listed on Schedule 1 hereto (each, along with Dex Media, a "Company Party," and collectively, the "Company"), (ii) the undersigned lenders and their affiliates under the SuperMedia Facility (as defined below), the Dex East Facility (as defined below), the Dex West Facility (as defined below), and the RHDI Facility (as defined below) (each, a "Supporting Lender" and collectively, the "Supporting Lenders"), and (iii) the undersigned subordinated noteholders and their affiliates under the Subordinated Notes (as defined below) (the "Supporting Noteholders" and together with the Supporting Lenders, the "Supporting Creditors"). Each of the Company, the Supporting Creditors, and each other person that becomes a party to this Agreement in accordance with its terms shall be referred to herein individually as a "Party" and collectively as the "Parties." Each of Mudrick Capital Management, L.P., Paulson & Co., Ares Management LLC and Silver Point Capital, L.P. shall be referred to as an "SC Member" and collectively as "SC Members." Any references to ownership as of any date of determination by an SC Member of principal amounts under any Loans (as defined below) shall also include the aggregate principal amount held, controlled, or under the ability to control by such SC Member's affiliates and managed accounts as of such date of determination.

## RECITALS

WHEREAS, SuperMedia Inc. ("SuperMedia") entered into that certain Loan Agreement, dated as of December 31, 2009 (as amended, restated, supplemented, or otherwise modified from time to time, the "SuperMedia Credit Agreement"), by and among SuperMedia as borrower, Dex Media, the banks and other financial institutions named therein as lenders, and JPMorgan Chase Bank, N.A., as administrative and collateral agent by which the lenders made available to SuperMedia a senior secured credit facility (as amended, the "SuperMedia Facility");

WHEREAS, Dex Media East, Inc. ("Dex East") entered into that certain Credit Agreement, dated as of October 24, 2007 (as amended, restated, supplemented, or otherwise modified from time to time, the "Dex East Credit Agreement"), by and among Dex East as borrower, Dex Media, Dex Media Holdings, Inc., the banks and other financial institutions named therein as lenders, and JPMorgan Chase Bank, N.A., as administrative and collateral agent by which the lenders made available to Dex East a senior secured credit facility (as amended, the "Dex East Facility");

WHEREAS, Dex Media West, Inc. ("Dex West") entered into that certain Credit Agreement, dated as of June 6, 2008 (as amended, restated, supplemented, or otherwise modified from time to time, the "Dex West Credit Agreement"), by and among Dex West as borrower, Dex Media, Dex Media Holdings, Inc., the banks and other financial institutions named therein as lenders, and JPMorgan Chase Bank, N.A., as administrative and collateral agent by which the lenders made available to Dex West a senior secured credit facility (as amended, the "Dex West Facility");

WHEREAS, R.H. Donnelley, Inc. ("RHDI") entered into that certain Credit Agreement, dated as of April 30, 2013 (as amended, restated, supplemented, or otherwise modified from time to time, the "RHDI Credit Agreement" and together with the SuperMedia Credit Agreement, the Dex East Credit Agreement, and the Dex West Credit Agreement, the "Credit Agreements"), by

and among RHDI as borrower, Dex Media, the banks and other financial institutions named therein as lenders, and Deutsche Bank Trust Company Americas, as administrative and collateral agent by which the lenders made available to RHDI a senior secured credit facility (as amended, the "<u>RHDI Facility</u>" and, together with the SuperMedia Facility, the Dex East Facility, and the Dex West Facility, the "<u>Loans</u>");

WHEREAS, R.H. Donnelley Corporation issued 12%/14% Senior Subordinated Notes due January 29, 2017 (the "<u>Subordinated Notes</u>" and, together with the Loans, the "<u>Debt Instruments</u>") pursuant to that certain Indenture, dated as of January 29, 2010, between R.H. Donnelley Corporation as issuer and The Bank of New York Mellon as trustee;

WHEREAS, the Parties have negotiated in good faith at arm's-length and agreed to support a restructuring of the Company's capital structure and financial obligations (the "<u>Restructuring</u>") that is mutually acceptable to the Company and the Supporting Lenders subject to and consistent with the terms and conditions set forth in this Agreement;

WHEREAS, it is contemplated that the Company will commence voluntary bankruptcy cases (the "<u>Chapter 11 Cases</u>") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "<u>Bankruptcy Code</u>"), in the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>"). In connection with the Chapter 11 Cases, the Company intends to distribute and file a disclosure statement (as may be amended from time to time, the "<u>Disclosure Statement</u>") and Approved Plan (as defined below);

WHEREAS, each Party desires that the Restructuring be implemented through a prepackaged chapter 11 plan filed in the Chapter 11 Cases in substantially the form annexed hereto as <u>Exhibit A</u> (as the same may be modified in accordance with the provisions of this Agreement, the "<u>Approved Plan</u>"),[1] the Exit Term Loan Facility annexed hereto as <u>Exhibit F</u> (the "<u>Exit Term Loan Facility Term Sheet</u>") and the Subordinated Noteholder Term Sheet annexed hereto as <u>Exhibit E</u> (as the same may be modified in accordance with the provisions of this Agreement, the "<u>Subordinated Noteholder Term Sheet</u>"), consistent with this Agreement; and

NOW, THEREFORE, in consideration of the recitals stated above and the premises and mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, each of the Parties agree as follows:

1.  ***Definitive Documentation and Exhibits.***  Each Party hereby covenants and agrees to (x) negotiate in good faith each of the documents implementing, achieving and relating to the Restructuring, including without limitation, all definitive documents necessary for the Approved Plan, including without limitation, (A) all first-day motions related to the maintenance of the existing cash management system (the "<u>Cash Management First Day Motions</u>"), (B) all other first-day motions, including those relating to applications, payment of general unsecured claims in the ordinary course, payment of utilities, payment of wages to employees, and payment to

---

[1]    The Company and the Supporting Lenders shall use commercially reasonable efforts to cause the Approved Plan and the Confirmation Order (as defined herein) to include mutual and third-party releases and exculpation provisions as set forth in the Approved Plan attached hereto as <u>Exhibit A</u>.  However, should the Bankruptcy Court fail to approve the mutual and third-party releases and exculpation provisions as set forth in the Approved Plan attached hereto as <u>Exhibit A</u>, no Party may terminate this Agreement or otherwise enforce any rights or remedies under this Agreement on account of such failure.

maintain insurance obligations (collectively, and together with the Cash Management First Day Motions, the "First Day Motions"), (C) the Approved Plan, (D) the Disclosure Statement, ballots, and other solicitation materials in respect of the Approved Plan (collectively, the "Plan Solicitation Materials"), (E) the motion to approve the Disclosure Statement and seeking confirmation of the Approved Plan, (F) the proposed order approving the Plan Solicitation Materials and confirming the Approved Plan (the "Confirmation Order"), (G) the stockholders agreement (the "Stockholders Agreement") as described in Exhibit B (the "Stockholders Agreement Term Sheet"), (H) the Exit Term Loan Facility (as defined in Exhibit F), and all other post-effective date financing documents, (I) the Warrants (as defined in the Subordinated Noteholder Term Sheet), (J) new or amended charter and by-laws of Dex Media, (K) the post-reorganization corporate structure and (L) the plan supplement (the "Plan Supplement") (the documents referred to in the foregoing clause (A) and clauses (C) through (J), collectively, the "Definitive Documents"), which Definitive Documents shall contain terms and conditions consistent in all respects with the Approved Plan and the Subordinated Noteholder Term Sheet and be on terms acceptable to the Required Supporting Lenders, and (y) execute (to the extent such Party is a party thereto) and otherwise support the Definitive Documents.

2.    ***Restructuring and Related Support.***

(a)    *The Company's Obligations.*  Except as set forth in Section 12 hereof, for so long as this Agreement has not been terminated in accordance with its terms, the Company covenants and agrees to, and to cause its affiliates to:

(i)    (A) support and complete the Restructuring and all transactions contemplated under this Agreement, including, without limitation, those described in the Approved Plan in accordance with the milestones set forth in Section 7 below (collectively, the "Milestones"), (B) take any and all reasonably necessary actions in furtherance of the Restructuring and the transactions contemplated under this Agreement, including, without limitation, as set forth in the Approved Plan, (C) use commercially reasonable efforts to cause holders of more than 66 2/3% of the claims under each of the Debt Instruments to vote to accept the Approved Plan, and (D) use commercially reasonable efforts to obtain any and all required regulatory and/or third-party approvals necessary to consummate the Restructuring;

(ii)    pay the reasonable and documented fees and expenses of Milbank, Tweed, Hadley & McCloy LLP, Houlihan Lokey Capital, Wachtell, Lipton, Rosen & Katz, PJT Partners, Inc., and Simpson Thacher & Bartlett LLP, in each case in accordance with the applicable engagement and/or fee letters, the Approved Plan and any related documents; provided that the Company Parties shall pay any accrued but unpaid amounts owing under such engagement and/or fee letters on the effective date of the Approved Plan (the "Plan Effective Date") and as otherwise required pursuant to the Cash Collateral Order (as defined herein);

(iii)    pay the reasonable and documented fees and expenses of Akin Gump Strauss Hauer & Feld LLP and Ducera Partners LLC up to $500,000.00 in the aggregate, pursuant to the terms of the Subordinated Noteholder Term Sheet;

(iv)  take no action that is inconsistent with this Agreement or the Approved Plan, or that would unreasonably delay approval of the Disclosure Statement or confirmation of the Approved Plan; and

(v)  if requested by the Required Supporting Lenders, take commercially reasonable efforts to obtain an order from the Bankruptcy Court approving the assumption of this Agreement as soon as practicable following such request.

(b)  *The Supporting Lenders' Obligations.*  For so long as this Agreement has not been terminated in accordance with its terms, each Supporting Lender covenants and agrees:

(i)  to (A) neither oppose nor object to the Disclosure Statement, and (B) neither join in nor support any objection to approval of the Disclosure Statement;

(ii)  to not (A) oppose or object to the Approved Plan, or the solicitation of votes with respect to an Approved Plan, (B) join in, encourage, or otherwise support any objection to the Disclosure Statement, Approved Plan, or the solicitation of votes with respect to an Approved Plan, or (C) otherwise commence any proceeding to oppose or alter any of the terms of an Approved Plan or any other Definitive Document filed by the Company in connection with the confirmation or implementation of an Approved Plan;

(iii)  upon being properly solicited with an Approved Plan and Disclosure Statement in accordance with applicable law, (A) timely vote all of its claims (as such term is defined in section 101(5) of the Bankruptcy Code), now or hereafter owned by such Supporting Lender, against any Company Party ("Supporting Lender Claims"), including, without limitation, Supporting Lender Claims arising under the Debt Instruments, to accept the Approved Plan and not thereafter withdraw, change, or revoke such vote (and to the extent any direction is requested with respect to voting of any claim held by a Supporting Lender for trades not settled (but which claims will be bound by the terms hereof upon the closing of such trade) to timely direct the vote of such claims to accept the Approved Plan in accordance with market convention), (B) to the extent such election is available, not elect on its ballot to preserve claims, if any, that each Supporting Lender may own or control that may be affected by any releases expressly contemplated by (and consistent with) the Approved Plan, and (C) support confirmation of the Approved Plan;

(iv)  to support (and not object to) the First Day Motions and other motions and documents filed by the Company in furtherance of the Restructuring, so long as such motions and/or documents contain terms and conditions consistent with the Approved Plan; provided, that the Approved Plan, Stockholders Agreement, Plan Supplement, Confirmation Order, the Cash Collateral Motion (as defined herein), the Cash Collateral Order (as well as any form of such order submitted to the Bankruptcy Court), the Confirmation Order, the New Dex Credit Facility, the Stockholders Agreement and the other Definitive Documents must be in form and substance acceptable to the Required Supporting Lenders;

(v)  subject to Section 2(b)(iv) hereof, to use commercially reasonable efforts to execute, and to instruct JPMorgan Chase Bank, N.A. and/or Deutsche Bank Trust Company Americas (together, the "Agents") to execute, any document and give any notice, order, instruction, or direction (including, without limitation, notice, instruction, or

direction to the applicable administrative and/or collateral agents under the Debt Instruments or related credit documents) necessary or reasonably requested by the Company and consented to by the Required Supporting Lenders (which consent shall not be unreasonably withheld) to support, facilitate, implement, or consummate or otherwise give effect to the Restructuring to the extent consistent with the Approved Plan;

(vi) to not take or instruct the Agents' taking of, under or relating to the applicable Loans or otherwise, any action against or in respect of the Company that would be inconsistent with this Agreement, the Approved Plan, or the Restructuring; and

(vii) to otherwise support and take all actions, and to instruct the Agents to support and take all actions, necessary or reasonably requested by the Company and consented to by the Required Supporting Lenders (which consent shall not be unreasonably withheld) to facilitate consummation of the Approved Plan and the Restructuring.

(c)      *The Supporting Noteholders' Obligations*. For so long as this Agreement has not been terminated in accordance with its terms, each Supporting Noteholder covenants and agrees:

(i)      to (A) neither oppose nor object to the Disclosure Statement, (B) neither join in nor support any objection to approval of the Disclosure Statement and (C) oppose any action by any other holder of Subordinated Notes adverse to the Disclosure Statement, the Approved Plan, or the Cash Collateral Order;

(ii)      to not (A) oppose or object to the Approved Plan, or the solicitation of votes with respect to an Approved Plan, (B) join in, encourage, or otherwise support any objection to the Disclosure Statement, Approved Plan, or the solicitation of votes with respect to an Approved Plan, or (C) otherwise commence any proceeding to oppose or alter any of the terms of an Approved Plan or any other Definitive Document filed by the Company in connection with the confirmation or implementation of an Approved Plan;

(iii)      upon being properly solicited with an Approved Plan and Disclosure Statement in accordance with applicable law, (A) timely vote all of its claims (as such term is defined in section 101(5) of the Bankruptcy Code), now or hereafter owned by such Supporting Noteholder, against any Company Party ("Supporting Noteholders Claims" and, together with the Supporting Lender Claims, the "Claims"), including, without limitation, Supporting Noteholder Claims arising under the Subordinated Notes, to accept the Approved Plan and not thereafter withdraw, change, or revoke such vote (and to the extent any direction is requested with respect to voting of any claim held by a Supporting Noteholder for trades not settled (but which claims will be bound by the terms hereof upon the closing of such trade) to timely direct the vote of such claims to accept the Approved Plan in accordance with market convention), (B) to the extent such election is available, not elect on its ballot to preserve claims, if any, that each Supporting Noteholder may own or control that may be affected by any releases expressly contemplated by (and consistent with) the Approved Plan, and (C) support confirmation of the Approved Plan;

(iv)      to support (and not object to) the First Day Motions and other motions and documents filed by the Company in furtherance of the Restructuring, so long as such motions and/or documents contain terms and conditions substantially consistent with the

Approved Plan; provided, that the Warrants must be substantially on the terms set forth in the Subordinated Notes Term Sheet and otherwise in form and substance reasonably acceptable to the Required Supporting Noteholders;

(v)    subject to Section 2(c)(iv) hereof, to use commercially reasonable efforts to execute, and to instruct The Bank of New York Mellon, as Trustee (the "Trustee") to execute, any document and give any notice, order, instruction, or direction (including, without limitation, notice, instruction, or direction to the applicable administrative and/or collateral agents under the Debt Instruments or related credit documents) necessary or reasonably requested by the Company and consented to by the Required Supporting Lenders (which consent shall not be unreasonably withheld) to support, facilitate, implement, or consummate or otherwise give effect to the Restructuring to the extent consistent with the Approved Plan; provided, that in no event will such Required Supporting Noteholders be required to provide indemnification to the Trustee;

(vi)    to support the Company's efforts to avoid the appointment of a unsecured creditors committee, and, if requested by the Company, communicate to the United States Trustee such support;

(vii)    to not take or instruct the Trustee's taking of, under or relating to the Subordinated Notes or otherwise, any action against or in respect of the Company that would be materially inconsistent with this Agreement, the Approved Plan, or the Restructuring; and

(viii)    to otherwise support and take all actions, and to instruct the Trustee to support and take all actions, necessary or reasonably requested by the Company and consented to by the Required Supporting Lenders (which consent shall not be unreasonably withheld) to facilitate consummation of the Approved Plan and the Restructuring; provided, that in no event will such Required Supporting Noteholders be required to provide indemnification to the Trustee.

(d)    *The Company Parties' and Supporting Creditors' Mutual Obligations.* Except as set forth in Section 12 hereof, and without limiting the commitments set forth in Section 2(a), Section 2(b), and Section 2(c) hereof in *any* respect, for so long as this Agreement has not been terminated in accordance with its terms, each Party covenants and agrees:

(i)    to support consummation of the Restructuring, including the solicitation, confirmation, and consummation of the Approved Plan, as may be applicable, pursuant to the terms set forth in this Agreement;

(ii)    to negotiate in good faith each of the documents implementing, achieving and relating to the Restructuring, including without limitation, the Definitive Documents;

(iii)    to not directly or indirectly (A) participate in the formulation of, file, or prosecute any plan, sale, proposal, or offer of dissolution, winding up, liquidation, reorganization, merger, or restructuring of the Company in lieu of or as an alternative to the Restructuring, (B) join in, support, or vote for any alternative plan or restructuring, including, without limitation, express support in writing of, or enter into any form of plan support agreement with respect to, any alternative plan or restructuring, or (C) take any

action not required by law to alter, delay, or impede approval of the Disclosure Statement and confirmation and consummation of the Approved Plan and any related documents;

(iv)  to not, nor encourage any other person or entity to, take any action which would, or would reasonably be expected to, breach or be inconsistent with this Agreement or delay, impede, appeal, or take any other negative action, directly or indirectly, to interfere with the acceptance or implementation of the Restructuring;

(v)  to execute (to the extent such Party is a party thereto) and otherwise support (and not oppose) the Definitive Documents; and

(vi)  the Company will not oppose the standing of any Supporting Lender, or representative thereof, to appear and be heard in the bankruptcy case as a party in interest.

provided, that except as expressly provided herein, this Agreement and all communications and negotiations among the Parties with respect hereto or any of the transactions contemplated hereunder are without waiver or prejudice to the Parties' rights and remedies, and the Parties hereby reserve all claims, defenses, and positions that they may have with respect to each other; provided, further, that nothing in this Agreement shall be deemed to limit or restrict any action by any Party to enforce any right, remedy, condition, consent, or approval requirement under the Definitive Documents.

3.    *Acknowledgements.*  Each Party acknowledges that (a) no securities of the Company are being offered or sold hereby and this Agreement neither constitutes an offer to sell nor a solicitation of an offer to buy any securities of the Company, and (b) that this Agreement is not, and shall not be deemed to be, a solicitation of a vote for the acceptance of the Approved Plan pursuant to section 1125 of the Bankruptcy Code.

4.    *Limitations on Transfer of Interests in the Debt Instruments.*

(a)    Subject to Section 4(b) hereof, no Supporting Creditor shall (i) sell, transfer, assign, pledge, grant a participation interest in, or otherwise dispose of, directly or indirectly, its right, title, or interest in respect of any of such Supporting Creditor's interest in its Claims in whole or in part, or (ii) grant any proxies, deposit any of such Supporting Creditor's Claims into a voting trust, or enter into a voting agreement with respect to any such Claim (collectively, the actions described in clauses (i) and (ii), a "Transfer"), unless such Transfer is to (x) another Supporting Creditor, or (y) any other entity that first agrees in writing to be bound by the terms of this Agreement by executing and delivering to the Company (and if such a Claim relates to a Debt Instrument, to the applicable Agent or the Trustee) a transferee acknowledgment substantially in the form attached hereto as Exhibit C (the "Transferee Acknowledgment"). With respect to Claims held by the relevant transferee upon consummation of a Transfer, such transferee is deemed to make all of the representations and warranties of a Supporting Creditor set forth in Section 10 hereof as of the date of such Transfer.  Upon compliance with the foregoing, the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of such transferred rights and obligations. Any Transfer made in violation of this Section 4 shall be deemed null and void and of no force or effect, regardless of any prior notice provided to the Company, and shall not create any obligation or liability of the Company to the purported transferee (it being understood that

the putative transferor shall continue to be bound by the terms and conditions set forth in this Agreement).

(b)     Notwithstanding the foregoing, (i) a Supporting Creditor may Transfer any Claim to an entity that is acting in its capacity as a Qualified Marketmaker (defined below) without the requirement that the Qualified Marketmaker be or become a Supporting Creditor, provided that such Qualified Marketmaker must subsequently Transfer such Claims to a transferee that is a Supporting Creditor (or becomes a Supporting Creditor at the time of the Transfer pursuant to a Transferee Acknowledgement) and (ii) if a Supporting Creditor, acting in its capacity as a Qualified Marketmaker, acquires a Claim from a holder of Claims that is not a Supporting Creditor, it may Transfer such Claim without the requirement that the transferee be or become a Supporting Creditor.  For purposes hereof, a "Qualified Marketmaker" shall mean an entity that (a) holds itself out to the market as standing ready in the ordinary course of its business to purchase from customers and sell to customers claims against the Company (including debt securities or other debt) or enter with customers into long and short positions in claims against the Company (including debt securities or other debt), in its capacity as a dealer or market maker in such claims and (b) is in fact regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

5.     ***Further Acquisition of Indebtedness***.  **Exempted Claims.** This Agreement shall in no way be construed to preclude any Supporting Creditor or any of its affiliates from acquiring additional Claims.  Any such additional Claims shall automatically be subject to the terms of this Agreement and such acquiring Supporting Creditor shall promptly (and, in no event later than five business days) inform the Company.

6.     ***Effectiveness of the Agreement***.

(a)     This Agreement shall become effective and binding upon each of the Parties upon the Company having received duly executed signature pages to this Agreement from (i) Supporting Lenders holding, controlling, or having the ability to control more than 51% in amount of claims in respect of each Loan, and (ii) Supporting Noteholders holding, controlling, or having the ability to control more than 66 2/3% in amount of claims in respect of the Subordinated Notes.

(b)     The effectiveness of this Agreement (i) is further subject to the satisfaction of the condition that the Company shall have paid the reasonable and documented fees and expenses of Milbank, Tweed, Hadley & McCloy LLP, Houlihan Lokey Capital, Wachtell, Lipton, Rosen & Katz, PJT Partners, Inc., and Simpson Thacher & Bartlett LLP through such date and (ii) with respect to the Required Supporting Noteholders, is further subject to the satisfaction of the condition that the Company shall have paid the reasonable and documented fees and expenses of Akin Gump Strauss Hauer & Feld LLP and Ducera Partners LLC up to $500,000.00 in the aggregate, pursuant to the terms of the Subordinated Noteholder Term Sheet.

(c)     For purposes of this Agreement, the term "Required Supporting Lenders" means not less than three SC Members holding, controlling, or having the ability to control more than 50% of the aggregate principal amount under the Debt Instruments held by all SC Members, calculated as of such date the Supporting Lenders make a determination in accordance with this Agreement.  For purposes of this Agreement, the term "Required Silo-Level Supporting Lenders" means SC Members holding 66 2/3% of the aggregate principal amount of each Debt

Instrument held by all SC Members and any reference to the Required Silo-Level Supporting Lenders of a Debt Instrument means SC Members holding, controlling, or having the ability to control 66 2/3% of the aggregate principal amount of such Debt Instrument held by all SC Members, calculated as of such date the Supporting Lenders make a determination in accordance with this Agreement.

(d)    For purposes of this Agreement, the term "<u>Required Supporting Noteholders</u>" means Supporting Noteholders holding, controlling, or having the ability to control more than 50% of the aggregate principal amount under the Subordinated Notes held by all Supporting Noteholders, calculated as of such date the Supporting Noteholders make a determination in accordance with this Agreement.

7.    ***Milestones.***  The Company Parties will comply with the following Milestones within the periods specified herein, unless otherwise expressly and mutually agreed in writing with the Required Supporting Lenders:

(a)    the Company Parties shall commence a solicitation of the Approved Plan within five (5) business days from the Company having received duly executed signature pages to this Agreement from Supporting Lenders holding, controlling, or having the ability to control at least 60% in amount of claims in respect of each Loan (the "<u>Solicitation Date</u>");

(b)    on the 14th day following the Solicitation Date (or such earlier date that is agreed to by the Company and the Required Supporting Lenders), the Company Parties shall commence the Chapter 11 Cases by filing voluntary petitions in the Bankruptcy Court, provided that the Company shall have received ballots approving the Approved Plan from (i) holders of more than 66 2/3% of the claims under each of the Loans, and (ii) more than 50% of the holders who timely submit valid ballots under each of the Loans (the date of such commencement, the "<u>Petition Date</u>");

(c)    the Company shall have filed on the Petition Date a motion seeking interim and final approval of a cash collateral order (the "<u>Cash Collateral Motion</u>"), the Approved Plan, and the Disclosure Statement, each in form and substance acceptable to the Required Supporting Lenders;

(d)    a cash collateral order in form and substance acceptable to the Required Supporting Lenders (the "<u>Cash Collateral Order</u>") shall have been approved (i) on an interim basis no later than 5 days after the Petition Date, and (ii) on a final basis, no later than 45 days after the Petition Date;

(e)    the Disclosure Statement shall be approved and the Approved Plan shall be confirmed pursuant to an order in form and substance acceptable to the Required Supporting Lenders within 120 days of the Petition Date; and

(f)    the Plan Effective Date shall occur on or prior to 120 days after the Petition Date.

8.    ***Enforceability.***  Each of the Parties acknowledges and agrees that this Agreement is being executed in connection with negotiations concerning the Restructuring and in contemplation of the potential commencement of the Chapter 11 Case, and the rights granted in

this Agreement are enforceable by each signatory hereto without approval of the Bankruptcy Court.

9.    *Termination.*

(a)    *The Company's Right to Terminate.*  Except as otherwise set forth in this Section 9(a), the Company may terminate this Agreement if, upon the occurrence of any of the following events (each, a "Company Termination Event"), the Company provides the Supporting Creditors written notice of such Company Termination Event delivered in accordance with Section 25 hereof, and (x) such Company Termination Event remains uncured for a period of five (5) business days following the Company's delivery of such notice, and (y) the Company has not waived such Company Termination Event on or before the expiration of the cure period:

(i)    if one or more Supporting Lenders have breached any of their respective obligations under this Agreement in any respect that materially and adversely affects the Company's interests in connection with the Restructuring, the Approved Plan, or this Agreement;

(ii)    the Supporting Lenders at any time after the Solicitation Date hold less than 60% of the aggregate amount of outstanding principal obligations under any of the Loans;

(iii)    if any court of competent jurisdiction or other competent governmental or regulatory authority shall have issued an order, which order is not subject to a stay of its effectiveness pending appeal, making illegal or otherwise restricting, preventing, or prohibiting the Restructuring in a manner that cannot be reasonably remedied by the Company;

(iv)    following the Company's determining that proceeding with the transactions contemplated by this Agreement would be inconsistent with the continued exercise of their fiduciary duties as described in Section 12 hereof; provided, that, notwithstanding any provision in this Agreement to the contrary, upon such determination, the Company shall be entitled to terminate this Agreement immediately upon written notice to the Supporting Creditors delivered in accordance with Section 25 hereof;

(v)    if any Supporting Lender, or an affiliate of the foregoing files any motion or pleading with the Bankruptcy Court that is not consistent with this Agreement and materially adversely affects the Company's interests in connection with the Restructuring, or the Approved Plan; or

(vi)    the Plan Effective Date shall not have occurred on or before 120 days after the Petition Date.

(b)    *The Required Supporting Lenders' Right to Terminate.*  The Required Supporting Lenders may terminate this Agreement if, upon the occurrence and continuation of any of the following events (each, a "Lender Termination Event"), the Required Supporting Lenders provide the Company and the Required Supporting Noteholders written notice of such Lender Termination Event delivered in accordance with Section 25 hereof, and (x) such Lender Termination Event remains uncured for a period of five (5) business days following

the Required Supporting Lenders' delivery of such notice, and (y) the Required Supporting Lenders have not waived such Lender Termination Event on or before the expiration of the cure period:

(i)  if the Company has (i) breached any of its obligations under this Agreement in any respect that adversely affects the Supporting Lenders' interests in connection with the Restructuring, the Approved Plan, or this Agreement, (ii) withdrawn the Approved Plan, (iii) publicly announced their intention not to support the Approved Plan, or (iv) proposed or filed a motion with the Bankruptcy Court seeking the approval of a chapter 11 plan other than the Approved Plan (or otherwise pursue an alternative plan with respect to any Company Party);

(ii)  in the event that the Company fails to meet a Milestone, which has not been waived or extended in a manner consistent with this Agreement;

(iii)  upon the filing by the Company of any motion or other request for relief seeking to (A) voluntarily dismiss the Chapter 11 Case, (B) other than with respect to Dex Media, convert the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, (C) appoint a trustee or examiner with expanded powers pursuant to section 1104 of the Bankruptcy Code in the Chapter 11 Case, or (D) sell one or more assets of the Company valued in excess of $5.0 million; provided that any sale of the Company's real property in St. Petersburg, Florida, Marlton, New Jersey, or Bristol, Tennessee, shall not give rise to a Lender Termination Event;

(iv)  if the Company makes or agrees to make any payments in respect of the Subordinated Notes outside of an Approved Plan or the Subordinated Notes Term Sheet;

(v)  if at any time since September 30, 2015, any event, development, condition or state of affairs exists or has occurred which results in, or would reasonably be expected to result in, a material adverse effect on the business, properties, financial condition or results of operations of the Company and its subsidiaries, taken as a whole (together, a "Material Adverse Effect"); provided, however, that (A) neither the filing, pendency nor announcement of the voluntary Chapter 11 Cases or the Restructuring made pursuant to this Agreement shall constitute a Material Adverse Effect, or be taken into account in determining whether any Material Adverse Effect has occurred, and (B) prior to the date hereof no event, developments, condition or state of affairs existing as of the date hereof which was disclosed to the SC Members shall constitute a Material Adverse Effect, or be taken into account in determining whether a Material Adverse Effect has occurred, to the extent that it is reasonably apparent that the information disclosed would reasonably be expected to give rise to a Material Adverse Effect;

(vi)  if any court of competent jurisdiction or other competent governmental or regulatory authority shall have issued an order, which order is not subject to a stay of its effectiveness pending appeal, making illegal or otherwise restricting, preventing, or prohibiting the Restructuring in a manner that cannot be reasonably remedied by the Company;

(vii) upon entry of a final, non-appealable judgment or order (A) denying confirmation of the Approved Plan, if it is not reasonably possible for the Company Parties

11

to subsequently obtain confirmation of the Approved Plan, (B) confirming the Approved Plan is reversed or vacated, if it is not reasonably possible for the Company Parties to subsequently obtain confirmation of the Approved Plan, (C) declaring this Agreement to be unenforceable, (D) other than with respect to Dex Media, converting the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, (E) appointing a trustee or examiner with expanded powers pursuant to section 1104 of the Bankruptcy Code in the Chapter 11 Cases, or (F) dismissing the Chapter 11 Cases, or (G) terminating the Company's exclusive right to file a chapter 11 plan;

(viii) if (A) one or more non-terminating Supporting Lenders have breached any of their respective obligations under this Agreement in any respect  (a "Defaulting Supporting Lender") that materially and adversely affects the non-Defaulting Supporting Lenders' interests in connection with the Restructuring, the Approved Plan, or this Agreement and (B) the non-Defaulting Supporting Lenders hold less than 60% of the aggregate amount of outstanding principal obligations under each of the Loans;

(ix)  if (A) one or more of the Supporting Noteholders have breached any of their respective obligations under this Agreement in any respect that adversely affects the Supporting Lenders' interests in connection with the Restructuring, the Approved Plan, or this Agreement and (B) the non-breaching Supporting Noteholders hold less than 66 2/3% of the aggregate claims in respect of the Subordinated Notes; and

(x)  the termination of the Company's right to use cash collateral on a consensual basis under the Cash Collateral Order.

(c)  *Individual Supporting Lenders' Right to Terminate*.  Any Supporting Lender, solely with respect to itself, may terminate this Agreement if, upon the occurrence and continuation of any of the following events (each, an "Individual Lender Termination Event"), such Supporting Lender provides the Company and the Required Supporting Noteholders written notice of such Individual Lender Termination Event delivered in accordance with Section 25 hereof, and (x) such Individual Lender Termination Event remains uncured for a period of five (5) business days following such Supporting Lender's delivery of such notice, and (y) such Supporting Lender has not waived such Individual Lender Termination Event on or before the expiration of the cure period:

(i)  any amendment to this Agreement (including the term sheets attached hereto) not approved by such Lender that (A) modifies the distribution entitlements of such Lender from that which is provided in the Approved Plan (prior to giving effect to such amendment), (B) increases the transfer restrictions applicable to the Claims held by such Lender or New Common Stock (as defined in Exhibit A) that will be distributed to such Lender from those provided in this Agreement and the Stockholders Agreement Term Sheet attached hereto as Exhibit B, (C) reduces the aggregate principal amount of the Exit Term Loan Facility from the aggregate principal amount set forth in Exhibit F, (D) other than ministerial changes, modifies in a manner adverse to such Lender the Stockholders Agreement Term Sheet, (E) increases the amount of New Common Stock reserved for issuance under the Management Incentive Plan (as defined in Exhibit A) from that which is provided in Exhibit A, or (F) modifies this Section 9(c) or Section 16 of this Agreement

(including any modifications to the definitions used therein in a manner that affects such Sections);

(ii)   the filing of a plan or other Definitive Document (or any amendment thereto or modification thereof) that (A) modifies the distribution entitlement of such Lender from that which is provided in the Approved Plan, (B) increases the transfer restrictions applicable to the New Common Stock from those provided in the Stockholders Agreement Term Sheet, (C) modifies the aggregate principal amount of the New Dex Credit Facility to less than the aggregate principal amount of the Exit Term Loan Facility set forth in Exhibit F, (D) other than ministerial changes, modifies in a manner adverse to such Lender the Stockholders Agreement Term Sheet, (E) increases the amount of New Common Stock reserved for issuance under the Management Incentive Plan (as defined in Exhibit A) from that which is provided in Exhibit A, or (F) results in Reorganized Parent (as defined in Exhibit A) continuing to be a reporting company under "under the Securities Exchange Act of 1934, as amended;

(iii)  in the event that any Company Party fails to meet the Milestone set forth in Section 7(f); or

(iv)  in the event that the Company makes or agrees to make any payment or distribution in respect of the Subordinated Notes not contemplated by this Agreement and the Approved Plan.

(d)    *The Required Supporting Noteholders' Right to Terminate*. The Required Supporting Noteholders may terminate this Agreement if, upon the occurrence and continuation of the following event (a "Noteholder Termination Event"), the Required Supporting Noteholders provide the Company and the Required Supporting Lenders written notice of such Noteholder Termination Event, delivered in accordance with Section 25 hereof, and (x) such Noteholder Termination Event remains uncured for a period of five (5) business days following the Required Supporting Noteholders' delivery of such notice, and (y) the Required Supporting Noteholders have not waived such Noteholder Termination Event on or before the expiration of the cure period:

(i)    the filing of a plan, other than the Approved Plan, or other Definitive Document (or any amendment thereto or modification thereof) that adversely modifies the distribution entitlement of the Supporting Noteholders or the terms of the Warrants as provided in the Subordinated Noteholder Term Sheet, as in effect on the date of execution of this Agreement.

(e)    *Limitation on Termination*.   Notwithstanding any provision in this Agreement to the contrary, no Party shall terminate this Agreement if such Party is in material breach of any provision hereof; provided, however, that the Company may terminate this Agreement under Section 9(a)(iv) hereof notwithstanding any existing breach by the Company.

(f)    *Mutual Termination.*  This Agreement and the obligations of all Parties hereunder may be terminated by mutual written agreement of the Company, the Required Supporting Lenders and the Required Supporting Noteholders.

13

(g) *Termination Upon Consummation of the Restructuring*. This Agreement shall terminate automatically without any further required action or notice on the Plan Effective Date.

(h) *Effect of Termination*.

(i) Upon termination of this Agreement by the Company, the Required Supporting Lenders, or the Required Supporting Noteholders, all obligations hereunder of the Company and the Supporting Creditors shall terminate and shall be of no further force and effect and any and all consents and ballots tendered by the Supporting Creditors prior to such termination shall be deemed, for all purposes, automatically to be null and void *ab initio*, shall not be considered or otherwise used in any manner by the Parties in connection with the Approved Plan and this Agreement or otherwise and such consents or ballots may be changed or resubmitted regardless of whether the applicable voting deadline has passed (without the need to seek a court order or consent from the Company allowing such change or resubmission); provided, however, that no such termination shall relieve any Party from liability for its breach or non-performance of its obligations hereunder prior to the date of termination.

(ii) Upon termination by any Supporting Lender as to itself only, all obligations hereunder between (A) such terminating Supporting Lender and the Company and other Supporting Creditors shall terminate and shall be of no further force and effect and (B) any and all consents and ballots tendered by such terminating Supporting Lender prior to such termination shall be deemed, for all purposes, automatically to be null and void *ab initio*, shall not be considered or otherwise used in any manner by the Parties in connection with the Approved Plan and this Agreement or otherwise and such consents or ballots may be changed or resubmitted regardless of whether the applicable voting deadline has passed (without the need to seek a court order or consent from the Company allowing such change or resubmission); provided, however, that no such termination shall relieve any Party from liability for its breach or non-performance of its obligations hereunder prior to the date of termination.

10. ***The Supporting Creditors' Representations and Warranties.***  To induce the Company to enter into and perform their obligations under this Agreement, each Supporting Creditor, severally but not jointly, represents, warrants, and acknowledges as follows:

(a) *Authority*. (i) The Supporting Creditor is duly organized, validly existing, and in good standing under the laws of the jurisdiction of its organization, and has all the requisite corporate, partnership, or other power and authority to execute, deliver and perform their obligations under this Agreement, and to consummate the transactions contemplated herein; and (ii) the execution, delivery and performance by the Supporting Creditor of this Agreement and the consummation of the transactions contemplated herein have been duly authorized by all necessary action (corporate partnership or otherwise) on the part of the Supporting Creditor and no other proceedings on the part of the Supporting Creditor are necessary to authorize and approve this Agreement or any of the transactions contemplated herein.

(b)    *Validity*.  This Agreement has been duly executed and delivered by the Supporting Creditor and constitutes the legal, valid, and binding agreement of the Supporting Creditor, enforceable against the Supporting Creditor in accordance with its terms.

(c)    *No Conflict*.    The execution, delivery, and performance by the Supporting Creditor (when such performance is due) of this Agreement does not and shall not (i) violate any provision of law, rule, or regulation applicable to it, or its certificate of incorporation or bylaws or other organizational documents, or (ii) conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it is a party.

(d)    *Authorization of Governmental Authorities*.  No action by (including any authorization, consent, or approval), in respect of, or filing with, any governmental authority is required for, or in connection with, the valid and lawful authorization, execution, delivery, and performance by the Supporting Creditor pursuant to this Agreement.

(e)    *No Reliance*.  The Supporting Creditor (i) is a sophisticated party with respect to the subject matter of this Agreement, (ii) has been represented and advised by legal counsel in connection with this Agreement, (iii) has adequate information concerning the matters that are the subject of this Agreement, and (iv) has independently and without reliance upon the Company, any other Party or any officer, employee, agent, or representative thereof, and based on such information as the Supporting Creditor has deemed appropriate, made their own analysis and decision to enter into this Agreement, except that the Supporting Creditor has relied upon the Company's express representations, warranties, and covenants in this Agreement, and the Supporting Creditor acknowledges that it has entered into this Agreement voluntarily and of its own choice and not under coercion or duress.

(f)    *Title*.  Subject to Section 4(b) hereof, the Supporting Creditor (i) is either (A) the sole legal and beneficial owner of the principal amount of the Claims set forth in Exhibit D, or (B) has sole investment or voting discretion with respect to the principal amount of the Claims set forth in Exhibit D and has the power and authority to bind the beneficial owner(s) of such Claims to the terms of this Agreement, (ii) has full power and authority to act on behalf of, vote, and consent to matters concerning such Claims and dispose of, exchange, assign, and transfer such Claims, and (iii) holds no Claims that are not identified in Exhibit D.  Other than pursuant to this Agreement, such Claims that are subject to this Section 10(f) are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal or other limitation on disposition or encumbrance of any kind, that would adversely affect in any way such Supporting Creditor's performance of its obligations contained in this Agreement at the time such obligations are required to be performed.

(g)    *Certification*.    The Supporting Creditor is either (i) a "qualified institutional buyer" as defined in Rule 144A of the Securities Act of 1933, as amended (the "Securities Act"), (ii) an "accredited investor" as defined by Rule 501 of the Securities Act, (iii) a non-U.S. person under Regulation S under the Securities Act, or (iv) the foreign equivalent of the foregoing subparts (i) or (ii).

11.    ***The Company's Representations and Warranties.***    To induce the Supporting Creditors to enter into and perform their obligations under this Agreement, the Company hereby represents, warrants, and acknowledges as follows, as of the date of this

Agreement and as of the Plan Effective Date (in each case other than those representations and warranties that address matters only as of a particular date or only with respect to a specific period of time, which need only be true and correct as of such date or with respect to such period):

(a)    *Authority*.    The Company (i) has the corporate or limited liability company, as applicable, power and authority to execute, deliver, and perform its obligations under this Agreement, and to consummate the transactions contemplated herein and (ii) the execution, delivery, and performance by the Company under this Agreement and the consummation of the transactions contemplated herein have been duly authorized by all necessary corporate or limited liability company and, if required, stockholder or member, action on the part of the Company.

(b)    *Validity*.    This Agreement has been duly executed and delivered by the Company and constitutes the legal, valid, and binding agreement of the Company, enforceable against the Company in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

(c)    *No Conflict*.    The execution, delivery, and performance by the Company (when such performance is due) of this Agreement does not and shall not (i) violate any provision of law, rule, or regulation applicable to it, or (ii) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under its certificate of incorporation or bylaws (or other organizational documents).

(d)    *Authorization of Governmental Authorities*.    To the best of the Company's knowledge, no action by (including any authorization, consent, or approval), in respect of, or filing with, any governmental authority is required for, or in connection with, the valid and lawful authorization, execution, delivery, and performance by the Company of this Agreement; provided that the Restructuring shall be subject to approval by the Bankruptcy Court in the Chapter 11 Cases.

(e)    *No Reliance*.    The Company (i) is a sophisticated party with respect to the matters that are the subject of this Agreement, (ii) has had the opportunity to be represented and advised by legal counsel in connection with this Agreement, (iii) has adequate information concerning the matters that are the subject of this Agreement, and (iv) has independently and without reliance upon the Supporting Creditors or any other Party, and based on such information as the Company has deemed appropriate, made its own analysis and decision to enter into this Agreement, except that the Company has relied upon the Supporting Creditors' express representations, warranties and covenants in this Agreement, which it enters, or as to which it acknowledges and agrees, voluntarily and of its own choice and not under coercion or duress.

12.    **Fiduciary Duties.**    Notwithstanding anything to the contrary herein, nothing in this Agreement shall require the Company, or any directors, officers, or employees of the Company (in such person's capacity as a director, officer, or employee) to take any action, or to refrain from taking any action, to the extent that taking such action or refraining from taking such action may be inconsistent with its or their fiduciary obligations under applicable law, and any such exercise of such fiduciary duties shall not be deemed to constitute a breach of the terms

of this Agreement; provided, that it is agreed that any such action that results in an event giving rise to the right of termination hereunder shall be subject to the provisions set forth in Section 9 hereof and the Company Parties shall provide the Supporting Creditors, the Trustee, and the Agents no less than three (3) business days advance written notice prior to taking any such action.

13.   ***Certain Additional Chapter 11 Related Matters.***   The Company shall provide draft copies of the Definitive Documents and the First Day Motions to counsel for the Supporting Creditors, if reasonably practicable, at least four (4) days prior to the date when the Company intends to file any such document (and, if not reasonably practicable, as soon as reasonably practicable prior to filing) and shall consult in good faith with such counsel regarding the substance of any such proposed filing with the Bankruptcy Court.  The Supporting Lenders shall provide all comments to such motions by no later than two (2) business days prior to the date when the Company intends to file such document, and shall consult in good faith with such counsel regarding the form and substance of any such proposed pleading.

14.   ***Governing Law; Jurisdiction.***

(a)   THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO ANY CONFLICTS OF LAW PROVISION WHICH WOULD REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION.

(b)   By its execution and delivery of this Agreement, each of the Parties hereto irrevocably and unconditionally agrees for itself that any legal action, suit, or proceeding against it with respect to any matter under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit, or proceeding, shall be brought, to the extent possible, in either the United States District Court for the Southern District of New York or any New York State court sitting in New York City or following the Petition Date, the Bankruptcy Court (the "Chosen Courts").  By execution and delivery of this Agreement, each of the Parties irrevocably accepts and submits itself to the exclusive jurisdiction of the Chosen Courts, generally and unconditionally, with respect to any such action, suit, or proceeding, and waives any objection it may have to venue or the convenience of the forum.

15.   ***Entire Agreement.***   This Agreement (including, for the avoidance of doubt, the Exhibits) constitutes the entire agreement with respect to the Restructuring and supersedes all prior and contemporaneous agreements, representations, warranties, terms sheets, proposals, and understandings of the Parties, whether oral, written, or implied, as to the subject matter hereof; provided, however, that any confidentiality agreement, waiver, or other agreement executed by a Supporting Creditor and the Company shall survive this Agreement and shall remain in full force and effect in accordance with its terms.

16.   ***Amendment or Waiver.***   Except as otherwise specifically provided herein, neither this Agreement nor the Approved Plan, the Stockholders Agreement Term Sheet, the Exit Term Loan Facility Term Sheet, the Subordinated Noteholder Term Sheet, or the Approved Plan may be modified, waived, amended, or supplemented unless such modification, waiver, amendment, or supplement is in writing and has been signed by the Company and the Required Supporting Lenders; provided that any such modification, waiver, amendment or supplement that would reasonably be expected to adversely and disproportionately affect the Supporting Lenders under

one or more of the Loans as compared to those under the other Loans, or that modifies the size of the Exit Term Loan Facility from that which is provided in <u>Exhibit F</u> (prior to giving effect to such amendment) or that modifies the distributions of New Common Stock or Warrants (as defined in <u>Exhibit E</u>) from that which is provided in the Approved Plan (prior to giving effect to such amendment) shall require the prior written consent of the Required Silo-Level Supporting Lenders of such Loan or Loans adversely and disproportionately affected; <u>provided</u>, <u>further</u> that any such modification, waiver, amendment or supplement that would adversely modify the distribution entitlements of the Supporting Noteholders or the terms of the Warrants as provided in the Subordinated Noteholder Term Sheet, shall require the prior written consent of the Required Supporting Noteholders.  No waiver of any of the provisions of this Agreement shall be deemed to constitute a waiver of any other provision of this Agreement, whether or not similar, nor shall any waiver be deemed a continuing waiver (unless such waiver expressly provides otherwise).

17.    ***Specific Performance; Remedies Cumulative***.  This Agreement is intended as a binding commitment enforceable in accordance with its terms.  Each Party acknowledges and agrees that the exact nature and extent of damages resulting from a breach of this Agreement are uncertain at the time of entering into this Agreement and that any such breach of this Agreement would result in damages that would be difficult to determine with certainty.  It is understood and agreed that money damages would not be a sufficient remedy for any such breach of this Agreement, and that any non-breaching Party shall be entitled to obtain specific performance and injunctive relief as remedies for any such breach, and each Party further agrees to waive, and to cause each of their representatives to waive, any requirement for the securing or posting of any bond in connection with requesting such remedy. Such remedies shall not be deemed to be the exclusive remedies for the breach of this Agreement by any Party or its representatives. All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy by any Party hereto shall not preclude the simultaneous or later exercise of any other such right, power, or remedy hereunder.

18.    ***Construction.***  This Agreement constitutes a fully negotiated agreement among commercially sophisticated parties and therefore shall not be construed or interpreted for or against any Party, and any rule or maxim of construction to such effect shall not apply to this Agreement.

19.    ***Receipt of Information; Representation by Counsel***.  Each Party acknowledges that it has received adequate information to enter into this Agreement and that it has been represented by counsel in connection with this Agreement and the transactions contemplated herein and therein.  Accordingly, any rule of law or any legal decision that would provide any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel shall have no application and is expressly waived.

20.    ***Binding Effect; Successor and Assigns.***  This Agreement shall inure to the benefit of and be binding upon the Parties and their respective successors, assigns, heirs, transferees, executors, administrators, and representatives, in each case solely as such parties are permitted under this Agreement.

21.    ***Counterparts.***  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which shall constitute one and the same Agreement.  The signatures of all of the Parties need not appear on the same counterpart. Delivery of an executed signature page of this Agreement by facsimile or electronic mail shall be effective as delivery of a manually executed signature page of this Agreement.

22.    ***Headings; Schedules and Exhibits.***  The headings of the sections, paragraphs, and subsections of this Agreement are inserted for convenience only and shall not affect the interpretation hereof.  References to sections, unless otherwise indicated, are references to sections of this Agreement.

23.    ***Severability and Construction.***  If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid or unenforceable, the remaining provisions shall remain in full force and effect if the essential terms and conditions of this Agreement for each Party remain valid, binding, and enforceable.

24.    ***Waiver of Jury Trial.***  EACH OF THE PARTIES HERETO HEREBY AGREE NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND HEREBY KNOWINGLY, VOLUNTARILY, INTENTIONALLY, UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THIS AGREEMENT OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH OR IN RESPECT OF ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENT (WHETHER VERBAL OR WRITTEN) OR ACTION OF ANY PARTY OR ARISING OUT OF ANY EXERCISE BY ANY PARTY OF ITS RIGHTS UNDER THIS AGREEMENT OR IN ANY WAY RELATING TO THE TRANSACTIONS CONTEMPLATED HEREBY (INCLUDING, WITHOUT LIMITATION, WITH RESPECT TO ANY ACTION TO RESCIND OR CANCEL THIS AGREEMENT AND WITH RESPECT TO ANY CLAIM OR DEFENSE ASSERTING THAT THIS AGREEMENT WAS FRAUDULENTLY INDUCED OR IS OTHERWISE VOID OR VOIDABLE). THIS WAIVER OF RIGHT TO TRIAL BY JURY IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE.  EACH OF THE PARTIES HERETO IS HEREBY AUTHORIZED TO FILE A COPY OF THIS SECTION 24 IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER.  THIS WAIVER OF JURY TRIAL IS A MATERIAL INDUCEMENT FOR THE PARTIES HERETO TO ENTER INTO THIS AGREEMENT.

25.    ***Notices.***  All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed effectively given: (a) upon personal delivery to the Party to be notified, (b) when sent by confirmed electronic mail if sent during normal business hours of the recipient, and if not so confirmed, then on the next business day, (c) three business days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (d) one business day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt. All communications shall be sent:

<u>To the Company or any Company Party at:</u>

c/o Dex Media, Inc.
2200 West Airfield Drive
P.O. Box 619810
DFW Airport, TX 75261
Attn:  Raymond Ferrell
       Andrew Hede
Fax:  (877) 238-4973
Email:  raymond.ferrell@dexmedia.com
       andrew.hede@dexmedia.com

With a copy (which copy shall not constitute notice) to:

Kirkland & Ellis LLP
300 N. LaSalle
Chicago, IL 60654
Attn:   Marc Kieselstein
        Adam Paul
Fax:    (312) 862-2200
Email:  mkieselstein@kirkland.com
        apaul@kirkland.com

<u>To a Supporting Lender at:</u>

The address set forth on the relevant signature page hereto.

With a copy (which copy shall not constitute notice) to:

Milbank, Tweed, Hadley & McCloy LLP
28 Liberty Street
New York, NY 10005
Attn:   Dennis Dunne
        Gerard Uzzi
        Mark Shinderman
        Brett Goldblatt
Fax:    (212) 530-2310
Email:  ddunne@milbank.com
        guzzi@milbank.com
        mshinderman@milbank.com
        bgoldblatt@milbank.com

<u>To a Supporting Noteholder at:</u>

The address set forth on the relevant signature page hereto.

With a copy (which copy shall not constitute notice) to:

Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, New York 10036
Attn:  Michael S. Stamer
          Sarah Schultz
Fax:    (212) 872-1002
Email: mstamer@akingump.com
          sschultz@akingump.com

26.    ***Consideration.***  The Parties hereby acknowledge that no consideration, other than that specifically described in this Agreement, shall be due or paid to any Supporting Creditor for its agreement to vote to accept the Approved Plan in accordance with the terms and conditions of this Agreement.

27.    ***No Third-Party Beneficiaries***.  This Agreement shall be solely for the benefit of the Parties hereto (or any other party that may become a Party to this Agreement pursuant to Section 4 hereof) and no other person or entity shall be a third-party beneficiary hereof.

28.    ***Several, Not Joint, Obligations***.  The agreements, representations, and obligations of the Parties under this Agreement are, in all respects, several and not joint.  It is understood and agreed that (i) each of the Supporting Creditors is entering into this Agreement on behalf of such Supporting Creditor, and not on behalf of any other Supporting Creditor, (ii) the relationship of the Supporting Creditors shall not be deemed a partnership, joint venture or similar arrangement, (iii) no Supporting Creditor shall have any liability for any breach of any provision of this Agreement by any other Supporting Creditor and (iv) any Supporting Creditor may trade in the Claims or other debt or equity securities of the Company without the consent of the Company or any other Supporting Creditor, subject to applicable laws, if any, Section 4 hereof, and the Debt Instruments (as may be applicable).  No Supporting Creditor shall have any responsibility for any such trading by any other entity by virtue of this Agreement.

29.    ***Parties***.  This Agreement shall be binding upon, and inure to the benefit of, the Parties.  No rights or obligations of any Party under this Agreement may be assigned or transferred to any other person or entity except as provided in Section 4 hereof.  Nothing in this Agreement, express or implied, shall give to any person or entity, other than the Parties, any benefit or any legal or equitable right, remedy, or claim under this Agreement.

30.    ***No Waiver of Participation and Reservation of Rights***.  Except as expressly provided in this Agreement and in any amendment among the parties, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict the ability of each of the Parties to protect and preserve its rights, remedies, and interests, including, without limitation, its claims against any of the other Parties (or their respective affiliates or subsidiaries).  If the transactions contemplated by this Agreement are not consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights remedies, or interests.

31.    ***No Admissions***.  This Agreement shall in no event be construed as or be deemed to be evidence of an admission or concession on the part of any Party of any claim or fault or liability or damages whatsoever.  Each of the Parties denies any and all wrongdoing or liability of any kind and does not concede any infirmity in the claims or defenses which it has asserted or could assert.  No Party shall have, by reason of this Agreement, a fiduciary relationship in

21

respect of any other Party or any person or entity, and nothing in this Agreement, expressed or implied, is intended to or shall be so construed as to impose upon any Party any obligations in respect of this Agreement except as expressly set forth herein.  This Agreement and the Restructuring are part of a proposed settlement of a dispute among the Parties.  Pursuant to Federal Rule of Evidence 408 and any applicable state rules of evidence, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding involving enforcement of the terms of this Agreement.

32.     ***Public Disclosure of Agreement.***  The Company shall disclose this Agreement in a press release or public filing in a form approved by the Required Supporting Lenders and the Agents, <u>provided</u> that in any such public disclosure the amount or percentage of Claims held by an individual Supporting Creditor shall be redacted (however the aggregate amount or percentage may be disclosed).  Without the prior written consent of each individual Supporting Creditor, the Company shall not disclose to any other person (other than (x) to its directors, senior officers, advisors, and counsel, (y) as required or requested pursuant to applicable law, regulatory authority, or legal proceeding, or (z) with the consent of such Supporting Lender), the amount or percentage of Claims held by any individual Supporting Creditor.

33.     ***Continued Banking Practices***.  Notwithstanding anything herein to the contrary, each Supporting Creditor, the Trustee, the Agents and their respective affiliates may accept deposits from, lend money to, and generally engage in any kind of banking, investment banking, trust or other business with, or provide debt financing (including debtor in possession or exit financing), equity capital or other services (including financial advisory services) to any Company Party or any affiliate of any Company Party or any other person, including, but not limited to, any person proposing or entering into a transaction related to or involving any Company Party or any affiliate thereof, and nothing in this Agreement shall limit or modify the rights of such Supporting Creditor, Trustee, Agent or its respective affiliates under any documents, instruments or agreements governing such banking relationship.

*[The remainder of this page is intentionally left blank.]*

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed and delivered by their respective duly authorized officers or other agents, solely in their respective capacity as officers or other agents of the undersigned and not in any other capacity, as of the date first set forth above.

**DEX MEDIA, INC.**
**DEX ONE DIGITAL, INC.**
**DEX MEDIA EAST, INC.**
**DEX MEDIA HOLDINGS, INC.**
**DEX MEDIA SERVICE LLC**
**DEX MEDIA WEST, INC.**
**DEX ONE SERVICE, INC.**
**R.H. DONNELLEY INC.**
**R.H. DONNELLEY APIL, INC.**
**R.H. DONNELLEY CORPORATION**
**SUPERMEDIA INC.**
**SUPERMEDIA LLC**
**SUPERMEDIA SALES INC.**

By: _____
    Name: Andrew Hede
    Title: Authorized Signatory

[Signature Page to Restructuring Support Agreement]

**SUPPORTING LENDERS:**

ALPINE SWIFT MASTER LP
By: Wingspan GP LLC, its general partner

By: _____
Name: Brendan Driscoll
Title: COO/CFO

Address for Notices:

c/o Wingspan Investment Management, LP
767 Fifth Avenue, 16th Floor
New York, NY 10153
notices@wingspanlp.com

Attn: David Crowe
Facsimile: 212-307-3409

[Signature Page to Restructuring Support Agreement]

**SUPPORTING LENDERS:**

WINGSPAN MASTER FUND, LP
By: Wingspan GP LLC, its general partner

By: _____
Name: Brendan Driscoll
Title: COO/CFO

Address for Notices:

c/o Wingspan Investment Management, LP
767 Fifth Avenue, 16th Floor
New York, NY 10153
notices@wingspanlp.com

Attn: David Crowe
Facsimile: 212-307-3409

[Signature Page to Restructuring Support Agreement]

**SUPPORTING LENDERS**:

SPCP Group, LLC

By: _____

Name:    David Steinmetz

Title:    Authorized Signatory

<u>Address for Notices</u>:

SPCP Group, LLC
c/o Silver Point Capital
2 Greenwich Plaza, 1st Floor
Greenwich, CT 06830
Attn:   CreditAdmin
Email: creditadmin@silverpointcapital.com
Facsimile: 201-719-2157

**SUPPORTING LENDERS:**

Ares NF CLO XIV Ltd

By: Ares NF CLO XIV Management, L.P., its
collateral manager

By: Ares NF CLO XIV Management LLC, Its
general partner

By: _____

Name:

Title:         JEFF MOORE
               VICE PRESIDENT

Address for Notices:

2000 Avenue of the Stars, 12th Floor
Los Angeles, CA 90067
Attn: Eddie Douglas
Tel: 310-201-4145; 310-201-4100
edouglas@aresmgmt.com

**SUPPORTING LENDERS:**

ARES XXI CLO LTD.

BY: ARES CLO MANAGEMENT XXI, L.P., ITS
INVESTMENT MANAGER

BY: ARES CLO GP XXI, LLC, ITS GENERAL
PARTNER

By: _____
Name:         JEFF MOORE
Title:        VICE PRESIDENT

Address for Notices:

2000 Avenue of the Stars, 12th Floor
Los Angeles, CA 90067
Attn: Eddie Douglas
Tel: 310-201-4145; 310-201-4100
edouglas@aresmgmt.com

[Signature Page to Restructuring Support Agreement]

**SUPPORTING LENDERS:**

ARES STRATEGIC INVESTMENT PARTNERS
LTD.

BY: ARES STRATEGIC INVESTMENT
MANAGEMENT LLC, AS INVESTMENT
MANAGER

By: _____

Name:

Title:            JEFF MOORE
                 VICE PRESIDENT


Address for Notices:

2000 Avenue of the Stars, 12th Floor
Los Angeles, CA 90067
Attn: Eddie Douglas
Tel: 310-201-4145; 310-201-4100
edouglas@aresmgmt.com

**SUPPORTING LENDERS:**

ARES STRATEGIC INVESTMENT PARTNERS
(L) LTD.

BY: ARES STRATEGIC INVESTMENT
MANAGEMENT LLC, AS ITS MANAGER

By: _____
Name:
Title:        JEFF MOORE
              VICE PRESIDENT

Address for Notices:

2000 Avenue of the Stars, 12th Floor
Los Angeles, CA 90067
Attn: Eddie Douglas
Tel: 310-201-4145; 310-201-4100
edouglas@aresmgmt.com

**SUPPORTING LENDERS:**

FUTURE FUND BOARD OF GUARDIANS

BY: ARES ENHANCED LOAN
INVESTMENT STRATEGY ADVISOR IV,
L.P., ITS INVESTMENT MANAGER (ON
BEHALF OF THE ASIP II SUB-ACCOUNT)

BY: ARES ENHANCED LOAN
INVESTMENT STRATEGY ADVISOR IV GP,
LLC, ITS GENERAL PARTNER

By: _____
Name:
Title:           JEFF MOORE
                 VICE PRESIDENT

Address for Notices:

2000 Avenue of the Stars, 12th Floor
Los Angeles, CA 90067
Attn: Eddie Douglas
Tel: 310-201-4145; 310-201-4100
edouglas@aresmgmt.com

[Signature Page to Restructuring Support Agreement]

**SUPPORTING LENDERS:**

ASIP (HOLDCO) IV S.À.R.L.

BY: ASIP OPERATING MANAGER IV LLC, ITS
INVESTMENT MANAGER

By: _____
Name:
Title:

JEFF MOORE
VICE PRESIDENT

Address for Notices:

2000 Avenue of the Stars, 12th Floor
Los Angeles, CA 90067
Attn: Eddie Douglas
Tel: 310-201-4145; 310-201-4100
edouglas@aresmgmt.com

[Signature Page to Restructuring Support Agreement]

**SUPPORTING LENDERS:**

ARES MULTI-STRATEGY CREDIT FUND V
(H), L.P.

BY: ARES MSCF V (H) MANAGEMENT LLC,
ITS MANAGER

By: _____

Name:

Title:

JEFF MOORE
VICE PRESIDENT

Address for Notices:

2000 Avenue of the Stars, 12th Floor
Los Angeles, CA 90067
Attn: Eddie Douglas
Tel: 310-201-4145; 310-201-4100
edouglas@aresmgmt.com

**SUPPORTING LENDERS:**

TRANSATLANTIC REINSURANCE COMPANY

BY: ARES ASIP VII MANAGEMENT, L.P., ITS
PORTFOLIO MANAGER

BY: ARES ASIP VII GP, LLC, ITS GENERAL
PARTNER

By: _____
Name:
Title:            JEFF MOORE
                 VICE PRESIDENT

Address for Notices:

2000 Avenue of the Stars, 12th Floor
Los Angeles, CA 90067
Attn: Eddie Douglas
Tel: 310-201-4145; 310-201-4100
edouglas@aresmgmt.com

**SUPPORTING LENDERS:**

RSUI INDEMNITY COMPANY

BY: ARES ASIP VII MANAGEMENT, L.P., ITS
PORTFOLIO MANAGER

BY: ARES ASIP VII GP, LLC, ITS GENERAL
PARTNER

By: _____
Name:         JEFF MOORE
Title:         VICE PRESIDENT

Address for Notices:

2000 Avenue of the Stars, 12th Floor
Los Angeles, CA 90067
Attn: Eddie Douglas
Tel: 310-201-4145; 310-201-4100
edouglas@aresmgmt.com

**SUPPORTING LENDERS:**

ARES ENHANCED CREDIT OPPORTUNITIES
FUND B, LTD.

BY: ARES ENHANCED CREDIT
OPPORTUNITIES FUND MANAGEMENT,
L.P., ITS INVESTMENT MANAGER

BY: ARES ENHANCED CREDIT
OPPORTUNITIES FUND MANAGEMENT GP,
LLC, ITS GENERAL PARTNER

By: _____
Name:  JEFF MOORE
Title:  VICE PRESIDENT

Address for Notices:

2000 Avenue of the Stars, 12th Floor
Los Angeles, CA 90067
Attn: Eddie Douglas
Tel: 310-201-4145; 310-201-4100
edouglas@aresmgmt.com

[Signature Page to Restructuring Support Agreement]

**SUPPORTING LENDERS:**

ARES ENHANCED CREDIT OPPORTUNITIES
FUND II, LTD.

BY: ARES ENHANCED CREDIT
OPPORTUNITIES INVESTMENT
MANAGEMENT II, LLC, ITS INVESTMENT
MANAGER

By: _____

Name:

Title:    JEFF MOORE
VICE PRESIDENT

Address for Notices:

2000 Avenue of the Stars, 12th Floor
Los Angeles, CA 90067
Attn: Eddie Douglas
Tel: 310-201-4145; 310-201-4100
edouglas@aresmgmt.com

[Signature Page to Restructuring Support Agreement]

**SUPPORTING LENDERS:**

RUSSELL INSTITUTIONAL FUNDS, LLC

BY: ARES MANAGEMENT LLC, IN ITS
CAPACITY AS MONEY MANAGER

FOR THE RUSSELL HIGH YIELD BOND FUND

By: _____

Name:

Title:

JEFF MOORE
VICE PRESIDENT

Address for Notices:

2000 Avenue of the Stars, 12th Floor
Los Angeles, CA 90067
Attn: Eddie Douglas
Tel: 310-201-4145; 310-201-4100
edouglas@aresmgmt.com

[Signature Page to Restructuring Support Agreement]

**SUPPORTING LENDERS:**

KAISER FOUNDATION HOSPITALS

BY: ARES MANAGEMENT LLC, AS
PORTFOLIO MANAGER

By: _____
Name:
Title:                    JEFF MOORE
                    VICE PRESIDENT

Address for Notices:

2000 Avenue of the Stars, 12th Floor
Los Angeles, CA 90067
Attn: Eddie Douglas
Tel: 310-201-4145; 310-201-4100
edouglas@aresmgmt.com

**SUPPORTING LENDERS:**

KAISER PERMANENTE GROUP TRUST

BY: KAISER FOUNDATION HEALTH PLAN,
INC., AS NAMED FIDUCIARY

BY: ARES MANAGEMENT LLC, AS
PORTFOLIO MANAGER

By: _____
Name:
Title:          JEFF MOORE
                VICE PRESIDENT

Address for Notices:

2000 Avenue of the Stars, 12th Floor
Los Angeles, CA 90067
Attn: Eddie Douglas
Tel: 310-201-4145; 310-201-4100
edouglas@aresmgmt.com

[Signature Page to Restructuring Support Agreement]

**SUPPORTING LENDERS:**

ARES INSTITUTIONAL LOAN FUND B.V.

BY: ARES MANAGEMENT LIMITED, AS MANAGER

By: _____
Name:
Title:          JEFF MOORE
                VICE PRESIDENT

Address for Notices:

2000 Avenue of the Stars, 12th Floor
Los Angeles, CA 90067
Attn: Eddie Douglas
Tel: 310-201-4145; 310-201-4100
edouglas@aresmgmt.com

[Signature Page to Restructuring Support Agreement]

**SUPPORTING LENDERS:**

SEI GLOBAL MASTER FUND PLC - THE SEI
HIGH YIELD FIXED INCOME FUND

BY: ARES MANAGEMENT LLC, AS
PORTFOLIO MANAGER

By: _____

Name:

Title:

JEFF MOORE
VICE PRESIDENT

Address for Notices:

2000 Avenue of the Stars, 12th Floor
Los Angeles, CA 90067
Attn: Eddie Douglas
Tel: 310-201-4145; 310-201-4100
edouglas@aresmgmt.com

[Signature Page to Restructuring Support Agreement]

**SUPPORTING LENDERS:**

SEI INSTITUTIONAL INVESTMENTS TRUST - HIGH YIELD BOND FUND

BY: ARES MANAGEMENT LLC, AS SUB-ADVISER

By: _____

Name:

Title:

Address for Notices:

2000 Avenue of the Stars, 12th Floor
Los Angeles, CA 90067
Attn: Eddie Douglas
Tel: 310-201-4145; 310-201-4100
edouglas@aresmgmt.com

[Signature Page to Restructuring Support Agreement]

**SUPPORTING LENDERS:**

SEI INSTITUTIONAL INVESTMENTS TRUST -
OPPORTUNISTIC INCOME FUND

BY: ARES MANAGEMENT LLC, AS
PORTFOLIO MANAGER

By: _____
Name:
Title:

JEFF MOORE
VICE PRESIDENT

Address for Notices:

2000 Avenue of the Stars, 12th Floor
Los Angeles, CA 90067
Attn: Eddie Douglas
Tel: 310-201-4145; 310-201-4100
edouglas@aresmgmt.com

[Signature Page to Restructuring Support Agreement]

**SUPPORTING LENDERS:**

SEI INSTITUTIONAL MANAGED TRUST - HIGH YIELD BOND FUND

BY: ARES MANAGEMENT LLC, AS SUB-ADVISER

By: _____
Name:
Title:

JEFF MOORE
VICE PRESIDENT

Address for Notices:

2000 Avenue of the Stars, 12th Floor
Los Angeles, CA 90067
Attn: Eddie Douglas
Tel: 310-201-4145; 310-201-4100
edouglas@aresmgmt.com

[Signature Page to Restructuring Support Agreement]

**SUPPORTING LENDERS:**

SEI INSTITUTIONAL MANAGED TRUST
ENHANCED INCOME FUND

BY: ARES MANAGEMENT LLC, AS SUB-
ADVISER

By: _____
Name:
Title:      JEFF MOORE
            VICE PRESIDENT


Address for Notices:

2000 Avenue of the Stars, 12th Floor
Los Angeles, CA 90067
Attn: Eddie Douglas
Tel: 310-201-4145; 310-201-4100
edouglas@aresmgmt.com

[Signature Page to Restructuring Support Agreement]

**SUPPORTING LENDERS:**

ARES SPECIAL SITUATIONS FUND III, L.P.

BY: ASSF OPERATING MANAGER III, LLC,
ITS MANAGER

By: _____
Name:
Title:
                JEFF MOORE
              VICE PRESIDENT

Address for Notices:

2000 Avenue of the Stars, 12th Floor
Los Angeles, CA 90067
Attn: Eddie Douglas
Tel: 310-201-4145; 310-201-4100
edouglas@aresmgmt.com

**SUPPORTING LENDERS:**

ARES SPECIAL SITUATIONS FUND IV, L.P.

BY: ASSF OPERATING MANAGER IV, L.P.,
ITS MANAGER

By: _____
Name:
Title:

JEFF MOORE
VICE PRESIDENT

Address for Notices:

2000 Avenue of the Stars, 12th Floor
Los Angeles, CA 90067
Attn: Eddie Douglas
Tel: 310-201-4145; 310-201-4100
edouglas@aresmgmt.com

[Signature Page to Restructuring Support Agreement]

**SUPPORTING LENDERS:**

ARES DYNAMIC CREDIT ALLOCATION
FUND, INC.

BY: ARES CAPITAL MANAGEMENT II,
LLC, ITS ADVISER

By: _____

Name:

Title:

JEFF MOORE
VICE PRESIDENT

Address for Notices:

2000 Avenue of the Stars, 12th Floor
Los Angeles, CA 90067
Attn: Eddie Douglas
Tel: 310-201-4145; 310-201-4100
edouglas@aresmgmt.com

[Signature Page to Restructuring Support Agreement]

**SUPPORTING LENDERS:**

BLACKWELL PARTNERS LLC – SERIES A
By Mudrick Capital Management, L.P.,
Its Investment Manager

By: _____
Name: Trevor Wiessmann, Esq.
Title: Corporate Secretary

BOSTON PATRIOT BATTERYMARCH ST LLC
By Mudrick Capital Management, L.P.,
Its Investment Manager

By: _____
Name: Trevor Wiessmann, Esq.
Title: Corporate Secretary

MUDRICK DISTRESSED OPPORTUNITY
FUND GLOBAL, LP
By Mudrick Capital Management, L.P.,
Its Investment Manager

By: _____
Name: Trevor Wiessmann, Esq.
Title: Corporate Secretary

P MUDRICK LTD.
By Mudrick Capital Management, L.P.,
Its Investment Manager

By: _____
Name: Trevor Wiessmann, Esq.
Title: Corporate Secretary

VERTO DIRECT OPPORTUNITY, LP
By Mudrick Capital Management, L.P.,
Its Investment Manager

By: _____
Name: Trevor Wiessmann, Esq.
Title: Corporate Secretary

[Signature Page to Restructuring Support Agreement]

MUDRICK DISTRESSED OPPORTUNITY
DRAWDOWN FUND, LP
By Mudrick Capital Management, L.P.,
Its Investment Manager

By: _____
Name: Trevor Wiessmann, Esq.
Title: Corporate Secretary

Address for Notices:

c/o Mudrick Capital Management, L.P.
527 Madison Avenue, 6th floor,
New York, NY 10022
ATTN: Legal Department
Tel: (646) 747 9500

**SUPPORTING LENDERS:**

GT NM, LP

By: GoldenTree Asset Management, LP

By: _____
Name:        Karen Weber
Title:        Director - Bank Debt


STELLAR PERFORMER GLOBAL SERIES:
SERIES G-GLOBAL CREDIT

By: GoldenTree Asset Management, LP

By: _____
Name:        Karen Weber
Title:        Director - Bank Debt


SAN BERNARDINO COUNTY EMPLOYEES'
RETIREMENT ASSOCIATION

By: GoldenTree Asset Management, LP

By: _____
Name:        Karen Weber
Title:       Director - Bank Debt

GOLDENTREE 2004 TRUST

By: GoldenTree Asset Management, LP

By: _____
Name:        Karen Weber
Title:       Director - Bank Debt


[Signature Page to Restructuring Support Agreement]

GN3 SIP LIMITED

By: GoldenTree Asset Management, LP

By:

Name:        Karen Weber
Title:        Director - Bank Debt


GOLDENTREE INSURANCE FUND SERIES
INTERESTS OF THE SALI MULTI-SERIES FUND,
LP

By: GoldenTree Asset Management, LP

By:

Name:        Karen Weber
Title:        Director - Bank Debt


GOLDENTREE LOAN OPPORTUNITIES III, LTD.

By: GoldenTree Asset Management, LP

By:

Name:        Karen Weber
Title:        Director - Bank Debt


GOLDENTREE LOAN OPPORTUNITIES IV, LTD.

By: GoldenTree Asset Management, LP

By:

Name:        Karen Weber
Title:        Director - Bank Debt


Address for Notices:

GoldenTree Asset Management, LP
300 Park Ave, 21st Floor
New York, NY 10022
Attn: Peter Alderman and Karen Weber
Tel: 212.847.3531 or 212.847.3460
kweber@goldentree.com
palderman@goldentree.com


[Signature Page to Restructuring Support Agreement]

**SUPPORTING LENDERS:**

PAULSON CREDIT OPPORTUNITIES
MASTER LTD.

By: _____
Name:
Title:

BLT 8 LLC

By: _____
Name:
Title:

Michael Wetanowski
Authorized Signatory

Address for Notices:

c/o Ashwinee Sawh
Credit Suisse Securities (USA) LLC
Eleven Madison Avenue, 5th Floor
New York NY 10010
Tel: 212 538 2905
Email: americas.loandocs@credit-suisse.com

[Signature Page to Restructuring Support Agreement]

**SUPPORTING LENDERS:**

PAULSON CREDIT OPPORTUNITIES
MASTER LTD.

By: _____
Name: Stuart Merzer
Title: Authorized Signatory

BLT 8 LLC

By: _____
Name:
Title:


Address for Notices:

c/o John Slater
Paulson & Co Inc
1251 Avenue of the Americas, 50th Floor
New York, NY 10020
Tel: 212 599 6335
Email: john.slater@paulsonco.com

[Signature Page to Restructuring Support Agreement]

**RAMAT SECURITIES, LTD.**

By: _____
Name:
Title:

DAVID ZLATIN

C.O.O.

Address for Notices:

23811 Chagrin Boulevard, Suite 200
Beachwood, OH 44122
Attn:  David Zlatin

[Signature Page to Restructuring Support Agreement]

**BENNETT RESTRUCTURING FUND, L.P.**

By:  Restructuring Capital Associates, L.P., its
general partner

    By:  Bennett Capital Corporation, its general
    partner

By: _____
Name:  James D. Bennett
Title:  President

**BRF HIGH VALUE, L.P.**

By:  Restructuring Capital Associates, L.P., its
general partner

    By:  Bennett Capital Corporation, its general
    partner

By: _____
Name:  James D. Bennett
Title:  President

**BENNETT OFFSHORE RESTRUCTURING
FUND, INC.**

By:  Bennett Offshore Investment Corporation, its
investment manager

By: _____
Name:  James D. Bennett
Title:  President

<u>Address for Notices</u>:
c/o Bennett Management Corporation
2 Stamford Plaza, Suite 1501
281 Tresser Blvd.
Stamford, CT 06901
Fax:  (203) 353-3113
Attn:  James D. Bennett

[Signature Page to Restructuring Support Agreement]

## Schedule 1

**DEX ONE DIGITAL, INC.**
**DEX MEDIA EAST, INC.**
**DEX MEDIA HOLDINGS, INC.**
**DEX MEDIA SERVICE LLC**
**DEX MEDIA WEST, INC.**
**DEX ONE SERVICE, INC.**
**R.H. DONNELLEY INC.**
**R.H. DONNELLEY APIL, INC.**
**R.H. DONNELLEY CORPORATION**
**SUPERMEDIA INC.**
**SUPERMEDIA LLC**
**SUPERMEDIA SALES INC.**

## **Exhibit A**

**Approved Plan**

**See <u>Exhibit A</u> to the Disclosure Statement**

## **Exhibit B**

**New Stockholders Agreement Term Sheet**

**See <u>Exhibit B</u> to the Approved Plan**

**Exhibit C**

**Transferee Acknowledgement**

This joinder (this "Joinder") to the Restructuring Support Agreement, dated as of _____ 2016, by and among Dex Media, Inc. ("Dex Media") and certain of its subsidiaries and the Supporting Creditors parties thereto (the "Agreement") is executed and delivered by [_____] (the "Joining Party") as of [_____], 2016.  Each capitalized term used herein but not otherwise defined shall have the meaning set forth in the Agreement.

1.     ***Agreement to be Bound***.  The Joining Party hereby agrees to be bound by all of the terms of the Agreement, a copy of which is attached to this Joinder as Annex I (as the same has been or may be hereafter amended, restated or otherwise modified from time to time in accordance with the provisions hereof).  The Joining Party shall hereafter be deemed to be a "Supporting Creditor" and a "Party" for all purposes under the Agreement.

2.     ***Representations and Warranties***.  With respect to all Claims held by the Joining Party, all related rights and causes of action arising out of or in connection with or otherwise relating to such claims, the Joining Party hereby makes all of the representations and warranties of a Supporting Creditor as set forth in the Agreement, including, without limitation, the representations and warranties set forth in Section 10 of the Agreement, as applicable.  The Joining Party further represents and warrants to each other Party to the Agreement that, as of the date hereof, such Joining Party is the legal or beneficial holder of, or holder of investment authority over (with authority to bind such holder), the Claims identified below its name on the signature page hereof.

3.     ***Governing Law***.  This Joinder shall be governed by and construed in accordance with the internal laws of the State of New York, without regard to any conflicts of law provisions which would require the application of the law of any other jurisdiction.

4.     ***Notice***.  All notices and other communications given or made pursuant to the Agreement shall be sent to:

To the Joining Party at:

[JOINING PARTY]
[ADDRESS]
Attn:
Facsimile: [FAX]
EMAIL:

IN WITNESS WHEREOF, the Joining Party has caused this Joinder to be executed as of the date first written above.

**[JOINING PARTY]**

By: _____

Name:

Title:

| Principal Amount Held | |
|---|---|
| **Claims (specify type)** | **Amount** |
| | |

**[SUPPORTING CREDITOR]**

By: _____

Name:

Title:

Holdings: _____

Acknowledged:

**Dex Media, Inc.**

By: _____

Name:

Title:

## **Exhibit D**

**Holdings of Supporting Creditors**

**[Redacted]**

## **Exhibit E**

**Subordinated Noteholder Term Sheet**

**See Exhibit C to the Approved Plan**

## **Exhibit F**

**Exit Term Loan Facility Term Sheet**

**See Exhibit A to the Approved Plan**

## **EXHIBIT C**

**Financial Projections**

## DEBTORS' FINANCIAL PROJECTIONS AND ASSUMPTIONS

### A. Introduction

The Debtors have prepared the Projections (as defined below) to assist the Bankruptcy Court in determining whether the Plan meets the "feasibility" requirements of section 1129(a)(11) of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"). The Debtors believe that the Plan meets such requirements. In connection with the negotiation and development of the Plan, and for the purpose of determining whether the Plan meets the feasibility standard outlined in the Bankruptcy Code, the Debtors analyzed their ability to satisfy their financial obligations while maintaining sufficient liquidity and capital resources during the Projection Period (as defined below). With this consideration in mind, the Debtors' management and advisors prepared consolidated financial projections (the "<u>Projections</u>") for the years ending December 31, 2016 through December 31, 2020 (the "<u>Projection Period</u>"). The Projections have been prepared on a consolidated basis, consistent with the Debtors' financial reporting practices, and include all Debtor and non-Debtor affiliates.

The Projections present, to the best of the Debtors' knowledge and belief, the Reorganized Debtors' projected financial position, results of operations, and cash flows for the Projection Period and reflect the Debtors' assumptions and judgments of the projections based on an estimated emergence date of June 30, 2016 (the "<u>Assumed Emergence Date</u>"). Although the Debtors are of the opinion that these assumptions are reasonable under current circumstances, such assumptions are subject to inherent uncertainties, including, but not limited to:

- the continuing decline in the use of print directories;

- increased competition, particularly from existing and emerging digital technologies;

- the impact of economic conditions outside of the Debtors' control and the corresponding impact on advertising sales;

- the Debtors' ability to collect trade receivables from customers to whom they extend credit;

- the Debtors' ability to generate sufficient cash to service their debt;

- the Debtors' ability to comply with the financial covenants contained in their debt agreements;

- increasing interest rates;

- changes in the Debtors' credit rating;

- changes in accounting standards;

- regulatory changes and judicial rulings impacting the Debtors' businesses;

- adverse results from litigation, governmental investigation, or tax related proceedings or audits;

- the impact of labor strikes, lock-outs, and negotiations;

- the Debtors' ability to maintain agreements with major internet search and local media companies;

- the Debtors' reliance on third-party vendors for various services;

- other events beyond the Debtors' control that may result in unexpected adverse operating results;

- the risks related to the impact of any chapter 11 cases and the Plan could have on the Debtors' business operations, financial condition, liquidity, or cash flow;

- the possibility that the Bankruptcy Court does not confirm the Plan, or requires a re-solicitation of votes; and

- the risks related to other parties objecting to the Plan and the resulting cost and expenses of delays in any chapter 11 cases.

The likelihood, and related financial impact, of a change in any of these factors cannot be predicted with certainty. Consequently, actual financial results could differ materially from the Projections. The Projections assume the Plan will be implemented in accordance with its stated terms. The Projections should be read in conjunction with the assumptions and qualifications contained herein. Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in either the Disclosure Statement or the Plan, as applicable.

For additional information about factors that could cause actual results to differ materially from those expressed or implied by the forward-looking statements, please see the reports that the Debtors have filed with the SEC.

THE PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARD COMPLIANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES ("GAAP") IN THE UNITED STATES. FURTHERMORE, THE PROJECTIONS HAVE NOT BEEN AUDITED OR REVIEWED BY A REGISTERED INDEPENDENT PUBLIC ACCOUNTING FIRM.

THE PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE BASED UPON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH MAY NOT BE REALIZED AND ARE SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES WHICH ARE BEYOND THE CONTROL OF THE DEBTORS. CONSEQUENTLY, THE PROJECTIONS SHOULD NOT BE REGARDED AS A REPRESENTATION OR WARRANTY BY THE DEBTORS, OR ANY OTHER PERSON, AS TO THE ACCURACY OF THE PROJECTIONS OR THAT THE PROJECTIONS WILL BE REALIZED. ACTUAL RESULTS MAY DIFFER MATERIALLY FROM THOSE PRESENTED IN THE PROJECTIONS. HOLDERS OF CLAIMS OR EQUITY INTERESTS MUST MAKE THEIR OWN ASSESSMENT AS TO THE REASONABLENESS OF SUCH ASSUMPTIONS AND THE RELIABILITY OF THE PROJECTIONS IN MAKING THEIR DETERMINATION OF WHETHER TO ACCEPT OR REJECT THE PLAN.

**B. Summary of Significant Assumptions and Basis for Presentation**

The Projections were developed by the Debtors' management using detailed assumptions for the revenues and costs. The Debtors considered the following factors in developing the Projections:

- current and projected market conditions in each of the Debtors' respective markets;

- ability to maintain sufficient working capital to fund operations;

- capital expenditure levels to support management's growth assumptions;

- no material acquisitions or divestitures;

- elimination of the Debtors' previous credit-silo structure consisting of Dex Media East, Inc. ("Dex East"), Dex Media West, Inc. ("Dex West"), SuperMedia Inc. ("SuperMedia"), and R.H. Donnelly, Inc. ("RHDI") (collectively, the "Silos");

- elimination of the Shared Services Agreement  and Tax Sharing Agreements  the Debtors operated under the previous credit-silo structure; and

▪ the Debtors' emergence from chapter 11 on the Assumed Emergence Date.

The Projections have been prepared in good faith based upon assumptions believed to be reasonable. The Projections include assumptions with respect to various financial accounts of the companies, which are based upon managements' estimates and market conditions.

Adjusted EBITDA is measured as earnings (defined as total operating revenue less total operating expenses, as described below) before interest, taxes, depreciation, and amortization. Pro Forma EBITDA is determined by adjusting EBITDA for (1) gain on debt repurchases, (2) impairment charges, (3) gain on sale of assets, net, and (4) restructuring charges and other nonrecurring items including transaction-related costs. Pro Forma EBITDA and Adjusted EBITDA are not measurements of operating performance computed in accordance with GAAP and should not be considered as a substitute for net income (loss) prepared in conformity with GAAP. In addition, Pro Forma EBITDA and Adjusted EBITDA may not be comparable to similarly titled measures of other companies. Management of the Debtors believe that these non-GAAP financial measures are important indicators of the Debtors' respective operations because they exclude items that may not be indicative of, or related to, the Debtors' core operating results, and provide a better baseline for analyzing the Debtors' underlying business. EBITDA, broadly defined, is a metric used by the Debtors' management and is frequently used by the financial community to provide insight into an organization's operating trends and to facilitate comparisons between peer companies, since interest, taxes, depreciation, and amortization can differ greatly between organizations as a result of differing capital structures and tax strategies.

Leveraged free cash flow is defined as the free cash flow that remains after the Debtors have paid their obligations on their debt—both interest and principal repayments. Leveraged free cash flow is not a measurement of operating performance computed in accordance with GAAP and should not be considered as a substitute for cash flow from operations prepared in conformity with GAAP. In addition, leveraged free cash flow may not be comparable to a similarly titled measure of other companies. Management believes that this cash flow measure provides investors and holders of Claims with a relevant measure of liquidity and a useful basis for assessing the Debtors' ability to fund their activities and obligations post-emergence.

## C. Business Description

The Debtors are a leading providers of local marketing solutions to over 400,000 business clients across the United States. Approximately 1,400 sales employees work directly with clients to provide multiple local marketing solutions that drive customer leads to clients and help clients connect with their customers.

The Debtors' local marketing solutions are primarily sold under various "Dex" and "Super" brands, including print directories, online local search engine websites, mobile local search applications and placement of client's information and advertisements on major search engine websites, with which the Debtors are affiliated. The Debtors' local marketing solutions also include website development, search engine optimization, market analysis, video development and promotion, reputation management, social media marketing and tracking/reporting of customer leads.

Several of the Debtors' print yellow page directories are co-branded with various local telephone service providers; including Verizon Communications Inc., AT&T Inc., CenturyLink, Inc., FairPoint Communications, Inc., and Frontier Communications Corporation. The Debtors operate as the authorized publisher of print yellow page directories in some of the markets where they provide telephone service,

and the Debtors are party to multiple agreements governing its relationship with each company, including publishing agreements, branding agreements, and non-competition agreements.

The Debtors operate two major business segments: print directories ("Print Segment") and digital solutions ("Digital Segment"):

*Print Segment*

In 2015, the Debtors published more than 1,400 distinct directory titles, consisting of directories that contain only yellow pages, directories that contain only white pages and directories that contain both yellow and white pages.

The Debtors' directories are designed to meet the advertising needs of local and national businesses and the information needs of consumers. The Debtors create customized advertising programs that are responsive to specific client needs and their promotional marketing budgets. The Debtors' yellow and white page print directories are also efficient sources of information for consumers, featuring a comprehensive list of businesses in local markets.

The Debtors' yellow pages directories provide a range of paid advertising options, as described below:

- <u>Listing Options</u>: An advertiser may increase visibility by paying for listings in additional headings; paying for highlighted, bold or super bold text listings and purchasing extra lines of text to include information, such as hours of operation, a website address or a more detailed business description.

- <u>In-Column Advertising Options</u>: For greater prominence on a page, an advertiser may expand their basic alphabetical listing by purchasing advertising space in the column in which their listing appears. In-column options include bolding, special fonts, color and special features, such as logos. The cost of in-column advertisements depends on the size and type of the advertisement purchased, and on the reach and scope of the directory.

- <u>Display Advertising Options</u>: A display advertisement allows businesses to include a wide range of information, illustrations, photographs and logos. Display advertisements are usually placed at the front of a heading, ordered first by size and then by advertiser seniority. This ordering process provides a strong incentive for advertisers to increase the size of their advertisements and to renew their advertising purchases each year to ensure their advertisements receive priority placement. Display advertisements range in size from a quarter column to as large as a two page spread. The cost of display advertisements depends on the size and type of the advertisement purchased, and on the reach and scope of the directory.

- <u>Specialty Advertising</u>: In addition to the advertisement options described above, the Debtors offer additional options that allow businesses to increase visibility or better target specific types of consumers. The Debtors' specialty advertising includes ads in the white pages section of the directories and gatefold sections, cover "tip-ons", cover advertising and specialty tabs that provide businesses with extra space to include more information in their advertisements.

Some state public utility commissions require local telephone service providers to publish and distribute white page directories of certain residences and businesses that order or receive local telephone service. These regulations also require a local telephone service provider, in specified cases, to include information relating to the provision of telephone service and information relating to local and state governmental agencies. Many state public utility commissions agreed to stop requiring local telephone service providers to distribute residential white page directories, instead opting for that they be made available upon request.

Under the Debtors' publishing agreements with the local telephone service providers, the Debtors' provide a free white page listing to certain residences and businesses with local wireline telephone service in the area, as well as a courtesy listing in the yellow pages for business clients to the extent the local telephone service provider is required to produce such directories.

*Digital Segment*

The Debtors operate DexKnows.com and Superpages.com, digital local search engines on both desktop and mobile devices. Through these sites, the Debtors distribute clients' business information to increase their internet traffic and extend their digital reach. In 2015, consumers conducted more than 129 billion searches using the Debtors' network. In addition to operating DexKnows.com and Superpages.com, the Debtors recognize the value of additional partnerships in the digital marketplace and will continue to evaluate relationships that allow the enhancement of its offerings to clients, such as its premier reseller relationship with Google.

The Debtors provide businesses with a basic listing on DexKnows.com and Superpages.com at no charge. The Debtors also offer digital advertising solutions for businesses comprised of the following:

- <u>Listings:</u> Listings focus on collecting content and distribution of that content through the Debtors' network. These solutions may also include listing enhancements such as larger sizes, logos and icons. To improve visibility and presence of its clients, the Debtors offer solutions to expand the reach of listing level information by providing local listing claiming services, whereby the Debtors take over the listing on the client's behalf and populate it with content. The Debtor's clients also may benefit from the reputation monitoring associated with the creation and claiming of these listings online.

- <u>Content:</u> The Debtors believe content is critical to its clients, and offer solutions that build content online for its clients. This includes both websites and mobile applications. Complementary to the Debtors' website solutions, it offers video solutions consisting of custom video creation and distribution for its clients. To improve visibility of websites, the Debtors also provide search engine optimization services.

- <u>Social Media:</u> Social media usage is growing and the Debtors believe this is an important medium for its clients to engage with existing and prospective customers. The Debtors offer social media solutions to assist its clients in the creation and management of their social reputation and presence. The primary supported social media are Facebook business pages and Google+ Local pages.

- <u>Performance:</u> The Debtors also offer flexible performance based solutions for its clients, consisting of pay per click and pay for calls solutions. These solutions allow clients to designate a performance based budget and bid based on the expected value of that advertising to their business, as well as receive the benefit of optimization services to their campaign with the goal of driving more effective results.

The Debtors have also introduced a new suite of presence products in the last twelve months branded as "Beyond Leads". Beyond Leads features two tools for customers.  DexLnk is a fully-functional Customer Engagement Platform that provides customer relationship management, appointment scheduling, and text marketing through one robust, easy-to-use dashboard. DexHub is an integrated platform that brings all of a client's digital marketing efforts together in one place.

**D.  Financial Forecast**

The following summarizes the underlying key assumptions upon which the Projections were based.

*Operating Revenue*

The Debtors derive operating revenue primarily from the sale of advertising in their print directories ("Print Revenue") and from digital-based marketing solutions as detailed above ("Digital Revenue")

Print Revenue is generated from local and national published sales which are then recognized as revenue over the life of the print directory. Print revenue has been declining for several years as clients have transitioned their marketing dollars to other strategies as a result of changing consumer behavior and the declining reliance on print directories.  Declines in print published sales are expected to stabilize at approximately (20%).

Digital Revenue, after experiencing a decline in 2016 of approximately (11%), is expected to return to growth during the projection period. Digital Revenue is expected to return to growth through the projection period through increased adoption of the Debtors' newly introduced Beyond Leads products: DexLnk and DexHub.  DexLnk is a fully-functional Customer Engagement Platform that provides customer relationship management, appointment scheduling, and text marketing through one robust, easy-to-use dashboard. DexHub is an integrated platform that brings all of a client's digital marketing efforts together in one place. In addition to its existing local markets, the Debtors are in the process of developing additional markets not traditionally serviced by the Debtors.

Due to the secular decline in print directories and the Debtors' continued focus and innovation in digital-based marketing solutions, the composition of the Debtors' business will change during the projection period. Print Revenue is expected to decline from approximately 67% of consolidated revenue to approximately 32% of consolidated revenue in FY2015 and FY2020, respectively. Conversely, Digital Revenue is expected to grow from approximately 34% of revenue to approximately 68% of consolidated revenue in FY2015 and FY2020, respectively. Consolidated revenue is expected to decline at a decreasing rate in FY2016 through FY2019 as the business continues to transition from print directories to digital-based marketing solutions. The transition of the business is expected to lead to consolidated revenue growth in FY2020 of approximately 0.4%.

*Operating Expenses*

Sales: Sales expense includes sales and non-sales salaries and overhead.  The Sales groups include Local and National for print and digital products.  The non-sales areas include sales management, sales training and support and sales planning and integration. Sales expense is expected to decline from $241 million to $196 million from 2016E to 2020E. This overall decline in sales expense is driven by the reduction in the total sales workforce to align with the decline in overall revenue generated by the Debtors over the period, as well as a reductions in commissions associated with the expected decline of the Print Segment. As a percentage of revenue, Sales expense is projected to decline from 19.5% to 18.4% from 2016E to 2020E, respectively, as the Debtors transition to more recurring revenue based products.

Operations: Operations expense includes salaries and overhead for print and digital products.  The most significant contributors to this expense category include distribution, publishing, and paper costs for print products.  Also included is the receivables management and billing for both print and digital products.  Additionally, there is also a significant sales support function. Operations expense is expected

to decline from $120 million to $83 million from 2016E to 2020E. The primary driver of this decline is related to the reduction of distribution, publishing and paper costs for print products aligning with the expected overall decline of Print Revenue over the projection period. Further, Operations expense is expected to decline as a percentage of sales from 9.8% to 7.7% from 2016E to 2020E as the Debtors transition to a majority digital offering with less required distribution, publishing and paper costs.

Information Technology: This category includes salaries and overhead for IT related to print and digital products as well as corporate information technology expenses.  This expense also includes the cost of the facilities housing IT staff and infrastructure. It should be noted that this expense covers both the development of certain products and services of the Digital Segment, as well as the IT infrastructure for all of the Debtors. Information Technology expense is expected to decline from $107 million to $91 million from 2016E to 2020E primarily driven by the overall reduction in the size and scale of the Debtors' operations. However, as a percentage of sales, Information Technology is expected to remain relatively constant between 8.5% and 9.0% of sales throughout the projection period.

Core Marketing: This category includes salaries and overhead for marketing related to print and digital products.  Specifically, core marketing includes call tracking lines, advertising and sales promotion. Additionally, core marketing includes distribution costs specifically related to print products. Core Marketing expense is expected to decline from $69 million to $46 million from 2016E to 2020E. Further, Core Marketing is expected to represent 5.6% of sales in 2016E and 4.3% of sales in 2020E. Both the aggregate and percentage of sales decline is driven by the expected overall reduction of the Print Segment during the projection period.

Direct Digital: This category includes traffic costs for the placement of the clients' information and advertisements on search engine websites and salaries and overhead for employees that service only digital products.  Direct Digital expense is expected to grow from $256 million to $330 million from 2016E to 2020E. Overall, Direct Digital expense is expected to grow as a percentage of total sales from 20.8% to 30.9% as the Debtors transition to a majority Digital business by the end of the projection period. Direct Digital expense is forecasted to decline as a percentage of Digital revenue from 56.3% to 45.2% in 2016E and 2020E, respectively as Management expects that there will be operating leverage in certain expense components and the Debtors' mix of products will transition away from SEM and SEO to presence-based and Beyond Leads products (as described more fully above), which carry lower traffic costs.

Other General & Administrative: This includes salaries and overhead for the Finance, Human Resources, Legal and Executive departments and the respective employees of these departments. These departments support the operations of all the Debtors. Due to the expected overall revenue decline, Other General & Administrative expense is expected to decline from $39 million to $35 million from 2016E to 2020E. However, Other General & Administrative expense is expected to remain stable as a percentage of sales throughout the projection period at approximately 3.3%, consistent with the infrastructure required to support the business going forward.

Other Period Expense: This includes Bad Debt, Net Capitalized Spending and Other expenses. Bad Debt expense represents the amount of non-collectable accounts receivable that is expected to occur in a given period. Management anticipates Bad Debt expense to represent approximately 2.0% of revenue in the medium and long-term. Net Capitalized Spending results from accounting entries to match expenses deferred sales commissions, NYPS commissions, printing costs and distribution costs to the balance sheet accruals for these accounts. Other expense includes pension costs, bonus accrual and other period costs. Other period costs mainly consist of payroll accrual, general liability insurance and various tax related items.

*Taxes*

The Projections assume that existing tax attributes, including Net Operating Loss Carryforwards and intangible asset basis will be partially offset by the cancellation of indebtedness income upon the consummation of the Plan. It is assumed, however, that the Debtors will retain certain tax attributes which will offset some taxable income during the Projection Period. Additionally, the Projections also assume that some of the remaining attributes are offset by reduction of deferred directory costs and accounts receivable.  The Debtors expect to return to being a full tax payer in FY2019. Any amount of attributes assumed to survive after the consummation of the Plan is based on the independent judgment of the Debtors and their advisors and does not represent the explicit or implicit endorsement of any taxing authority. The ultimate amount of tax attributes available to the Debtors will be independently determined by the Internal Revenue Service of the United States  after the consummation of the Plan and, as such, any Holder of Claims or Equity Interest must make their own assessment of the reasonableness of the assumptions.

*Post-Emergence Debt*

Upon the consummation of the plan, the Debtors are assumed to have the following debt obligations:

- A Libor + 1000bps $600 million New First Lien Term Loan

Consistent with the plan, the New First Lien Term Loan will require a cash flow sweep paid quarterly. The financial projections included below include a 100% cash flow sweep for the entire projection period for illustrative purposes and do not contemplate the retention of cash by the Debtors for permitted acquisitions. Consistent with the Plan, the Debtors have not assumed any additional debt obligations or funding sources.

The interest expense and excess free cash flow sweep are included in the Projections and are consistent with the requirements of the post-emergence debt currently contemplated in the Plan.

*Capital Expenditures*

The capital expenditure requirements of the Debtors' business are modest and forecasted to represent between 1.5% and 2.0% of annual operating revenues or approximately $20 million per year. The majority of capital expenditures are associated with capitalized software development.

*Net Working Capital*

Management forecasted changes in net working capital based on historical trends and averages for Accounts Receivable, Deferred Directory Costs, Prepaid Expense and Accounts Payable, among other items. The estimated change in net working capital is expected to follow the overall trajectory of the business and not deviate meaningfully from historical experience.

*Employee Retirement Benefits*

Cost associated with maintaining the Debtors' pension plans including cash contributions. The total cash impact is offset partially by the addition of non-cash items included in the Debtors' income statement.

## CONSOLIDATED DEX MEDIA, INC.

| ($ in millions) | Memo FY2016P | Emergence | Fiscal Year Ended December 31, | | | | |
|---|---|---|---|---|---|---|---|
| | | | 2H 2016P | 2017P | 2018P | 2019P | 2020P |
| *Ad Sales* | | | | | | | |
| **Print** | **$655.0** | | **$307.7** | **$524.0** | **$419.2** | **$335.4** | **$268.3** |
| **Digital** | 557.6 | | 288.6 | 616.2 | 690.1 | 779.1 | 870.9 |
| **Total Mult-Product Ad Sales** | **$1,212.6** | | **$596.3** | **$1,140.2** | **$1,109.3** | **$1,114.5** | **$1,139.2** |
| *YoY Growth %* | *(9.7%)* | | *na* | *(6.0%)* | *(2.7%)* | *0.5%* | *2.2%* |
| *Revenue* | | | | | | | |
| Print | $779.2 | | $367.8 | $631.3 | $511.7 | $416.2 | $338.5 |
| *YoY Growth %* | *(21.9%)* | | *(19.0%)* | *(18.9%)* | *(18.7%)* | *(18.7%)* | *(18.7%)* |
| Digital | 455.7 | | 230.2 | 501.8 | 569.9 | 648.5 | 730.8 |
| *YoY Growth %* | *(9.4%)* | | *10.1%* | *13.6%* | *13.6%* | *13.8%* | *12.7%* |
| **Total Revenue, Net** | **$1,234.9** | | **$598.0** | **$1,133.1** | **$1,081.6** | **$1,064.7** | **$1,069.3** |
| *YoY Growth %* | *(17.7%)* | | *na* | *(8.2%)* | *(4.5%)* | *(1.6%)* | *0.4%* |
| *Operating Costs* | | | | | | | |
| Sales | 240.7 | | 117.3 | 221.9 | 210.1 | 203.0 | 196.3 |
| Operations | 120.5 | | 57.2 | 108.9 | 99.3 | 91.4 | 82.6 |
| Information Technology | 106.7 | | 50.4 | 97.7 | 96.7 | 95.6 | 90.7 |
| Core Marketing | 68.7 | | 34.0 | 58.1 | 54.0 | 49.5 | 45.9 |
| Direct Digital | 256.4 | | 127.3 | 262.0 | 278.2 | 302.7 | 330.2 |
| Other General & Administrative | 39.3 | | 19.0 | 37.4 | 37.4 | 35.2 | 35.2 |
| Other Period Expense | 42.3 | | 11.5 | 26.0 | 17.4 | 14.7 | 13.2 |
| **Total Operating Costs** | **$874.6** | | **$416.6** | **$812.0** | **$793.2** | **$792.3** | **$794.2** |
| Pro Forma EBITDA | $360.3 | | $181.4 | $321.1 | $288.4 | $272.4 | $275.1 |
| Less: Cost to Achieve | (17.9) | | (7.4) | (4.9) | (0.6) | (0.8) | (0.4) |
| **Adj. EBITDA** | **$342.4** | | **$174.0** | **$316.2** | **$287.9** | **$271.6** | **$274.8** |
| *YoY Growth %* | *(29.5%)* | | *na* | *(7.6%)* | *(9.0%)* | *(5.6%)* | *1.2%* |
| *% Margin* | *27.7%* | | *29.1%* | *27.9%* | *26.6%* | *25.5%* | *25.7%* |
| Cash Interest | | | (31.3) | (46.0) | (30.0) | (13.7) | (1.1) |
| Cash Taxes | | | -- | (99.3) | (66.8) | (88.3) | (93.8) |
| CAPEX | | | (9.3) | (20.0) | (20.0) | (20.0) | (20.0) |
| NWC | | | 4.2 | 9.4 | (4.4) | (7.0) | (8.4) |
| Other Items | | | (4.5) | (8.4) | (11.4) | (11.6) | (11.0) |
| **LFCF** | | | **$133.1** | **$151.9** | **$155.3** | **$131.0** | **$140.4** |
| *100% Excess Cash Flow Sweep* | | | *$133.1* | *$151.9* | *$155.3* | *$131.0* | *$28.6* |
| PF Debt | | $600.0 | $466.9 | $315.0 | $159.6 | $28.6 | $ -- |
| Less: Cash | | (35.0) | (35.0) | (35.0) | (35.0) | (35.0) | (146.8) |
| **PF Net Debt / (Cash)** | | **$565.0** | **$431.9** | **$280.0** | **$124.6** | **($6.4)** | **($146.8)** |
| PF Debt / LTM Adj. EBITDA | | 1.5x | 1.4x | 1.0x | 0.6x | 0.1x | -- |
| PF Net Debt / LTM Adj. EBITDA | | 1.4x | 1.3x | 0.9x | 0.4x | NM | NM |
| PF Debt / LTM PF EBITDA | | 1.6x | 1.3x | 1.0x | 0.6x | 0.1x | -- |
| PF Net Debt / LTM Adj. EBITDA | | 1.5x | 1.2x | 0.9x | 0.4x | NM | NM |

*[The remainder of this page is intentionally left blank]*

## SUPERMEDIA

| ($ in millions) | Fiscal Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| | 2016E | 2017E | 2018E | 2019E | 2020E |
| **Ad Sales** | | | | | |
| **Print** | **$319.5** | **$255.6** | **$204.5** | **$163.6** | **$130.9** |
| **Digital** | **275.2** | **302.6** | **337.7** | **380.2** | **424.2** |
| **Total Mult-Product Ad Sales** | **$594.7** | **$558.2** | **$542.1** | **$543.7** | **$555.1** |
| *YoY Growth %* | *(11.4%)* | *(6.1%)* | *(2.9%)* | *0.3%* | *2.1%* |
| **Revenue** | | | | | |
| Print | $393.1 | $321.1 | $260.7 | $212.2 | $172.5 |
| *YoY Growth %* | *(21.5%)* | *(18.3%)* | *(18.8%)* | *(18.6%)* | *(18.7%)* |
| Digital | 211.8 | 231.4 | 261.4 | 296.1 | 332.8 |
| *YoY Growth %* | *(12.0%)* | *9.3%* | *12.9%* | *13.3%* | *12.4%* |
| **Total Revenue, Net** | **$604.9** | **$552.5** | **$522.1** | **$508.3** | **$505.3** |
| *YoY Growth %* | *(18.4%)* | *(8.7%)* | *(5.5%)* | *(2.6%)* | *(0.6%)* |
| **Operating Costs** | | | | | |
| Sales | 114.5 | 111.9 | 105.4 | 101.3 | 97.2 |
| Operations | 61.8 | 55.6 | 50.5 | 46.1 | 41.2 |
| Information Technology | 52.7 | 47.8 | 47.2 | 46.2 | 43.3 |
| Core Marketing | 36.4 | 31.4 | 29.1 | 26.5 | 24.3 |
| Direct Digital | 126.6 | 128.3 | 135.7 | 146.1 | 157.6 |
| Other General & Administrative | 15.3 | 14.4 | 14.4 | 13.3 | 13.2 |
| Other Period Expense | 11.5 | 7.7 | 5.9 | 4.7 | 4.2 |
| **Total Operating Costs** | **$418.9** | **$397.3** | **$388.2** | **$384.2** | **$381.0** |
| | | | | | |
| Pro Forma EBITDA | $186.0 | $155.2 | $133.9 | $124.1 | $124.2 |
| Less: Cost to Achieve | (8.8) | (2.4) | (0.3) | (0.4) | (0.2) |
| **Adj. EBITDA** | **$177.2** | **$152.8** | **$133.6** | **$123.7** | **$124.1** |
| *YoY Growth %* | *(32.5%)* | *(13.7%)* | *(12.5%)* | *(7.5%)* | *0.3%* |
| *% Margin* | *29.3%* | *27.7%* | *25.6%* | *24.3%* | *24.6%* |

*[The remainder of this page is intentionally left blank]*

**RHDI**

| ($ in millions) | Fiscal Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| | **2016E** | **2017E** | **2018E** | **2019E** | **2020E** |
| ***Ad Sales*** | | | | | |
| **Print** | **$130.0** | **$104.0** | **$83.2** | **$66.6** | **$53.3** |
| **Digital** | **128.9** | **143.1** | **160.8** | **182.0** | **203.8** |
| **Total Mult-Product Ad Sales** | **$259.0** | **$247.2** | **$244.0** | **$248.6** | **$257.1** |
| *YoY Growth %* | *(8.0%)* | *(4.6%)* | *(1.3%)* | *1.9%* | *3.4%* |
| ***Revenue*** | | | | | |
| Print | $156.6 | $125.0 | $101.1 | $82.3 | $67.0 |
| *YoY Growth %* | *(23.5%)* | *(20.2%)* | *(19.1%)* | *(18.6%)* | *(18.6%)* |
| Digital | 108.9 | 120.7 | 137.6 | 157.1 | 177.4 |
| *YoY Growth %* | *(7.8%)* | *10.8%* | *14.1%* | *14.2%* | *12.9%* |
| **Total Revenue, Net** | **$265.5** | **$245.6** | **$238.7** | **$239.4** | **$244.4** |
| *YoY Growth %* | *(17.7%)* | *(7.5%)* | *(2.8%)* | *0.3%* | *2.1%* |
| ***Operating Costs*** | | | | | |
| Sales | 53.4 | 48.4 | 46.4 | 45.4 | 44.4 |
| Operations | 25.3 | 23.3 | 21.4 | 20.0 | 18.3 |
| Information Technology | 22.9 | 21.0 | 21.0 | 21.1 | 20.4 |
| Core Marketing | 13.5 | 11.4 | 10.7 | 9.9 | 9.3 |
| Direct Digital | 55.1 | 56.3 | 60.3 | 66.8 | 74.2 |
| Other General & Administrative | 6.7 | 6.3 | 6.4 | 6.1 | 6.2 |
| Other Period Expense | 12.2 | 5.9 | 4.2 | 3.5 | 3.0 |
| **Total Operating Costs** | **$189.2** | **$172.7** | **$170.3** | **$172.7** | **$175.8** |
| | | | | | |
| Pro Forma EBITDA | $76.3 | $72.9 | $68.4 | $66.7 | $68.6 |
| Less: Cost to Achieve | (3.9) | (1.0) | (0.1) | (0.2) | (0.1) |
| **Adj. EBITDA** | **$72.4** | **$71.9** | **$68.3** | **$66.5** | **$68.5** |
| *YoY Growth %* | *(42.1%)* | *(0.7%)* | *(5.0%)* | *(2.6%)* | *2.9%* |
| *% Margin* | *27.3%* | *29.3%* | *28.6%* | *27.8%* | *28.0%* |

*[The remainder of this page is intentionally left blank]*

**EAST**

| ($ in millions) | Fiscal Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| | 2016E | 2017E | 2018E | 2019E | 2020E |
| *Ad Sales* | | | | | |
| Print | $97.9 | $78.3 | $62.7 | $50.1 | $40.1 |
| Digital | 75.4 | 83.8 | 94.2 | 106.7 | 119.5 |
| **Total Mult-Product Ad Sales** | **$173.3** | **$162.1** | **$156.9** | **$156.8** | **$159.6** |
| *YoY Growth %* | *(8.5%)* | *(6.5%)* | *(3.2%)* | *(0.0%)* | *1.8%* |
| | | | | | |
| *Revenue* | | | | | |
| Print | $108.9 | $87.9 | $71.1 | $57.8 | $47.0 |
| *YoY Growth %* | *(22.1%)* | *(19.3%)* | *(19.1%)* | *(18.6%)* | *(18.7%)* |
| Digital | 66.0 | 73.2 | 83.6 | 95.5 | 107.9 |
| *YoY Growth %* | *(4.3%)* | *10.9%* | *14.2%* | *14.3%* | *13.0%* |
| **Total Revenue, Net** | **$174.9** | **$161.1** | **$154.7** | **$153.4** | **$155.0** |
| *YoY Growth %* | *(16.2%)* | *(7.9%)* | *(4.0%)* | *(0.8%)* | *1.0%* |
| *Operating Costs* | | | | | |
| Sales | 34.5 | 29.9 | 28.4 | 27.5 | 26.7 |
| Operations | 16.1 | 15.1 | 13.8 | 12.8 | 11.6 |
| Information Technology | 14.8 | 13.8 | 13.7 | 13.7 | 13.1 |
| Core Marketing | 8.3 | 6.9 | 6.4 | 5.9 | 5.5 |
| Direct Digital | 35.7 | 37.1 | 39.6 | 43.3 | 47.6 |
| Other General & Administrative | 4.3 | 4.2 | 4.2 | 3.9 | 4.0 |
| Other Period Expense | 9.9 | 6.1 | 3.4 | 3.3 | 3.2 |
| **Total Operating Costs** | **$123.6** | **$113.0** | **$109.5** | **$110.3** | **$111.7** |
| | | | | | |
| Pro Forma EBITDA | $51.3 | $48.1 | $45.2 | $43.1 | $43.3 |
| Less: Cost to Achieve | (2.5) | (0.7) | (0.1) | (0.1) | (0.1) |
| **Adj. EBITDA** | **$48.8** | **$47.4** | **$45.1** | **$42.9** | **$43.3** |
| *YoY Growth %* | *(32.8%)* | *(2.9%)* | *(4.8%)* | *(4.8%)* | *0.7%* |
| *% Margin* | *27.9%* | *29.4%* | *29.2%* | *28.0%* | *27.9%* |

*[The remainder of this page is intentionally left blank]*

**WEST**

| ($ in millions) | Fiscal Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| | 2016E | 2017E | 2018E | 2019E | 2020E |
| **Ad Sales** | | | | | |
| Print | $107.6 | $86.1 | $68.9 | $55.1 | $44.1 |
| Digital | 78.0 | 86.6 | 97.4 | 110.2 | 123.4 |
| **Total Mult-Product Ad Sales** | **$185.7** | **$172.7** | **$166.2** | **$165.3** | **$167.5** |
| *YoY Growth %* | *(7.2%)* | *(7.0%)* | *(3.8%)* | *(0.5%)* | *1.3%* |
| | | | | | |
| **Revenue** | | | | | |
| Print | $120.7 | $97.4 | $78.8 | $64.0 | $52.0 |
| *YoY Growth %* | *(21.0%)* | *(19.3%)* | *(19.0%)* | *(18.8%)* | *(18.7%)* |
| Digital | 69.0 | 76.5 | 87.3 | 99.7 | 112.6 |
| *YoY Growth %* | *(8.6%)* | *10.8%* | *14.1%* | *14.2%* | *13.0%* |
| **Total Revenue, Net** | **$189.7** | **$173.9** | **$166.1** | **$163.7** | **$164.6** |
| *YoY Growth %* | *(16.9%)* | *(8.3%)* | *(4.5%)* | *(1.5%)* | *0.6%* |
| **Operating Costs** | | | | | |
| Sales | 38.3 | 31.8 | 29.9 | 28.9 | 28.0 |
| Operations | 17.3 | 14.8 | 13.6 | 12.6 | 11.5 |
| Information Technology | 16.2 | 15.0 | 14.8 | 14.7 | 13.9 |
| Core Marketing | 9.8 | 7.6 | 7.1 | 6.5 | 6.1 |
| Direct Digital | 39.0 | 40.2 | 42.7 | 46.5 | 50.8 |
| Other General & Administrative | 4.7 | 4.5 | 4.5 | 4.2 | 4.3 |
| Other Period Expense | 8.6 | 6.2 | 3.9 | 3.2 | 2.9 |
| **Total Operating Costs** | **$133.9** | **$120.2** | **$116.7** | **$116.7** | **$117.4** |
| | | | | | |
| Pro Forma EBITDA | $55.8 | $53.6 | $49.4 | $47.0 | $47.3 |
| Less: Cost to Achieve | (2.7) | (0.7) | (0.1) | (0.1) | (0.1) |
| **Adj. EBITDA** | **$53.1** | **$52.9** | **$49.4** | **$46.9** | **$47.2** |
| *YoY Growth %* | *(33.3%)* | *(0.3%)* | *(6.7%)* | *(5.0%)* | *0.7%* |
| *% Margin* | *28.0%* | *30.4%* | *29.7%* | *28.7%* | *28.7%* |

*[The remainder of this page is intentionally left blank]*

## CORPORATE & OTHER

| ($ in millions) | Fiscal Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| | 2016E | 2017E | 2018E | 2019E | 2020E |
| **Total Revenue, Net** | $ -- | $ -- | $ -- | $ -- | $ -- |
| *YoY Growth %* | | | | | |
| ***Operating Costs*** | | | | | |
| Sales | 0.0 | -- | -- | -- | -- |
| Operations | 0.0 | -- | -- | -- | -- |
| Information Technology | 0.0 | -- | -- | -- | -- |
| Core Marketing | 0.7 | 0.7 | 0.7 | 0.7 | 0.7 |
| Direct Digital | 0.0 | -- | -- | -- | -- |
| Other General & Administrative | 8.3 | 8.0 | 7.8 | 7.7 | 7.5 |
| Other Period Expense | 0.0 | -- | -- | -- | -- |
| **Total Operating Costs** | **$9.0** | **$8.7** | **$8.6** | **$8.4** | **$8.3** |
| | | | | | |
| Pro Forma EBITDA | ($9.0) | ($8.7) | ($8.6) | ($8.4) | ($8.3) |
| Less: Cost to Achieve | (0.0) | -- | -- | -- | -- |
| **Adj. EBITDA** | **($9.0)** | **($8.7)** | **($8.6)** | **($8.4)** | **($8.3)** |
| *YoY Growth %* | *(10.3%)* | *(3.5%)* | *(1.8%)* | *(1.7%)* | *(1.7%)* |
| *% Margin* | *nm* | *nm* | *nm* | *nm* | *nm* |

*[The remainder of this page is intentionally left blank]*

**<u>EXHIBIT D</u>**

**Liquidation Analysis**

# Dex Media, Inc.

## Liquidation Analysis

## (Deconsolidated Chapter 7 Scenario)

May 2, 2016

**Overview**

A Chapter 11 plan cannot be confirmed unless the bankruptcy court determines that the plan is in the "best interests" of all holders of claims and interests that are impaired by the plan and that have not accepted the plan. The "best interests" test requires a bankruptcy court to find either that (i) all members of an impaired class of claims or interests have accepted the plan or (ii) the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor were liquidated under Chapter 7 of the Bankruptcy Code (as defined in the Disclosure Statement).

The following document is the Best Interests Analysis (the "Liquidation Analysis") of Dex Media, Inc. et. al. (the "Debtors," "Dex Media, Inc.," or the "Company"). The Liquidation Analysis assumes the Debtors' estates are not substantively consolidated.

The Debtors have prepared this Liquidation Analysis based on a hypothetical liquidation under Chapter 7 of the Bankruptcy Code. It is assumed, among other things, that the hypothetical liquidation under Chapter 7 would commence under the direction of a court-appointed trustee and would continue for a period of time, during which time all of the Debtors' major assets would be sold or tendered to the respective lien holders, and the cash proceeds, net of liquidation related costs, would then be distributed to creditors in accordance with relevant law.

The determination of the costs of, and proceeds from, the hypothetical liquidation of the Debtors' assets in a Chapter 7 case is an uncertain process involving the extensive use of estimates and assumptions that, although considered reasonable by the Debtors, are inherently subject to significant business, economic, and competitive uncertainties and contingencies beyond the control of the Debtors, their management, and their advisors. Inevitably, some assumptions in the Liquidation Analysis would not materialize in an actual Chapter 7 liquidation, and unanticipated events and circumstances could affect the ultimate results in an actual Chapter 7 liquidation.

THE LIQUIDATION ANALYSIS IS NOT INTENDED AND SHOULD NOT BE USED FOR ANY OTHER PURPOSE. THE LIQUIDATION ANALYSIS DOES NOT PURPORT TO BE A VALUATION OF THE DEBTORS' ASSETS AS A GOING CONCERN, AND THERE MAY BE A SIGNIFICANT DIFFERENCE BETWEEN THE LIQUIDATION ANALYSIS AND THE VALUES THAT MAY BE REALIZED IN AN ACTUAL LIQUIDATION. THIS ANALYSIS ASSUMES "LIQUIDATION VALUES" BASED ON THE DEBTORS' BUSINESS JUDGEMENT. THE RECOVERIES SHOWN DO NOT CONTEMPLATE A SALE OR SALES OF BUSINESS UNITS ON A GOING CONCERN BASIS. WHILE THE DEBTORS MAKE NO ASSURANCES, IT IS POSSIBLE THAT PROCEEDS RECEIVED FROM ANY GOING CONCERN SALE(S) WOULD BE MORE THAN THE HYPOTHETICAL LIQUIDATION, THE COSTS ASSOCIATED WITH THE SALE(S) WOULD BE LESS, FEWER CLAIMS WOULD BE ASSERTED AGAINST THE BANKRUPTCY ESTATES, OR CERTAIN ORDINARY COURSE CLAIMS WOULD BE ASSUMED BY THE BUYER(S) OF SUCH BUSINESS(ES).

The underlying financial information in the Liquidation Analysis was not compiled or examined by any independent accountants. NEITHER THE DEBTORS NOR THEIR ADVISORS MAKE ANY REPRESENTATIONS OR WARRANTIES THAT THE ACTUAL RESULTS WOULD OR WOULD NOT APPROXIMATE THE ESTIMATES AND ASSUMPTIONS REPRESENTED IN THE LIQUIDATION

ANALYSIS. ACTUAL RESULTS COULD VARY MATERIALLY. THIS ANALYSIS ASSUMES "LIQUIDATION VALUES" BASED ON THE DEBTORS' BUSINESS JUDGEMENT.

This Liquidation Analysis assumes that a liquidation of the Debtors would occur over approximately 6 months. During the first 30 days, it is assumed that the Chapter 7 trustee would arrange for the Debtors to discontinue most, if not all, of their ordinary course business activities other than minimal required operations. Thereafter, it is assumed that the Chapter 7 trustee would arrange for the Debtors to focus efforts to monetize substantially all assets in an orderly manner.

*Dex Media, Inc.*
**May 2016**

The Liquidation Analysis should be read in conjunction with the following notes and assumptions:

**Summary Notes to Liquidation Analysis**:

1. *Dependence on assumptions.* The Liquidation Analysis depends on estimates and assumptions. The Liquidation Analysis is based on a number of estimates and assumptions that, although developed and considered reasonable by the management and the advisors of the Debtors, are inherently subject to significant economic, business, regulatory, and competitive uncertainties and contingencies beyond the control of the Debtors or their management. The Liquidation Analysis is also based on the Debtors' best judgement of how numerous decisions in the liquidation process would be resolved. Accordingly, there can be no assurance that the values reflected in this Liquidation Analysis would be realized if the Debtors were, in fact, to undergo such a liquidation and actual results could vary materially and adversely from those contained herein.

2. *Additional claims.* The cessation of business in a liquidation is likely to trigger certain claims that otherwise would not exist under a plan absent a liquidation. Some of these claims could be significant and may be entitled to priority in payment over general unsecured claims. Those priority claims would be paid in full from the liquidation proceeds before the balance would be made available to pay general unsecured claims or to make any distribution in respect of equity interests.

3. *Dependence on unaudited financial statements.* This Liquidation Analysis contains numerous estimates that are still under review, and remains subject to further legal and accounting analysis.

4. *Preference or fraudulent transfers.* No recovery or related litigation costs have been attributed to any potential avoidance actions under the Bankruptcy Code, including potential preference or fraudulent transfer actions due to, among other issues, uncertainty and anticipated disputes about these matters.

5. *Chapter 7 liquidation costs and length of liquidation process.* The Debtors have assumed that the initial phase of a liquidation would involve minimal operations. Subsequently, a limited group of personnel would be retained in order to pursue orderly sales of substantially all of the remaining assets, collect receivables, arrange distributions, and otherwise administer and close the estates. Thus, this Liquidation Analysis assumes the liquidation would be completed within 6 months. In an actual liquidation, the wind down process and time period(s) could vary, thereby impacting recoveries. For example, the potential for priority, contingent, and other claims, litigation, rejection costs, and the final determination of allowed claims could substantially impact both the timing and amount of the distribution of the asset proceeds to the creditors. Accordingly, there can be no assurance that the values reflected in this Liquidation Analysis would be realized if the Debtors were, in fact, to undergo such a liquidation.

   Pursuant to section 726 of the Bankruptcy Code, the allowed administrative expenses incurred by Chapter 7 trustee, including, but not limited to, expenses incurred in connection with selling the Debtors' assets, will be entitled to payment in full prior to any distribution to Chapter 11 administrative and other priority claims. The estimate used in the Liquidation Analysis for these expenses includes estimates for certain legal, accounting, and other professionals, as well as an assumed 3% fee based upon liquidated assets payable to a Chapter 7 trustee.

6. *Claims estimates.* Claims are estimated based upon known book liabilities as of February 2016, except for certain Senior Bank Debt and Employee liabilities that have been updated as of April 2016.

7. *Distribution of net proceeds.* Priority and administrative claim amounts, professional fees, trustee fees, and other such claims that may arise in a liquidation scenario would be paid in full from the liquidation proceeds before the balance those proceeds will be made available to pay pre-bankruptcy priority, secured, and unsecured claims. Under the absolute priority rule, no junior creditor would receive any distribution until all senior creditors are paid in full, and no equity holder would receive any distribution until all creditors are paid in full. The assumed distributions to creditors as reflected in the liquidation Analysis are estimated in accordance with the absolute priority rule.

8. ***Conclusion:*** **The Debtors have determined, as summarized in the following analysis, that confirmation of the plan of reorganization will provide all creditors with a recovery that is not less than what they would otherwise receive pursuant to a liquidation of the Debtors under chapter 7 of the Bankruptcy Code.**

***Dex Media, Inc.***
**May 2016**

## Summary Notes to Liquidation Analysis:

| Based on DRAFT Balance Sheet as of 2/29/16[1] | | | | | |
|---|---|---|---|---|---|
| (in $000s) | | | Projected Recovery | | |
| | | **Low** | | **High** | |
| **Gross Proceeds Available for Distribution** | | | | | |
| Cash and Cash Equivalents | (a) | $ 166,530 | | $ 166,530 | |
| Accounts Receivable | (b) | 71,221 | | 99,108 | |
| Deferred Revenue | (c) | 157,217 | | 206,048 | |
| Fixed Assets | (d) | 12,950 | | 16,040 | |
| Intangible Assets | (e) | 10,159 | | 20,319 | |
| Pension | (f) | - | | 8,260 | |
| **Gross Proceeds** | | $ **418,078** | | $ **516,304** | |
| | | | | | |
| **Costs Associated with Liquidation** | | | | | |
| Wages | | $ 7,192 | | $ 7,192 | |
| Rent | | 4,466 | | 4,466 | |
| Other G&A | | 675 | | 675 | |
| Trustee Fees | | 12,542 | | 15,489 | |
| Professional Fees | | 6,300 | | 6,300 | |
| Other | | 750 | | 750 | |
| **Less: Wind-down Costs** | | $ **31,925** | | $ **34,872** | |
| | | | | | |
| **Net Proceeds Available for Distribution** | | $ **386,152** | | $ **481,432** | |
| | | | | | |
| **Mid-Point of Net Proceeds Available for Distribution** | | | $ **433,792** | | |

[1] Cash, debt balances, and employee and lease rejection claims updated as of 4/15/16.

**Dex Media, Inc.**
**May 2016**

| Chapter 7 - Deconsolidated | | | | |
|---|---|---|---|---|
| (in $000s) | | | **Projected Recovery** | |
| | | **Claims** | **$'s** | **%'s** |
| **Net Proceeds Available for Distribution** | | | **$433,792** | |
| **Priority / Administrative claims** [1] | | | | |
| Employee Liabilities | $ | 16,869 | $ - | 0% |
| Taxes | | 5,956 | - | 0% |
| Other Priority Claims | | 355 | - | 0% |
| | $ | 23,180 | $ - | 0% |
| *Proceeds Available for Remaining Claims* | | | $ 433,792 | |
| **Secured Claims** [2] | | | | |
| Senior Bank Debt | $ | 2,128,846 | $ 433,704 | 20% |
| | | 2,128,846 | 433,704 | 20% |
| *Proceeds Available for Remaining Claims* | | | $ 88 | |
| **Unsecured Claims** [3] | | | | |
| Bond debt | $ | 300,381 | $ - | 0% |
| Employee claims [4] | | 100,000 | 79 | 0% |
| Accounts payable, trade | | 48,664 | - | 0% |
| Leases | | 14,986 | 0 | 0% |
| Taxes | | 7,526 | 0 | 0% |
| Other [5] | | 10,000 | 9 | 0% |
| | $ | 481,557 | $ 88 | 0% |
| | $ | 2,633,582 | $ 433,792 | 16% |

Notes

[1] Priority claims may exceed the allowable per claim limit as stipulated by the Bankruptcy Code.

[2] Includes recoveries from deficiency claims for the secured lenders.

[3] Unsecured claimholders receive their pro-rata share of the total distibution to the unsecured creditors.

[4] Employee claims include $91MM liability for under-funded portion of qualified pension plans.

[5] Other includes amounts related to unsettled litigation matters and potential claims not currently projected; range of $5MM (Low) to $15MM (High).

*Dex Media, Inc.*
**May 2016**

## Detailed Assumptions

### *Asset Recovery Estimates*

Asset recovery estimates presented in this Liquidation Analysis are based on the Company's unaudited balance sheet as of February 29, 2016 and updated where noted:

(a) Cash and cash equivalents: Cash and cash equivalents include investments in money market accounts, as well as concentration and lockbox accounts and allow for withdrawal on demand. Balances updated as of April 15, 2016. The Liquidation Analysis assumes that operations are discontinued and would not generate additional cash available for distribution except for net proceeds from the disposition of non-cash assets. No funds are assumed to be collected from dental, long-term disability, or medical claim accounts.

| (in $000s) | Book Value | Estimated Recovery | | | | | |
| | | Low | | Mid [1] | | High | |
| | | $s | % | $s | % | $s | % |
|---|---|---|---|---|---|---|---|
| **Cash and Cash equivalents** | $   166,610 | $   166,530 | 100% | $   166,530 | 100% | $   166,530 | 100% |

Note:
[1] Mid projected recovery represents the mid-point of "Low" and "High" estimated recoveries.

(b) Accounts receivable: Accounts receivable consists primarily of outstanding invoices for completed services for customers according to terms per the customer's agreement. It is assumed that the Chapter 7 trustee would retain certain existing staff of the Debtors to administer the collection of outstanding invoices. Projected collections are based on accounts receivable balance excluding bad debt reserve. Print receivables, which account for approximately 65% of total sales, are assumed to be collected at 60% for the Low scenario and 80% for the High scenario. Digital receivables, which account for approximately 35% of total sales, are assumed to be collected at 10% for the Low scenario and 20% for the High scenario. Estimated recovery percentages highlighted below represent the blended rated for both print and digital accounts receivable.

| (in $000s) | Book Value | Estimated Recovery | | | | | |
| | | Low | | Mid [1] | | High | |
| | | $s | % | $s | % | $s | % |
|---|---|---|---|---|---|---|---|
| **Accounts receivable [2]** | $   169,639 | $   71,221 | 42% | $   85,165 | 50% | $   99,108 | 58% |

Note:
[1] Mid projected recovery represents the mid-point of "Low" and "High" estimated recoveries.
[2] Accounts receivable balance excludes reduction for allowance for doubtful accounts.

(c) Deferred revenue: Deferred revenue represents unbilled and future receivables from local print customers. The Liquidation Analysis assumes that the Chapter 7 trustee would retain certain existing staff of the Debtors to administer the invoicing and collection of the unbilled receivables

*Dex Media, Inc.*
**May 2016**

over a 180 day period. The remaining unbilled receivables are projected to be sold to a third-party collection agency for 10% of the face value of the receivable.

| (in $000s) | Book Value | Low | | Estimated Recovery Mid [1] | | High | |
|---|---|---|---|---|---|---|---|
| | | $s | % | $s | % | $s | % |
| **Deferred revenue** | $ 351,402 | $ 157,217 | 45% | $ 181,633 | 52% | $ 206,048 | 59% |

Note:
[1] Mid projected recovery represents the mid-point of "Low" and "High" estimated recoveries.

(d) <u>Fixed assets</u>: Includes land, buildings, furniture and fixtures, data processing equipment, personal computers, and automobiles. Estimated recoveries under the High scenario for land and buildings are based on broker opinions for Bristol, TN; St. Petersburg, FL; and Marlton, NJ properties. Recoveries are reduced by 30% for the Low scenario, which also incorporate an allowance for broker and other selling related expenses. Company management and the Debtors' advisors estimate that remaining fixed assets would yield 5% - 25% of book value depending on the asset type.

| (in $000s) | Book Value | Low | | Estimated Recovery Mid [1] | | High | |
|---|---|---|---|---|---|---|---|
| | | $s | % | $s | % | $s | % |
| **Fixed assets, net** | $ 32,199 | $ 12,950 | 40% | $ 14,495 | 45% | $ 16,040 | 50% |

Note:
[1] Mid projected recovery represents the mid-point of "Low" and "High" estimated recoveries.

(e) <u>Intangible assets</u>: Intangible assets include client relationships (i.e., contact lists), directory service agreements, patented technologies, trade/domain names, and advertising commitments. Company management and the Debtors' advisors have assumed that only the directory service agreements have marketable value, due to their exclusivity. Minimal recovery is assumed due to limited comparable market transactions.

| (in $000s) | Book Value | Low | | Estimated Recovery Mid [1] | | High | |
|---|---|---|---|---|---|---|---|
| | | $s | % | $s | % | $s | % |
| **Intangible assets** | $ 382,167 | $ 10,159 | 3% | $ 15,239 | 4% | $ 20,319 | 5% |

Note:
[1] Mid projected recovery represents the mid-point of "Low" and "High" estimated recoveries.

(f) <u>Pension</u>: Company's SuperMedia Management pension plan is over-funded by approximately $33MM. The Liquidation Analysis assumes that all of the Company's pension plans would be terminated and transferred to the Pension Benefit Guaranty Corporation for administration. Based on guidance provided by the Debtors' legal advisors, the Company may be able to recover the over-funded assets. However, the actual recovery would be subject to revised assumptions that could be materially lower due to fees, expenses, and tax. This process includes multiple assumptions for

calculation of overfunded amounts, and any termination would result in fees, expenses, and excise tax.

| (in $000s) | Book Value | | Estimated Recovery | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | Low | | Mid [1] | | High [2] | |
| | | | $s | % | $s | % | $s | % |
| **Pension** | $    33,038 | $    - | 0% | $    4,130 | 13% | $    8,260 | 25% |

Note:
[1] Mid projected recovery represents the mid-point of "Low" and "High" estimated recoveries.
[2] Amount subject to the adjustments, revised assumptions, fees, expenses, and tax. Actual recovery so could be materially lower in the event of plan termination..

### *Liquidation Expenses and Claims*

(a) <u>Wind-down expenses</u>: Includes payroll and benefits, rent, Chapter 7 trustee fees, professional fees, estate obligations, and other general & administration costs. The Liquidation Analysis assumes payroll cost for limited Debtors' staff required to realize projected recoveries on non-cash assets. During the initial month of the wind-down, the Liquidation Analysis assumes that approximately 155 of the Debtors' employees are retained and employed. During the remaining 150 days, the headcount declines each month, whereby the Debtors are projected to employ approximately 50 staff in the final 30 days. Rent costs assume 120 days for the currently occupied non-headquarter facilities, and 180 days for the Company headquarters. Chapter 7 trustee fees are forecasted as 3% of gross proceeds for both Low and High scenarios. Other costs include document retention, final W-2s, final tax returns and 401(k) termination costs.

| **Wind-down expenses** | | |
|---|---|---|
| (in $000s) | **Forecast** | |
| | **Low** | **High** |
| Wages | $ 7,192 | $    7,192 |
| Rent | 4,466 | 4,466 |
| Other G&A | 675 | 675 |
| Trustee Fees | 12,542 | 15,489 |
| Professional Fees | 6,300 | 6,300 |
| Other | 750 | 750 |
| **Total Wind-down expenses** | **$31,925** | **$34,872** |

(b) <u>Claims</u>: As of the date of the Liquidation Analysis, the Company has not incurred any post-petition administration expenses other than section 503(b)(9) claims. All post-petition expenses incurred to monetize non-cash assets are fully accounted for within Wind-down expenses. The Company has incurred section 503(b)(9) claims as a result of receiving goods 20 days in advance of the filing date. Section 503(b)(9) claims are given administrative expense priority in bankruptcy. The secured

*Dex Media, Inc.*
**May 2016**

claims include the pre-petition senior credit facility and related deficiency claims. The unsecured claim amount includes bond debt, employee claims, accounts payable (trade), lease rejection damages, and pre-petition taxes.

| Claims | |
|---|---|
| (in $000s) | |
| | **Total** |
| Priority / Administrative claims [1] | $   23,180 |
| Secured Claims [2] | 2,128,846 |
| Unsecured Claims [3] | 481,557 |
| **Total Claims** | **$2,633,582** |

Notes
[1] Priority / Administrative claims include section 503(b)(9) claims for goods received 20 days in advance of the filing
[2] Includes deficiency claims for the secured lenders.
[3] Unsecured claimholders receive their pro-rata share of the total distibution to the unsecured creditors.

<u>Appendix</u>

**Dex Media, Inc.**
Debtors' headcount and Professional fees - wind-down process
*($s in 000s)*

| Debtors' headcount by month during wind-down | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **$ Wages by department** [1] | **Month # --->** | **1** | **2** | **3** | **4** | **5** | **6** | **Total** |
| Credit | | 325 | 316 | 404 | 170 | 129 | 94 | 1,438 |
| Finance - accounting | | 374 | 374 | 447 | 151 | 120 | 91 | 1,558 |
| Human resources | | 199 | 192 | 274 | 126 | 118 | 118 | 1,028 |
| Legal | | 28 | 28 | 42 | - | - | - | 98 |
| Facilities | | 97 | 77 | 87 | 45 | 40 | 34 | 379 |
| IT | | 297 | 289 | 416 | 183 | 166 | 140 | 1,492 |
| Contingency [2] | | 264 | 255 | 334 | 135 | 115 | 95 | 1,199 |
| **Total $ Wages by department** | | **1,584** | **1,531** | **2,004** | **811** | **689** | **572** | **7,192** |
| **Headcount by department** | | | | | | | | |
| Credit | | 57 | 55 | 48 | 31 | 23 | 15 | |
| Finance - accounting | | 33 | 33 | 26 | 13 | 10 | 7 | |
| Human resources | | 18 | 17 | 16 | 12 | 11 | 11 | |
| Legal | | 2 | 2 | 2 | - | - | - | |
| Facilities | | 13 | 12 | 9 | 7 | 6 | 5 | |
| IT | | 31 | 30 | 29 | 19 | 17 | 14 | |
| Contingency | | - | - | - | - | - | - | |
| **Total Headcount by department** | | **154** | **149** | **130** | **82** | **67** | **52** | |

Note:
[1] Wages calcualcated using employees' actual 2015 salary, plus 35% for fully-loaded benefits and taxes.
[2] Contingency includes incremental 20% of total wages for Credit, Finance-accounting, Human resources, Legal, Facilities and Information technology.

| Debtors' professional fees by month during wind-down | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Professionals** [1] | **Month # --->** | **1** | **2** | **3** | **4** | **5** | **6** | **Total** |
| Financial advisors | | 500 | 500 | 500 | 350 | 350 | 350 | 2,550 |
| Legal advisors | | 750 | 750 | 750 | 500 | 500 | 500 | 3,750 |
| **Total $ Wages by department** | | **1,250** | **1,250** | **1,250** | **850** | **850** | **850** | **6,300** |

Note:
[1] Excludes costs for Chapter 7 Trustee.

**Dex Media, Inc.**
Liquidation analysis
*($s in 000s)*

| Scenario: Mid | Dex Media Inc. | Dex One Digital, Inc. | Dex Media Holdings | Dex Media Service | Dex Media East | Dex Media West | Dex One Service, Inc. | R.H. Donnelley Inc. | R.H. Donnelley APIL | R.H. Donnelley Corp. | SuperMedia Inc. | SuperMedia LLC. | SuperMedia Sales | Consolidated |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Liquidation Proceeds** | | | | | | | | | | | | | | |
| Cash | - | 214 | 132 | - | 35,827 | 13,619 | 1,982 | 22,128 | - | - | - | 92,629 | - | 166,530 |
| Accounts receivable | - | 778 | - | - | 11,027 | 10,126 | - | 16,985 | - | - | - | 46,249 | - | 85,165 |
| Deferred revenue collection | - | - | - | - | 20,333 | 31,782 | - | 34,679 | - | - | - | 94,839 | - | 181,633 |
| Accrued taxes receivable | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Prepaid expenses | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Fixed assets | - | - | - | - | 13 | 0 | 3,500 | 12 | - | - | - | 7,121 | 3,849 | 14,495 |
| Intangible assets | - | - | - | - | 4,986 | 6,084 | - | 2,945 | - | - | - | 1,224 | - | 15,239 |
| Pension | - | - | - | - | - | - | - | - | - | - | 4,130 | - | - | 4,130 |
| Deferred tax asset | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Source of funds** | - | 992 | 132 | - | 72,185 | 61,611 | 5,481 | 76,750 | - | - | 4,130 | 242,062 | 3,849 | 467,191 |
| **Less (Liquidation costs)** | | | | | | | | | | | | | | |
| Wages | - | 15 | 2 | - | 1,113 | 946 | 84 | 1,181 | - | - | 58 | 3,733 | 59 | 7,192 |
| Rent | - | 9 | 1 | - | 692 | 587 | 52 | 733 | - | - | 36 | 2,318 | 37 | 4,466 |
| Other costs | - | 2 | 0 | - | 116 | 99 | 9 | 123 | - | - | 6 | 389 | 6 | 750 |
| Financial advisers | - | 5 | 1 | - | 395 | 335 | 30 | 419 | - | - | 20 | 1,324 | 21 | 2,550 |
| Counsel | - | 8 | 1 | - | 581 | 493 | 44 | 616 | - | - | 30 | 1,946 | 31 | 3,750 |
| Chapter 11 Trustee fees | - | 30 | 4 | - | 2,166 | 1,848 | 164 | 2,303 | - | - | 124 | 7,262 | 115 | 14,016 |
| Other G&A | - | 1 | 0 | - | 105 | 89 | 8 | 111 | - | - | 5 | 350 | 6 | 675 |
| **Total Liquidation costs** | - | 71 | 9 | - | 5,167 | 4,398 | 391 | 5,485 | - | - | 279 | 17,323 | 276 | 33,399 |
| **Total Proceeds Available for Distributions** | - | 921 | 122 | - | 67,019 | 57,213 | 5,090 | 71,265 | - | - | 3,851 | 224,739 | 3,573 | 433,792 |
| | | | | | | | | | | | | | | |
| **Claims recovery** | | | | | | | | | | | | | | |
| Priority / Administrative Claims | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Employee Liability | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Post-petition accounts payable | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 503(b)(9) | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other Priority claims | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Priority / Administrative Claims | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Recovery from Encumbered assets | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Excess / (Deficiency) | - | 921 | 122 | - | 67,019 | 57,213 | 5,090 | 71,265 | - | - | 3,851 | 224,739 | 3,573 | 433,792 |
| Proceeds from Unencumbered assets | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Excess / (Deficiency) available to Secured and** | | | | | | | | | | | | | | |
| **Unsecured  claims** | - | 921 | 122 | - | 67,019 | 57,213 | 5,090 | 71,265 | - | - | 3,851 | 224,739 | 3,573 | 433,792 |
| | | | | | | | | | | | | | | |
| **Secured claims** | | | | | | | | | | | | | | |
| Pre-petition bank debt | - | - | - | - | 304,140 | 276,860 | - | 576,077 | - | - | 971,768 | - | - | 2,128,846 |
| Recovery from Encumbered assets, excl. Guaranty claim | - | - | - | - | 67,019 | 57,213 | - | 71,265 | - | - | 3,851 | - | - | 199,347 |
| Excess / (Deficiency) for Pre-petition bank debt | - | - | - | - | (237,121) | (219,648) | - | (504,812) | - | - | (967,917) | - | - | (1,929,499) |
| Guaranty claim on Pre-petition bank debt | 961,581 | - | 1,929,499 | - | - | - | 1,929,499 | - | 504,812 | - | - | 967,917 | 967,917 | 1,929,499 |
| Recovery for Encumbered assets for Guaranty claim | - | - | 122 | - | - | - | 5,090 | - | - | - | - | 224,739 | 3,573 | 233,525 |
| **Total Secured Excess / (Deficiency)** | (959,131) | 921 | (1,695,974) | - | (236,444) | (218,866) | (1,695,974) | (503,822) | (503,822) | - | (736,843) | (736,843) | (736,843) | (1,695,974) |
| | | | | | | | | | | | | | | |
| **Unsecured claims** | | | | | | | | | | | | | | |
| Bond debt | 300,381 | - | - | - | - | - | - | - | - | - | - | - | - | 300,381 |
| Employee claims | 93,023 | 91,023 | 91,023 | 91,023 | 91,023 | 91,023 | 109,535 | 93,023 | 93,023 | 91,023 | 98,357 | 91,023 | 91,023 | 116,869 |
| Accounts payable, trade | - | - | - | - | - | - | 49,019 | - | - | - | - | - | - | 49,019 |
| Leases | - | 550 | 492 | - | - | - | 6,814 | - | - | - | 4,516 | 2,614 | - | 14,986 |
| Taxes | 3,947 | 5 | - | - | 96 | 94 | 545 | 86 | - | - | 1,968 | 6,647 | 93 | 13,482 |
| Other | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 |
| Guaranty claim - Unsecured | 1,695,974 | 959,131 | 1,695,974 | - | 1,459,530 | 1,477,108 | 1,695,974 | 1,192,153 | 503,822 | 959,131 | 959,131 | 736,843 | 736,843 | 1,695,974 |
| Total Unsecured claims | 2,103,325 | 1,060,709 | 1,797,489 | 101,023 | 1,560,650 | 1,578,225 | 1,871,887 | 1,295,262 | 606,845 | 1,060,154 | 1,073,972 | 847,128 | 837,959 | 2,200,710 |
| Recovery | - | 921 | - | - | - | - | - | - | - | - | - | - | - | 921 |
| **Excess / (Deficiency)** | (2,102,493) | (1,059,789) | (1,796,657) | (101,023) | (1,796,261) | (1,796,258) | (1,871,054) | (1,798,251) | (606,672) | (1,059,750) | (1,809,982) | (846,700) | (837,531) | (2,199,790) |

## **EXHIBIT E**

**Valuation Analysis**

## REORGANIZED DEBTORS VALUATION ANALYSIS

THE VALUATION INFORMATION CONTAINED HEREIN IS NOT A PREDICTION OR GUARANTEE OF THE ACTUAL MARKET VALUE THAT MAY BE REALIZED THROUGH THE SALE OF ANY SECURITIES TO BE ISSUED PURSUANT TO THE PLAN.  THIS VALUATION IS PRESENTED SOLELY FOR THE PURPOSE OF PROVIDING ADEQUATE INFORMATION AS REQUIRED BY SECTION 1125 OF THE BANKRUPTCY CODE TO ENABLE THE HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN TO MAKE AN INFORMED JUDGMENT ABOUT THE PLAN AND SHOULD NOT BE USED OR RELIED UPON FOR ANY OTHER PURPOSE, INCLUDING THE PURCHASE OR SALE OF CLAIMS AGAINST THE DEBTORS.

At the Debtors' request, Moelis & Company LLC ("Moelis") performed a valuation analysis of the Reorganized Debtors.

Based upon and subject to the review and analysis described herein, and subject to the assumptions, limitations and qualifications described herein, Moelis' view, as of March 22, 2016 was that the estimated going concern enterprise value of the Reorganized Debtors, as of an assumed Effective Date for purposes of Moelis' valuation analysis of June 30, 2016 (the "Assumed Effective Date"), would be in a range between $1,450 million and $1,650 million.  The midpoint of our enterprise valuation range of $1,550 million plus the excess cash balance management has estimated the Reorganized Debtors will have at the Assumed Effective Date of $51 million, equals $1,601 million.  Moelis' views are necessarily based on economic, monetary, market, and other conditions as in effect on, and the information made available to Moelis as of, the date of its analysis. It should be understood that, although subsequent developments may affect Moelis' views, Moelis does not have any obligation to update, revise, or reaffirm its estimate.

Moelis' analysis is based, at the Debtors' direction, on a number of assumptions, including, among other assumptions, that (i) the Debtors will be reorganized in accordance with the Plan which will be effective on the Assumed Effective Date, (ii) the Reorganized Debtors will achieve the results set forth in the Debtors' management's Projections (as defined in this Disclosure Statement and attached as Exhibit C to this Disclosure Statement) for 2016 through 2020 (the "Projection Period") provided to Moelis by the Debtors, (iii) the Reorganized Debtors' capitalization and available cash will be as set forth in the Plan and this Disclosure Statement (in particular, the pro forma indebtedness of the Reorganized Debtors as of the Assumed Effective Date will not exceed $600 million), and (iv) the Reorganized Debtors will be able to obtain all future financings, on the terms and at the times, necessary to achieve the results set forth in the Projections. Moelis makes no representation as to the achievability or reasonableness of such assumptions. In addition, Moelis assumed that there will be no material change in economic, monetary, market, and other conditions as in effect on, and the information made available to Moelis as of the Assumed Effective Date.

Moelis assumed, at the Debtors' direction, that the Projections prepared by the Debtors' management were reasonably prepared on a basis reflecting the best currently available estimates and judgments of the Debtors' management as to the future financial and operating performance of the Reorganized Debtors. The future results of the Reorganized Debtors are dependent upon various factors, many of which are beyond the control or knowledge of the Debtors, and consequently are inherently difficult to project. The Reorganized Debtors' actual future results may differ materially (positively or negatively)

from the Projections and, as a result, the actual enterprise value of the Reorganized Debtors may be materially higher or lower than the estimated range herein. Among other things, failure to consummate the Plan in a timely manner may have a materially negative impact on the enterprise value of the Reorganized Debtors.

The estimated enterprise value in this section represents a hypothetical enterprise value of the Reorganized Debtors as the continuing operators of the business and assets of the Debtors, after giving effect to the Plan, based on consideration of certain valuation methodologies as described below. The estimated enterprise value in this section does not purport to constitute an appraisal or necessarily reflect the actual market value that might be realized through a sale or liquidation of the Reorganized Debtors, its securities or its assets, which may be materially higher or lower than the estimated enterprise value range herein. The actual value of an operating business such as the Reorganized Debtors' business is subject to uncertainties and contingencies that are difficult to predict and will fluctuate with changes in various factors affecting the financial condition and prospects of such a business.

In conducting its analysis, Moelis, among other things: (i) reviewed certain publicly available business and financial information relating to the Reorganized Debtors that Moelis deemed relevant; (ii) reviewed certain internal information relating to the business, earnings, cash flow, assets, liabilities, and prospects of the Reorganized Debtors, including the Projections, furnished to Moelis by the Debtors; (iii) conducted discussions with members of senior management and representatives of the Debtors concerning the matters described in clauses (i) and (ii) of this paragraph, as well as their views concerning the Debtors' business and prospects before giving effect to the Plan, and the Reorganized Debtors' business prospects after giving effect to the Plan; (iv) reviewed publicly available financial and stock market data for certain other companies in lines of business that Moelis deemed relevant; (v) reviewed publicly available financial data for certain transactions that Moelis deemed relevant; (vi) reviewed a draft of the Plan dated May 2, 2016; and (vii) conducted such other financial studies and analyses and took into account such other information as Moelis deemed appropriate. In connection with its review, Moelis did not assume any responsibility for independent verification of any of the information supplied to, discussed with, or reviewed by Moelis and, with the consent of the Debtors, relied on such information being complete and accurate in all material respects. In addition, at the direction of the Debtors, Moelis did not make any independent evaluation or appraisal of any of the assets or liabilities (contingent, derivative, off-balance-sheet, or otherwise) of the Reorganized Debtors, nor was Moelis furnished with any such evaluation or appraisal. Moelis also assumed, with the Debtors' consent, that the final form of the Plan does not differ in any respect material to its analysis from the final draft that Moelis reviewed.

The estimated enterprise value in this section does not constitute a recommendation to any holder of a Claim or Interest as to how such holder should vote or otherwise act with respect to the Plan. Moelis has not been asked to and does not express any view as to what the trading value of the Reorganized Debtors' securities would be when issued pursuant to the Plan or the prices at which they may trade in the future. The estimated enterprise value set forth herein does not constitute an opinion as to fairness from a financial point of view to any holder of the consideration to be received by such holder under the Plan or of the terms and provisions of the Plan.

**Valuation Methodologies**

In preparing its valuation, Moelis performed a variety of financial analyses and considered a variety of factors. The following is a brief summary of the material financial analyses performed by Moelis, which consisted of (a) a discounted cash flow analysis, (b) a selected publicly traded companies analysis, and (c)a selected transactions analysis. This summary does not purport to be a complete description of the analyses performed and factors considered by Moelis. The preparation of a valuation analysis is a complex analytical process involving various judgmental determinations as to the most appropriate and relevant methods of financial analysis and the application of those methods to particular facts and circumstances, and such analyses and judgments are not readily susceptible to summary description. As such, Moelis' valuation analysis must be considered as a whole. Reliance on only one of the methodologies used, or portions of the analysis performed, could create a misleading or incomplete conclusion as to enterprise value.

   A. ***Discounted Cash Flow Analysis.*** The discounted cash flow ("DCF") analysis is a forward-looking enterprise valuation methodology that estimates the value of an asset or business by calculating the present value of expected future cash flows to be generated by that asset or business. Moelis' DCF analysis used the Projections' estimated debt-free, after-tax free cash flows through December 31, 2020. These cash flows were then discounted at a range of estimated weighted average costs of capital ("Discount Rate") for the Reorganized Debtors. The Discount Rate reflects the estimated blended rate of return that would be expected by debt and equity investors to invest in the Reorganized Debtors' business based on its target capital structure. The enterprise value was determined by calculating the present value of the Reorganized Debtors' unlevered after-tax free cash flows based on the Projections plus an estimate for the value of the Reorganized Debtors beyond the Projection Period known as the terminal value. In determining the estimated terminal value of the Reorganized Debtors, Moelis relied upon the perpetuity growth rate method which estimates a range of values that the Reorganized Debtors will be valued at the end of the Projection Period based on a constant growth profile of its unlevered free cash flow. The range of growth rates selected for the perpetuity growth rate method was centered around the expected unlevered free cash flow growth forecast by the end of the of the Projection Period.

   To determine the Discount Rate, Moelis used the estimated cost of equity and the estimated after-tax cost of debt for the Reorganized Debtors, assuming a targeted long-term debt-to-total capitalization ratio (based on debt-to-capitalization ratios of the selected publicly traded companies and the proposed capital structure contemplated by the Plan initially and after giving effect to the projected financial performance of the Reorganized Debtors during the Projection Period). Moelis calculated the cost of equity based on (i) the capital asset pricing model, which assumes that the expected equity return is a function of the risk-free rate and the correlation of a publicly-traded stock's performance to the return on the broader market and (ii) an adjustment related to the estimated equity market capitalization of the Reorganized Debtors, which reflects the historical equity returns of small, medium, and large equity market capitalization companies that are not accounted for by the capital asset pricing model.

   In addition, consistent with the Projections, Moelis assumed that certain of the Reorganized Debtors' Net Operating Loss Carryforwards and intangible asset basis, amortizable for tax purposes, will survive post Reorganization. The Net Operating Loss Carryforwards and intangible asset basis provide the Reorganized Debtors with an additional tax shield not reflected in its GAAP financials. For the avoidance of doubt, Net Operating Losses generated the pre-emergence period of 2016 will

survive and be available to offset taxable income in the post-emergence period of 2016; however, no Net Operating Loss Carryforwards are expected to survive the transaction once taxes for the 2016 tax year have been filed. Moelis separately analyzed the present value of the Reorganized Debtors' Net Operating Loss Carryforward and intangible asset basis amortization utilizing the Projections, the expected capitalization of the Reorganized Debtors pursuant to the Plan (including any cash flow paydown contemplated by the financing sources) and the expected cost of debt pursuant to the Plan. Moelis relied on the Debtors and their advisors for the expected balances of Net Operating Loss Carryforwards and intangible asset basis as of the Assumed Effective Date and the impact of the transaction and cancellation of debt on these attribute balances. Any amount of attributes assumed to survive after the transaction is based on the independent judgment of the Debtors and their advisors and does not represent the explicit or implicit endorsement of any taxing authority. The ultimate amount of tax attributes available to the Reorganized Debtors will be independently determined by the Internal Revenue Service of the United States after the Assumed Effective Date.

B. ***Selected Publicly Traded Companies Analysis.*** The selected publicly traded companies analysis is based on the enterprise values of selected North American and European-based publicly traded directory publishing, local digital media, and newspaper publishing companies that have operating and financial characteristics comparable in certain respects to the Reorganized Debtors. For example, such characteristics may include similar size and scale of operations, end-market exposure, product mix, operating margins, growth rates and geographical exposure. Under this methodology, certain financial multiples that measure financial performance and value are calculated for each selected company and then applied to the Reorganized Debtors' financials to imply an enterprise value for the Reorganized Debtors. Moelis used, among other measures, enterprise value (defined as market value of equity plus book value of debt, book value of preferred stock and minority interests less cash, subject to adjustments for underfunded pension and retirement obligations and other items where appropriate) for each selected company as a multiple of such company's publicly available consensus projected EBITDA for the calendar year ending 2016.

Although the selected companies were used for comparison purposes, no selected company is either identical or directly comparable to the business of the Reorganized Debtors. Accordingly, Moelis' comparison of selected companies to the business of the Reorganized Debtors and analysis of the results of such comparisons was not purely mathematical, but instead involved considerations and judgments concerning differences in operating and financial characteristics and other factors that could affect the relative values of the selected companies and the Reorganized Debtors. The selection of appropriate companies for this analysis is a matter of judgment and subject to limitations due to sample size and the public availability of meaningful market-based information.

C. ***Selected Transactions Analysis.*** The selected transactions analysis is based on the implied enterprise values of companies and assets involved in publicly disclosed merger and acquisition transactions for which the targets had operating and financial characteristics comparable in certain respects to the Reorganized Debtors. Under this methodology, the enterprise value of each such target is determined by an analysis of the consideration paid and the net debt assumed in the merger or acquisition transaction. The enterprise value is then compared to a selected operating metric, in this case, EBITDA for the last twelve month period for which financial results have not been publicly announced ("LTM"), in order to determine an enterprise value multiple. Moelis analyzed various merger and acquisition transactions that have occurred in the directory publishing sector since 2010. Moelis limited its search to transactions since 2010 because the economic and directory publishing sector environment in the period prior to 2010 was materially different than the environment today. In this analysis, the LTM EBITDA enterprise value multiples were utilized to determine a range of implied enterprise value for the Reorganized Debtors.

Other factors not directly related to a company's business operations can affect a valuation in a transaction, including, among others factors: (a) circumstances surrounding a merger transaction may introduce "diffusive quantitative results" into the analysis (e.g., a buyer may pay an additional premium for reasons that are not solely related to competitive bidding); (b) the market environment is not identical for transactions occurring at different periods of time; and (c) circumstances pertaining to the financial position of the company may have an impact on the resulting purchase price (e.g., a company in financial distress may receive a lower price due to perceived weakness in its bargaining leverage).

Moelis considered, but did not rely on, the selected transactions analysis for the purposes of the valuation of the Reorganized Debtors due to the limited universe of transactions in the directory publishing sector since 2010.

**Valuation Considerations**

As a result of the foregoing, the estimated enterprise value in this section is not necessarily indicative of actual value, which may be significantly higher or lower than the estimate herein. Accordingly, none of the Debtors, Moelis or any other person assumes responsibility for the accuracy of such estimated enterprise value. Depending on the actual financial results of the Debtors or changes in the financial markets, the enterprise value of the Reorganized Debtors as of the Assumed Effective Date may differ from the estimated enterprise value set forth herein as of an Assumed Effective Date of June 30, 2016. In addition, the market prices, to the extent there is a market, of Reorganized Debtors' securities will depend upon, among other things, prevailing interest rates, conditions in the financial markets, the investment decisions of prepetition creditors receiving such securities under the Plan (some of whom may prefer to liquidate their investment rather than hold it on a long-term basis), and other factors that generally influence the prices of securities.