**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| DEX MEDIA, INC., *et al.*,[1] | ) | Case No. 16-11200 (KG) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

**NOTICE OF FILING OF PLAN SUPPLEMENT FOR THE**
**JOINT PREPACKAGED CHAPTER 11 PLAN OF REORGANIZATION**
**OF DEX MEDIA, INC. AND ITS DEBTOR AFFILIATES**

**PLEASE TAKE NOTICE** that on July 8, 2016, the above-captioned debtors (collectively, the "Debtors") filed the *Plan Supplement for the Joint Prepackaged Chapter 11 Plan of Reorganization of Dex Media, Inc. and Its Debtor Affiliates* (the "Plan Supplement"). The documents contained in the Plan Supplement are integral to and part of the *Debtors' Joint Prepackaged Chapter 11 Plan* [Docket No. 57] (as may be amended from time to time, the "Plan") and, if the Plan is approved, shall be approved. The hearing to consider confirmation of the Plan currently is scheduled for July 15, 2016, at 10:00 a.m. (prevailing Eastern Time).

**PLEASE TAKE FURTHER NOTICE** that the Plan Supplement includes the following documents, as may be modified, amended, or supplemented from time to time:

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Dex Media, Inc. (0040); Dex Media East, Inc. (5763); Dex Media Holdings, Inc. (9762); Dex Media Service LLC (9647); Dex Media West, Inc. (7004); Dex One Digital, Inc. (9750); Dex One Service, Inc. (0222); R.H. Donnelley APIL, Inc. (6495); R.H. Donnelley Corporation (2490); R.H. Donnelley Inc. (7635); SuperMedia Inc. (5175); SuperMedia LLC (6092); and SuperMedia Sales Inc. (4411).  The location of the Debtors' service address is:  2200 West Airfield Drive, P.O. Box 619810, DFW Airport, Texas 75261.

| Exhibit | Description |
|---------|-------------|
| A | Schedule of Retained Causes of Action |
| B | Warrant Agreement |
| C | Reorganized Debtors' Corporate Structure and Associated Restructuring Transactions |
| D | Schedule of Rejected Executory Contracts and Unexpired Leases |
| E | New Organizational Documents |
| F | Section 1129(a)(5) Disclosures |
| G | New Stockholders Agreement |
| H | Material Takeback First Lien Term Loan Documents |

**PLEASE TAKE FURTHER NOTICE** that the Debtors reserve the right, subject to the terms and conditions set forth in the Plan and the Restructuring Support Agreement,[2] to alter, amend, modify, or supplement any document in the Plan Supplement; provided, if any document in the Plan Supplement is altered, amended, modified, or supplemented in any material respect prior to the hearing to confirm the Plan, the Debtors will file a blackline of such document with the Bankruptcy Court.

**PLEASE TAKE FURTHER NOTICE** that the Plan, the Disclosure Statement, the Plan Supplement, as well as further information regarding these chapter 11 cases are available for inspection on the Bankruptcy Court's website at www.deb.uscourts.gov, or free of charge on the Debtors' restructuring website at http://www.dm.epiq11.com/DEX.

---

[2]    Capitalized terms used but not defined herein have the meanings ascribed to them in the Plan.

2

Wilmington, Delaware
Dated:  July 8, 2016

*/s/ Patrick A. Jackson*

Pauline K. Morgan (Bar No. 3650)
Patrick A. Jackson (Bar No. 4976)
**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:    (302) 571-6600
Facsimile:    (302) 571-1253
Email:        pmorgan@ycst.com
              pjackson@ycst.com

- and -

James H.M. Sprayregen, P.C. (admitted *pro hac vice*)
Marc Kieselstein, P.C. (admitted *pro hac vice*)
Adam Paul (admitted *pro hac vice*)
Bradley Thomas Giordano (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:        james.sprayregen@kirkland.com
              marc.kieselstein@kirkland.com
              adam.paul@kirkland.com
              bradley.giordano@kirkland.com

*Counsel for the*
*Debtors and Debtors in Possession*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| DEX MEDIA, INC., *et al.*,[1] | ) | Case No. 16-11200 (KG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**PLAN SUPPLEMENT FOR THE JOINT
PREPACKAGED CHAPTER 11 PLAN OF REORGANIZATION
OF DEX MEDIA, INC. AND ITS DEBTOR AFFILIATES**

**TABLE OF CONTENTS**

| **Exhibit** | **Description** |
|---|---|
| A | Schedule of Retained Causes of Action |
| B | Warrant Agreement |
| C | Reorganized Debtors' Corporate Structure and Associated Restructuring Transactions |
| D | Schedule of Rejected Executory Contracts and Unexpired Leases |
| E | New Organizational Documents |
| F | Section 1129(a)(5) Disclosures |
| G | New Stockholders Agreement |
| H | Material Takeback First Lien Term Loan Documents |

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Dex Media, Inc. (0040); Dex Media East, Inc. (5763); Dex Media Holdings, Inc. (9762); Dex Media Service LLC (9647); Dex Media West, Inc. (7004); Dex One Digital, Inc. (9750); Dex One Service, Inc. (0222); R.H. Donnelley APIL, Inc. (6495); R.H. Donnelley Corporation (2490); R.H. Donnelley Inc. (7635); SuperMedia Inc. (5175); SuperMedia LLC (6092);and SuperMedia Sales Inc. (4411).  The location of the Debtors' service address is:  2200 West Airfield Drive, P.O. Box 619810, DFW Airport, Texas 75261.

**Exhibit A**

**Schedule of Retained Causes of Action**

Article IV.L of the Plan provides in accordance with section 1123(b) of the Bankruptcy Code, but subject in all respects to Article IV.M and Article VIII of the Plan, and as otherwise set forth in the Restructuring Support Agreement or any other order of the Court, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and such rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date.  The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Causes of Action against it as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action against it.  The Debtors or the Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan. Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Restructuring Support Agreement or the Plan, Confirmation Order, or other Court order, the Debtors or Reorganized Debtors, as applicable, expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

In accordance with section 1123(b)(3) of the Bankruptcy Code, except as otherwise provided in the Plan, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors.  The applicable Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action.  The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Court.

Notwithstanding, and without limiting the generality of, Article IV.L of the Plan, the following Exhibit A(i) through Exhibit A(vi) include specific types of Causes of Actions expressly preserved by the Debtors and the Reorganized Debtors, including:  (a) claims related to accounts receivable and accounts payable; (b) claims related to insurance policies; (c) claims related to deposits, adequate assurance postings, and other collateral postings; (d) claims, defenses, cross-claims, and counter-claims related to litigation and possible litigation; (e) claims related to contracts and leases; and (f) claims related to customer and vendor obligations, which are attached hereto as Exhibit A(i), Exhibit A(ii), Exhibit A(iii), Exhibit A(iv), Exhibit A(v), and Exhibit A(vi) respectively.  Each such exhibit is subject to the terms of the Plan and the information provided in this Exhibit A.

## EXHIBIT A(i)

Claims Related to Accounts Receivable and Accounts Payable

The following Exhibit A(i) includes Entities that owe or that may in the future owe money to the Debtors or Reorganized Debtors. Unless otherwise released by the Plan, the Debtors expressly reserve all Causes of Action against or related to all Entities that owe or that may in the future owe money to the Debtors or Reorganized Debtors, regardless of whether such Entity is included on the schedule accompanying this Exhibit A(i). Furthermore, the Debtors expressly reserve all Causes of Action against or related to all Entities who assert or may assert that the Debtors or Reorganized Debtors owe money to them.

## EXHIBIT A(i)

Claims Related to Accounts Receivable and Accounts Payable

| ADVERSE PARTY | ADDRESS | ATTORNEY FOR COUNTERPARTY (IF APPLICABLE) | CAPTION, CASE NUMBER, & JURISDICTION (IF APPLICABLE) | DESCRIPTION |
|---|---|---|---|---|
| 3H CONTRACTING INC | STE E 922 E 124TH AVE TAMPA, FL 33612-3503 | | SUPERMEDIA LLC VS 3H CONTRACTING INC, CASE NO. 12-18556, VENUE: 13TH JUDICIAL CIRCUIT CT, HILLSBOROUGH COUNTY, FL | COLLECTIONS |
| A PRINCETON WOMEN'S CENTER, PC | 29 EMMONS DR., PRINCETON, NJ 08540 | | SUPERMEDIA LLC VS A PRINCETON WOMEN'S CENTER, PC, CASE NO. L-1867- 13, VENUE: SUPERIOR COURT OF NEW JERSEY LAW DIVISION COUNTY OF MERCER, NJ | COLLECTIONS |
| A TO Z USED AUTO PARTS | 42137 4TH ST E LANCASTER CA 93535-5308 | | SUPERMEDIA LLC VS A TO Z USED AUTO PARTS, CASE NO. MC-025960, VENUE: SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES, CA | COLLECTIONS |
| A-1 ACCESS CONSTRUCTION CO. | 361 HARRISON AVE, GARFIELD, NJ 07026-1115 | | SUPERMEDIA, LLC F/K/A IDEARC MEDIA LLC, IDEARC MEDIA CORP F/K/A  VERIZON DIRECTORIES CORP VS. A-1 ACCESS CONSTRUCTION CO., CASE NO. L-005859-12, VENUE: SUPERIOR BERGEN COUNTY, NJ | COLLECTIONS |
| AARDVARK ANIMAL AND PEST CONTROL LLC D/B/A AARDVARK PEST CONTROL | 681 LAWLINS RD, WYCKOFF, NJ 07481-1449 | | SUPERMEDIA LLC VS AARDVARK ANIMAL AND PEST CONTROL LLC D/B/A AARDVARK PEST CONTROL, CASE NO. DC-014223-14, VENUE: SUPERIOR COURT OF NEW JERSEY LAW DIVISION, SPECIAL CIVIL PART COUNTY OF BERGEN, NJ | COLLECTIONS |
| ABOUTTIME PLUMBING & DRAIN CLEANING INC AND MARK WILLIAMS | 26312 TWIN PINES CT ZEPHYRHILLS, FL 33544-3239 | | SUPERMEDIA LLC VS ABOUTTIME PLUMBING & DRAIN CLEANING INC AND MARK WILLIAMS, CASE NO. 51-2015-CA00372, VENUE: 6TH JUDICIAL CIRCUIT COURT, PASCO COUNTY, FL | COLLECTIONS |
| ACQUIRED HOME SERVICES | MOLD AID P.O. BOX 868 GAINESVILLE, VA 20156 | | SUPERMEDIA V. ACQUIRED HOME SERVICES, INC. A/K/A ACQUIRED HOME SERVICES T/A MOLD AIR, CASE NO. CL14-8323, VENUE: COMMONWEALTH OF VIRGINIA - CIRCUIT COURT FOR PRINCE WILLIAM COUNTY, VA | COLLECTIONS |
| ACROSSTOWN DOOR SERVICE | 10340 W BELDEN UNIT B MELROSE PARK, IL 60164 | | DEX MEDIA VS. ACROSSTOWN DOOR SERVICE, CASE NO. 15-M4-000840, VENUE: COOK COUNTY CIRCUIT COURT, 4TH DISTRICT, IL | COLLECTIONS |

| ADVERSE PARTY | ADDRESS | ATTORNEY FOR COUNTERPARTY (IF APPLICABLE) | CAPTION, CASE NUMBER, & JURISDICTION (IF APPLICABLE) | DESCRIPTION |
|---|---|---|---|---|
| ACS MARKETING, INC | 10655 SW 69TH TERRACE, OCALA, FL 34476 | | RH DONNELLEY INC V. ACS MARKETING, INC, CASE NO. 2013-CA-1558, VENUE: MARION COUNTY, FL | COLLECTIONS |
| AGIM SEJDINI | ALBA GARAGE DOORS 200 WEDGEWOOD CIRCLE LAKE IN THE HILLS, IL 60156 | | DEX MEDIA HOLDINGS, INC. VS. AGIM SEJDINI, CASE NO. 14 AR 419, VENUE: CIRCUIT COURT OF MCHENRY COUNTY, IL | COLLECTIONS |
| AIR AMBULANCE AMERICA | 6538 COLLINS AVE MIAMI BEACH, FL 33141 | | BELL ATLANTIC YELLOW PAGES VS AIR AMBULANCE AMERICA, CASE NO. 98-16636CA01-10, VENUE: MIAMI CIRCUIT COURT, MIAMI, FL | COLLECTIONS |
| ALARM CENTER INC., SECURITY SYSTEMS & SERVICES | PO BOX 6281, LAKELAND, FL 33807-6281 | | SUPERMEDIA LLC, F/K/A IDEARC MEDIA LLC VS ALARM CENTER INC., SECURITY SYSTEMS & SERVICES, CASE NO. 80584, VENUE: COUNTY COURT OF THE TENTH JUDICIAL CIRCUIT IN AND FOR POLK COUNTY, FL | COLLECTIONS |
| ALL OUT FIRE PROTECT | STE 5 40 STATE ROUTE 31 FLEMINGTON, NJ 08822-1659 | | SUPERMEDIA LLC VS ALL OUT FIRE PROTECTION LLC, CASE NO. SOM L-000482 12, VENUE: SUPERIOR COURT, SOMERSET COUNTY, NJ | COLLECTIONS |
| ALLSTATE AIR & HEATING LLC | 30549 N BAREBACK TRL, QUEEN CREEK, AZ 85143- 4387 | | IDEARC MEDIA LLC VS. ALLSTATE AIR & HEATING LLC, AN ARIZONA LIMITED LIABILITY COMPANY, CASE NO. CV2015- 0524, VENUE: #7 APACHE JUNCTION JUSTICE COURT, PINAL COUNTY, AZ | COLLECTIONS |
| AMERICAN DRY BASEMENTS SYSTEM INC | 28 DEL MAR DR BROOKFIELD, CT 06804-2401 | | IDEARC MEDIA LLC VS AMERICAN DRY BASEMENTS SYSTEM INC, CASE NO. DBD-CV09- 5008 4855, VENUE: SUPERIOR COURT, JUDICIAL DISTRICT OF DANBURY, CT | COLLECTIONS |
| ANDREA L. CRONE D/B/A THE FICTITIOUSLY NAMED SPEEDY ROOTER | SPEEDY ROOTER 6851 BLUEBIRD LANE DOVER, PA 17315-0294 | | SUPERMEDIA LLC VS ANDREA L. CRONE D/B/A THE FICTITIOUSLY NAMED SPEEDY ROOTER, CASE NO. 14-SU-002279-86, VENUE: COURT OF COMMON PLEAS, CIVIL, CHESTER COUNTY, PA | COLLECTIONS |
| ANDRESEN RYAN COFFEE COMPANY | 2206 WINTER SUPERIOR WI 54880-1437 | | ANDRESEN RYAN COFFEE COMPANY, CASE NO. 69DU-CV-06-845, VENUE: ST. LOUIS COUNTY, MN | COLLECTIONS |

| ADVERSE PARTY | ADDRESS | ATTORNEY FOR COUNTERPARTY (IF APPLICABLE) | CAPTION, CASE NUMBER, & JURISDICTION (IF APPLICABLE) | DESCRIPTION |
|---|---|---|---|---|
| BANKRUPTCY LAW GROUP OF SOUTHERN NEVADA | 5550 PAINTED MIRAGE STE 320, LAS VEGAS, NV 89149 | | RH DONNELLEY V BANKRUPTCY LAW GROUP OF SOUTHERN NEVADA, CASE NO. A-13-685771C, VENUE: EIGHTH JUDICIAL DISTRICT COURT-CLARK COUNTY, NV | COLLECTIONS |
| B-DRY SYSTEMS OF SOUTH JERSEY & PHILADELPHIA INC | ATTN: DOUGLAS SCHOEN, REGMOUNT HOLLY, NJ 08060 | | SUPERMEDIA LLC F/K/A IDEARC MEDIA LLC, IDEARC MEDIA CORP F/K/A VERIZON DIRECTORIES CORP VS B- DRY SYSTEMS OF SOUTH JERSEY & PHILADELPHIA INC, CASE NO. L-807-13, VENUE: SUPERIOR COURT OF NEW JERSEY BURLINGTON COUNTY LAW DIVISION, NJ | COLLECTIONS |
| BEAN MASSEY BURGE FUNERAL HOME | 2951 S BELT LINE RD, GRAND PRAIRIE, TX 75052- 5999 | | SUPERMEDIA, LLC VS SCI TEXAS FUNERAL SERVICES, INC. D/B/A BEAN- MASSEY-BURGE FUNERAL HOME BELTLINE ROAD F/K/A GRAND PRAIRIE FUNERAL HOME, INC. D/B/A BEAN, MASSEY, BURGE FUNERAL HOME, CASE NO. 1052477, VENUE: COUNTY CIVIL COUTY AT LAW NO. FOUR, HARRIS COUNTY, TX | COLLECTIONS |
| BEELER TREE EXPERT CO INC | 89 STILLWELL RD HOLMDEL NJ 07733-2242 | | SUPERMEDIA LLC VS BEELER TREE EXPERT CO INC, CASE NO. MON-L-004575-15, VENUE: MONMOUTH COUNTY LAW DIVISION, NJ | COLLECTIONS |
| BEST BUY BLINDS, LLC | 10624 S EASTERN AVE, HENDERSON, NV 89052 | | RH DONNELLEY V BEST BUY BLINDS, LLC, CASE NO. A-12-663348, VENUE: EIGHTH JUDICIAL DISTRICT COURT-CLARK COUNTY, NV | COLLECTIONS |
| BETTER HOMES APPLIANCES SERVICE | 2192 BELL CHEER DR CLEARWATER FL 33764 USA | | SUPERMEDIA LLC VS BETTER HOMES APPLIANCES SERVICE, CASE NO. IN PROGRESS, VENUE: CIRCUIT COURT PINELLAS COUNTY, FL | COLLECTIONS |
| BRADLEY ENTERPRISES, INC | 46 STONEHILL RD OSWEGO, IL 60543 | | DEX MEDIA, INC. VS. BRADLEY ENTERPRISES, INC, CASE NO. 15 LM 470, VENUE: 23RD JUDICIAL CIRCUIT KENDALL COUNTY, IL | COLLECTIONS |
| BRANDON YARES | 6469 CAVELL AVE N BROOKLYN PARK MN 55428-1833 | | BRANDON YARES, CASE NO. 27-CV-08-9617, VENUE: HENNEPIN COUNTY, MN | COLLECTIONS |
| BRIAN E REED | 530 W LANCASTER BLVD LANCASTER, CA 93534-2516 | | SUPERMEDIA LLC VS BRIAN E REED, CASE NO. MC-022241, VENUE: SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES, CA | COLLECTIONS |

| ADVERSE PARTY | ADDRESS | ATTORNEY FOR COUNTERPARTY (IF APPLICABLE) | CAPTION, CASE NUMBER, & JURISDICTION (IF APPLICABLE) | DESCRIPTION |
|---|---|---|---|---|
| BRINSON, RAYMOND AKA BRINSON, RAY DBA A-1 AFFORDABLE HEATING & COOLING | 421 BRIAN AVE, VIRGINIA BEACH, VA 23462-2001 | | SUPERMEDIA LLC, F/K/A IDEARC MEDIA LLC VS BRINSON, RAYMOND AKA BRINSON, RAY DBA A-1 AFFORDABLE HEATING & COOLING, CASE NO. GV14017161-00, VENUE: GENERAL DISTRICT COURT CHESAPEAKE CITY, VA | COLLECTIONS |
| BUCKS COUNTY ARTESIAN WELL DRILLING COMPANY | LEONARD W STONE 1075 GENERAL SULLIVAN RD WSHNGTN XING PA 18977-1334 | | SUPERMEDIA LLC F/K/A IDEARC MEDIA LLC, IDEARC MEDIA CORP. VS BUCKS COUNTY ARTESIAN WELL DRILLING COMPANY, CASE NO. 2015-07669-0, VENUE: THE COURT OF COMMON PLEAS BUCK COUNTY PENNSYLVANIA, PA | COLLECTIONS |
| CANDELIGHT SERVICES LLC & GLENN GOSHERN | 933 S WASHINGTON ST KOKOMO IN 46901-5319 | | SUPERMEDIA LLC VS CANDELIGHT SERVICES LLC & GLENN GOSHERN, CASE NO. 49-DO21510CC- 034440, VENUE: MARION SUPERIOR COURT, IN | COLLECTIONS |
| CAPSTONE COATING | 325 THOMPSON LN. CHATSWORTH, CA 91311-7057 | | AMERICAN RECOVERY SERVICE, INC., A CORPORATION VS. CAPSTONE COATINGS & WINDOWS, ET AL., CASE NO. PC 046927, VENUE: SUPERIOR COURT OF THE STATE OF CALIFORNIA FOR THE COUNTY OF LOS ANGELES - NORTH VALLEY DISTRICT CHATSWORTH COURTHOUSE, CA | COLLECTIONS |
| CARPET POLICE, LLC | 7925 N ORACLE RD. TUCSON, AZ 85704 | | DEX MEDIA, INC VS CARPET POLICE, LLC, CASE NO. CV OC 1401518, VENUE: SUPERIOR COURT- PIMA COUNTY, AZ | COLLECTIONS |
| CHANCE SMITH DBA ABC INSURANCE | 3501 E MAIN ST., FARMINGTON, NM 87402 | | DEX MEDIA, INC V CHANCE SMITH DBA ABC INSURANCE, CASE NO. D-1116-CV-2014-00403, VENUE: 11TH JUDICIAL DISTRICT COURT, SAN JUAN COUNTY, NM | COLLECTIONS |
| CHANCES BAIL BONDS LLC | AARON DUNCAN DBA CHA PO BOX 1163 DUMFRIES, VA 22026-9163 | | SUPERMEDIA LLC VS CHANCES BAIL BONDS LLC, CASE NO. CL14-3651, VENUE: PRINCE WILLIAM CIRCUIT, VA | COLLECTIONS |
| CHARLES AYDELOTTE | 9855 SHOUP AVE, CHATSWORTH, CA 91311-2739 | | SUPERMEDIA, LLC VS CHARLES AYDELOTTE, CASE NO. PC056357, VENUE: SUPERIOR COURT LOS ANGELES COUNTY, CA | COLLECTIONS |
| CHARLES GILLILAND AND TREEPRO LLC | 1183 KEPLER RD, POTTSTOWN, PA 19464-3047 | | SUPERMEDIA LLC, VS CHARLES GILLILAND AND TREEPRO LLC, CASE NO. 2013-05980, VENUE: COURT OF COMMON PLEAS MONTGOMERY COUNTY, PA | COLLECTIONS |

| ADVERSE PARTY | ADDRESS | ATTORNEY FOR COUNTERPARTY (IF APPLICABLE) | CAPTION, CASE NUMBER, & JURISDICTION (IF APPLICABLE) | DESCRIPTION |
|---|---|---|---|---|
| CHARLES JOHN PEARCE D/B/A SOUTHWEST WINDOW TINTING | 15785 DELASOL LN, NAPLES, FL 34110 | | R.H. DONNELLEY PUBLISHING VS. CHARLES JOHN PEARCE D/B/A SOUTHWEST WINDOW TINTING, CASE NO. SOM DC-005764-13, VENUE: BROWARD COUNTY, FL | COLLECTIONS |
| CHARLES MOON PLUMBING AND HEATING INC | 2901 PHILADELPHIA PIKE CLAYMONT, DE 19703-2507 | | SUPERMEDIA LLC VS CHARLES MOON PLUMBING AND HEATING INC, CASE NO. N14C-06-189-PRW, VENUE: SUPERIOR COURT, NEW CASTLE COUNTY, DE | COLLECTIONS |
| CHRISTOPHER JON ELECTRICAL | 108 FROST ST, BROOKLYN, NY 11211-2304 | | SUPERMEDIA LLC F/K/A IDEARC MEDIA CORP VS CHRISTOPHER JON ELECTRICAL CONTRACTORS, INC. AND CHRISTOPHER JON PACCIONE D/B/A CHRISTOPHER JON ELECTRICAL, CASE NO. 606009/14, VENUE: SUPREME COURT OF THE STATE OF NEW YORK COUNTY OF NASSAU, NY | COLLECTIONS |
| COLUMBIA HEATING & COOLING LLC | CLARENCE LITTON MORRIS 1013 PLYMOUTH DR, COLUMBIA, MO 65203 | | SUPERMEDIA LLC, F/K/A IDEARC INC. VS COLUMBIA HEATING & COOLING LLC, CASE NO. 14BA-CV02106, VENUE: THE CIRCUIT COURT OF BOONE COUNTY, MISSOURI ASSOCIATE DIVISION, MO | COLLECTIONS |
| CUNNINGHAM DUCT CLNG CO | 6 REDINGTON ST BAY SHORE, NY 11706-7409 | | SUPERMEDIA LLC FKA IDEARC MEDIA LLC V. CUNNINGHAM DUCT CLEANING CO., INC., CASE NO. 13-14219, VENUE: SUPREME COURT, SUFFOLK COUNTY, NY | COLLECTIONS |
| DANNOUN HEATING AND COOLING LLC AND DYOCK ASHRAF A/K/A ASHRAF DYOCK | 15 ACORN ST, TOTOWA, NJ 07512-2473 | | SUPERMEDIA LLC VS DANNOUN HEATING AND COOLING LLC AND DYOCK ASHRAF A/K/A ASHRAF DYOCK, CASE NO. L-3083-13, VENUE: SUPERIOR COURT OF NEW JERSEY LAW DIVISION, SPECIAL CIVIL PART COUNTY OF PASSAIC, NJ | COLLECTIONS |
| DENNIS HAARSMA DBA ACE SEPTIC | PO BOX 85581 SIOUX FALLS, SD 57118-5581 | | DEX MEDIA V. DENNIS HAARSMA DBA ACE SEPTIC, CASE NO. 13-1312, VENUE: 2ND JUDICIAL CIRCUIT, MINNEHAHA COUNTY, SD | COLLECTIONS |
| DICAPRIO CARPET CLEANING INC | 1103 N CROTON AVE NEW CASTLE PA 16101-0803 | | SUPERMEDIA LLC VS DICAPRIO CARPET CLEANING INC, CASE NO. 11153-15, VENUE: COURT OF COMMON PLEAS-LAWRENCE COUNTY, CA | COLLECTIONS |
| DINIZULU LAW GROUP, LTD. | 221 N LA SALLE ST CHICAGO, IL 60601 | | DEX MEDIA INC VS. DINIZULU LAW GROUP, LTD., CASE NO. 15M1-131671, VENUE: CIRCUIT COURT OF COOK COUNTY, IL | COLLECTIONS |

| ADVERSE PARTY | ADDRESS | ATTORNEY FOR COUNTERPARTY (IF APPLICABLE) | CAPTION, CASE NUMBER, & JURISDICTION (IF APPLICABLE) | DESCRIPTION |
|---|---|---|---|---|
| DISCOUNT AWNINGS INC | 9715 ROYAL PALM DR BRADENTON, FL 34210-1331 | | SUPERMEDIA LLC VS DISCOUNT AWNINGS INC, CASE NO. 12-CA-04410, VENUE: 12TH JUDICIAL CIRCUIT CT, MANATEE COUNTY, FL | COLLECTIONS |
| DJ'S LIMOUSINE SERVICE, INC. | 248 W WESTFIELD AVE, ROSELLE PARK, NJ 07204- 1819 | | SUPERMEDIA LLC F/K/A IDEARC MEDIA LLC, IDARC MEDIA CORP F/K/A VERIZON DIRECTORIES CORP VS DJ'S LIMOUSINE SERVICE, INC., CASE NO. L1006-11, VENUE: SUPERIOR COURT OF NEW JERSEY UNION COUNTY LAW DIVISION, NJ | COLLECTIONS |
| ELLIS, SHERRY. P.A. | 1834 MAIN STREET SARASOTA , FL 34236 | | SUPERMEDIA LLC F/K/A IDEARC MEDIA LLC F/K/A IDEAR MEDIA CORP. F/K/A VERIZON DIRECTORIES CORP. V. SHERRY F. ELLIS, P.A., CASE NO. 2012CA000295NC, VENUE: CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT OF THE STATE OF FLORIDA, IN AND FOR SARASOTA COUNTY, FL | COLLECTIONS |
| EZ GARAGE DOORS INC | 5803 SOUTH 3RD ST. PHOENIX, AZ 85040-3005 | | DEX MEDIA INC VS EZ GARAGE DOORS INC, CASE NO. CV2010-091303, VENUE: SUPERIOR COURT- MARICOPA COUNTY, AZ | COLLECTIONS |
| GARDEN STATE SEAMLESS GUTTER | 325 GANO ROAD, ANNANDALE, NJ 08801 | | SUPERMEDIA LLC F/K/A IDEARC MEDIA LLC, IDEARC MEDIA CORP. F/K/A VERIZON DIRECTORIES CORP VS GARDEN STATE SEAMLESS GUTTER, CASE NO. L-000452-12, VENUE: SUPERIOR COURT OF NEW JERSEY HUNTERDON COUNTY LAW DIVISION, NJ | COLLECTIONS |
| GEORGE E MARZLOFF T/A GEORGE E MARZLOFF AND ASSOCIATES PC | GEORGE E MARZLOFF P. 385 GARRISONVILLE RD SUITE 110A STAFFORD, VA 22554 | | IDEARC MEDIA LLC VS GEORGE E MARZLOFF T/A GEORGE E MARZLOFF AND ASSOCIATES PC, CASE NO. CL09-868, VENUE: STAFFORD CIRCUIT COURT, VA | COLLECTIONS |
| HARRY A JOHNSON | 6500 BARRIE RD MINNEAPOPLIS MN 55435-2348 | | HARRY A JOHNSON, CASE NO. 27-CV-09-32026, VENUE: HENNEPIN COUNTY, MN | COLLECTIONS |
| HOFFMAN & HOFFMAN TA | 200 E LEXINGTON ST STE 801 BALTIMORE, MD 21202-3596 | | SUPERMEDIA FKA IDEARC MEDIA V. HOFFMAN & HOFFMAN, P.A., CASE NO. 24-C-15002469, VENUE: CIRCUIT COURT, BALTIMORE CITY, MD | COLLECTIONS |

| ADVERSE PARTY | ADDRESS | ATTORNEY FOR COUNTERPARTY (IF APPLICABLE) | CAPTION, CASE NUMBER, & JURISDICTION (IF APPLICABLE) | DESCRIPTION |
|---|---|---|---|---|
| HOLT ELECTRICAL CONTRACTORS INC | STE 228 12154 DARNESTOWN RD GAITHERSBURG, MD 20878-2206 | | SUPERMEDIA LLC VS HOLT ELECTRICAL CONTRACTORS INC, CASE NO. 60100211082013, VENUE: DISTRICT COURT OF MARYLAND, MONTGOMERY COUNTY, MD | COLLECTIONS |
| HOUSE OF SHADES LAMPS INC | 12691 SEMINOLE BLVD LARGO, FL 33778-2203 | | SUPERMEDIA LLC VS HOUSE OF SHADES LAMPS INC, CASE NO. 10-004134-CI, VENUE: 6TH JUDICIAL CIRCUIT, PINELLAS COUNTY, FL | COLLECTIONS |
| J R CRAS INC | 4605 STATE RD DREXEL HILL, PA 19026- 4423 | | SUPERMEDIA LLC VS J R CRAS INC, CASE NO. 14-5424, VENUE: COURT OF COMMON PLEAS, CIVIL, DELAWARE COUNTY, PA | COLLECTIONS |
| JAMES HOY INDIVIDUALLY AND DBA FICTITIOUSLY NAMED HORIZON OVERHEARD DOORS | JAMES HOY DBA HORIZO 20 E 4TH ST REAR BRIDGEPORT, PA 19405- 1420 | | SUPERMEDIA LLC VS JAMES HOY INDIVIDUALLY AND DBA FICTITIOUSLY NAMED HORIZON OVERHEARD DOORS, CASE NO. 2013-36053, VENUE: COURT OF COMMON PLEAS, CIVIL, MONTGOMERY COUNTY, PA | COLLECTIONS |
| JEFF BRITO T-A CLASSIC MOVING | 1400 INDUSTRIAL WAY TOMS RIVER, NJ 08753 | | SUPERMEDIA LLC VS JEFF BRITO T-A CLASSIC MOVING, CASE NO. OCN-L-3157- 13, VENUE: SUPERIOR COURT, OCEAN COUNTY, NJ | COLLECTIONS |
| JOHN MARSH AKA MARSH CONSTRUCTION | 11224 MOROCCO RD NE ALBUQUERQUE NM 87181 | | DEX MEDIA, INC V JOHN MARSH AKA MARSH CONSTRUCTION, CASE NO. D-0202-CV-2014- 01774, VENUE: 2ND JUDICIAL DISTRICT- BERNALILLO COUNTY, NM | COLLECTIONS |
| JOLANO INC, DBA THE GLASS DOCTOR | 6614 CENTRAL AVE PIKE, KNOXVILLE, TN 37912 | | RH DONNELLEY INC. VS. JOLANO INC, DBA THE GLASS DOCTOR, CASE NO. 10-CA-3659- 15-W, VENUE: 5TH SESSIONS COURT TENNESSEE-KNOX COUNTY, TN | COLLECTIONS |
| JRC DEMOLITION AND RUBBISH REMOVAL LLC | 78 GROVE AVE, VERONA, NJ 07044- 1614 | | SUPERMEDIA LLC F/K/A IDEARC MEDIA LLC, IDEARC MEDIA CORP F/K/A VERIZON DIRECTORIES CORP VS JRC DEMOLITION AND RUBBISH REMOVAL LLC, CASE NO. L-005813-12, VENUE: SUPERIOR COURT OF NEW JERSEY ESSEX COUNTY LAW DIVISION, NJ | COLLECTIONS |
| KAREN M GLOVER ATTORNEY AT LAW | 2123 PINNACLE CIR N PALM HARBOR, FL 34684- 1769 | | SUPERMEDIA LLC VS KAREN M GLOVER ATTORNEY AT LAW, CASE NO. 12-005435-CI, VENUE: 6TH JUDICIAL CIRCUIT, PINELLAS COUNTY, FL | COLLECTIONS |

| ADVERSE PARTY | ADDRESS | ATTORNEY FOR COUNTERPARTY (IF APPLICABLE) | CAPTION, CASE NUMBER, & JURISDICTION (IF APPLICABLE) | DESCRIPTION |
|---|---|---|---|---|
| KELBIE HOME IMPROVEMENTS INC | 5430 LYNX LANE PNB 212 COLUMBIA, MD 21044 | | SUPERMEDIA LLC VS KELBIE HOME IMPROVEMENTS INC, CASE NO. 02-C-11-163165, VENUE: CIRCUIT COURT OF MARYLAND, HOWARD COUNTY, MD | COLLECTIONS |
| KENNETH P. KELLER, INDIVIDUALLY AND D/B/A FREEDOM RESTORATION | FREEDOM RESTORATION 461 HINMAN AVE, BUFFALO, NY 14216-1018 | | SUPERMEDIA LLC F/K/A IDEARC MEDIA CORP VS KENNETH P. KELLER, INDIVIDUALLY AND D/B/A FREEDOM RESTORATION, CASE NO. 810516/14, VENUE: SUPREME COURT OF THE STATE OF NEW YORK COUNTY OF ERIE, NY | COLLECTIONS |
| KINGSFORD LAW LLC | 825 10TH ST. SUITE 100, GREELEY, CO 80631 | | DEX MEDIA, INC VS. KINGSFORD LAW LLC, CASE NO. 14CV30063, VENUE: WELD COUNTY, CO | COLLECTIONS |
| LA LIMOUSINE | CHRISTINE BENSON DBA 223 GIBBONS HWY WILTON, NH 03086-5969 | | SUPERMEDIA LLC VS LA LIMOUSINE, CASE NO. 458-2012-CV-00062, VENUE: 9TH DISTRICT CT, MILFORD COUNTY, NH | COLLECTIONS |
| LAW OFFICE OF DAVID J AVERETTE, PC | ALBERT GASSEL 7719 CASTOR AVE PHILA, PA 19152-3615 | | SUPERMEDIA LLC VS LAW OFFICE OF DAVID J AVERETTE, PC, CASE NO. 285, VENUE: COURT OF COMMON PLEAS, CIVIL, PHILADELPHIA, PA | COLLECTIONS |
| LELAND ENTERPRISES, INC | STEVE OWEN VIRGINIA BCH, VA 23452- 4336 | | SUPERMEDIA INC. VS LELAND ENTERPRISES, INC, CASE NO. CL13-442, VENUE: CIRCUIT COURT FOR VIRGINIA BEACH COUNTY, VA | COLLECTIONS |
| LONG BEACH CITY LOCKSMITH AND RENEE LOPEZ AN INDIV AND EFRAIN BARRAJAS AN INDIV | LONG BEACH CITY LOCK 1997 DAISY AVE LONG BEACH, CA 90806- 5222 | | IDEARC MEDIA LLC VS LONG BEACH CITY LOCKSMITH AND RENEE LOPEZ AN INDIV AND EFRAIN BARRAJAS AN INDIV, CASE NO. NC054044, VENUE: SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES, CA | COLLECTIONS |
| LSB CAPITAL, INC. D/B/A DURACLEAN BY KIRSCH | 6624 BUDDY LN PORT RICHEY, FL 34668- 3807 | | SUPERMEDIA LLC VS LSB CAPITAL, INC. D/B/A DURACLEAN BY KIRSCH, CASE NO. 51- 2011-CA-1852 WS, VENUE: 6TH JUDICIAL CIRCUIT CT, PASCO COUNTY, FL | COLLECTIONS |
| MARK JAMESON CONTRACTOR INC. AND MARK JAMESON | 788 SHREWBURY AVE BLDG 2, TITON FALLS, NJ 07724 | | SUPERMEDIA LLC F/K/A IDEARC MEDIA LLC, IDEARC MEDIA CORP. F/K/A VERIZON DIRECTORS CORP VS MARK JAMESON CONTRACTOR INC. AND MARK JAMESON, CASE NO. L-0752-13, VENUE: SUPERIOR COURT OF NEW JERSEY LAW DIVISION, SPECIAL CIVIL PART COUNTY OF UNION, NJ | COLLECTIONS |

| ADVERSE PARTY | ADDRESS | ATTORNEY FOR COUNTERPARTY (IF APPLICABLE) | CAPTION, CASE NUMBER, & JURISDICTION (IF APPLICABLE) | DESCRIPTION |
|---|---|---|---|---|
| MID-STATE MOVING & STORAGE INC. D/B/A FLORIDA VAN LINES INC. | 13755 US HIGHWAY 19 N, CLEARWATER, FL 33764-7233 | | SUPERMEDIA LLC, VS MID-STATE MOVING & STORAGE INC. D/B/A FLORIDA VAN LINES INC., CASE NO. 14- 005680-CI, VENUE: CIRCUIT COURT OF THE 6TH JUDICIAL CIRCUIT IN AND FOR PINELLAS COUNTY, FL | COLLECTIONS |
| MILLER LAW CORP - HAROLD MILLER | 333 E CHANNEL ST STE 3 STOCKTON CA 95202-2416 | | SUPERMEDIA LLC VS HAROLD I MILLER A PROFESSIONAS LAW CORP DBA MILLER LAW CORP, CASE NO. VOC 2015 0010461, VENUE: SUPERIOR COURT SAN JOAQUIN, CA | COLLECTIONS |
| MOVE RITE INC | 3704 LOTTSFORD VISTA RD MITCHELLVILLE, MD 20721-4016 | | VERIZON DIRECTORY CORP VS MOVE RITE INC., CASE NO. CAL03-18328, VENUE: PRINCE GEORGE COUNTY CIRCUIT COURT, MD | COLLECTIONS |
| MURPHY BURNS INC | 3431 5TH AVE N VERSAILLES, PA 15137- 2319 | | SUPERMEDIA LLC VS MURPHY BURNS, INC. F/K/A MURPHY BURNS INC. D/B/A EZ HOME EXTERIORS ALSO D/B/A E-Z HOME EXTERIORS, CASE NO. GD-14-020941, VENUE: COURT OF COMMON PLEAS, CIVIL, ALLEGHANY COUNTY, PA | COLLECTIONS |
| MUSSO PLMBNG & HTNG | 8574 SHERIDAN DR WILLIAMSVILLE, NY 14221-6210 | | DEX MEDIA V. MUSSO PLUMBING & HEATING, INC., CASE NO. 15-7140, VENUE: SUPREME COURT, MONROE COUNTY, NY | COLLECTIONS |
| NADIA O'NEAL DDS PA DBA NUSMILE DENTAL ALSO DBA NEW SMILE DENTAL | NADIA O'NEAL DDS PA 10763 70TH AVE SEMINOLE, FL 33772 | | SUPERMEDIA LLC VS NADIA O'NEAL DDS PA DBA NUSMILE DENTAL ALSO DBA NEW SMILE DENTAL, CASE NO. 13-011162-CI-19, VENUE: 6TH JUDICIAL CIRCUIT, PINELLAS COUNTY, FL | COLLECTIONS |
| NATIONAL SEVICE ALLIANCE LLC DBA THE COOL TEAM, TIM EIMAN & STEVEN BYRD INDIV | THE COOL TEAM 21933 US HIGHWAY 19 N CLEARWATER, FL 33765-2359 | | SUPERMEDIA LLC VS NATIONAL SEVICE ALLIANCE LLC DBA THE COOL TEAM, TIM EIMAN & STEVEN BYRD INDIV, CASE NO. 13-002055-CI- 19, VENUE: 6TH JUDICIAL CIRCUIT, PINELLAS COUNTY, FL | COLLECTIONS |
| NETWORK; TECHNOLOGY ACADEMY | #402 20-40 HOLLAND SOMERVILLE, MA 02144 | | VERIZON DIRECTORY CORP VS NETWORK; TECHNOLOGY ACADEMY, CASE NO. 200636CV108, VENUE: SOMERVILLE DISTRICT COURT, SOMERVILLE COUNTY, MA | COLLECTIONS |
| NEW ENGLAND AUTO SALES INC | 350 LYNNFIELD STREET LYNN MA 01904 | | SUPERMEDIA LLC VS NEW ENGLAND AUTO SALES INC, CASE NO. 2015/13CV0772, VENUE: LYNN DISTRICK COURT, MASSACHUSETTS, MA | COLLECTIONS |

| ADVERSE PARTY | ADDRESS | ATTORNEY FOR COUNTERPARTY (IF APPLICABLE) | CAPTION, CASE NUMBER, & JURISDICTION (IF APPLICABLE) | DESCRIPTION |
|---|---|---|---|---|
| OZ-THEE GENTLEMEN'S CLUB | 11509 SINATRA CT, NEW PORT RICHEY, FL 34654 | | SUPERMEDIA, LLC, F/K/A IDEARC MEDIA, LLC, F/K/A IDEARC MEDIA, INC. F/K/A VERIZON VS. GULF COAST HOLDINGS, LLC, D/B/A OZ-THEE GENTLEMEN'S CLUB, CASE NO. 13-009528- CI, VENUE: CIRCUIT CIVIL PINELLAS COUNTY, FL | COLLECTIONS |
| PAL'S PLUMBING | 1720 GINESI DRIVE FREEHOLD, NJ 07728-8851 | TIME LUKETICH HAMBRO & MITCHELL 12 STULTS ROAD, SUITE 104 DAYTON, NJ 08810 | SUPERMEDIA, LLC V. PAL'S PLUMBING SERVICES, INC., AIA LUMBING, LLC, MR. ROOTER OF CENTRAL JERSEY, ANDREW AUGUST, SHERYL AUGUST, JOHN DOES A-Z AND ABC, CORP., 1- 10, CASE NO. MON-L-4225-11, VENUE: SUPERIOR COURT OF NEW JERSEY LAW DIVISION - MONMOUTH COUNTY , NJ | COLLECTIONS |
| PAPA ADVERTISING | 1673 W 8TH ST  ERIE, PA 16505 | | DEX MEDIA VS. PAPA ADVERTISING, CASE NO. 13-11525, VENUE: WESTERN DISTRICT OF PA | COLLECTIONS |
| PEOPLES PLUMBING & HEATING | 335 SAN PEDRO DR ALBUQUERQUE, NM 87108-1845 | | DEX MEDIA, INC. V. PEOPLES PLUMBING,  HEATING & COOLING, INC., CASE NO. D-202-CV- 2015-04931, VENUE: 2ND JUDICIAL DISTRICT, BERNALILLO COUNTY, NM | COLLECTIONS |
| PITCHER PERFECT SIDING & WINDOW CO., INC AND RAINMASTER SYSTEMS INC. FKA RAINMASTER GUTTER SYSTEMS INC. | 898 S MAIN ST EAST PEORIA, IL 61611 | | R. H.  DONNELLEY PUBLISHING & ADVERTISING OF ILLINOIS, PARTNERSHIP FOR SBC DIRECTORIES VS. PITCHER PERFECT SIDING & WINDOW CO., INC AND RAINMASTER SYSTEMS INC. FKA RAINMASTER GUTTER SYSTEMS INC. , CASE NO. 2014L 191, VENUE: THE CIRCUIT COURT OF TAZEWELL COUNTY, IL | COLLECTIONS |
| POPULAR MOTORS, INC. | 607 SPRINGFIELD AV, NWK, NJ 07103 | | SUPERMEDIA LLC VS POPULAR MOTORS, INC., CASE NO. DC-014250-14, VENUE: SUPERIOR COURT OF NEW JERSEY LAW DIVISION, SPECIAL CIVIL PART COUNTY OF ESSEX, NJ | COLLECTIONS |
| PORTABLE STORAGE ON WHEELS | 4980 DODD RD EAGAN MN 55123-2115 | | PORTABLE STORAGE ON WHEELS, CASE NO. 19HA- CV-14-2550, VENUE: DAKOTA COUNTY, MN | COLLECTIONS |

| ADVERSE PARTY | ADDRESS | ATTORNEY FOR COUNTERPARTY (IF APPLICABLE) | CAPTION, CASE NUMBER, & JURISDICTION (IF APPLICABLE) | DESCRIPTION |
|---|---|---|---|---|
| PRO SATELLITE | P.O. BOX 420448 SAN DIEGO, CA 92142 | KENNETH E. BONUS PILLSBURY WINTHROP SHAW PITTMAN LLP 12255 EL CAMINO REAL, SUITE 300 SAN DIEGO, CA 92130 | NANCY J. WOLF V. SUPERMEDIA LLC F/K/A IDEARC MEDIA LLC CONVERTED FROM IDEARC MEDIA. CORP., CASE NO. 07-06613-LA-7, VENUE: US BANKRUPTCY COURT - SOUTHERN DISTRICT OF CALIFORINIA, CA | COLLECTIONS |
| PROFESSIONAL APPLIANCE | 16550 SCHEER BLVD STE 2 HUDSON, FL 34667-4241 | | SUPERMEDIA, LLC FKA IDEARC MEDIA LLC V. COOLQUEST, INC DBA A PROFESSIONAL APPLIANCE REPAIR, CASE NO. 51-2011-CA- 3690, VENUE: 6TH JUDICIAL CIRCUIT, PASCO COUNTY, FL | COLLECTIONS |
| RAPID ROOTER PLUMBING AND DRAIN CLEANING SERVICES INC AND DAVID NIEVES | P O BOX 188, AUDUBON, NJ 08106-0188 | | SUPERMEDIA LLC VS RADIP ROOTER PLUMBING AND DRAIN CLEANING SERVICES INC AND DAVID NIEVES, CASE NO. L-4369-13, VENUE: SUPERIOR COURT OF NEW JERSEY LAW DIVISION, SPECIAL CIVIL PART COUNTY OF CAMDEN, NJ | COLLECTIONS |
| RICHARD M. ROCHA, PA | 2708 W KENNEDY BLVD, TAMPA, FL 33609-3204 | | SUPERMEDIA LLC, VS RICHARD M. ROCHA, PA, CASE NO. 14-CA-000196, VENUE: THE CIRCUIT COURT OF THE 13TH JUDICIAL CIRCUIT IN AND FOR HILLSBOROUGH COUNTY, FL | COLLECTIONS |
| ROBERT SELPH D/B/A MASTERCRAFT PLUMBING | P O BOX 61, KERENS, TX 75144-0061 | | SUPERMEDIA, LLC F/K/A IDEARC MEDIA LLC F/K/A IDEARC MEDIA CORP. F/K/A VERIZON DIRECTORIES CORP. VS. ROBERT SELPH D/B/A MASTERCRAFT PLUMBING, CASE NO. D14-23202-CV, VENUE: COUNTY CIVIL COURT, HARRIS COUNTY, TX | COLLECTIONS |
| ROBERT THOMAS DBA T & R FENCE | 1621 S FT HOOD ST KILLEEN, TX 76542 | | R.H. DONNELLEY, INC. VS. ROBERT THOMAS DBA T & R FENCE, CASE NO. 81945, VENUE: COUNTY COURT AT LAW NO. 1 OF BELL COUNTY, TX | COLLECTIONS |
| ROM CULVER D/B/A AAA BEST PLUMBING | CULVER INC 801 LOVE DR, O FALLON, MO 63366-1738 | | SUPERMEDIA LLC F/K/A IDEARC INC. VS ROM CULVER D/B/A AAA BEST PLUMBING, CASE NO. 1411-CC00810, VENUE: CIRCUIT COURT OF ST CHARLES COUNTY, MO | COLLECTIONS |
| ROXY GLASS, LLC | 8115 AURORA AVE N SEATTLE, WA 98103 | | DEX MEDIA, INC. VS. ROXY GLASS, LLC, CASE NO. 155-07087, VENUE: KING COUNTY DISTRICT COURT - WEST, WA | COLLECTIONS |

| ADVERSE PARTY | ADDRESS | ATTORNEY FOR COUNTERPARTY (IF APPLICABLE) | CAPTION, CASE NUMBER, & JURISDICTION (IF APPLICABLE) | DESCRIPTION |
|---|---|---|---|---|
| SEASCAPE AQUARIUM INC AKA SEASCAPE AQUARIUM & PET CENTER | 2162 GULF GATE DR SARASOTA, FL 34231-4813 | | SUPERMEDIA LLC VS SEASCAPE AQUARIUM INC AKA SEASCAPE AQUARIUM & PET CENTER, CASE NO. 11-CA-003093, VENUE: 12TH JUDICIAL CIRCUIT CT, SARASOTA COUNTY, FL | COLLECTIONS |
| SLATER BROTHERS WELL DRILLING INC. | 764 HIGH MOUNTAIN RD, NORTH HALEDON, NJ 07508-2722 | | SUPERMEDIA LLC VS SLATER BROTHERS WELL DRILLING INC., CASE NO. L-003092-13, VENUE: SUPERIOR COURT OF NEW JERSEY LAW DIVISION COUNTY OF PASSAIC, NJ | COLLECTIONS |
| SPECIALIZED, LLC, D/B/A SPECIALIZED 72 DEGREES, F/D/B/A SPECIALIZED HEATING & AIR CONDITIONING, LLC | 1280 S GRANT AVE LOVELAND, CO 80537 | | DEX MEDIA, INC., D/B/A DEX, D/B/A DEX ONE V. SPECIALIZED, LLC, D/B/A SPECIALIZED 72 DEGREES, F/D/B/A SPECIALIZED HEATING & AIR CONDITIONING, LLC, CASE NO. 14CV30011, VENUE: LARIMER COUNTY DISTRICT COURT, NV | COLLECTIONS |
| SUGAR HOUSE FAN LINES DBA SUGAR HOUSE MOVING & STORAGE | 1736 S 4250  SALT LAKE CITY, UT 84104 | | DEX MEDIA HOLDINGS, INC. FKA DEX MEDIA , INC. VS. SUGAR HOUSE FAN LINES DBA SUGAR HOUSE MOVING & STORAGE, CASE NO. 159906119 DC, VENUE: 3RD JUDICIAL DISTRICT COURT, SALT LAKE COUNTY, UT | COLLECTIONS |
| SUMMERTIME SCREEN ENCLOSURES | 5245 TOWER WAY, SANFORD, FL 32773 | | RH DONNELLEY INC. VS. SUMMERTIME SCREEN ENCLOSURES, CASE NO. 10-CA-3659-15-W, VENUE: SEMINOLE COUNTY, FLORIDA, FL | COLLECTIONS |
| TAMPA BAY LOCK & KEY INC, AKA SID ROSE DBA TAMPA LOCK AND SAFE | 813 E CHELSEA ST TAMPA, FL 33603-4134 | | SUPERMEDIA LLC VS TAMPA BAY LOCK & KEY INC, AKA SID ROSE DBA TAMPA LOCK AND SAFE, CASE NO. 2013-04571, VENUE: 13TH JUDICIAL CIRCUIT CT, HILLSBOROUGH COUNTY, FL | COLLECTIONS |
| THE LAW OF OFFICE OF JOSEPH LAMY, ALIAS JOSEPH LAMY | THE LAW OFFICE OF JOSEPH LAMY 696 RESERVOIR AVE, PROVIDENCE, RI 02910 | | SUPERMEDIA LLC VS THE LAW OF OFFICE OF JOSEPH LAMY, ALIAS JOSEPH LAMY, ALIAS JOSEPH LAMY, ALIAS, CASE  NO. PC 13-2187, VENUE: SUPERIOR COURT STATE OF RHODE ISLAND PROVIDENCE COUNTY, RI | COLLECTIONS |
| THE VAN HOUSE MOBILITY PR | 2002 E PEMBROKE AVE HAMPTON, VA 23664-1111 | | SUPERMEDIA LLC FKA IDEARC MEDIA LLC V. WORMILL, INC. DBA THE VAN HOUSE AKA THE VAN HOUSE MOBILITY AKA THE VAN HOUSE MOBILITY PRODUCTS, CASE NO. CL-12-505, VENUE: 8TH JUDICIAL DISTRICT, HAMPTON CITY, VA | COLLECTIONS |

| ADVERSE PARTY | ADDRESS | ATTORNEY FOR COUNTERPARTY (IF APPLICABLE) | CAPTION, CASE NUMBER, & JURISDICTION (IF APPLICABLE) | DESCRIPTION |
|---|---|---|---|---|
| THE WILLY'S WORLD WELLNESS & CONFERENCE CENTER LLC | PO BOX 498 ORLEANS, MA 02653-0498 | | SUPERMEDIA LLC VS THE WILLY'S WORLD WELLNESS & CONFERENCE CENTER LLC, CASE NO. 20136CV288, VENUE: SALEM DISTRICT CIVIL, SALEM COUNTY, MA | COLLECTIONS |
| TONY LIKER ATTORNEY AT LAW | 1051 N EASTERN AVE LAS VEGAS, NV 89101 | | RH DONNELLEY V TONY LIKER ATTORNEY AT LAW, CASE NO. A-13-685342-C, VENUE: EIGHTH JUDICIAL DISTRICT COURT-CLARK COUNTY, NV | COLLECTIONS |
| TPG ENTERPRISES, INC. DBA GILLIAMS TREE SERVICE | GILLIAMS TREE SERVICE 3438 E STONE DR KINGSPORT, TN 37660 | | DEX MEDIA HOLDINGS INC. FKA DEX MEDIA INC. VS. TPG ENTERPRISES, INC. DBA GILLIAMS TREE SERVICE, CASE NO. K0039885, VENUE: SULLIVAN COUNTY CHANCERY COURT, TN | COLLECTIONS |
| VERIZON DIRECTORY CORP VS ASSERTIVE DRIVING SCHOOL INC | ESSIE ARMSTEAD T-A A 860 W MOUNT AIRY AVE PHILADELPHIA, PA 19119 | | VERIZON DIRECTORY CORP VS ASSERTIVE DRIVING SCHOOL INC, CASE NO. 2004 #1203, VENUE: PHILADELPHIA COUNTY COURT OF COMMON PLEAS, PA | COLLECTIONS |
| WALTER JOHN NIESEN AND KOREY JOHN NIESEN AS PARTNERS D/B/A BONDED TRANSMISSION SPECIALISTS | 1790 UNIVERSITY AVE, ST PAUL MN 55104 | | DEX ONE CORPORATION D/B/A DEX MEDIA VS. WALTER JOHN NIESEN AND KOREY JOHN NIESEN AS PARTNERS D/B/A BONDED TRANSMISSION SPECIALISTS, CASE NO. 27-CV-14-902, VENUE: 4TH JUDICIAL COURT-HENNEPIN COUNTY, MN | COLLECTIONS |
| WOOTTEN ENTERPRISES DBA ABC RENTAL WORLD | 306 S RIVER DR. TEMPE AZ 85281 | | DEX MEDIA INC VS. WOOTTEN ENTERPRISES DBA ABC RENTAL WORLD, CASE NO. C20124869, VENUE: SUPERIOR COURT-COUNTY MARICOPA, AZ | COLLECTIONS |

**EXHIBIT A(ii)**

Claims Related to Insurance Policies

Unless otherwise released by the Plan, the Debtors expressly reserve all Causes of Action based in whole or in part upon any and all insurance contracts, insurance policies, occurrence policies, and occurrence contracts to which any Debtor or Reorganized Debtor is a party or pursuant to which any Debtor or Reorganized Debtor has any rights whatsoever, regardless of whether such contract or policy is included on Exhibit A(ii), including Causes of Action against insurance carriers, reinsurance carriers, insurance brokers, underwriters, occurrence carriers, or surety bond issuers relating to coverage, indemnity, contribution, reimbursement, or any other matters.  There is no schedule to this Exhibit A(ii).

**EXHIBIT A(iii)**

<u>Claims Related to Deposits, Adequate Assurance Postings, and Other Collateral Postings</u>

Unless otherwise released by the Plan, the Debtors expressly reserve all Causes of Action based in whole or in part upon any and all postings of a security deposit, adequate assurance payment, or any other type of deposit or collateral, regardless of whether such posting of security deposit, adequate assurance payment, or other type of deposit or collateral is included on <u>Exhibit A(iii)</u>.  There is no schedule to this <u>Exhibit A(iii)</u>.

**EXHIBIT A(iv)**

Claims, Defenses, Cross-Claims, and
Counter-Claims Related to Litigation and Possible Litigation

Unless otherwise released by the Plan, the Debtors expressly reserve all claims, defenses, cross claims, and counterclaims against or related to all Entities that are party to or that may in the future become party to litigation, arbitration, or any other type of adversarial proceeding or dispute resolution proceeding, whether formal or informal, judicial or non-judicial. There is no schedule to this Exhibit A(iv).

**EXHIBIT A(v)**

Claims Related to Contracts and Leases

Unless otherwise released by the Plan, the Debtors expressly reserve the Causes of Action, based in whole or in part upon any and all contracts and leases to which any Debtor or Reorganized Debtor is a party or pursuant to which any Debtor or Reorganized Debtor has any rights whatsoever.  The claims and Causes of Actions reserved include, without limitation, Causes of Action against vendors, suppliers of goods or services, or any other parties:  (a) for overpayments, back charges, duplicate payments, improper holdbacks, deposits, warranties, guarantees, indemnities, recoupment, or setoff; (b) for wrongful or improper termination, suspension of services or supply of goods, or failure to meet other contractual or regulatory obligations; (c) for failure to fully perform or to condition performance on additional requirements under contracts with any one or more of the Debtors before the assumption or rejection, if applicable, of such contracts; (d) for payments, deposits, holdbacks, reserves, or other amounts owed by any creditor, utility, supplier, vendor, insurer, surety, factor, lender, bondholder, lessor, or other party; (e) for any liens, including mechanic's, artisan's, materialmen's, possessory, or statutory liens held by any one or more of the Debtors; (f) counter-claims and defenses related to any contractual obligations; (g) any turnover actions arising under section 542 or 543 of the Bankruptcy Code; (h) for unfair competition, interference with contract or potential business advantage, breach of contract, infringement of intellectual property, or any business tort claims; and (i) any accumulated service credits, both those that may apply to future vendor invoices and those from which the Debtors may be entitled to receive a refund.  There is no schedule to this Exhibit A(v).

**Exhibit A(vi)**

Claims Related to Customer and Vendor Obligations

Unless otherwise released by the Plan, the Debtors expressly reserve all Causes of Action against or related to all customers or vendors that owe or may in the future owe money or other obligations to the Debtors or the Reorganized Debtors, whether for unpaid invoices; unreturned, missing, or damaged inventory; indemnification; warranties; or any other matter whatsoever. In order to protect the privacy of the Debtors' customers and vendors, there is no schedule to this Exhibit A(vi).

## Exhibit B

**Warrant Agreement**

DEX MEDIA, INC.,

COMPUTERSHARE INC.,

and

COMPUTERSHARE TRUST COMPANY

———————————————————————

WARRANT AGREEMENT

Dated as of July [   ], 2016

———————————————————————

Warrants to Purchase Common Stock, par value $0.01 per share

———————————————————————

#4822-8967-4289

# TABLE OF CONTENTS

**Page**

ARTICLE I
ISSUANCE OF WARRANTS

Section 1.01    Defined Terms ..................................................................................1
Section 1.02    Appointment of Warrant Agent; Issuance of Warrants ..........................5

ARTICLE II
WARRANT PRICE, DURATION AND EXERCISE OF WARRANTS

Section 2.01    Exercise Price..................................................................................6
Section 2.02    Duration of Warrants .......................................................................6
Section 2.03    Exercise of Warrants.........................................................................6
Section 2.04    Reservation of Warrant Shares ...........................................................9

ARTICLE III
OTHER PROVISIONS RELATING TO RIGHTS OF HOLDERS OF
WARRANT

Section 3.01    No Rights as Stockholder Conferred by Warrants..................................10
Section 3.02    Notice of Certain Events....................................................................10
Section 3.03    Access to Information and Reports.......................................................11
Section 3.04    Rights of Action..............................................................................11
Section 3.05    Issuance Obligation Unconditional.......................................................11
Section 3.06    No Redemption................................................................................11

ARTICLE IV
EXCHANGE AND TRANSFER

Section 4.01    Exchange and Transfer .....................................................................11
Section 4.02    Restrictions on Transfer; Restrictive Legend ........................................12
Section 4.03    Treatment of Holders of Warrants .......................................................14

ARTICLE V
ADJUSTMENT OF WARRANT PRICE AND NUMBER OF WARRANT
SHARES

Section 5.01    Adjustments Generally.......................................................................14
Section 5.02    Stock Dividends; Split-Ups.................................................................15
Section 5.03    Aggregation of Shares........................................................................15
Section 5.04    Other Dividends................................................................................15
Section 5.05    Replacement of Securities upon Reorganization ....................................16
Section 5.06    Adjustment Rules..............................................................................17

i

Section 5.07   Notices of Changes in Warrant .......................................................................17
Section 5.08   No Fractional Shares ..........................................................................................17

## ARTICLE VI
### CONCERNING THE WARRANT AGENT

Section 6.01   Warrant Agent .....................................................................................................18
Section 6.02   Fees and Expenses of Warrant Agent ...............................................................18
Section 6.03   Liability of Warrant Agent ................................................................................18
Section 6.04   Rights and Duties of Warrant Agent .................................................................19
Section 6.05   Acceptance of Agency ........................................................................................21
Section 6.06   Limitation of Liability ........................................................................................21
Section 6.07   Survival ...............................................................................................................21
Section 6.08   Further Assurances .............................................................................................21
Section 6.09   Resignation and Appointment of Successor ......................................................21

## ARTICLE VII
### MISCELLANEOUS

Section 7.01   Amendment ..........................................................................................................22
Section 7.02   Notices and Demands to the Company ..............................................................23
Section 7.03   Addresses .............................................................................................................23
Section 7.04   Applicable Law ...................................................................................................24
Section 7.05   Persons Having Rights Under Warrant Agreement ..........................................24
Section 7.06   Headings ..............................................................................................................24
Section 7.07   Counterparts ........................................................................................................24
Section 7.08   Inspection of Warrant Agreement .....................................................................24
Section 7.09   Binding Effects ...................................................................................................24
Section 7.10   Severability .........................................................................................................24
Section 7.11   Entire Agreement ...............................................................................................24
Section 7.12   Assignment .........................................................................................................25

#4822-8967-4289

**WARRANT AGREEMENT**

THIS WARRANT AGREEMENT (this "Warrant Agreement") dated as of July [___], 2016 (the "Effective Date") among DEX MEDIA, INC., a Delaware corporation (herein called the "Company"), and COMPUTERSHARE INC., a Delaware corporation ("Computershare"), and its wholly-owned subsidiary COMPUTERSHARE TRUST COMPANY, N.A., a federally chartered trust company together with Computershare and each of their successors and permitted assigns under Section 6.09, the "Warrant Agent"). Any capitalized term used but not defined herein shall have the meaning ascribed to such term in the Stockholders Agreement.

W I T N E S S E T H :

WHEREAS, this Warrant Agreement is being entered into pursuant to and in accordance with the Plan (as defined below), which provides, among other things, that the Company shall issue to the holders of Subordinated Note Claims (as defined below) Warrants (the "Warrants"), entitling the holders thereof or their registered permitted assigns (collectively, the "Holders") to purchase shares (the "Warrant Shares") of the Company's Common Stock, par value $0.01 per share (the "Common Stock"); and

WHEREAS, the Company has engaged the Warrant Agent to act on behalf of the Company in connection with the issuance, registration, transfer, exchange, and exercise of the Warrants, and in this Warrant Agreement sets forth, among other things, the terms and provisions of the Warrants and the terms and conditions on which they may be issued, transferred, exchanged, exercised and replaced.

NOW, THEREFORE, in consideration of the premises and of the mutual agreements herein contained, the parties hereto agree as follows:

**ARTICLE I**
**ISSUANCE OF WARRANTS**

Section 1.01    Defined Terms.

"Affiliate" means, with respect to any specified Person, any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person, or any Related Fund of any of the foregoing. For the purposes of this definition, "control" when used with respect to any specified Person means the power to direct or cause the direction of the management and policies of such specified Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing. Notwithstanding the foregoing, in no event shall any Stockholder or any of its Affiliates be deemed to be an Affiliate of any other Stockholder or any of its Affiliates (other than the Company) solely by reason of such Stockholder's control of the Company.

"Bankruptcy Code" means title 11 of the United States Code, as amended and in effect during the pendency of the Chapter 11 Cases.

#4822-8967-4289

"Board" means the Board of Directors of the Company.

"Business Day" means any day (other than a day which is a Saturday, Sunday or legal holiday in the State of New York) on which banks are open for business in the State of New York.

"Cashless Exercise" has the meaning set forth in Section 2.03(a).

"Common Stock" has the meaning set forth in the recitals.

"Company" has the meaning set forth in the preamble until a successor Person shall have become such pursuant to Section 7.12 and thereafter "Company" shall mean such successor Person.

"Competitor" means any Person engaged (whether directly or indirectly through the control of any other person) other than through the Company and its Subsidiaries in the business of providing yellow page services or other similar targeted advertising in North America; provided that no potential Transferee shall be deemed to be a Competitor on account of owning less than 10% (or, in the case of any Person that was a Term Loan Lender (as defined in the Plan) as of the Petition Date, 20%) of the outstanding shares of equity securities issued by any Competitor; provided, further, that the potential Transferee does not have the right to appoint, and no director, officer or employee of such potential Transferee is, a director of such Competitor.

"Consideration" means (i) in the case of an acquisition specified in clause (i) of the definition of "Sale of the Company," the aggregate of any cash, securities or other property paid to acquire Common Stock of the Company in the transaction or series of related transactions constituting such acquisition, (ii) in the case of a transaction specified in clause (ii) of the definition of "Sale of the Company," the aggregate of any securities, cash or other property receivable upon distribution or paid to holders in respect of shares of Common Stock and (iii) in the case of a sale, transfer or other disposition specified in clause (iii) of the definition of "Sale of the Company," the aggregate of any securities, cash or other property receivable upon distribution or paid to holders in respect of shares of Common Stock.

"Effective Date" has the meaning set forth in the preamble.

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations of the SEC promulgated thereunder.

"Exercise Date" has the meaning set forth in Section 2.03(b).

"Exercise Form" means the Exercise Form substantially in the form attached hereto as Exhibit B.

"Exercise Price" has the meaning set forth in Section 2.01.

"Expiration Time" means 5:00 p.m. Pacific time on [___], 2023.

2

#4822-8967-4289

"Funds" has the meaning set forth in Section 2.03(k).

"Holders" has the meaning set forth in the recitals.

"Joinder" means a Joinder Agreement to the Stockholders Agreement in the form attached hereto as Exhibit D.

"Non-Surviving Transaction" has the meaning set forth in Section 5.05.

"Plan" means that certain Joint Prepackaged Chapter 11 Plan of Reorganization of Dex Media, Inc. and its Debtor Affiliates, as filed with the United States Bankruptcy Court for the District of Delaware, Chapter 11 Case No. 16-11200 (KG), on [___], 2016.

"Person" means an individual, partnership, corporation, unincorporated organization, joint stock company, limited liability company, trust, joint venture or other legal entity, or a governmental agency or political subdivision thereof.

"Petition Date" has the meaning set forth in the Plan.

"Property Dividend" has the meaning set forth in Section 5.04.

"Related Fund" means, with respect to any Person, a fund, pooled investment vehicle or managed account now or hereafter existing that is (i) controlled by one or more general partners or managing members, or any Affiliates of such general partners or managing members, of such Person, or (ii) managed or advised by the same manager or advisor, or any Affiliates of such manager or advisor, as such Person.

"Sale Date" has the meaning set forth in Section 2.02.

"Sale of the Company" means the consummation of (i) a transaction or series of related transactions pursuant to which any Person or "group" (as such term is used in Section 13(d)(3) of the Exchange Act) purchases all or substantially all of the outstanding shares of Common Stock, (ii) any reorganization, merger, share exchange or consolidation of the Company with or into any other Person in which transaction the holders of the Common Stock of the Company immediately prior to such transaction, in the aggregate, own immediately after such transaction less than 50% of the total voting power of the Common Stock of the Company or, if the Company is not the acquiring or surviving entity in such transaction, the successor entity (other than transactions solely involving the merger or consolidation of a wholly owned Subsidiary with or into the Company or another wholly owned direct or indirect subsidiary of the Company) or (iii) the sale, transfer or other disposition of all or substantially all of the assets or business of the Company and its Subsidiaries, taken as a whole, which is followed by a distribution to the Stockholders of the net proceeds of such sale.

"Sale Price" means, with respect to a Sale of the Company, the fair market value of the consideration paid in respect of one share of Common Stock in such Sale of the Company, as determined in good faith by the Board, whose determination shall absent manifest error be conclusive and evidenced by a board resolution filed with the Warrant Agent.  The Company is

3

#4822-8967-4289

not required, and no Holder may demand, any appraisal in connection with the determination of the Sale Price.

"SEC" means the United States Securities and Exchange Commission, or any other federal agency at the time administering the Securities Act or the Exchange Act.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations of the SEC promulgated thereunder.

"Stockholder" has the meaning set forth in the Stockholders Agreement.

"Stockholders Agreement" shall mean that certain Stockholders Agreement, dated as of the date hereof, among the Company and the stockholders party thereto, in the form attached hereto as Exhibit C, as may be amended from time to time, copies of which amendments the Company shall promptly provide to the Holders in accordance with Section 7.03.

"Subordinated Note Claims" has the meaning set forth in the Plan.

"Subsidiary" means any Person in which the Company, directly or indirectly through Subsidiaries or otherwise, beneficially owns more than 50% of either the equity interests in, or the voting control of, such Person.

"Transfer" means, with respect to any security of the Company, to directly or indirectly sell, exchange, transfer, hypothecate, negotiate, gift, bequeath, convey in trust, pledge, mortgage, grant a security interest in, assign, encumber, or otherwise dispose of all or any portion of such security, including by recapitalization, merger, consolidation, liquidation, dissolution, dividend, distribution or otherwise; provided, however, that a pledge or grant of a security interest in Warrants to secure a "bona fide" loan shall in no event be deemed a Transfer for any purpose of this Warrant Agreement so long as (i) written notice is provided to the Company identifying the pledgee or Person to whom a security interest in the Warrants is granted (the "Pledgee"); and (ii) the Pledgee's interest in the Warrants is limited to an actual or contingent economic interest, it being understood and agreed that the pledge or grant of a security interest in Warrants does not grant such Pledgee the rights of a Holder under this Warrant Agreement, including any right to vote, or the right to direct the vote of, the pledged Warrants; provided, further, that any foreclosure, transfer in lieu of foreclosure or other enforcement of such pledge or security interest shall be deemed to constitute a Transfer hereunder and shall be subject to the rights of the Company and the Holders set forth in this Warrant Agreement. "Transferred," "Transferor" and "Transferee" shall have the correlative meanings. Notwithstanding the foregoing, the exercise of a Warrant for Warrant Shares that does not involve the issuance of Warrant Shares in a name other than the record holder of the applicable Warrant shall in no event constitute a "Transfer."

"Transfer Agent" means the transfer agent for the Common Stock.

"Transfer Request" has the meaning set forth in Section 4.02(b).

"Warrant Agreement" has the meaning set forth in the preamble.

4

#4822-8967-4289

"Warrant Agent" has the meaning set forth in the preamble.

"Warrant Agent Office" has the meaning set forth in Section 2.03(a).

"Warrant Legend" has the meaning set forth in Section 4.02(e).

"Warrant Register" has the meaning set forth in Section 4.01(a).

"Warrant Shares" has the meaning set forth in the recitals.

"Warrant Statement" has the meaning set forth in Section 1.02(d).

"Warrants" has the meaning set forth in the recitals.

Section 1.02    Appointment of Warrant Agent; Issuance of Warrants.

(a)    The Company hereby appoints the Warrant Agent to act as agent for the Company for the Warrants, and the Warrant Agent hereby accepts such appointment and agrees to perform the same in accordance with the express terms and conditions set forth in this Warrant Agreement.

(b)    Each Warrant shall initially represent the right, subject to the provisions contained herein and therein, to purchase one Warrant Share subject to adjustment as provided herein.  The Warrants shall initially entitle the Holders of such Warrants to purchase, in the aggregate, up to **[___] [INSERT: 10% of Effective Date outstanding including Warrants]** Warrant Shares, as such amount may be adjusted from time to time pursuant to this Warrant Agreement, upon the exercise of all of the Warrants in accordance with the terms of this Warrant Agreement.

(c)    On the terms and subject to the conditions of this Warrant Agreement and in accordance with the terms of the Plan, on or as soon as practicable after the Effective Date, the Company shall issue the Warrants.

(d)    The Warrants shall be issued in uncertificated form by book-entry registration in the Warrant Register with the issuance thereof confirmed by statements delivered by the Warrant Agent to the Holders of the Warrants reflecting such book-entry positions, substantially in the form of Exhibit A hereto (including the Warrant Legend therein) (the "Warrant Statements").

(e)    The Company represents and warrants to the Warrant Agent that (i) all shares of Common Stock issued and outstanding as of the date hereof are, or to be issued during the term of this appointment will be upon issuance, duly authorized, validly issued, fully-paid and nonassessable and (ii) all Warrants issued and outstanding as of the date hereof are, or to be issued during the term of this appointment will be upon issuance, duly authorized and validly issued. All such warrants or Common Stock are (or, in the case of shares that have not yet been issued, will be) duly registered under the Securities Act and the Securities Exchange Act of 1934 or are exempt from such registration, and all appropriate state securities law filings have been made with respect to the warrants or shares. Any warrants or Common Stock not so

5

registered were or shall be issued or transferred in a transaction or series of transactions exempt from the registration provisions of the relevant law, and in each such issuance or transfer, the Company was or shall be so advised by its legal counsel and all shares issued or to be issued bear or shall bear all appropriate legends.

## ARTICLE II
## WARRANT PRICE, DURATION AND EXERCISE OF WARRANTS

Section 2.01   Exercise Price.  The initial exercise price for each Warrant shall be $[___] per Warrant Share, subject to adjustment as provided herein (as so adjusted, the "Exercise Price").

Section 2.02   Duration of Warrants.   Subject to the provisions of this Warrant Agreement, Warrants may be exercised in whole or in part in any whole number of Warrants at any time prior to the Expiration Time in accordance with the procedures set forth in Section 2.03. Each Warrant not exercised prior to the Expiration Time shall become void, and all rights of the Holder and any beneficial owners of such Warrants under this Warrant Agreement shall cease. If a Sale of the Company is consummated prior to the Expiration Time in which 100% of the Consideration paid to or received by non-employee holders of Common Stock in such Sale of the Company consists of cash and the Sale Price is less than or equal to the Exercise Price on the date (the "Sale Date") the Sale of the Company is consummated, each Warrant not exercised at or before the Sale Date shall become void, and all rights of the Holder and any beneficial owners of such Warrants under this Warrant Agreement shall cease.

Section 2.03   Exercise of Warrants.

(a)   Warrants may be exercised, at the option of the Holder, in whole or in part in any whole number of Warrants, at any time or from time to time prior to the Expiration Time, by (i) delivering an Exercise Form duly completed as to the whole number of Warrants being exercised duly executed by such Holder or its duly authorized agent or attorney to the Warrant Agent at its corporate actions department or such other office designated by the Warrant Agent for such purposes (the "Warrant Agent Office"), notice of which the Warrant Agent shall have given to the Company in accordance with Section 7.03, (ii) except in the case of a Cashless Exercise, delivering a certified or official bank check payable to the Company to the Warrant Agent at the Warrant Agent Office or transferring by wire in immediately available funds to the account (No. 530354616; ABA No. 02100021; Reference: Dex Media Warrants; Attention: Corp Action) of the Company at JP Morgan Chase Bank or such other account of the Company at such banking institution in the United States of America and the Company shall have given notice to the Warrant Agent and the Holders in accordance with Section 7.03, in the amount of the aggregate Exercise Price for the Warrant Shares into which such Warrants are being exercised, and (iii) delivering a Joinder duly executed by the Person in whose name the Warrant Shares are requested to be issued to the Warrant Agent at the Warrant Agent Office unless the Stockholders Agreement is not then in effect or if such Person is already a party to the Stockholders Agreement; provided, however, that if the Warrant Shares are to be issued in a name other than the record holder of the applicable Warrant, such record holder shall be deemed to have requested a Transfer of such Warrant prior to such exercise, which Transfer must comply with the provisions of this Warrant Agreement.  Without limitation of the right of Holders to exercise

6

Warrants at any time pursuant to the preceding sentence, if the exercise of any Warrant is made commencing with the period 30 days before and ending 30 days after the closing of a Sale of the Company with respect to which the Sale Price is greater than the Exercise Price on the Sale Date, any Holder may elect to exercise Warrants effective (if Warrants are exercised prior to the closing of such Sale of the Company) only upon the closing of such Sale of the Company by authorizing the Company to effect a cashless exercise (a "Cashless Exercise") by withholding and not issuing to such Holder, in payment of the Exercise Price thereof, a number of such Warrant Shares equal to (x) the total number of Warrant Shares for which the Warrants are being exercised (before withholding), multiplied by (y) the Exercise Price, and divided by (z) the Sale Price with respect to such Sale of the Company (and such withheld Warrant Shares shall no longer be issuable under such Warrants, and the Holder shall not have any rights or be entitled to any payment with respect to such withheld Warrant Shares). For the avoidance of doubt, a Cashless Exercise (if Warrants are exercised prior to the closing of such Sale of the Company) will be effective only if the closing of such Sale of the Company actually occurs. The delivery of the executed Exercise Form and (if applicable) Joinder and (except in the case of a Cashless Exercise) payment of the Exercise Price and, solely in the case of the issuance of Warrant Shares in a name other than that in which the Warrant Shares were registered, payment of any taxes as and in the manner specified in Section 2.03(e), are the only procedures required of, and no legal opinion or other information or instructions shall be required to be delivered by, a Holder to exercise any Warrant.

(b) The later of (i) the first date on which the Warrant Agent has received a valid Exercise Form and (if applicable) Joinder at the Warrant Agent Office in accordance with this Warrant Agreement and (except in the case of a Cashless Exercise) the Exercise Price has been paid in full and (ii) solely in the case of a Cashless Exercise, the Sale Date, shall be deemed to be the date on which the Warrant is exercised (the "Exercise Date"). Subject to clause (k), the Warrant Agent shall promptly deposit all certified or official bank checks received by it in payment for the exercise of Warrants.

(c) The Company shall cause the Transfer Agent, within ten Business Days after the Exercise Date, to issue to the Holder the aggregate number of whole Warrant Shares issuable upon such exercise and deliver to the Holder written confirmation that such Warrant Shares have been duly issued and recorded on the books of the Transfer Agent. The Warrant Shares so issued shall be registered in the name of the Holder or such other name as shall be designated in the Exercise Form and Joinder (if applicable) delivered by the Holder. Such Warrant Shares shall be deemed to have been issued and any person so designated to be named therein shall be deemed to have become the holder of record of such Warrant Shares as of the Exercise Date. Notwithstanding any provision herein to the contrary, the Company shall not be required to register Warrant Shares in the name of any person who acquired any Warrant or any Warrant Shares otherwise than in accordance with this Warrant Agreement.

(d) In case an exercise of Warrants is in part only, the Warrant Agent shall make an appropriate adjustment to the account of the Holder to reflect a number of Warrants equal (without giving effect to any adjustment thereof) to the number of such Holder's Warrants prior to such exercise, minus the number of Warrants so exercised as designated by the Holder upon such exercise in the Exercise Form.

#4822-8967-4289

(e)     The Company will from time to time pay all documentary, stamp or similar issue or transfer taxes and charges (other than income taxes) imposed upon the Company or the Warrant Agent or otherwise payable in respect of the issuance or delivery of Warrant Shares upon exercise of Warrants, but neither the Warrant Agent nor the Company shall be required to pay any documentary, stamp or other tax or other charge required to be paid in connection with the issuance of the Warrant Shares in a name other than that in which the Warrants were registered, and in the event that any Warrant Shares are to be issued in a name other than that in which the Warrants were registered, neither the Warrant Agent nor the Company shall be required to issue or deliver any Warrant Share until it has been established to the Company's and the Warrant Agent's satisfaction that such tax or other charge has been paid or that no such tax or other charge is due.

(f)     Any exercise of a Warrant pursuant to the terms of this Warrant Agreement shall be irrevocable and shall constitute a binding agreement between the Holder and the Company, enforceable in accordance with its terms.

(g)     The Warrant Agent shall:

(i)     examine all Exercise Forms, Joinders and all other documents delivered to it by or on behalf of Holders as contemplated hereunder to ascertain whether or not, on their face, such Exercise Forms, Joinders and any such other documents have been executed and completed in accordance with their terms and the terms hereof;

(ii)    where an Exercise Form, Joinder or other document appears on its face to have been improperly completed or executed or some other irregularity or deficiency in connection with the exercise of the Warrants exists, the Warrant Agent shall endeavor to inform the appropriate parties (including the Person submitting such instrument) of the need for fulfillment of all requirements, specifying those requirements which appear to be unfulfilled;

(iii)   inform the Company of and reasonably cooperate with and assist the Company in resolving any reconciliation problems between the Exercise Forms received and the crediting of Warrant Shares to the respective Holders' accounts; and

(iv)    advise the Company no later than five Business Days after receipt of an Exercise Form, of (A) the receipt of such Exercise Form, the number of Warrants exercised in accordance with the terms and conditions of this Warrant Agreement and the amount deposited, (B) the identity of the Holder that has submitted the Exercise Form, (C) the percentage of the then outstanding Warrants represented by such exercise and (D) such other information as the Company shall reasonably request.

(h)     All questions as to the validity, form and sufficiency (including time of receipt) of any Exercise Form and Joinder (if applicable) will be determined by the Company in good faith and absent manifest error shall be final and binding. The Company reserves the right to reject any and all Exercise Forms not in proper form, not accompanied by a Joinder in proper form (if applicable) and duly executed by the Person in whose name the

8

Warrant Shares are to be issued, pursuant to which Warrant Shares are to be issued in the name of a Person other than the record holder of the applicable Warrant unless such deemed Transfer complies with the terms of this Warrant Agreement.  Such determination by the Company shall be made in good faith and absent manifest error shall be final and binding on the Holders, absent manifest error.    Moreover, the Company reserves the absolute right to waive any of the conditions to the exercise of Warrants or defects in the exercise thereof with regard to any particular exercise of Warrants.  The Company shall give notice to the Warrant Agent of any such determinations, however, neither the Company nor the Warrant Agent shall be under any duty to give notice to the Holders of the Warrants of any irregularities in any Exercise Form or Joinder (if applicable), nor shall it incur any liability for the failure to give such notice.

(i)      If, at the time of issuance of Warrant Shares, the provisions in respect of restrictions on transfer of shares of Common Stock in the Stockholders Agreement are still in effect, then (unless newly issued shares of Common Stock are generally not subject to the provisions in respect of restrictions on transfer of shares of Common Stock in the Stockholders Agreement) each of the Warrant Shares issued upon the exercise of a Warrant, the book-entry account in which such Warrant Shares are held or Warrants Statement issued in respect thereof shall also be stamped or otherwise imprinted with the legend set forth in the Stockholders Agreement.

(j)      Notwithstanding any provision herein to the contrary, prior to the deemed issuance of Warrant Shares on the Exercise Date upon exercise of any Warrant, Holders shall not be entitled to any voting, registration, preemptive or other rights under the Stockholders Agreement. For the avoidance of doubt, upon exercise of the Warrants and deemed issuance of the Warrant Shares on the Exercise Date, the Holders of such Warrant Shares shall have the same rights as similarly situated holders of Common Stock under the Stockholders Agreement.

(k)      All funds received by the Warrant Agent under this Warrant Agreement that are to be distributed or applied by Computershare in the performance of its services hereunder (the "Funds") shall be held by Computershare as agent for the Company and deposited in one or more bank accounts to be maintained by Computershare in its name as agent for the Company.    Until distributed pursuant to the terms of this Warrant Agreement, Computershare will hold the Funds through such accounts in: deposit accounts of commercial banks with Tier 1 capital exceeding $1 billion or with an average rating above investment grade by S&P (LT Local Issuer Credit Rating), Moody's (Long Term Rating) and Fitch Ratings, Inc. (LT Issuer Default Rating) (each as reported by Bloomberg Finance L.P.).  Computershare shall have no responsibility or liability for any diminution of the Funds that may result from any deposit made by Computershare in accordance with this paragraph, including any losses resulting from a default by any bank, financial institution or other third party.  Computershare may from time to time receive interest, dividends or other earnings in connection with such deposits.  Computershare shall not be obligated to pay such interest, dividends or earnings to the Company, any holder of Warrants or any other party.

Section 2.04    Reservation of Warrant Shares.

(a)      For the purpose of enabling it to satisfy any obligation to issue Warrant Shares upon exercise of Warrants, the Company covenants that it will at all times

9

#4822-8967-4289

through the Expiration Time, reserve and keep available out of its aggregate authorized but unissued or treasury shares of Common Stock, the number of Warrant Shares deliverable upon the exercise of all outstanding Warrants, and the Transfer Agent is hereby irrevocably authorized and directed at all times to reserve such number of authorized and unissued or treasury shares of Common Stock as shall be required for such purpose.  The Company further covenants that it will, from time to time, take all steps necessary to increase the number of authorized shares of its Common Stock if at any time the number of authorized shares that remain unissued would otherwise be insufficient to allow delivery of all Warrant Shares then deliverable upon the exercise in full of all outstanding Warrants.  The Company will keep a copy of this Warrant Agreement on file with the Transfer Agent.  If Warrant Shares are to be represented by stock certificates, the Warrant Agent is hereby irrevocably authorized to requisition from time to time from such Transfer Agent stock certificates issuable upon exercise of outstanding Warrants, and the Company will supply such Transfer Agent with duly executed stock certificates for such purpose.

(b)    The Company covenants that all Warrant Shares will, upon issuance in accordance with the terms of this Warrant Agreement, be fully paid and nonassessable and free from preemptive rights (other than those set forth in the Stockholders Agreement) and all taxes, liens, charges and security interests created by or imposed upon the Company with respect to the issuance and holding thereof.

(c)    The Company shall take all such actions as may be necessary to ensure that all Warrant Shares upon issuance will be duly and validly issued, fully paid and nonassessable.

## ARTICLE III
## OTHER PROVISIONS RELATING TO RIGHTS OF HOLDERS OF WARRANT

Section 3.01    No Rights as Stockholder Conferred by Warrants.  Subject to Section 2.03(c), no Warrant shall, and nothing contained in this Warrant Agreement or in the Warrant Statement shall be construed to, entitle the Holder or any beneficial owner thereof to any of the rights of a holder or beneficial owner of Warrant Shares, including, without limitation, the right to vote or to consent or to receive notice as a stockholder in respect of any meeting of stockholders for the election of directors of the Company or any other matter, to receive dividends on Warrant Shares or any rights whatsoever as stockholders of the Company, until such Warrant is duly exercised in accordance with this Warrant Agreement and such Holder is issued (or in accordance with Section 2.03(c) is deemed to have been issued) the Warrant Shares to which it is entitled in connection therewith.

Section 3.02    Notice of Certain Events.  The Company shall (a) provide at least five Business Days prior written notice to each Holder in accordance with Section 7.03 of any record date relating to the payment by the Company of a dividend or distribution on the Common Stock and any effective date for any other event specified in Article V that may cause a Warrant Share and/or Exercise Price adjustment and (b) provide prior notice to each Holder in accordance with Section 7.03, at least five Business Days prior to such event, of (i) any Sale of the Company, (ii) any liquidation event with respect to the Company or (iii) any transaction

10

#4822-8967-4289

involving the right of a holder of Common Stock to exercise "tag along" rights under Section 5.2 of the Stockholders Agreement.

Section 3.03    Access to Information and Reports.  The Company shall (a) furnish to the Holders the reports required to be delivered to the holders of Common Stock pursuant to Section 6.1(a) of the Stockholders Agreement at the same time such reports are delivered or made available to such holders of Common Stock, (b) provide Holders access to the conference calls required to be held by the Company pursuant to Section 6.1(b) of the Stockholders Agreement at the same time such conference calls are held for the holders of Common Stock, and (c) furnish to the Holders the budgets required to be furnished to the holders of Common Stock pursuant to Section 6.1(c) of the Stockholders Agreement at the same time and in the same manner such budgets are furnished to the holders of Common Stock, in each case subject to the confidentiality restrictions set forth in Section 6.4 of the Stockholders Agreement.

Section 3.04    Rights of Action.  All rights of action against the Company in respect of this Warrant Agreement are vested in the Holders of the Warrants, and any Holder of any Warrant, without the consent of the Warrant Agent or the Holder of any other Warrant, may, in such Holder's own behalf and for such Holder's own benefit, enforce and may institute and maintain any suit, action or proceeding against the Company suitable to enforce, or otherwise in respect of, such Holder's right to exercise such Holder's Warrants in the manner provided in this Warrant Agreement.

Section 3.05    Issuance Obligation Unconditional.  The Company's obligations to issue and deliver Warrant Shares upon an exercise of any Warrant in accordance with Article II are absolute and unconditional, irrespective of any action or inaction by the Holder to enforce the same, any waiver or consent with respect to any provision hereof, the recovery of any judgment against any person or entity or any action to enforce the same, or any setoff, counterclaim, recoupment, limitation or termination, or any breach or alleged breach by the Holder of such Warrant or any other person or entity of any obligation to the Company or any violation or alleged violation of law by the Holder of such Warrant or any other person or entity, and irrespective of any other circumstance which might otherwise limit such obligation of the Company to the Holder of such Warrant in connection with the issuance of Warrant Shares. Nothing herein shall limit the right of the Holder of any Warrant to pursue any other remedies available to it hereunder, at law or in equity, including, without limitation, a decree of specific performance or injunctive relief with respect to the Company's failure to timely issue Warrant Shares upon exercise of such Warrant as required pursuant to the terms hereof.

Section 3.06    No Redemption.  The Warrants shall not be subject to redemption by the Company or its Subsidiaries; provided that the Warrants may be acquired by means other than a redemption, whether by tender offer, open market purchases, negotiated transactions or otherwise, in accordance with applicable securities laws, so long as such acquisition does not otherwise violate the terms of this Warrant Agreement or the Stockholders Agreement.

**ARTICLE IV**
**EXCHANGE AND TRANSFER**

Section 4.01    Exchange and Transfer.

11

#4822-8967-4289

(a)     The Warrant Agent shall keep, at the Warrant Agent Office, books (the "Warrant Register") in which, subject to such reasonable regulations as it may prescribe, it shall record the name and address of the Person in whose name each Warrant has been registered and exchanges and transfers of outstanding Warrants upon request to exchange or transfer such Warrants; provided that (i) the Warrant Agent shall have received a written instruction of transfer or exchange in form satisfactory to the Warrant Agent, duly executed by the Holder thereof or by such Holder's duly authorized agent or attorney, providing all information required to be delivered hereunder, such signature to be guaranteed by an eligible guarantor institution solely to the extent required by the Warrant Agent; (ii) such exchange or transfer is not expressly prohibited by the restrictions set forth in this Warrant Agreement; and (iii) such exchange or transfer otherwise complies with all of the requirements expressly set forth herein, without further inquiry, investigation and confirmation on the part of the Warrant Agent.  Upon any such registration of transfer, a Warrant Statement shall be issued to the transferee.

(b)     No service charge shall be made for any exchange or registration of transfer of Warrants; provided, however, that the Warrant Agent and/or the Company may require payment of a sum sufficient to cover any stamp or other tax or other charge that may be imposed in connection with any such registration of transfer.  Neither the Warrant Agent nor the Company shall be required to pay any stamp or other tax or other charge required to be paid in connection with such transfer, and neither the Warrant Agent nor the Company shall be required to issue or deliver any Warrant Share until it has been established to the Company's and the Warrant Agent's satisfaction that such tax or other charge has been paid or that no such tax or other charge is due.

(c)     The Warrant Agent shall not effect any exchange or registration of transfer which will result in the issuance of a fraction of a Warrant or a whole number of Warrants and a fraction of a Warrant.

(d)     All Warrants credited to a Holder's or transferee's account upon any exchange or transfer of Warrants in accordance with the provisions of this Warrant Agreement shall be the valid obligations of the Company, evidencing the same obligations, and entitled to the same benefits under this Warrant Agreement, as the Warrants that were so exchanged or transferred.

Section 4.02    Restrictions on Transfer; Restrictive Legend.

(a)     General Restriction.  A Holder may Transfer any Warrant, provided that such Transfer (i) would be permitted under the terms of the Stockholders Agreement (other than Section 4.1(f) of the Stockholders Agreement) if such Warrant constituted shares of Common Stock as defined in the Stockholders Agreement, (ii) is not made to any Person determined by the Board to be a Competitor without the prior approval of the Board, and (iii) is permitted by the other terms of this Article IV.  Common Stock issued upon exercise of the Warrants will be subject to restrictions on transfer set forth in the Stockholders Agreement unless the provisions in respect of restrictions on transfers of shares of Common Stock in the Stockholders Agreement are not then in effect.  For the avoidance of doubt, a Holder may exercise Warrants and the Company shall cause the Transfer Agent to issue to the Holder the aggregate number of whole Warrant Shares issuable upon such exercise in accordance with the

12

terms of this Warrant Agreement notwithstanding that such exercise and issuance may cause the number of holders of record of shares of Common Stock to exceed the limits set forth in Section 4.1(f) of the Stockholders Agreement.

(b)      Requests for Transfer.  In order to provide for effective compliance with this Section 4.02, a Holder who proposes to effect a Transfer of Warrants, or who proposes to effect a deemed Transfer pursuant to which Warrant Shares are to be issued in the name of a Person other than the record h older of the applicable Warrant, must submit to the Company in accordance with Section 7.03, prior to the date of the proposed Transfer, a written request (a "Transfer Request") that the Company review the proposed Transfer and authorize or not authorize the proposed Transfer pursuant to this Section 4.02.  A Transfer Request shall include: (i) the name, address, jurisdiction of organization or citizenship and telephone number of the proposed Transferee, (ii) the number of Warrants proposed to be so Transferred, (iii) the date on which the proposed Transfer is expected to take place, (iv) the name of the Holder proposing such Transfer, and (v) such information as the Company in its discretion may reasonably request (and which may, in the Company's sole discretion, include an opinion of counsel to be provided at the Transferor's sole cost and expense to such effect) to establish that registration of the proposed Transfer is not required under the Securities Act or any applicable state securities or "blue sky" laws.  The Company shall, within five Business Days after its receipt of a Transfer Request that includes all of the information set forth in the foregoing clauses (i) through (v), determine whether to authorize the Transfer proposed in such Transfer Request and shall notify the proposed Transferor of such determination; provided that the only bases on which a Transfer may be denied are failure to comply with the applicable obligations and restrictions set forth in this Article IV or in Article 4 of the Stockholders Agreement (other than Section 4.1(f) of the Stockholders Agreement); provided, further, that if the Company does not notify the proposed Transferor of its determination within such time period, the Transfer proposed in such Transfer Request shall be deemed to be approved hereunder.

(c)      Exchange Act Reporting Obligations.  Notwithstanding anything to the contrary in this Warrant Agreement, no Holder may Transfer any Warrant if, as a result of such Transfer, Warrants would be held of record by 1,980 or more Persons or 480 or more Persons who are not "accredited investors" (as defined in Rule 501(a) promulgated under the Securities Act) or otherwise in circumstances that the Board determines in good faith, based on a written opinion of legal counsel, would require the Company to file reports under the Exchange Act, if the Company is not otherwise subject to such requirements.  Nothing contained in this Article IV shall limit the authority of the Board to take such other action to the extent permitted by law and not in conflict with the terms of the Warrant Agreement and the rights of Holders hereunder as it deems necessary or advisable to preserve the Company's status as a non-reporting company under the Exchange Act.

(d)      Any attempted or purported transfer of all or a portion of the Warrants held by a Holder in violation of this Section 4.02 shall be null and void and of no force or effect whatsoever, such purported transferee will not be treated as an owner of the Warrants for purposes of this Warrant Agreement or otherwise, and the Company will not register such transfer.

13

(e)     Each Warrant Statement shall include, and the account of each Holder on the Warrant Register shall be marked with, a legend in the following or a substantially comparable form (the "Warrant Legend"):

THE SECURITIES REPRESENTED HEREBY (THE "SECURITIES") WERE ORIGINALLY ISSUED IN RELIANCE UPON AN EXEMPTION FROM THE REGISTRATION REQUIREMENT OF SECTION 5 OF THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), PROVIDED BY SECTION 1145 OF THE BANKRUPTCY CODE, 11 U.S.C. 1145.  THE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE ACT OR ANY STATE SECURITIES LAW, AND TO THE EXTENT THE HOLDER OF THE SECURITIES IS AN "UNDERWRITER," AS DEFINED IN SECTION 1145(B)(1) OF THE BANKRUPTCY CODE, THE SECURITIES MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN EXEMPTION FROM REGISTRATION THEREUNDER.

THE VOTING, SALE, TRANSFER, ENCUMBRANCE OR OTHER DISPOSITION OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO THE TERMS AND CONDITIONS OF THE WARRANT AGREEMENT BY AND AMONG DEX MEDIA, INC., COMPUTERSHARE INC. AND COMPUTERSHARE TRUST COMPANY N.A. DATED AS OF JULY [     ], 2016, AS AMENDED AND THE STOCKHOLDERS AGREEMENT REFERRED TO THEREIN.

(f)     A Holder (or its transferee, as applicable) shall be entitled to receive from the Company, without expense, new Warrants of like tenor accompanied by a Warrant Statement, and registered in the Warrant Register to the account of such Holder, without being marked with the Warrant Legend when the provisions in respect of restrictions on transfer of shares of Common Stock in the Stockholders Agreement are no longer in effect or when any Warrant Shares then issuable upon exercise of such Warrant, if issued upon such exercise, would not be subject to the provisions in respect of restrictions on transfer of shares of Common Stock in the Stockholders Agreement.

Section 4.03   Treatment of Holders of Warrants.  Each Holder of Warrants, by accepting the same, consents and agrees with the Company, the Warrant Agent and every subsequent Holder of such Warrants that until the transfer of such Warrants is registered on the books of such Warrant Agent, the Company and the Warrant Agent may treat the registered Holder of such Warrants as the absolute owner thereof for any purpose and as the person entitled to exercise the rights represented by the Warrants evidenced thereby, any notice to the contrary notwithstanding.

**ARTICLE V**
**ADJUSTMENT OF WARRANT PRICE AND NUMBER OF WARRANT SHARES**

Section 5.01   Adjustments Generally.  The Exercise Price, and the number of Warrant Shares issuable upon exercise of Warrants, are subject to adjustment from time to time upon the

#4822-8967-4289

occurrence of the events enumerated in this Article V, as specified in  Section 5.02, 5.03, 5.04 and 5.05. The Company hereby agrees that it will provide the Warrant Agent with reasonable notice of such adjustment events. The Company further agrees that it will provide to the Warrant Agent with any new or amended exercise terms.  The Warrant Agent shall have no obligation under any Section of this Warrant Agreement to determine whether an adjustment event has occurred or are scheduled or contemplated to occur or to calculate any of the adjustments set forth in this Warrant Agreement.

Section 5.02    Stock Dividends; Split-Ups.  If after the date hereof, and subject to the provisions of Section 5.05, the number of outstanding shares of Common Stock is increased by a stock dividend payable in shares of Common Stock, or by a split-up of shares of Common Stock, or other similar event (in each case, other than upon (x) a reclassification or reorganization involving other than solely a change in the number of outstanding shares of Common Stock or (y) a merger or consolidation or sale or transfer to which Section 5.05 applies), then, immediately after the date for determination of the holders of Common Stock entitled to receive such stock dividend or the effective date of such split-up or similar event, the number of shares of Common Stock issuable on exercise of each Warrant shall be increased in proportion to such increase in outstanding shares of Common Stock.  Whenever the number of Warrant Shares purchasable upon the exercise of the Warrants is adjusted pursuant to this Section 5.02, the Exercise Price shall be adjusted (to the nearest cent) by multiplying such Exercise Price immediately prior to such adjustment by a fraction (a) the numerator of which shall be the number of Warrant Shares purchasable upon the exercise of the Warrants immediately prior to such adjustment and (b) the denominator of which shall be the number of Warrant Shares so purchasable immediately thereafter.

Section 5.03    Aggregation of Shares.  If after the date hereof, and subject to the provisions of Section 5.05, the number of outstanding shares of Common Stock is decreased by a consolidation, combination, reverse stock split or reclassification of shares of Common Stock or other similar event (in each case, other than upon (x) a reclassification or reorganization involving other than solely a change in the number of outstanding shares of Common Stock or (y) a merger or consolidation or sale or transfer to which Section 5.05 applies), then immediately after the effective date of such consolidation, combination, reverse stock split, reclassification or similar event, the number of shares of Common Stock issuable on exercise of each Warrant shall be decreased in proportion to such decrease in outstanding shares of Common Stock.  Whenever the number of Warrant Shares purchasable upon the exercise of the Warrants is adjusted pursuant to this Section 5.03, the Exercise Price shall be adjusted (to the nearest cent) by multiplying such Exercise Price immediately prior to such adjustment by a fraction (a) the numerator of which shall be the number of Warrant Shares purchasable upon the exercise of the Warrants immediately prior to such adjustment and (b) the denominator of which shall be the number of Warrant Shares so purchasable immediately thereafter.

Section 5.04    Other Dividends.  If the Company pays a dividend or makes any other distribution upon the Common Stock that is payable in any of its assets (including cash) or debt securities or any rights, options or warrants to purchase debt securities, assets or other securities of the Company (other than (i) a distribution of Common Stock pursuant to which Section 5.02 applies or (ii) a distribution upon a reclassification, reorganization, merger or consolidation or sale or transfer to which Section 5.05 applies) (a "Property Dividend"), then and in each such

15

event the Exercise Price for each Warrant in effect immediately prior to the close of business on the date for the determination of the holders of Common Stock entitled to receive such dividend or distribution shall be decreased by the fair market value (as determined in good faith by the Board, whose determination shall absent manifest error be conclusive and evidenced by a board resolution filed with the Warrant Agent) as of the record date for such distribution of such Property Dividend so distributed for each share of Common Stock (after taking into account, in the case of rights, warrants or options, the consideration required to be paid upon exercise thereof).

Any adjustment under this Section 5.04 shall be made on the date the holders of Common Stock receive the Property Dividend with effect retroactive to the record date with respect to such Property Dividend.

For purposes of clarity, if a declared Property Dividend would have reduced the Exercise Price to an amount below the par value per share of the Common Stock, the Exercise Price will be reduced to the par value per share of the Common Stock and any remaining fair market value of the Property Dividend that would have resulted in a reduction of the Exercise Price below the par value per share of the Common Stock shall be disregarded.

Section 5.05   Replacement of Securities upon Reorganization.  Subject to Section 2.02, in case of any reclassification or reorganization of the outstanding shares of Common Stock (other than a change covered by Section 5.02 or 5.03), or in the case of any merger or consolidation of the Company with or into another corporation (other than a consolidation or merger in which the Company is the continuing corporation and that does not result in any reclassification or reorganization of the outstanding shares of Common Stock), or in the case of any sale or transfer to another corporation or entity of the assets or other property of the Company as an entirety or substantially as an entirety, (x) the Holders shall thereafter have the right to purchase and receive, upon the basis and upon the terms and conditions specified in the Warrants and in lieu of the shares of the Warrant Shares immediately theretofore purchasable and receivable upon the exercise of the rights represented thereby, the kind and amount of shares of stock or other securities or property (including cash) receivable upon such reclassification, reorganization, merger or consolidation, or upon any such sale or transfer, that the Holder would have received if such Holder had exercised his, her or its Warrant(s) immediately prior to such event; and (y) in any such case, if necessary, the obligations of the Company (or, in the case of any such merger or consolidation in which the Company is not the continuing corporation or such a sale or transfer (each, a "Non-Surviving Transaction"), the other person) set forth herein with respect to the rights of each Holder to exercise a Warrant in exchange for the Warrant Shares theretofore purchasable upon exercise of a Warrant shall be appropriately adjusted so as to be applicable, as nearly as may reasonably be, to such Holder's right to exercise a Warrant in exchange for shares of stock or other securities or property pursuant to this paragraph. The Company shall (or, in the case of a Non-Surviving Transaction, the Company shall cause such other person to) execute and deliver to the Warrant Agent a written instrument providing (A) as set forth in clause (i)(x) and (y) above and for adjustments which, for events subsequent to the effective date of such written instrument, shall be as nearly equivalent as may be practicable to the adjustments provided for in this Article V and (B) in the case of a Non-Surviving Transaction, for the express assumption by such other person of the due and punctual performance of every covenant in this Warrant Agreement on the part of the Company to be

16

performed and observed.  The provisions of this <u>Section 5.05</u> shall similarly apply to successive reclassifications, reorganizations, mergers or consolidations, sales or other transfers.  In determining the kind and amount of stock, securities or the property receivable upon exercise of a Warrant following the consummation of such reclassification, reorganization, merger or consolidation or sale or other transfer, if the holders of Common Stock have the right to elect the kind or amount of consideration receivable upon consummation of such reclassification, reorganization, merger or consolidation or sale or other transfer, then the holders of Warrants will be given the same right and time period to elect the kind or amount of consideration as given to holders of Common Stock and (x) if a Holder of a Warrant timely makes such election, the consideration that a Holder of such Warrant shall be entitled to receive upon exercise shall be deemed to be the consideration so selected and (y) if a Holder of a Warrant fails to timely make such an election, the consideration that a Holder of such Warrant shall be entitled to receive upon exercise shall be deemed to be the kinds and amounts of consideration received by the majority of all holders of the shares of Common Stock (excluding any holder that is a Person into which the Company consolidated or into which the Company merged or which merged into the Company or to which such sale or other transfer is made or an Affiliate of any thereof)  that affirmatively make an election, in each case with the consideration receivable upon the exercise of any Warrant being recorded in the Warrant Register.

Section 5.06    <u>Adjustment Rules</u>.  Any adjustments pursuant to this <u>Article V</u> shall be made successively whenever an event referred to herein shall occur.  If an adjustment in Exercise Price made hereunder would otherwise reduce the Exercise Price to an amount below the par value per share of the Common Stock, then such adjustment in Exercise Price made hereunder shall reduce the Exercise Price to the par value per share of the Common Stock.

Section 5.07    <u>Notices of Changes in Warrant</u>.  Upon every adjustment of the Exercise Price or the number of Warrant Shares issuable upon exercise of a Warrant, the Company shall give written notice thereof to the Warrant Agent and to the Holders, which notice shall state the increase or decrease in the Exercise Price or the number of Warrant Shares purchasable at such price upon the exercise of a Warrant, setting forth in reasonable detail the method of calculation and the facts upon which such calculation is based.  Upon the Company determining the date for determination of holders of Common Stock entitled to receive any dividend or distribution, or the effective date (including any Effective Date) for any other event specified in <u>Section 5.02</u>, <u>5.03</u>, <u>5.04</u> or <u>5.05</u> or then, in any such event, the Company shall give or cause to be given written notice to each Holder in accordance with <u>Section 7.03</u>, no later than five Business Days following such date for determination or effective date, as applicable, of such date for determination or effective date of the event.  Failure to give such notice, or any defect therein, shall not affect the legality or validity of such event.  The Warrant Agent shall be fully protected in relying upon such a certificate and shall have no duty to investigate or inquire as to whether such adjustment is accurate, and shall not be deemed to have knowledge of, and shall not be required to take any action with respect to any adjustments, unless and until the Warrant Agent shall have received such a certificate.

Section 5.08    <u>No Fractional Shares</u>.  Notwithstanding any provision contained in this Warrant Agreement to the contrary, the Company shall not issue fractional shares upon exercise of Warrants.  If, by reason of any adjustment made pursuant to this <u>Article V</u>, any Holder would be entitled, upon the exercise of such Warrant, to receive a fractional interest in a share of

17

Common Stock, the Company shall, upon such exercise, round down to the nearest whole number the number of the shares of Common Stock to be issued to the Holder.

## ARTICLE VI
## CONCERNING THE WARRANT AGENT

Section 6.01    Warrant Agent.  The Company has appointed the Warrant Agent to act as agent of the Company in respect of the Warrants pursuant to this Warrant Agreement and the Warrant Agent has therein accepted such appointment.  The Warrant Agent shall have the powers and authority granted to and conferred upon it herein and such further powers and authority to act on behalf of the Company as the Company may hereafter grant to or confer upon it.

Section 6.02    Fees and Expenses of Warrant Agent.  The Company agrees to pay the Warrant Agent reasonable remuneration in an amount separately agreed to between the Company and the Warrant Agent for its services as Warrant Agent hereunder and will promptly reimburse the Warrant Agent, promptly following any demand therefor, for all expenditures that the Warrant Agent may reasonably incur in the execution of its duties hereunder.

Section 6.03    Liability of Warrant Agent.

(a)    Whenever, in the performance of its duties under this Warrant Agreement, the Warrant Agent shall deem it necessary or desirable that any fact or matter be proved or established by the Company prior to taking or suffering any action hereunder, such fact or matter (unless other evidence in respect thereof be herein specifically prescribed) may be deemed to be conclusively proved and established by a statement signed by the [ _____, _____ _____ ] of the Company and delivered to the Warrant Agent. The Warrant Agent may rely upon, and be held harmless for such reliance, upon such statement for any action taken or suffered by it pursuant to the provisions of this Warrant Agreement, and shall not be held liable in connection with any delay in receiving such statement.

(b)    The Warrant Agent shall be liable hereunder only for its own gross negligence, willful misconduct or bad faith (each as determined by a final judgment of a court of competent jurisdiction).   The Company covenants and agrees to indemnify and to hold the Warrant Agent harmless against any costs, expenses (including reasonable fees of its legal counsel), losses or damages, which may be paid, incurred or suffered by or to which it may become subject, arising from or out of, directly or indirectly, any claims or liability resulting from its actions as Warrant Agent pursuant hereto; provided, however, that such covenant and agreement of the Company does not extend to, and the Warrant Agent shall not be indemnified with respect to, such costs, expenses, losses and damages incurred or suffered by the Warrant Agent as a result of, or arising out of, its gross negligence, bad faith, or willful misconduct (each as determined by a final judgment of a court of competent jurisdiction).

(c)    The Warrant Agent shall have no responsibility with respect to the validity of this Warrant Agreement or with respect to the validity or execution of any Warrant (except its countersignature hereof and thereof); nor shall it be responsible for any breach by the

18

Company of any covenant or condition contained in this Warrant Agreement or in any Warrant; nor shall it be responsible to make any adjustments required under the provisions of Section 5 hereof or responsible for the manner, method or amount of any such adjustment or the ascertaining of the existence of facts that would require any such adjustment; nor shall it, by any act hereunder, be deemed to make any representation or warranty as to the authorization or reservation of any Common Stock to be issued pursuant to this Warrant Agreement or any Warrant or as to whether any Common Stock will when issued be valid and fully paid and nonassessable.

(d)     From time to time, the Company may provide the Warrant Agent with instructions concerning the services performed by the Warrant Agent hereunder.   In addition, at any time the Warrant Agent may apply to any officer of Company for instruction, and may consult with legal counsel for the Warrant Agent or the Company with respect to any matter arising in connection with the services to be performed by the Warrant Agent under this Warrant Agreement.  The Warrant Agent and its agents and subcontractors shall not be liable and shall be indemnified by Company for any action taken, suffered or omitted to be taken by The Warrant Agent in reliance upon any Company instructions or upon the advice or opinion of such counsel.  The Warrant Agent shall not be held to have notice of any change of authority of any person, until receipt of written notice thereof from Company.

Section 6.04    Rights and Duties of Warrant Agent.  Except as would not constitute gross negligence, willful misconduct or bad faith of the Warrant Agent (each as determined by a final judgment of a court of competent jurisdiction):

(a)     The Warrant Agent may consult with legal counsel (who may be legal counsel for the Company), and the opinion of such counsel shall be full and complete authorization and protection to the Warrant Agent as to any action taken or omitted by it in accordance with such opinion.

(b)     The Warrant Agent shall not be liable for or by reason of any of the statements of fact or recitals contained in this Warrant Agreement (except its countersignature hereof) or be required to verify the same, and all such statements and recitals are and shall be deemed to have been made by the Company only.

(c)     The Warrant Agent shall not have any duty or responsibility in the case of the receipt of any written demand from any holder of Warrants with respect to any action or default by the Company, including, without limiting the generality of the foregoing, any duty or responsibility to initiate or attempt to initiate any proceedings at law or otherwise or to make any demand upon the Company.

(d)     The Warrant Agent and any stockholder, director, officer or employee of the Warrant Agent may buy, sell or deal in any of the Warrants or other securities of the Company or become pecuniarily interested in any transaction in which the Company may be interested, or contract with or lend money to the Company or otherwise act as fully and freely as though it were not the Warrant Agent under this Warrant Agreement. Nothing herein shall preclude the Warrant Agent from acting in any other capacity for the Company or for any other legal entity.

19

(e)     The Warrant Agent may execute and exercise any of the rights or powers hereby vested in it or perform any duty hereunder either itself or by or through its attorney or agents, and the Warrant Agent shall not be answerable or accountable for any act, default, neglect or misconduct of any such attorney or agents or for any loss to the Company resulting from any such act, default, neglect or misconduct, absent gross negligence, bad faith or willful misconduct (each as determined by a final judgment of a court of competent jurisdiction) in the selection and continued employment thereof.

(f)     The Warrant Agent may rely on and shall be held harmless and protected and shall incur no liability for or in respect of any action taken, suffered or omitted to be taken by it in reliance upon any certificate, statement, instrument, opinion, notice, letter, facsimile transmission, telegram or other document, or any security delivered to it, and believed by it to be genuine and to have been made or signed by the proper party or parties, or upon any written or oral instructions or statements from the Company with respect to any matter relating to its acting as the Warrant Agent hereunder.

(g)     The Warrant Agent shall not be obligated to expend or risk its own funds or to take any action that it believes would expose or subject it to expense or liability or to a risk of incurring expense or liability, unless it has been furnished with assurances of repayment or indemnity satisfactory to it.

(h)     The Warrant Agent shall not be liable or responsible for any failure of the Company to comply with any of its obligations relating to any registration statement filed with the SEC or this Warrant Agreement, including without limitation obligations under applicable regulation or law.

(i)     The Warrant Agent shall not be accountable or under any duty or responsibility for the use by the Company of any Warrants authenticated by the Warrant Agent and delivered by it to the Company pursuant to this Warrant Agreement or for the application by the Company of the proceeds of the issue and sale, or exercise, of the Warrants.

(j)     The Warrant Agent may rely on and be fully authorized and protected in acting or failing to act upon (a) any guaranty of signature by an "eligible guarantor institution" that is a member or participant in the Securities Transfer Agents Medallion Program or other comparable "signature guarantee program" or insurance program in addition to, or in substitution for, the foregoing; or (b) any law, act, regulation or any interpretation of the same even though such law, act, or regulation may thereafter have been altered, changed, amended or repealed.

(k)     In the event the Warrant Agent believes any ambiguity or uncertainty exists hereunder or in any notice, instruction, direction, request or other communication, paper or document received by the Warrant Agent hereunder, the Warrant Agent, may, in its reasonable discretion, refrain from taking any action, and shall be fully protected and shall not be liable in any way to Company, the Holder of any Warrant or any other Person for refraining from taking such action, unless the Warrant Agent receives written instructions signed by the Company which eliminates such ambiguity or uncertainty to the satisfaction of Warrant Agent.

20

#4822-8967-4289

Section 6.05   Acceptance of Agency.  The Warrant Agent shall act hereunder solely as agent for the Company, and its duties shall be determined solely by the express provisions hereof (and no duties or obligations shall be inferred or implied).  The Warrant Agent shall not assume any obligations or relationship of agency or trust with any of the owners or holders of the Warrants.  The Warrant Agent hereby accepts the agency established by this Warrant Agreement and agrees to perform the same upon the terms and conditions herein set forth.

Section 6.06   Limitation of Liability.  Notwithstanding anything contained herein to the contrary, the Warrant Agent's aggregate liability during any term of this Warrant Agreement with respect to, arising from, or arising in connection with this Warrant Agreement, or from all services provided or omitted to be provided under this Warrant Agreement, whether in contract, or in tort, or otherwise, is limited to, and shall not exceed, the amounts paid hereunder by the Company to the Warrant Agent as fees and charges, but not including reimbursable expenses, during the [twelve (12)] months immediately preceding the event for which recovery from the Warrant Agent is being sought. Neither party to this Warrant Agreement shall be liable to the other party for any consequential, indirect, special, punitive or incidental damages under any provisions of this Warrant Agreement or for any consequential, indirect, punitive, special or incidental damages arising out of any act or failure to act hereunder even if that party has been advised of or has foreseen the possibility or likelihood of such damages.

Section 6.07   Survival.  The provisions of this Article VI shall survive the termination of this Warrant Agreement and the resignation, removal or replacement of the Warrant Agent.

Section 6.08   Further Assurances.   The Company agrees to perform, execute, acknowledge and deliver, or cause to be performed, executed, acknowledged and delivered, all such further and other acts, instruments and assurances as may reasonably be required by the Warrant Agent for the carrying out or performing of the provisions of this Warrant Agreement.

Section 6.09   Resignation and Appointment of Successor.

(a)   The Company agrees, for the benefit of the Holders from time to time of the Warrants, that there shall at all times be a Warrant Agent hereunder until all the Warrants have been exercised or are no longer exercisable.

(b)   The Warrant Agent may at any time resign as such by giving written notice of its resignation to the Company, specifying the desired date on which its resignation shall become effective; provided, however, that such date shall be not less than 30 days after the date on which such notice is given unless the Company agrees to accept shorter notice.  Upon receiving such notice of resignation, the Company shall promptly appoint a successor Warrant Agent (which shall be a bank or trust company in good standing, authorized under the laws of the jurisdiction of its organization to exercise corporate trust powers) by written instrument in duplicate signed on behalf of the Company, one copy of which shall be delivered to the resigning Warrant Agent and one copy to the successor Warrant Agent.  The Company may, at any time and for any reason, remove the Warrant Agent and appoint a successor Warrant Agent (qualified as aforesaid) by written instrument in duplicate signed on behalf of the Company and specifying such removal and the date when it is intended to become effective, one copy of which shall be delivered to the Warrant Agent being removed and one

21

copy to the successor Warrant Agent. Any resignation or removal of the Warrant Agent and any appointment of a successor Warrant Agent shall become effective upon acceptance of appointment by the successor Warrant Agent as provided in this Section 6.09(b).  In the event a successor Warrant Agent has not been appointed and accepted its duties within 30 days of the Warrant Agent's notice of resignation, the Warrant Agent and/or any Holder may apply to any court of competent jurisdiction for the designation of a successor Warrant Agent (qualified as aforesaid).  Upon its resignation, replacement or removal, the Warrant Agent shall be entitled to the payment by the Company of the compensation and to the reimbursement of all reasonable out-of-pocket expenses incurred by it hereunder.

(c)      The Company shall remove the Warrant Agent and appoint a successor Warrant Agent if the Warrant Agent (i) shall become incapable of acting, (ii) shall be adjudged bankrupt or insolvent, (iii) shall commence a voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect to it or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official of it or any substantial part of its property, (iv) shall consent to, or shall have had entered against it a court order for, any such relief or to the appointment of or taking possession by any such official in any involuntary case or other proceedings commenced against it, (v) shall make a general assignment for the benefit of creditors or (vi) shall fail generally to pay its debts as they become due.  Upon the appointment as aforesaid of a successor Warrant Agent and acceptance by it of such appointment, the predecessor Warrant Agent shall, if not previously disqualified by operation of law, cease to be Warrant Agent hereunder.

(d)      Any successor Warrant Agent appointed hereunder shall execute, acknowledge and deliver to its predecessor and the Company an instrument accepting such appointment hereunder, and thereupon such successor Warrant Agent, without any further act, deed or conveyance, shall become vested with all the authority, rights, powers, immunities, duties and obligations of such predecessor with like effect as if originally named as Warrant Agent hereunder, and, upon the payment of all outstanding fees to the predecessor Warrant Agent, such predecessor shall thereupon become obligated to transfer, deliver and pay over, and such successor Warrant Agent shall be entitled to receive, all monies, securities and other property on deposit with or held by such predecessor as Warrant Agent hereunder.

(e)      Any Person into which the Warrant Agent hereunder may be merged or converted or any Person with which the Warrant Agent may be consolidated, or any Person resulting from any merger, conversion or consolidation to which the Warrant Agent shall be a party, or any Person to which the Warrant Agent shall sell or otherwise transfer all or substantially all the assets and business of the Warrant Agent, provided that it shall be qualified as aforesaid, shall be the successor Warrant Agent under this Warrant Agreement without the execution or filing of any paper or any further act on the part of any of the parties hereto.

### ARTICLE VII
### MISCELLANEOUS

Section 7.01   Amendment.  The terms of the Warrants may be amended, modified or waived by the Company together with the affirmative vote or consent of the Holders of a

22

#4822-8967-4289

majority of the Warrants then outstanding; provided, that the consent of each Holder affected thereby shall be required for any amendment, modification or waiver pursuant to which (i) the Exercise Price would be increased and/or the number of Warrant Shares would be decreased (in each case, other than pursuant to adjustments pursuant to Article V), or (ii) the Expiration Time is modified to occur earlier then the date set forth herein.  Notwithstanding the foregoing, the Company and the Warrant Agent may from time to time supplement or amend this Warrant Agreement without the approval of any Holders in order to cure any ambiguity, manifest error or other mistake in this Warrant Agreement, or to correct or supplement any provision contained herein that may be defective or inconsistent with any other provision herein.  The Company and the Warrant Agent may also from time to time supplement or amend this Warrant Agreement to make any other provisions in regard to matters or questions arising hereunder that the Company and the Warrant Agent may deem necessary or desirable and that shall not adversely affect, alter or change the interests of any Holder.  Notwithstanding anything to the contrary herein, upon the delivery of a certificate from an appropriate officer of the Company, which states that the proposed supplement or amendment is in compliance with the terms of this Section 7.01 and, provided such supplement or amendment does not change the Warrant Agent's own rights, duties, liabilities, immunities or obligations hereunder, the Warrant Agent shall execute such supplement or amendment.  Any amendment, modification or waiver effected pursuant to and in accordance with the provisions of this Section 7.01 shall be effected by a written instrument executed and delivered by the Company and the Warrant Agent and will be binding upon all Holders and upon each future Holder, the Company and the Warrant Agent.  In the event of any amendment, modification or waiver, the Company will give prompt notice thereof to all Holders in accordance with Section 7.03.  For the avoidance of doubt, the Stockholders Agreement may be amended in accordance with the terms thereof at any time without the consent of any Holder. A Warrant ceases to be outstanding if such Warrant is exercised or if the Company or an Affiliate of the Company holds or is beneficial owner of such Warrant.

Section 7.02    Notices and Demands to the Company.  If the Warrant Agent shall receive any notice or demand addressed to the Company by a Holder, the Warrant Agent shall promptly forward such notice or demand to the Company.

Section 7.03    Addresses.  Any communication to the Warrant Agent with respect to this Warrant Agreement shall be delivered in writing to [250 Royall Street, Canton, Massachusetts 02021, Attention: Client Administration, Fax: (781) 575-2549], or such other address as shall have been set forth in a notice delivered to all Holders and the Company in accordance with this Section 7.03.  Any communication to the Company with respect to this Warrant Agreement shall be delivered in writing to Dex Media, Inc., [_____], Attention:  [_____] or such other address as shall have been set forth in a notice delivered to all Holders and the Warrant Agent in accordance with this Section 7.03.  Any communication to a Holder with respect to this Warrant Agreement shall be deemed to have been effectively given (a) when delivered by hand to the party to be notified, (b) one Business Day after deposit with a national overnight delivery service with next-business-day delivery guaranteed, (c) three Business Days after deposit in the United States mail postage prepaid by certified or registered mail return receipt requested, in the case of each of clause (a), (b), and (c), addressed to the party to be notified at the addresses set forth for such party in the warrant register, or (d) when posted to an Intralinks or similar site to which all Holders have been offered access.  If regular mail service is suspended or if it is impractical to give notice by mail, then notification to the Holder shall be made by a method approved by the

23

Warrant Agent as one which would be most reliable under the circumstances for successfully delivering the notice to the addressee.

Section 7.04    Applicable Law.    The validity, interpretation and performance of this Warrant Agreement and of the terms hereof and thereof shall be governed by, and construed in accordance with, the laws of the State of Delaware, without giving effect to conflict of laws. The Company hereby agrees that any action, proceeding or claim against it arising out of or relating in any way to this Warrant Agreement shall be brought and enforced in the courts of the State of Delaware, and irrevocably submits to such jurisdiction, which jurisdiction shall be exclusive. The Company hereby waives any objection to such exclusive jurisdiction and that such courts represent an inconvenient forum.

Section 7.05    Persons Having Rights Under Warrant Agreement.    Subject to Section 2.03(c), the Warrants shall not, and nothing contained herein or otherwise shall, be construed as conferring upon the Holder any right as a stockholder of the Company or the right to vote or to consent or to receive notice as a stockholder in respect of any meeting of stockholders for the election of directors of the Company or any other matter, to receive dividends or any rights whatsoever as stockholders of the Company.

Section 7.06    Headings.    The descriptive headings of the several Articles and Sections of this Warrant Agreement are inserted for convenience only and shall not control or affect the meaning or construction of any of the provisions hereof.

Section 7.07    Counterparts.    This Warrant Agreement may be executed in any number of counterparts, each of which as so executed shall be deemed to be an original, but such counterparts shall together constitute but one and the same instrument.

Section 7.08    Inspection of Warrant Agreement.    A copy of this Warrant Agreement shall be available at all reasonable times for inspection by the Holder of any Warrant at the office of the Warrant Agent designated for such purposes.    The Warrant Agent may require such Holder to submit evidence of ownership of a Warrant for inspection by it.

Section 7.09    Binding Effects.    This Warrant Agreement shall inure to the benefit and shall be binding upon the Company, the Warrant Agent and the Holders and their respective heirs, legal representatives, successors and assigns.    Nothing in this Warrant Agreement, express or implied, is intended to or shall confer on any Person other than the Company, the Warrant Agent and the Holders, or their respective heirs, legal representatives, successors or assigns, any rights, remedies, obligations or liabilities under or by reason of this Warrant Agreement.

Section 7.10    Severability.    In the event that any one or more of the provisions contained herein, or the application thereof in any circumstances, is held invalid, illegal or unenforceable, the validity, legality and enforceability of any such provisions in every other respect and of the remaining provisions contained herein and therein shall not be affected or impaired thereby.

Section 7.11    Entire Agreement.    This Warrant Agreement sets forth the entire agreement of the parties hereto as to the subject matter hereof and supersedes all previous agreements among all or some of the parties hereto with respect thereto, whether written, oral or otherwise.

#4822-8967-4289

25

Section 7.12   <u>Assignment</u>.   Except as provided in <u>Section 5.05</u>, neither this Warrant Agreement nor any Warrant nor any of the rights, interests or obligations hereunder or thereunder may be assigned, by operation of law or otherwise, in whole or in part, by the Company without the prior written consent of the Holder affected thereby.

[SIGNATURE PAGE FOLLOWS]

25

#4822-8967-4289

IN WITNESS WHEREOF, the parties hereto have caused this Warrant Agreement to be duly executed as of the Effective Date.

DEX MEDIA, INC.

By: _____

     Name:
     Title:

COMPUTERSHARE INC.

COMPUTERSHARE TRUST COMPANY, N.A.

By: _____

     Name:
     Title:

[Signature Page to Warrant Agreement]

#4822-8967-4289

A-1

FORM OF WARRANT STATEMENT

[to come]

A-1

EXHIBIT B

FORM OF EXERCISE FORM

[under review]

(To be executed upon exercise of Warrant(s))

The undersigned hereby irrevocably elects to exercise the right, represented by _____ book-entry Warrant(s), to purchase the full number of shares of Common Stock, par value $0.01 per share (the "Warrant Shares") of DEX MEDIA, INC. into which such Warrants are exercisable and represents that (unless exercising Cashless Exercise as specified below) has tendered payment for such Warrant Shares by certified check or official bank check or by bank wire transfer, in each case, in immediately available funds, in the amount of $ _____ in accordance with the terms of the Warrant Agreement.  The undersigned requests the Warrant Shares to which the Holder is entitled be registered in such names and a statement representing such Warrant Shares be delivered, all as specified in accordance with the instructions set forth below.

This Exercise Form is accompanied by a duly executed Joinder as and to the extent required under the Warrant Agreement.

☐  Please check if the undersigned, in lieu of tendering the cash payment, as aforesaid, hereby elects Cashless Exercise pursuant to Section 2.03(a) of the Warrant Agreement. (*Note: May only be used as permitted by, and will be effective only upon the closing of a Sale of the Company as specified in, Section 2.03(a) of the Warrant Agreement.*)

Dated: _____

Name_____
            (Please Print)

_____
(Insert Social Security or Other
Identifying Number of Holder)

Address_____

_____

Signature_____
            (Signed exactly as name appears
            in the records of the Warrant Agent)

B-1

#4822-8967-4289

B-2

The foregoing Warrants may be exercised by delivering the Exercise Form to AST at the following addresses:

By hand at          American Stock Transfer & Trust Company, LLC
                    Corp Action Dex Media, Inc. Warrants
                    6201 15th Avenue
                    Brooklyn, NY 11219

By mail at          American Stock Transfer & Trust Company, LLC
                    Corp Action Dex Media, Inc. Warrants
                    6201 15th Avenue
                    Brooklyn, NY 11219

(Instructions as to form and delivery of Warrant Shares):

**(NOTE:  The signature(s) must be medallion guaranteed by a commercial bank or trust company in the United States or by a member firm of the New York Stock Exchange)**

B-2

#4822-8967-4289

[FORM OF ASSIGNMENT]

(TO BE EXECUTED TO TRANSFER THE WARRANT)

For value received, _____ hereby sells, assigns and transfers unto the Assignee(s) named below the rights represented by such number of Warrants listed opposite the respective name(s) of the Assignee(s) named below and all other rights of the Holder with respect to such Warrants, and does hereby irrevocably constitute and appoint_____ attorney, to transfer said Warrant on the books of the Warrant Agent with respect to the number of Warrants set forth below, with full power of substitution:

| Name(s) of Assignee(s) | Address | No. of Warrants |
|---|---|---|
| | | |

Dated: _____

_____
Signature
(Signed exactly as name appears in the
records of the Warrant Agent)

Signature Guarantee:

_____
Participant in a recognized Signature
Guarantee Medallion Program (or other
signature guarantor program reasonably
acceptable to the Warrant Agent)

**(NOTE:  The signature(s) must be medallion guaranteed by a commercial bank or trust company in the United States or by a member firm of the New York Stock Exchange)**

B-3

EXHIBIT C

STOCKHOLDERS AGREEMENT

Please see attached.

C-1

#4822-8967-4289

EXHIBIT D

FORM OF JOINDER

This Joinder Agreement (this "**_Agreement_**"), dated as of _____, 201_, is made by and among DEX MEDIA, INC., a Delaware corporation (the "**_Company_**"), and _____ (the "**_Joining Party_**").  Capitalized terms that are used but are not otherwise defined herein shall have the meanings given to them in the Stockholders Agreement, dated as of [____], 2016 (as may be amended, supplemented or otherwise modified from time to time pursuant to the terms thereof, the "**_Stockholders Agreement_**").

1. Agreement to be Bound.  The Joining Party hereby agrees that upon execution of this Agreement, it shall become a party to the Stockholders Agreement and shall be fully bound by, and subject to, all of the covenants, terms and conditions of the Stockholders Agreement as though an original party thereto and shall be deemed included in the definition of "Stockholder" therein for all purposes thereof.  In addition, the Joining Party hereby agrees that all of the Transferred Shares shall be subject to all of the covenants, terms and conditions applicable to Shares under the Stockholders Agreement.  The Joining Party acknowledges that it has been furnished with and has carefully read a copy of the Stockholders Agreement prior to its execution of this Agreement.

2. Counterparts.  This Agreement may be signed in counterparts, any of which may be delivered via facsimile, PDF, or other forms of electronic delivery, each of which shall be deemed an original, and all of which are deemed to be one and the same agreement binding upon the Company and the Joining Party.

3. Headings.  The headings of the various sections of this Agreement have been inserted for convenience of reference only and shall not be deemed to be a part of this Agreement.

4. Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to its conflicts of law doctrine.  Each party hereby submits to the exclusive jurisdiction of the Delaware Court of Chancery and any state appellate court therefrom within the State of Delaware (unless the Delaware Court of Chancery shall decline to accept jurisdiction over a particular matter, in which case, in any Delaware state or federal court within the State of Delaware, and any appellate court thereof), and any judicial proceeding brought against any of the Parties on any dispute arising out of this Agreement or any matter related hereto shall be brought in such courts.  Each party hereby irrevocably waives, to the fullest extent permitted by law, any objection it may have or hereafter have to the laying of the venue of any such proceeding brought in such a court and any claim that any such proceeding brought in such a court has been brought in an inconvenient forum.  The Joining Party hereby consents to process being served in any such proceeding by the mailing of a copy thereof by registered or certified mail, postage prepaid, to the address set forth under its signature below, or in any other manner permitted by

D-1

#4822-8967-4289

D-2

law.   EACH PARTY HERETO HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHTS IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY SUCH ACTION OR PROCEEDING.

5.   <u>Severability</u>.   The invalidity or unenforceability of any provisions of this Agreement in any jurisdiction shall not affect the validity, legality or enforceability of the remainder of this Agreement in such jurisdiction or the validity, legality or enforceability of any provision of this Agreement in any other jurisdiction, it being intended that all rights and obligations of the parties hereunder shall be enforceable to the fullest extent permitted by law.

6.   <u>Entire Agreement</u>.   This Agreement and the Stockholders Agreement (together with the documents attached as exhibits thereto and any documents or agreements specifically contemplated thereby) constitute the entire agreement between the parties with respect to the subject matter of this Agreement and supersedes all prior agreements and understandings, both oral and written, between the parties with respect to the subject matter of this Agreement.

D-2

#4822-8967-4289

**Exhibit C**

**Reorganized Debtors' Corporate Structure and Associated Restructuring Transactions**

**Description of Transaction Steps Necessary
to Effectuate the Reorganized Debtors' Corporate Structure**

Pursuant to Article IV.A, of the *Joint Prepackaged Chapter 11 Plan of Reorganization of Dex Media, Inc. and its Debtor Affiliates* (the "<u>Plan</u>"),[1] the Reorganized Debtors intend to implement the Restructuring Transactions described herein.   The Debtors reserve all rights to alter the steps set forth in the summary below to the extent they determine, in the exercise of their reasonable business judgment, that alternative steps are preferable in order to implement the Restructuring Transactions.

This Description of Transaction Steps is intended only as a summary of the Restructuring Transactions.  To the extent there is any inconsistency between this Description of Transaction Steps and the Plan, the Plan shall govern.

The Restructuring Transactions will be effectuated as follows:

1. Dex Media BRE LLC merges upstream into its 100% owner, Dex Media Holdings Inc., under state law.

2. Dex Media East BRE LLC merges upstream into its 100% owner, Dex Media East Inc., under state law.

3. Dex Media West BRE LLC merges upstream into its 100% owner, Dex Media West Inc., under state law.

4. Dex One Services BRE LLC merges upstream into its 100% owner, Dex One Service Inc., under state law.

5. Dex One Digital BRE LLC merges upstream into its 100% owner, Dex One Digital Inc., under state law.

6. R.H. Donnelley BRE LLC merges upstream into its 100% owner, R.H. Donnelley Inc., under state law.

7. R.H. Donnelley 2 BRE LLC merges upstream into its 100% owner, R.H. Donnelley Corp., under state law.

8. SuperMedia BRE LLC merges upstream into its 100% owner, SuperMedia LLC, under state law.

9. Dex Media Inc. contributes (i) New Common Stock and (ii) loans arising under the Takeback First Lien Term Loan to R.H. Donnelley Inc., Dex Media Holdings Inc., and SuperMedia Inc. as a capital contribution.

---

[1] Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the Plan.

10.     The creditors of R.H. Donnelley Inc. receive the (i) New Common Stock and (ii) loans arising under the Takeback First Lien Term Loan from R.H. Donnelley Inc. in exchange for their Allowed RHDI Credit Facility Claims.

11.     Dex Media Holdings Inc. contributes the (i) New Common Stock and (ii) loans arising under the Takeback First Lien Term Loan to Dex Media East Inc. and Dex Media West Inc. as a capital contribution.

12.     The creditors of Dex Media East Inc. receive the (i) New Common Stock and (ii) loans arising under the Takeback First Lien Term Loan from Dex Media East Inc. in exchange for their Allowed Dex East Credit Facility Claims.

13.     The creditors of Dex Media West Inc. receive the (i) New Common Stock and (ii) loans arising under the Takeback First Lien Term Loan from Dex Media West Inc. in exchange for their Allowed Dex West Credit Facility Claims.

14.     The creditors of SuperMedia Inc. receive the (i) New Common Stock and (ii) loans arising under the Takeback First Lien Term Loan from SuperMedia Inc. in exchange for their Allowed SuperMedia Credit Facility Claims.

15.     Dex One Service Inc. merges with and into R.H. Donnelley Inc. under state law, with R.H. Donnelley Inc. surviving the merger.  In the merger, Dex Media Inc. receives additional shares of R.H. Donnelley Inc. in exchange for the cancelled stock of Dex One Service Inc. on a share-for-share basis.

16.     Dex One Digital Inc. merges with and into R.H. Donnelley Inc. under state law, with R.H. Donnelley Inc. surviving the merger.  In the merger, Dex Media Inc. receives additional shares of R.H. Donnelley Inc. in exchange for the cancelled stock of Dex One Digital Inc. on a share-for-share basis.

17.     R.H. Donnelley Corp. merges with and into R.H. Donnelley Inc. under state law, with R.H. Donnelley Inc. surviving the merger.  In the merger, Dex Media Inc. receives additional shares of R.H. Donnelley Inc. in exchange for the cancelled stock of R.H. Donnelley Corp. on a share-for-share basis.



**Exhibit D**

**Schedule of Rejected Executory Contracts and Unexpired Leases**

**SCHEDULE OF REJECTED EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

The lease set forth in the chart below will be rejected pursuant to section 365 of the Bankruptcy Code and pursuant to the Plan.[1] On the Effective Date, except as otherwise provided herein, all Executory Contracts or Unexpired Leases not otherwise assumed or rejected will be deemed assumed by the applicable Reorganized Debtor in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than: (i) those that are identified on this Schedule of Rejected Executory Contracts and Unexpired Leases; (ii) those that have been previously rejected by a Final Order; (iii) those that are the subject of a motion to reject Executory Contracts or Unexpired Leases that is pending on the Confirmation Date; or (iv) those that are subject to a motion to reject an Executory Contract or Unexpired Lease pursuant to which the requested effective date of such rejection is after the Effective Date.

In the event of a dispute regarding (a) the amount of any Cure Claim, (b) the ability of Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (c) any other matter pertaining to assumption, the cure payments required by section 365(b)(l) of the Bankruptcy Code shall be made following the entry of a Final Order or orders resolving the dispute and approving the assumption and shall not prevent or delay implementation of the Plan or the occurrence of the Effective Date; *provided* that until any such dispute is resolved, section 365 of Bankruptcy Code shall remain in full force and effect with respect to such Executory Contract or Unexpired Lease.

Nothing herein shall be construed as a concession or evidence that the lease identified herein: (i) constitutes an "executory contract" within the meaning of 11 U.S.C. § 365 and other applicable law; or (ii) has not expired, been terminated or otherwise currently is in full force and effect. Rather, the Debtors expressly reserve all of their rights with respect thereto, including their right to seek a later determination of these issues and their right to dispute the validity, status, characterization, or enforceability of the lease set forth herein. This lease may have expired or may have been modified, amended or supplemented from time to time by various amendments, restatements, waivers, estoppel certificates, letters and other documents, instruments and agreements that may not be listed herein, but are nonetheless incorporated herein by this reference. Prior to the entry of a Final Order approving the assumption and assignment of any Executory Contract or Unexpired Lease, the Debtors reserve the right to reject any Executory Contract or Unexpired Lease, including any Executory Contract or Unexpired Lease not listed on this Schedule of Rejected Executory Contracts and Unexpired Leases.

---

1    Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Plan.

2

| DEBTOR | CONTRACT COUNTERPARTY NAME AND ADDRESS | DESCRIPTION |
|---|---|---|
| DEX ONE SERVICE, INC. | SVT 2000 PERIMETER PARK DRIVE, L.P. C/O STARWOOD CAPITAL GROUP 591 WEST PUTNAM AVENUE GREENWICH, CT 06830 <br><br> WITH COPY TO: VANDERBILT OFFICE PROPERTIES, LLC C/O CA - VENTURES 161 N. CLARK STREET, STE. 3000 CHICAGO, IL 60601 <br><br> WITH COPY TO: TP TRIANGLE, LLC 3020 CARRINGTON MILL BOULEVARD, STE. 425 MORRISVILLE, NC 27560 | LEASE AT MORRISVILLE, NC PROPERTY NO LONGER NECESSARY FOR OPERATIONS |

**Exhibit E**

**New Organizational Documents**

**SECOND AMENDED AND RESTATED CERTIFICATE OF INCORPORATION**

**OF**

**DEX MEDIA, INC.**

_____

The undersigned, [_____], hereby certifies that:

1.      He is the duly elected and acting [_____] of Dex Media, Inc. (the "Corporation"), a corporation organized and existing under and by virtue of the General Corporation Law of the State of Delaware (the "DGCL").

2.      The Certificate of Incorporation of the Corporation was originally filed with the Secretary of State of the State of Delaware on August 17, 2012 under the name "Newdex, Inc." The Amended and Restated Certificate of Incorporation of the Corporation was filed with the State of Delaware on April 30, 2013.

3.      On May 16, 2016, the Corporation filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

4.      This Second Amended and Restated Certificate of Incorporation has been duly adopted in accordance with Sections 242, 245 and 303 of the DGCL to put into effect and carry out the Prepackaged Joint Plan of Reorganization for Dex Media, Inc., et al., as confirmed on [_____] (the "Plan") by an order of the Bankruptcy Court entered on [_____] (the "Order"). Provision for the making of this Second Amended and Restated Certificate of Incorporation is contained in the Order of the Bankruptcy Court having jurisdiction under the Bankruptcy Code for the formation of the Corporation.

5.      The effective date of this Certificate shall be the date it is filed with the Secretary of State of the State of Delaware.

6.      The Certificate of Incorporation of the Corporation shall be amended and restated to read in full as follows:

**ARTICLE I**

The name of the corporation is Dex Media, Inc.

**ARTICLE II**

The address of the Corporation's registered office in the State of Delaware is Corporation Trust Center, 1209 Orange Street, Wilmington, New Castle County, Delaware 19801. The name of its registered agent at such address is The Corporation Trust Company.

## ARTICLE III

The purpose of the Corporation is to engage in any lawful act or activity for which corporations may be organized under the DGCL.

## ARTICLE IV

(a)     Authorized Stock.  The total number of shares of stock which the Corporation shall have authority to issue is [_____] , consisting of [_____] shares of preferred stock, par value $0.01 per share ("Preferred Stock"), and [_____] shares of common stock, par value $0.01 per share ("Common Stock").

(b)     Common Stock.  Except as otherwise provided by law, or by the resolution or resolutions adopted by the Board of Directors designating the rights, powers and preferences of any series of Preferred Stock, the holders of outstanding shares of Common Stock shall have the right to vote on all matters, including the election of directors, to the exclusion of all other stockholders, and holders of Preferred Stock shall not be entitled to receive notice of any meeting of stockholders at which they are not entitled to vote.  Each holder of record of Common Stock shall be entitled to one vote for each share of Common Stock standing in the name of the stockholder on the books of the Corporation.

(c)     Shares of Preferred Stock may be issued from time to time in one or more series.  The Board of Directors (or any committee to which it may duly delegate the authority granted in this Article IV) is hereby empowered to authorize the issuance from time to time of shares of Preferred Stock in one or more series, for such consideration and for such corporate purposes as the Board of Directors (or such committee thereof) may from time to time determine, and by filing a certificate (hereinafter referred to as a "Preferred Stock Designation") pursuant to applicable law of the State of Delaware as it presently exists or may hereafter be amended to establish from time to time for each such series the number of shares to be included in each such series and to fix the designations, powers, rights and preferences of the shares of each such series, and the qualifications, limitations and restrictions thereof to the fullest extent now or hereafter permitted by this Second Amended and Restated Certificate of Incorporation and the laws of the State of Delaware, including, without limitation, voting rights (if any), dividend rights, dissolution rights, conversion rights, exchange rights and redemption rights thereof, as shall be stated and expressed in a resolution or resolutions adopted by the Board of Directors (or such committee thereof) providing for the issuance of such series of Preferred Stock.  Each series of Preferred Stock shall be distinctly designated.  The authority of the Board of Directors with respect to each series of Preferred Stock shall include, but not be limited to, determination of the following:

(i)     the designation of the series, which may be by distinguishing number, letter or title;

(ii)     the number of shares of the series, which number the Board of Directors may thereafter (except where otherwise provided in the Preferred Stock

2

Designation) increase or decrease (but not below the number of shares thereof then outstanding);

(iii)    the amounts payable on, and the preferences, if any, of shares of the series in respect of dividends, and whether such dividends, if any, shall be cumulative or noncumulative;

(iv)    the dates at which dividends, if any, shall be payable;

(v)    the redemption rights and price or prices, if any, for shares of the series;

(vi)    the terms and amount of any sinking fund provided for the purchase or redemption of shares of the series;

(vii)    the amounts payable on, and the preferences, if any, of shares of the series in the event of any voluntary or involuntary liquidation, dissolution or winding up of the affairs of the Corporation;

(viii)    whether shares of the series shall be convertible into or exchangeable for shares of any other class or series, or any other security, of the Corporation or any other corporation, and, if so, the specification of such other class or series or such other security, the conversion or exchange price or prices or rate or rates, any adjustments thereof, the date or dates at which such shares shall be convertible or exchangeable and all other terms and conditions upon which such conversion or exchange may be made;

(ix)    the restrictions on the issuance of shares of the same series or of any other class or series; and

(x)    the voting rights, if any, of the holders of shares of the series.

(d)    The Corporation shall not issue any non-voting equity securities to the extent prohibited by Section 1123 of the Bankruptcy Code as in effect on the effective date of the Plan; provided, however, that this Article IV(c): (i) shall have no further force and effect beyond that required under Section 1123 of the Bankruptcy Code, (ii) shall have such force and effect, if any, only for so long as such section of the Bankruptcy Code is in effect and applicable to the Corporation, and (iii) in all events may be amended or eliminated in accordance with applicable law as from time to time may be in effect.

**ARTICLE V**

The directors shall have power to adopt, amend or repeal the Amended and Restated Bylaws of the Corporation, except as may otherwise be provided in the Amended and Restated Bylaws of the Corporation.

## ARTICLE VI

A director of the Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except for liability (i) for any breach of the director's duty of loyalty to the Corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) under Section 174 of the DGCL, or (iv) for any transaction from which the director derived an improper personal benefit. If the DGCL is amended to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of the Corporation shall be eliminated or limited to the fullest extent permitted by the DGCL, as so amended. Any repeal or modification of the foregoing paragraph shall not adversely affect any right or protection of a director of the Corporation existing at the time of such repeal or modification.

## ARTICLE VII

(a)     Right to Indemnification. Each director and officer, past or present, of the Corporation, and each person who serves or may have served at the request of the Corporation as a director or officer of another corporation or of a partnership, joint venture, limited liability company, trust, association or other enterprise, and their respective heirs, administrators and executors, shall be indemnified and held harmless by the Corporation in accordance with, and to the fullest extent permitted by, the provisions of the DGCL as it may from time to time be amended (but, in the case of any such amendment, only to the extent that such amendment permits the Corporation to provide broader indemnification rights than permitted prior thereto). Such indemnification shall continue as to an indemnitee who has ceased to be a director or officer, and shall include indemnification for all expense, liability and loss (including attorneys' fees, costs and charges, and related disbursements, judgments, fines, excise taxes or penalties under the Employee Retirement Income Security Act of 1974, as amended from time to time ("ERISA"), penalties and amounts paid or to be paid in settlement) reasonably incurred or suffered by such indemnitee in connection with such indemnitee's service as a director or officer of the Corporation (whether or not the expense, liability or loss arises out of such indemnitee's official capacity as a director or officer), or service at the request of the Corporation as a director or officer of another corporation or of a partnership, joint venture, limited liability company, trust, association or other enterprise, if the indemnitee acted in good faith and in a manner the indemnitee reasonably believed to be in or not opposed to the best interests of the Corporation, and, with respect to any criminal action or proceeding to which the indemnitee is involved, or is a party or threatened to be made a party (including involvement, without limitation, as a witness), had no reasonable cause to believe the indemnitee's conduct was unlawful. The termination of any action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the indemnitee did not act in good faith and in a manner which he or she reasonably believed to be in or not opposed to the best interests of the Corporation, and, with respect to any criminal action or proceeding, had reasonable cause to believe that his or her conduct was unlawful. Each employee and agent of the Corporation and each person who serves or may have served at the request of the Corporation as an employee or agent of another corporation, or as an employee or

4

agent of any partnership, joint venture, limited liability company, trust, association or other enterprise may, in the discretion of the Board of Directors of the Corporation, be indemnified by the Corporation to the same extent as provided herein with respect to directors and officers of the Corporation.  The provisions of this Section (a) of Article VII shall apply to any member of any committee appointed by the Board of Directors of the Corporation as fully as though such person shall have been an officer or director of the Corporation.

(b)     Advancement.   The Corporation shall pay the expenses incurred in defending any such proceeding in advance of its final disposition (an "advance of expenses"); provided, however, that an advance of expenses incurred by an indemnitee shall be made only upon delivery to the Corporation of an undertaking, by or on behalf of such indemnitee, to repay all amounts so advanced if it shall ultimately be determined by final judicial decision from which there is no further right to appeal (a "final adjudication") that such indemnitee is not entitled to be indemnified for such expenses under this Section (b) of Article VII or otherwise. The Corporation may, to the extent authorized from time to time by the Board of Directors, grant rights to the advancement of expenses to any employee or agent of the Corporation to the fullest extent of the provisions of this Article VII with respect to the advancement of expenses of directors and officers of the Corporation.

(c)     Procedure for Indemnification.   Any indemnification or advance of expenses (including attorneys' fees, costs and charges) under Section (a) of this Article VII shall be made promptly, and in any event within forty-five days (or, in the case of an advance of expenses, twenty days, provided that the undertaking contemplated by Section (a) of this Article VII has been delivered to the Corporation), upon the written request of the indemnitee.  If a determination by the Corporation that the indemnitee is entitled to indemnification pursuant to this Article VII is required, and the Corporation fails to respond within sixty days to a written request for indemnity, the Corporation shall be deemed to have approved the request.  If the Corporation denies a written request for indemnification or advance of expenses, in whole or in part, or if payment in full pursuant to such request is not made within forty-five days (or, in the case of an advance of expenses, twenty days, provided that the undertaking contemplated by Section (b) of this Article VII has been delivered to the Corporation), the right to indemnification or advancement as granted by this Article VII shall be enforceable by the indemnitee in the Delaware Court of Chancery (the "Court of Chancery").  Such indemnitee's costs and expenses incurred in connection with successfully establishing his or her right to indemnification, in whole or in part, in any such action shall also be indemnified by the Corporation.  It shall be a defense to any action by an indemnitee for indemnification or the advance of expenses (other than an action brought to enforce a claim for the advance of expenses where the undertaking required pursuant to Section (b) of this Article VII, if any, has been tendered to the Corporation) that the claimant has not met the standards of conduct which make it permissible under the DGCL for the Corporation to indemnify the claimant for the amount claimed, but the burden of proving such defense shall be on the Corporation.  Neither the failure of the Corporation (including its Board of Directors, independent legal counsel or its stockholders) to have made a determination prior to the commencement of such action that indemnification of the claimant is proper in the circumstances because such person has met the applicable standard of conduct set forth in the DGCL, nor an actual determination by the Corporation (including its Board of Directors, independent legal counsel or its stockholders) that the claimant has not met such applicable standard of conduct, shall create a presumption that the claimant has not met the applicable

5

standard of conduct.  The procedure for indemnification of employees and other agents for whom indemnification and advancement of expenses is provided pursuant to Sections (a) and (b) of this Article VII shall be the same procedure set forth in this Section (c) for directors and officers, unless otherwise set forth in the action of the Board of Directors of the Corporation providing indemnification and advancement of expenses for such employee or agent.

(d)    Insurance.  The Corporation may purchase and maintain insurance on its own behalf and on behalf of any person who is or was or has agreed to become a director, officer, employee or agent of the Corporation or is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation or of a partnership, joint venture, limited liability company, trust, association or other enterprise against any expense, liability or loss asserted against him or her and incurred by him or her in any such capacity, or arising out of his or her status as such, whether or not the Corporation would have the power to indemnify such person against such expenses, liability or loss under the DGCL.

(e)    Service for Subsidiaries.  Any person serving, or who has served, as a director, officer, trustee or employee of another corporation or of a partnership, joint venture, limited liability company, trust, association or other enterprise, at least 50% of whose equity interests or assets are owned, directly or indirectly, by the Corporation (a "subsidiary" for this Article VII) shall be conclusively presumed to be, or to have been, serving in such capacity at the request of the Corporation.

(f)    Reliance.  Persons who after the date of the adoption of this provision become or remain directors or officers of the Corporation or who, while a director or officer of the Corporation, become or remain a director or officer of a subsidiary, shall be conclusively presumed to have relied on the rights to indemnity, advance of expenses and other rights contained in this Article VII in entering into or continuing such service.  The rights to indemnification and to the advance of expenses conferred in this Article VII shall apply to claims made against an indemnitee arising out of acts or omissions which occurred or occur both prior and subsequent to the adoption hereof.

(g)    Other Rights; Continuation of Right to Indemnification.  The provisions of this Article VII shall be in addition to and not in limitation of any other rights, indemnities, or limitations of liability to which any director or officer may now or in the future be entitled, as a matter of law or under any by-law, agreement, vote of stockholders or disinterested directors or otherwise.  All rights to indemnification under this Article VII shall be deemed to be a contract between the Corporation and each person entitled to indemnification under Section (a) of this Article VII at any time while this Article VII is in effect.

(h)    Amendment or Repeal; Successors. No amendment, modification or repeal of the provisions of this Article VII, nor the adoption of any provision of this Second Amended and Restated Certificate of Incorporation inconsistent with this Article VII, nor to the fullest extent permitted by applicable law, any modification of law, shall adversely affect (or eliminate or reduce) any right or protection hereunder of any person in respect of any event, act or omission occurring prior to the time of such amendment, modification or repeal, or adoption of any inconsistent provision or, if applicable, modification of law (regardless of when any Proceeding (or part thereof) relating to such event, act or omission arises or is first threatened,

6

commenced or completed). The rights conferred by this Article VII shall inure to the benefit of any indemnified person (and shall continue as to an indemnified person who has ceased to be a director or officer) and such person's legal representatives, executors, administrators, heirs, devises and legatees. For purposes of this Article, references to "the Corporation" shall include any constituent corporation absorbed in a merger with this Corporation which, if its separate existence had continued, would have had power and authority to indemnify its directors, officers, and employees or agents, so that any person who is or was a director, officer, employee or agent of such constituent corporation, or is or was serving at the request of such constituent corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, shall stand in the same position under this Article with respect to this Corporation as such person would have with respect to such constituent corporation if its separate existence had continued.

The amendment, alteration or repeal of this Article VII  shall require the affirmative vote of the holders of at least 66 2/3% of the voting power of the then outstanding shares of capital stock of the Corporation entitled to vote generally in the election of directors, voting together as a single class; all other amendments to this Second Amended and Restated Certificate of Incorporation shall require the affirmative vote of the holders of at least a majority of the voting power of the then outstanding shares of capital stock of the Corporation entitled to vote generally in the election of directors, voting together as a single class.

(i)    Exception to Right of Indemnification and/or Advancement of Expenses. Notwithstanding any other provisions of this Article VII and except as may otherwise be agreed by the Corporation, no person shall be entitled to indemnification or advancement of expenses by the Corporation with respect to any action, suit or proceeding brought by such person (other than an action, suit or proceeding brought by such person (a) by way of defense or counterclaim, (b) to enforce such person's rights under this Certificate of Incorporation or under the Corporation's bylaws, or (c) to enforce any other rights of such person to indemnification or advancement of expenses by the Corporation under any contract or under statute or applicable law, including any rights under Section 145 of the DGCL), unless the bringing of such action, suit or proceeding shall have been approved by the Board of Directors of the Corporation.

(j)    Subrogation. In the event of payment under this Article VII, the Corporation shall be subrogated to the extent of such payment to all of the rights of recovery of the indemnified person, who shall execute all papers required and shall do everything that may be reasonably necessary to secure such rights, including the execution of such documents reasonably necessary to enable the Corporation effectively to bring suit to enforce such rights.

(k)    Savings Clause.  If this Article VII or any portion hereof shall be invalidated on any ground by any court of competent jurisdiction, then the Corporation shall nevertheless indemnify and advance expenses to each person entitled to indemnification under Section (a) of this Article VII as to all expense, liability and loss (including attorneys' fees and related disbursements, judgments, fines, ERISA excise taxes and penalties, penalties and amounts paid or to be paid in settlement) actually and reasonably incurred or suffered by such person and for which indemnification or advancement of expenses is available to such person pursuant to this Article VII to the fullest extent permitted by any applicable portion of this

Article VII that shall not have been invalidated and to the fullest extent permitted by applicable law.

      (l)    <u>Jurisdiction</u>. The Court of Chancery shall have exclusive jurisdiction to hear and determine all actions for indemnification or advancement of expenses brought with respect to this Article VII, and the Court of Chancery may summarily determine the Corporation's obligation to advance expenses (including attorneys' fees) under this Article VII.

## ARTICLE VIII

      Elections of directors need not be by written ballot, except as may otherwise be provided in the Amended and Restated Bylaws of the Corporation.

\*     \*     \*

8

IN WITNESS WHEREOF, the undersigned has executed this Second Amended and Restated Certificate of Incorporation of Dex Media, Inc. as of the [__] day of [_____].

_____

[NAME], [TITLE]

# DEX MEDIA, INC.

# AMENDED AND RESTATED BYLAWS

## ARTICLE I - OFFICES

Dex Media, Inc. (the "Corporation") may have an office or offices other than its registered office at such place or places, either within or outside the State of Delaware, as the Board of Directors of the Corporation (the "Board of Directors") may from time to time determine or the business of the Corporation may require.

## ARTICLE II - STOCKHOLDERS

Section 1.      Annual Meeting.

An annual meeting of the stockholders, for the election of directors to succeed those whose terms expire and for the transaction of such other business as may properly come before the meeting, shall be held at such place, on such date, and at such time as the Board of Directors shall each year fix, which date shall be within 13 months of the last annual meeting of stockholders. The first such meeting shall be held within 13 months of the date on which these Bylaws are adopted.

Section 2.      Special Meetings.

Special meetings of the stockholders, for any purpose or purposes prescribed in the notice of the meeting, may be called (i) by a majority of the directors in office, the Chairman of the Board, the President and Chief Executive Officer, (ii) pursuant to a resolution adopted by the Board of Directors, or (iii) by the Secretary at the request in writing of stockholders holding shares representing at least 15% of the voting power of shares of stock issued and outstanding and entitled to vote on the matter(s) and for the purposes stated in the written request of such stockholders.

Section 3.      Notice of Meetings.

Notice of the place, if any, date, and time of all meetings of the stockholders, the means of remote communications, if any, by which stockholders and proxyholders may be deemed to be present in person and vote at such meeting, and the record date for determining the stockholders entitled to vote at the meeting, if such date is different from the record date for determining stockholders entitled to notice of the meeting, shall be given, not less than 10 nor more than 60 days before the date on which the meeting is to be held, to each stockholder entitled to vote at such meeting as of the record date for determining the stockholders entitled to notice of the meeting, except as otherwise provided herein or required by law (meaning, here and hereinafter, as required from time to time by the Delaware General Corporation Law or the Certificate of Incorporation of the Corporation).

Section 4. When a meeting is adjourned to another time or place, notice need not be given of the adjourned meeting if the time and place, if any, thereof, and the means of remote

communications, if any, by which stockholders and proxyholders may be deemed to be present in person and vote at such adjourned meeting are announced at the meeting at which the adjournment is taken; provided, however, that if the date of any adjourned meeting is more than 30 days after the date for which the meeting was originally noticed, notice of the place, if any, date, and time of the adjourned meeting and the means of remote communications, if any, by which stockholders and proxyholders may be deemed to be present in person and vote at such adjourned meeting, shall be given to each stockholder in conformity herewith.  If after the adjournment a new record date for stockholders entitled to vote is fixed for the adjourned meeting, the Board of Directors shall fix a new record date for notice of such adjourned meeting, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board of Directors and, except as otherwise required by law, shall not be more than 60 nor less than 10 days before the date of such adjourned meeting, and shall give notice of the adjourned meeting to each stockholder of record entitled to vote at such adjourned meeting as of the record date fixed for notice of such adjourned meeting.  At any adjourned meeting, any business may be transacted which might have been transacted at the original meeting.

Section 5.    Quorum.

At any meeting of the stockholders, the holders of a majority of all of the shares of the stock entitled to vote at the meeting, present in person or by proxy, shall constitute a quorum for all purposes, unless or except to the extent that the presence of a larger number may be required by law.  Where a separate vote by a class or classes or series is required, a majority of the shares of such class or classes or series present in person or represented by proxy shall constitute a quorum entitled to take action with respect to that vote on that matter.

If a quorum shall fail to attend any meeting, the chairman of the meeting or the holders of a majority of the shares of stock entitled to vote who are present, in person or by proxy, may adjourn the meeting to another place, if any, date, or time.

Section 6.    Organization.

The Chairman of the Board, if any, or such person as the Board of Directors may have designated or, in the absence of such a person, the President and Chief Executive Officer of the Corporation or, in his or her absence, such person as may be chosen by the holders of a majority of the shares entitled to vote who are present, in person or by proxy, shall call to order any meeting of the stockholders and act as chairman of the meeting.  In the absence of the Secretary of the Corporation, the secretary of the meeting shall be such person as the chairman of the meeting appoints.

Section 7.    Conduct of Business.

Except as may be set forth in any stockholders agreement or in the Certificate of Incorporation of the Corporation then in effect, the chairman of any meeting of stockholders shall determine the order of business and the procedure at the meeting, including such regulation of the manner of voting and the conduct of discussion as seem to him or her in order.  The date and time of the opening and closing of the polls for each matter upon which the stockholders will vote at the meeting shall be announced at the meeting.

2

Section 8.    Proxies and Voting.

At any meeting of the stockholders, every stockholder entitled to vote may vote in person or by proxy authorized by an instrument in writing or by a transmission permitted by law filed in accordance with the procedure established for the meeting. Any copy, facsimile telecommunication or other reliable reproduction of the writing or transmission created pursuant to this paragraph may be substituted or used in lieu of the original writing or transmission for any and all purposes for which the original writing or transmission could be used, provided that such copy, facsimile telecommunication or other reproduction shall be a complete reproduction of the entire original writing or transmission.

The Corporation may, and to the extent required by law, shall, in advance of any meeting of stockholders, appoint one or more inspectors to act at the meeting and make a written report thereof. The Corporation may designate one or more alternate inspectors to replace any inspector who fails to act. If no inspector or alternate is able to act at a meeting of stockholders, the person presiding at the meeting may, and to the extent required by law, shall, appoint one or more inspectors to act at the meeting. Each inspector, before entering upon the discharge of his or her duties, shall take and sign an oath faithfully to execute the duties of inspector with strict impartiality and according to the best of his or her ability. Every vote taken by ballots shall be counted by an inspector or inspectors appointed by the chairman of the meeting.

Except as may be set forth in any stockholders agreement or in the Certificate of Incorporation of the Corporation then in effect, all elections shall be determined by a plurality of the votes cast, and except as otherwise required by law, all other matters shall be determined by a majority of the votes cast affirmatively or negatively.

Section 9.    Stock List.

The officer who has charge of the stock ledger of the Corporation shall, at least 10 days before every meeting of stockholders, prepare and make a complete list of stockholders entitled to vote at any meeting of stockholders, provided, however, if the record date for determining the stockholders entitled to vote is less than 10 days before the meeting date, the list shall reflect the stockholders entitled to vote as of the 10th day before the meeting date, arranged in alphabetical order and showing the address of each such stockholder and the number of shares registered in his or her name. Such list shall be open to the examination of any stockholder for a period of at least 10 days prior to the meeting in the manner provided by law.

A stock list shall also be open to the examination of any stockholder during the whole time of the meeting as provided by law. This list shall presumptively determine (a) the identity of the stockholders entitled to examine such stock list and to vote at the meeting and (b) the number of shares held by each of them.

Section 10.    Consent of Stockholders in Lieu of Meeting.

Any action required to be taken at any annual or special meeting of stockholders of the Corporation, or any action which may be taken at any annual or special meeting of the stockholders, may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken, shall be signed by the holders of

3

outstanding stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted and shall be delivered to the Corporation by delivery to its registered office in Delaware, its principal place of business, or an officer or agent of the Corporation having custody of the book in which proceedings of meetings of stockholders are recorded.  Delivery made to the Corporation's registered office shall be made by hand or by certified or registered mail, return receipt requested.

Every written consent shall bear the date of signature of each stockholder who signs the consent and no written consent shall be effective to take the corporate action referred to therein unless, within 60 days of the earliest dated consent delivered to the Corporation, a written consent or consents signed by a sufficient number of holders to take action are delivered to the Corporation in the manner prescribed in the first paragraph of this Section.  A telegram, cablegram or other electronic transmission consenting to an action to be taken and transmitted by a stockholder or proxyholder, or by a person or persons authorized to act for a stockholder or proxyholder, shall be deemed to be written, signed and dated for the purposes of this Section to the extent permitted by law.  Any such consent shall be delivered in accordance with Section 228(d)(1) of the Delaware General Corporation Law.

Any copy, facsimile or other reliable reproduction of a consent in writing may be substituted or used in lieu of the original writing for any and all purposes for which the original writing could be used, provided that such copy, facsimile or other reproduction shall be a complete reproduction of the entire original writing.

<u>ARTICLE III</u> - <u>BOARD OF DIRECTORS</u>

<u>Section 1</u>.        <u>Number and Term of Office</u>.

Except as may be set forth in any stockholders agreement or in the Certificate of Incorporation of the Corporation then in effect, the number of directors who shall constitute the whole Board of Directors shall be such number as the Board of Directors shall from time to time have designated, except that in the absence of any such designation, such number shall be seven. Each director shall be elected for a term of one year and until his or her successor is elected and qualified, except as otherwise provided herein or required by law. The Chairman of the Board, if any, and the Vice Chairman of the Board of Directors, if any, shall be elected annually by the Board of Directors at the first meeting of the Board of Directors held after each annual meeting of stockholders or as soon thereafter as is convenient. The initial Chairman of the Board shall be [____].

Except as may be set forth in any stockholders agreement or in the Certificate of Incorporation of the Corporation then in effect, whenever the authorized number of directors is increased between annual meetings of the stockholders, a majority of the directors then in office shall have the power to elect such new directors for the balance of a term and until their successors are elected and qualified.  Except as may be set forth in any stockholders agreement or in the Certificate of Incorporation of the Corporation then in effect, any decrease in the authorized number of directors shall not become effective until the expiration of the term of the directors then in office unless, at the time of such decrease, there shall be vacancies on the board

4

which are being eliminated by the decrease.

Section 2.    Vacancies.

Except as may be set forth in any stockholders agreement or in the Certificate of Incorporation of the Corporation then in effect, if the office of any director becomes vacant by reason of death, resignation, disqualification, removal or other cause, a majority of the directors remaining in office, although less than a quorum, may elect a successor for the unexpired term and until his or her successor is elected and qualified.

Section 3.    Regular Meetings.

Regular meetings of the Board of Directors shall be held at such place or places, on such date or dates, and at such time or times as shall have been established by the Board of Directors and publicized among all directors.  A notice of each regular meeting shall not be required.

Section 4.    Special Meetings.

Special meetings of the Board of Directors may be called by the Chairman of the Board of Directors, any two directors then in office or by the President and Chief Executive Officer and shall be held at such place, on such date, and at such time as they or he or she shall fix.  Notice of the place, date, and time of each such special meeting shall be given to each director by whom it is not waived by mailing written notice not less than five days before the meeting or by telegraphing or telexing or by facsimile or electronic transmission of the same not less than 24 hours before the meeting.  Unless otherwise indicated in the notice thereof, any and all business may be transacted at a special meeting.

Section 5.    Quorum.

At any meeting of the Board of Directors, a majority of the total number of the whole Board of Directors shall constitute a quorum for all purposes.  If a quorum shall fail to attend any meeting, a majority of those present may adjourn the meeting to another place, date, or time, without further notice or waiver thereof.

Section 6.    Participation in Meetings By Conference Telephone.

Members of the Board of Directors, or of any committee thereof, may participate in a meeting of such Board of Directors or committee by means of conference telephone or other communications equipment by means of which all persons participating in the meeting can hear each other and such participation shall constitute presence in person at such meeting.

Section 7.    Conduct of Business.

At any meeting of the Board of Directors, business shall be transacted in such order and manner as the Board of Directors may from time to time determine, and all matters shall be determined by the vote of a majority of the directors present, except as otherwise provided herein, required by law or as set forth in any stockholders agreement of the Corporation

5

then in effect.  Action may be taken by the Board of Directors without a meeting if all members thereof consent thereto in writing or by electronic transmission, and the writing or writings or electronic transmission or transmissions are filed with the minutes of proceedings of the Board of Directors.  Such filing shall be in paper form if the minutes are maintained in paper form and shall be in electronic form if the minutes are maintained in electronic form.

Section 8.    Compensation of Directors.

Directors, as such, may receive, pursuant to resolution of the Board of Directors, fixed fees and other compensation for their services as directors, including, without limitation, their services as members of committees of the Board of Directors.

ARTICLE IV - COMMITTEES

Section 1.    Committees of the Board of Directors.

The Board of Directors may from time to time designate committees of the Board of Directors, with such lawfully delegable powers and duties as it thereby confers, to serve at the pleasure of the Board of Directors and shall, for those committees and any others provided for herein, elect a director or directors to serve as the member or members, designating, if it desires, other directors as alternate members who may replace any absent or disqualified member at any meeting of the committee.  In the absence or disqualification of any member of any committee and any alternate member in his or her place, the member or members of the committee present at the meeting and not disqualified from voting, whether or not he or she or they constitute a quorum, may by unanimous vote appoint another member of the Board of Directors to act at the meeting in the place of the absent or disqualified member.

Section 2.    Conduct of Business.

Each committee may determine the procedural rules for meeting and conducting its business and shall act in accordance therewith, except as otherwise provided herein, required by law or as set forth in any stockholders agreement of the Corporation then in effect.  Adequate provision shall be made for notice to members of all meetings; a majority of the members shall constitute a quorum unless the committee shall consist of one or two members, in which event one member shall constitute a quorum; and all matters shall be determined by a majority vote of the members present.  Action may be taken by any committee without a meeting if all members thereof consent thereto in writing or by electronic transmission, and the writing or writings or electronic transmission or transmissions are filed with the minutes of the proceedings of such committee.  Such filing shall be in paper form if the minutes are maintained in paper form and shall be in electronic form if the minutes are maintained in electronic form.

ARTICLE V - OFFICERS

Section 1.    Generally.

The officers of the Corporation shall consist of a President and Chief Executive Officer, one or more Vice Presidents, a Secretary, a Chief Financial Officer, a Treasurer and such other officers as may from time to time be appointed by the Board of Directors.  Officers

6

shall be elected by the Board of Directors, which shall consider that subject at its first meeting after every annual meeting of stockholders.  Each officer shall hold office until his or her successor is elected and qualified or until his or her earlier resignation or removal.  Any number of offices may be held by the same person.

Section 2.      Chief Executive Officer.

The Chief Executive Officer shall be the chief executive officer of the Corporation.  Subject to the provisions of these Bylaws and to the direction of the Board of Directors, he or she shall have the responsibility for the general and active management and control of the business and affairs of the Corporation, shall be the Corporation's chief policy making officer and shall perform all duties and have all powers which are commonly incident to the office of chief executive or which are delegated to him or her by the Board of Directors.  He or she shall have power to sign all contracts and other instruments of the Corporation which are authorized and shall have general supervision and direction of all of the other officers, employees and agents of the Corporation.

Section 3.      President and Chief Executive Officer.

The President and Chief Executive Officer shall have general charge of the business, affairs and property of the Corporation, and control over its officers, agents and employees. The President and Chief Executive Officer shall see that all orders and resolutions of the Board of Directors are carried into effect. He or she shall have power to sign all stock certificates, contracts and other instruments of the Corporation which are authorized and shall have general supervision and direction of all of the other officers, employees and agents of the Corporation.

Section 4.      Vice President.

Each Vice President shall have such powers and duties as may be delegated to him or her by the Board of Directors.  One Vice President shall be designated by the Board of Directors to perform the duties and exercise the powers of the President and Chief Executive Officer in the event of the President and Chief Executive Officer's absence or disability.

Section 5.      Chief Financial Officer.

The Chief Financial Officer of the Corporation shall, under the direction of the President and Chief Executive Officer, be responsible for all financial and accounting matters and for the direction of the offices of Treasurer and Controller.  The Chief Financial Officer shall have such other powers and perform such other duties as may be prescribed by the Chairman of the Board, the President and Chief Executive Officer or the Board of Directors or as may be provided in these Bylaws.

Section 6.      Secretary and Assistant Secretaries.

The Secretary shall issue all authorized notices for, and shall keep minutes of, all meetings of the stockholders and the Board of Directors.  He or she shall have charge of the corporate books and shall perform such other duties as the Board of Directors may from time to

time prescribe. The Assistant Secretary, or if there be more than one, any of the assistant secretaries, shall in the absence or disability of the Secretary, perform the duties and exercise the powers of the Secretary and shall perform such other duties and have such other powers as the Board of Directors, the Chairman of the Board, the President and Chief Executive Officer, or the Secretary may, from time to time, prescribe. The Secretary and any Assistant Secretary shall have the powers and perform the duties incident to those positions.

Section 7.        Treasurer and Assistant Treasurers.

The Treasurer shall have the custody of the corporate funds and securities; shall keep full and accurate accounts of receipts and disbursements in books belonging to the Corporation; shall deposit all monies and other valuable effects in the name and to the credit of the Corporation as may be ordered by the Board of Directors; shall cause the funds of the Corporation to be disbursed when such disbursements have been duly authorized, taking proper vouchers for such disbursements; and shall render to the President and Chief Executive Officer and the Board of Directors, at its regular meeting or when the Board of Directors so requires, an account of the Corporation; shall have such powers and perform such duties as the Board of Directors, the Chairman of the Board, the President and Chief Executive Officer or these Bylaws may, from time to time, prescribe. If required by the Board of Directors, the Treasurer shall give the Corporation a bond (which shall be rendered every six years) in such sums and with such surety or sureties as shall be satisfactory to the Board of Directors for the faithful performance of the duties of the office of Treasurer and for the restoration to the Corporation, in case of death, resignation, retirement, or removal from office, of all books, papers, vouchers, money, and other property of whatever kind in the possession or under the control of the Treasurer belonging to the Corporation. The Assistant Treasurer, or if there shall be more than one, the Assistant Treasurers in the order determined by the Board of Directors, shall in the absence or disability of the Treasurer, perform the duties and exercise the powers of the Treasurer. The Assistant Treasurers shall perform such other duties and have such other powers as the Board of Directors, the Chairman of the Board, the President and Chief Executive Officer or Treasurer may, from time to time, prescribe.

Section 8.        Other Officers, Assistant Officers and Agents.

Officers, assistant officers and agents, if any, other than those whose duties are provided for in these Bylaws, shall have such authority and perform such duties as may from time to time be prescribed by resolution of the Board of Directors.

Section 9.        Delegation of Authority.

The Board of Directors may from time to time delegate the powers or duties of any officer to any other officers or agents, notwithstanding any provision hereof.

Section 10.        Removal.

Any officer of the Corporation may be removed at any time, with or without cause, by the Board of Directors.

8

Section 11.    Action with Respect to Securities of Other Corporations.

Unless otherwise directed by the Board of Directors, the President and Chief Executive Officer or any officer of the Corporation authorized by the President and Chief Executive Officer shall have power to vote and otherwise act on behalf of the Corporation, in person or by proxy, at any meeting of stockholders of or with respect to any action of stockholders of any other corporation in which this Corporation may hold securities and otherwise to exercise any and all rights and powers which this Corporation may possess by reason of its ownership of securities in such other corporation.

## ARTICLE VI - STOCK

Section 1.    Certificates of Stock.

Each holder of stock represented by certificates shall be entitled to a certificate signed by, or in the name of the Corporation by, the Chairman of the Board, if any, or the President or a Vice President, and by the Secretary or an Assistant Secretary, or the Treasurer or an Assistant Treasurer, certifying the number of shares owned by him or her.  Any or all of the signatures on the certificate may be by facsimile.

Section 2.    Transfers of Stock.

Transfers of stock shall be made only upon the transfer books of the Corporation kept at an office of the Corporation or by transfer agents designated to transfer shares of the stock of the Corporation.  Except where a certificate is issued in accordance with Section 4 of this Article VI of these Bylaws, an outstanding certificate, if one has been issued, for the number of shares involved shall be surrendered for cancellation before a new certificate, if any, is issued therefor.

Section 3.    Record Date.

In order that the Corporation may determine the stockholders entitled to notice of any meeting of stockholders or any adjournment thereof, the Board of Directors may, except as otherwise required by law, fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board of Directors, and which record date shall not be more than 60 nor less than 10 days before the date of such meeting.  If the Board of Directors so fixes a date, such date shall also be the record date for determining the stockholders entitled to vote at such meeting unless the Board of Directors determines, at the time it fixes such record date, that a later date on or before the date of the meeting shall be the date for making such determination.  If no record date is fixed by the Board of Directors, the record date for determining stockholders entitled to notice of and to vote at a meeting of stockholders shall be at the close of business on the day next preceding the day on which notice is given or, if notice is waived, at the close of business on the day next preceding the day on which the meeting is held.  A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjournment of the meeting; provided, however, that the Board of Directors may fix a new record date for determination of stockholders entitled to vote at the adjourned meeting, and in such case shall also fix as the record date for stockholders entitled to notice of such adjourned meeting the same or an earlier date as that fixed

9

for determination of stockholders entitled to vote in accordance with the foregoing provisions of this Section 3 at the adjourned meeting.

In order that the Corporation may determine the stockholders entitled to receive payment of any dividend or other distribution or allotment of any rights or the stockholders entitled to exercise any rights in respect of any change, conversion or exchange of stock, or for the purpose of any other lawful action, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted, and which record date shall be not more than 60 days prior to such action. If no record date is fixed, the record date for determining stockholders for any such purpose shall be at the close of business on the day on which the Board of Directors adopts the resolution relating thereto.

In order that the Corporation may determine the stockholders entitled to consent to corporate action without a meeting, (including by telegram, cablegram or other electronic transmission as permitted by law), the Board of Directors may fix a record date, which shall not precede the date upon which the resolution fixing the record date is adopted by the Board of Directors, and which record date shall be not more than ten days after the date upon which the resolution fixing the record date is adopted. If no record date has been fixed by the Board of Directors and no prior action by the Board of Directors is required by the Delaware General Corporation Law, the record date shall be the first date on which a consent setting forth the action taken or proposed to be taken is delivered to the Corporation in the manner prescribed by Article II, Section 9 hereof. If no record date has been fixed by the Board of Directors and prior action by the Board of Directors is required by the Delaware General Corporation Law with respect to the proposed action by consent of the stockholders without a meeting, the record date for determining stockholders entitled to consent to corporate action without a meeting shall be at the close of business on the day on which the Board of Directors adopts the resolution taking such prior action.

Section 4.    Lost, Stolen or Destroyed Certificates.

In the event of the loss, theft or destruction of any certificate of stock, another may be issued in its place pursuant to such regulations as the Board of Directors may establish concerning proof of such loss, theft or destruction and concerning the giving of a satisfactory bond or bonds of indemnity.

Section 5.    Regulations.

The issue, transfer, conversion and registration of certificates of stock shall be governed by such other regulations as the Board of Directors may establish.

ARTICLE VII - NOTICES

Section 1.    Notices.

Unless otherwise provided in any stockholders agreement of the Corporation then in effect, all notices to stockholders shall be delivered in writing or by a form of electronic transmission if receipt thereof has been consented to by the stockholder to whom the notice is given. If mailed, such notice shall be deemed given when deposited in the United States mail,

10

postage prepaid, addressed to the stockholder at his, her or its address as the same appears on the records of the Corporation. If given by facsimile telecommunication, such notice shall be deemed given when directed to a number at which the stockholder has consented to receive notice by facsimile. Subject to the limitations contained herein, if given by electronic transmission, such notice shall be deemed to be delivered: (i) by electronic mail, when directed to an electronic mail address at which the stockholder has consented to receive notice; (ii) if by a posting on an electronic network together with separate notice to the stockholder of such specific posting, upon the later of (x) such posting and (y) the giving of such separate notice; and (iii) if by any other form of electronic transmission, when directed to the stockholder. An affidavit of the secretary or an assistant secretary of the Corporation, the transfer agent of the Corporation or any other agent of the Corporation that the notice has been given shall, in the absence of fraud, be prima facie evidence of the facts stated therein.

Without limiting the manner by which notice otherwise may be given effectively to stockholders of the Corporation pursuant to the Delaware General Corporation Law, the Certificate of Incorporation or these Bylaws, any notice to stockholders of the Corporation given by the Corporation under any provision of the Delaware General Corporation Law, the Certificate of Incorporation or these Bylaws shall be effective if given by a form of electronic transmission consented to by the stockholder of the Corporation to whom the notice is given. Any such consent shall be deemed revoked if: (i) the Corporation is unable to deliver by electronic transmission two (2) consecutive notices given by the Corporation in accordance with such consent; and (ii) such inability becomes known to the secretary or an assistant secretary of the Corporation or to the transfer agent or other person responsible for the giving of notice. However, the inadvertent failure to treat such inability as a revocation shall not invalidate any meeting or other action. For purposes of these Bylaws, except as otherwise limited by applicable law, the term "electronic transmission" means any form of communication not directly involving the physical transmission of paper that creates a record that may be retained, retrieved and reviewed by a recipient thereof and that may be directly reproduced in paper form by such recipient through an automated process.

Section 2.    Waivers.

A written waiver of any notice, signed by a stockholder or director, or waiver by electronic transmission by such person, whether given before or after the time of the event for which notice is to be given, shall be deemed equivalent to the notice required to be given to such person.  Neither the business nor the purpose of any meeting need be specified in such a waiver.

ARTICLE VIII - MISCELLANEOUS

Section 1.    Facsimile Signatures.

In addition to the provisions for use of facsimile signatures elsewhere specifically authorized in these Bylaws, facsimile signatures of any officer or officers of the Corporation may be used whenever and as authorized by the Board of Directors or a committee thereof.

Section 2.    Corporate Seal.

The Board of Directors may provide a suitable seal, containing the name of the Corporation, which seal shall be in the charge of the Secretary.  If and when so directed by the

11

Board of Directors or a committee thereof, duplicates of the seal may be kept and used by the officers authorized to use such seal.

Section 3.    Reliance upon Books, Reports and Records.

Each director, each member of any committee designated by the Board of Directors, and each officer of the Corporation shall, in the performance of his or her duties, be fully protected in relying in good faith upon the books of account or other records of the Corporation and upon such information, opinions, reports or statements presented to the Corporation by any of its officers or employees, or committees of the Board of Directors so designated, or by any other person as to matters which such director or committee member reasonably believes are within such other person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Corporation.

Section 4.    Fiscal Year.

The fiscal year of the Corporation shall be as fixed by the Board of Directors. In the absence of such resolution, the fiscal year of the Corporation shall be the calendar year beginning January 1 and ending December 31.

Section 5.    Time Periods.

In applying any provision of these Bylaws which requires that an act be done or not be done a specified number of days prior to an event or that an act be done during a period of a specified number of days prior to an event, calendar days shall be used, the day of the doing of the act shall be excluded, and the day of the event shall be included.

ARTICLE IX- FORUM FOR ADJUDICATION OF DISPUTES

Section 1.    Exclusive Forum. Unless the Corporation consents in writing to the selection of an alternative forum, the sole and exclusive forum for (i) any derivative action or proceeding brought on behalf of the Corporation, (ii) any action asserting a claim of breach of a fiduciary duty owed by any director, officer or other employee of the Corporation to the Corporation or the Corporation's stockholders, (iii) any action asserting a claim arising pursuant to any provision of the General Corporation Law of the State of Delaware, the Certificate of Incorporation or these Bylaws or (iv) any action asserting a claim governed by the internal affairs doctrine shall, to the fullest extent permitted by law, be a state or federal court located within the State of Delaware, in all cases subject to the court's having personal jurisdiction over the indispensable parties named as defendants. Any person or entity owning, purchasing or otherwise acquiring any interest in shares of capital stock of the Corporation shall be deemed to have notice of and consented to the provisions of this Article X

Section 2.    Personal Jurisdiction. If any action the subject matter of which is within the scope of Section 1 immediately above is filed in a court other than a court located within the State of Delaware (a "Foreign Action") in the name of any stockholder, such stockholder shall, to the fullest extent permitted by law, be deemed to have consented to (i) the personal jurisdiction of the state and federal courts located within the State of Delaware in connection with any action brought in any such court to enforce Section 1 immediately above (an

12

"FSC Enforcement Action") and (ii) having service of process made upon such stockholder in any such FSC Enforcement Action by service upon such stockholder's counsel in the Foreign Action as agent for such stockholder.

Section 3.      Notice. Any Person purchasing or otherwise acquiring or holding any interest in shares of capital stock of the Corporation (including, without limitation, shares of Common Stock) shall be deemed to have notice of and to have consented to the provisions of this Article X.

## ARTICLE X - AMENDMENTS

These Bylaws may be amended or repealed by the Board of Directors at any meeting or by the stockholders at any meeting.

\*      \*      \*

13

## Exhibit F

### Section 1129(a)(5) Disclosures

In accordance with Article IV.I of the Plan[1] and section 1129(a)(5) of the Bankruptcy Code, this Exhibit F lists the identities and affiliations of the members of the New Boards of the Reorganized Debtors and the officers of the Reorganized Debtors who will serve on the Effective Date and who have been identified as of the date hereof, together with the nature of the compensation to be paid to such individuals.

I.    **List of Members and Nature of Compensation of the New Boards of Reorganized Debtors**

    A.    **List of Members and Nature of Compensation of the New Board of Reorganized Parent**

On the Effective Date, the New Board will comprise seven members. At present, five of the seven members of the New Board have been selected. It is anticipated that the other two members of the New Board will be named prior to the Confirmation Hearing. The members of the New Board who have been identified as of the date hereof and their relevant experience are set forth below:

| Name | Relevant Experience |
| --- | --- |
| **Scott Galloway** | Scott Galloway is a Clinical Professor of Marketing at NYU Stern School of Business where he teaches Brand Strategy and Digital Marketing to second-year MBA students and is the author of the Digital IQ Index®, a global ranking of prestige brands' digital competence. In 2012, Professor Galloway was named "One of the World's 50 Best Business School Professors" (Poets & Quants). Professor Galloway is also the founder of several firms including: (a) L2, a subscription business intelligence firm serving prestige brands; (b) Red Envelope, an e-commerce firm (2007, $100 million revenues); and (c) --Prophet, a global brand strategy consultancy with 250+ professionals. Professor Galloway was elected to the World Economic Forum's "Global Leaders of Tomorrow," which recognizes 100 individuals under the age of 40 "whose accomplishments have had impact on a global level." Professor Galloway has served on the board of directors of Eddie Bauer (Nasdaq: EBHI), The New York Times Company (NYSE: NYT), Gateway Computer, and Berkeley's Haas School of Business. He received a BA from UCLA and an MBA from UC Berkeley. |

---

[1]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Plan.

| Name | Relevant Experience |
|---|---|
| **Scott Kasen** | Since 2010 Mr. Kasen has been a private investor. Commencing February 2016 Mr. Kasen joined the broad of directors of Targus Cayman Holdco Limited, a leading supplier of carrying cases and accessories for laptop and mobile devices. From 2003–2009, Mr. Kasen was a Managing Director of Contrarian Capital, a $4 billion investment firm based in Greenwich, CT. Mr. Kasen served as Co-Portfolio Manager of Contrarian European Fund, LP and Assistant Portfolio Manager of Contrarian Capital Senior Secured, LP. In June 2006, Mr. Kasen joined the Board of Cascade Timberlands, LLC an owner of 292,000 acres of timberland in Oregon. From June 2004–May 2006, Mr. Kasen served as a member of the Board of Directors of Special Metals, Inc., a developer and manufacturer of high performance nickel based alloys. Prior to joining Contrarian Capital, Mr. Kasen was a Vice President of The Trump Organization (1992 to 1995), a Partner and Investment Manager of A. B. Edelman Management Company (1995 to 2000) and a Partner at Velocity Crossover Investors (2001 to 2002). Mr. Kasen is a graduate of Rutgers University (BS, 1988) and The Columbia Business School (MBA, 1998). |
| **Jason Mudrick** | Jason Mudrick is the Founder and Chief Investment Officer of Mudrick Capital Management, L.P. an investment firm that specializes in long and short investments in distressed credit. Mr. Mudrick began his Wall Street career in 2000 advising on mergers and acquisitions transactions as an Associate in Merrill Lynch's Mergers & Acquisitions Investment Banking Group. In 2001 he joined Contrarian Capital Management, where he began his focus on distressed investing. In October 2002, Mr. Mudrick launched the Contrarian Equity Fund, an investment vehicle focused on purchasing distressed debt that would be restructured into equity, post-bankruptcy equities and other event driven deep value special situations. Mr. Mudrick left Contrarian in October 2008 to launch Mudrick Capital. Mr. Mudrick has served on multiple creditors' committees and served on the Board of Directors of numerous public and private companies, including Safety-Kleen Holdings, Integrated Alarm Services Group, Salton and Rotech Healthcare. Mr. Mudrick also spent two years in graduate school teaching economics classes to Harvard University undergraduates. Mr. Mudrick has a B.A. in Political Science from the College of the University of Chicago and a J.D. from Harvard Law School. Mr. Mudrick was previously admitted to the New York State Bar. |
| **John Slater** | Mr. Slater serves as a Partner at Paulson where he focuses on investments in the media, telecom and technology sectors. Mr. Slater |

2

| Name | Relevant Experience |
|------|---------------------|

joined Paulson in January 2009.  Previously, he was a vice president at Lehman Brothers and Barclays Capital where he worked from 2004 to 2008 in the global trading strategies group, focusing on investments in media and other sectors. Prior to Lehman Brothers, Mr. Slater was senior director, finance and strategy, at NextSet Software Inc., a financial trading systems software vendor.  He started his career as an associate consultant at Burlington Consultants, a strategy consultancy based in London and Seattle.  Mr. Slater served on the Dex Media, Inc. Board of Directors from April 2013 to June 2015 and as a Director of SuperMedia Inc. from January 2010 to April 2013.  Mr. Slater holds an MA and BA from the University of Cambridge and an MBA from INSEAD.  He is a CFA Charterholder and also holds a Certified Diploma in Accounting and Finance (ACCA).

**Joseph Walsh**

Prior to joining the Debtors in 2014, Mr. Walsh was the Chairman and Chief Executive Officer of Walsh Partners, a private company founded in 2012 that has been focused on investments and advisory services.  Mr. Walsh has also served as the Executive Chairman of Cambium Learning Group, Inc., a leading educational solutions and services company, since March 2013. Mr. Walsh was previously employed by Yellowbook Inc., a digital and print marketing solutions company, from 1987 until 2011, and served as President and Chief Executive Officer and a member of its board of directors from 1993 until 2011.  In 1982, Mr. Walsh co-founded IYP Publishing, a company sold in 1985 to DataNational Corporation, a leading provider for enterprise software and services.  He served as Vice President of Sales at DataNational until joining Yellowbook in 1987. Mr. Walsh served as Chairman of the Local Search Association (LSA) and on the board of LSA's predecessor, the Yellow Pages Association.  He was also Chairman and a long-term board member of the Association of Directory Publishers and served on the board of the Association of Directory Marketing.

**6th Director**

It is anticipated that the other two members of the New Board will be named prior to the Confirmation Hearing.

**7th Director**

It is anticipated that the other two members of the New Board will be named prior to the Confirmation Hearing.

Following the Effective Date, it is expected that a compensation committee of Reorganized Parent will be formed.  Director compensation may be determined by Reorganized Parent's compensation committee or its New Board.  It is not expected that Mr. Walsh will be entitled to compensation in his capacity as a director of Reorganized Parent.

3

Each such director shall serve from and after the Effective Date pursuant to the terms of the New Organizational Documents, the New Stockholders Agreement, and other constituent documents of Reorganized Parent and the Reorganized Debtors.

**B.    List of Members and Nature of Compensation of the New Boards of the Other Reorganized Debtors**

As of the Effective Date, the existing directors of the Reorganized Debtors, other than Reorganized Parent, will be the directors of such Debtors existing immediately prior to the Effective Date. The members of the New Boards who have been identified as of the date hereof and their relevant experience are set forth below:

| Name | Relevant Experience |
| --- | --- |
| **Raymond Ferrell**[2] | Prior to joining the Debtors in 2009, Mr. Ferrell was Senior Counsel—Vice President in the American Express General Counsel's office for over eight years, providing primary support for Global Commercial Cards and the Interactive business unit. Prior to joining American Express, he worked in private practice in New York City and New Jersey, specializing in corporate securities, technology, e-commerce law, and commercial card work. |
| **Paul Rouse** | Prior to joining the Debtors in 2014, Mr. Rouse served as the Chief Financial Officer of Apple and Eve LLC, one of the largest privately held juice companies in the United States, since 2012. Mr. Rouse was employed by Yellowbook Inc., a digital and print marketing solutions company, from 1987 until 2012 where he served as Vice President of Finance and as Treasurer, and had responsibility for corporate and business development. Earlier in his career, Mr. Rouse was employed at JPMorgan in international internal audit and at Ernst and Young in public accounting. |
| **Joseph Walsh** | See above. |

It is not expected that such board members will receive compensation or grants under the Management Incentive Plan in their capacities as directors of such Reorganized Debtors; *provided* that such directors that are also officers or employees of the Reorganized Debtors will receive compensation and will be entitled to grants under the Management Incentive Plan in their capacities as officers or employees of such Reorganized Debtors.

---

[2]    Mr. Ferrell will serve on the New Boards of each of the Reorganized Debtors except for Reorganized Parent and SuperMedia Sales Inc.

4

Each such director shall serve from and after the Effective Date pursuant to the terms of the organizational documents of such Reorganized Debtors and other constituent documents of such Reorganized Debtors.

**II.    List and Nature of Compensation of the Reorganized Debtors' Officers and Executives**

As of the Effective Date, the initial officers of the Reorganized Debtors will be the officers of the Debtors existing immediately prior to the Effective Date and receive compensation consistent with current practices.  Each such officer shall serve from and after the Effective Date pursuant to the terms of the New Organizational Documents and other constituent documents of Reorganized Parent and the Reorganized Debtors.

| Name—Position[3] | Relevant Experience |
| --- | --- |
| **Joseph Walsh—President and Chief Executive Officer[4]** | See above. |
| **Paul Rouse—Executive Vice President, Chief Financial Officer, and Treasurer** | See above. |
| **Mark Cairns—Executive Vice President, Integration and Client Experience[5]** | Prior to joining the Debtors in 2014, Mr. Cairns was principal of Treales, LLC, a general business consulting company. Prior to that, from 2011 to 2013, he served as the Head of Operations in the United States and United Kingdom for hibu plc (previously Yell Group plc), a company offering digital and print marketing solutions and directories, including Yell.com and Yellow Pages in the United Kingdom, and Yellowbook in the United States. Since joining Yell Group in 1984, Mr. Cairns held a variety of management positions at Yell Group in the United Kingdom and United States, including as Chief Publishing Officer of Yellow Book Inc. |
| **Raymond Ferrell— Executive Vice President,** | See above. |

---

[3]    The titles listed in this chart reflect the each officer's position in Reorganized Parent.  Unless otherwise noted, each officer shall serve in a substantially similar position at each of the other Reorganized Debtors.

[4]    Mr. Walsh will serve as Chief Executive Officer of each of the Reorganized Debtors except for SuperMedia Sales Inc.

[5]    As of the Effective Date, Mr. Cairns will only serve as an officer of Reorganized Parent.

| | |
|---|---|
| **General Counsel, and Corporate Secretary** | |
| **Gordon Henry—Executive Vice President, Chief Marketing Officer** | Before joining the Debtors in 2014, Mr. Henry was a senior advisor at Walsh Partners, a business consulting company. He previously held the role of vice president and general manager at Deluxe Corp, a digital and print marketing solutions company, from 2011 to 2014, where he led the company's transformation to a provider of Internet marketing services for small and medium-size businesses.  Prior to joining Deluxe he served as Chief Marketing Officer of Yellowbook Inc., a digital and print marketing solutions company, from 2001 to 2008, where he managed print and online products. |
| **James McCusker— Executive Vice President, Chief Revenue Officer**[6] | Before joining the Debtors, McCusker was president and chief sales officer of hibu (formerly Yellowbook), where he oversaw U.S. operations and media/advertising sales.  He began his career at Yellowbook as a sales rep in 1990, gradually progressing through a series of sales leadership roles (including vice president of sales and chief of sales).  During his tenure, he assisted in driving the company's digital transformation and was instrumental in propelling Yellowbook's revenues from $70 million to $2 billion over a ten-year period. |
| **Debra Ryan—Executive Vice President, Chief Human Resources Officer**[7] | Ms. Ryan previously served as Executive Vice President—Human Resources and Employee Administration of SuperMedia Inc. from April 2012.  Before joining SuperMedia, she served as VP—Franchise Development for the Dex One Corporation from 2009 to 2011, VP—Human Resources-Sales and Operations from 2006 to 2009, and VP—Human Resources from 2002 to 2006 at R.H. Donnelley, responsible for the company's human resources function.  Prior to that, Ms. Ryan held various human resources and sales management executive positions. |
| **Carelton Shaw—Executive Vice President, Chief Information Officer** | Prior to joining the Debtors in 2014, Mr. Shaw was a principal with Houstonian Partners, LLC, focused on investment and advisory services. Prior to joining Houstonian Partners, LLC, Mr. Shaw was the Global Chief Information Officer at hibu plc (previously Yell Group plc), a company offering digital and print marketing solutions and directories, including Yellowbook in the United States, from 2011 until 2013. |

---

[6]   As of the Effective Date, Mr. McCusker will only serve as an officer of Reorganized Parent.

[7]   As of the Effective Date, Ms. Ryan will only serve as an officer of Reorganized Parent.

6

|  | Previously he held various roles at Yellowbook from 1990, including as EVP—Operations to Chief Information Officer, responsible for Yellowbook's technology and enterprise change management. |
|---|---|
| **John Wholey—Executive Vice President, Operations and Client Services** | Prior to joining the Debtors in 2015, Mr. Wholey served as a Head of United States Operations of hibu plc (previously Yell Group plc), a company offering digital and print marketing solutions and directories, including Yellowbook in the United States, from March 2014 until November 2014, where he was responsible for all operational aspects of the business from order capture to production, fulfillment, publishing, distribution, customer service and sales support for all print and digital product offerings. Previously, from March 2011 to March 2014, Mr. Wholey headed contact centers for Hibu in the United States and United Kingdom and prior to that Mr. Wholey served as hibu's Vice President of Operations since 2000. |

As set forth in the Plan, all employment, severance, retirement, indemnification, and other similar employee-related agreements or arrangements in place as of the Effective Date with the Debtors and the Non-Debtor Subsidiaries, including retirement income plans and welfare benefit plans, or discretionary bonus plans or variable incentive plans regarding payment of a percentage of annual salary based on performance goals and financial targets for certain employees, shall be assumed by the Reorganized Debtors and shall remain in place after the Effective Date in accordance with the terms of such agreements or arrangements, as may be amended by agreement between the beneficiaries of such agreements, plans, or arrangements, on the one hand, and the Debtors (with the consent of the Required Supporting Lenders), on the other hand, or, after the Effective Date, by agreement with the Reorganized Debtors, and the Reorganized Debtors will continue to honor such agreements, arrangements, programs, and plans; *provided* that the foregoing shall not apply to the Debtors' Value Creation Program or any of the Debtors' existing equity-based compensation, agreements, or arrangements, which, for the avoidance of doubt, shall be cancelled as of the Effective Date.

In addition, on the Effective Date, equity grants equal to 10 percent of the New Common Stock (on a fully diluted basis) shall be reserved for issuance under the Management Incentive Plan for directors, officers, and employees of the Reorganized Debtors. The form, terms, and timing of Management Incentive Plan grants will be determined by the compensation committee of the New Board of the Reorganized Parent. For the avoidance of doubt, such program will be supplemental to, and not a substitute for, existing compensation arrangements; *provided* that the foregoing shall not apply to the Debtors' Value Creation Program or any of the Debtors' existing equity-based compensation, agreements, or arrangements, which, for the avoidance of doubt, shall be cancelled as of the Effective Date. It is not expected that Mr. Walsh will be entitled to grants under the Management Incentive Plan in his capacity as a director of any Reorganized Debtor; *provided* that it is expected that he will be entitled to grants under the Management Incentive Plan in his capacity as an officer of the Reorganized Debtors.

7

**Exhibit G**

**New Stockholders Agreement**

**DEX MEDIA, INC.**

**STOCKHOLDERS AGREEMENT**

**DATED AS OF [____], 2016**

**TABLE OF CONTENTS**

Page

ARTICLE 1. DEFINITIONS; RULES OF INTERPRETATION ......................................................1

Section 1.1    Definitions.......................................................................1

Section 1.2    Rules of Interpretation ..................................................10

ARTICLE 2. CORPORATE GOVERNANCE ...............................................................10

Section 2.1    Authority .......................................................................10

Section 2.2    Powers and Duties of the Board...................................11

Section 2.3    Election of Directors; Number and Composition of the Board ................11

Section 2.4    Exculpation ...................................................................15

Section 2.5    Further Assurances.........................................................15

Section 2.6    Management Incentive Plan............................................15

Section 2.7    Stockholder Consent ......................................................15

Section 2.8    Transactions with Affiliates...........................................15

ARTICLE 3. REGISTRATION RIGHTS ....................................................................16

Section 3.1    Demand Registration .....................................................16

Section 3.2    Approved Public Offering...............................................19

Section 3.3    Piggyback Registration ..................................................22

Section 3.4    Certain Information.........................................................24

Section 3.5    Expenses ........................................................................24

Section 3.6    Registration and Qualification .......................................25

Section 3.7    Underwriting; Due Diligence.........................................28

Section 3.8    Indemnification and Contribution...................................28

Section 3.9    Rule 144 Information ......................................................31

Section 3.10   Transfer of Registration Rights......................................31

Section 3.11   Grant of Additional Registration Rights.........................31

Section 3.12   Holdback Agreement ......................................................31

Section 3.13   Termination....................................................................32

ARTICLE 4. TRANSFERS OF SHARES .....................................................................32

Section 4.1    Restrictions on Transfers ...............................................32

Section 4.2    Legend on Certificates ...................................................34

i

ARTICLE 5. DRAG-ALONG; TAG-ALONG ................................................................34

    Section 5.1    Drag-Along Sale ................................................................34

    Section 5.2    Tag-Along Sale .................................................................36

ARTICLE 6. ADDITIONAL AGREEMENTS ...........................................................37

    Section 6.1    Access to Information; Reports ........................................37

    Section 6.2    Certificate of Incorporation and Bylaws..........................38

    Section 6.3    No Other Voting Agreements ..........................................38

    Section 6.4    Confidentiality .................................................................39

    Section 6.5    Preemptive Rights............................................................40

    Section 6.6    Debt Preemptive Rights ...................................................41

ARTICLE 7. MISCELLANEOUS ...............................................................................42

    Section 7.1    Survival of Agreement; Term .........................................42

    Section 7.2    Notices .............................................................................42

    Section 7.3    Binding Effect .................................................................43

    Section 7.4    Entire Agreement ............................................................43

    Section 7.5    Amendment......................................................................43

    Section 7.6    Third-Party Beneficiary ..................................................44

    Section 7.7    Counterparts.....................................................................44

    Section 7.8    Headings ..........................................................................44

    Section 7.9    Governing Law; Consent to Jurisdiction and Service of Process ..............44

    Section 7.10    Injunctive Relief...............................................................44

    Section 7.11    Severability .....................................................................45

    Section 7.12    Recapitalization and Similar Events ................................45

Exhibit A       Form of Joinder Agreement

## STOCKHOLDERS AGREEMENT

This Stockholders Agreement ( this "Agreement") is made as of [____], 2016, by and among Dex Media, Inc., a Delaware corporation (the "Company"), each of the Stockholders (as defined below) named on the signature pages hereto, and each Person (as defined below) that hereafter becomes a Stockholder.

## WITNESSETH

WHEREAS, the Stockholders as of the date of this Agreement have received shares of Common Stock pursuant to the Joint Prepackaged Chapter 11 Plan of Reorganization, as filed with the United States Bankruptcy Court for the District of Delaware, Chapter 11 Case No. 16-11200 (KG), on May 17, 2016 (including all exhibits, schedules, supplements, and ancillary documents, and as may be amended from time to time, the "Plan") for Dex Media, Inc. and the other Debtors (as defined in the Plan) in the jointly administered cases which were commenced under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the District of Delaware.

NOW, THEREFORE, in consideration of the premises and the mutual agreements, covenants and provisions contained herein, and other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound hereby, agree as follows:

## ARTICLE 1. DEFINITIONS; RULES OF INTERPRETATION

Section 1.1    Definitions.   As used herein, the terms below shall have the following meanings.  Any such term, unless the context otherwise requires, may be used in the singular or plural, depending on reference:

"5% Stockholder" means each Stockholder who, together with its Affiliates, as of a specified date, owns or holds with power to vote 5% or more of the outstanding shares of Common Stock as of such date.

"Accredited Investor" has the meaning defined in Regulation D promulgated under the Securities Act.

"Added Seats" has the meaning set forth in clause (2) of the proviso to Section 2.3(c)(ii).

"Affiliate" means, with respect to any specified Person, any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person, or any Related Fund of any of the foregoing.  For the purposes of this definition, "control" when used with respect to any specified Person means the power to direct or cause the direction of the management and policies of such specified Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing. Notwithstanding the foregoing, in no event shall any Stockholder or any of its Affiliates be

deemed to be an Affiliate of any other Stockholder or any of its Affiliates (other than the Company) solely by reason of such Stockholder's control of the Company.

"Agreement" has the meaning set forth in the preamble of this Agreement.

"Allocated Share" has the meaning set forth in Section 6.6(a).

"APO Shares" has the meaning set forth in Section 3.2(c).

"Appointing Stockholder Group" means each Stockholder Group that beneficially owns 10% or more of the then outstanding shares of Common Stock of the Company.

"Approved Public Offering" has the meaning set forth in Section 3.2(a).

"Approved Public Offering Holder" has the meaning set forth in Section 3.2(b).

"Approved Public Offering Holder Notice" has the meaning set forth in Section 3.2(c).

"Approved Public Offering Notice" has the meaning set forth in Section 3.2(b).

"Approved Public Offering Percentage" has the meaning set forth in Section 3.2(a).

"Approved Public Offering Sale Amount" means an amount equal to the Approved Public Offering Percentage *multiplied by* the aggregate number of Registrable Securities held at such time by all Stockholders.

"Audit Committee" has the meaning set forth in Section 2.3(e).

"Board" means the Board of Directors of the Company.

"Business Day" means any day (other than a day which is a Saturday, Sunday or legal holiday in the State of New York) on which banks are open for business in the State of New York.

"Bylaws" means the bylaws of the Company, as may be amended, modified or amended and restated and in effect from time to time.

"Cause" with respect to any Director means (a) the conviction of such Director of a crime constituting a felony under the laws of any state, the District of Columbia or the United States, or (b) a "bad actor" disqualifying event applicable to such Director described in Rule 506(d)(1)(i)-(viii) promulgated under the Securities Act.

"Certificate of Incorporation" means the Second Amended and Restated Certificate of Incorporation of the Company, as may be amended, modified, supplemented or amended and restated and in effect from time to time, including any certificates of correction or amendment thereto that are filed with the Secretary of State of the State of Delaware.

2

"Common Stock" means common stock of the Company, par value $ 0.01 per share.

"Company" has the meaning set forth in the preamble of this Agreement.

"Company Sale Notice" has the meaning set forth in Section 6.5(b).

"Company Securities" has the meaning set forth in Section 3.1(a).

"Compensation Committee" has the meaning set forth in Section 2.3(e).

"Competitor" means any Person engaged (whether directly or indirectly through the control of any other person) other than through the Company and its Subsidiaries in the business of providing yellow page services or other similar targeted advertising in North America; provided, that no potential Transferee shall be deemed to be a Competitor on account of owning less than 10% (or, in the case of any Person that was a Term Loan Lender (as defined in the Plan) as of the Petition Date, 20%) of the outstanding shares of equity securities of a Competitor so long as such potential Transferee does not have the right to appoint, and no director, officer or employee of such potential Transferee is, a director of such Competitor or any of its Subsidiaries.

"Control Transfer" means a Transfer of Shares in an aggregate amount equal to 35% or more of the outstanding shares of Common Stock, but specifically excluding any Transfer by a Stockholder pursuant to Section 4.1(b).

"Credit Agreement" means (i) the Takeback First Lien Term Loan (as defined in the Plan) or (ii) any other credit facility to which the Company or any of its subsidiaries is bound.

"Debt Exercise Notice" has the meaning set forth in Section 6.6(b).

"Debt Preemptive Rights Notice" has the meaning set forth in Section 6.6(a).

"Demand Registration Notice" has the meaning set forth in Section 3.1(a).

"DGCL" means the General Corporation Law of the State of Delaware.

"Diluted Approved Public Offering Percentage" has the meaning set forth in Section 3.2(c).

"Dilutive Securities" has the meaning set forth in Section 6.5(a).

"Director" means a member of the Board.

"Drag-Along Notice" has the meaning set forth in Section 5.1(a).

"Drag-Along Rights" has the meaning set forth in Section 5.1(a).

3

"Drag-Along Sale" shall mean (i) a sale transaction pursuant to which a buyer has agreed to purchase all or substantially all of the outstanding shares of Common Stock, (ii) any merger or consolidation of the Company with or into any other corporation or entity (other than transactions solely involving the merger or consolidation of a wholly owned Subsidiary with or into the Company or another wholly owned Subsidiary of the Company) or (iii) the sale, transfer or other disposition of all or substantially all of the assets or business of the Company and its Subsidiaries, taken as a whole, which is followed by a distribution to the Stockholders of the net proceeds of such sale; provided, that in no event shall any of the transactions described in clauses (i), (ii) and (iii) of this definition be deemed a Drag-Along Sale unless such transaction has been approved by the Board, which approval must include at least one Non-Appointed Outside Director.

"Drag-Along Sellers" has the meaning set forth in Section 5.1(a).

"Dragged Stockholders" means, collectively, with respect to any Drag-Along Sale, all of the Stockholders to whom a Drag-Along Notice with respect to such Drag-Along Sale is given pursuant to Section 5.1(a).

"Eligible Participating Stockholder" has the meaning set forth in Section 5.2(a).

"Employee Shares" means any shares of Common Stock received by a Stockholder under or pursuant to the terms of the Management Incentive Plan or any other employee stock option plan, stock purchase plan, employee benefit plan, employment contract or any similar benefit or incentive program or agreement covering directors, employees or consultants of the Company or its Subsidiaries.

"Exchange Act" means the Securities Exchange Act of 1934, and the rules and regulations of the SEC promulgated thereunder.

"Exchange Act Reporting Date" means the first date after the Plan Effective Date on which the Company becomes required under the Exchange Act to file reports pursuant thereto.

"Family Members" means, with respect to any natural person, such person's spouse, children, parents and lineal descendants of such person's parents (in each case, natural or adopted).

"Family Trust" of any natural person means a trust benefiting solely such person or the Family Members of such individual.

"FINRA" means the Financial Industry Regulatory Authority.

"Forfeited Seats" has the meaning set forth in clause (1) of the proviso to Section 2.3(c)(ii).

"Increased Board Election" has the meaning set forth in Section 2.3(c)(ii)(D).

"Incremental Shares" has meaning set forth in Section 3.2(b).

4

"Initial Directors" has the meaning set forth in Section 2.3(b).

"Initial Requesting Holder" means, with respect to any registration of Registrable Securities that is requested pursuant to Section 3.1(a), the Stockholder or Stockholders (as the case may be) who made the underlying Registration Demand.

"Initial Stockholders" means (a) each Person (other than the Company) named on the signature pages to this Agreement and (b) each Person deemed to be a party to this Agreement pursuant to Article IV.B.2 of the Plan.

"Losses" has the meaning set forth in Section 3.8(a).

"Management Incentive Plan" means the Company's Management Equity Incentive Plan adopted by the Company pursuant to the Plan.

"Minority Director" means the director elected pursuant to Section 2.3(c)(iii).

"Minority Director Nominating Stockholder Group" means each Stockholder Group that beneficially owns 5% or more, but less than 10%, of the outstanding shares of Common Stock.

"Minority Director Nominees" means one or more persons nominated by the Minority Director Nominating Stockholder Groups holding a majority of the shares of Common Stock held by all Minority Director Nominating Stockholder Groups.

"Necessary Action" means, with respect to a specified result, all actions that are permitted by law and necessary or desirable to cause such result, including (i) including each Director to be nominated pursuant to Section 2.3 in the Company's slate of nominees to the Stockholders for each election of Directors, (ii) attending meetings in person or by proxy for purposes of obtaining a quorum, (iii) voting or providing a written consent or proxy with respect to shares of Common Stock, (iv) causing the adoption of Stockholders' resolutions and amendments to the Organizational Documents, (v) executing agreements and instruments, (vi) making, or causing to be made, with governmental, administrative or regulatory authorities, all filings, registrations or similar actions that are required to achieve such result, and (vii) causing the election or removal of Directors.

"Non-Appointed Outside Directors" means the Remaining Director(s) and the Minority Director.

"Non-Appointing Stockholders" means all Stockholders that are not members of an Appointing Stockholder Group.

"Organizational Documents" means the Certificate of Incorporation and the Bylaws.

"Permitted Offering" has the meaning set forth in Section 6.5(c).

5

"Person" means an individual, partnership, corporation, unincorporated organization, joint stock company, limited liability company, trust, joint venture or other legal entity, or a governmental agency or political subdivision thereof.

"Personal Representative" means, with respect to any natural person, the estate, executor, executrix or other personal representative, custodian, administrator or guardian of such natural person.

"Petition Date" has the meaning set forth in the Plan.

"Piggyback Registration" means any proposed filing of a Registration Statement with respect to Company Securities that requires the Company to provide the Stockholders with a Piggyback Registration Notice.

"Piggyback Registration Notice" has the meaning set forth in Section 3.3(a).

"Piggyback Registration Request" has the meaning set forth in Section 3.3(a).

"Plan" has the meaning set forth in the recitals to this Agreement.

"Plan Effective Date" has the meaning set forth in the Plan with respect to the term "Effective Date."

"Pledgee" has the meaning set forth in the definition of "Transfer" herein.

"Preemptive Rights Offer" has the meaning set forth in Section 6.5(b).

"Preemptive Rights Period" has the meaning set forth in Section 6.5(b).

"Preemptive Rights Stockholder" has the meaning set forth in Section 6.5(a).

"Proposed Buyer" has the meaning set forth in Section 5.2(a).

"Proposed Offering" has the meaning set forth in Section 6.5(a).

"Proposed Sale" has the meaning set forth in Section 5.2(a).

"Proposed Seller" has the meaning set forth in Section 5.2(a).

"Public Offering" means any bona fide firm commitment underwritten sale of Common Stock to the public pursuant to an effective Registration Statement.

"Registrable Securities" means all shares of Common Stock issued by the Company to a Stockholder pursuant to the Plan, any additional shares of Common Stock held by a Stockholder (including Shares acquired upon the exercise of any preemptive rights and upon exercise of options or settlement of other awards issued pursuant to the Management Incentive Plan or any similar plan), and any additional Shares issued or distributed by way of a dividend or other distribution in respect of any such Shares; provided, that such Registrable Securities shall

6

cease to be Registrable Securities (i) upon any sale pursuant to a Registration Statement or Rule 144 and (ii) upon repurchase by the Company.

"Registration Demand" has the meaning set forth in Section 3.1(a).

"Registration Expenses" means any and all expenses incident to the performance of or compliance with Article 3, including (i) the fees, disbursements and expenses of the Company's counsel and accountants (including the expenses of any annual audit letters and "cold comfort" letters required or incidental to the performance of such obligations), (ii) the reasonable fees and disbursements of one counsel for all of the Selling Holders, which counsel shall be selected by the Company and be reasonably acceptable to holders of a majority of the Registrable Securities to be registered on the Registration Statement, (iii) all expenses, including filing fees, in connection with the preparation, printing and filing of the Registration Statement, any free writing, preliminary prospectus or final prospectus, any other offering document and amendments and supplements thereto and the mailing and delivering of copies thereof to any underwriters and dealers, (iv) the cost of printing or producing any agreements among underwriters, underwriting agreements, any selling agreements and any other documents in connection with the offering, sale or delivery of the securities to be disposed of, (v) all expenses in connection with the qualification of the securities to be disposed of for offering and sale under state securities laws, (vi) the filing fees incidental to securing any required review by FINRA of the terms of the sale of the securities to be disposed of, (vii) transfer agents' and registrars' fees and expenses and the fees and expenses of any other agent or trustee appointed in connection with such offering, (viii) all security engraving and security printing expenses, (ix) all fees and expenses payable in connection with the listing of the securities on any national securities exchange and (x) all rating agency fees.

"Registration Request" has the meaning set forth in Section 3.1(a).

"Registration Statement" means a registration statement under the Securities Act that is filed by the Company with the SEC for a public offering and sale of securities of the Company, other than a registration statement on Form S-8 or Form S-4 or any successor forms thereto.

"Related Fund" means, with respect to any Person, a fund, pooled investment vehicle or managed account now or hereafter existing that is (i) controlled by one or more general partners or managing members, or any Affiliates of such general partners or managing members, of such Person, or (ii) managed or advised by the same manager or advisor, or any Affiliates of such manager or advisor, as such Person.

"Remaining Director" has the meaning set forth in Section 2.3(c)(iv).

"Requested Approved Public Offering Notice" has the meaning set forth in Section 3.2(a).

"Requesting Holder" means, with respect to any Registration Statement that is used to register Registrable Securities pursuant to Article 3, any Stockholder who is an Initial Requesting Holder or timely submits a Registration Request pursuant to Section 3.1, any Approved Public Offering Holder who timely submits a Requested Approved Public Offering

7

Notice pursuant to Section 3.2, or any Stockholder who timely submits a Piggyback Registration Request pursuant to Section 3.3.

"Required Board Size" has the meaning set forth in Section 2.3(h)(i).

"Required Information" means (i) information (A) reasonably requested by the Company, the lead underwriters or their counsel or counsel for the Requesting Holders that is necessary in connection with the Public Offering, including any information required by any law or governmental entity in connection with a Public Offering, including information necessary to comply with SEC disclosure requirements, FINRA review of the offering and any required tax forms or certificates or (B) reasonably requested by counsel to the Company or counsel for the Requesting Holders to provide an opinion to the underwriters as to due authorization, execution and delivery of documents and valid transfer of title to the Registrable Securities, (ii) any certificates or other applicable instruments representing the Registrable Securities of any Approved Public Offering Holder to be included in the Approved Public Offering, together with a notarized, limited power-of-attorney authorizing the Company or its representative to Transfer such Registrable Securities on the terms contemplated in the Approved Public Offering Notice and receive payment therefor and to execute a lockup letter as set forth in Section 3.2 and wire transfer or other instructions for payment of the consideration for the Registrable Securities being Transferred in such Approved Public Offering and (iii) all other documents reasonably required to be executed in connection with a Approved Public Offering or sale of Registrable Securities pursuant to Section 3.1 or Section 3.3.

"Responsible Requesting Holder" has the meaning set forth in Section 3.5.

"Rule 144" means Rule 144 under the Securities Act, and any successor rule or regulation hereafter adopted by the SEC.

"SEC" means the United States Securities and Exchange Commission, or any other Federal agency at the time administering the Securities Act or the Exchange Act.

"Secondary Offering Shares" has the meaning set forth in Section 3.2(a).

"Securities Act" means the Securities Act of 1933, and the rules and regulations of the SEC promulgated thereunder.

"Selling Holder" means, with respect to any Registration Statement that is used to register Registrable Securities pursuant to Article 3, any Stockholder who beneficially owns Registrable Securities or other shares of Common Stock included in such Registration Statement.

"Shares" means, collectively, all shares of Common Stock held by the Stockholders and shall include all securities issued or issuable with respect thereto by way of a split, dividend, or other division of securities, or in connection with a combination of securities, conversion, exchange, replacement, recapitalization, merger, consolidation, or other reorganization or otherwise.

"Stockholder Group" means one or more Stockholders that are Affiliates of each other; provided, however, that any action or election permitted to be taken by any Stockholder

8

Group shall be deemed taken if approved by members of such Stockholder Group holding a majority of the shares of Common Stock held by all members of such Stockholder Group.

"Stockholders" means, collectively, (i) all Initial Stockholders, (ii) any other Person who is a Transferee of Shares beneficially owned by another Stockholder in a Transfer that complies with the terms and conditions of this Agreement and who is required by this Agreement to agree to be bound by the terms and conditions of this Agreement and (iii) any other person who otherwise becomes a party to this Agreement pursuant to the terms and conditions of this Agreement.

"Subsidiary" means any Person in which the Company, directly or indirectly through Subsidiaries or otherwise, beneficially owns more than 50% of either the equity interests in, or the voting control of, such Person.

"Tag-Along Notice" has the meaning set forth in Section 5.2(a).

"Tag-Along Portion" means, with respect to any Tagging Stockholder in any Proposed Sale that is subject to Section 5.2, a number of Shares, rounded down to the nearest whole Share, equal to (i) the total number of Shares proposed to be Transferred by the Proposed Seller in such Proposed Sale *multiplied by* (ii) a fraction the numerator of which is the total number of Shares held by such Tagging Stockholder immediately prior to such Transfer and the denominator of which is the total number of Shares outstanding immediately prior to such Transfer.

"Tagging Stockholder" has the meaning set forth in Section 5.2(b).

"Transfer" means, with respect to any security of the Company, to directly or indirectly sell, exchange, transfer, hypothecate, negotiate, gift, bequeath, convey in trust, pledge, mortgage, grant a security interest in, assign, encumber, or otherwise dispose of all or any portion of such security, including by recapitalization, merger, consolidation, liquidation, dissolution, dividend, distribution or otherwise; provided, however, that a pledge or grant of a security interest in Shares to secure a "bona fide" loan shall in no event be deemed a Transfer for any purpose of this Agreement so long as the Pledgee's interest in the Shares is limited to an actual or contingent economic interest, it being understood and agreed that the pledge or grant of a security interest in Shares does not grant such Pledgee the rights of a Stockholder under this Agreement, including any right to vote, or the right to direct the vote of, the pledged Shares; provided, further, that any foreclosure, transfer in lieu of foreclosure or other enforcement of such pledge or security interest shall be deemed to constitute a Transfer hereunder and shall be subject to the rights of the Company and the Stockholders set forth in this Agreement (including but not limited to Article 4 and Article 5). "Transferred," "Transferor" and "Transferee" shall have the correlative meanings.

"Transfer Request" has the meaning set forth in Section 4.1(d).

"Triggering Group" means (a) prior to the second anniversary of the Plan Effective Date, Stockholders beneficially owning a majority of the outstanding shares of Common Stock, and (b) thereafter, Stockholders beneficially owning not less than 35% of the outstanding shares of Common Stock.

9

"Underwriter's Maximum Number" has the meaning set forth in Section 3.1(j).

"Underwriting Agreement" has the meaning set forth in Section 3.7(a).

"Voting Shares" means (i) all shares of Common Stock beneficially owned by Non-Appointing Stockholders and (ii) all shares of Common Stock held by each Appointing Stockholder Group in excess of the minimum shares of Common Stock necessary for the Director appointment rights exercised by such Appointing Stockholder Group pursuant to Section 2.3(c)(ii).

Section 1.2    Rules of Interpretation.    Unless the context otherwise clearly requires:  (a) a term has the meaning assigned to it; (b) "or" is not exclusive; (c) wherever from the context it appears appropriate, each term stated in either the singular or the plural shall include the singular and the plural, and pronouns stated in either the masculine, feminine or neuter shall include the masculine, feminine and neuter; (d) provisions apply to successive events and transactions; (e) all references in this Agreement to "including" shall be deemed to be followed by the phrase "without limitation"; (f) all references in this Agreement to designated "Articles," "Sections," "paragraphs," "clauses" and other subdivisions are to the designated Articles, Sections, paragraphs, clauses and other subdivisions of this Agreement, and the words "herein," "hereof," "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular Article, Section, paragraph, clause or other subdivision; (g) any definition of or reference to any agreement, instrument, document, statute, rule or regulation herein shall be construed as referring to such agreement, instrument, document, statute, rule or regulation as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein) and (h) the word "extent" and the phrase "to the extent" when used in this Agreement shall mean the degree to which a subject or other thing extends, and such word or phrase shall not merely mean "if."  This Agreement is among financially sophisticated and knowledgeable Persons and is entered into by such Persons in reliance upon the economic and legal bargains contained herein and shall be interpreted and construed in a fair and impartial manner without regard to such factors as the Person who prepared, or cause the preparation of, this Agreement or the relative bargaining power of such Persons.  Subject to applicable law, wherever in this Agreement a Stockholder is empowered to take or make a decision, direction, consent, vote, determination, election, action or approval, such Stockholder is entitled to consider, favor and further such interests and factors as it desires, including its own interests, and has no duty or obligation to consider, favor or further any other interest of the Company, any Subsidiary or any other Stockholder.

## ARTICLE 2. CORPORATE GOVERNANCE

Section 2.1    Authority.    Subject to the limitations provided in this Agreement and except as specifically contemplated by this Agreement, the Board shall have exclusive and complete authority and discretion to manage the operations and affairs of the Company and to make all decisions regarding the business of the Company.  Any action authorized by the Board shall constitute the act of and serve to bind the Company.  Persons dealing with the Company are entitled to rely conclusively on the power and authority of the Board as set forth in this Agreement.

Section 2.2    Powers and Duties of the Board. Except as otherwise specifically provided herein, the Board shall have such authority, rights and powers in the management of the Company business to do any and all acts and things necessary, proper, convenient or advisable to effectuate the purposes of this Agreement.

Section 2.3    Election of Directors; Number and Composition of the Board.

(a)    Generally. Each Stockholder and the Company hereby agrees to take all Necessary Action so as to (i) cause the Board to be initially constituted with seven persons, which number may be increased or reduced as provided in Section 2.3(h) and in accordance with the Bylaws, and (ii) take or cause to be taken such action as may be necessary to effectuate the provisions of this Section 2.3.

(b)    Initial Board. The initial Board as of the Plan Effective Date shall consist of the Directors identified below in accordance with the terms and conditions of the Plan (collectively, the "Initial Directors"), and each Stockholder hereby consents to the election of each such Initial Director, effective as of the Plan Effective Date:

| Name of Director[1] |
| --- |
| **[MUDRICK APPOINTEE]** |
| **[MUDRICK APPOINTEE]** |
| **[MUDRICK APPOINTEE]** |
| **[PAULSON APPOINTEE]** |
| **[MINORITY DIRECTOR]** |
| **[REMAINING DIRECTOR]** |
| Joe Walsh |

(c)    Subsequent Board Composition. Beginning with the first election of directors following the Plan Effective Date, each of the Stockholders shall take all Necessary Action to cause the Board to be constituted as follows:

(i)    Chief Executive Officer Director. The Chief Executive Officer of the Company shall be elected as a Director.

(ii)    Appointing Stockholder Group Directors. The following persons shall be elected as a Director:

(A)    so long as any Appointing Stockholder Group beneficially owns Common Stock constituting at least 10%, but less than 20%, of the

---

[1] NTD: Subject to revision based on actual holdings as of the effective date of this Agreement.

11

outstanding shares of Common Stock, one person designated by such Appointing Stockholder Group;

(B)    so long as any Appointing Stockholder Group beneficially owns Common Stock constituting at least 20%, but less than 30%, of the outstanding shares of Common Stock, two persons designated by such Appointing Stockholder Group;

(C)    so long as any Appointing Stockholder Group beneficially owns Common Stock constituting at least 30%, but less than 40%, of the outstanding shares of Common Stock, three persons designated by such Appointing Stockholder Group;

(D)    so long as any Appointing Stockholder Group beneficially owns Common Stock constituting at least 40%, but less than 50%, of the outstanding shares of Common Stock, three persons designated by such Appointing Stockholder Group; provided, however, that if such Appointing Stockholder Group provides written notice to the Company that such Appointing Stockholder Group elects to increase the Board to nine Directors (with additional Directors appointed pursuant to Section 2.3(c)(iv)) (the "Increased Board Election"), then (I) the Company shall provide written notice to the Stockholders of such election, (II) promptly following such election, the Company, by action of the Board, shall increase the size of the Board to nine Directors, (III) the Company shall request from the Stockholders nominations for the new vacancies so created, and (IV) effective as of the date of the increase of the size of the Board to nine Directors, four persons designated by such Appointing Stockholder Group shall be elected to the Board;

(E)    so long as any Appointing Stockholder Group beneficially owns Common Stock constituting at least 50% of the outstanding shares of Common Stock, (I) five persons designated by such Appointing Stockholder Group and (II) for each additional 10% of the outstanding shares of Common Stock beneficially owned by such Appointing Stockholder Group in excess of 50%, an additional person designated by such Appointing Stockholder Group if so requested by such Appointing Stockholder Group by written notice to the Company;

provided, however, that:

(1)    if the percentage ownership of Common Stock of any Stockholder Group decreases such that the number of Directors that may be designated by such Stockholder Group pursuant to this Section 2.3(c)(ii) is reduced (the amount so reduced, the "Forfeited Seats"), then such Stockholder Group shall, and, at the request of the Company, the other Stockholders shall, take all Necessary Action to cause a number of Directors appointed by such Appointing Stockholder Group equal to the Forfeited Seats to resign or be

12

removed from the Board promptly following the Company becoming aware of such reduction, and

(2)     if the percentage ownership of Common Stock of any Stockholder Group increases such that the number of Directors that may be designated by such Stockholder Group pursuant to this Section 2.3(c)(ii) is increased (the amount so increased, the "Added Seats"), then (A) the Company shall, and, at the request of the Company, the other Stockholders shall, take all Necessary Action to elect to the Board an additional number of persons designated by such Stockholder Group equal to the Added Seats and (B) if, as a result of the election of such Directors, the number of Directors that would be elected pursuant to Section 2.3(c)(iv) would be reduced, then the Company shall, and, at the request of the Company, the other Stockholders shall, take all Necessary Action to cause such Directors no longer permitted to be designated pursuant to Section 2.3(c)(iv) to resign or be removed from the Board concurrently with the election of Directors pursuant to the foregoing clause (A).

(iii)     Minority Director.  Non-Appointing Stockholders holding a majority of the then outstanding Common Stock held by all Non-Appointing Stockholders shall have the right to elect one Minority Director Nominee to serve as a director of the Board.

(iv)     Remaining Directors.  The remaining Directors not subject to rights of designation set forth above (after taking proper account of the provisions of Section 2.3(h)), if any, shall be elected by the holders of a majority of the outstanding Voting Shares (each, a "Remaining Director").

(d)     Removal; Vacancies.

(i)     Each Director shall hold office from the time of his or her appointment until his or her resignation or removal.  Upon written notice to the Company, a Director may be removed (A) by a majority of the Board, at any time, with Cause and (B) with respect to a Director designated and elected pursuant to Section 2.3(c), by the Stockholders entitled to designate or elect, as applicable, such Director.  Any Director may resign at any time upon written notice to the Company.  Any such resignation shall take effect at the time specified therein or, if the time be not specified, upon receipt thereof, and the acceptance of such resignation, unless required by the terms thereof, shall not be necessary to make such resignation effective.

(ii)     Vacancies on the Board shall be filled in accordance with the designation, nomination and election rights set forth in Section 2.3(c).

(e)     Committees.  The Company shall at all times maintain an audit committee of the Board (the "Audit Committee") and a compensation committee of the Board (the "Compensation Committee") unless otherwise agreed in writing by Stockholders owning a majority of the then outstanding shares of Common Stock.  Each of the Company and each Stockholder shall take all Necessary Action to cause to be appointed to each of the Audit Committee and the Compensation Committee (i) the Minority Director and (ii) with respect to

13

each Appointing Stockholder Group that designated a Director pursuant to Section 2.3(c)(ii), one Director designated by such Appointing Stockholder Group to be appointed to such committee or committees, if any.

(f)    Chairperson; Vice Chairman.  The initial chairperson of the Board, chairperson of the Audit Committee of the Board, and chairperson of the Compensation Committee of the Board shall be as follows:

| |
|---|
| Chairperson of the Board:  [____] |
| Chairperson of the Audit Committee: [____] |
| Chairperson of the Compensation Committee:  [____] |

Beginning with the first election of directors following the Plan Effective Date, the chairperson of the Board, vice chairperson of the Board, chairperson of the Audit Committee of the Board and chairperson of the Compensation Committee of the Board shall be selected by the Board.

(g)    Compensation.  The members of the Board may receive compensation for services to the Company in their capacities as Directors in such manner and in such amounts as may be fixed from time to time by the Board; provided, that each of the following Directors shall only be entitled to compensation equal to one-half of the compensation of other similarly situated directors: (i) any Director that is an officer or employee of a member of an Appointing Stockholder Group or an Affiliate thereof, or (ii) any Director that is a consultant of a member of an Appointing Stockholder Group or an Affiliate thereof and is determined by majority vote of the Directors other than the Directors appointed by such Appointing Stockholder Group to be the equivalent of a substantially full-time employee of such member or Affiliate of such Appointing Stockholder Group notwithstanding being classified as a consultant.

(h)    Board Size.  The Company and, at the written request of the Company, each Stockholder, shall take all Necessary Action to cause the size of the Board to be constituted as follows:

(i)  If at any time the number of persons that constitute the Board is less than the greater of (I) seven Directors, and (II) (i) two Directors (or, following an Increased Board Election, three Directors) plus (ii) the number of Directors that the Appointing Stockholder Groups have the right to appoint pursuant to Section 2.3(c)(ii) (the "Required Board Size"), then the Company, by action of the Board of Directors, shall increase the size of the Board of Directors to such number of Directors.

(ii)    If at any time the number of persons that constitute the Board is both (A) greater than seven and (B) greater than the Required Board Size, then the Company, by action of the Board, shall decrease the number of persons that constitute the Board to the greater of (x) seven and (y) the Required Board Size.

(iii)    If at any time Stockholders holding a majority of the outstanding shares of Common Stock provide written notice to the Company electing to increase the

14

Board to 11 Directors, then the Company, by action of the Board, shall increase the number of persons that constitute the Board to the greater of (x) 11 and (y) the Required Board Size.

Section 2.4     Exculpation.  The Company and the Stockholders agree that no Stockholder, nor any Affiliate of any Stockholder, shall have any liability as a result of designating any individual as a Director or proposing to nominate any individual for election as a Director, solely for any act or omission by such individual in his or her capacity as a Director, nor shall any Stockholder or any Affiliate of any Stockholder have any liability as a result of voting for any such individual in accordance with the provisions of this Agreement; provided, however, that this Section 2.4 shall not exculpate any Stockholder for any action taken or omitted to be taken by such Stockholder that is a breach or violation of this Agreement.

Section 2.5     Further Assurances.  Each Stockholder hereby agrees to be present and to vote, in person or by proxy, all of its shares of Common Stock, at any annual or special meeting of Stockholders or by the written consent of Stockholders in lieu of a meeting, and take all other Necessary Action (a) to effect the provisions of Section 2.3, including causing the election of Directors designated in accordance therewith and, as applicable, the removal of Directors, the filling of Board vacancies and changes in the size of the Board, in each case in accordance with Section 2.3, (b) against any matter that is presented to Stockholders for a vote or consent that is inconsistent with the express terms of this Agreement, and (c) to ensure that the Organizational Documents do not at any time conflict with the provisions of this Agreement. Notwithstanding the fact that the DGCL, the Certificate of Incorporation or Bylaws may provide for the right of a stockholder of the Company to take such action, no Stockholder shall take any action with respect to the nomination or election of Directors (including the calling of a special meeting of Stockholders or executing any written consent in lieu of a special meeting of Stockholders) if such action is in violation of or inconsistent with any of the terms of this Article 2.

Section 2.6     Management Incentive Plan.  The initial grants to the senior executive officers of the Company pursuant to the Management Incentive Plan shall be subject to the approval of the Board, which approval must include the approval of the Minority Director, and the Company shall not make such initial grants prior to obtaining such requisite approval.

Section 2.7     Stockholder Consent.  Notwithstanding anything herein to the contrary and without limiting the DGCL, the Company shall not, without first obtaining the affirmative vote or written consent of Stockholders holding not less than 66⅔% of the then outstanding Common Stock, declare or pay any dividend or make any other distribution.

Section 2.8     Transactions with Affiliates.  Other than transactions expressly contemplated by this Agreement, the Company shall not enter into any agreement or transaction between the Company or any Subsidiary, on the one hand, and any member of an Appointing Stockholder Group or any Affiliate thereof, on the other, without the prior approval of a majority of the disinterested members of the Board.

15

**ARTICLE 3. REGISTRATION RIGHTS**

Section 3.1    Demand Registration.

(a)    Requests for Registration.  Subject to Section 3.1(b) and the other terms of this Article 3, any 5% Stockholder shall have the right to, in each case, pursuant to Section 3.1(c) or Section 3.1(d), request the Company to effect the registration under and in accordance with the provisions of the Securities Act of the offering of all or any portion of the Registrable Securities beneficially owned by such 5% Stockholder by submitting a written request of such registration and specifying the amount of Registrable Securities proposed to be registered and the intended method (or methods) and plan of disposition thereof, including whether such requested registration is to involve an underwritten offering (a "Registration Demand").  The Company shall give prompt written notice thereof (a "Demand Registration Notice") (and in any event within ten Business Days from the date of receipt of such Registration Demand) to each of the other 5% Stockholders, each of whom shall be entitled to elect to include, subject to the terms and conditions set forth in this Article 3, Registrable Securities beneficially owned by it in the Registration Statement to which a Demand Registration Notice relates, by submitting a written request to the Company (a "Registration Request") within 15 days after the date of such Demand Registration Notice, specifying the number of Registrable Securities that such Stockholder intends to dispose of pursuant to such Registration Statement.  Except as otherwise provided in this Agreement, the Company shall prepare and use its reasonable best efforts to file with the SEC, within 90 days after the date of the applicable Registration Demand, a Registration Statement with respect to the following (in either case subject to Section 3.1(j) if the Registrable Securities will be sold in an underwritten offering):  (i) all Registrable Securities of the Initial Requesting Holder included in such Registration Demand and (ii) all Registrable Securities that other Stockholders elect to include in such Registration Statement, pursuant to one or more timely submitted Registration Requests.  Thereafter, the Company shall use its reasonable best efforts, in accordance with Section 3.6, to effect the registration of the offering of such Registrable Securities under the Securities Act and applicable state securities laws, for disposition in accordance with the intended method or methods of disposition stated in the underlying Registration Demand.  Subject to Section 3.1(j), the Company may include in such Registration Statement such number of shares of Common Stock or other securities of the Company (collectively, "Company Securities") as the Company proposes to offer and sell for its own account or the account of any other Person.

(b)    Limitation on Demand Registration.  Notwithstanding anything to the contrary in this Section 3.1, no 5% Stockholder may make a Registration Demand until the earliest to occur of (i) the Exchange Act Reporting Date (other than the occurrence of the Exchange Act Reporting Date due to the Company's initial Public Offering of shares of Common Stock), (ii) the six-month anniversary of the Company's initial Public Offering of shares of Common Stock and (iii) the date on which the Board approves the making of a Registration Demand pursuant to this Section 3.1.

(c)    Form S-1 Registration.  Subject to the terms and conditions of this Article 3, any 5% Stockholder, shall have the right to submit a Registration Demand to effect the registration on Form S-1 (or any successor form) of all or any portion of the Registrable Securities held by such Stockholders; provided, that the Stockholders, shall, collectively, be

16

limited to three such Registration Demands. Any registration pursuant to such a Registration Demand may, if so requested in the underlying Registration Demand, be a "shelf" registration for an offering of Registrable Securities on a continuous or delayed basis pursuant to Rule 415 under the Securities Act (or any successor rule that is subsequently adopted by the SEC).

(d) Registration; Shelf Registration. Subject to the terms and conditions of this Article 3, at any time that the Company is eligible to use Form S-3 (or any successor form) for the registration of Registrable Securities for resale, each 5% Stockholder shall have the right, subject to the terms and conditions of this Article 3, to submit a Registration Demand to effect the registration on Form S-3 (or any successor form) of the Registrable Securities held by such Stockholder. Any registration pursuant to such a Registration Demand may, if so requested in the underlying Registration Demand, be a "shelf" registration for an offering of Registrable Securities on a continuous or delayed basis pursuant to Rule 415 under the Securities Act (or any successor rule that is subsequently adopted by the SEC). Subject to paragraph (f), the number of Registration Demands that may be made pursuant to this paragraph is unlimited.

(e) Delay for Disadvantageous Condition. If, in connection with any registration requested or ongoing pursuant to a Registration Demand, the Company provides a certificate to the Requesting Holders, signed by the President or Chief Executive Officer of the Company and stating that, in the good faith judgment of the Board, it would be materially detrimental to the Company or its Stockholders for such Registration Statement either to become effective or to remain effective for as long as such Registration Statement otherwise would be required to remain effective, or if the Company is prohibited by the terms of any applicable underwriting or securities purchase agreement, then the Company shall have the right to defer taking action with respect to such Registration Statement and any time periods with respect to filing or effectiveness thereof shall be tolled correspondingly; provided, however, that (i) the aggregate number of days in all such delay periods in any period of 12 consecutive months shall not exceed 135 days and (ii) at least 30 days shall elapse between the termination of any delay period and the commencement of the immediately succeeding delay period.

(f) Limitation on Successive Registrations and Underwritten Offerings. The Company shall not be required to effect a registration of Registrable Securities pursuant to Section 3.1(c) or Section 3.1(d) for a period of 90 days immediately following the effective date of any Registration Statement filed pursuant to this Section 3.1 and in no event shall the Company be required to file more than three Registration Statements pursuant to Section 3.1(d) during any 12 month period. Without limiting the foregoing, in addition, in no event shall the Company have the obligation to effect more than three underwritten offerings pursuant to this Section 3.1.

(g) Demand Withdrawal. With respect to any registration requested pursuant to this Section 3.1, (i) the Initial Requesting Holder who submitted the underlying Registration Demand may withdraw such Registration Demand and (ii) any Requesting Holder may withdraw its Registrable Securities from such registration, in either case by providing written notice to the Company at any time (x) in the case of an underwritten offering, prior to the filing of the preliminary prospectus pursuant to such registration, and (y) in the case of non-underwritten offering, prior to the effective date of the Registration Statement relating to such Registration Demand. If all of the Registrable Securities to be included in the registration pursuant to any

17

Registration Demand are so withdrawn, then such Registration Demand shall be deemed withdrawn.  In the event of any such actual or deemed withdrawal of a Registration Demand, the Company shall cease all efforts to effect the registration of the Registrable Securities requested to be included in such registration, without liability to any Requesting Holder.  Such registration will be deemed to have been effected (including for purposes of Section 3.1(c) and Section 3.1(d), with respect to a Registration Demand made thereunder) unless (A) each Requesting Holder who has withdrawn its Registration Demand or has withdrawn all of its Registrable Securities from such registration has paid (or reimbursed the Company for), pursuant to Section 3.5, its pro rata share (based on a fraction, the numerator of which is the number of Registrable Securities that such Requesting Holder asked to be included in such withdrawn registration and the denominator of which is the aggregate number of Registrable Securities that all Requesting Holders, collectively, requested to be included in such withdrawn registration) of the Registration Expenses incurred by the Company in connection with such withdrawn registration; provided, that if any revocation was based on the Company's failure to comply in any material respect with its obligations hereunder, such reimbursement of Registration Expenses shall not be required or (B) the withdrawal is made following the occurrence of a material adverse change in the business or financial condition of the Company that is made known to the Initial Requesting Holder after the date of the applicable Registration Demand, or (C) if the registration is interfered with by any stop order, injunction or other order or requirement of the SEC or other governmental agency or court for any reason other than a misrepresentation or omission by any Requesting Holder; provided, that if any such stop order, injunction, order or requirement is issued or imposed as a result of any misrepresentation or omission by any Requesting Holder(s), the Responsible Requesting Holder(s) shall be solely responsible for paying (or reimbursing the Company for) all of the Registration Expenses to be paid or reimbursed to the Company pursuant to Section 3.5.

(h)    Effective Registration.  Notwithstanding anything to the contrary in this Agreement, except to the extent expressly set forth in Section 3.1(g), a Registration Statement filed pursuant to this Section 3.1 shall not be deemed to have been requested or effected (including for purposes of Section 3.1(c) and Section 3.1(d), with respect to a Registration Demand made thereunder) unless it has been declared effective by the SEC and shall have remained effective for 180 days (excluding any periods of time during which such Registration Statement is tolled or suspended pursuant to Section 3.1(e) or Section 3.6(c)) or such shorter period as may be required to sell all Registrable Securities included in such Registration Statement; provided, that in the case of any registration of Registrable Securities that are intended to be offered on a continuous or delayed basis, such 180-day period shall be extended, if necessary, to keep the Registration Statement effective until all such Registrable Securities are sold.  In no event shall a registration be deemed to have been effected if (i) after the Registration Statement has been declared effective by the SEC, such registration is interfered with by any stop order, injunction or other order or requirement of the SEC or other governmental agency or court, for any reason other than a misrepresentation or an omission by any Requesting Holder and, as a result thereof, the Registrable Securities requested to be registered therein cannot be completely distributed in accordance with the plan of distribution set forth in such Registration Statement or (ii) the conditions to closing the sale of Registrable Securities specified in any purchase agreement or Underwriting Agreement, which agreement was entered into in connection with such registration for the purpose of distributing Registrable Securities in accordance with the plan of distribution set forth in the applicable Registration Statement, are not

18

satisfied or waived other than solely by reason of some act or omission by any Requesting Holder.

(i) <u>Selection of Underwriters</u>.  Subject to <u>Section 3.1(f)</u>, any registration of Registrable Securities pursuant to this <u>Section 3.1</u> may, if so requested in the underlying Registration Demand, be effected as an underwritten offering, and in such event the Company shall have the right to select the managing underwriter or underwriters for the offering; <u>provided</u>, that such underwriter or underwriters shall be reasonably acceptable to the Requesting Holder(s).

(j) <u>Priority</u>.  If a registration under this <u>Section 3.1</u> involves an underwritten offering and the managing underwriter(s) in its good faith judgment advises the Company that the number of Registrable Securities requested to be included in the Registration Statement by the Requesting Holders exceeds the number of securities that can be sold without adversely affecting the price, timing, distribution or sale of securities in the offering (the "<u>Underwriter's Maximum Number</u>"), the Company shall be required to include in such Registration Statement only such number of securities as is equal to the Underwriter's Maximum Number and the Company and the Requesting Holders shall participate in such offering in the following order of priority:

(i) <u>First</u>, the Company shall be obligated and required to include in the Registration Statement the number of Registrable Securities that the Requesting Holder(s) have requested to be included in the Registration Statement and that does not exceed the Underwriter's Maximum Number; <u>provided</u>, that if there are multiple Requesting Holders, the Registrable Securities to be included in the Registration Statement shall be allocated among all such Requesting Holders in proportion, as nearly as practicable, to the respective number of Registrable Securities held by them on the date of the underlying Registration Demand.  If any Requesting Holder would thus be entitled to include more Registrable Securities than it requested to be registered, the excess shall be allocated among other Requesting Holders pro rata in the manner described in the preceding sentence.

(ii) <u>Second</u>, the Company shall be entitled to include in such Registration Statement such number of Company Securities as the Company proposes to offer and sell for its own account or the account of any other Person to the full extent of the remaining portion of the Underwriter's Maximum Number.

Section 3.2   <u>Approved Public Offering</u>.

(a) At any time with respect to which the Board shall have approved the pursuit of such an offering pursuant to this <u>Section 3.2</u>, the Triggering Group may deliver a notice to the Company (the "<u>Requested Approved Public Offering Notice</u>") of the Triggering Group's intention to sell shares of Common Stock in a Public Offering and require, pursuant to this <u>Section 3.2</u>, that each Stockholder be required to sell Shares in such Public Offering (an "<u>Approved Public Offering</u>"). The Requested Approved Public Offering Notice shall identify the maximum number of shares of Common Stock required to be sold in such Approved Public Offering by each Stockholder (the "<u>Secondary Offering Shares</u>"), which maximum amount shall not exceed 15% of the shares of Common Stock held by each Stockholder and required to be

19

sold (inclusive of shares subject to a customary overallotment option granted to the underwriters), subject to Section 3.2(c) and subject to any adjustment to be implemented pursuant to Section 3.2(h), which adjustment of such Secondary Offering Shares shall not increase such percentage above 15% (in each case, inclusive of shares subject to a customary over-allotment option granted to the underwriters) (the percentage represented by such the maximum number of shares, the "Approved Public Offering Percentage").

(b)   If the Triggering Group delivers the Requested Approved Public Offering Notice, each Stockholder, including, the members of the Triggering Group, but expressly excluding any employee of the Company who is employed by the Company on the date of the Requested Approved Public Offering Notice (each such Stockholder, an "Approved Public Offering Holder") shall (A) sell in the Approved Public Offering shares of Common Stock equal to (subject to increase or reduction as provided in Section 3.2(c) and subject to exercise of the over-allotment option) (i) the Approved Public Offering Percentage multiplied by (ii) the number of shares of Common Stock held by such Approved Public Offering Holder, in each case at the price determined pursuant to Section 3.2(i) and in accordance with other provisions of this Section 3.2; and (B) otherwise take all other actions reasonably necessary or desirable to consummate the Approved Public Offering; provided, that this clause (B) shall not obligate any Approved Public Offering Holder to enter into any lockup or restriction on Transfers other than as specifically provided in this Agreement or incur costs or liabilities other than as specifically provided in this Agreement. The Company shall provide notice of an Approved Public Offering to each Approved Public Offering Holder (an "Approved Public Offering Notice") not later than ten Business Days prior to the scheduled launch of marketing of the proposed Approved Public Offering. The Approved Public Offering Notice shall (i) identify the Approved Public Offering Percentage, (ii) notify the Approved Public Offering Holders (x) of any Required Information that such Approved Public Offering Holder is required to provide in connection with the Approved Public Offering and (y) that, subject to Section 3.2(c), each Approved Public Offering Holder shall participate in the Approved Public Offering by selling a percentage of the shares of Common Stock held by such Approved Public Offering Holder that is (i) equal to the Approved Public Offering Percentage plus an additional number that is greater than the Approved Public Offering Percentage as may be designated by such Approved Public Offering Holder in its sole discretion (any such shares of Common Stock designated pursuant to this clause (i) as being in addition to the Approved Public Offering Percentage, "Incremental Shares"), (ii) equal to the Approved Public Offering Percentage without any reduction to such sales resulting from sales by other Approved Public Offering Holders or (iii) equal to the Diluted Approved Public Offering Percentage, in each case at the same price as the price in the Approved Public Offering. Each Approved Public Offering Holder shall be required to participate in the Approved Public Offering on the terms and conditions set forth in the Approved Public Offering Notice.

(c)   Each Approved Public Offering Holder shall provide notice to the Company (a "Approved Public Offering Holder Notice") not later than seven Business Days after receipt of the Approved Public Offering Notice, which notice shall specify one (but only one) of the following three options with respect to the Approved Public Offering: (x) such Approved Public Offering Holder desires to sell the Approved Public Offering Percentage and a greater fixed percentage of its shares of Common Stock above the Approved Public Offering Percentage (i.e., Incremental Shares) (and specify the percentage desired to be sold), (y) such

20

Approved Public Offering Holder desires to sell the Approved Public Offering Percentage of its shares of Common Stock without any reduction to such sales resulting from sales by other Approved Public Offering Holders or (z) such Approved Public Offering Holder is willing to have the shares of Common Stock sold by it reduced (down to zero, if applicable) by the sales of Incremental Shares being sold in the Public Offering (such Registrable Securities, the "APO Shares"). The shares of Common Stock to be sold in the Approved Public Offering shall be sold as follows: (i) first, all of the shares of Common Stock requested to be sold pursuant to clause (y) of the preceding sentence and the Approved Public Offering Percentage of the shares of Common Stock held by Stockholders that elected to sell Incremental Shares pursuant to clause (x) of the preceding sentence; (ii) second, all of the Incremental Shares requested to be sold pursuant to the Approved Public Offering Holder Notices in excess of those to be sold pursuant to clause (i); and (iii) third, the percentage of shares of Common Stock to be sold by the remaining Approved Public Offering Holders (such percentage, the "Diluted Approved Public Offering Percentage"), which shall be determined by deducting the number of the shares of Common Stock to be sold pursuant to clauses (i) and (ii) above from the Approved Public Offering Sale Amount, applying such reduction pro rata to the Approved Public Offering Percentage for the shares of Common Stock of the remaining Approved Public Offering Holders subject to the Approved Public Offering Notice and then selling the shares of Common Stock (if any) subject to such Diluted Approved Public Offering Percentage. If an Approved Public Offering Holder fails to timely deliver an Approved Public Offering Holder Notice, such Approved Public Offering Holder shall be deemed to have requested to sell shares of Common Stock pursuant to clause (y) of the first sentence of this paragraph and be obligated to sell the percentage of such Stockholder's shares of Common Stock pursuant to the Approved Public Offering as calculated pursuant to this paragraph (c).

(d)    If the managing underwriters for such Approved Public Offering advise the Company and the Approved Public Offering Holders that the number of shares of Common Stock and, if permitted hereunder, other securities requested to be included in such Approved Public Offering exceeds the number of shares of Common Stock and other securities, if any, which can be sold in an orderly manner in such offering within a price range required pursuant to this Section 3.2, the Company shall include in such Approved Public Offering the number of shares of Common Stock which can be so sold in the following order of priority: (i) first, the shares of Common Stock requested to be included in such Approved Public Offering in clause (y) of the first sentence of Section 3.2(c) and the Approved Public Offering Percentage of the Registrable Securities held by Stockholders that elected to sell Incremental Shares pursuant to clause (x) of the first sentence of Section 3.2(c), (ii) second, the Incremental Shares requested to be included in such Approved Public Offering in clause (x) of the first sentence of Section 3.2(c), pro rata among the respective Approved Public Offering Holders of such Incremental Shares on the basis of the number of shares of Common Stock requested to be included therein by each such Approved Public Offering Holder, (iii) third, the securities the Company proposes to sell, if any, and (iv) fourth, the shares of Common Stock requested to be included in such Approved Public Offering in clause (z) of the first sentence of Section 3.2(c), pro rata among the respective Approved Public Offering Holders of such Registrable Securities on the basis of the number of shares of Common Stock requested to be included therein by each such Approved Public Offering Holder.

21

(e)      Each Approved Public Offering Holder shall deliver, within three Business Days after receipt of the Approved Public Offering Notice, the Required Information with respect to such Approved Public Offering Holder.

(f)      If (i) within three Business Days of being notified of the proposed offering price range for shares of Common Stock (as set forth in any preliminary prospectus for the Approved Public Offering) in the Approved Public Offering one or more members of the Triggering Group notify the Company in writing that the proposed offering price range is not acceptable and (ii) the remaining members of the Triggering Group would no longer constitute a Triggering Group with the absence of such objecting members, then the Company shall return to each of the Approved Public Offering Holders the limited power-of-attorney and all certificates, if any, that such Approved Public Offering Holders have delivered for transfer pursuant hereto, together with any other documents in the possession of the Company executed by the Approved Public Offering Holders in connection with the proposed Approved Public Offering. Subject to compliance with the immediately preceding sentence, neither the Company (or its managers or officers) nor any Requesting Holder shall have any liability to any Stockholder if an Approved Public Offering or a Public Offering is not consummated for any reason.

(g)      The provisions of this Section 3.2 shall not be deemed to impose any restrictions on transfer until the date that is seven days prior to the pricing of the proposed Approved Public Offering and any such restrictions shall terminate if the Approved Public Offering is not consummated or is abandoned pursuant to paragraph (f).

(h)      In the event that an over-allotment option is granted to the underwriters of an Approved Public Offering and such over-allotment option expires and has not been exercised in full in accordance with its terms or less than all the APO Shares or Incremental Shares are sold in a Public Offering as a result of Section 3.2(c), the Company shall be obligated to promptly return to each of the Approved Public Offering Holders all certificates, if any, representing such shares of Common Stock and any applicable transfer instruments in respect thereof that such Approved Public Offering Holders have delivered for transfer pursuant hereto with respect to the portion of such Approved Public Offering Holder's APO Shares or Incremental Shares that remain unsold as a result thereof.

(i)      Each of (i) the sale price for the shares of Common Stock to be offered in connection with the Public Offering implemented pursuant to the Approved Public Offering, (ii) the selection of investment banker(s) and manager(s) to administer the offering (which shall consist of one or more reputable nationally recognized investment banks) and (iii) any revision to the Approved Public Offering Percentage from the amount specified in the Requested Approved Public Offering Notice, which revision may not cause the Approved Public Offering Percentage to exceed 15% of the Common Stock held by each Approved Public Offering Holder (inclusive of shares subject to a customary overallotment option granted to the underwriters), shall be determined by the Board.

Section 3.3      Piggyback Registration.

(a)      Notice of Registrations.  In the event that the Company proposes to file a Registration Statement with respect to Company Securities (other than a Registration

22

Statement (i) filed in connection with the Company's initial Public Offering, (ii) filed pursuant to Section 3.1 or Section 3.2, or (iii) filed solely in connection with a dividend reinvestment plan or an employee benefit plan covering only officers or directors of the Company or its Affiliates), whether or not for sale for its own account, the Company shall provide each Stockholder with written notice of its intention to do so (a "Piggyback Registration Notice") at least 30 days prior to filing such Registration Statement.   Any Stockholder may elect to include Registrable Securities beneficially owned by it in the Registration Statement to which a Piggyback Registration Notice relates, by submitting a written request (a "Piggyback Registration Request") to the Company within 15 days after the date of such Piggyback Registration Notice, specifying the number of Registrable Securities that such Stockholder intends to dispose of pursuant to such Registration Statement, and the intended method of disposition thereof.   The Company shall use its reasonable best efforts to effect the registration under the Securities Act of all Registrable Securities that Stockholders have requested, pursuant to timely submitted Registration Requests, to be included in the Registration Statement to which the underlying Piggyback Registration Notice relates.

(b)     Withdrawal of Registration.   If, at any time after the Company provides a Piggyback Registration Notice and prior to the effective date of any Registration Statement filed in connection therewith, the Company shall determine for any reason not to register the Company Securities to which such Piggyback Registration Notice relates, the Company may, in its sole discretion, give the Requesting Holders written notice of such determination and thereupon shall be relieved of its obligation to register any Registrable Securities that the Requesting Holders requested to be registered pursuant to a Piggyback Registration Request delivered in response to such Piggyback Registration Notice.   Each Stockholder shall be permitted to withdraw all or any portion of the Registrable Securities of such Stockholder from a Piggyback Registration at any time prior to the effective date of such Piggyback Registration.

(c)     Priority.   If a registration under this Section 3.3 involves an underwritten offering and the managing underwriter(s) in its good faith judgment advises the Company that the number of Registrable Securities requested to be included in the Registration Statement by the Requesting Holders exceeds the Underwriter's Maximum Number, the Company shall be required to include in such Registration Statement only such number of securities as is equal to the Underwriter's Maximum Number and the Company and the Requesting Holders shall participate in such offering in the following order of priority:

(i)     First, the Company shall be entitled to include in such Registration Statement the Company Securities that the Company proposes to offer and sell for its own account in such registration and that does not exceed the Underwriter's Maximum Number.

(ii)     Second, the Company shall be obligated and required to include in such Registration Statement that number of Registrable Securities that the Requesting Holders have, collectively, requested to be included in such offering, to the full extent of the remaining portion of the Underwriter's Maximum Number; provided, that if such number of Registrable Securities exceeds the remaining portion of the Underwriter's Maximum Number, the Registrable Securities to be included in such offering shall be allocated among all of the Requesting Holders, in proportion, as nearly as practicable, to the

23

respective number of Registrable Securities held by them on the date of the underlying Piggyback Registration Notice.  If any Requesting Holder would thus be entitled to include more Registrable Securities than it requested to be registered, the excess shall be allocated among other Requesting Holders pro rata in the manner described in the preceding sentence.

(iii)    Third, the Company shall be entitled to include in such Registration Statement that number of Company Securities that the Company proposes to offer and sell for the account of any other Person, to the full extent of any remaining portion of the Underwriter's Maximum Number.

(d)    Not a Demand Registration.  No registration of Registrable Securities effected under this Section 3.3 shall relieve the Company of its obligation to effect any registration of Registrable Securities pursuant to Section 3.1 or 3.2.

Section 3.4    Certain Information.    In connection with any request for registration pursuant to Section 3.1, Section 3.2, or Section 3.3, each Selling Holder shall furnish to the Company such information regarding itself, the Registrable Securities held by it, and the intended method of disposition of such Registrable Securities as the Company shall reasonably request, to the extent required to complete the filing of such Registration Statement in accordance with applicable law (including the Securities Act and any state securities or "blue sky" laws).

Section 3.5    Expenses.    Except as expressly provided otherwise in this Agreement, if the Company is required to effect the registration of any Registrable Securities pursuant to Section 3.1, Section 3.2 or Section 3.3, the Company shall pay all Registration Expenses with respect to such registration; provided, that each Selling Holder shall bear its pro rata share, on the basis of the number of Registrable Securities or shares of Common Stock, as applicable, sold in such registration, of all underwriting discounts, selling commissions and stock transfer taxes, and each such Selling Holder shall be responsible for any fees and expenses of any persons retained by such Selling Holder.  Notwithstanding the foregoing, in the event that any registration of Registrable Securities or shares of Common Stock, as applicable, requested pursuant to Section 3.1 is withdrawn or deemed withdrawn pursuant to Section 3.1(g) and the Initial Requesting Holder(s) elects not to have such withdrawn registration counted as a registration under Section 3.1, the Initial Requesting Holder(s) and each Requesting Holder withdrawing all of its Registrable Securities or shares of Common Stock, as applicable, shall pay (or reimburse the Company for) its pro rata share (in proportion to the number of Registrable Securities or shares of Common Stock, as applicable, that it asked to be included in such withdrawn registration) of the Registration Expenses incurred by the Company with respect to such withdrawn registration.  The immediately preceding sentence shall not apply if such registration is withdrawn (i) as a result of information concerning the occurrence of a material adverse change in the business or financial condition of the Company that is made known to the Requesting Holders after the date on which such registration was requested, (ii) if the revocation of such Selling Holder's request for registration is based on the Company's failure to comply in any material respect with its obligations hereunder or (iii) if the registration is interfered with by any stop order, injunction or other order or requirement of the SEC or other governmental agency or court for any reason other than a misrepresentation or omission by any Requesting

24

Holder; provided, that if any such stop order, injunction, order or requirement is issued or imposed as a result of any misrepresentation or omission by any Requesting Holder(s), such Requesting Holder(s) (each, a "Responsible Requesting Holder") shall be solely responsible for paying (or reimbursing the Company for) all of the Registration Expenses incurred by the Company with respect to such withdrawn registration; provided, further, that if more than one Responsible Requesting Holder is responsible for such payment or reimbursement of Registration Expenses, then each such Responsible Requesting Holder shall be responsible for its pro rata share of such Registration Expenses (for each Responsible Requesting Holder based on a fraction, the numerator of which is the number of Registrable Securities or shares of Common Stock, as applicable, that such Responsible Requesting Holder asked to be included in such withdrawn registration and the denominator of which is the aggregate number of Registrable Securities or shares of Common Stock, as applicable, that all Responsible Requesting Holder, collectively, asked to be included in such withdrawn registration).

Section 3.6    Registration and Qualification.

(a)    In the event that the Company is required to effect the registration of any Registrable Securities or shares of Common Stock, as applicable, pursuant to this Article 3, the Company shall:

(i)    use its reasonable best efforts to, as promptly as practicable, prepare, file and cause to become effective and remain effective a Registration Statement relating to such Registrable Securities or shares of Common Stock, as applicable;

(ii)    prepare and file with the SEC such amendments (including post-effective amendments) and supplements to the Registration Statement for such Registrable Securities or shares of Common Stock, as applicable, and the prospectus used in connection therewith as may be necessary to keep such Registration Statement effective and to comply with the provisions of the Securities Act with respect to the disposition of all such Registrable Securities or shares of Common Stock, as applicable, until such time as all of such Registrable Securities or shares of Common Stock, as applicable, have been disposed of; provided, that the Company shall, as far in advance as practicable but at least five Business Days prior to filing a Registration Statement or prospectus (or any amendment or supplement thereto), furnish to each Selling Holder, for their review, copies of such Registration Statement or prospectus (or amendment or supplement) as proposed to be filed (including, upon the request of such Selling Holder, documents to be incorporated by reference therein); provided, further, that each Selling Holder may request reasonable changes to such Registration Statement, prospectus, amendment or supplement (as the case may be) and the Company shall be required to comply therewith to the extent necessary to lawfully complete such filing or maintain the effectiveness of such Registration Statement;

(iii)    furnish to each Selling Holder and each underwriter of such Registrable Securities or shares of Common Stock, as applicable, such number of conformed copies of such Registration Statement and each amendment and supplement thereto (in each case including all exhibits), such number of copies of the prospectus included in such Registration Statement (including each preliminary prospectus and any summary

25

prospectus), in conformity with the requirements of the Securities Act, such documents as are incorporated by reference in such Registration Statement or prospectus (including any amendments or supplements thereto), and such other documents as such Selling Holder or underwriter may reasonably request;

(iv)    promptly notify each Selling Holder in writing of the effectiveness of the Registration Statement and of any stop order issued or threatened by the SEC with respect thereto, use its reasonable best efforts to prevent the entry of any such stop order that is threatened and promptly remove any such stop order that has been entered, and promptly notify each Selling Holder of such lifting or withdrawal of any such stop order;

(v)    use its reasonable best efforts to (x) register or qualify all Registrable Securities or shares of Common Stock, as applicable, covered by such Registration Statement under the securities or blue sky laws of such jurisdictions as may be requested by any Selling Holder or underwriter of such Registrable Securities or shares of Common Stock, as applicable, and promptly notify the Selling Holders of the receipt of any notification with respect to the suspension of the qualification of Registrable Securities or shares of Common Stock, as applicable, for sale or offer in any such jurisdiction and (y) obtain all appropriate registrations, permits and consents in connection with such registrations and qualifications, and do any and all other acts and things (including using reasonable best efforts to promptly remove any such suspension) necessary or advisable to enable the Selling Holders and underwriters to consummate the disposition of such Registrable Securities or shares of Common Stock, as applicable, in such jurisdictions; provided, that the Company shall not be required to qualify to do business as a foreign corporation in any such jurisdiction where it is not so qualified, to consent to general service of process in any such jurisdiction or to amend its Organizational Documents;

(vi)    in an underwritten offering, use its reasonable best efforts to furnish to each underwriter of such Registrable Securities or shares of Common Stock, as applicable, (x) an opinion of counsel to the Company addressed to each such underwriter and dated the date of the closing under the Underwriting Agreement  and (y) "cold comfort" letters dated the effective date of the Registration Statement (and brought down to the date of closing under the Underwriting Agreement) addressed to each underwriter and signed by the independent public accountants who have certified the Company's financial statements included in such Registration Statement, in each such case covering substantially the same matters as are customarily covered in such opinions and cold comfort letters in connection with underwritten public offerings of securities;

(vii)    if requested by the managing underwriter, use its reasonable best efforts to list all such Registrable Securities or shares of Common Stock, as applicable, covered by such registration on each national securities exchange on which shares of Common Stock are then listed;

(viii)    furnish for delivery in connection with the closing of the registered offering of such Registrable Securities or shares of Common Stock, as applicable, unlegended certificates representing ownership of such Registrable Securities or shares of Common Stock, as applicable, in such denominations as shall be requested by the Selling

26

Holders or the underwriters (if any) for such Registrable Securities or shares of Common Stock, as applicable;

(ix)     not later than the effective date of the applicable Registration Statement, (x) retain a transfer agent and registrar (if the Company does not already have one), (y) obtain a CUSIP number for all Registrable Securities or shares of Common Stock, as applicable, included in such Registration Statement and (z) provide the applicable transfer agent with printed certificates for the Registrable Securities or shares of Common Stock, as applicable, which are in a form eligible for deposit with The Depository Trust Company or other applicable clearing agency;

(x)     in the case of an underwritten offering of such Registrable Securities or shares of Common Stock, as applicable, cause its senior executive officers to participate in such customary "road show" presentations as may be reasonably requested by the managing underwriter, and to otherwise facilitate, cooperate with, and participate in each proposed offering of Registrable Securities or shares of Common Stock, as applicable, pursuant to this Article 3 and customary selling efforts related thereto; and

(xi)     otherwise use its reasonable best efforts to comply with all applicable securities laws, including the Securities Act, the Exchange Act, and state securities and "blue sky" laws.

(b)     In the event that the Company delivers a prospectus covering Registrable Securities or shares of Common Stock, as applicable, to the Selling Holders and such prospectus is subsequently amended to comply with the requirements of the Securities Act, the Company shall promptly notify each Selling Holder and may, in its discretion, request that the Selling Holders cease making offers of Registrable Securities or shares of Common Stock, as applicable, and return to the Company all prospectuses in their possession. In the event that the Company makes such a request each Selling Holder shall immediately cease making such offers and shall promptly return all such prospectuses. The Company shall promptly provide the Selling Holders with revised prospectuses and each Selling Holder shall be free, following its receipt of such revised prospectuses, to resume making offers of the Registrable Securities or shares of Common Stock, as applicable.

(c)     In the event that the Company determines, in its sole discretion, that it is advisable to suspend use of a prospectus included in a Registration Statement due to pending material developments or other events that have not yet been publicly disclosed and as to which the Company believes public disclosure would be detrimental to the Company, the Company shall direct the Selling Holders to discontinue sales of Registrable Securities or shares of Common Stock, as applicable, pursuant to such prospectus, and each Selling Holder shall immediately so discontinue, until such Selling Holder has received copies of a supplemented or amended prospectus or until such Selling Holder is advised in writing by the Company that the then-current prospectus may be used and has received copies of any additional or supplemental filings that are incorporated or deemed incorporated by reference in such prospectus. The Company shall promptly furnish to each Selling Holder copies of any such supplemented or amended prospectuses or additional or supplemental filings, as the case may be. Notwithstanding anything to the contrary in this Agreement, the Company shall not exercise its

27

rights under this Section 3.6(c) to suspend sales of Registrable Securities or shares of Common Stock, as applicable, for a period in excess of 135 days during any period of 365 consecutive days.

Section 3.7    Underwriting; Due Diligence.    In the event of an underwritten offering of Registrable Securities pursuant to a registration requested under this Article 3, the Company shall, if requested by the underwriters for such offering, enter into an underwriting agreement with such underwriters (an "Underwriting Agreement").    Any such Underwriting Agreement shall contain such representations, warranties and covenants by the Company and such other terms and provisions as are customarily contained in underwriting agreements with respect to secondary distributions, and shall include indemnification and contribution provisions substantially to the effect and extent of those set forth in Section 3.8, and agreements as to the provision of opinions of counsel and accountants' letters substantially to the effect and extent of those set forth in Section 3.6(a)(vi).    The Selling Holders on whose behalf such Registrable Securities are to be distributed by the underwriters shall enter into such Underwriting Agreement, which shall also contain such representations, warranties and indemnities by the Selling Holders as are customarily provided by selling stockholders in underwriting agreements with respect to secondary distributions.    With respect to any Underwriting Agreement:  (i) all of the conditions precedent to the obligations of the underwriters thereunder shall be conditions precedent to the obligations of the Selling Holders and (ii) no Selling Holder shall be required to make any representations or warranties to, or agreements with, the Company or the underwriters, other than customary representations, warranties or agreements generally made by selling stockholders in similar offerings.

Section 3.8    Indemnification and Contribution.

(a)    The Company's Indemnification Obligations.    To the fullest extent permitted by law, the Company agrees to indemnify and hold harmless each Selling Holder, its Affiliates, and their respective directors, officers, members, managers, partners, employees, stockholders, agents, advisors, investment managers and any Person who "controls" such Selling Holder (within the meaning of Section 15 of the Securities Act), from and against any and all losses, claims, damages and liabilities, including any legal or other costs, fees and expenses reasonably incurred in connection with defending or investigating any such action or claim (collectively, "Losses") insofar as such Losses are caused by (i) any untrue statement or alleged untrue statement of a material fact contained in any Registration Statement or amendment thereto, any free writing prospectus, any preliminary prospectus or prospectus (as amended or supplemented) relating to the Registrable Securities, (ii)  any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, or (iii) any violation by the Company of any federal, state or common law rule or regulation applicable to the Company and relating to action required of or inaction by the Company in connection with such registration, except insofar as such Losses (x) relate to a transaction or sale made by a Selling Holder in violation of Section 3.6(c) or (y) are caused by any such untrue statement or omission or alleged untrue statement or omission that is based upon and in conformity with information relating to a Selling Holder which is furnished to the Company in writing by such Selling Holder expressly for use therein; provided, that clause (y) shall not apply to the extent that the Selling Holder has furnished in writing to the Company prior to the filing of such Registration Statement, free writing prospectus, preliminary

28

prospectus, prospectus, amendment or supplement information expressly for use in such document which information corrected or made not misleading the information previously furnished to the Company by such Selling Holder, and the Company failed to include such information therein.

(b)     To the fullest extent permitted by law, each Selling Holder agrees to indemnify and hold harmless the Company, all Affiliates of the Company, each of their respective directors, officers, members, managers, partners, employees, stockholders, agents and advisors and each Person, if any, who "controls" (within the meaning of Section 15 of the Securities Act) the Company, from and against any and all Losses insofar as such Losses are caused by any untrue statement or alleged untrue statement of a material fact contained in any Registration Statement or amendment thereto, any free writing prospectus, preliminary prospectus or prospectus (as amended or supplemented if the Company shall have furnished any amendments or supplements thereto) relating to the Registrable Securities, or caused by any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, but only with reference to information relating to such Selling Holder furnished in writing by or on behalf of such Selling Holder expressly for use in such Registration Statement, free writing prospectus, preliminary prospectus, prospectus, amendments or supplement; provided, that such Selling Holder shall not be liable in any such case to the extent that it has furnished in writing to the Company prior to the filing of any such Registration Statement, free writing prospectus, preliminary prospectus, prospectus, amendment or supplement information expressly for use in such document which information corrected or made not misleading the information previously furnished to the Company by such Selling Holder, and the Company failed to include such information therein.  Notwithstanding anything to the contrary in this Section 3.8, each Selling Holder's indemnification obligations under this paragraph are several, and not joint and several, and shall not exceed, with respect to any given registration of Registrable Securities pursuant to this Article 3, the amount of net proceeds received by such Selling Holder in connection with the offering of its Registrable Securities under such registration.

(c)     Each party that is entitled to indemnification under paragraph (a) or (b) of this Section 3.8 shall, promptly after receipt of notice of a claim or action against such indemnified party in respect of which indemnity may be sought hereunder, notify the indemnifying party in writing of the claim or action and the indemnifying party shall assume the defense thereof, including the employment of counsel reasonably satisfactory to such indemnified party, and shall assume the payment of all fees and expenses; provided, that the failure of any indemnified party to so notify the indemnifying party shall not relieve the indemnifying party of its obligations hereunder except to the extent that the indemnifying party is materially prejudiced by such failure to notify.  In any such action, any indemnified party shall have the right to retain its own counsel, but the fees and expenses of such counsel shall be at the sole expense of such indemnified party unless (i) the indemnifying party and the indemnified party shall have mutually agreed to the retention of such counsel or (ii) in the reasonable judgment of such indemnified party, representation of both parties by the same counsel would be inappropriate due to actual or potential differing interests between them, in which case the fees and expenses of such counsel shall be at the sole expense of the indemnifying party; provided, that in the event that the Company, as indemnifying party, is required to pay expenses of separate legal counsel for any one or more Selling Holders as indemnified party, a single counsel shall be

designated in writing to the Company by the Selling Holder with the largest number of Registrable Securities included in such registration. All such fees and expenses shall be reimbursed as they are incurred. The indemnifying party shall not be liable for any settlement of any claim or action effected without its written consent, which consent shall not be unreasonably withheld or delayed, but if settled with such consent, or if there be a final judgment for the plaintiff, the indemnifying party shall indemnify and hold harmless such indemnified parties from and against any loss or liability (to the extent stated above) by reason of such settlement or judgment. No indemnifying party shall, without the prior written consent of the indemnified party, effect any settlement of any pending or threatened claim or action in respect of which any indemnified party is or could have been a party and indemnity could have been sought hereunder by such indemnified party, unless such settlement includes an unconditional release of such indemnified party from all liability arising out of such proceeding and imposes no obligations on such indemnified party other than the payment of monetary damages (which damages will be paid by the indemnifying party hereunder).

(d) If the indemnification provided for in this Section 3.8 shall for any reason be unavailable (other than in accordance with its terms) to an indemnified party in respect of any Loss referred to therein, then the indemnifying party shall, in lieu of indemnifying such indemnified party, contribute to the amount paid or payable by the indemnified party as a result of such Loss in such proportion as is appropriate to reflect the relative fault of the indemnifying party on the one hand and the indemnified party on the other. The relative fault shall be determined by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or the omission or alleged omission to state a material fact relates to information supplied by the indemnifying party or the indemnified party and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such untrue statement or omission. Notwithstanding anything to the contrary in this paragraph, no indemnifying party (other than the Company) shall be required to contribute any amount in excess of the amount by which the net proceeds received by such indemnifying party from the sale of Registrable Securities in the offering to which the Loss relates exceeds the amount of any damages which such indemnifying party has otherwise been required to pay by reason of such untrue statement or omission. The parties to this Agreement agree that it would not be just and equitable if contribution pursuant to this paragraph were determined by pro rata allocation or by any other method of allocation that does not take into account the equitable considerations referred to in Section 3.8(c). No Person who is guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) that results in a Loss shall be entitled to contribution with respect to such Loss from any Person who is not guilty of such fraudulent misrepresentation.

(e) Indemnification and contribution similar to that specified in the preceding paragraphs of this Section 3.8 (with appropriate modifications) shall be given by the Company, the Selling Holders and the underwriters with respect to any required registration or other qualification of Registrable Securities under any state law or regulation or governmental authority.

(f) The obligations of the parties under this Section 3.8 shall be in addition to any liability which any party may otherwise have to any other party. If indemnification is available under this Section 3.8, the indemnifying parties shall indemnify each indemnified party

30

to the fullest extent permitted by applicable law and as provided in paragraphs (a) and (b) hereof without regard to the relative fault of said indemnifying parties or indemnified party.

(g)    The rights and obligations of the Company and the Selling Holders under this Section 3.8 shall survive the termination of this Agreement.

Section 3.9    Rule 144 Information.  The Company hereby covenants and agrees that as soon as practicable after the first issuance of Company Securities in a Public Offering, it shall (a) file such periodic reports as it is required to file under the Exchange Act or if the Company is not required to file such reports, it shall, upon the reasonable request of any Stockholder, use commercially reasonable efforts to make publicly available such information as is necessary to permit such Stockholder to sell Registrable Securities pursuant to Rule 144 and (b) use commercially reasonable efforts to take such further action as any Stockholder may reasonably request, to the extent such action is necessary to permit such Stockholder to sell Registrable Securities pursuant to Rule 144.

Section 3.10    Transfer of Registration Rights.  A Stockholder may Transfer all or any portion of its registration rights under this Article 3 with respect to any of its Registrable Securities in connection with any Transfer of such Registrable Securities that fully complies with the terms and conditions of this Agreement.  Any other purported direct or indirect Transfer of such registration rights by any Stockholder shall be null and void and of no force or effect.

Section 3.11    Grant of Additional Registration Rights.    Except for the registration rights granted pursuant to this Article 3, the Company shall not grant any registration rights with respect to shares of Common Stock to any other Person without the prior written consent of Stockholders holding a majority of the then outstanding Common Stock unless such registration rights so granted do not materially affect the rights of the Stockholders under this Agreement with respect to their priority in any Public Offering.

Section 3.12    Holdback Agreement.  The Company and each Stockholder that holds greater than 5% of the Common Stock (whether or not such Registrable Securities are included in a Registration Statement filed pursuant to Section 3.1, Section 3.2 or Section 3.3) agree, if requested (pursuant to a timely written notice) by the lead or managing underwriter or underwriters in an underwritten offering, not to effect any public sale or distribution of any of the Registrable Securities, including a sale pursuant to Rule 144 (except as part of such underwritten offering), for a customary period (which period shall be the same for all applicable Stockholders and shall not be longer than 180 days in the case of the Company's first Public Offering and 90 days in the case of any other Public Offering, except to the extent required by FINRA regulations or applicable law), as reasonably determined by the lead or managing underwriter or underwriters in consultation with the Stockholders, after the closing date of the underwritten offering made pursuant to such Registration Statement; provided, that no Stockholder that holds greater than 5% of the Common Stock shall be subject to any such restrictions unless (a) all such restrictions shall have been requested of, and shall be applicable to, all Stockholders that holds greater than 5% of the Common Stock and (b) such underwriter(s) shall have obtained written holdback agreements from the Company, each executive officer of the Company and each other person who has been granted registration rights by the Company.  No waiver of any such restrictions shall be effective with respect to any Stockholder unless such waiver applies

31

uniformly to all such Stockholders.  Notwithstanding anything contained in this Section 3.12, all obligations of the Stockholders under this Section 3.12 shall terminate in the event that the Company or any underwriter terminates, releases or waives, in whole or in part, the holdback agreements with respect to the Company, any executive officer of the Company or any such other Person who has been granted registration rights by the Company, unless such termination, release or waiver also applies proportionally (based on their respective ownership of Registrable Securities relative to the number of Registrable Securities held by such executive officer or other Person) to each Stockholder.

Section 3.13  Termination.  All of the Company's obligations to register Registrable Securities under Sections 3.1 and 3.3 shall terminate on the date on which the Stockholders cease to beneficially own any Registrable Securities.

## ARTICLE 4. TRANSFERS OF SHARES

Section 4.1  Restrictions on Transfers.

(a)  Transferability.  Each Stockholder hereby agrees that it shall not in any way, directly or indirectly, Transfer all or any portion of its Shares, except in compliance with the Securities Act, any other applicable securities or "blue sky" laws, any applicable restrictive legends and the terms and conditions of this Agreement, including this Article 4 and, to the extent applicable, Article 5.  Any Transfer of Shares not expressly permitted herein shall be null and void and of no force or effect, and the Company shall not recognize any such attempted Transfer in its books and records and the purported Transferee or successor by operation of law shall not be deemed to be a Stockholder or a holder of Shares or Common Stock for any purpose, and shall not be entitled to any of the rights of ownership with respect to such Shares, including the right to vote such Shares or to receive a certificate for such Shares or to receive any dividends or other distributions on or with respect to such Shares.

(b)  Transfers to Affiliates.  Any Stockholder may Transfer all or any portion of its Shares at any time to an Affiliate, Family Member, Family Trust or Personal Representative of such Stockholder; provided, that (i) the Transfer complies with the Securities Act and all applicable state securities and "blue sky" laws and (ii) the Transferor submits, pursuant to Section 4.1(d), a Transfer Request for such Transfer that is approved by the Company.  Any Transfer that is made in accordance with this paragraph shall not be subject to any of the provisions of Article 5.

(c)  Transfers to Persons other than Affiliates.  Any Stockholder may Transfer all or any portion of its Shares at any time to one or more of the Stockholders or to any other Person that are determined to be an Accredited Investor; provided, that (i) the Board determines the Transferee is not a Competitor, or, in the case that the Board has determined the Transferee is a Competitor, the Board approves of such Transfer, (ii) the Transfer complies with the Securities Act, any applicable restrictive legends and all applicable state securities and "blue sky" laws, (iii) the Transferor submits, pursuant to Section 4.1(d), a Transfer Request for such Transfer that is approved by the Company, (iv) the Transfer will not result in an event of default under the Credit Agreement and (v) except for Transfers pursuant to Section 4.1(b), if such Transfer or

32

series of related Transfers constitutes a Control Transfer, then such Shares shall be subject to the tag-along provisions set forth in Section 5.2.

(d)    Requests for Transfer.  In order to provide for the effective policing of this Section 4.1, a Stockholder who proposes to effect a Transfer pursuant to Section 4.1(c) must submit, prior to the date of the proposed Transfer, a written request in writing (a "Transfer Request") that the Company review the proposed Transfer and authorize or not authorize the proposed Transfer pursuant to this Section 4.1.  A Transfer Request shall include:  (i) the name, address, jurisdiction of organization or citizenship and telephone number of the proposed Transferee, (ii) the number of Shares proposed to be so Transferred, (iii) the date on which the proposed Transfer is expected to take place, (iv) the name of the Stockholder proposing such Transfer, (v) certification that such Stockholder is an Accredited Investor, and (vi) such information as the Company in its reasonable discretion may request (and which may, in the Company's reasonable discretion, include an opinion of counsel to be provided at the Transferor's sole cost and expense to such effect) to establish that registration of the proposed Transfer is not required under the Securities Act or any applicable state securities or "blue sky" laws.  The Company shall, within five Business Days after its receipt of a Transfer Request that includes all of the information set forth in the foregoing clauses (i) through (v), determine whether to authorize (subject to compliance with all of the applicable provisions, if any, set forth in Article 5) the Transfer proposed in such Transfer Request and shall notify the proposed Transferor of such determination; provided, that the only bases on which a Transfer may be denied are failure to comply with the applicable obligations and restrictions set forth in this Article 4 or in Article 5 (including paragraph (f) below) if applicable; provided, further, that if the Company does not notify the proposed Transferor of its determination within such time period, the Transfer proposed in such Transfer Request shall be deemed to be approved hereunder.

(e)    Joinder.  With respect to any Transfer of Shares (including the issuance, sale or other Transfer of Shares by the Company), the Transferee of such Shares shall execute and deliver to the Company, as a condition precedent to such Transfer, an instrument in substantially the form attached hereto as Exhibit A (or such other documentation as is agreed by the Company and such Transferee) to confirm that the Transferee takes such Shares subject to all the terms and conditions of this Agreement and agrees to be bound by all of the terms and conditions of this Agreement.

(f)    Exchange Act Reporting Obligations.  Notwithstanding anything to the contrary in this Agreement, but only to the extent the Company is not already subject to reporting obligations under the Exchange Act, no Stockholder may Transfer any Shares if, as a result of such Transfer, shares of Common Stock would be held of record by more than 280 Persons or otherwise in circumstances that the Company or the Board determines could require the Company to file reports under the Exchange Act, if it is not otherwise subject to such requirements.  So long as the Company is not subject to reporting obligations under the Exchange Act, nothing contained in this Article 4 shall limit the authority of the Board to take such other action to the extent permitted by law as it deems necessary or advisable to preserve the Company's status as a non-reporting company under the Exchange Act.

33

(g)      Inapplicability of Section 4.1.  Notwithstanding anything to the contrary in this Section 4.1, the restrictions on transfer set forth in this Article 4 and in Article 5 shall be inapplicable to any sale pursuant to an effective Registration Statement in accordance with Article 3.

Section 4.2      Legend on Certificates.

(a)      All certificates for Shares shall conspicuously bear the following legend:

THE VOTING, SALE, TRANSFER, ENCUMBRANCE OR OTHER DISPOSITION OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO THE TERMS AND CONDITIONS OF A STOCKHOLDERS AGREEMENT, DATED AS OF [____], 2016, AMONG DEX MEDIA, INC. AND CERTAIN HOLDERS OF ITS OUTSTANDING CAPITAL STOCK (AS THE SAME MAY BE AMENDED, MODIFIED, SUPPLEMENTED OR RESTATED FROM TIME TO TIME), A COPY OF WHICH MAY BE OBTAINED AT NO COST BY WRITTEN REQUEST MADE BY THE HOLDER OF RECORD OF THIS CERTIFICATE TO THE SECRETARY OF DEX MEDIA, INC.

(b)      In the event that any shares of Common Stock shall be registered under the Securities Act, the Company shall, upon the written request of the holder thereof, issue to such holder a new certificate evidencing such stock without the legend required by Section 4.2(a) endorsed thereon.  In the event that the Common Stock shall cease to be subject to the restrictions on transfer set forth in this Article 4, the Company shall, upon the written request of the holder thereof, issue to such holder a new certificate evidencing such stock without the legend required by Section 4.2(a) endorsed thereon.

## ARTICLE 5. DRAG-ALONG; TAG-ALONG

Section 5.1      Drag-Along Sale.  (a)  In the event that Stockholders holding a majority of the then outstanding shares of Common Stock ("Drag-Along Sellers") propose to effect a Drag-Along Sale, the Drag-Along Sellers shall have the right (a "Drag-Along Right") to require each of the other Stockholders to Transfer their Shares in such Drag-Along Sale in accordance with this Section 5.1.  Such Drag-Along Sellers shall give written notice of such Drag-Along Sale (a "Drag-Along Notice") to the Company, and the Company shall deliver such notice to each of the other Stockholders, at least ten Business Days prior to the closing of such Drag-Along Sale, which notice shall state that such Drag-Along Sellers desire the Dragged Stockholders to enter into such Drag-Along Sale and shall include the following information with respect to the proposed Drag-Along Sale:  (i) the names of all of the parties thereto, (ii) a summary of the material terms and conditions thereof and (iii) the proposed amount and form of consideration to be received by the Drag-Along Sellers and Dragged Stockholders, whereupon all Drag-Along Sellers, Dragged Stockholders and the Company (as applicable) shall consent to, cooperate with, and not object to or otherwise impede consummation of the Drag-Along Sale.  In the event that the Drag-Along Sale is structured as a merger or consolidation, each Dragged Stockholder shall vote its Shares to approve such merger or consolidation, whether at a meeting of Stockholders or by written consent of Stockholders in lieu of a meeting.  In the event that the

34

Drag-Along Sale is structured as a sale of all of the outstanding Shares, then each Dragged Stockholder shall agree to sell, and shall sell, all of its Shares and any other rights to acquire Shares, on the terms and conditions set forth in the Drag-Along Notice.  In the event that the Drag-Along Sale is structured as a sale, transfer or other disposition of all or substantially all of the assets or business of the Company, then each Dragged Stockholder shall vote its Shares to approve such sale and any subsequent dissolution or winding up of the Company or other distribution of the proceeds therefrom, whether at a meeting of Stockholders or by written consent of Stockholders in lieu of a meeting, with respect to the sale, transfer or other disposition of assets.  In furtherance of the foregoing, each Dragged Stockholder shall (x) waive all dissenter's rights, appraisal rights and similar rights in connection with such Drag-Along Sale, and (y) take, with respect to its Shares, all Necessary Action reasonably requested by the Drag-Along Sellers in connection with the consummation of the Drag-Along Sale.

(b)	No Dragged Stockholder shall be required to sell any Shares in a Drag-Along Sale pursuant to this Section 5.1 unless (i) the total amount of such consideration per share payable to such Dragged Stockholder is the same as that paid to the Drag-Along Sellers, and (ii) such Shares are sold by such Dragged Stockholder generally upon the same terms in connection with such Drag-Along Sale.  Notwithstanding the foregoing, no Dragged Stockholder shall be required to make any representation or warranty, or provide any indemnity to any Person, in connection with any Drag-Along Sale except that each Dragged Stockholder shall be obligated (A) to make representations and warranties with respect to the unencumbered title to its Shares, its power, authority and legal right to Transfer such Shares and, the enforceability of relevant agreements against such Dragged Stockholder, (B) to enter into reasonable and customary covenants to complete the Transfer of such Dragged Stockholder's Shares in connection with such Drag-Along Sale and (C) to enter into reasonable and customary indemnification obligations with respect to the foregoing; provided, that all representations, warranties, covenants and indemnities shall be made by the Drag-Along Sellers and Dragged Stockholder severally and not jointly; provided, further, that any indemnification obligation (including, if applicable, with respect to representations made by the Company) shall be pro rata based on the consideration received by the Drag-Along Sellers and Dragged Stockholder, in each case in an amount not to exceed the aggregate proceeds received by the Drag-Along Sellers and Dragged Stockholder in connection with the Drag-Along Sale; and provided, further, that in no event shall a Dragged Stockholder be required to (i) make any representation regarding the Company (including with respect to its business or results of operations) or (ii) except in the case of a Stockholder that is an officer or employee of the Company or any of its Subsidiaries, agree to any "non-competition," "non-solicit" or other covenant or restriction with respect to competing with the Company or its business or soliciting or hiring its employees.

(c)	At the closing of any Drag-Along Sale pursuant to this Section 5.1, the Drag-Along Sellers and each Dragged Stockholder shall deliver, against payment of the purchase price therefor, certificates (or evidence thereof) representing its Shares, duly endorsed for Transfer or accompanied by duly endorsed stock powers, evidence of good title to the Shares, the absence of liens, encumbrances and adverse claims with respect thereto, and such other documents as are reasonably requested by the Drag-Along Sellers and the Company for the proper Transfer of such Shares on the books of the Company.

(d)    The provisions of Section 5.2 shall be subordinate to any Transfer or exercise of rights contemplated by this Section 5.1.

Section 5.2    Tag-Along Sale.  (a)  In the event that any Stockholder or group of Stockholders (a "Proposed Seller") proposes to Transfer Shares pursuant to one or more related transactions that would constitute a Control Transfer (if Drag-Along Rights are not exercised pursuant to Section 5.1) (any such Transfer, a "Proposed Sale"), each other Stockholder other than any Stockholder that is an officer or employee of the Company or any of its Subsidiaries (collectively, the "Eligible Participating Stockholders") shall have the right to participate in the Proposed Sale by Transferring its pro rata portion of Shares to the Proposed Buyer in accordance with this Section 5.2.  Such Proposed Seller shall give written notice of such Proposed Sale (a "Tag-Along Notice") to each of the Eligible Participating Stockholders, with a copy to the Company.  The Tag-Along Notice shall offer to each Eligible Participating Stockholder the option to participate in such Proposed Sale on the terms and conditions set forth in the Tag-Along Notice (and, in any event, on the same terms and conditions as the Proposed Seller) and shall include the following information with respect to the Proposed Sale:  (i) the name of each proposed Transferee(s) (the "Proposed Buyer"), (ii) a summary of the material terms and conditions thereof, (iii) the percentage of the Proposed Seller's Shares proposed to be Transferred therein, (iv) the proposed amount and form of consideration to be received by the Proposed Seller and (v) other such information as shall be reasonably requested.

(b)    Each Eligible Participating Stockholder may, by written notice given to the Proposed Seller within ten Business Days after the date of the Tag-Along Notice, elect to sell up to the number of Shares in the Proposed Sale as equals the Tag-Along Portion of such Eligible Participating Stockholder, on the terms and conditions approved by the Proposed Seller, which terms and conditions shall be the same as those on which the Proposed Seller's Shares are to be sold and shall be consistent with the terms and conditions set forth in the Tag-Along Notice (each Eligible Participating Stockholder who timely makes such election, a "Tagging Stockholder").  The Proposed Seller shall cause the Proposed Buyer to purchase from each Tagging Stockholder the number of Shares equal to the Tag-Along Portion of such Tagging Stockholder.  The decision by any Eligible Participating Stockholder as to whether to elect to participate in any Proposed Sale shall not adversely affect such Eligible Participating Stockholder's right to elect to participate as a Tagging Stockholder in any other Proposed Sale. The Proposed Seller shall have a period of 60 days following the expiration of the ten Business Day notice period mentioned above to consummate the Proposed Sale to the Proposed Buyer in accordance with this Section 5.2 without being required to provide an additional Tag-Along Notice to Eligible Participating Stockholders.

(c)    At the closing of any Proposed Sale pursuant to this Section 5.2, each Proposed Seller and each Tagging Stockholder shall deliver at such closing, against payment of the purchase price therefor, certificates or other documentation governing the terms of any such Shares (or other evidence thereof acceptable to the transferee of such Shares) representing their Shares to be sold, duly endorsed for Transfer or accompanied by duly endorsed stock powers, evidence of good title to the Shares to be sold, the absence of liens, encumbrances and adverse claims with respect thereto and such other documents as are deemed reasonably necessary by the Proposed Seller and the Company for the proper Transfer of such Shares on the books of the Company.

36

(d)     In no event shall a Tagging Stockholder that is not an officer or employee of the Company or any of its Subsidiaries be required to (i) make any representation regarding the Company (including with respect to its business or results of operations) or (ii) agree to any "non-competition," "non-solicit" or other covenant or restriction with respect to competing with the Company or its business or soliciting or hiring its employees.

(e)     The provisions of this Section 5.2 shall be subject to and subordinate to the provisions of Section 5.1.

## ARTICLE 6. ADDITIONAL AGREEMENTS

Section 6.1     Access to Information; Reports.  (a)  The Company shall provide to each Stockholder of the Company (by means of providing access to an Intralinks or similar site) the following financial and business information relating to the Company and its Subsidiaries, and with respect to clauses (i) and (ii) below, accompanied by a reasonably detailed narrative discussion of the changes in the Company's financial condition and results of operations compared with the prior periods presented, which will, with respect to the Company's audited consolidated annual financial statements, be in form and substance similar to the discussion contained in the "Management's Discussion and Analysis of Financial Condition and Results of Operation" section of an Exchange Act report, all of which shall be posted to a freely accessible section of the Company's website:

(i)     subject to the proviso to this Section 6.1(a), as soon as available and in any event no later than 120 days after the end of each fiscal year (or with respect to the fiscal year ending December 31, 2016, the later of 120 days after (x) the end of such fiscal year and (y) delivery of audited financial statements for the fiscal year ended December 31, 2015; provided that if the Company is unable deliver audited financial statements for the fiscal year ended December 31, 2016 within 120 days of such fiscal year end, the Company shall deliver unaudited financial statements for such fiscal year within 120 days after the end of such fiscal year subject to normal year-end audit adjustments, the absence of footnote disclosures and completion of the Prior Tax Calculation (as defined in the Plan) , a true and complete copy of the audited consolidated balance sheet and the related consolidated statements of operations, stockholders' equity and cash flows of the Company and its Subsidiaries as of and for the fiscal year then ended, together with the notes relating thereto, all in reasonable detail and accompanied by a copy of the audit report of the Company's independent public accountants, which report shall be unqualified as to the scope of the audit and shall state that such consolidated financial statements present fairly the consolidated financial position, results of operations and cash flows of the Company and its Subsidiaries as of the dates thereof and for the fiscal year then ended in accordance with United States generally accepted accounting principles consistently applied; and

(ii)     subject to the proviso to this Section 6.1(a), as soon as available and in any event no later than 60 days after the end of each of the first three quarters of each fiscal year of the Company, a true and complete copy of the unaudited consolidated balance sheet and related consolidated statements of operations, stockholders' equity and cash flows of the Company and its Subsidiaries as of and for the period then ended, prepared

37

in accordance with United States generally accepted accounting principles consistently applied, subject only to the absence of footnotes and normal year-end audit adjustments and completion of the Prior Tax Calculation;

provided, however, that if, prior to the time at which financial statements are required to be delivered by the Company pursuant to subparagraph (i) or (ii) above, the Company provides financial statements to the agent or lenders under the Credit Agreement in form and substance substantially similar to the financial statements required to be delivered under such subparagraph (i) or (ii), as applicable (including unaudited annual financial statements), then the Company shall provide to the Stockholders the financial statements required to be delivered under such subparagraph (i) or (ii), as applicable, substantially concurrently with the provision of such substantially similar financial statements to such lenders.

(b)     Promptly after issuing the annual and quarterly reports described in Section 6.1(a), the Company shall hold a conference call to discuss with the Stockholders the information contained in such annual and quarterly reports, including the results of the Company's operations and the financial performance of the Company, and to answer questions thereto, and the Company shall provide the Stockholders with conference call access to each such conference call. The intention is that such conference calls be held concurrently with the earnings calls for lenders of the Company; however, if the lender earnings calls are held separately, the Stockholders will be invited to and permitted to join such earnings calls.

(c)     As soon as available and in any event no later than [__] days after the end of the fiscal year of the Company, each Stockholder will be furnished with the then-current budget of the Company. Such annual budgets will be made available by means of providing access to an Intralinks or similar site.

(d)     All information provided pursuant to this Section 6.1, including the information disclosed in the conference calls pursuant to Section 6.1(b), shall be subject to the confidentiality restrictions set forth in Section 6.4.

Section 6.2     Certificate of Incorporation and Bylaws.  If and to the extent that any provision of this Agreement conflicts with or is inconsistent with any provision of the Organizational Documents, then to the fullest extent permitted by law, such provision of this Agreement shall be controlling and, to the extent practicable, the conflicting or inconsistent provision of the Organizational Documents shall be construed in a manner consistent with such provision of this Agreement.

Section 6.3     No Other Voting Agreements.  Except as specifically contemplated hereby, no Stockholder shall (a) grant any proxy or enter into or agree to be bound by any voting trust with respect to any Shares or (b) enter into any stockholder agreement or arrangement of any kind with any Person with respect to Shares that is, in the case of either clause (a) or (b), in violation of the provisions of this Agreement (irrespective of whether such agreement or arrangement is with one or more other Stockholders), including, but not limited to, agreements or arrangements with respect to the acquisition, disposition, pledge or voting of Shares, nor shall any Stockholder act, for any reason, as a member of a group or in concert with any other Person (other than an Affiliate of such Stockholder) in connection with the acquisition, disposition or

38

voting of Shares in any manner that is in violation of the provisions of this Agreement. Nothing in this Section 6.3 is intended to restrict any Stockholder from entering into any agreement or arrangement with respect to its Shares (with any other Stockholder or otherwise) that is not in violation of the provisions of this Agreement.

Section 6.4    Confidentiality. Each Stockholder hereby agrees that it will keep strictly confidential and will not disclose, divulge or use for any purpose, other than to hold, vote, dispose and monitor its existing investment in the Company, any confidential information obtained from the Company pursuant to the terms of this Agreement (including pursuant to Section 6.1 above), unless such confidential information is known or becomes known to the public in general (other than as a result of a breach of this Section 6.4 by such holder or its Affiliates) or is or becomes available from a source other than the Company or its Affiliates (provided the Stockholder is not aware that such source is under an obligation to keep such information confidential); provided, however, that a Stockholder may disclose (on a confidential basis) confidential information (a) to its attorneys, accountants, consultants, and other professionals to the extent necessary to obtain their services in connection with its holding, voting, disposition and monitoring of its existing investment in the Company, (b) to any Affiliate, or to any director, officer, employee, partner, member or regulator of such Stockholder or Affiliate in the ordinary course of business, to the extent necessary to hold, vote, dispose and monitor its existing investment in the Company, (c) to a potential Transferee of Shares, to the extent reasonably necessary to consummate a Transfer, provided that such Transferee has executed a confidentiality agreement with such Stockholder in such form as may be reasonably required by the Company or (d) as may otherwise be required by applicable law or judicial or administrative process; provided, further, that in the case of any such disclosure under this clause (d), such Stockholder shall take, at the Company's expense, all reasonable steps requested by the Company to minimize the extent of any such required disclosure, and to the extent practicable, awaits the final outcome of any motion for a protective order that the Company may file before disclosing any confidential information; and provided, further, that the acts and omissions of any Person to whom any Stockholder may disclose confidential information pursuant to the foregoing clauses (a), (b) and (c) shall be attributable to such Stockholder for purposes of determining such Stockholder's compliance with this Section 6.4, unless such Person and the Company have entered into a confidentiality agreement between them that imposes confidentiality restrictions on such Person that are no less restrictive than those contained in this Section 6.4, in which case the acts and omissions of such Person shall not be attributable to such Stockholder. Notwithstanding any earlier termination of this Agreement, the obligations of each Stockholder under this Section 6.4 shall survive until the earlier of (i) the first anniversary of the termination of this Agreement pursuant to Section 7.1 and (ii) the first anniversary of the date on which such Stockholder ceased to own any Shares.

Notwithstanding the foregoing, in the case of a Stockholder owned, directly or indirectly, by one or more funds or other pooled investment vehicles, such Stockholder shall be entitled to disclose such confidential information to investors and limited partners of such fund or pooled investment vehicle, and to prospective investors or other Persons as part of fundraising or marketing activities undertaken by the manager of such fund or pooled investment vehicle or any of its affiliates, or prospective investors or other Persons as part of fundraising or marketing activities of such Stockholder or its affiliates, or lenders or prospective lenders of such

39

Stockholder or its affiliates, provided such disclosures are made to Persons subject to an obligation of confidentiality with respect to such information.

Section 6.5    Preemptive Rights.  (a)  In the event that the Company proposes to sell or otherwise issue (a "Proposed Offering") equity securities of the Company (including shares of Common Stock or preferred stock), any securities convertible into or exchangeable for equity securities of the Company or any options rights or warrants to purchase equity securities of the Company (any of the foregoing, "Dilutive Securities"), other than in a Permitted Offering, each Stockholder holding Shares as of the date of the Company Sale Notice that is an Accredited Investor (each, a "Preemptive Rights Stockholder") shall have the right to acquire that number or amount of such Dilutive Securities as is determined in accordance with Section 6.5(b) below, at the same price and upon the same terms and conditions as such Dilutive Securities are being offered by the Company in the Proposed Offering.  No Dilutive Securities shall be issued by the Company to any Person unless the Company has first offered such securities to each Preemptive Rights Stockholder in the accordance with this Section 6.5.  Notwithstanding anything contained in this Section 6.5, the rights of a holder of Employee Shares under this Section 6.5 shall only be granted to a holder of Employee Shares who has provided to the Company evidence (satisfactory to the Company its sole discretion) that such holder qualifies as an Accredited Investor.

(b)    At least 15 Business Days prior to the consummation of any Proposed Offering to which this Section 6.5 applies, the Company shall give written notice thereof to each Preemptive Rights Stockholder (the "Company Sale Notice"), setting forth the price and the other terms and conditions on which the Dilutive Securities are being offered to the proposed transferee(s), and offering to sell to each Preemptive Rights Stockholder its pro rata share of such Dilutive Securities on the same terms and conditions (the "Preemptive Rights Offer"); provided, that such pro rata share shall be based upon a ratio of the relative number of Shares beneficially owned by such Preemptive Rights Stockholder to the total number of Shares outstanding immediately prior to consummation of the Proposed Offering.  Each Preemptive Rights Stockholder shall be entitled to accept any Preemptive Rights Offer by providing written notice to the Company not later than ten Business Days after the date of the applicable Company Sale Notice (the "Preemptive Rights Period"), and any Preemptive Rights Stockholder who fails to timely accept any Preemptive Rights Offer shall have no further rights with respect to the Proposed Offering to which such Preemptive Rights Offer relates.  Any Dilutive Securities that are offered in a Preemptive Rights Offer but are not accepted by Preemptive Rights Stockholders during the Preemptive Rights Period may be sold by the Company at any time prior to the 90th day following the expiration of the Preemptive Rights Period on the same terms and conditions as are set forth in the applicable Company Sale Notice.

(c)    As used herein, "Permitted Offering" means (i) any sale or issuance by the Company of Employee Shares, (ii) any sale or issuance by the Company of Dilutive Securities (A) pursuant to any stock split, subdivision of shares, stock dividend or similar transaction by the Company, (B) pursuant to any merger or business combination transaction involving the Company or any of its Subsidiaries or as consideration for the acquisition by the Company or any of its Subsidiaries of assets or another business or entity, provided that in no event may any such exception be used with the intent to circumvent the rights of the stockholders under this Section 6.5, (C) in any Public Offering, or (D) upon the exercise of any rights or agreements, options, warrants or convertible securities outstanding as of the date of this Agreement or issued

40

or issuable pursuant to the exercise of any such rights or agreements granted after the date of this Agreement, (iii) any issuance by the Company to (A) banks, equipment lessors or other financial institutions, or to real property lessors, pursuant to a debt financing, equipment leasing or real property leasing transaction approved by the Board or (B) suppliers or third party service providers in connection with the provision of goods or services pursuant to a transaction approved by the Board or (iv) any issuance in connection with strategic partnerships approved by the Board (but specifically excluding any transaction that has the primary purpose of a Person providing cash to the company in exchange for Common Stock).

(d)     Except as provided in this Section 6.5, the Company shall not grant to any Person any preemptive rights with respect to the issuance of equity securities of the Company. This clause (d) shall not apply to the grant of the preemptive rights set forth in this Section 6.5 to any Person who becomes a party to this Agreement pursuant to Section 4.1(e) hereof.  The preemptive rights set forth in this Section 6.5 may not be assigned or transferred, except that such right may be assigned by any Preemptive Rights Stockholder to any Affiliate of such Preemptive Rights Stockholder.

(e)     Notwithstanding the other provisions of this Section 6.5, if the Board determines that the Company should, in the best interests of the Company, issue new equity securities that would otherwise be required to be offered to the Preemptive Rights Stockholders pursuant to this Section 6.5 prior to their issuance, the Company may issue such new equity securities without first complying with the provisions of this Section 6.5; provided, however, that (i) within 45 days after such issuance the Company shall offer to each Preemptive Rights Stockholder the opportunity to purchase the number of new equity securities that such Preemptive Rights Stockholder would have otherwise been entitled to purchase pursuant to the terms of this Section 6.5 and (ii) (A) include in the subscription (or similar) agreement with the purchaser(s) of such new equity securities a provision permitting the Company to repurchase such equity securities in an amount necessary to satisfy the provisions of this Section 6.5 or (B) cause the issuance of additional equity securities in an amount necessary to permit each requesting Preemptive Rights Stockholder to purchase the portion of such issuance that it would be entitled to purchase pursuant to this Section 6.5, including the portion sold pursuant to this paragraph.

Section 6.6     Debt Preemptive Rights.

(a)     In the event the Company or any of its Subsidiaries issues any debt securities to, or borrows money from, one or more members of an Appointing Stockholder Group or any Affiliate thereof, other than borrowings under the Company's and its Subsidiaries' existing credit facilities (except to the extent such borrowings are being increased), each Preemptive Rights Stockholder shall have the right to purchase or lend, as applicable, up to an amount of such debt securities or borrowed amounts (its "Allocated Share") equal to the product of (x) the principal amount of debt securities being issued or the principal amount being borrowed, as applicable, and (y) a fraction (expressed as a percentage), the numerator of which is the number of shares of Common Stock beneficially owned by such Preemptive Rights Stockholder and the denominator of which is the aggregate number of outstanding shares of Common Stock.  If the Company intends to issue any debt securities to, or borrow money from, one or more Stockholders or their Affiliates, the Company shall deliver a written notice (a "Debt

41

Preemptive Rights Notice") to the Preemptive Rights Stockholders specifying (i) the amount of its Allocated Share, (ii) the anticipated closing date; and (iii) any other material terms of such issuance or borrowing.

(b)      Within ten Business Days following receipt of a Debt Preemptive Rights Notice, each Preemptive Rights Stockholder shall deliver to the Company a written notice (a "Debt Exercise Notice") (i) indicating whether it will exercise its right to participate in the offering or borrowing and (ii) specifying the principal amount it wishes to purchase or lend in connection therewith up to its Allocated Share.  If any Preemptive Rights Stockholder fails to deliver a Debt Exercise Notice to the Company within such ten Business Day period, such Preemptive Rights Stockholder shall be deemed to have elected not to participate in such offering or borrowing.

(c)      To the extent any Preemptive Rights Stockholder fails to exercise fully its aggregate preemptive rights granted pursuant to this Section 6.6 with respect to such offering or borrowing, the Company shall have 90 days thereafter to sell such notes or borrow such amounts upon terms no more favorable than specified in the Debt Preemptive Rights Notice.

(d)      The preemptive rights set forth in this Section 6.6 may not be assigned or transferred, except that such right may be assigned by any Preemptive Rights Stockholder to any Affiliate of such Preemptive Rights Stockholder.

## ARTICLE 7. MISCELLANEOUS

Section 7.1      Survival of Agreement; Term.      This Agreement, and the Company's and the Stockholders' respective rights and obligations hereunder shall remain in effect until terminated (a) at any time by the written agreement of the Company and Stockholders holding at least 90% of the then outstanding Common Stock or (b) automatically upon the occurrence of the Exchange Act Reporting Date; provided, that (i) Article 3 shall survive any such termination and (ii) the right to appoint or nominate directors to the Board shall survive any such termination as may be modified or terminated to the extent necessary to meet applicable listing requirements of any securities exchange or quotation system on which the Company's Common Stock is expected to be listed or quoted.  This Agreement shall terminate automatically with respect to any Stockholder when such Stockholder ceases to beneficially own any Shares; provided, that Section 6.4 and this Article 7 shall survive any such termination and shall terminate as set forth therein.

Section 7.2      Notices.  All notices, requests, waivers and other communications made pursuant to this Agreement shall be in writing and shall be deemed to have been effectively given (a) when delivered by hand, facsimile or electronic transmission to the party to be notified, (b) one Business Day after deposit with a national overnight delivery service with next-business-day delivery guaranteed, (c) three Business Days after deposit in the United States mail postage prepaid by certified or registered mail return receipt requested, in each case addressed to the party to be notified at the addresses set forth below such party's respective signature to this Agreement, or (d) when posted to an Intralinks or similar site to which all Stockholders have been offered access.  Any party to this Agreement may change its address for purposes of notice

42

hereunder by giving ten days' written notice of such change to all other parties to this Agreement, in the manner provided in this Section 7.2.

Section 7.3    Binding Effect.  This Agreement shall be binding upon and inure to the benefit of the respective successors and assigns of the parties hereto.

Section 7.4    Entire Agreement.  This Agreement (together with the documents attached as exhibits hereto and any documents or agreements specifically contemplated hereby) supersedes all prior discussions and agreements among any of the parties hereto (and their Affiliates) with respect to the subject matter hereof and contains the entire understanding of the parties with respect to the subject matter hereof.

Section 7.5    Amendment.  This Agreement shall not be amended, modified or supplemented, and no provision in this Agreement may be waived, except pursuant to a written instrument duly executed by or on behalf of the Company and Stockholders holding a majority of the then outstanding Common Stock; provided, however, that:

(a)    if any such amendment, modification, supplement or waiver would reasonably be expected to disproportionately affect any Stockholder in any material respect, approval of each such Stockholder so affected shall be required;

(b)    if any such amendment, modification, supplement or waiver would result in the reduction in the number of Directors an Appointing Stockholder Group has the right to appoint pursuant to Section 2.3(c)(ii), such Appointing Stockholder Group's approval shall be required;

(c)    if any such amendment, modification, supplement or waiver would materially and adversely affect (i) the rights of a Stockholder rights under Section 5.2, 6.1, 6.5, or 6.6, (ii) protections benefitting a Stockholder under Section 3.2 or 5.1 (including the approval rights to trigger a Drag-Along Sale as described in the definition thereof), or (iii) the rights of a Stockholder under the proviso to Section 6.4, such Stockholder's approval shall be required;

(d)    if such amendment, modification, supplement or waiver would increase the transfer restrictions applicable to any Stockholder, such Stockholder's approval shall be required;

(e)    if any such amendment, modification, supplement or waiver is to the nomination rights of the Minority Director Nominating Stockholder Groups with respect to the Minority Director, each such Minority Director Nominating Stockholder Group's approval shall be required;

(f)    if any such amendment, modification, supplement or waiver is to Section 2.3(c)(ii)(D), or Section 2.3(c)(iv), the approval of the holders of a majority of the outstanding Voting Shares shall be required;

(g)    if any such amendment, modification, supplement or waiver is to Section 2.3(c)(iii), the approval of each Nominating Stockholder and Stockholders beneficially owning a

43

majority of the outstanding shares of Common Stock beneficially owned by all Non-Appointing Stockholders shall be required;

(h)    if any such amendment, modification, supplement or waiver is to Section 2.7, the approval of Stockholders holding not less than 66⅔% of the outstanding shares of Common Stock shall be required; and

(i)    if any such amendment or waiver is to Section 7.1 the approval of Stockholders holding at least 90% of the outstanding shares of Common Stock will be required.

Section 7.6    Third-Party Beneficiary.  This Agreement is intended solely for the benefit of each of the parties hereto and their respective successors and permitted assigns, and this Agreement shall not confer any rights upon any other Person, except that each of the Persons entitled to indemnification under Section 3.8 is an intended third-party beneficiary of such provision.

Section 7.7    Counterparts.  This Agreement may be signed in any number of counterparts, any of which may be delivered via facsimile, portable document format (PDF), or other forms of electronic delivery, each of which shall be deemed an original, and all of which are deemed to be one and the same agreement binding upon the Company and each of the Stockholders.

Section 7.8    Headings.  The headings of the various sections of this Agreement have been inserted for convenience of reference only and shall not be deemed to be a part of this Agreement.

Section 7.9    Governing Law; Consent to Jurisdiction and Service of Process.  This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to its conflicts of law doctrine.  Each party hereby submits to the exclusive jurisdiction of the Delaware Court of Chancery and any state appellate court therefrom within the State of Delaware (unless the Delaware Court of Chancery shall decline to accept jurisdiction over a particular matter, in which case, in any Delaware state or federal court within the State of Delaware, and any appellate court thereof), and any judicial proceeding brought against any of the parties on any dispute arising out of this Agreement or any matter related hereto shall be brought in such courts.  Each party hereby irrevocably waives, to the fullest extent permitted by law, any objection it may have or hereafter have to the laying of the venue of any such proceeding brought in such a court and any claim that any such proceeding brought in such a court has been brought in an inconvenient forum.  Each party hereby consents to process being served in any such proceeding by the mailing of a copy thereof by registered or certified mail, postage prepaid, to the address below such party's respective signature to this Agreement, or in any other manner permitted by law.  EACH PARTY HERETO HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHTS IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY SUCH ACTION OR PROCEEDING.

Section 7.10    Injunctive Relief.  The parties to this Agreement hereby agree and acknowledge that it will be impossible to measure the monetary damages that would be suffered if any party to this Agreement fails to comply with any of the obligations imposed on it by this

44

Agreement, and that in the event of any such failure, an aggrieved Person will be irreparably damaged and will not have an adequate remedy at law.  Accordingly, each of the parties to this Agreement shall be entitled to injunctive relief, including specific performance, to enforce such obligations, and if any action should be brought in equity to enforce any of the provisions of this Agreement, none of the parties hereto shall raise the defense that there is an adequate remedy at law.  Each of the parties to this Agreement hereby waives, and causes its respective representatives to waive, any requirement for the securing or posting of any bond in connection with any action brought for injunctive relief hereunder.

Section 7.11    Severability.  The invalidity or unenforceability of any provisions of this Agreement in any jurisdiction shall not affect the validity, legality or enforceability of the remainder of this Agreement in such jurisdiction or the validity, legality or enforceability of any provision of this Agreement in any other jurisdiction, it being intended that all rights and obligations of the parties hereunder shall be enforceable to the fullest extent permitted by law.

Section 7.12    Recapitalization and Similar Events.  In the event that any shares of capital stock or other securities are issued in respect of, in exchange for, or in substitution of, Shares by reason of any reorganization, recapitalization, reclassification, merger, consolidation, spin-off, partial or complete liquidation, stock dividend, split-up, sale of assets, distribution to Stockholders or combination of shares of Common Stock or any other change in the Company's capital structure, appropriate adjustments shall be made to the provisions of this Agreement, as determined in good faith by the Board, so as to fairly and equitably preserve, as far as practicable, the original rights and obligations of the parties hereto under this Agreement.

[SIGNATURE PAGE FOLLOWS]

**IN WITNESS WHEREOF**, the undersigned, thereunto duly authorized, have hereunto set their respective hands as of the date and year first written above.

**DEX MEDIA, INC.**

By: _____
Name:
Title:

**Address for Notices:**

[_____]
[_____]

Attn:  Board of Directors

[Signature Page to Stockholders Agreements]

**STOCKHOLDER**

**[_____]**


By: _____

Name:
Title


**Address for Notices:**

[_____]
[_____]

Attn:  [_____]


_____
Facsimile

_____
Telephone

_____
Email

[Signature Page to Stockholders Agreements]

**STOCKHOLDER**
**[_____]**


By: _____

Name:
Title



**Address for Notices:**

[_____]
[_____]

Attn:  [_____]


_____
Facsimile

_____
Telephone

_____
Email

[Signature Page to Stockholders Agreements]

**STOCKHOLDER**

**[_____]**

By: _____

Name:
Title

**Address for Notices:**

[_____]
[_____]

Attn:  [_____]

_____
Facsimile

_____
Telephone

_____
Email

[Signature Page to Stockholders Agreements]

**STOCKHOLDER**

**[_____]**

By: _____

Name:

Title

**Address for Notices:**

[_____]
[_____]

Attn:  [_____]

_____

Facsimile

_____

Telephone

_____

Email

[Signature Page to Stockholders Agreements]

**STOCKHOLDER**

**[_____]**

By: _____

Name:
Title

**Address for Notices:**

[_____]
[_____]

Attn:  [_____]

_____
Facsimile

_____
Telephone

_____
Email

[Signature Page to Stockholders Agreements]

**EXHIBIT A**

**FORM OF JOINDER AGREEMENT**

This Joinder Agreement (this "***Agreement***"), dated as of _____, 201_, is made by and among DEX MEDIA, INC., a Delaware corporation (the "***Company***"), and _____ (the "***Joining Party***").  Capitalized terms that are used but are not otherwise defined herein shall have the meanings given to them in the Stockholders Agreement, dated as of [____], 2016 (as may be amended, supplemented or otherwise modified from time to time pursuant to the terms thereof, the "***Stockholders Agreement***").

    1.    <u>Agreement to be Bound</u>.  The Joining Party hereby agrees that upon execution of this Agreement, it shall become a party to the Stockholders Agreement and shall be fully bound by, and subject to, all of the covenants, terms and conditions of the Stockholders Agreement as though an original party thereto and shall be deemed included in the definition of "Stockholder" therein for all purposes thereof.  In addition, the Joining Party hereby agrees that all of the Transferred Shares shall be subject to all of the covenants, terms and conditions applicable to Shares under the Stockholders Agreement.  The Joining Party acknowledges that it has been furnished with and has carefully read a copy of the Stockholders Agreement prior to its execution of this Agreement.

    2.    <u>Counterparts</u>.  This Agreement may be signed in counterparts, any of which may be delivered via facsimile, PDF, or other forms of electronic delivery, each of which shall be deemed an original, and all of which are deemed to be one and the same agreement binding upon the Company and the Joining Party.

    3.    <u>Headings</u>.  The headings of the various sections of this Agreement have been inserted for convenience of reference only and shall not be deemed to be a part of this Agreement.

    4.    <u>Governing Law</u>.  This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to its conflicts of law doctrine.  Each party hereby submits to the exclusive jurisdiction of the Delaware Court of Chancery and any state appellate court therefrom within the State of Delaware (unless the Delaware Court of Chancery shall decline to accept jurisdiction over a particular matter, in which case, in any Delaware state or federal court within the State of Delaware, and any appellate court thereof), and any judicial proceeding brought against any of the Parties on any dispute arising out of this Agreement or any matter related hereto shall be brought in such courts. Each party hereby irrevocably waives, to the fullest extent permitted by law, any objection it may have or hereafter have to the laying of the venue of any such proceeding brought in such a court and any claim that any such proceeding brought in such a court has been brought in an inconvenient forum.  The Joining Party hereby consents to process being served in any such proceeding by the mailing of a copy thereof by registered or certified mail, postage prepaid, to the

address set forth under its signature below, or in any other manner permitted by law.  EACH PARTY HERETO HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHTS IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY SUCH ACTION OR PROCEEDING.

5.    Severability.   The invalidity or unenforceability of any provisions of this Agreement in any jurisdiction shall not affect the validity, legality or enforceability of the remainder of this Agreement in such jurisdiction or the validity, legality or enforceability of any provision of this Agreement in any other jurisdiction, it being intended that all rights and obligations of the parties hereunder shall be enforceable to the fullest extent permitted by law.

6.    Entire Agreement.  This Agreement and the Stockholders Agreement (together with the documents attached as exhibits thereto and any documents or agreements specifically contemplated thereby) constitute the entire agreement between the parties with respect to the subject matter of this Agreement and supersedes all prior agreements and understandings, both oral and written, between the parties with respect to the subject matter of this Agreement.

IN WITNESS WHEREOF, the undersigned, thereunto duly authorized, have hereunto set their respective hands as of the date and year first written above.

**JOINING PARTY:**

_____

By: _____
Name:
Title:

**Address for Notices:**

_____
Address – Line 1

_____
Address – Line 2

_____
Address – Line 3

_____
Attention

_____
Facsimile

_____
Telephone

_____
Email

ACCEPTED:

DEX MEDIA, INC.

By: _____
     Name:
     Title:

## Exhibit J

**Material Takeback First Lien Term Loan Documents**

**FILED**

CREDIT AGREEMENT

dated as of

[_____], 2016,

among

DEX MEDIA, INC.

as Borrower,

The Lenders Party Hereto

and

WILMINGTON TRUST,
NATIONAL ASSOCIATION

as Administrative Agent

TABLE OF CONTENTS

Page

ARTICLE I

DEFINITIONS

Section 1.01.  Defined Terms .............................................................................................................1
Section 1.02.  Classification of Loans and Borrowings ....................................................................20
Section 1.03.  Terms Generally .........................................................................................................20
Section 1.04.  Accounting Terms; GAAP .........................................................................................20

ARTICLE II

THE CREDITS

Section 2.01.  Loans ..........................................................................................................................21
Section 2.02.  Borrowings .................................................................................................................21
Section 2.03.  Interest Elections ........................................................................................................21
Section 2.04.  Repayment of Loans; Evidence of Debt ....................................................................22
Section 2.05.  [Reserved] ..................................................................................................................22
Section 2.06.  Prepayment of Loans ..................................................................................................22
Section 2.07.  Fees .............................................................................................................................24
Section 2.08.  Interest ........................................................................................................................24
Section 2.09.  Alternate Rate of Interest ...........................................................................................24
Section 2.10.  Increased Costs; Illegality ..........................................................................................24
Section 2.11.  Break Funding Payments ............................................................................................25
Section 2.12.  Taxes ...........................................................................................................................26
Section 2.13.  Payments Generally; Pro Rata Treatment; Sharing of Setoffs ..................................29
Section 2.14.  Mitigation Obligations; Replacement of Lenders ......................................................29
Section 2.15.  Voluntary Repurchases Below Par..............................................................................30

ARTICLE III

REPRESENTATIONS AND WARRANTIES

Section 3.01.  Organization; Powers..................................................................................................31
Section 3.02.  Authorization; Enforceability......................................................................................32
Section 3.03.  Governmental Approvals; No Conflicts......................................................................32
Section 3.04.  Financial Condition.....................................................................................................32
Section 3.05.  Properties ....................................................................................................................32
Section 3.06.  Litigation and Environmental Matters ........................................................................32
Section 3.07.  Compliance with Laws and Agreements......................................................................33
Section 3.08.  Investment Company Status.........................................................................................33
Section 3.09.  Taxes............................................................................................................................33
Section 3.10.  ERISA..........................................................................................................................33
Section 3.11.  Margin Regulations......................................................................................................33
Section 3.12.  Disclosure ...................................................................................................................33
Section 3.13.  Subsidiaries .................................................................................................................33
Section 3.14.  Insurance......................................................................................................................33
Section 3.15.  Labor Matters...............................................................................................................34
Section 3.16.  Solvency.......................................................................................................................34
Section 3.17.  Security Documents ....................................................................................................34
Section 3.18.  Liens.............................................................................................................................34
Section 3.19.  Bankruptcy Court Orders ............................................................................................35

Section 3.20.    Indebtedness ...................................................................................................35
Section 3.21.    Bank Accounts ..................................................................................................35
Section 3.22.    Anti-Bribery, Anti-Corruption and Anti-Money Laundering Laws; Sanctions ...............35

ARTICLE IV

CONDITIONS

Section 4.01.    Effectiveness of Agreement ..............................................................................35

ARTICLE V

AFFIRMATIVE COVENANTS

Section 5.01.    Financial Statements and Other Information ......................................................38
Section 5.02.    Notices of Material Events................................................................................39
Section 5.03.    Information Regarding Collateral ......................................................................40
Section 5.04.    Existence; Conduct of Business ........................................................................40
Section 5.05.    Payment of Obligations.....................................................................................40
Section 5.06.    Maintenance of Properties.................................................................................40
Section 5.07.    Insurance ...........................................................................................................41
Section 5.08.    Casualty and Condemnation .............................................................................41
Section 5.09.    Books and Records; Inspection and Audit Rights.............................................41
Section 5.10.    Compliance with Laws......................................................................................41
Section 5.11.    Additional Subsidiaries ....................................................................................41
Section 5.12.    Further Assurances............................................................................................41
Section 5.13.    [Reserved] .........................................................................................................42
Section 5.14.    Anti-Bribery, Anti-Corruption and Anti-Money Laundering Laws; Sanctions ..............42

ARTICLE VI

NEGATIVE COVENANTS

Section 6.01.    Indebtedness; Certain Equity Securities............................................................42
Section 6.02.    Liens..................................................................................................................43
Section 6.03.    Fundamental Changes .......................................................................................44
Section 6.04.    Investments, Loans, Advances, Guarantees and Acquisitions ..........................44
Section 6.05.    Asset Sales ........................................................................................................45
Section 6.06.    Sale and Leaseback Transactions......................................................................46
Section 6.07.    Swap Agreements .............................................................................................46
Section 6.08.    Restricted Payments; Certain Payments of Indebtedness..................................46
Section 6.09.    Transactions with Affiliates ..............................................................................47
Section 6.10.    Restrictive Agreements .....................................................................................47
Section 6.11.    Change in Business ...........................................................................................48
Section 6.12.    Fiscal Year ........................................................................................................48
Section 6.13.    Amendment of Material Documents ..................................................................48
Section 6.14.    Leverage Ratio ..................................................................................................48
Section 6.15.    Capital Expenditures.........................................................................................48

ARTICLE VII

EVENTS OF DEFAULT

ARTICLE VIII

THE AGENT

ARTICLE IX

MISCELLANEOUS

Section 9.01.    Notices ................................................................................................................51
Section 9.02.    Waivers; Amendments.......................................................................................52
Section 9.03.    Expenses; Indemnity; Damage Waiver ............................................................53
Section 9.04.    Successors and Assigns......................................................................................54
Section 9.05.    Survival ..............................................................................................................56
Section 9.06.    Counterparts; Integration; Effectiveness ..........................................................57
Section 9.07.    Severability ........................................................................................................57
Section 9.08.    Right of Setoff....................................................................................................57
Section 9.09.    Governing Law; Jurisdiction; Consent to Service of Process ...........................57
Section 9.10.    WAIVER OF JURY TRIAL................................................................................58
Section 9.11.    Headings .............................................................................................................58
Section 9.12.    Confidentiality ...................................................................................................58
Section 9.13.    Interest Rate Limitation .....................................................................................59
Section 9.14.    Termination or Release ......................................................................................59
Section 9.15.    USA Patriot Act .................................................................................................59
Section 9.16.    Acknowledgement and Consent to Bail-In of EEA Financial Institutions.......................59

SCHEDULES:

Schedule 1.01A      —      Directory Consolidation Project
Schedule 1.01B      —      Mortgaged Property
Schedule 2.01(a)    —      Loans
Schedule 3.05       —      Properties
Schedule 3.09       —      Taxes
Schedule 3.13       —      Subsidiaries
Schedule 3.14       —      Insurance
Schedule 3.17       —      UCC Filing Jurisdictions
Schedule 3.21       —      Bank Accounts
Schedule 5.01(f)    —      Summary of Key Performance Indicators
Schedule 6.01       —      Existing Indebtedness
Schedule 6.02       —      Existing Liens
Schedule 6.04       —      Existing Investments
Schedule 6.10       —      Existing Restrictions

EXHIBITS:

Exhibit A     —      Form of Assignment and Assumption
Exhibit B     —      Form of Guarantee and Collateral Agreement
Exhibit C     —      Form of Election Notice
Exhibit D     —      Form of Tax Certificates
Exhibit E     —      Form of Promissory Note

CREDIT AGREEMENT, dated as of [__], 2016 (this "Agreement"), among DEX MEDIA, INC., a Delaware corporation (the "Borrower"), the several banks and other financial institutions or entities from time to time party hereto (the "Lenders"), and WILMINGTON TRUST, NATIONAL ASSOCIATION, as administrative agent for such lenders.

Recitals

WHEREAS, on May 17, 2016 (the "Petition Date"), the Borrower and its Subsidiaries (as defined below) each commenced bankruptcy cases (the "Chapter 11 Cases") by filing voluntary petitions under chapter 11 of the Bankruptcy Code (as defined below) in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court");

WHEREAS, on the Petition Date, the Borrower and its Subsidiaries filed with the Bankruptcy Court the Reorganization Plan (as defined below) and the Disclosure Statement (as defined below);

WHEREAS, on [July 15], 2016, the Bankruptcy Court entered the Confirmation Order (as defined below) confirming the Reorganization Plan; and

WHEREAS, pursuant to the Reorganization Plan, the Borrower and certain of its Subsidiaries are herewith entering into this Agreement and the other Loan Documents to repay certain obligations under the Prepetition Facilities and to consummate the Reorganization Plan.

Now, therefore, the parties hereto agree as follows:

ARTICLE I

DEFINITIONS

Section 1.01.    Defined Terms.    As used in this Agreement, the following terms have the meanings specified below:

"ABR", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Alternate Base Rate.

"Acceptable Payment Percentage" has the meaning assigned to such term in Section 2.15(c).

"Accepted Amount" has the meaning assigned to such term in Section 2.15(c).

"Adjusted LIBO Rate" means, with respect to any Eurodollar Borrowing for any Interest Period, an interest rate per annum (rounded upwards, if necessary, to the next 1/100 of 1%) equal to (a) the LIBO Rate for such Interest Period multiplied by (b) the Statutory Reserve Rate.

"Administrative Agent" means Wilmington Trust, National Association, in its capacity as administrative agent for the Lenders hereunder and its Affiliates and permitted successors acting in such capacity.

"Administrative Questionnaire" means an Administrative Questionnaire in a form supplied by the Administrative Agent.

"Affiliate" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"Agent" means the Administrative Agent and each of its Affiliates and successors acting in any such capacity. The Administrative Agent may act on behalf of or in place of any Person included in the "Agent".

"Agreement" has the meaning assigned in the preamble hereto.

"Alternate Base Rate" means, for any day, a rate per annum equal to the greatest of (a) the Prime Rate in effect on such day, (b) the Federal Funds Effective Rate in effect on such day plus 1/2 of 1%, (c) the Adjusted LIBO Rate for a Eurodollar Loan with an Interest Period of one month commencing on such day plus 1% and (d) 2.00%, provided that, for the avoidance of doubt, the Adjusted LIBO Rate for any day shall be based on the rate appearing on Reuters Screen LIBOR 01 Page (or on any successor or substitute of such page) at approximately 11:00 a.m., London time, on such day. Any change in the Alternate Base Rate due to a change in the Prime Rate, the Federal Funds Effective Rate or the Adjusted LIBO Rate shall be effective from and including the effective date of such change in the Prime Rate or the Federal Funds Effective Rate or the Adjusted LIBO Rate, as the case may be.

"Alternate Rate Period" has the meaning assigned to such term in Section 2.09(a).

"Applicable Payment Percentage" has the meaning assigned to such term in Section 2.15(c).

"Applicable Rate" means, for any day, with respect to any Loan, 10.00% per annum.

"Approved Fund" has the meaning assigned to such term in Section 9.04.

"Asset Disposition" means (a) any sale, lease, license, sublicense, assignment, conveyance, transfer or other disposition (including pursuant to a sale and leaseback, securitization or spin-off transaction) of any property or asset of the Borrower or any Subsidiary other than (i) dispositions described in clauses (a), (b), (c), (e), (f) and (g) of Section 6.05 and (ii) dispositions described in Section 6.05(d) resulting in aggregate Net Proceeds not exceeding $2,500,000 during the term of this Agreement and (b) any casualty or other insured damage to, or any taking under power of eminent domain or by condemnation or similar proceeding of, any property or asset of the Borrower or any Subsidiary, but only to the extent that the Net Proceeds therefrom have not been applied to repair, restore or replace such property or asset within 365 days after such event.

"Assignment and Assumption" means an assignment and assumption entered into by a Lender and an assignee (with the consent of any party whose consent is required by Section 9.04), and accepted by the Administrative Agent, in the form of Exhibit A or any other form approved by the Administrative Agent.

"Attributable Debt" means, on any date, in respect of any lease of the Borrower or any Subsidiary entered into as part of a sale and leaseback transaction subject to Section 6.06, (a) if such lease is a Capital Lease Obligation, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP and (b) if such lease is not a Capital Lease Obligation, the capitalized amount of the remaining lease payments under such lease that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP if such lease were accounted for as a Capital Lease Obligation.

"Bail-In Action" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"Bail-In Legislation" means, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"Bankruptcy Code" means title 11 of the United States Code (11 U.S.C. §101 et seq.), as amended from time to time, and any successor statute.

"Bankruptcy Court" has the meaning assigned to such term in the recitals to this Agreement.

"Board" means the Board of Governors of the Federal Reserve System of the United States of America.

"Borrower" has the meaning assigned to such term in the preamble to this Agreement.

"Borrower's Percentage" means 25%.

"Borrower's Excess Cash Flow Amount" means for any full fiscal quarter ending after the Closing Date, starting with the fiscal quarter commencing on [_____][1], an amount determined following the end of such fiscal quarter of the Borrower (and certified by a Financial Officer of the Borrower pursuant to Section 5.01(c)(xi)), equal to Excess Cash Flow for such fiscal quarter multiplied by the Borrower's Percentage.

"Borrowing" means Loans of the same Type, made or continued on the same date and, in the case of Eurodollar Loans, as to which a single Interest Period is in effect.

"Business Day" means any day that is not a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to remain closed; provided, that, when used in connection with a Eurodollar Loan, the term "Business Day" shall also exclude any day on which banks are not open for dealings in dollar deposits in the London interbank market.

"Capital Expenditures" means, for any period, without duplication, the additions to property, plant and equipment and other capital expenditures of the Borrower and its consolidated Subsidiaries for such period, determined in accordance with GAAP.

"Capital Lease Obligations" of any Person means the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP, and the amount of such obligations shall be the capitalized amount thereof determined in accordance with GAAP.

"Change in Control" means the ownership, beneficially or of record, by any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Securities Exchange Act of 1934, as amended (the "Exchange Act")), other than a Permitted Holder or Permitted Holders (or a group more than half the interest in which is held by Permitted Holders) of more than 35% of the outstanding Equity Interests in the Borrower entitled to vote for election of directors, which person or group owns more of the Equity Interests in the Borrower entitled to vote for election of directors than the Permitted Holders.

"Change in Law" means (a) the adoption of any law, rule or regulation after the date of this Agreement, (b) any change in any law, rule or regulation or in the interpretation or application thereof by any Governmental Authority after the date of this Agreement or (c) compliance by any Lender (or, for purposes of Section 2.10(b), by any lending office of such Lender or by such Lender's holding company, if any) with any request, guideline or directive (whether or not having the force of law) of any Governmental Authority made or issued after the date of this Agreement.

"Chapter 11 Cases" has the meaning assigned to such term in the recitals to this Agreement.

"Charges" has the meaning assigned to such term in Section 9.13.

"Closing Date" means the date on which the conditions precedent set forth in Section 4.01 shall have been satisfied (or waived) and the notice contemplated in the last sentence of Section 4.01 shall have been delivered, which date is [__], 2016.

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Collateral" means all property of the Loan Parties, now owned or hereafter acquired, upon which a Lien is purported to be created by any Security Document.

---

[1] For calculation purposes, this will be the first day of the first full fiscal quarter starting after the Closing Date.

"Collateral and Guarantee Requirement" means the requirement that:

(a)        the Administrative Agent shall have received from each Loan Party either (i) a counterpart of the Guarantee and Collateral Agreement duly executed and delivered on behalf of such Loan Party or (ii) in the case of any Subsidiary that becomes a Loan Party after the Closing Date, a supplement to the Guarantee and Collateral Agreement, in the form specified therein, duly executed and delivered on behalf of such Subsidiary;

(b)        all outstanding Equity Interests of each Subsidiary of Borrower shall have been pledged pursuant to the Guarantee and Collateral Agreement (except that the Borrower and each other Loan Party shall not be required to pledge more than 65% of the outstanding voting Equity Interests of any first-tier Foreign Subsidiary or any Equity Interests of a Foreign Subsidiary that is not directly owned by a Loan Party) and the Administrative Agent shall have received all certificates or other instruments representing such Equity Interests, together with stock powers or other instruments of transfer with respect thereto endorsed in blank;

(c)        all documents and instruments, including Uniform Commercial Code financing statements, required by law or reasonably requested by the Agent or Required Lenders to be filed, registered or recorded to create the Liens intended to be created by the Security Documents and perfect such Liens to the extent required by, and with the priority required by, the Guarantee and Collateral Agreement, shall have been filed, registered or recorded or delivered to the Agent for filing, registration or recording;

(d)        the Administrative Agent shall have received (i) counterparts of any Mortgage required to be entered into after the Closing Date pursuant to Section 5.12 with respect to each Mortgaged Property duly executed and delivered by the record owner of such Mortgaged Property, (ii) a policy or policies of title insurance issued by a nationally recognized title insurance company insuring the Lien of each such Mortgage as a valid first Lien on the Mortgaged Property described therein, free of any other Liens except as expressly permitted by Section 6.02, together with such endorsements, coinsurance and reinsurance as the Required Lenders and the Administrative Agent may reasonably request, (iii) such surveys, abstracts, appraisals, legal opinions and other documents as the Required Lenders and the Administrative Agent may reasonably request with respect to any such Mortgage or Mortgaged Property and (iv) flood certificates covering each Mortgaged Property in form and substance reasonably acceptable to the Required Lenders and the Administrative Agent, certified to the Administrative Agent in its capacity as such and certifying whether or not each such Mortgaged Property is located in a flood hazard zone by reference to the applicable FEMA map; and

(e)        each Loan Party shall have obtained all consents and approvals required to be obtained by it in connection with the execution and delivery of all Security Documents (or supplements thereto) to which it is a party, the performance of its obligations thereunder and the granting by it of the Liens thereunder.

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. Section 1 et seq.), as amended from time to time, and any successor statute.

"Competitor" means any Person engaged (whether directly or indirectly through the control of any other person) other than through the Borrower and its Subsidiaries in the business of providing yellow page services or other similar targeted advertising in North America; provided, that no potential assignee shall be deemed to be a Competitor on account of owning less than 10% (or, in the case of any Person that was a Term Loan Lender (as defined in the Reorganization Plan) as of the Petition Date, 20%) of the outstanding shares of equity securities of a Competitor so long as such potential assignee does not have the right to appoint, and no director, officer or employee of such potential assignee is, a director of such Competitor or any of its Subsidiaries.

"Confirmation Order" means that certain order approving the Disclosure Statement and confirming the Reorganization Plan pursuant to the Bankruptcy Code entered by the Bankruptcy Court on [July 15], 2016.

"Consolidated EBITDA" means, for any period, Consolidated Net Income for such period plus (a) without duplication and to the extent deducted in determining such Consolidated Net Income, the sum of (i) consolidated interest expense for such period, (ii) consolidated income tax expense for such period, (iii) all amounts attributable to depreciation and amortization for such period, (iv) any extraordinary charges and any non-

- 4 -

cash charges for such period (including in respect of equity compensation of employees), (v) non-recurring business optimization expenses and other restructuring charges, including expenses incurred in connection with inventory optimization programs, office or facility closure, relocation, headcount savings, product margin and integration savings,  office or facility consolidations and openings, retention, severance, systems establishment costs, contract termination costs and reconstruction, decommissioning, recommissioning or reconfiguration of fixed assets for alternative uses, (vi) payments of customary investment and commercial banking fees and expenses, (vii) cash premiums, penalties or other payments payable in connection with the early extinguishment or repurchase of Indebtedness, and (viii) Specified Charges for such period, and minus (b) without duplication and to the extent included in determining such Consolidated Net Income, (i) consolidated interest income for such period and (ii) any extraordinary gains and non-cash gains (including, without limitation, any gain arising from the retirement of Indebtedness) for such period, all determined on a consolidated basis in accordance with GAAP. For purposes of calculating the Leverage Ratio as of any date, if the Borrower or any consolidated Subsidiary has (i) made any Permitted Acquisition, (ii) consummated any sale, transfer, lease, license, sublicense or other disposition outside of the ordinary course of business of a Subsidiary or of assets constituting a business unit, in each case as permitted by Section 6.05, or (iii) effected or commenced any restructuring of the business of the Borrower or any of its Subsidiaries that is expected to have a continuing impact that is factually supportable, including cost savings resulting from head count reduction, closure of facilities and similar operational and other cost savings, which adjustments the Borrower determines are reasonable as set forth in a certificate of a Financial Officer of the Borrower, in each case during the period of four consecutive fiscal quarters (a "Reference Period") most recently ended on or prior to such date (or since the end of the Reference Period and prior to the date of determination), Consolidated EBITDA for such Reference Period shall be calculated after giving pro forma effect thereto, as if such transaction (and any related incurrence, repayment or assumption of Indebtedness with any new Indebtedness being deemed to be amortized over the applicable testing period in accordance with its terms) had occurred on the first day of such Reference Period. The calculation of Consolidated EBITDA shall exclude (i) any non-cash impact attributable to the reduction in deferred revenue or reduction in deferred costs to balance sheet accounts as a result of the fair value exercise undertaken as required by purchase method of accounting for the transactions contemplated by any acquisition, in accordance with GAAP and (ii) any non-cash impact attributable to the Borrower's adoption of fresh-start accounting in accordance with GAAP upon effectiveness of the Reorganization Plan. Notwithstanding anything to the contrary contained in this definition, for the purpose of determining Consolidated EBITDA under this Agreement for any period that includes the fiscal quarters ending December 31, 2015, March 31, 2016 or June 30, 2016, Consolidated EBITDA for such fiscal quarters shall be, [____], [____],and [____], respectively.

"Consolidated Net Income" means, for any period, the net income or loss, before the effect of the payment of any dividends or other distributions in respect of preferred stock, of the Borrower and its Subsidiaries for such period determined on a consolidated basis in accordance with GAAP and adjusted to eliminate (i) any non-cash impact attributable to the reduction in deferred revenue or reduction in deferred costs to balance sheet accounts as a result of the fair value exercise undertaken as required by purchase method of accounting for the transactions contemplated by any acquisition, in accordance with GAAP and (ii) any non-cash impact attributable to the Borrower's adoption of fresh-start accounting in accordance with GAAP upon effectiveness of the Reorganization Plan; provided, that there shall be excluded (a) the income of any Person (other than the Borrower or a Loan Party) in which any other Person (other than the Borrower or any Loan Party or any director holding qualifying shares in compliance with applicable law) owns an Equity Interest, except to the extent of the amount of dividends or other distributions actually paid to the Borrower or any Loan Party during such period, and (b) except as otherwise contemplated by the definition of "Consolidated EBITDA", the income or loss of any Person accrued prior to the date it becomes a Subsidiary or is merged into or consolidated with the Borrower or any Subsidiary or the date that such Person's assets are acquired by the Borrower or any Subsidiary.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"Debt Issuance" means the incurrence by the Borrower or any Subsidiary of any Indebtedness, other than Indebtedness permitted by Section 6.01(a).

"Default" means any event or condition that constitutes an Event of Default or which upon notice, lapse of time or both would, unless cured or waived, become an Event of Default.

"Default Rate Interest" has the meaning assigned to such term in Section 2.08(b).

"Defaulting Lender" means any Lender, as reasonably determined by the Administrative Agent, that has (a) notified the Borrower, the Administrative Agent or any other Lender in writing that it does not intend to comply with any of its funding obligations under this Agreement or has made a public statement to the effect that it does not intend to comply with its funding obligations under this Agreement or under agreements in which it commits to extend credit generally, (b) otherwise failed to pay over to the Administrative Agent or any other Lender any other amount required to be paid by it hereunder within three Business Days of the date when due, unless the subject of a good faith dispute, (c) (i) been (or has a parent company that has been) adjudicated as, or determined by any Governmental Authority having regulatory authority over such Person or its assets to be, insolvent or (ii) become the subject of a bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or custodian, appointed for it, or has taken any action in furtherance of, or indicating its consent to, approval of or acquiescence in any such proceeding or appointment or has a parent company that has become the subject of a bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or custodian appointed for it, or has taken any action in furtherance of, or indicating its consent to, approval of or acquiescence in any such proceeding or appointment, unless in the case of any Lender referred to in this clause (c) the Borrower and the Administrative Agent shall be satisfied that such Lender intends, and has all approvals required to enable it, to continue to perform its obligations as a Lender hereunder, or (d) become the subject of a Bail-In Action. For the avoidance of doubt, a Lender shall not be deemed to be a Defaulting Lender solely by virtue of the ownership or acquisition of any Equity Interest in such Lender or its parent by a Governmental Authority.

"Dex Digital" means Dex One Digital, Inc., a Delaware corporation.

"Dex East" means Dex Media East Inc., a Delaware corporation.

"Dex East Prepetition Credit Agreement" means the Credit Agreement, dated as of October 24, 2007 (as amended and restated as of January 29, 2010, as further amended and restated as of April 30, 2013, and as further amended, restated, amended and restated, supplemented or otherwise modified from time to time), among the Borrower, Dex Holdings, Dex East, the several banks and other financial institutions or entities from time to time party thereto, and JPMorgan Chase Bank, N.A., as administrative agent and collateral agent.

"Dex Holdings" means Dex Media Holdings, Inc., a Delaware corporation.

"Dex West" means Dex Media West Inc., a Delaware corporation.

"Dex West Prepetition Credit Agreement" means the Credit Agreement, dated as of June 6, 2008 (as amended and restated as of January 29, 2010, as further amended and restated as of April 30, 2013, and as further amended, restated, amended and restated, supplemented or otherwise modified from time to time), among the Borrower, Dex Holdings, Dex West, the several banks and other financial institutions or entities from time to time party thereto, and JPMorgan Chase Bank, N.A., as administrative agent.

"Directory Consolidation Project" means the initiative described in Schedule 1.01A.

"Disclosed Matters" means the matters, proceedings, transactions and other information disclosed in the Disclosure Statement (other than any risk factor disclosures contained under the heading "Risk Factors", any disclosures of risks in the "Forward-Looking Statements" disclaimer or any other similar forward-looking statements in the Disclosure Statement).

"Disclosure Statement" means the Disclosure Statement for the Reorganization Plan filed in the Chapter 11 Cases at Docket No. 19, the adequacy of which was approved by the Bankruptcy Court pursuant to the Confirmation Order.

"Discounted Voluntary Repurchase" has the meaning assigned to such term in Section 2.15(a).

"Discounted Voluntary Repurchase Amount" has the meaning assigned to such term in Section 2.15(c).

"Discounted Voluntary Repurchase Notice" has the meaning assigned to such term in Section 2.15(c).

"Disinterested Member" means a member of the Borrower's Governing Board who does not have a financial interest in a relevant transaction or arrangement (or series of related transactions or arrangements), excluding, in all cases, a financial interest in such transaction or arrangement (or series of transactions or arrangements) solely as an equity holder or member of the Governing Board of the Borrower and/or its Subsidiaries.

"Dollars" or "$" refers to lawful money of the United States of America.

"Dutch Auction" has the meaning assigned to such term in Section 2.15(a).

"ECF Open Market Percentage" means 37.5%.

"EEA Financial Institution" means (a) any institution established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent;

"EEA Member Country" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority" means any public administrative authority or any Person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Election Notice" means a written notice from the Borrower to the Administrative Agent in the form of Exhibit C hereto.

"Environmental Laws" means all applicable federal, state, and local laws (including common law), regulations, rules, ordinances, codes, decrees, judgments, directives, orders (including consent orders), and binding agreements with any Governmental Authority in each case, relating to protection of the environment, natural resources, human health and safety or the presence, Release of, or exposure to, Hazardous Materials, or the generation, manufacture, processing, distribution, use, treatment, storage, transport, recycling or handling of, or the arrangement for such activities with respect to, Hazardous Materials.

"Environmental Liability" means any liability, claim, action, suit, judgment or order under or relating to any Environmental Law for any damages, injunctive relief, losses, fines, penalties, fees, expenses (including reasonable fees and expenses of attorneys and consultants) or costs, whether contingent or otherwise, including those arising from or relating to: (a) compliance or non-compliance with any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the Release of any Hazardous Materials or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Equity Interests" means shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in a Person of whatever nature, and any warrants, options or other rights entitling the holder thereof to purchase or acquire any of the foregoing.

"Equity Issuance" means the issuance by the Borrower or any Subsidiary of any Equity Interests, or the receipt by the Borrower or any Subsidiary of any capital contribution, other than (i) any issuance of Equity Interests or receipt of capital contributions to the extent such Equity Interests, or the proceeds thereof or of such capital contributions, are promptly used as consideration for a Permitted Acquisition or other Investment permitted hereunder or (ii) any issuance of Equity Interests to, or receipt of any capital contribution from, the Borrower or any Subsidiary.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"ERISA Affiliate" means any trade or business (whether or not incorporated) that, together with any Loan Party, is treated as a single employer under Section 414(b) or (c) of the Code or, solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414(m) of the Code.

"ERISA Event" means (a) any "reportable event", as defined in Section 4043 of ERISA or the regulations issued thereunder with respect to a Plan (other than an event for which the 30-day notice period is waived); (b) any failure by any Plan to satisfy the minimum funding standards (within the meaning of Sections 412 and 430 of the Code or Section 302 of ERISA) applicable to such Plan, whether or not waived; (c) the filing pursuant to Section 412(c) of the Code or Section 302(c) of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan, the failure to make by its due date a required installment under Section 430(j) of the Code with respect to any Plan or the failure by any Loan Party or any of its ERISA Affiliates to make any required contribution to a Multiemployer Plan; (d) the incurrence by any Loan Party or any of its ERISA Affiliates of any liability under Title IV of ERISA with respect to the termination of any Plan, including but not limited to the imposition of any Lien in favor of the PBGC or any Plan; (e) a determination that any Plan is, or is expected to be, in "at risk" status (within the meaning of Section 430 of the Code or Section 303 of ERISA; (f) the receipt by any Loan Party or any of its ERISA Affiliates from the PBGC or a plan administrator of any notice relating to an intention to terminate any Plan or Plans or to appoint a trustee to administer any Plan under Section 4042 of ERISA; (g) the incurrence by any Loan Party or any of its ERISA Affiliates of any liability with respect to the withdrawal or partial withdrawal from any Plan or Multiemployer Plan; or (h) the receipt by any Loan Party or any of its ERISA Affiliates of any notice, or the receipt by any Multiemployer Plan from a Loan Party or any of its ERISA Affiliates of any notice, concerning the imposition of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, insolvent or in endangered or critical status, within the meaning of Section 432 of the Code or Section 305 or Title IV of ERISA.

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor Person), as in effect from time to time.

"Eurodollar", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Adjusted LIBO Rate.

"Event of Default" has the meaning assigned to such term in Article VII.

"Excess Cash Flow" means, for any full fiscal quarter ending after the Closing Date, starting with the fiscal quarter commencing on [_____][2], without duplication, (i) net cash provided by operating activities of the Borrower and its Subsidiaries for such quarterly period as reflected in the statement of cash flows on the consolidated financial statements of the Borrower for such fiscal quarter, minus (ii) the amount of Capital Expenditures made during such period, minus (iii) net cash provided by operating activities, if any, required so that the Loan Parties would have held cash and Permitted Investments equal to the Minimum Liquidity Amount as of the last day of such fiscal quarter.

"Excess Purchased Amount" has the meaning assigned to such term in Section 2.15(d).

---

[2] For calculation purposes, this will be the first day of the first full fiscal quarter starting after the Closing Date.

- 8 -

"Exchange Act" has the meaning assigned to such term in the definition of "Change in Control".

"Excluded Swap Obligation" means, with respect to any Guarantor, any Swap Obligation if, and to the extent, all or a portion of the Guarantee of such Guarantor of, or the grant by such Guarantor of a security interest to secure, such Swap Obligation (or any Guarantee thereof) is or becomes illegal or unlawful under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Guarantor's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act at the time the Guarantee of such Guarantor or the grant of such security interest would otherwise have become effective with respect to such related Swap Obligation but for such Guarantor's failure to constitute an "eligible contract participant" at such time.

"Excluded Taxes" means, any of the following Taxes imposed on or with respect to the Administrative Agent, any Lender or any other recipient or required to be withheld or deducted from a payment to the Administrative Agent, any Lender or any other recipient, (a) any Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case (i) imposed as a result of the Administrative Agent, any Lender or any other recipient being organized under the laws of, or having its principal office located in or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender (other than an assignee pursuant to a request by the Borrower under Section 2.14(b)), any U.S. withholding Tax that is in effect and would apply to amounts payable to such Lender at the time such Lender becomes a party to this Agreement (or designates a new lending office), except to the extent that such Lender (or its assignor, if any) was entitled, at the time of designation of a new lending office (or assignment), to receive additional amounts from the Borrower with respect to any withholding Tax pursuant to Section 2.12(a), (c) Taxes attributable to such Lender's failure (other than as a result of any Change in Law) to comply with Section 2.12(e) and (d) any U.S. Federal withholding Taxes imposed under FATCA.

"FATCA" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreement entered into pursuant to Section 1471(b)(1) of the Code, and any applicable intergovernmental agreement with respect thereto and applicable official implementing guidance thereunder.

"Federal Funds Effective Rate" means, for any day, the weighted average (rounded upwards, if necessary, to the next 1/100 of 1%) of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average (rounded upwards, if necessary, to the next 1/100 of 1%) of the quotations for such day for such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing selected by it.

"Financial Officer" means the chief financial officer, principal accounting officer, treasurer or controller of the Borrower.

"Foreign Lender" means any Lender that is not a "United States person" within the meaning of Section 7701(a)(30) of the Code.

"Foreign Subsidiary" means (i) a Subsidiary organized under the laws of a jurisdiction located outside the United States of America or (ii) a Subsidiary of any Person described in the foregoing clause (i).

"GAAP" means generally accepted accounting principles in the United States of America.

"Governing Board" means (a) the managing member or members or any controlling committee of members of any Person, if such Person is a limited liability company, (b) the board of directors of any Person, if such Person is a corporation or (c) any similar governing body of any Person.

"Governmental Authority" means the government of the United States of America, any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"Guarantee" of or by any Person (the "guarantor") means any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation or (d) as an account party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness or other obligation; provided, that the term Guarantee shall not include endorsements for collection or deposit in the ordinary course of business.

"Guarantee and Collateral Agreement" means the Guarantee and Collateral Agreement, dated as of the date hereof, among each Loan Party and the Agent, substantially in the form of Exhibit B hereto.

"Guarantors" means Dex Digital, R.H. Donnelley Corporation, RHDI, SuperMedia, Dex Holdings, Service Company, Dex West, Dex East, R.H. Donnelley Apil, Inc., SuperMedia LLC, SuperMedia Sales, Inc., each other direct and indirect domestic subsidiary of the Borrower now existing or hereafter formed or acquired (excluding Dex Media Service LLC) and each other Person party to the Guarantee and Collateral Agreement as a guarantor thereunder and each other Person, if any, that executes a guaranty or other similar agreement in favor of the Administrative Agent in connection with the transactions contemplated by this Agreement and the other Loan Documents.[3]

"Hazardous Materials" means (a) any petroleum products or byproducts and all other hydrocarbons, coal ash, radon gas, asbestos, urea formaldehyde foam insulation, polychlorinated biphenyls, chlorofluorocarbons and all other ozone-depleting substances; or (b) any chemical, material, substance or waste that is prohibited, limited or regulated by or pursuant to any applicable Environmental Law.

"Indebtedness" of any Person means, without duplication, (a) all obligations of such Person for borrowed money or with respect to deposits or advances of any kind, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (c) all obligations of such Person under conditional sale agreements relating to property acquired by such Person, (d) all obligations of such Person in respect of the deferred purchase price of property or services (excluding current accounts payable incurred in the ordinary course of business), (e) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, whether or not the Indebtedness secured thereby has been assumed, (f) all Guarantees by such Person of Indebtedness of others, (g) all Capital Lease Obligations of such Person, (h) all obligations, contingent or otherwise, of such Person as an account party in respect of letters of credit and letters of guaranty and (i) all obligations, contingent or otherwise, of such Person in respect of bankers' acceptances. The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor.

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document and, (b) to the extent not otherwise described in (a), Other Taxes.

"Indemnitee" has the meaning assigned to such term in Section 9.03(b).

---

[3] Guarantors on the closing date subject to change. Company considering undergoing a corporate reorganization prior to emergence.

"Information" has the meaning assigned to such term in Section 9.12.

"Intellectual Property" means the collective reference to all rights, priorities and privileges relating to intellectual property, whether arising under United States, multinational or foreign laws or otherwise, including copyrights, copyright licenses, patents, patent licenses, Marks, Mark licenses, technology, know-how and processes, and all rights to sue at law or in equity for any infringement or other impairment thereof, including the right to receive all proceeds and damages therefrom.

"Interest Election Request" means a request by the Borrower to continue a Borrowing in accordance with Section 2.03.

"Interest Payment Date" means (a) with respect to any Eurodollar Loan, the last day of the Interest Period applicable to the Borrowing of which such Loan is a part and, in the case of a Eurodollar Borrowing with an Interest Period of more than three months' duration, each day prior to the last day of such Interest Period that occurs at intervals of three months' duration after the first day of such Interest Period and (b) with respect to any ABR Loan, the last day of each March, June, September and December.

"Interest Period" means, with respect to any Eurodollar Borrowing, the period commencing on the date of such Borrowing and ending on the numerically corresponding day in the calendar month that is one, two, three or six months thereafter, as the Borrower may elect; provided, that (a) if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day and (b) any Interest Period that commences on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the last calendar month of such Interest Period) shall end on the last Business Day of the last calendar month of such Interest Period. For purposes hereof, the date of a Borrowing initially shall be the date on which such Borrowing is made and thereafter shall be the effective date of the most recent conversion or continuation of such Borrowing.

"Investment" means purchasing, holding or acquiring (including pursuant to any merger with any Person that was not a wholly owned Subsidiary prior to such merger) any Equity Interest, evidences of indebtedness or other securities (including any option, warrant or other right to acquire any of the foregoing) of, or making or permitting to exist any loans or advances (other than commercially reasonable extensions of trade credit) to, guaranteeing any obligations of, or making or permitting to exist any investment in, any other Person, or purchasing or otherwise acquiring (in one transaction or a series of transactions) any assets of any Person constituting a business unit. The amount, as of any date of determination, of any Investment shall be the original cost of such Investment (including any Indebtedness of a Person existing at the time such Person becomes a Subsidiary in connection with any Investment and any Indebtedness assumed in connection with any acquisition of assets), plus the cost of all additions, as of such date, thereto and minus the amount, as of such date, of any portion of such Investment repaid to the investor in cash or property as a repayment of principal or a return of capital (including pursuant to any sale or disposition of such Investment), as the case may be, but without any other adjustments for increases or decreases in value, or write-ups, write-downs or write-offs with respect to such Investment. In determining the amount of any Investment or repayment involving a transfer of any property other than cash, such property shall be valued at its fair market value at the time of such transfer.

"Lenders" has the meaning assigned to such term in the preamble to this Agreement.

"Leverage Ratio" means, on any date, the ratio of (a) Total Indebtedness as of such date to (b) Consolidated EBITDA for the period of four consecutive fiscal quarters of the Borrower most recently ended as of such date for which internal financial statements of the Borrower are available.

"LIBO Rate" means, with respect to any Eurodollar Borrowing for any Interest Period, the greater of (a) the rate per annum determined on the basis of the rate for deposits in Dollars for a period equal to such Interest Period commencing on the first day of such Interest Period appearing on Reuters Screen LIBOR 01 Page as of 11:00 A.M., London time, two Business Days prior to the beginning of such Interest Period (or in the event that such rate does not appear on Reuters Screen LIBOR 01 Page (or otherwise on such screen), the "LIBO Rate" shall be determined by reference to such other comparable publicly available service for displaying eurodollar rates as may

be selected by the Administrative Agent or, in the absence of such availability, by reference to the rate at which the major banks are offered Dollar deposits at or about 10:00 A.M., New York City time, two Business Days prior to the beginning of such Interest Period in the interbank eurodollar market where its eurodollar and foreign currency and exchange operations are then being conducted for delivery on the first day of such Interest Period for the number of days comprised therein and (b) 1.00%.

"Lien" means, with respect to any asset, (a) any mortgage, deed of trust, lien, pledge, hypothecation, encumbrance, charge or security interest in, on or of such asset, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"Loan" has the meaning assigned to such term in Section 2.01(a).

"Loan Documents" means this Agreement and the Security Documents.

"Loan Parties" means the Borrower and the Guarantors.

"Margin Stock" shall have the meaning assigned to such term in Regulation U of the Board.

"Marks" means all current and future (i) trademarks, service marks, trade styles, and logos (including all registrations and recordings thereof and all applications in connection therewith, whether in the United States Patent and Trademark Office or in any similar office or agency of the United States, any state thereof or any other country or any political subdivision thereof, or otherwise) and (ii) trademark rights in any trade names, corporate names, company names, business names, fictitious business names, other source or business identifiers Internet domain names, subdomain names and social media account or page addresses (but excluding all other rights in the foregoing items in this subsection (ii), including any rights in any registrations or recordings for the foregoing items), and in each case of subsections (i) and (ii), all goodwill associated therewith and all common-law rights related thereto.

"Material Adverse Effect" means a material adverse effect on (a) the business, assets, property, material agreements, liabilities, financial condition or results of operations of the Borrower and the Subsidiaries, taken as a whole, or (b) the validity or enforceability of this Agreement or any of the other Loan Documents or the rights and remedies of the Agent or the Lenders under any of the Loan Documents.

"Material Indebtedness" means Indebtedness (other than the Loans but including, for the avoidance of doubt, Guarantees) of any one or more of the Borrower and its Subsidiaries, in an aggregate principal amount exceeding $25,000,000. For purposes of determining Material Indebtedness, the "principal amount" of the obligations of the Borrower or any of its Subsidiaries in respect of any Swap Agreement at any time shall be the maximum aggregate amount (giving effect to any netting agreements) that the Borrower or such Subsidiary would be required to pay if such Swap Agreement were terminated at such time.

"Maturity Date" means [_____], 2021[4], or, if such day is not a Business Day, the next preceding Business Day.

"Maximum Rate" has the meaning assigned to such term in Section 9.13.

"Minimum Liquidity Amount" means $35,000,000 in cash and Permitted Investments that does not appear (or is not required to appear) as "restricted" on a consolidated balance sheet or such lesser amount of cash and Permitted Investments that does not appear (or is not required to appear) as "restricted" on a consolidated balance sheet, in each case, as the Governing Board of the Borrower shall determine in its sole discretion.

"Moody's" means Moody's Investors Service, Inc.

---

[4] The date that is 5 years after the Closing Date.

- 12 -

"Mortgage" means any mortgage, deed of trust, assignment of leases and rents, leasehold mortgage or other security document granting a Lien on any real property and improvements thereto to secure the Obligations delivered after the Closing Date pursuant to Section 5.12. Each Mortgage shall be reasonably satisfactory in form and substance to the Administrative Agent.

"Mortgaged Property" means each parcel of real property and improvements thereto listed on Schedule 1.01B and each other parcel of real property and improvements thereto owned in fee by a Loan Party with respect to which a Mortgage is granted pursuant to Section 5.12.

"Multiemployer Plan" means a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"Net Proceeds" means, with respect to any event (a) the cash proceeds received in respect of such event including (i) any cash received in respect of any non-cash proceeds, including cash received in respect of any debt instrument or equity security received as non-cash proceeds, but only as and when received, (ii) in the case of a casualty, insurance proceeds, and (iii) in the case of a condemnation or similar event, condemnation awards and similar payments, net of (b) the sum of (i) all reasonable fees and out-of-pocket expenses (including underwriting discounts and commissions and collection expenses) paid or payable by the Loan Parties or any Subsidiary thereof to third parties (including Affiliates, if permitted by Section 6.09) in connection with such event, (ii) in the case of a sale, transfer or other disposition of an asset (including pursuant to a sale and leaseback transaction or a casualty or a condemnation or similar proceeding), the amount of all payments required to be made by the Loan Parties or any Subsidiary thereof as a result of such event to repay Indebtedness (other than Loans) secured by such asset or otherwise subject to mandatory prepayment as a result of such event (it being understood that this clause shall not apply to customary asset sale provisions in offerings of debt securities) and (iii) the amount of all taxes paid (or reasonably estimated to be payable) by the Loan Parties or any Subsidiary thereof (provided that such amounts withheld or estimated for the payment of taxes shall, to the extent not utilized for the payment of taxes, be deemed to be Net Proceeds received when such nonutilization is determined), and the amount of any reserves established by the Loan Parties or any Subsidiary thereof to fund contingent liabilities reasonably estimated to be payable, in each case that are directly attributable to such event (provided that such reserves and escrowed amounts shall be disclosed to the Administrative Agent promptly upon being taken or made and any reversal of any such reserves will be deemed to be Net Proceeds received at the time and in the amount of such reversal), in each case as determined reasonably and in good faith by the chief financial officer of the Borrower.

"Obligations" means (a) the prompt payment in full when due (whether at stated maturity, by acceleration or otherwise, including amounts that would become due but for the operation of the automatic stay under the Bankruptcy Code) of the principal of and interest on the Loans made by the Lenders to the Borrower and all fees, indemnification payments, premium and other amounts whatsoever, whether direct or indirect, absolute or contingent, now or hereafter from time to time owing or existing to the Lenders or the Administrative Agent by the Borrower under the Credit Agreement and by any Loan Party under any of the Loan Documents, in each case strictly in accordance with the terms thereof and including all interest, fees, premium and expenses accrued or incurred subsequent to the commencement of any bankruptcy or insolvency proceeding with respect to the Borrower or any Loan Party, whether or not such interest, fees, premium or expenses are enforceable or allowed as a claim in such proceeding. Notwithstanding anything herein or in any other Loan document to the contrary, the Obligations shall not include any Excluded Swap Obligations.

"Open Market Cure Right" has the meaning assigned to such term in Section 2.15(d).

"Open Market Excess Cash Flow Amount" means an amount determined following the end of each fiscal quarter of the Borrower (and certified by the Financial Officer of the Borrower pursuant to Section 5.01(c)(xi)), commencing with the first full fiscal quarter ending after the Closing Date, equal to Excess Cash Flow as of the end of such fiscal quarter multiplied by the ECF Open Market Percentage.

"Open Market Purchases" has the meaning assigned to such term in Section 2.15(a).

"Optional Repurchase" means, with respect to any outstanding Indebtedness, any optional or voluntary repurchase, redemption or prepayment made in cash of such Indebtedness, the related payment in cash of accrued interest to the date of such repurchase, redemption or prepayment on the principal amount of such

- 13 -

Indebtedness repurchased, redeemed or prepaid, the payment in cash of associated premiums (whether voluntary or mandatory) on such principal amount and the cash payment of other fees and expenses incurred in connection with such repurchase, redemption or prepayment.

"Other Connection Taxes" means, with respect to the Administrative Agent, any Lender or any other recipient, Taxes imposed as a result of a present or former connection between such party and the jurisdiction imposing such Tax (other than connections arising from the recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"Other Taxes" means any and all present or future recording, stamp, court, documentary, intangible, excise, transfer, sales, property or similar Taxes, charges or levies arising from any payment made under any Loan Document or from the execution, delivery or enforcement of, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 2.14).

"Participant" has the meaning assigned to such term in Section 9.04(c)(i).

"Participant Register" has the meaning assigned to such term in Section 9.04(c)(iii).

"Payment Percentage" has the meaning assigned to such term in Section 2.15(c).

"PBGC" means the Pension Benefit Guaranty Corporation referred to and defined in ERISA and any successor entity performing similar functions.

"Permitted Acquisitions" means any acquisition (by merger, consolidation or otherwise) by the Borrower or a Loan Party of all or substantially all the assets of, or all the Equity Interests in, a Person or division or line of business of a Person, if (a) both before and immediately after giving effect thereto, no Default or Event of Default has occurred and is continuing or would result therefrom, (b) substantially all the business of such acquired Person or business consists of one or more Permitted Businesses, (c) each Subsidiary resulting from such acquisition (and which survives such acquisition) other than any Foreign Subsidiary, shall be a Loan Party and 100% of the Equity Interests of each such Subsidiary shall be owned directly by the Borrower and/or Loan Parties and shall have been (or within ten Business Days (or such longer period as may be acceptable to the Required Lenders) after such acquisition shall be) pledged pursuant to the Guarantee and Collateral Agreement (subject to the limitations of the pledge of Equity Interests of Foreign Subsidiaries set forth in the definition of "Collateral and Guarantee Requirement"), (d) the Collateral and Guarantee Requirement shall have been (or within ten Business Days (or such longer period as may be acceptable to the Required Lenders) after such acquisition shall be) satisfied with respect to each such Subsidiary, (e) the Borrower and the Subsidiaries are in Pro Forma Compliance after giving effect to such acquisition and (f) the Borrower has delivered to the Agent an officer's certificate to the effect set forth in clauses (a), (b), (c), (d) and (e) above, together with all relevant financial information for the Person or assets acquired and reasonably detailed calculations demonstrating satisfaction of the requirement set forth in clause (e) above.

"Permitted Business" means the telephone and internet, targeted print, marketing, digital and directory services businesses (including CRM applications) and businesses reasonably related, incidental or ancillary thereto or any business or activity that is reasonably similar thereto or a reasonable extension, development or expansion thereof or ancillary thereto.

"Permitted Encumbrances" means:

(a)     Liens imposed by law for taxes that are not yet due or are being contested in compliance with Section 5.05;

- 14 -

(b)      carriers', warehousemen's, mechanics', materialmen's, landlord's, repairmen's and other like Liens imposed by law, arising in the ordinary course of business and securing obligations that are not overdue by more than 30 days or are being contested in compliance with Section 5.05;

(c)      pledges and deposits made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations;

(d)      deposits to secure the performance of bids, trade contracts, leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature, in each case in the ordinary course of business;

(e)      judgment Liens in respect of judgments or attachments that do not constitute a Default or an Event of Default under clause (i) of Article VII; provided that any such Lien is released within 30 days following the creation thereof;

(f)      easements, zoning restrictions, rights-of-way and similar encumbrances on real property imposed by law or arising in the ordinary course of business that are not substantial in amount and do not, or could not reasonably be expected to, materially detract from the value of the affected property or interfere with the ordinary conduct of business of the Borrower or any Subsidiary;

(g)      Liens arising solely by virtue of any statutory or common law provisions relating to bankers' Liens, rights of set-off or similar rights and remedies as to deposit accounts or other funds maintained with a creditor depositary institution;

(h)      any interest or title of a lessor under any lease entered into by the Borrower or any Subsidiary of the Borrower in the ordinary course of its business and covering only the assets so leased;

(i)      the licensing or sublicensing (other than exclusive licenses or sublicenses) of Intellectual Property (i) granted to or in favor of another Guarantor pursuant to the Directory Consolidation Project or (ii) otherwise in the ordinary course of business in a manner that does not, or could not reasonably be expected to, materially interfere with the business of the Borrower and its Subsidiaries; and

(j)      any provision for the retention of title to any property by the vendor or transferor of such property, which property is acquired by the Borrower or a Subsidiary of the Borrower in a transaction entered into in the ordinary course of business of the Borrower or such Subsidiary of the Borrower and for which kind of transaction it is normal market practice for such retention of title provision to be included;

provided, that the term "Permitted Encumbrances" shall not include any Lien securing Indebtedness.

"Permitted Holder" means any Person who owns Equity Interests in the Borrower as of the Closing Date, and any Affiliate of any such Person.

"Permitted Investments" means:

(a)      direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States of America (or by any agency thereof to the extent such obligations are backed by the full faith and credit of the United States of America), in each case maturing or allowing for liquidation at the original par value at the option of the holder within one year from the date of acquisition thereof;

(b)      investments in commercial paper (other than commercial paper issued by the Borrower or any of their Affiliates) maturing within 270 days from the date of acquisition thereof and having, at such date of acquisition, the highest credit rating obtainable from S&P or from Moody's;

(c)      investments in certificates of deposit, banker's acceptances, time deposits or overnight bank deposits maturing within 180 days from the date of acquisition thereof issued or guaranteed by or placed with, and money

- 15 -

market deposit accounts issued or offered by, any domestic office of any commercial bank organized under the laws of the United States of America or any State thereof which has a combined capital and surplus and undivided profits of not less than $500,000,000, and having a debt rating of "A-1" or better from S&P or "P-1" or better from Moody's;

(d)     fully collateralized repurchase agreements with a term of not more than 30 days for securities described in clause (a) above and entered into with a financial institution satisfying the criteria described in clause (c) above; and

(e)     money market funds that (i) comply with the criteria set forth in Securities and Exchange Commission Rule 2a-7 under the Investment Company Act of 1940, (ii) are rated AAA by S&P and Aaa by Moody's and (iii) have portfolio assets of at least $5,000,000,000.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Petition Date" has the meaning assigned to such term in the recitals to this Agreement.

"Plan" means any employee pension benefit plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA, and in respect of which any Loan Party or any ERISA Affiliate is (or, if such plan were terminated, would under Section 4062 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"Prepayment Event" means any (a) Asset Disposition, (b) Equity Issuance or (c) Debt Issuance.

"Prepetition Agents" means JPMorgan Chase Bank, N.A. and Deutsche Bank Trust Company Americas, each in their capacity as the administrative agent and collateral agent under any of the Prepetition Loan Documents, as applicable, or any other successor administrative agent.

"Prepetition Facilities" means, collectively, the Dex East Prepetition Credit Agreement, the Dex West Prepetition Credit Agreement, the RHDI Prepetition Credit Agreement and the SuperMedia Prepetition Credit Agreement.

"Prepetition Lenders" means the lenders party to the Prepetition Facilities, from time to time, under (and as defined in) the Prepetition Facilities.

"Prepetition Loan Documents" means the "Loan Documents" as defined in each of the Prepetition Facilities.

"Prepetition Obligations" means all indebtedness, obligations and liabilities of the Loan Parties to the Prepetition Lenders and the Prepetition Agents incurred prior to the Petition Date arising from or related to the Prepetition Facilities and the other agreements, instruments and other documents related thereto including fees, premiums, expenses, indemnities and reimbursement obligations due thereunder and interest thereon accruing both before and after the Petition Date, whether such indebtedness, obligations or liabilities are direct or indirect, joint or several, absolute or contingent, due or to become due, whether for payment or performance, now existing or hereafter arising.

"Prime Rate" means the rate last quoted by The Wall Street Journal as the "Prime Rate" in the United States or, if The Wall Street Journal ceases to quote such rate, the highest per annum interest rate published by the FRB in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate or, if such rate is no longer quoted therein, any similar rate quoted therein (as determined by Agent) or any similar release by the FRB (as determined by Agent); each change in the Prime Rate shall be effective from and including the date such change is publicly announced as being effective.

"Pro Forma Compliance" means, with respect to any event, that the Borrower is in pro forma compliance with Section 6.14 recomputed as if the event with respect to which Pro Forma Compliance is being

- 16 -

tested had occurred on the first day of the four fiscal quarter period most recently ended on or prior to such date for which financial statements have been delivered pursuant to Section 5.01.

"Pro Forma Leverage Ratio" means, on any date, the Leverage Ratio on the last day of Borrower's most recently completed fiscal quarter after giving pro forma effect through and including such date to (i) all payments, prepayments, redemptions, retirements, sinking fund payments, and borrowings, issuances and other incurrences, of Indebtedness (and, for the avoidance of doubt, for purposes of calculating Pro Forma Leverage Ratio pursuant to Section 2.06(c)(ii), all payments, prepayments, redemptions, retirements and sinking fund payments in respect of the Loans required to be made pursuant to Section 2.06(c)(i) with respect to the applicable fiscal quarter) and (ii) all Permitted Acquisitions, including any proposed Permitted Acquisition with respect to which the Pro Forma Leverage Ratio is to be tested.

"Range" has the meaning assigned to such term in Section 2.15(c).

"Refinanced Debt" has the meaning assigned to such term in the definition of "Refinancing Indebtedness".

"Refinancing Indebtedness" means Indebtedness issued or incurred (including by means of the extension or renewal of existing Indebtedness) to extend, renew or refinance existing Indebtedness ("Refinanced Debt"); provided, that (a) such extending, renewing or refinancing Indebtedness is in an original aggregate principal amount not greater than the aggregate principal amount of, and unpaid interest on, the Refinanced Debt plus the amount of any premiums paid thereon and fees and expenses associated therewith, (b) such Indebtedness has a later maturity and a longer weighted average life than the Refinanced Debt, (c) such Indebtedness bears a market interest rate (as reasonably determined in good faith by the board of directors of the Borrower) as of the time of its issuance or incurrence, (d) if the Refinanced Debt or any Guarantees thereof are subordinated to the Obligations, such Indebtedness and Guarantees thereof are subordinated to the Obligations on terms no less favorable to the holders of the Obligations than the subordination terms of such Refinanced Debt or Guarantees thereof (and no Loan Party that has not guaranteed such Refinanced Debt guarantees such Indebtedness), (e) such Indebtedness contains covenants and events of default and is benefited by Guarantees (if any) which, taken as a whole, are reasonably determined in good faith by the board of directors of the Borrower not to be materially less favorable to the Lenders than the covenants and events of default of or Guarantees (if any) in respect of such Refinanced Debt, (f) if such Refinanced Debt or any Guarantees thereof are secured, such Indebtedness and any Guarantees thereof are either unsecured or secured only by such assets as secured the Refinanced Debt and Guarantees thereof, (g) if such Refinanced Debt and any Guarantees thereof are unsecured, such Indebtedness and Guarantees thereof are also unsecured, (h) such Indebtedness is issued only by the issuer of such Refinanced Debt and (i) the proceeds of such Indebtedness are applied promptly (and in any event within 45 days) after receipt thereof to the repayment of such Refinanced Debt.

"Register" has the meaning assigned to such term in Section 9.04(b)(iv).

"Reinvestment" has the meaning assigned to such term in Section 2.06(b).

"Related Parties" means, with respect to any specified Person, such Person's Affiliates and the directors, officers, employees, agents, trustees, Controlling Persons and advisors of such Person and of each of such Person's Affiliates.

"Release" means any actual or threatened release, spill, emission, leaking, dumping, injection, pouring, deposit, disposal, discharge, dispersal, leaching or migration into or through the environment or within or upon any building, structure, facility or fixture.

"Reorganization Plan" means the Debtors' Joint Prepackaged Chapter 11 Plan for the Borrower and its debtor Subsidiaries, including any exhibits, supplements, appendices and schedules thereto, dated May 16, 2016 and filed with the Bankruptcy Court on the Petition Date, as amended, supplemented or otherwise modified from time to time in accordance with the terms and as confirmed by the Bankruptcy Court pursuant to the Confirmation Order.

- 17 -

"Required Lenders" means, at any time, Lenders having Loans representing more than 50% of the sum of the total outstanding Loans at such time.

"Restricted Payment" means, with respect to any Person, any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interests in such Person, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation, termination or amendment of any Equity Interests in such Person or of any option, warrant or other right to acquire any such Equity Interests in such Person.

"RHDI" means R.H. Donnelley Inc., a Delaware corporation.

"RHDI Prepetition Credit Agreement" means the Fourth Amended and Restated Credit Agreement, dated as of April 30, 2013 (as further amended, restated, amended and restated, supplemented or otherwise modified from time to time), among Dex Holdings, RHDI, the several banks and other financial institutions or entities from time to time party thereto and Deutsche Bank Trust Company Americas, as administrative agent.

"S&P" means Standard & Poor's Financial Services LLC.

"Sanctioned Country" has the meaning assigned to such term in Section 3.22.

"Sanctioned Person" has the meaning assigned to such term in Section 3.22.

"Sanctions" has the meaning assigned to such term in Section 3.22.

"Secured Parties" has the meaning assigned to such term in the Guarantee and Collateral Agreement.

"Security Documents" means the Guarantee and Collateral Agreement, the Mortgages and each other security agreement or other instrument or document executed and delivered by any Loan Party pursuant to Section 5.11 or 5.12 or pursuant to the Guarantee and Collateral Agreement to secure any of the Obligations.

"Service Company" means Dex One Service, Inc., a Delaware corporation.

"Solvent" and "Solvency" mean, with respect to Borrower and its Subsidiaries, on a consolidated basis, taken as a whole, on any date of determination, that on such date (a) the fair value of the assets of Borrower and its Subsidiaries, on a consolidated basis, taken as a whole (calculated on a going concern basis), is greater than the total amount of debt, including contingent liabilities, of Borrower and its Subsidiaries, taken as a whole, (b) the present fair saleable value of the assets of Borrower and its Subsidiaries on a consolidated basis taken as a whole, is greater than the total amount that will be required to pay the probable liabilities (including contingent liabilities) of such Person as they become absolute and matured in the ordinary course, (c) the capital of Borrower and its Subsidiaries, taken as a whole, is not unreasonably small in relation to the business of Borrower and its Subsidiaries, taken as a whole, contemplated as of such date; and (d) Borrower and its Subsidiaries, taken as a whole, do not intend to incur, or believe that they will incur, debts including current obligations beyond their ability to pay such debt as they mature in the ordinary course of business. For the purpose hereof, the amount of any contingent liability at any time shall be computed as the amount that, in light of all the facts and circumstances existing at such time, representing the amount that can reasonably be expected to become an actual or matured liability.

"Specified Charges" means (a) out-of-pocket costs, fees and expenses for attorneys, auditors, accountants, consultants, and advisors retained by the Borrower incurred in connection with this Agreement, and in connection with the events leading up to, and through, the ongoing administration of the Chapter 11 Cases and (b) out-of-pocket costs, fees and expenses for attorneys, auditors, accountants, consultants, and advisors retained by the Administrative Agent and the steering committee Lenders and reimbursed by the Borrower (without, including without limitation, the fees and expenses of the Administrative Agent and the steering committee Lenders) incurred

- 18 -

in connection with this Agreement, and in connection with the events leading up to, and throughout, the ongoing administration of the Chapter 11 Cases.

"Statutory Reserve Rate" means a fraction (expressed as a decimal), the numerator of which is the number one and the denominator of which is the number one minus the aggregate of the maximum reserve percentages (including any marginal, special, emergency or supplemental reserves) expressed as a decimal established by the Board to which the Administrative Agent is subject with respect to eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of the Board). Such reserve percentages shall include those imposed pursuant to such Regulation D. Eurodollar Loans shall be deemed to constitute eurocurrency funding and to be subject to such reserve requirements without benefit of or credit for proration, exemptions or offsets that may be available from time to time to any Lender under such Regulation D or any comparable regulation. The Statutory Reserve Rate shall be adjusted automatically on and as of the effective date of any change in any reserve percentage.

"Stockholders' Equity" means, as of any date of determination, consolidated stockholders' equity of Borrower and its Subsidiaries as of the date determined in accordance with GAAP.

"Subsidiary" means, with respect to any Person (the "parent") at any date, any corporation, limited liability company, partnership, association or other entity the accounts of which would be consolidated with those of the parent in the parent's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date, as well as any other corporation, limited liability company, partnership, association or other entity of which securities or other ownership interests representing more than 50% of the equity or more than 50% of the ordinary voting power or, in the case of a partnership, more than 50% of the general partnership interests are, as of such date, owned, Controlled or held by the parent or one or more Subsidiaries of the parent or by the parent and one or more Subsidiaries of the parent. Unless otherwise qualified, all references to a "Subsidiary" or to "Subsidiaries" in this Agreement shall refer to a Subsidiary or Subsidiaries of the Borrower.

"Supermajority Lenders" means, at any time, Lenders having Loans representing more than 66-2/3% of the sum of the total outstanding principal amount of Loans at such time.

"SuperMedia" means SuperMedia Inc., a Delaware corporation.

"SuperMedia Prepetition Credit Agreement" means the Amended and Restated Loan Agreement, dated as of December 31, 2009, as amended and restated as of April 30, 2013 (as further amended, restated, amended and restated, supplemented or otherwise modified from time to time), among SuperMedia, the several banks and other financial institutions or entities from time to time party thereto, and JPMorgan Chase Bank, N.A., as administrative agent.

"Swap Agreement" means any agreement with respect to any swap, forward, future or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions; provided that no phantom stock or similar plan providing for payments only on account of services provided by current or former directors, officers, employees or consultants of the Borrower or the Subsidiaries shall be a Swap Agreement.

"Taxes" means any and all present or future taxes, levies, imposts, duties, deductions, charges, fees, assessments or withholdings (including backup withholding) imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Total Indebtedness" means, as of any date, an amount equal to (a) the aggregate principal amount of Indebtedness of the Borrower and the Subsidiaries outstanding as of such date, determined on a consolidated basis in accordance with GAAP minus, solely for purposes of Section 6.14, (b), the aggregate unencumbered cash and Permitted Investments (provided that any such cash and Permitted Investments to the extent subject to a Lien created under the Loan Documents or otherwise subject to a Permitted Encumbrance shall be deemed to be

unencumbered for purposes of this definition) maintained by the Borrower and the Subsidiaries as of such date; provided, that the amount of such Indebtedness shall be (A) without regard to the effects of purchase method of accounting requiring that the amount of such Indebtedness be valued at its fair market value instead of its outstanding principal amount and (B) determined exclusive of any letters of credit to the extent undrawn.

"Transactions" means (a) the execution, delivery and performance by each Loan Party of the Loan Documents to which it is to be a party, (b) the effectiveness and consummation of the Reorganization Plan pursuant to the Confirmation Order and (c) the payment of fees and expenses in connection with clause (b) hereof and the Loan Documents.

"Type", when used in reference to any Loan or Borrowing, refers to whether the rate of interest on such Loan, or on the Loans comprising such Borrowing, is determined by reference to the Adjusted LIBO Rate or the Alternate Base Rate.

"U.S. Person" means "United States person" within the meaning of Section 7701(a)(30) of the Code.

"U.S. Tax Compliance Certificate" has the meaning assigned to such term in Section 2.12(e)(ii)(B)(3).

"USA Patriot Act" has the meaning assigned to such term in Section 9.15.

"Withdrawal Liability" means liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Title IV of ERISA.

"Write-Down and Conversion Powers" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

Section 1.02.    Classification of Loans and Borrowings.   For purposes of this Agreement, Loans may be classified and referred to by Type (e.g., a "Eurodollar Loan"). Borrowings also may be classified and referred to by Type (e.g., a "Eurodollar Borrowing").

Section 1.03.    Terms Generally.   The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation". The word "will" shall be construed to have the same meaning and effect as the word "shall". Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, restated, supplemented or otherwise modified (subject to any restrictions on such amendments, restatements, supplements or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement and (e) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

Section 1.04.    Accounting Terms; GAAP.   Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with GAAP, as in effect from time to time; provided that, if the Borrower notifies the Administrative Agent that the Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the date hereof in GAAP or in the application thereof on the operation of such provision (or if the Administrative Agent notifies the Borrower that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be

- 20 -

interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith. Any reference made in this Agreement or any other Loan Document to any consolidated financial statement or statements of the Borrower and the Subsidiaries means such financial statement or statements prepared on a combined basis for the Borrower and the Subsidiaries pursuant to GAAP, not utilizing the equity method. Notwithstanding any other provision contained herein, all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to herein shall be made, without giving effect to any election under Statement of Financial Accounting Standards 159 (or any other Financial Accounting Standard having a similar result or effect) to value any Indebtedness or other liabilities of the Borrower, the Borrower or any of their respective Subsidiaries at "fair value", as defined therein.

ARTICLE II

THE CREDITS

Section 2.01.    Loans.    (a) Subject to the terms and conditions set forth herein, each Lender severally agrees to make and shall be deemed to have made, on and as of the Closing Date, a term loan denominated in Dollars to the Borrower in an amount set forth opposite such Lender's name on Schedule 2.01(a) (the "Loans"). The Loans deemed made or issued pursuant to this Section 2.01(a) shall be made without any actual funding. The aggregate principal amounts of the Loans on the Closing Date shall be $600,000,000.

(b)    Amounts deemed to be borrowed under Section 2.01 and subsequently repaid or prepaid, in whole or in part, may not be reborrowed.

Section 2.02.    Borrowings.    (a) Subject to Section 2.09, each Borrowing shall be comprised entirely of Eurodollar Loans.

(b)    At the commencement of each Interest Period for any Borrowing, such Borrowing shall be in an aggregate amount that is an integral multiple of $1,000,000 and not less than $5,000,000. Borrowings of more than one Type may be outstanding at the same time; provided that there shall not at any time be more than a total of 5 Borrowings outstanding.

(c)    Notwithstanding any other provision of this Agreement, the Borrower shall not be entitled to elect to continue, any Borrowing for an Interest Period of more than one month's duration if the Interest Period requested with respect thereto would end after the Maturity Date.

Section 2.03.    Interest Elections.    (a) The Borrower may elect to continue each Borrowing and may elect Interest Periods therefor, all as provided in this Section. The Borrower may elect different options with respect to different portions of the affected Borrowing, in which case each such portion shall be allocated ratably among the Lenders holding the Loans comprising such Borrowing, and the Loans comprising each such portion shall be considered a separate Borrowing.

(b)    To make an election pursuant to this Section, the Borrower shall notify the Administrative Agent of such election by telephone in the case of an election to continue a Eurodollar Borrowing, by not later than 2:00 p.m., New York City time, three Business Days before the date of the proposed continuation. Each such telephonic Interest Election Request shall be irrevocable and shall be confirmed promptly by hand delivery or telecopy to the Administrative Agent of a written Interest Election Request in a form approved by the Administrative Agent and signed by the Borrower.

(c)    Each telephonic and written Interest Election Request shall specify the following information in compliance with Section 2.02:

(i)    the Borrowing to which such Interest Election Request applies and, if different options are being elected with respect to different portions thereof, the portions

- 21 -

thereof to be allocated to each resulting Borrowing (in which case the information to be specified pursuant to clause (iii) below shall be specified for each resulting Borrowing);

(ii)    the effective date of the election made pursuant to such Interest Election Request, which shall be a Business Day; and

(iii)    the Interest Period to be applicable thereto after giving effect to such election, which shall be a period contemplated by the definition of the term "Interest Period".

If any such Interest Election Request does not specify an Interest Period, if the Borrower fails to deliver a timely Interest Election Request with respect to a Borrowing prior to the end of the Interest Period applicable thereto or if an Event of Default has occurred and is continuing, then the Borrower shall be deemed to have selected an Interest Period of one month's duration.

(d)    Promptly following receipt of an Interest Election Request, the Administrative Agent shall advise each Lender of the details thereof and of such Lender's portion of each resulting Borrowing.

Section 2.04.    Repayment of Loans; Evidence of Debt.  (a) The Borrower hereby unconditionally promises to pay on the Maturity Date to the Administrative Agent for the account of each Lender the then unpaid principal amount of each Loan of such Lender outstanding on such date, together with all other Obligations in respect thereof.

(b)    Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower to such Lender resulting from each Loan made by such Lender, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder.

(c)    The Administrative Agent shall maintain accounts in which it shall record (i) the amount of each Loan made hereunder, the Type thereof and the Interest Period applicable thereto, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder and (iii) the amount of any sum received by the Administrative Agent hereunder for the account of the Lenders and each Lender's share thereof.

(d)    The entries made in the accounts maintained pursuant to paragraph (b) or (c) of this Section shall be prima facie evidence of the existence and amounts of the obligations recorded therein; provided that the failure of any Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligation of the Borrower to repay the Loans in accordance with the terms of this Agreement.

(e)    Any Lender may request that Loans made by it be evidenced by a promissory note. In such event, the Borrower shall prepare, execute and deliver to such Lender a promissory note payable to the order of such Lender (or, if requested by such Lender, to such Lender and its registered assigns) and in a form attached hereto as Exhibit E. Such promissory note shall state that it is subject to the provisions of this Agreement. Thereafter, the Loans evidenced by such promissory note and interest thereon shall at all times (including after assignment pursuant to Section 9.04) be represented by one or more promissory notes in such form payable to the order of the payee named therein (or, if such promissory note is a registered note, to such payee and its registered assigns).

Section 2.05.    [Reserved]Prepayment of Loans.

(a)    Optional Prepayment. The Borrower shall have the right at any time and from time to time to prepay any Borrowing in whole or in part, without premium or penalty (but subject to Section 2.11), in an aggregate principal amount that (except as otherwise provided in Section 2.15) is an integral multiple of $1,000,000 and not less than $1,000,000 or, if less, the amount outstanding, subject to the requirements of this Section.

(b)    Mandatory Prepayment Generally.  In the event and on each occasion that any Net Proceeds are received by or on behalf of any Loan Party in respect of any Prepayment Event, the Borrower shall, not later than the Business Day next after the date on which such Net Proceeds are received, prepay Borrowings in an aggregate amount

- 22 -

equal to 100% of such Net Proceeds, <u>provided</u> that, solely in the case of any Asset Disposition (other than a sale and leaseback transaction pursuant to Section 6.06(ii)), if the Borrower shall deliver to the Administrative Agent a certificate of a Financial Officer of the Borrower to the effect that the Borrower or a Subsidiary intends to apply the Net Proceeds from such Asset Disposition (or a portion thereof specified in such certificate), within 365 days after receipt of such Net Proceeds, to acquire real property, equipment or other assets to be used in the business of the Borrower or such Subsidiaries or to fund a Permitted Acquisition in accordance with the terms of Section 6.04, in each case as specified in such certificate (any such event, a "<u>Reinvestment</u>"), and certifying that no Default has occurred and is continuing, then no prepayment shall be required pursuant to this paragraph in respect of the Net Proceeds in respect of such Asset Disposition (or the portion of such Net Proceeds specified in such certificate, if applicable) except to the extent of any such Net Proceeds therefrom (i) that the Borrower or the applicable Subsidiary shall have determined not to, or shall have otherwise ceased to, or is not able to, by operation of contract or law or otherwise, apply toward such Reinvestment or (ii) that have not been so applied, or contractually committed to be so applied, by the end of such 365-day period, in each case at which time a prepayment shall be required in an amount equal to such Net Proceeds that have not been, or have been determined not to be, so applied (it being understood that if any portion of such proceeds are not so used within such 365-day period but within such 365-day period are contractually committed to be used, then upon the earlier to occur of (A) the termination of such contract and (B) the expiration of a 180-day period following such 365-day period, such remaining portion shall constitute Net Proceeds as of the date of such termination or expiry without giving effect to this proviso); <u>provided</u>, <u>further</u>, that the Net Proceeds applied toward Reinvestments or contractually committed to be so applied pursuant to the foregoing proviso shall not exceed $20,000,000 in the aggregate during any fiscal year.

(c)     <u>Mandatory Prepayment or Repurchases from Excess Cash Flow</u>.

(i)     Following the end of each fiscal quarter of the Borrower, commencing with the fiscal quarter ending [_____], 2016, the Borrower shall prepay or repurchase Borrowings in an aggregate amount equal to 75% of the Excess Cash Flow (if positive) generated during such fiscal quarter <u>minus</u> the sum of (A) any voluntary prepayments of Loans made pursuant to Section 2.06(a) during such fiscal quarter utilizing (x) Excess Cash Flow generated in such fiscal quarter or (y) accumulated Borrower's Excess Cash Flow Amount and (B) the aggregate amount of Discounted Voluntary Repurchases made pursuant to Section 2.15 during such fiscal quarter utilizing Excess Cash Flow generated during such fiscal quarter. Each prepayment or repurchase pursuant to this paragraph shall be made within 45 days after the date on which financial statements for such fiscal quarter are (or are required to have been) delivered pursuant to Section 5.01.

(ii)     Solely to the extent that the Pro Forma Leverage Ratio as of the last day of any fiscal quarter, commencing with the fiscal quarter ending [_____], 2016, is above 1.25 to 1.00, the Borrower shall prepay or repurchase Borrowings in an aggregate amount equal to the Borrower's Excess Cash Flow Amount generated during such fiscal quarter, <u>minus</u> any Discounted Voluntary Repurchases pursuant to Section 2.15 that have been made in excess of 75% of the Excess Cash Flow limitation for such fiscal quarter. Each prepayment or repurchase pursuant to this paragraph shall be made within 45 days after the date on which financial statements for such fiscal quarter are (or are required to have been) delivered pursuant to Section 5.01. For the avoidance of doubt, if the Pro Forma Leverage Ratio is at or below 1.25 to 1.00, the Borrower's Excess Cash Flow Amount may be retained by the Borrower to be utilized for general corporate purposes expressly permitted by this Agreement, including, but not limited to, Permitted Acquisitions, Discounted Voluntary Repurchases pursuant to Section 2.15 and optional prepayments under Section 2.06(a).

(d)     <u>Administration</u>. The Borrower shall notify the Administrative Agent by telephone (confirmed by telecopy) of any prepayment hereunder not later than 2:00 p.m., New York City time, three Business Days before the date of prepayment. Each such notice shall be irrevocable and shall specify the prepayment date, the principal amount of each Borrowing or portion thereof to be prepaid and, in the case of a mandatory prepayment, a reasonably detailed calculation of the amount of such prepayment. Promptly following receipt of any such notice, the Administrative Agent shall advise the Lenders of the contents thereof. Each partial prepayment of any Borrowing shall be in an amount that would be permitted in the case of an advance of a Borrowing of the same Type as provided in Section 2.02, except as necessary to apply fully the required amount of a mandatory prepayment or to prepay such Borrowing in full. Each

prepayment of a Borrowing shall be applied ratably to the Loans included in the prepaid Borrowing. Prepayments under Section 2.06 shall be accompanied by accrued interest and other amounts to the extent required by Sections 2.08 and 2.11.

Section 2.07.    Fees.  (a) The Borrower agrees to pay to the Administrative Agent, for its own account, fees payable in the amounts and at the times separately agreed upon between the Borrower and the Administrative Agent.

(b)    All fees payable hereunder shall be paid on the dates due, in immediately available funds, to the Administrative Agent. Fees paid shall not be refundable under any circumstances.

Section 2.08.    Interest.  (a) The Loans shall bear interest at the Adjusted LIBO Rate for the Interest Period in effect for such Borrowing plus the Applicable Rate.

(b)    Notwithstanding the foregoing, upon the occurrence and during the continuance of an Event of Default, the Loans, and all other Obligations then outstanding, shall bear interest, after as well as before judgment, at a rate per annum equal to 2% ("Default Rate Interest") plus the rate otherwise applicable to such Loan or Obligation.

(c)    Accrued interest on each Loan shall be payable in arrears on each Interest Payment Date for such Loan; provided that (i) interest accrued pursuant to paragraph (b) of this Section shall be payable on demand and (ii) in the event of any repayment or prepayment of any Loan pursuant to Section 2.06, accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment

(d)    All interest hereunder shall be computed on the basis of a year of 360 days and shall be payable for the actual number of days elapsed (including the first day but excluding the last day). The applicable Adjusted LIBO Rate shall be determined by the Administrative Agent, and such determination shall be conclusive absent manifest error.

Section 2.09.    Alternate Rate of Interest.

(a)    If the Administrative Agent determines (which determination shall be conclusive absent manifest error) that adequate and reasonable means do not exist for ascertaining the Adjusted LIBO Rate for such Interest Period, then the Administrative Agent shall give notice thereof to the Borrower and the Lenders by telephone or telecopy as promptly as practicable thereafter and, until the Administrative Agent notifies the Borrower and the Lenders that the circumstances giving rise to such notice no longer exist ("Alternate Rate Period").

(b)    During the Alternate Rate Period, the Loans shall bear interest at the Alternate Base Rate plus the Applicable Rate.

(c)    Interest computed by reference to the Alternate Base Rate at times when the Alternate Base Rate is based on the Prime Rate shall be computed on the basis of a year of 365 days (or 366 days in a leap year), and shall be payable for the actual number of days elapsed (including the first day but excluding the last day). The applicable Alternate Base Rate shall be determined by the Administrative Agent, and such determination shall be conclusive absent manifest error.

Section 2.10.    Increased Costs; Illegality.  (a) If any Change in Law shall:

(i)    impose, modify or deem applicable any reserve, special deposit or similar requirement against assets of, deposits with or for the account of, or credit extended by, any Lender (except any such reserve requirement reflected in the Adjusted LIBO Rate);

(ii)    subject the Administrative Agent or any Lender to any Taxes (other than Indemnified Taxes and Excluded Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or

- 24 -

(iii) impose on any Lender or the London interbank market any other condition affecting this Agreement or Eurodollar Loans made by such Lender;

and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining any Eurodollar Loan (or of maintaining its obligation to make any such Loan) or to increase the cost to such Lender or to reduce the amount of any sum received or receivable by such Lender hereunder (whether of principal, interest or otherwise), then the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender for such additional costs incurred or reduction suffered.

(b) If any Lender determines that any Change in Law regarding capital or liquidity requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement or the Loans made by such Lender, to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy and liquidity), then from time to time after submission by such Lender to the Borrower of a written request therefor, the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c) A certificate of a Lender setting forth in reasonable detail the matters giving rise to a claim under this Section 2.10 and the calculation of such claim by such Lender or its holding company, as the case may be, shall be delivered to the Borrower and shall be conclusive absent manifest error. The Borrower shall pay such Lender the amount shown as due on any such certificate within 10 days after receipt thereof.

(d) Failure or delay on the part of any Lender to demand compensation pursuant to this Section shall not constitute a waiver of such Lender's right to demand such compensation; provided, that the Borrower shall not be required to compensate a Lender pursuant to this Section for any increased costs or reductions incurred more than 180 days prior to the date that such Lender notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor; provided, further, that if the Change in Law giving rise to such increased costs or reductions is retroactive, then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof.

(e) Notwithstanding any other provision herein, if any Change in Law shall make it unlawful for any Lender to maintain Eurodollar Loans as contemplated by this Agreement, (i) the commitment of such Lender hereunder to continue Eurodollar Loans as such shall forthwith be canceled and (ii) such Lender's Loans then outstanding as Eurodollar Loans, if any, shall be converted automatically to ABR Loans on the respective last days of the then current Interest Periods with respect to such Loans or within such earlier period as required by applicable law. If any such conversion of a Eurodollar Loan occurs on a day which is not the last day of the then current Interest Period with respect thereto, the Borrower shall pay to such Lender such amounts, if any, as may be required pursuant to Section 2.11.

(f) For the avoidance of doubt, notwithstanding anything herein to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines, requirements and directives thereunder, issued in connection therewith or in implementation thereof, and (ii) all requests, rules, guidelines, requirements and directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a Change in Law regardless of the date enacted, adopted, issued or implemented.

Section 2.11.   Break Funding Payments.  In the event of (a) the payment of any principal of any Loan other than on the last day of an Interest Period applicable thereto (including as a result of an Event of Default), (b) the failure to prepay any Loan on the date specified in any notice delivered pursuant hereto (regardless of whether such notice may be revoked under Section 2.06(d) and is revoked in accordance therewith) or (c) the assignment of any Eurodollar Loan other than on the last day of the Interest Period applicable thereto as a result of a request by the Borrower pursuant to Section 2.14 or 9.02(c), then, in any such event, the Borrower shall compensate each Lender for the loss, cost and expense attributable to such event. Such loss, cost or expense to any Lender shall consist of an amount determined by such Lender to be the excess, if any, of (i) the amount of interest that would have accrued on the principal amount of such Loan had such event not occurred, at the Adjusted LIBO Rate that

would have been applicable to such Loan (without giving effect to clause (b) of the definition of LIBO Rate), for the period from the date of such event to the last day of the then current Interest Period therefor (or, in the case of a failure to continue, for the period that would have been the Interest Period for such Loan), over (ii) the amount of interest that would accrue on such principal amount for such period at the interest rate that such Lender would bid were it to bid, at the commencement of such period, for dollar deposits of a comparable amount and period from other banks in the Eurodollar market. A certificate of any Lender setting forth any amount or amounts that such Lender is entitled to receive pursuant to this Section shall be delivered to the Borrower and shall be conclusive absent manifest error. The Borrower shall pay such Lender the amount shown as due on any such certificate within 10 days after receipt thereof.

Section 2.12.   Taxes.  (a) Any and all payments by or on account of any obligation of any Loan Party hereunder or under any other Loan Document shall be made free and clear of, and without deduction for, any Taxes, except as required by applicable law; provided that if the applicable withholding agent shall be required to deduct any Taxes from such payments (as determined in the good faith discretion of the applicable withholding agent), then (i) if such Taxes are Indemnified Taxes, the sum payable shall be increased as necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section) the Administrative Agent or Lender (as the case may be) receives an amount equal to the sum it would have received had no such deductions been made, (ii) the applicable withholding agent shall make such deductions and (iii) the applicable withholding agent shall pay the full amount deducted to the relevant Governmental Authority in accordance with applicable law.

(b)   In addition, without duplication of any amounts paid pursuant to subsection (a), the Borrower shall pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law, or, at the option of the Administrative Agent timely reimburse it for the payment thereof.

(c)   Without duplication of any amounts paid pursuant to subsections (a) or (b), the Loan Parties shall jointly and severally indemnify the Administrative Agent and each Lender within 10 days after written demand therefor, for the full amount of any Indemnified Taxes paid by the Administrative Agent or such Lender, as the case may be, on or with respect to any payment by or on account of any obligation of the Borrower hereunder or under any other Loan Document or required to be withheld or deducted from a payment to such Administrative Agent or Lender (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section) and any reasonable expenses arising therefrom or with respect thereto. A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(d)   As soon as practicable after any payment of Taxes by any Loan Party to a Governmental Authority pursuant to this Section 2.12, such Loan Party shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(e)   For purposes of this Section 2.12(e), each instance of "Lender" shall be read to refer to any Lender and the Administrative Agent.  (i) Any Lender that is entitled to an exemption from or reduction of withholding Tax under the law of the jurisdiction in which the Borrower is located, or any treaty to which such jurisdiction is a party, with respect to payments under this Agreement shall deliver to the Borrower (with a copy to the Administrative Agent), at the time or times prescribed by applicable law, such properly completed and executed documentation prescribed by applicable law or reasonably requested by the Borrower as will permit such payments to be made without withholding or at a reduced rate of withholding and will also provide any documentation as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements. Notwithstanding anything to the contrary in this clause 2.12(e)(i), the completion, execution and submission of such documentation (other than such documentation set forth in Section 2.12(e)(ii)(A), (ii)(B) and (ii)(D) below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii)   Without limiting the generality of the foregoing, in the event that the Borrower is a U.S. Person,

(A)    any Lender that is a U.S. Person shall deliver to the Borrower and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed originals of IRS Form W-9 certifying that such Lender is exempt from U.S. Federal backup withholding tax;

(B)    any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), whichever of the following is applicable:

(1)    in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed originals of IRS Form W-8BEN or IRS Form W-8BEN-E establishing an exemption from, or reduction of, U.S. Federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN or IRS Form W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(2)    executed originals of IRS Form W-8ECI;

(3)    in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit D-1 to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code (a "U.S. Tax Compliance Certificate") and (y) executed originals of IRS Form W-8BEN or IRS Form W-8BEN-E; or

(4)    to the extent a Foreign Lender is not the beneficial owner, executed originals of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN, IRS Form W-8BEN-E, a U.S. Tax Compliance Certificate substantially in the form of Exhibit D-2 or Exhibit D-3, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit D-4 on behalf of each such direct and indirect partner;

(C)    any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed originals of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable

- 27 -

law to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made; and

(D) if a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower and the Administrative Agent in writing of its legal inability to do so.

(f) If the Administrative Agent or a Lender determines, in its sole judgment exercised in good faith, that it has received a refund of any Indemnified Taxes as to which it has been indemnified by the Borrower or with respect to which the Borrower has paid additional amounts pursuant to this Section 2.12, it shall pay over such refund to the Borrower within a reasonable period of time (but only to the extent of indemnity payments made, or additional amounts paid, by the Borrower under this Section 2.12 with respect to the Indemnified Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of the Administrative Agent or such Lender and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); provided, that the Borrower, upon the request of the Administrative Agent or such Lender, agrees to repay the amount paid pursuant to this Section 2.12(f) to the Administrative Agent or such Lender in the event the Administrative Agent or such Lender is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this paragraph (f), in no event will the Administrative Agent or such Lender be required to pay any amount to the Borrower pursuant to this paragraph (f) the payment of which would place the Administrative Agent or such Lender in a less favorable net after-Tax position than the Administrative Agent or such Lender would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This Section shall not be construed to require the Administrative Agent or any Lender to make available its tax returns (or any other information relating to its Taxes that it deems confidential) to the Borrower or any other Person.

(g) Each Lender shall indemnify the Administrative Agent within 10 days after written demand therefor, for the full amount of (i) any Indemnified Taxes attributable to such Lender (but only to the extent that the Borrower has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Borrower to do so) and (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 9.04 (c) relating to the maintenance of a Participant Register, in either case, that are payable or paid by the Administrative Agent, and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability prepared in good faith and delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this paragraph (g).

(h) The agreements in this Section 2.12 shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

- 28 -

Section 2.13.    <u>Payments Generally; Pro Rata Treatment; Sharing of Setoffs</u>.    (a) The Borrower shall make each payment required to be made by it hereunder or under any other Loan Document (whether of principal, interest or fees, or of amounts payable under Section 2.10, 2.11 or 2.12, or otherwise) prior to the time expressly required hereunder or under such other Loan Document for such payment (or, if no such time is expressly required, prior to 2:00 p.m., New York City time), on the date when due, in immediately available funds, without setoff or counterclaim. Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon. All such payments shall be made to the Administrative Agent at its offices set forth in the notice section below, except that payments pursuant to Sections 2.10, 2.11, 2.12 and 9.03 shall be made directly to the Persons entitled thereto and payments pursuant to other Loan Documents shall be made to the Persons specified therein. The Administrative Agent shall distribute any such payments received by it for the account of any other Person to the appropriate recipient promptly following receipt thereof. If any payment under any Loan Document shall be due on a day that is not a Business Day (except as otherwise provided in the definition of "Interest Period"), the date for payment shall be extended to the next succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension. All payments under each Loan Document shall be made in Dollars.

(b)    If at any time insufficient funds are received by and available to the Administrative Agent to pay fully all amounts of principal, interest and fees then due hereunder, such funds shall be applied (i) first, towards payment of interest and fees then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest and fees then due to such parties, and (ii) second, towards payment of principal then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of principal then due to such parties.

(c)    If any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Loans resulting in such Lender receiving payment of a greater proportion of the aggregate amount of its Loans and accrued interest thereon than the proportion received by any other Lender, then the Lender receiving such greater proportion shall purchase (for cash at face value) participations in the Loans of other Lenders to the extent necessary so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the relative aggregate amounts of principal of and accrued interest on their Loans; <u>provided</u> that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest, and (ii) the provisions of this paragraph shall not be construed to apply to any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement or any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant, other than to the Borrower or any Subsidiary or Affiliate thereof (as to which the provisions of this paragraph shall apply). The Borrower consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against the Borrower rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of the Borrower in the amount of such participation.

(d)    Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders hereunder that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders the amount due. In such event, if the Borrower has not in fact made such payment, then each of the Lenders severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

(e)    If any Lender shall fail to make any payment required to be made by it pursuant to Section 2.13(d) or 9.03(c), then the Administrative Agent may, in its discretion (notwithstanding any contrary provision hereof), apply any amounts thereafter received by the Administrative Agent for the account of such Lender to satisfy such Lender's obligations under such Sections until all such unsatisfied obligations are fully paid.

Section 2.14.    <u>Mitigation Obligations; Replacement of Lenders</u>.    (a) If any Lender requests compensation under Section 2.10, or if the Borrower is required to pay any additional amount to any Lender or any

Governmental Authority for the account of any Lender pursuant to Section 2.12, then such Lender shall use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 2.10 or 2.12, as the case may be, in the future and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender, provided that nothing in this Section shall affect or postpone any of the obligations of the Borrower or the rights of any Lender pursuant to Section 2.10 or 2.12. The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b)    If any Lender requests compensation under Section 2.10, or if the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.12, or if any Lender is not able to maintain Eurodollar Loans for reasons described in Section 2.10(e), or if any Lender becomes a Defaulting Lender, then the Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in Section 9.04, provided that the Borrower or assignee must pay any applicable processing or recordation fee), all its interests, rights and obligations under this Agreement to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment); provided, further, that (i) the Borrower shall have received the prior written consent of the Administrative Agent, which consent shall not unreasonably be withheld and (ii) such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder, from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts) and such Lender shall be released from all obligations hereunder. A Lender shall not be required to make any such assignment and delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrower to require such assignment and delegation cease to apply.

Section 2.15.    Voluntary Repurchases Below Par.  (a) The Borrower may elect to make below par voluntary repurchases of the Loans (each such repurchase a "Discounted Voluntary Repurchase") (1) through open market loan purchases conducted through a broker ("Open Market Purchases") or (2) pursuant to the procedures set forth in Section 2.15(c) (a "Dutch Auction"); provided that Discounted Voluntary Repurchases made as Open Market Purchases shall only be permitted to be made in amounts not exceeding the Open Market Excess Cash Flow Amount for each such fiscal quarter for which such Discounted Voluntary Repurchase is being made (subject to the Open Market Cure Right) or with any accumulated Borrower's Excess Cash Flow Amount. Accrued interest on each Loan repurchased pursuant to a Discounted Voluntary Repurchase shall be payable in the manner approved by the Governing Board of the Borrower and as negotiated with the Lender of the applicable repurchased Loan.

(b)    At the time of any Discounted Voluntary Repurchase (or, if necessary, immediately subsequent in the case of an Open Market Purchase), the Borrower shall certify to the Administrative Agent, with reasonable supporting detail, (i) compliance with the requirements of this Section 2.15, (ii) a schedule setting forth the computation of any utilization by the Borrower of Excess Cash Flow, including, as applicable, satisfaction of the requirements of Section 2.06(c) or use of any accumulated Borrower's Excess Cash Flow Amount, and (iii) that such Discounted Voluntary Repurchase shall have been approved by the Borrower's Governing Board.  No proposed Discounted Voluntary Repurchase shall be made if the amount of cash expended to make Discounted Voluntary Repurchase would exceed an amount equal to the Excess Cash Flow available for such repurchase at such time (subject to the Open Market Cure Right).

(c)    Terms Specific to Dutch Auctions:

(i)    In connection with any Dutch Auction, the Borrower shall notify the Administrative Agent and the Lenders (the "Discounted Voluntary Repurchase Notice") that the Borrower desires to repurchase Loans with cash in an aggregate amount (each, a "Discounted Voluntary Repurchase Amount") specified by the Borrower at a price within a range (the "Range") to be specified by the Borrower equal to a percentage of par (not to exceed 100%) (the "Payment Percentage") of the principal amount of the Loans to be repurchased; provided that only one Discounted Voluntary Repurchase Notice may be in

- 30 -

effect at any time. The Discounted Voluntary Repurchase Notice shall further specify the date by which Lenders are required to indicate their election to participate in such proposed Discounted Voluntary Repurchase, which shall be at least five Business Days following the date of the Discounted Voluntary Repurchase Notice (the "Acceptance Date").

(ii)    On or prior to the Acceptance Date for any Dutch Auction, each Lender may specify by written notice to the Administrative Agent the minimum Payment Percentage (the "Acceptable Payment Percentage") within the Range and the maximum principal amount of Loans that such Lender is willing to sell at the Acceptable Payment Percentage (the "Accepted Amount").  Based on the Acceptable Payment Percentages and the Accepted Amounts specified by all Lenders, the Borrower agrees to accept all offers received by the Administrative Agent on the Acceptance Date, in order from the Acceptable Payment Percentage that is the largest discount to par to the Acceptable Payment Percentage that is the smallest discount to par, up to and including the Acceptable Payment Percentage that is the smallest discount to par within the Range which yields, in aggregate for all purchases, the Discounted Voluntary Repurchase Amount; provided that if the Accepted Amount for all participating Lenders at the Acceptable Payment Percentage that has the smallest discount to par within the Range which yields the Discounted Voluntary Repurchase Amount exceeds the Discounted Voluntary Repurchase Amount, each participating Lender shall participate pro-rata in accordance with the Accepted Amount of each such Lender (subject to rounding requirements specified by the Administrative Agent).  The Borrower shall prepay Loans (or the respective portions thereof) by remitting such amount to the Administrative Agent (for distribution to each respective Lender to be prepaid).

(d)    In the event that the Borrower makes Open Market Purchases in an amount that exceeds the Open Market Excess Cash Flow Amount for a fiscal quarter ("Excess Purchased Amount"), which amount shall be required to be a reasonable estimate of the Open Market Excess Cash Flow Amount for such fiscal quarter, the Borrower may either (i) designate such amount as a utilization of the Borrower's Excess Cash Flow Amount or (ii) have the right (the "Open Market Cure Right"), to reduce the amount of cash permitted to be utilized for Open Market Purchases in the subsequent fiscal quarter in an amount equal to the Excess Purchased Amount.

(e)    Each Dutch Auction shall be consummated pursuant to procedures (including as to rounding and minimum amounts, Type and Interest Periods of accepted Loans, irrevocability of Discounted Voluntary Repurchase Notice and other notices by the Borrower and Lenders and determination of Applicable Payment Percentage, if required) reasonably established by the Administrative Agent in consultation with the Borrower and not inconsistent with the terms hereof.

(f)    Notwithstanding anything to the contrary in this Agreement (including, without limitation, Sections 2.06 and 2.13), the Lenders hereby consent to the transactions described in this Section 2.15 and further acknowledge that in connection with any Discounted Voluntary Repurchase principal and interest payments may be made on a non-pro rata basis to the applicable Lenders.

(g)    This Section 2.15 shall not require any Lender to participate in any Discounted Voluntary Repurchase.

ARTICLE III

REPRESENTATIONS AND WARRANTIES

The Borrower represents and warrants to the Agent and the Lenders that, after giving effect to the Reorganization Plan and the Confirmation Order:

Section 3.01.    Organization; Powers.  The Borrower and its Subsidiaries are duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, has all requisite power and authority to carry on its business as now conducted and, except where the failure to do so, individually or in the

aggregate, could not reasonably be expected to result in a Material Adverse Effect, is qualified to do business in, and is in good standing in, every jurisdiction where such qualification is required.

Section 3.02.    Authorization; Enforceability.    The Transactions entered into and to be entered into by each the Loan Parties are within such Person's corporate or limited liability company powers and have been duly authorized by all necessary corporate or limited liability company and, if required, stockholder or member action. This Agreement has been duly executed and delivered by each of the Loan Parties and constitutes, and each other Loan Document to which any of the Loan Parties is to be a party, when executed and delivered by such Person, will constitute, a legal, valid and binding obligation of such Person, enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

Section 3.03.    Governmental Approvals; No Conflicts.    The Transactions (a) do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority other than the Bankruptcy Court's order approving the Reorganization Plan, except as have been obtained or made and are in full force and effect and except filings necessary to perfect Liens created under the Loan Documents, (b) will not violate any applicable law or regulation or the charter, limited liability company agreement, by-laws or other organizational documents of the Borrower or any of its Subsidiaries or any order of any Governmental Authority, (c) will not violate or result in a default under any indenture, agreement or other instrument binding upon the Borrower or any of its Subsidiaries or any of their assets, or give rise to a right thereunder to require any payment to be made by the Borrower or any of its Subsidiaries, and (d) will not result in the creation or imposition of any Lien on any asset of the Borrower or any of its Subsidiaries, except Liens permitted under Section 6.02.

Section 3.04.    Financial Condition.    The unaudited consolidated balance sheet of the Borrower as of December 31, 2015 and the related unaudited consolidated statements of operations and of cash flows for the twelve-month period ended on such date present fairly, in all material respects, the financial position and results of operations and cash flows of the Borrower as of such date and for such period in accordance with GAAP, subject to normal year-end audit adjustments and absence of footnote disclosures, and subject to completion of the Prior Tax Calculation (as defined in the Reorganization Plan).

Section 3.05.    Properties.    (a) The Borrower and each of its Subsidiaries has good title to, or valid leasehold interests in, all its real and personal property material to its business (including its Mortgaged Properties), except for minor defects in title that do not, or could not reasonably be expected to, interfere with its ability to conduct its business as currently conducted or to utilize such properties for their intended purposes.

(b)    The Borrower and each of its Subsidiaries owns, or is licensed to use, all trademarks, trade names, copyrights, patents and other Intellectual Property material to its business, and the use thereof by the Borrower and its Subsidiaries does not infringe upon the rights of any other Person, except, in each case, for any matters that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect (other than the Disclosed Matters).

(c)    Schedule 3.05 sets forth the address of each real property that is owned or leased by the Borrower or any of its Subsidiaries as of the Closing Date.

Section 3.06.    Litigation and Environmental Matters.    (a) There are no actions, suits or proceedings by or before any arbitrator or Governmental Authority pending against or, to the knowledge of the Borrower, threatened against or affecting the Borrower, any of its Subsidiaries or any of their respective executive officers or directors (i) which could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect (other than the Disclosed Matters) or (ii) that involve any of the Loan Documents or the Transactions.

(b)    Except for either the Disclosed Matters or any other matters that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, none of the Borrower or any of its Subsidiaries (i) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, (ii) has become subject to any Environmental Liability,

- 32 -

(iii) has received notice of any claim with respect to any Environmental Liability or (iv) knows of any facts or circumstances which are reasonably likely to form the basis for any Environmental Liability.

Section 3.07.    Compliance with Laws and Agreements.    The Borrower and each of its Subsidiaries is in compliance with all laws, regulations and orders of any Governmental Authority applicable to it or its property and all indentures, agreements and other instruments binding upon it or its property, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect. No Default has occurred and is continuing.

Section 3.08.    Investment Company Status.    None of the Borrower or any of its Subsidiaries is required to be registered as an "investment company" as defined in the Investment Company Act of 1940.

Section 3.09.    Taxes.    Each of the Borrower and its Subsidiaries has timely filed or caused to be filed all material Tax returns and reports required to have been filed and has paid or caused to be paid all material Taxes required to have been paid by it, except any Taxes that are being contested in good faith by appropriate proceedings and for which the Borrower or such Subsidiary, as applicable, has set aside on its books adequate reserves in accordance with GAAP. Except as set forth in Schedule 3.09, no material tax Liens have been filed.

Section 3.10.    ERISA.    During the five year period prior to the date on which this representation is made or deemed to be made with respect to any Plan or Multiemployer Plan, no ERISA Event has occurred or is reasonably expected to occur that, when taken together with all other such ERISA Events for which liability has occurred during such five year period or for which liability is reasonably expected to occur, could reasonably be expected to result in a Material Adverse Effect. The present value of all accumulated benefit obligations under each Plan (based on the assumptions used for purposes of Accounting Standards Codification No. 715: Compensation Retirement Benefits) did not, as of the date of the most recent financial statements reflecting such amounts, exceed the fair market value of the assets of such Plan by an amount that would reasonably be expected to have a Material Adverse Effect, and the present value of all accumulated benefit obligations of all underfunded Plans (based on the assumptions used for purposes of Accounting Standards Codification No. 715: Compensation Retirement Benefits) did not, as of the date of the most recent financial statements reflecting such amounts, exceed the fair market value of the assets of all such underfunded Plans by an amount that would reasonably be expected to have a Material Adverse Effect.

Section 3.11.    Margin Regulations.    Neither the Borrower nor any of its Subsidiaries is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of buying or carrying Margin Stock.

Section 3.12.    Disclosure.    None of the written reports, financial statements, certificates or other written information (including, without limitation, the Disclosure Statement (as supplemented in writing through the Closing Date)) taken as a whole, furnished by or on behalf of any Loan Party to the Administrative Agent or any Lender in connection with the negotiation of this Agreement or any other Loan Document or delivered hereunder or thereunder (as of the date thereof and as modified or supplemented by other information so furnished) contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made taken as a whole, not misleading; provided that, with respect to projected financial information, the Borrower represents only that such information was prepared in good faith based upon assumptions believed to be reasonable (i) at the time such projected financial information was prepared and (ii) as of the date hereof. The Bankruptcy Court entered an order on or about [July 15], 2016 approving the adequacy of the Disclosure Statement.

Section 3.13.    Subsidiaries.    Schedule 3.13 sets forth the name of, and the ownership interest of the Borrower in each Subsidiary of the Borrower and identifies each such Subsidiary that is a Loan Party, in each case as of the Closing Date. As of the Closing Date, the Borrower does not have any Subsidiaries other than those set forth on Schedule 3.13.

Section 3.14.    Insurance.    Schedule 3.14 sets forth a description of all insurance maintained by or on behalf of the Borrower and its Subsidiaries as of the Closing Date. As of the Closing Date, all premiums due

- 33 -

and payable in respect of such insurance have been paid. The Borrower believes that the insurance maintained by or on behalf of the Borrower and its Subsidiaries is adequate.

Section 3.15.    Labor Matters.  As of the Closing Date, other than the Disclosed Matters, there are no strikes, lockouts or slowdowns against the Borrower or any Subsidiary pending or, to the knowledge of the Borrower, threatened. Except as could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect: (a) the hours worked by and payments made to employees of the Borrower and the Subsidiaries have not been in violation of the Fair Labor Standards Act or any other applicable Federal, state, local or foreign law dealing with such matters; (b) all payments due from the Borrower or any Subsidiary, or for which any claim may be made against the Borrower or any Subsidiary, on account of wages and employee health and welfare insurance and other benefits, have been paid or accrued as a liability on the books of the Borrower or such Subsidiary; and (c) the consummation of the Transactions will not give rise to any right of termination or right of renegotiation on the part of any union under any collective bargaining agreement to which the Borrower or any Subsidiary is bound.

Section 3.16.    Solvency.  On the Closing Date, after giving effect to the Reorganization Plan and the Confirmation Order, the Borrower and its Subsidiaries, on a consolidated basis, taken as a whole, are Solvent.

Section 3.17.    Security Documents.  (a) The Guarantee and Collateral Agreement is effective to create in favor of the Administrative Agent, for the benefit of the Secured Parties, a legal, valid and enforceable security interest in the Collateral described therein and proceeds thereof. In the case of the Pledged Shares (each as defined in the Guarantee and Collateral Agreement) described in the Guarantee and Collateral Agreement, when stock certificates representing such Pledged Shares are delivered to the Administrative Agent, and in the case of the other Collateral described in the Guarantee and Collateral Agreement (other than the Intellectual Property, as defined in the Guarantee and Collateral Agreement, for which such filings will not perfect same under applicable law), when financing statements and other filings are filed in the offices specified on Schedule 3.17 (as updated by the Borrower from time to time in accordance with Section 5.03), the Guarantee and Collateral Agreement shall constitute a fully perfected Lien on, and security interest in, all right, title and interest of the Loan Parties in such Collateral and the proceeds thereof, as security for the Obligations to the extent perfection can be obtained by filing Uniform Commercial Code financing statements, or in the case of Pledged Shares, by possession or control, in each case prior and superior in right to any other Person (except, in the case of Collateral other than Pledged Shares, Liens permitted by Section 6.02(a)).

(b)    When the Guarantee and Collateral Agreement or a summary thereof or short form security agreements with respect thereto are properly filed in the United States Patent and Trademark Office and the United States Copyright Office, and, with respect to Collateral in which a security interest cannot be perfected by such filings, upon the proper filing of the financing statements referred to in paragraph (a) above, the Guarantee and Collateral Agreement and such financing statements shall constitute a fully perfected (if and to the extent required to be perfected pursuant to the Guarantee and Collateral Agreement) Lien on, and security interest in, all right, title and interest of the grantors thereunder in the Intellectual Property (as defined in the Guarantee and Collateral Agreement), in each case prior and superior in right to any other Person (it being understood that subsequent recordings in the United States Patent and Trademark Office and the United States Copyright Office may be necessary to perfect a lien on registered trademarks and patents, trademark and patent applications and registered copyrights acquired by the grantors after the date hereof).

(c)    The Mortgages entered into after the Closing Date pursuant to Section 5.12, when entered shall be effective to create in favor of the Administrative Agent, for the ratable benefit of the Secured Parties, a legal, valid and enforceable Lien on all of the Loan Parties' right, title and interest in and to the Mortgaged Property thereunder and the proceeds thereof, and when such Mortgages are filed in the proper real estate filing offices, such Mortgages shall constitute a fully perfected Lien on, and security interest in, all right, title and interest of the Loan Parties in such Mortgaged Property and the proceeds thereof, in each case prior and superior in right to any other Person, other than with respect to the rights of Person pursuant to Liens expressly permitted by Section 6.02(a).

Section 3.18.    Liens.  There are no Liens of any nature whatsoever on any properties of the Borrower or any of its Subsidiaries other than Permitted Encumbrances and Liens permitted by Section 6.02.

Section 3.19.    <u>Bankruptcy Court Orders</u>.   The Confirmation Order has been entered by the Bankruptcy Court, and such order has not been stayed, reversed, modified or vacated on appeal.

Section 3.20.    <u>Indebtedness</u>.   Except as set forth in Schedule 6.01, the Loan Parties do not have (i) any Indebtedness for borrowed money outstanding on the Closing Date or (ii) Indebtedness (other than Indebtedness for borrowed money) in excess of $5,000,000 in the aggregate outstanding on the Closing Date.

Section 3.21.    <u>Bank Accounts</u>.   Schedule 3.21 sets forth the true, correct and complete account numbers and location of all of the bank accounts of the Loan Parties as of the Closing Date.

Section 3.22.    <u>Anti-Bribery, Anti-Corruption and Anti-Money Laundering Laws; Sanctions</u>.   None of the Borrower or any of its Subsidiaries is (i) the subject of any economic or trade sanctions or restrictive measures specifically enacted, administered, imposed or enforced against any such Person, under the Special Economic Measures Act (Canada), the United Nations Act, (Canada), the Freezing Assets of Corrupt Foreign Officials Act (Canada), Part II.1 of the Criminal Code, (Canada) or the Export and Import Permits Act (Canada), or, by OFAC, the U.S. Department of State, the United Nations Security Council, the European Union, the French Republic, Her Majesty's Treasury and/or any other relevant sanctions authority (collectively, "<u>Sanctions</u>"; any such Person, a "<u>Sanctioned Person</u>") or (ii) located, organized or resident in a country or territory that is, or whose government is, the subject of Sanctions broadly prohibiting dealings with such government, country, or territory (a "<u>Sanctioned Country</u>"), including Cuba, Iran, Burma, North Korea, Sudan and Syria.   None of the Borrower or any of its Subsidiaries has engaged in any activity or conduct which would violate in any material respect any applicable anti-bribery, anticorruption or anti-money laundering laws, regulations or rules in any applicable jurisdiction, and it and its Subsidiaries have instituted and maintain policies and procedures designed to prevent any such violation.

ARTICLE IV

CONDITIONS

Section 4.01.    <u>Effectiveness of Agreement</u>.   The effectiveness of this Agreement and the deemed making of the Loans on the Closing Date under Section 2.01(a) are subject to the satisfaction or waiver of the following conditions precedent (and the delivery of the notice contemplated in the last sentence of this Section 4.01):

(a)    <u>Loan Documents</u>. The Administrative Agent shall have received (i) this Agreement, executed and delivered by the Borrower, the Administrative Agent and the Lenders and (ii) an executed Guarantee and Collateral Agreement substantially in the form of Exhibit B hereto from each Loan Party.

(b)    <u>Confirmation of the Reorganization Plan</u>. The Reorganization Plan shall have been confirmed by the Bankruptcy Court pursuant to the Confirmation Order. The Confirmation Order shall not have been stayed, modified, or vacated on appeal. All conditions precedent to the effectiveness of the Reorganization Plan shall have been satisfied (or waived) or shall be concurrently with the effective date of the Reorganization Plan satisfied (or waived) in accordance with the terms of the Reorganization Plan.

(c)    <u>Satisfaction of Prepetition Obligations</u>. The Prepetition Obligations have been satisfied and discharged in the manner contemplated by the Reorganization Plan and the Confirmation Order concurrently with the effectiveness of this Agreement, together with the termination of security interests in intellectual property, UCC-3 termination statements for all UCC-1 financing statements filed by the Prepetition Agents in connection with the Prepetition Facilities and termination of any control agreements covering any accounts subject to Liens under the Prepetition Facilities.

(d)    <u>Indebtedness</u>. The Required Lenders shall be reasonably satisfied that, on the Closing Date, immediately after giving effect to the Reorganization Plan, and any other transactions to occur on the Closing Date, the Loan Parties shall have outstanding no Indebtedness (other than Indebtedness for borrowed money) in excess of $5,000,000 in the aggregate other than Indebtedness outstanding under the Loan Documents and Indebtedness set forth on Schedule 6.01.

(e)    Liens. The Administrative Agent and the Required Lenders shall have received UCC, tax and judgment lien searches and other appropriate evidence evidencing the absence of any other liens or mortgages on the Collateral other than Liens that have been satisfied and discharged in the manner contemplated by the Reorganization Plan and Permitted Encumbrances and other existing liens acceptable to the Required Lenders in their sole discretion.

(f)    Business Plan. The business plan of the Loan Parties shall be in form and substance satisfactory to the Required Lenders, in their sole discretion. The Required Lenders hereby acknowledge and agree that the business plan delivered to the Required Lenders on or about May 3, 2016 is satisfactory.

(g)    Fees. The Lenders, the Administrative Agent (including attorneys' fees of Simpson, Thacher and Bartlett LLP, as counsel to Prepetition Agents, and Katten Muchin Rosenman LLP), Milbank, Tweed, Hadley & McCloy LLP, any local counsel to the Lenders, and [_____] shall have received all fees required to be paid, and all expenses required to be for which reasonably detailed invoices have been presented, on or before the Closing Date.

(h)    No Actions. There shall be no action, suit, investigation or proceeding pending or, to the knowledge of the Borrower, threatened in any court or before any arbitrator or Governmental Authority that could reasonably be expected to (x) have a material adverse effect on the business, assets, properties, liabilities (actual and contingent), operations or condition (financial or otherwise) of the Loan Parties and their respective Subsidiaries, taken as a whole, (y) adversely affect the ability of any Loan Party to perform its obligations under the Loan Documents or (z) adversely affect the rights and remedies of the Agent or the Lenders under the Loan Documents.

(i)    Know Your Customer Information. The Administrative Agent and each requesting Lender shall have received no later than two Business Days prior to the Closing Date all documentation and other information reasonably requested in writing by the Administrative Agent or such Lender, as applicable, at least ten days prior to the Closing Date in order to allow the Administrative Agent and such Lender to comply with applicable "know your customer" and anti-money laundering rules and regulations, including without limitation the USA Patriot Act.

(j)    Financial Statements. The Lenders shall have received the unaudited consolidated financial statements described in Section 3.04.

(k)    Closing Certificates. The Administrative Agent and the Lenders shall have received and the Required Lenders shall be satisfied with (x) a certificate of an authorized officer of each Loan Party, dated the Closing Date, with appropriate insertions and attachments including (i) the certificate of incorporation or formation, as applicable, of such Person, as applicable, certified by the relevant authority of the jurisdiction of organization of such Person, as applicable, (ii) a complete copy of resolutions adopted by the Governing Board of such Person authorizing the execution, delivery and performance in accordance with their respective terms of the Loan Documents to which such Person is a party and any other documents required or contemplated hereunder (in the case of the Borrower, a copy of the Confirmation Order in lieu of such resolutions; provided that a copy of the resolutions adopted by the new Governing Board of the Borrower ratifying the execution, delivery and performance in accordance with their respective terms of the Loan Documents to which the Borrower is a party shall be delivered to the Administrative Agent on the Closing Date) and (iii) a good standing certificate of such Person, as applicable, from its jurisdiction of organization, (y) a certificate signed by the president, a vice president or a Financial Officer of the Borrower confirming that the conditions in Sections 4.01(o) and 4.01(r) have been satisfied, as applicable and (z) a perfection certificate signed by the president, a vice president or a Financial Officer of the Borrower in form satisfactory to the Required Lenders, together with all schedules and attachments contemplated thereby.

(l)    Legal Opinions. The Administrative Agent shall have received the following executed opinions, in each case in form and substance satisfactory to the Required Lenders: (i) the legal opinion of Kirkland & Ellis LLP, counsel to the Borrower and its Subsidiaries and (ii) the legal opinion of [_____],[5] the general counsel of the Borrower.

(m)    Pledged Stock; Stock Powers; Pledged Notes. To the extent not previously delivered, the Agent shall have received (i) the certificates or other instruments representing all outstanding Equity Interests of each Subsidiary owned by or on behalf of any Loan Party pledged pursuant to the Guarantee and Collateral Agreement,

---

[5] Subject to review upon receipt of K&E and GC opinions.

together with stock powers or other instruments of transfer with respect thereto endorsed in blank and (ii) each promissory note pledged and required to be delivered to the Agent pursuant to the Guarantee and Collateral Agreement, together with note powers or other instruments of transfer with respect thereto endorsed in blank.

(n)      Filings, Registrations and Recordings. All documents and instruments, including Uniform Commercial Code financing statements, required by law or reasonably requested by the Required Lenders to be filed, registered or recorded to create the Liens intended to be created by the Guarantee and Collateral Agreement and perfect such Liens to the extent required by, and with the priority required by, the Guarantee and Collateral Agreement, shall have been executed and be in proper form for filing, subject only to exceptions satisfactory to the Required Lenders and the Collateral and Guarantee Requirement shall have otherwise been satisfied.

(o)      Representations and Warranties. The representations and warranties of each Loan Party set forth in the Loan Documents shall be true and correct in all material respects (except to the extent already qualified as to materiality in which case such representations and warranties shall be true in all respects) on and as of the Closing Date, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties shall be true and correct in all material respects (except to the extent already qualified as to materiality in which case such representations and warranties shall be true in all respects) on and as of such earlier date).

(p)      [Mortgages. The Collateral and Guarantee Requirement shall have been satisfied with respect to the Mortgaged Properties listed on Schedule 1.01B.][6]

(q)      Control Agreements. To the extent not previously delivered, the Agent shall have received control agreements executed by all parties thereto with respect to each "deposit account" (as defined in the Guarantee and Collateral Agreement) and "securities account" (as defined in the Guarantee and Collateral Agreement) with respect to which a control agreement is required to be delivered by any Loan Party to the Agent pursuant to the Guarantee and Collateral Agreement, in each case in form and substance reasonably satisfactory to the Agent and the Required Lenders.

(r)      No Default. No Default shall have occurred and be continuing as of the Closing Date.

(s)      [reserved].

(t)      Flood Hazards. The Administrative Agent shall have received a completed "Life-of-Loan" Federal Emergency Management Agency Standard Flood Hazard Determination with respect to each Mortgaged Property (together with a notice about special flood hazard area status and flood disaster assistance duly executed by the Borrower and each Loan Party relating thereto), if any, and if any such Mortgaged Property is located in a special flood hazard area, evidence of flood insurance in form and amount reasonably satisfactory to the Required Lenders.

(u)      Insurance. The Administrative Agent shall have received evidence that the Administrative Agent has been named as loss payee and additional insured on all general liability and property insurance policies set forth on Schedule 3.14.

(v)      Solvency Certificate. The Administrative Agent and the Lenders shall have received a certificate of an authorized officer of the Borrower, dated the Closing Date, in form and substance reasonably satisfactory to the Required Lenders, certifying that, on the Closing Date, after giving effect to the Reorganization Plan and the Confirmation Order, the Borrower and its Subsidiaries, on a consolidated basis, taken as a whole, are Solvent.

ARTICLE V

AFFIRMATIVE COVENANTS

Until the principal of and interest on each Loan and all fees payable hereunder shall have been paid in full (other than unasserted contingent obligations), the Borrower covenants and agrees with the Lenders that:

---

[6] If unable to complete by closing, will be handled post-closing. Timeline to be agreed upon.

Section 5.01.    Financial Statements and Other Information.    The Borrower will furnish to the Administrative Agent and each Lender:

(a)    within 120 days after the end of each fiscal year of Borrower ending after the Closing Date (or with respect to the fiscal year ending December 31, 2016, the later of 120 days after (x) the end of such fiscal year and (y) delivery of audited financial statements for the fiscal year ended December 31, 2015; provided that if Borrower is unable deliver audited financial statements for the fiscal year ended December 31, 2016 within 120 days of such fiscal year end, the Borrower shall deliver unaudited financial statements for such fiscal year within 120 days after the end of such fiscal year subject to normal year-end audit adjustments, the absence of footnote disclosures and completion of the Prior Tax Calculation (as defined in the Reorganization Plan), a consolidated balance sheet of Borrower and its Subsidiaries as at the end of such fiscal year, and the related consolidated statements of income or operations, changes in Stockholders' Equity and cash flows for such fiscal year, setting forth in each case in comparative form the figures for the previous fiscal year, all in reasonable detail and prepared in accordance with GAAP, audited and accompanied by a report and opinion of an independent certified public accountant of nationally recognized standing, which report and opinion shall be prepared in accordance with generally accepted auditing standards and shall not be subject to any "going concern" or like qualification (other than as a result of current debt maturity) or qualification as to the scope of such audit (except for qualifications relating to changes in accounting principles or practices reflecting changes in GAAP and required or approved by such independent certified public accountants; provided that if the Borrower switches from one independent public accounting firm to another, the audit report of any such new accounting firm may contain a qualification or exception as to the scope of such consolidated or consolidating financial statements that relate to any fiscal year prior to its retention which, for the avoidance of doubt, shall have been the subject of an audit report of the previous accounting firm meeting the criteria set forth above) and a "Management's Discussion and Analysis of Financial Condition and Results of Operations" with respect to such financial statements, certified by the chief executive officer, chief financial officer, treasurer or controller of Borrower as fairly presenting, in all material respects, the financial condition, results of operations, Stockholders' Equity and cash flows of Borrower and its Subsidiaries on a consolidated basis in accordance with GAAP; provided, that detailed income statement and balance sheet information reflecting the elimination of the Borrower's adoption of fresh start accounting in accordance with GAAP upon effectiveness of the Reorganization Plan shall be included in Management's Discussion and Analysis of Financial Condition and Results of Operations, in the case of the financial statements delivered pursuant to this section (a);

(b)    within 60 days after the end of each of the first three fiscal quarters of each fiscal year of Borrower, a consolidated balance sheet of Borrower and its Subsidiaries, as at the end of such fiscal quarter, the related consolidated statements of income or operations for such fiscal quarter and for the portion of Borrower's fiscal year then ended, and the related consolidated statements of changes in Stockholders' Equity and cash flows for the portion of Borrower's fiscal year then ended, in each case setting forth in comparative form, as applicable, the figures for the corresponding fiscal quarter of the previous fiscal year and the corresponding portion of the previous fiscal year, all in reasonable detail, and a reasonably detailed narrative discussion of the changes in Borrower's financial condition and results of operations compared with the prior periods presented, which need not be as fulsome as the "Management's Discussion and Analysis of Financial Condition and Results of Operations" presented in connection annual reports pursuant to clause (a) above, certified by the chief executive officer, chief financial officer, treasurer or controller of Borrower as fairly presenting, in all material respects, the financial condition, results of operations, Stockholders' Equity and cash flows of Borrower and its Subsidiaries in accordance with GAAP, subject only to normal year-end audit adjustments and the absence of footnotes and subject to completion of the Prior Tax Calculation (as defined in the Reorganization Plan); provided, that detailed income statement and balance sheet information reflecting the elimination of the Borrower's adoption of fresh start accounting in accordance with GAAP upon effectiveness of the Reorganization Plan shall be included in the management's discussion;

(c)    as soon as reasonably practicable, audited financial statements for the fiscal year ending December 31, 2015;

(d)    concurrently with any delivery of financial statements under clause (a) or (b) above, a certificate of a Financial Officer of the Borrower (i) certifying as to whether a Default has occurred and, if a Default has occurred, specifying the details thereof and any action taken or proposed to be taken with respect thereto, (ii) setting forth reasonably detailed calculations demonstrating compliance with Section 6.14, (iii) stating whether any change in GAAP or in the application thereof has occurred since the Closing Date that has had an effect on the financial statements accompanying such certificate and specifying any such change and the related effect, (iv) identifying any Subsidiary of the

- 38 -

Loan Parties formed or acquired since the end of the previous fiscal quarter, (v) identifying any parcels of real property or improvements thereto with a value exceeding $10,000,000 that have been acquired by the Loan Parties since the end of the previous fiscal quarter, (vi) identifying any changes of the type described in Section 5.03(a) that have not been previously reported by the Borrower, (vii) identifying any Permitted Acquisition or other acquisitions of going concerns that have been consummated since the end of the previous fiscal quarter, including the date on which each such acquisition or Investment was consummated and the consideration therefor, (viii) identifying any material Intellectual Property (as defined in the Guarantee and Collateral Agreement) with respect to which a notice is required to be delivered under the Guarantee and Collateral Agreement and has not been previously delivered, (ix) identifying any Prepayment Events that have occurred since the end of the previous fiscal quarter and setting forth a reasonably detailed calculation of the Net Proceeds received from any such Prepayment Events, (x) identifying any change in the locations at which equipment and inventory, in each case with a value in excess of $10,000,000, are located, if not owned by the Loan Parties, and (xi) attaching a schedule setting forth a computation (and any utilization by the Borrower) of Excess Cash Flow, Borrower's Excess Cash Flow Amount for the relevant fiscal quarter and the current cumulative amount, and Open Market Excess Cash Flow Amount, each as of the end of the period covered by such financial statements;

(e)    concurrently with any delivery of financial statements under clause (a) above, a certificate of the accounting firm that reported on such financial statements stating whether they obtained knowledge during the course of their examination of such financial statements of any Default or Event of Default in respect of Section 6.14 (which certificate may be limited to the extent required by accounting rules, guidelines or practice);

(f)    within 60 days after the commencement of each fiscal year of the Borrower, a detailed consolidated budget for such fiscal year (including a projected consolidated balance sheet and related statements of projected operations and cash flow as of the end of and for such fiscal year and setting forth the assumptions used for purposes of preparing such budget, in form reasonably satisfactory to the Required Lenders it being agreed that the form previously delivered to the Required Lenders prior to the Closing Date is acceptable), promptly when available, any material significant revisions of such budget;

(g)    within (i) 30 days after the end of each of the first three fiscal quarters of the Borrower and (ii) 45 days after the end of the fourth fiscal quarter of the Borrower, the key performance indicators for such fiscal quarters set forth on Schedule 5.01(f) hereto, in the form set forth therein;

(h)    promptly following any request therefor, such other information regarding the operations, business affairs and financial condition of the Loan Parties, or compliance with the terms of any Loan Document, as the Administrative Agent (including on behalf of any Lender) may reasonably request;

(i)    promptly following receipt thereof, copies of any documents described in Sections 101(k) or 101(l) of ERISA that any Loan Party or any ERISA Affiliate may request with respect to any Multiemployer Plan; provided, that if the Loan Parties or any of their ERISA Affiliates have not requested such documents or notices from the administrator or sponsor of the applicable Multiemployer Plan, then, upon reasonable request of the Administrative Agent, the Loan Parties and/or their ERISA Affiliates shall promptly make a request for such documents or notices from such administrator or sponsor and the Borrower shall provide copies of such documents and notices to the Administrative Agent (on behalf of each requesting Lender) promptly after receipt thereof; provided, further, that the rights granted to the Administrative Agent in this section shall be exercised not more than once during a 12-month period;

(j)    within (i) 45 days after the end of each of the first three fiscal quarters of the Borrower and (ii) 60 days after the end of the fourth fiscal quarter of the Borrower, a Financial Officer of the Borrower shall host a telephone conference call for the Lenders to review and discuss the most recent key performance indicators; and

(k)    concurrently with any delivery of financial statements under clause (a) or (b) above, a statement of changes in the intercompany balances of the Loan Parties with the Service Company in substantially the form delivered to the Lenders prior to the Closing Date.

Section 5.02.    Notices of Material Events.  The Borrower will furnish to the Administrative Agent and each Lender written notice of the following promptly after any Financial Officer or executive officer of the Borrower or any Subsidiary obtains knowledge thereof:

- 39 -

(a)        the occurrence of any Default;

(b)        the filing or commencement of any action, suit or proceeding by or before any arbitrator or Governmental Authority against or affecting the Loan Parties or, to the knowledge of the Loan Parties, any Affiliate thereof that involves (i) a reasonable possibility of an adverse determination and which, if adversely determined, could reasonably be expected to result in a Material Adverse Effect or (ii) which directly relates to the Loan Documents and could have an adverse effect on the rights or obligations of the Credit Parties thereunder;

(c)        the occurrence of any ERISA Event that, alone or together with any other ERISA Events that have occurred, could reasonably be expected to result in a Material Adverse Effect; and

(d)        any other development that results in, or could reasonably be expected to result in, a Material Adverse Effect.

Each notice delivered under this Section shall be accompanied by a statement of a Financial Officer or other executive officer of the Borrower setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto.

Section 5.03.        Information Regarding Collateral.    (a) The Borrower will furnish to the Administrative Agent prompt written notice of any change (i) in the legal name of any of the Loan Parties, as reflected in its organization documents, (ii) in jurisdiction of organization or corporate structure of any of the Loan Parties and (iii) in the identity, Federal Taxpayer Identification Number or organization number of any of the Loan Parties, if any, assigned by the jurisdiction of its organization. The Borrower agrees not to effect or permit any change referred to in clauses (i) through (iii) of the preceding sentence unless all filings have been made under the Uniform Commercial Code or otherwise that are required in order for the Agent to continue at all times following such change to have a valid, legal and perfected security interest in all the Collateral of the Loan Parties for the benefit of the Secured Parties. The Borrower also agrees promptly to notify the Administrative Agent if any damage to or destruction of Collateral of the Loan Parties that is uninsured and has a fair market value exceeding $10,000,000 occurs.

(b)        Each year, at the time of delivery of annual financial statements with respect to the preceding fiscal year pursuant to clause (a) of Section 5.01, the Borrower shall deliver to the Administrative Agent a certificate of a Financial Officer and the chief legal officer of the Borrower certifying that all Uniform Commercial Code financing statements (including fixture filings, as applicable) or other appropriate filings, recordings or registrations, including all refilings, rerecordings and reregistrations, containing a description of the Collateral and required pursuant to the Loan Documents to be filed, have been filed of record in each governmental, municipal or other appropriate office in each jurisdiction necessary to protect and perfect the security interests under the Guarantee and Collateral Agreement for a period of not less than 18 months after the date of such certificate (except as noted therein with respect to any continuation statements to be filed within such period).

Section 5.04.        Existence; Conduct of Business.    The Borrower will, and will cause each of its Subsidiaries to, do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence and the rights, contracts, licenses, permits, privileges and franchises material to the conduct of its business; provided, that the foregoing shall not prohibit any merger, consolidation, liquidation or dissolution permitted under Section 6.03 or any sale of assets permitted under Section 6.05.

Section 5.05.        Payment of Obligations.    The Borrower will, and will cause each of its Subsidiaries to, pay its material Indebtedness and other material obligations, including Tax liabilities, before the same shall become delinquent or in default, except where (a) the validity or amount thereof is being contested in good faith by appropriate proceedings and (b) the Borrower or such Subsidiary has set aside on its books adequate reserves with respect thereto in accordance with GAAP.

Section 5.06.        Maintenance of Properties.    The Borrower will, and will cause each of its Subsidiaries to, keep and maintain all property (other than Intellectual Property) material to the conduct of its business in good working order and condition, ordinary wear and tear excepted. The Borrower will, and will cause

each of its Subsidiaries to, subject to its and their reasonable business judgment, take all actions to maintain all registrations and applications with respect to material Intellectual Property owned by any of them.

Section 5.07.    <u>Insurance</u>.   The Borrower will, and will cause each of its Subsidiaries to, maintain, with financially sound and reputable insurance companies (a) insurance in such amounts (with no greater risk retention) and against such risks as are customarily maintained by companies of established repute engaged in the same or similar businesses operating in the same or similar locations and (b) all insurance required to be maintained pursuant to the Security Documents. The Borrower will furnish to the Lenders, upon request of the Administrative Agent, information in reasonable detail as to the insurance so maintained.

Section 5.08.    <u>Casualty and Condemnation</u>.   The Borrower (a) will furnish to the Administrative Agent and the Lenders prompt written notice of any casualty or other insured damage to any Collateral of the Loan Parties fairly valued at more than $10,000,000 or the commencement of any action or proceeding for the taking of any Collateral of the Loan Parties or any material part thereof or material interest therein under power of eminent domain or by condemnation or similar proceeding and (b) will ensure that the Net Proceeds of any such event (whether in the form of insurance proceeds, condemnation awards or otherwise) are collected and applied in accordance with the applicable provisions of the Security Documents and this Agreement.

Section 5.09.    <u>Books and Records; Inspection and Audit Rights</u>.   The Borrower will, and will cause each of its Subsidiaries to, keep proper books of record and account in which full, true and correct entries are made of all dealings and transactions in relation to its business and activities. The Borrower will, and will cause each of its Subsidiaries to, permit any representatives designated by the Administrative Agent or any Lender, upon reasonable prior notice, to visit and inspect its properties, to examine and make extracts from its books and records, and to discuss its affairs, finances and condition with its officers, employees and independent accountants, all at such reasonable times and as often as reasonably requested.

Section 5.10.    <u>Compliance with Laws</u>.   The Borrower will, and will cause each of its Subsidiaries to, comply with all laws, rules, regulations, including Environmental Laws, and orders of any Governmental Authority applicable to it, its operations or its property, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

Section 5.11.    <u>Additional Subsidiaries</u>.   If any additional Subsidiary of the Loan Parties is formed or acquired after the Closing Date, the Borrower will, within three Business Days after such Subsidiary is formed or acquired, notify the Administrative Agent and the Lenders thereof and, within 15 Business Days (or such longer period as the Administrative Agent shall agree) after such Subsidiary is formed or acquired, cause any applicable provisions of the Collateral and Guarantee Requirement to be satisfied with respect to such Subsidiary and with respect to any Equity Interest in or Indebtedness of such Subsidiary owned by or on behalf of the Loan Parties.

Section 5.12.    <u>Further Assurances</u>.   (a) The Borrower will, and will cause each other Loan Party to, execute any and all further documents, financing statements, agreements and instruments, and take all such further actions (including the filing and recording of financing statements, fixture filings, Mortgages and other documents), that may be required under any applicable law, or that the Administrative Agent or the Required Lenders may reasonably request, to cause all provisions of the Collateral and Guarantee Requirement applicable to the Loan Parties to be and remain satisfied, all at the expense of the Loan Parties; <u>provided</u>, that such provisions of the Collateral and Guarantee Requirement need not be satisfied with respect to (i) real properties owned by the Loan Parties with an individual fair market value (including fixtures and improvements) that is less than $10,000,000 and (ii) any real property held by the Loan Parties as a lessee under a lease. The Borrower also agrees to provide to the Administrative Agent, from time to time upon request, evidence reasonably satisfactory to the Administrative Agent as to the perfection and priority of the Liens created or intended to be created by the Security Documents.

(b)    If any material asset (including any fee interest in real property or improvements thereto or any interest therein) that has an individual fair market value of more than $10,000,000 is acquired by the Loan Parties after the Closing Date or owned by an entity at the time it becomes a Loan Party (in each case other than assets constituting Collateral under the Guarantee and Collateral Agreement that become subject to the Lien of the Guarantee and Collateral Agreement upon acquisition thereof), the Borrower will notify the Administrative Agent and the Lenders thereof, and, if

- 41 -

requested by the Administrative Agent or the Required Lenders, the Borrower will cause such asset to be subjected to a Lien securing the Obligations and will take, and cause the Loan Parties to take, such actions as shall be necessary or reasonably requested by the Administrative Agent to grant and perfect such Liens, including actions described in paragraph (a) of this Section, all at the expense of the Loan Parties; provided, that the Collateral and Guarantee Requirement need not be satisfied with respect to (i) real properties owned by the Loan Parties with an individual fair market value (including fixtures and improvements) that is less than $10,000,000, (ii) any real property held by any of the Loan Parties as a lessee under a lease and (iii) other assets with respect to which the Agent determines that the cost or impracticability of including such assets as Collateral would be excessive in relation to the benefits to the Secured Parties.

Section 5.13.    [Reserved] Anti-Bribery, Anti-Corruption and Anti-Money Laundering Laws; Sanctions.  The Borrower shall (i) maintain and ensure that its Subsidiaries maintain policies and procedures designed to prevent violation of any applicable anti-bribery, anti-corruption or anti-money laundering laws, regulations or rules in any applicable jurisdiction; and (ii) not, directly or indirectly, use the proceeds of any Loan, or lend, contribute or otherwise make available such proceeds to any subsidiary, joint venture partner or other Person, (A) to fund any activities or business of or with any Person, or in any country or territory, that, at the time of such funding, is, a Sanctioned Person or Sanctioned Country, as applicable, or (B) in any other manner that would result in a violation in any material respect of Sanctions by any Person.

## ARTICLE VI

## NEGATIVE COVENANTS

Until the principal of and interest on each Loan and all fees payable hereunder shall have been paid in full (other than unasserted contingent obligations), the Borrower covenants and agrees with the Lenders that:

Section 6.01.    Indebtedness; Certain Equity Securities.  (a) The Borrower will not, and will not permit any Subsidiary to, create, incur, assume or permit to exist any Indebtedness or any Attributable Debt, except:

(i)    Indebtedness created under the Loan Documents;

(ii)    Indebtedness existing on the Closing Date and set forth in Schedule 6.01 and Refinancing Indebtedness in respect thereof;

(iii)    Indebtedness of the Borrower to any Subsidiary and of any Subsidiary to the Borrower or any other Subsidiary;

(iv)    Guarantees by the Borrower of Indebtedness of any Loan Party and by any Subsidiary of Indebtedness of the Borrower or any Loan Party;

(v)    Indebtedness and Attributable Debt of the Borrower or any Subsidiary incurred to finance the acquisition, construction or improvement of any fixed or capital assets, including Capital Lease Obligations and any Indebtedness assumed in connection with the acquisition of any such assets or secured by a Lien on any such assets prior to the acquisition thereof, and extensions, renewals, refinancings and replacements of any such Indebtedness that do not increase the outstanding principal amount thereof (other than by an amount not greater than fees and expenses, including premium and defeasance costs, associated therewith) or result in a decreased average weighted life thereof; provided that (1) such Indebtedness or Attributable Debt is incurred prior to or within 90 days after such acquisition or the completion of such construction or improvement and (2) the aggregate principal amount of Indebtedness and Attributable Debt permitted by this clause (v), shall not exceed $60,000,000 at any time outstanding;

(vi)    Indebtedness of any Person that becomes a Subsidiary after the Closing Date and Refinancing Indebtedness in respect thereof; provided that (A) such Indebtedness (other than Refinancing Indebtedness) exists at the time such Person becomes a Subsidiary

- 42 -

and is not created in contemplation of or in connection with such Person becoming a Subsidiary (except to the extent such Indebtedness refinanced other Indebtedness to facilitate such entity becoming a Subsidiary) and (B) the aggregate principal amount of Indebtedness permitted by this clause (vi) shall not exceed $75,000,000 at any time outstanding;

(vii)    Indebtedness of the Borrower or any Subsidiary in respect of letters of credit in an aggregate face amount not exceeding $25,000,000 at any time outstanding;

(viii)    Indebtedness in an amount not to exceed $25,000,000 at any time outstanding of the Borrower or any Subsidiary in favor of , and required by, a Cash Management Bank (as defined in the Guarantee and Collateral Agreement) in connection with cash management services and arrangements; and

(ix)    Indebtedness not otherwise permitted hereunder in an amount not to exceed $25,000,000 at any one time outstanding.

(b)    The Borrower will not, nor will it permit any Subsidiary to, issue any preferred stock or other preferred Equity Interests, other than i) preferred Equity Interests that are not redeemable at the election of the holder thereof (other than in connection with an event that would constitute a Change of Control) prior to the Maturity Date and ii) preferred Equity Interests issued in lieu of Indebtedness permitted pursuant to clause (a) above upon delivery by the Borrower to the Administrative Agent that such Equity Interests shall, for purposes of this Agreement, count as Indebtedness for all purposes hereunder, including incurrence pursuant to Section 6.01 and calculation of the Leverage Ratio;

Section 6.02.    Liens.  (a) The Borrower will not, and will not permit any Subsidiary to, create, incur, assume or permit to exist any Lien on any property or asset now owned or hereafter acquired by it, or assign or sell any income or revenues (including accounts receivable) or rights in respect of any thereof, except:

(i)    Liens created under the Loan Documents;

(ii)    Permitted Encumbrances;

(iii)    any Lien existing on the Closing Date and set forth in Schedule 6.02 on any property or asset of the Borrower or any Subsidiary; provided that (A) such Lien shall not apply to any other property or asset of the Borrower or any Subsidiary (other than proceeds) and (B) such Lien shall secure only those obligations which it secures on the date hereof and extensions, renewals, refinancings and replacements thereof that do not increase the outstanding principal amount thereof or result in an earlier maturity date or decreased weighted average life thereof;

(iv)    any Lien existing on any property or asset prior to the acquisition thereof by the Borrower or any Subsidiary or existing on any property or asset of any Person that becomes a Subsidiary after the Closing Date prior to the time such Person becomes a Subsidiary; provided that (A) such Lien is not created in contemplation of or in connection with such acquisition or such Person becoming a Subsidiary, as the case may be, (B) such Lien shall not apply to any other property or assets of the Borrower or any Subsidiary (other than proceeds) and (C) such Lien shall secure only those obligations which it secures on the date of such acquisition or the date such Person becomes a Subsidiary, as the case may be and extensions, renewals, refinancings and replacements thereof that do not increase the outstanding principal amount thereof (other than by an amount not in excess of fees and expenses, including premium and defeasance costs, associated therewith) or result in a decreased average weighted life thereof;

(v)    Liens on fixed or capital assets acquired, constructed or improved by the Borrower or any Subsidiary; provided that (A) such Liens secure Indebtedness permitted by

- 43 -

clause (v) of Section 6.01(a), (B) such Liens and the Indebtedness secured thereby are incurred prior to or within 90 days after such acquisition or the completion of such construction or improvement, (C) the Indebtedness secured thereby does not exceed the cost of acquiring, constructing or improving such fixed or capital assets and (D) such Liens shall not apply to any other property or assets of the Borrower or any Subsidiary (other than proceeds);

(vi)   Liens on cash collateral securing letters of credit permitted by Section 6.01(a)(vii) in an aggregate amount not to exceed $25,000,000;

(vii)   Liens in the nature of non-exclusive licenses of Intellectual Property granted to or in favor of another Guarantor pursuant to the Directory Consolidation Project;

(viii)   Liens on accounts receivable and accounts with a Cash Management Bank securing Indebtedness incurred pursuant to clause 6.01(viii), provided such Liens are subject to a customary intercreditor agreement in form and substance reasonably satisfactory to the Administrative Agent; and

(ix)   (i) Liens not otherwise permitted by this Section 6.02 securing obligations other than Indebtedness and (ii) involuntary Liens not otherwise permitted by this Section 6.02 securing Indebtedness, which in the case of clauses (i) and (ii) hereof, are in an aggregate amount not in excess of $15,000,000 at any time outstanding.

Section 6.03.   <u>Fundamental Changes</u>.   (a) The Borrower will not, nor will it permit any Subsidiary to, merge into or consolidate with any other Person, or permit any other Person to merge into or consolidate with it, or liquidate, wind up or dissolve, except that, if at the time thereof and immediately after giving effect thereto no Default shall have occurred and be continuing, (i) any Subsidiary may merge into the Borrower in a transaction in which the Borrower is the surviving entity, (ii) any Subsidiary may merge into any Subsidiary in a transaction in which the surviving entity is a wholly-owned Subsidiary and, if any party to such merger is a Loan Party, a Loan Party, (iii) any Subsidiary may merge or consolidate with any other Person in order to effect a Permitted Acquisition or an asset disposition permitted pursuant to Section 6.05 and (iv) any Subsidiary (other than the Borrower) may liquidate or dissolve if the Borrower determines in good faith that such liquidation or dissolution is in the best interests of the Borrower and is not materially disadvantageous to the Lenders.

(b)   The Borrower will not, and will not permit any of its Subsidiaries to, engage to any material extent in any business other than a Permitted Business.

Section 6.04.   <u>Investments, Loans, Advances, Guarantees and Acquisitions</u>.   The Borrower will not, and will not permit any of its Subsidiaries to, make, purchase, hold or acquire (including pursuant to any merger with any Person that was not a wholly owned Subsidiary prior to such merger) any Investment, except:

(a)   Permitted Investments;

(b)   Investments existing on the date hereof and set forth on Schedule 6.04;

(c)   Investments by the Borrower and its Subsidiaries in Equity Interests in Subsidiaries that are Loan Parties immediately prior to the time of such Investments;

(d)   loans or advances made by (the Borrower to any Loan Party and made by any Subsidiary to the Borrower or any Loan Party;

(e)   Guarantees constituting Indebtedness permitted by Section 6.01;

(f)        Investments (including debt obligations and equity securities) received in connection with the bankruptcy or reorganization of, or settlement of delinquent accounts and disputes with, customers and suppliers, in each case in the ordinary course of business;

(g)        extensions of trade credit in the ordinary course of business;

(h)        Investments consisting of non-cash consideration received in respect of sales, transfers or other dispositions of assets to the extent permitted by Section 6.05;

(i)        loans and advances by the Borrower and any of its Subsidiaries to their employees in the ordinary course of business and for bona fide business purposes in an aggregate amount at any time outstanding not in excess of $2,500,000;

(j)        Investments, other that Permitted Acquisitions, in an amount not to exceed the then total accumulated Borrower's Excess Cash Flow Amount that had not been previously utilized;

(k)        Permitted Acquisitions in an aggregate amount not to exceed $10,000,000 in the aggregate (so long as not funded with Borrower's Excess Cash Flow Amount) for all such acquisitions during the term of this Agreement;

(l)        so long as at the time of such Permitted Acquisition, the Pro Forma Leverage Ratio is below 1.25 to 1.00, Permitted Acquisitions in an aggregate amount not to exceed the then total accumulated Borrower's Excess Cash Flow Amount that had not been previously utilized; and

(m)        Swap Agreements entered into in compliance with Section 6.07.

Section 6.05.        Asset Sales. The Borrower will not, and will not permit any of its Subsidiaries to, sell, transfer, lease, license or sublicense or otherwise dispose of any asset, including any Equity Interest owned by it and any sale of assets in connection with a securitization, nor will the Borrower permit any of its Subsidiaries to issue any additional Equity Interest in such Subsidiary, except:

(a)        sales of (x) inventory, (y) used, surplus, obsolete or worn-out equipment and (z) Permitted Investments in the ordinary course of business;

(b)        sales, transfers and dispositions to the Borrower or a Subsidiary; provided that any such sales, transfers or dispositions involving a Subsidiary that is not a Loan Party shall be made in compliance with Section 6.09;

(c)        sale and leaseback transactions permitted by Section 6.06;

(d)        sales, transfers and other dispositions of assets (other than Equity Interests in a Subsidiary) to bona fide third parties that are not Affiliates of the Borrower and that are not permitted by any other clause of this Section; provided, that the aggregate cumulative fair market value of all assets sold, transferred or otherwise disposed of after the Closing Date in reliance upon this clause (d) shall not exceed $20,000,000;

(e)        the licensing or sublicensing (other than exclusive licenses or sublicenses) of Intellectual Property (i) granted to or in favor of another Guarantor pursuant to the Directory Consolidation Project or (ii) otherwise in the ordinary course of business in a manner that does not, and could not reasonably be expected to, materially interfere with the business of the Borrower and its Subsidiaries; and

(f)        the expiration of Intellectual Property in accordance with its statutory term;

(g)        abandonment or lapse of Intellectual Property in the ordinary course of business in a manner that does not, and could not reasonably be expected to, materially interfere with the business of the Borrower and its Subsidiaries; and

- 45 -

(h)     the sales, transfers or other dispositions in connection with the Directory Consolidation Project;

provided, that (x) all sales, transfers, leases, licenses, sublicenses and other dispositions permitted hereby (other than pursuant to clauses (a)(y), (a)(z), (b), (e), (f) and (g) above) shall be made for at least 80% cash consideration or, in the case of Permitted Investments, sales of receivables or sale and leaseback transactions, 100% cash consideration, and (y) all sales, transfers, leases and other dispositions permitted by clauses (a)(x), (d) and (e)(ii) above shall be made for fair value.

Section 6.06.     Sale and Leaseback Transactions.  The Borrower will not, and will not permit any of its Subsidiaries to, enter into any arrangement, directly or indirectly, whereby it shall sell or transfer any property, real or personal, used or useful in its business, whether now owned or hereinafter acquired, and thereafter rent or lease such property or other property that it intends to use for substantially the same purpose or purposes as the property sold or transferred, except (i) any such sale of any fixed or capital assets that is made for cash consideration in an amount not less than the cost of such fixed or capital asset and is consummated within 90 days after the Borrower or such Subsidiary acquires or completes the construction of such fixed or capital asset, to the extent all Capital Lease Obligations, Attributable Debt and Liens associated with such sale and leaseback transaction are permitted by Sections 6.01(a)(v) and 6.02(a)(v) (treating the property subject thereto as being subject to a Lien securing the related Attributable Debt, in the case of a sale and leaseback not accounted for as a Capital Lease Obligation) and (ii) sale and leaseback transactions with respect to real property or equipment having a fair market value in the aggregate not to exceed $50,000,000. For the avoidance of doubt, the Net Proceeds received from a sale and leaseback transaction pursuant to subsection (ii) of this Section 6.06 are subject to the mandatory prepayment provisions of Section 2.06(b).

Section 6.07.     Swap Agreements.  The Borrower will not, and will not permit any of its Subsidiaries to, enter into any Swap Agreement, except (a) Swap Agreements entered into in the ordinary course of business to hedge or mitigate risks to which the Borrower or any Subsidiary has actual exposure (other than those in respect of Equity Interests of the Borrower or any of its Subsidiaries) in the conduct of its business or the management of its liabilities and (b) Swap Agreements entered into in order to effectively cap, collar or exchange interest rates (from floating to fixed rates, from one floating rate to another floating rate or otherwise) with respect to any interest-bearing liability or investment of the Borrower or any Subsidiary.

Section 6.08.     Restricted Payments; Certain Payments of Indebtedness.  (a) The Borrower will not, nor will it permit any Subsidiary to, declare or make, or agree to pay or make, directly or indirectly, any Restricted Payment, or incur any obligation (contingent or otherwise) to do so, except (i) Subsidiaries of the Borrower may declare and pay dividends or distributions ratably with respect to their Equity Interests, (ii) Restricted Payments deemed to have occurred in connection with cashless exercise of warrants and options in respect of Equity Interests shall be permitted, and (iii) so long as no Event of Default shall have occurred and be continuing or would result therefrom, Borrower may make Restricted Payments to any present, former or future director, officer, employee, member of management or consultant of Borrower of any of its Subsidiaries (or their respective estates, heirs, family members, spouses or former spouses) pursuant to any management equity or stock option plan or any other management or employee benefit plan or agreement or arrangement or upon such person's death, disability, retirement or termination of employment, in an aggregate amount not to exceed $2,000,000 in any fiscal year.

(b)     The Borrower will not, nor will it permit any Subsidiary to, make or agree to pay or make, directly or indirectly, any payment or other distribution (whether in cash, securities or other property) of or in respect of principal of or interest on any Indebtedness, or any payment or other distribution (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any Indebtedness, except:

(i)     payment of Indebtedness created under the Loan Documents;

(ii)     payment of (x) interest and principal payments on Indebtedness incurred pursuant to Section 6.01(viii) or (y) regularly scheduled interest and principal payments as and when due in respect of any Indebtedness (other than Indebtedness incurred pursuant to Section

- 46 -

6.01(viii)), in each case, other than payments in respect of subordinated Indebtedness to the extent prohibited by the subordination provisions thereof;

> (iii)    refinancings of Indebtedness to the extent permitted by Section 6.01;

> (iv)    payment of secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness;

> (v)    prepayment of Capital Lease Obligations outside the ordinary course of business in an aggregate cumulative amount from and after the Closing Date not exceeding $5,000,000; and

> (vi)    payment of any Indebtedness owing to the Borrower or any Loan Party.

(c)    The Borrower will not, and will not permit any Subsidiary to, furnish any funds to, make any Investment in, or provide other consideration to any other Person for purposes of enabling such Person to, or otherwise permit any such Person to, make any Restricted Payment or other payment or distribution restricted by this Section that could not be made directly by the Borrower in accordance with the provisions of this Section.

(d)    Notwithstanding anything to the contrary in this Agreement or the other Loan Documents, the Loan Parties shall be permitted to make all distributions required to be made by the Loan Parties on or after the Closing Date pursuant to the Reorganization Plan and the Confirmation Order.

Section 6.09.    <u>Transactions with Affiliates</u>.    The Borrower will not, nor will it permit any Subsidiary to, sell, lease, license, sublicense or otherwise transfer any property or assets to, or purchase, lease or otherwise acquire any property or assets from, or otherwise engage in any other transactions with, any of its Affiliates, except (a) transactions on terms and conditions not less favorable, considered as a whole, to the Borrower or such Subsidiary than could be obtained on an arm's-length basis from unrelated third parties, provided that with respect to any transaction or series of related transactions (other than Discounted Voluntary Repurchases made in accordance with Section 2.15) involving consideration of more than $1,000,000, such transaction(s) shall be approved by a majority of Disinterested Members of the Governing Board of the Borrower, (b) transactions between or among the Loan Parties not involving any other Affiliate, (c) any payment permitted by Section 6.08 or any Investment permitted by Section 6.04 specifically contemplated by Section 6.04 to be made among Affiliates, (d) the issuance by the Borrower or any Subsidiary of Equity Interests to, or the receipt of any capital contribution from, the Borrower or a Subsidiary, (e) the non-exclusive licensing or sublicensing of Intellectual Property and (f) pursuant to the transactions in connection with the Directory Consolidation Project.

Section 6.10.    <u>Restrictive Agreements</u>.    The Borrower will not, nor will it permit any Subsidiary to, directly or indirectly, enter into, incur or permit to exist any agreement or other arrangement that prohibits, restricts or imposes any condition upon (a) the ability of the Borrower or any Subsidiary to create, incur or permit to exist any Lien upon any of its property or assets to the Secured Parties securing the Obligations, or (b) the ability of any Subsidiary to pay dividends or other distributions with respect to any of its Equity Interests or to make or repay loans or advances to the Borrower or any other Subsidiary or to Guarantee Indebtedness of the Borrower or any other Subsidiary; <u>provided</u>, that (i) the foregoing shall not apply to restrictions and conditions imposed by law or by any Loan Document, (ii) the foregoing shall not apply to restrictions and conditions existing on the date hereof identified on Schedule 6.10 (but shall apply to any extension or renewal of, or any amendment or modification expanding the scope of, any such restriction or condition), (iii) the foregoing shall not apply to customary restrictions and conditions contained in agreements relating to the sale of a Subsidiary pending such sale, <u>provided</u> such restrictions and conditions apply only to the Subsidiary that is to be sold and such sale is permitted hereunder, (iv) clause (a) of the foregoing shall not apply to restrictions or conditions imposed by any agreement relating to secured Indebtedness permitted by this Agreement if such restrictions or conditions apply only to the property or assets securing such Indebtedness and the proceeds thereof, (v) clause (a) of the foregoing shall not apply to customary provisions in leases restricting the assignment thereof, (vi) clause (a) of the foregoing shall not apply to restrictions or conditions imposed by any agreement related to any Indebtedness incurred by a Subsidiary prior to the date on which such Subsidiary was acquired by the Borrower (but shall apply to any extension or renewal of, or any amendment or modification expanding the scope of, any such restriction or condition), (vii) clause (a) of the

- 47 -

foregoing shall not apply to restrictions or conditions imposed by any agreement related to the refinancing of Indebtedness, <u>provided</u> that the terms of any such restrictions or conditions are not materially less favorable to the Lenders than the restrictions or conditions contained in the predecessor agreements and (viii) the foregoing shall not apply to customary provisions in joint venture agreements.

Section 6.11.    <u>Change in Business</u>.  The Borrower will not, and will not permit any Subsidiary to, engage at any time in any business or business activity other than a Permitted Business.

Section 6.12.    <u>Fiscal Year</u>.  The Borrower shall not change its fiscal year for accounting and financial reporting purposes to end on any date other than December 31.

Section 6.13.    <u>Amendment of Material Documents</u>.  The Borrower will not, nor will it permit any Subsidiary to, amend, modify or waive any of its rights under its certificate of incorporation, by-laws or other organizational documents if, taken as a whole, such amendment, modification or waiver is adverse in any material respect to the interests of the Lenders.

Section 6.14.    <u>Leverage Ratio</u>.  he Borrower will not permit the Leverage Ratio as of the last day of each fiscal quarter commencing with the first full fiscal quarter ending after the Closing Date to exceed 5.00 to 1.00.

Section 6.15.    <u>Capital Expenditures</u>.  The Borrower will not, and will not permit any Subsidiary to, make or commit to make any Capital Expenditure, except Capital Expenditures of the Borrower and its Subsidiaries in the ordinary course of business not exceeding $40,000,000 in each fiscal year.

ARTICLE VII

<u>EVENTS OF DEFAULT</u>

If any of the following events ("<u>Events of Default</u>") shall occur:

(a)    the Borrower shall fail to pay any principal of any Loan when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or otherwise;

(b)    the Borrower shall fail to pay any interest on any Loan or any fee or any other amount (other than an amount referred to in clause (a) of this Article) payable under this Agreement or any other Loan Document, when and as the same shall become due and payable, and such failure shall continue unremedied for a period of five days;

(c)    any representation or warranty made or deemed made by or on behalf of any Loan Party in or in connection with any Loan Document or any amendment or modification thereof or waiver thereunder, or in any certificate furnished pursuant to or in connection with any Loan Document or any amendment or modification thereof or waiver thereunder, shall prove to have been incorrect in any material respect when made or deemed made;

(d)    the Borrower shall fail to observe or perform any covenant, condition or agreement contained in Section 5.02 or 5.04 (with respect to the existence of the Borrower) or in Article VI;

(e)    any Loan Party shall fail to observe or perform any covenant, condition or agreement contained in any Loan Document (other than those specified in clause (a), (b) or (d) of this Article), and such failure shall continue unremedied for a period of 30 days after notice thereof from the Administrative Agent to the Borrower (which notice will promptly be given at the request of any Lender);

(f)    any Loan Party or any of its Subsidiaries shall fail to make any payment (whether of principal or interest and regardless of amount) in respect of any Material Indebtedness, when and as the same shall become due and payable (after giving effect to any applicable grace period specified in the agreement or instrument governing such Indebtedness);

- 48 -

(g)     any event or condition occurs that results in any Material Indebtedness becoming due prior to its scheduled maturity or that enables or permits (with or without the giving of notice, the lapse of time or both) the holder or holders of any Material Indebtedness or any trustee or agent on its or their behalf to cause any Material Indebtedness to become due, or to require the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity; provided, that this clause (g) shall not apply to (A) secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness, (B) Optional Repurchases permitted hereunder, (C) refinancings of Indebtedness to the extent permitted by Section 6.01 and (D) Guarantees by the Borrower's Subsidiaries of the Obligations under the Loan Documents unless any payment shall have been demanded to be made by, or any other remedy shall have been exercised against, the Borrower's Subsidiaries or their respective assets in respect of such Guarantees;

(h)     an involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking (i) liquidation, reorganization or other relief in respect of the Borrower or any other Loan Party or its debts, or of a substantial part of its assets, under any Federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect or (ii) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for the Borrower or any other Loan Party or for a substantial part of its assets, and, in any such case, such proceeding or petition shall continue undismissed for 60 days or an order or decree approving or ordering any of the foregoing shall be entered;

(i)     the Borrower or any other Loan Party shall (i) voluntarily commence any proceeding or file any petition seeking liquidation, reorganization or other relief under any Federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect, (ii) consent to the institution of any proceeding or petition described in clause (g) of this Article, (iii) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for the Borrower or any other Loan Party or for a substantial part of its assets, (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding that would entitle the other party or parties to an order for relief, (v) make a general assignment for the benefit of creditors or (vi) take any action for the purpose of effecting any of the foregoing;

(j)     one or more judgments for the payment of money in an aggregate amount in excess of $20,000,000 (net of amounts covered by insurance) shall be rendered against the Borrower or any of its Subsidiaries or any combination thereof and the same shall remain undischarged for a period of 30 consecutive days during which execution shall not be effectively stayed, or any action shall be legally taken by a judgment creditor to attach or levy upon any assets of the Borrower or any of its Subsidiaries to enforce any such judgment;

(k)     (i) an ERISA Event shall have occurred, (ii) a trustee shall be appointed by a United States district court to administer any Plan(s), (iii) the PBGC shall institute proceedings to terminate any Plan, or (iv) any Loan Party or ERISA Affiliate shall have been notified by the sponsor of a Multiemployer Plan that it has incurred or will be assessed Withdrawal Liability to such Multiemployer Plan and such entity does not have reasonable grounds for contesting such Withdrawal Liability in a timely and appropriate manner; and in each cases (i) through (iv) above, such event or condition, in the opinion of the Required Lenders, when taken together with all other such events or conditions, if any, could reasonably be expected to result in a Material Adverse Effect;

(l)     any Lien purported to be created under any Security Document shall cease to be, or shall be asserted by any Loan Party not to be, a valid and perfected Lien on any Collateral having, in the aggregate, a value in excess of $10,000,000, with the priority required by the applicable Security Document, except (i) as a result of the sale or other disposition of the applicable Collateral in a transaction permitted under the Loan Documents or (ii) as a result of the Agent's failure to maintain possession of any stock certificates, promissory notes or other instruments delivered to it under the Guarantee and Collateral Agreement;

(m)     a Change in Control shall occur;

(n)     any guarantee under the Guarantee and Collateral Agreement for any reason shall cease to be in full force and effect (other than in accordance with its terms), or any Guarantor shall assert in writing that the Guarantee and Collateral Agreement or any guarantee thereunder has ceased to be or is not enforceable;

(o)     the Confirmation Order fails to be in full force and effect or fails to be final, valid, subsisting and continuing, or has been modified, reversed, stayed, vacated or subject to any appeal, in each case, in any material respects that are materially adverse to the Lenders without the consent of the Required Lenders;

then, and in every such event (other than an event with respect to the Borrower described in clause (g) or (h) of this Article), and at any time thereafter during the continuance of such event, the Administrative Agent may with the consent of the Required Lenders, and at the request of the Required Lenders shall, by notice to the Borrower, declare the Loans then outstanding to be due and payable in whole, and thereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and all fees and other obligations of the Borrower accrued hereunder, shall become due and payable immediately, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower; and in case of any event with respect to the Borrower described in clause (g) or (h) of this Article, the principal of the Loans then outstanding, together with accrued interest thereon and all fees and other obligations of the Borrower accrued hereunder, shall automatically become due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower.

ARTICLE VIII

THE AGENT

Each of the Lenders hereby irrevocably appoints the Agent as its agent and authorizes the Agent to take such actions on its behalf and to exercise such powers as are delegated to the Agent by the terms of the Loan Documents, together with such actions and powers as are reasonably incidental thereto.

The bank serving as the Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Agent, and such bank and its Affiliates may accept deposits from, lend money to and generally engage in any kind of business with the Borrower or any Subsidiary or other Affiliate thereof as if it were not the Agent hereunder.

The Agent shall not have any duties or obligations except those expressly set forth in the Loan Documents. Without limiting the generality of the foregoing, (a) the Agent shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing, (b) the Agent shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated by the Loan Documents that the Agent is required to exercise in writing as directed by the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 9.02), and (c) except as expressly set forth in the Loan Documents, the Agent shall not have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower or any of its Subsidiaries that is communicated to or obtained by the bank serving as Agent or any of its Affiliates in any capacity (other than as Agent). The Agent shall not be liable for any action taken or not taken by it with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 9.02) or in the absence of its own gross negligence or willful misconduct. The Agent shall be deemed not to have knowledge of any Default unless and until written notice thereof is given to the Agent by the Borrower or a Lender, and the Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with any Loan Document, (ii) the contents of any certificate, report or other document delivered thereunder or in connection therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth in any Loan Document, (iv) the validity, enforceability, effectiveness or genuineness of any Loan Document or any other agreement, instrument or document, or (v) the satisfaction of any condition set forth in Article IV or elsewhere in any Loan Document, other than to confirm receipt of items expressly required to be delivered to the Agent.

The Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing believed by it to be genuine and to have been signed or sent by the proper Person. The Agent also may rely upon any statement made to it orally or by telephone and believed by it to be made by the proper Person, and shall not incur any liability for relying thereon. The Agent may consult with legal counsel (who may be counsel for the Borrower), independent

- 50 -

accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the reasonable advice of any such counsel, accountants or experts.

The Agent may perform any and all its duties and exercise its rights and powers by or through any one or more sub-agents appointed by the Agent. The Agent and any such sub-agent may perform any and all its duties and exercise its rights and powers through their respective Related Parties. The exculpatory provisions of the preceding paragraphs shall apply to any such sub-agent and to the Related Parties of each Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Agent.

Subject to the appointment and acceptance of a successor to the Agent as provided in this paragraph, the Agent may (i) resign at any time by notifying the Lenders and the Borrower or (ii) be removed at any time by the Required Lenders by notifying the Administrative Agent and Borrower. Upon any such resignation or removal, the Required Lenders shall have the right, with the consent of the Borrower (such consent not to be unreasonably withheld or delayed and such consent not to be required if an Event of Default has occurred and is continuing), to appoint a successor. If no successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Agent gives notice of its resignation or the retiring Agent has received notice of removal from the Required Lenders, then the retiring Agent may, on behalf of the Lenders, appoint a successor Agent which shall be a bank with an office in New York, New York, or an Affiliate of any such bank. Upon the acceptance of its appointment as Agent hereunder by a successor, such successor shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring Agent, and the retiring Agent shall be discharged from its duties and obligations hereunder. The fees payable by the Borrower to a successor Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor. After the Agent's resignation or removal hereunder, the provisions of this Article and Section 9.03 shall continue in effect for the benefit of such retiring Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while it was acting as Agent.

Each Lender acknowledges that it has, independently and without reliance upon the Agent or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender also acknowledges that it will, independently and without reliance upon the Agent or any other Lender and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or related agreement or any document furnished hereunder or thereunder.

ARTICLE IX

MISCELLANEOUS

Section 9.01.    Notices.  (a) Except in the case of notices and other communications expressly permitted to be given by telephone, all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopy, as follows:

(i)        if to the Borrower, to it at Dex Media, Inc., 2200 West Airfield Drive P.O. Box 619810, DFW Airport, Texas 75261 ], Attention [General Counsel (Telecopy No. (972)253-7200)]; with a copy to: Kirkland & Ellis LLP, 300 North LaSalle, Chicago, IL 60657, Attention Anh B. Lee (Telecopy No. (312) 862-2200);

(ii)        if to the Agent, to Wilmington Trust, National Association, 50 South Sixth Street, Suite 1290, Minneapolis, MN 55402, Attention: Jeffery Rose, Vice President (Email: jrose@wilmingtontrust.com; Phone No.: (612) 217-5630; Telecopy No. (612) 217-5651), with a copy to Katten Muchin Rosenman LLP, 575 Madison Avenue, New York, NY 10022-2585, Attention: Angela L Batterson (Email: angela.batterson@kattenlaw.com; Phone No.: (212) 940-6694; Telecopy No. (212) 940-8776); and

- 51 -

(iii)    if to any other Lender, to it at its address (or telecopy number) set forth in its Administrative Questionnaire.

(b)    Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communications pursuant to procedures approved by the Administrative Agent; provided, that the foregoing shall not apply to notices pursuant to Article II unless otherwise agreed by the Administrative Agent and the applicable Lender. The Administrative Agent or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; provided that approval of such procedures may be limited to particular notices or communications.

(c)    Any party hereto may change its address or telecopy number for notices and other communications hereunder by notice to the other parties hereto. All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt.

Section 9.02.    Waivers; Amendments. (a) No failure or delay by the Agent or any Lender in exercising any right or power hereunder or under any other Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the Agent and the Lenders hereunder and under the other Loan Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have. No waiver of any provision of any Loan Document or consent to any departure by any Loan Party therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. Without limiting the generality of the foregoing, the making of a Loan shall not be construed as a waiver of any Default, regardless of whether the Agent or any Lender may have had notice or knowledge of such Default at the time.

(b)    Neither this Agreement nor any other Loan Document nor any provision hereof or thereof may be waived, amended or modified except (x) in the case of this Agreement, pursuant to an agreement or agreements in writing entered into by the Borrower and the Required Lenders, (y) in the case of any other Loan Document, pursuant to an agreement or agreements in writing entered into by the Agent and the Loan Party or Loan Parties that are parties thereto, in each case with the consent of the Required Lenders, or (z) in the case of this Agreement or any other Loan Document, pursuant to an agreement or agreements in writing entered into by the Loan Party or Loan Parties subject to such Loan Document and the Agent to cure any ambiguity, omission, defect or inconsistency; provided that no such agreement shall (i) reduce the principal amount of any Loan held by such Lender or reduce the rate of interest thereon (excluding the waiver of the imposition of Default Rate Interest), or reduce any fees payable to such Lender hereunder, without the written consent of such Lender, (ii) postpone the maturity of such Lender's Loan, or any scheduled date of payment of the principal amount of such Lender's Loan under Section 2.05, or any date for the payment of any interest or fees payable to such Lender hereunder, or reduce the amount of, waive or excuse any such payment, without the written consent of such Lender, (iii) change Section 2.13(b) or (c) in a manner that would alter the pro rata sharing of payments required thereby, without the written consent of each Lender, (iv) change any of the provisions of this Section or the definitions of "Required Lenders" or "Supermajority Lenders" or any other provision of any Loan Document specifying the number or percentage of Lenders required to waive, amend or modify any rights thereunder or make any determination or grant any consent thereunder, without the written consent of each Lender, (v) except as provided by Section 9.14, release any Guarantor from its Guarantee under a Guarantee and Collateral Agreement or other applicable Security Document (except as expressly provided in the applicable Guarantee and Collateral Agreement or other Security Document), or limit its liability in respect of such Guarantee, without the written consent of each Lender, (vi) release all or substantially all of the Collateral from the Liens of the Security Documents, without the written consent of each Lender; provided, further, that no such agreement shall change any of the provisions of Section 6.08(a), Section 6.09, Section 2.06(c), Section 2.15 or Section 2.05(b) regarding use of proceeds from the incurrence by the Borrower or any Subsidiary of Indebtedness under a revolving or asset-based lending facility, the definitions as used therein or any other provisions in the Loan Documents the effect of which would be to change Section 6.08(a), Section 6.09, Section 2.06(c), Section 2.15 or Section 2.05(b) regarding use of proceeds from the incurrence by the Borrower or any Subsidiary of Indebtedness under a revolving or asset-based lending facility without the prior written consent of Supermajority Lenders. Notwithstanding the foregoing, any provision of this Agreement may be amended by an agreement in writing entered into by the Borrower, the Required Lenders and the Agent if at the time such amendment becomes effective,

each Lender not consenting thereto receives payment in full of the principal of and interest accrued on each Loan made by it and all other amounts owing to it or accrued for its account under this Agreement.

(c)     If, in connection with any proposed change, waiver, discharge or termination of or to any of the provisions of this Agreement solely as contemplated by clauses (b)(i) through (b)(vi), inclusive, of the first proviso to Section 9.02(b), the consent of Lenders having Loans representing more than 66-2/3% of the sum of the total outstanding Loans at such time is obtained but the consent of one or more of such other Lenders whose consent is required is not obtained, then the Borrower shall have the right, so long as all non-consenting Lenders whose individual consent is required are treated as described in either clause (i) or (ii) below, to either (i) replace each such non-consenting Lender or Lenders with one or more assignees pursuant to, and with the effect of an assignment under, Section 2.14 so long as at the time of such replacement, each such assignee consents to the proposed change, waiver, discharge or termination or (ii) repay the outstanding Loans of such Lender that gave rise to the need to obtain such Lender's consent; provided (A) that, unless the Loans that are repaid pursuant to the preceding clause (ii) are immediately replaced in full at such time through the addition of new Lenders or the increase of the outstanding Loans of existing Lenders (who in each case must specifically consent thereto), then in the case of any action pursuant to the preceding clause (ii), Lenders having Loans representing more than 66-2/3% of the sum of the total outstanding Loans at such time (determined after giving effect to the proposed action) shall specifically consent thereto and (B) any such replacement or termination transaction described above shall be effective on the date notice is given of the relevant transaction and shall have a settlement date no earlier than five Business Days and no later than 90 days after the relevant transaction.

Section 9.03.     Expenses; Indemnity; Damage Waiver.     (a) The Borrower shall pay (i) all documented and reasonable out-of-pocket expenses incurred by the Agent, including the documented and reasonable out-of-pocket fees, charges and disbursements of (a) a single transaction and documentation counsel for the Agent and (b) such other local counsel and special counsel as may be required in the reasonable judgment of the Agent, in connection with the preparation and administration of the Loan Documents or any amendments, modifications or waivers of the provisions thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), and (ii) all documented and reasonable out-of-pocket expenses incurred by the Agent and one financial advisor to the Agent (including such local counsel and special counsel as may be required in the reasonable judgment of the Agent) or any Lender (and one financial advisor and one legal advisor to the Lenders as determined by a majority in interest of the Lenders), in connection with the enforcement or protection of its/their rights in connection with the Loan Documents, including its rights under this Section, or in connection with the Loans made hereunder, including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans.

(b)     The Borrower shall indemnify the Agent and each Lender, and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses, including the fees, charges and disbursements of (a) a single transaction and documentation counsel for any Indemnitee and (b) such other local counsel and special counsel as may be required in the reasonable judgment of the Agent, incurred by or asserted against any Indemnitee arising out of, in connection with, or as a result of (i) the execution or delivery of any Loan Document or any other agreement or instrument contemplated hereby, the performance by the parties to the Loan Documents of their respective obligations thereunder or the consummation of the Transactions or any other transactions contemplated hereby, (ii) any Loan or the use of the proceeds therefrom, (iii) any actual or alleged presence or Release of Hazardous Materials on or from any Mortgaged Property or any other property currently or formerly owned or operated by the Borrower or any of its Subsidiaries, or any Environmental Liability related in any way to the Borrower or any of its Subsidiaries, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory and regardless of whether any Indemnitee is a party thereto; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee.  This Section 9.03(b) shall not apply with respect to Taxes other than any Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim.

(c)     To the extent that the Borrower fails to pay any amount required to be paid by it to the Agent under paragraph (a) or (b) of this Section, but without affecting the Borrower's obligations thereunder, each Lender severally agrees to pay to the Agent such Lender's pro rata share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount; provided that the unreimbursed expense

- 53 -

or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Agent in its capacity as such. For purposes hereof, a Lender's "pro rata share" shall be determined based upon its share of the sum of the total outstanding Loans at the time.

(d)    To the extent permitted by applicable law, the Borrower shall not assert, and hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement or any agreement or instrument contemplated hereby, the Transactions or any Loan or the use of the proceeds thereof.

(e)    All amounts due under this Section shall be payable not later than 30 days after written demand therefor.

Section 9.04.    <u>Successors and Assigns</u>.  (a) The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that (i) the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender (and any attempted assignment or transfer by the Borrower without such consent shall be null and void) and (ii) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section. Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants (to the extent provided in paragraph (c) of this Section) and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)    (i) Subject to the conditions set forth in paragraph (b)(ii) below, any Lender may assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of the Loans at the time owing to it), with the prior written consent (such consent not to be unreasonably withheld or delayed) of the Administrative Agent, <u>provided</u> that no consent of the Administrative Agent shall be required for an assignment of Loans to an assignee that is (x) a Lender immediately prior to giving effect to such assignment, (y) an Affiliate of a Lender or an Approved Fund, or (z) made in connection with a repurchase of a Loan pursuant to Section 2.15.

(ii)    Assignments shall be subject to the following conditions:

(A)    except in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund, an assignment of the entire remaining amount of the assigning Lender's Loan or a repurchase undertaken in accordance with Section 2.15, the amount of the Loan of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent) shall not be less than $1,000,000, in each case unless each of the Borrower and the Administrative Agent otherwise consent, <u>provided</u> that no such consent of the Borrower shall be required if an Event of Default has occurred and is continuing;

(B)    each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement;

(C)    the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500 (it being understood that only a single processing and recordation fee of $3,500 will be payable with respect to any multiple assignments to or by a Lender, an Affiliate of a Lender or an Approved Fund pursuant to clause (ii)(A) above, each of which is individually less than $1,000,000, that are simultaneously consummated);

- 54 -

(D)      the assignee, if it shall not be a Lender or the Borrower, shall deliver to the Administrative Agent an Administrative Questionnaire;

(E)      the assignee shall not be a Competitor; and

(F)      notwithstanding anything to the contrary contained herein, the Borrower, or its Affiliates or its Subsidiaries may, from time to time, purchase or prepay Loans, in each case, on a non-pro rata basis through (1) Dutch Auction open to all Lenders on a pro rata basis in accordance with Section 2.15 or (2) Open Market Purchases in accordance with Section 2.15, provided that any such Loans acquired by the Borrower or its Affiliates or its Subsidiaries shall be retired or cancelled immediately upon the acquisition thereof.

For purposes of this Section 9.04, the term "Approved Fund" has the following meaning:

"Approved Fund" means any Person (other than a natural person) that is engaged in making, purchasing, holding or investing in bank loans and similar extensions of credit in the ordinary course and that is administered, advised or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) any entity or an Affiliate of an entity that administers, advises or manages a Lender.

(iii)      Subject to acceptance and recording thereof pursuant to paragraph (b)(iv) of this Section, from and after the effective date specified in each Assignment and Assumption the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 2.10, 2.11, 2.12 and 9.03). Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section 9.04 shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with paragraph (c) of this Section.

(iv)      The Administrative Agent, acting for this purpose as an agent of the Borrower, shall maintain at one of its offices in the United States a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the principal amount (and stated interest) of the Loans owing to, each Lender pursuant to the terms hereof from time to time, which register shall indicate that each lender is entitled to interest paid with respect to such Loans (the "Register"). The entries in the Register shall be conclusive, and the Borrower, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Borrower and any Lender, at any reasonable time and from time to time upon reasonable prior notice and an electronic copy of the Register shall be available by the Borrower and any Lender, from time to time upon reasonable prior request.  The parties intend that all extensions of credit to the Borrower and its Affiliates hereunder shall at all times be treated as being in registered form within the meaning of Sections 163(f), 871(h)(2), and 881(c)(2) of the Code (and any successor provisions) and the regulations thereunder and shall interpret the provisions herein regarding the Register consistent with such intent.

(v)      Upon its receipt of a duly completed Assignment and Assumption executed by an assigning Lender and an assignee, the assignee's completed Administrative Questionnaire (unless the assignee shall already be a Lender hereunder), the processing and recordation fee referred to in paragraph (b) of this Section and any written consent to such

assignment required by paragraph (b) of this Section, the Administrative Agent shall accept such Assignment and Assumption and record the information contained therein in the Register. No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this paragraph.

(c)    (i) Any Lender may, without the consent of, or notice to, the Borrower or the Administrative Agent, sell participations to one or more banks or other entities (a "Participant") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of the Loans owing to it); provided, that (A) such Lender's obligations under this Agreement shall remain unchanged, (B) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (C) the Borrower, the Administrative Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in the second proviso to Section 9.02(b) that affects such Participant. Subject to paragraph (c)(ii) of this Section, the Borrower agrees that each Participant shall be entitled to the benefits of Sections 2.10, 2.11 and 2.12 (subject to the requirements and limitations therein, including the requirements under Section 2.12(e) (it being understood that the documentation required under Section 2.12(e) shall be delivered to the participating Lender)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section. To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 9.08 as though it were a Lender, provided such Participant agrees to be subject to Section 2.13(c) as though it were a Lender.

(ii)    A Participant shall not be entitled to receive any greater payment under Section 2.10 or 2.12 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent or, except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation.

(iii)    Each Lender that sells a participation shall, acting solely for this purpose as an agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under this Agreement (the "Participant Register"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.

(d)    Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including without limitation any pledge or assignment to secure obligations to a Federal Reserve Bank, and this Section shall not apply to any such pledge or assignment of a security interest; provided that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

Section 9.05.    Survival. All covenants, agreements, representations and warranties made by the Loan Parties in the Loan Documents and in the certificates or other instruments delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of the Loan Documents and the making of any Loans, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Administrative Agent or any Lender may have had notice or knowledge of any Default or incorrect representation or

- 56 -

warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any fee or any other amount payable under this Agreement is outstanding and unpaid. The provisions of Sections 2.10, 2.11, 2.12 and 9.03 and Article VIII shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Loans or the termination of this Agreement or any provision hereof.

Section 9.06.    Counterparts; Integration; Effectiveness.    This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement, the other Loan Documents and any separate letter agreements with respect to fees payable to the Administrative Agent constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. This Agreement shall become effective when the conditions set forth in Section 4.01 hereof shall have been satisfied, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns. Delivery of an executed counterpart of a signature page of this Agreement by telecopy or email transmission shall be effective as delivery of a manually executed counterpart of this Agreement.

Section 9.07.    Severability.    Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

Section 9.08.    Right of Setoff.    If an Event of Default shall have occurred and be continuing, each Lender and each of its Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, but excluding any payroll, trust and Tax withholding accounts) at any time held and other obligations at any time owing by such Lender or Affiliate to or for the credit or the account of the Borrower against any of and all the Obligations of the Borrower now or hereafter existing under this Agreement held by such Lender then due and owing, irrespective of whether or not such Lender shall have made any demand under this Agreement and although such Obligations may be owed to a branch or office of such Lender different from the branch or office holding such deposit or obligated on such Indebtedness. The rights of each Lender under this Section are in addition to other rights and remedies (including other rights of setoff) which such Lender may have.

Section 9.09.    Governing Law; Jurisdiction; Consent to Service of Process.    (a) This Agreement shall be construed in accordance with and governed by the law of the State of New York.

(b)    The Borrower hereby irrevocably and unconditionally submits, for itself and its property, to the nonexclusive jurisdiction of the Supreme Court of the State of New York sitting in New York County and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to any Loan Document, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such Federal court. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Agreement or any other Loan Document shall affect any right that the Agent or any Lender may otherwise have to bring any action or proceeding relating to this Agreement or any other Loan Document against the Borrower or its properties in the courts of any jurisdiction.

(c)    The Borrower hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or any other Loan Document in any court referred to in paragraph (b) of this Section. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)    After the Closing Date, the Bankruptcy Court's retention of jurisdiction shall not govern the interpretation or enforcement of the Loan Documents or any rights or remedies related thereto.

(e)    Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 9.01. Nothing in this Agreement or any other Loan Document will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

Section 9.10.    WAIVER OF JURY TRIAL.  EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

Section 9.11.    Headings.  Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

Section 9.12.    Confidentiality.  Each of the Agent and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its and its Affiliates' directors, officers, partners, employees and agents, including accountants, legal counsel and other advisors (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority, (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, (d) to any other party to this Agreement, (e) in connection with the exercise of any remedies hereunder or any suit, action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions at least as restrictive as those of this Section, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement, (ii) any pledgee referred to in Section 9.04(d), (iii) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to the Borrower and its obligations or (iv) any credit insurance provider relating to the Borrower and its Obligations, (g) with the consent of the Borrower or (h) to the extent such Information (i) becomes publicly available other than as a result of a breach of this Section or (ii) becomes available to the Agent or any Lender on a nonconfidential basis from a source other than the Borrower or any Subsidiary thereof. For the purposes of this Section, "Information" means all information received from the Borrower or any Subsidiary thereof relating to the Borrower or any Subsidiary thereof or its business, other than any such information that is available to the Agent or any Lender on a nonconfidential basis prior to disclosure by the Borrower or any Subsidiary thereof; provided, that, in the case of information received from the Borrower or any Subsidiary thereof after the date hereof, such information is clearly identified at the time of delivery as confidential. Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to confidential information of its other customers.

Each Lender acknowledges that information furnished to it pursuant to this Agreement or the other Loan Documents may include material non-public information concerning the Borrower and its Affiliates and their Related Parties or their respective securities, and confirms that it has developed compliance procedures regarding the use of material non-public information and that it will handle such material non-public information in accordance with those procedures and applicable law, including Federal and state securities laws.

All information, including requests for waivers and amendments, furnished by the Borrower or its Affiliates or the Administrative Agent pursuant to, or in the course of administering, this Agreement or the other

Loan Documents will be syndicate-level information, which may contain material non-public information about the Borrower and its Affiliates and their Related Parties or their respective securities. Accordingly, each Lender represents to the Borrower and the Administrative Agent that it has identified in its Administrative Questionnaire a credit contact who may receive information that may contain material non-public information in accordance with its compliance procedures and applicable law, including Federal and state securities laws.

Section 9.13.    Interest Rate Limitation.  Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any Loan, together with all fees, charges and other amounts which are treated as interest on such Loan under applicable law (collectively the "Charges"), shall exceed the maximum lawful rate (the "Maximum Rate") which may be contracted for, charged, taken, received or reserved by the Lender holding such Loan in accordance with applicable law, the rate of interest payable in respect of such Loan hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of such Loan but were not payable as a result of the operation of this Section shall be cumulated and the interest and Charges payable to such Lender in respect of other Loans or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Federal Funds Effective Rate to the date of repayment, shall have been received by such Lender.

Section 9.14.    Termination or Release.  (a) At such time as the Loans, all accrued interest and fees under this Agreement, and all other Obligations of the Loan Parties under the Loan Documents (other than Obligations under Sections 2.12 and 9.03 that are not then due and payable) shall have been paid in full in cash, (i) the Collateral shall automatically be released from the Liens created by the Security Documents and (ii) the Obligations (other than those expressly stated to survive termination) of the Agent and each Loan Party under the Security Documents shall automatically terminate, all without delivery of any instrument or performance of any act by any Person.

(b)    A Loan Party shall automatically be released from its Obligations under the Guarantee and Collateral Agreement and the security interests in the Collateral of such Loan Party shall be automatically released upon the consummation of any transaction permitted by this Agreement or any other Loan Document.

(c)    Upon any sale or other transfer by any Loan Party of any Collateral that is permitted under this Agreement or any other Loan Document to any Person that is not a Loan Party, or upon the effectiveness of any written consent to the release of the security interest granted by the Guarantee and Collateral Agreement or any other Loan Document in any Collateral of the Loan Parties pursuant to Section 9.02 of this Agreement, the security interest in such Collateral granted pursuant to  the Guarantee and Collateral Agreement and the other Loan Documents shall be automatically released.

(d)    In connection with any termination or release pursuant to paragraph (a), (b) or (c) of this Section 9.14, the Administrative Agent shall execute and deliver to any Loan Party at such Loan Party's expense all documents that such Loan Party shall reasonably request to evidence such termination or release. Any execution and delivery of documents pursuant to this Section 9.14 shall be without recourse to or warranty by the Administrative Agent or any Lender.

Section 9.15.    USA Patriot Act.  Each Lender hereby notifies the Borrower that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "USA Patriot Act"), it is required to obtain, verify and record information that identifies the Borrower, which information includes the name and address of the Borrower and other information that will allow such Lender to identify the Borrower in accordance with the USA Patriot Act.

Section 9.16.    Acknowledgement and Consent to Bail-In of EEA Financial Institutions.  Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Loan Document may be subject to the write-down and conversion powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)  the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

(b)  the effects of any Bail-In Action on any such liability, including, if applicable:

(i)  a reduction in full or in part or cancellation of any such liability;

(ii)  a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent entity, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)  the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of any EEA Resolution Authority.

[*remainder of page intentionally left blank*]

- 60 -

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

DEX MEDIA, INC.

By: _____
     Name:
     Title:

WILMINGTON TRUST, NATIONAL ASSOCIATION
as Administrative Agent

By: _____
     Name:
     Title:

#4849-2103-6079v21

*Signature Page to Credit Agreement*